# EXHIBIT 1
# FILED UNDER SEAL



# AWARD

**CHAMBRE DE COMMERCE INTERNATIONALE — INTERNATIONAL CHAMBER OF COMMERCE (ICC)**
**COUR INTERNATIONALE D'ARBITRAGE — INTERNATIONAL COURT OF ARBITRATION**

www.iccarbitration.org

HEADQUARTERS
33-43 avenue
du Président Wilson
75116 Paris, France
T +33 (0)1 49 53 28 28
F +33 (0)1 86 26 67 43
E arb@iccwbo.org

ASIA OFFICE (HKSAR)
Suite 2, 12/F Fairmont House
8 Cotton Tree Drive
Central, Hong Kong
T +852 3607 5600
F +852 2523 1619
E ica8@iccwbo.org

NORTH AMERICA OFFICE
in affiliation with SICANA, Inc.
140 East 45th Street, Suite 14C
New York, NY 10017, USA
T +1 646 699 5704
F +1 646 737 9467
E ica9@iccwbo.org

BRAZIL OFFICE
in affiliation with SCIAB LTDA.
rua Surubim, 504, Brooklin Novo
CEP 04571-050, Sao Paulo
Brazil
T +55 11 3040 8830
E ica10@iccwbo.org

SINGAPORE OFFICE
in affiliation with SICAS
28 Maxwell Road #02-01,
Maxwell Chambers Suites,
Singapore 069120
T +65 6971 1000
E ica11@iccwbo.org

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 23546/MK

CAROLENG INVESTMENTS LIMITED

(British Virgin Islands)

**vs/**

BLUESTONE RESOURCES, INC.

(U.S.A.)

This document is an original of the Final Award rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

**INTERNATIONAL CHAMBER OF COMMERCE**
**INTERNATIONAL COURT OF ARBITRATION**

**ICC ARBITRATION CASE NO.  23546/MK**


**IN THE MATTER OF AN INTERNATIONAL ARBITRATION**

- between –

**CAROLENG INVESTMENTS LIMITED**

(Claimant)

- and -

**BLUESTONE RESOURCES, INC.**

(Respondent)

---

**FINAL AWARD**

---

**The Arbitral Tribunal**

Ms. Jennifer M. Smith
Mr. Joseph R. Profaizer
Dr. Dietmar W. Prager (President)

**Date: 13 May 2020**

# TABLE OF CONTENTS

**Page**

I.  BRIEF OVERVIEW OF THE ARBITRATION ............................................. 1

II. THE ARBITRATION PROCEEDINGS ................................................... 1

   A.  The Parties and Their Legal Representatives ......................................... 1

   B.  The Arbitration Agreement and Applicable Law ................................. 3

   C.  The Applicable Procedural Rules ......................................................... 3

   D.  The Tribunal ......................................................................................... 4

   E.  Summary of Procedural History ......................................................... 4

III. FACTUAL BACKGROUND .......................................................................... 13

   A.  The Parties ............................................................................................. 13

   B.  History of the Transaction Agreement ................................................ 13

      1.  The 2009 Transaction ........................................................... 13

      2.  The 2015 Transaction Agreement ......................................... 14

   C.  Relevant Terms of the 2015 Transaction Agreement between
       Caroleng and Bluestone ...................................................................... 16

   D.  The CM Sale .......................................................................................... 19

   E.  History of the Pay-out Calculations ................................................... 22

IV. ANALYSIS AND DECISION ........................................................................ 28

   A.  Burden of Proof ..................................................................................... 32

   B.  Respondent's Deductions for Escrows ............................................... 34

      1.  Claimant's Arguments ........................................................... 34

      2.  Respondent's Arguments ....................................................... 35

      3.  The Tribunal's Analysis ......................................................... 36

   C.  The Earn-out and Reverse Earn-out Payments ................................. 40

      1.  Claimant's Arguments ........................................................... 40

      2.  Respondent's Arguments ....................................................... 41

      3.  The Tribunal's Analysis ......................................................... 41

   D.  Access to Documents ........................................................................... 44

      1.  Claimant's Arguments ........................................................... 44

      2.  Respondent's Arguments ....................................................... 44

      3.  The Tribunal's Analysis ......................................................... 45

   E.  Deferred Royalty Payments ................................................................ 48

      1.  Claimant's Arguments ........................................................... 48

      2.  Respondent's Arguments ....................................................... 49

      3.  The Tribunal's Analysis ......................................................... 49

F. The Pardee Lease Deduction ...............................................................49

    1. Background ........................................................................50

    2. The Tribunal's Analysis.....................................................51

G. The Justice Equipment Deduction ......................................................75

    1. The Justice Equipment Was Part of the Assets Purchased by CM Energy .......................................................77

    2. The Purchase Price Allocation ...............................................77

    3. Respondent's Internal Valuation of the Justice Equipment ...........................................................................78

    4. The Southern Heavy Equipments Report ...............................79

    5. The Blandford Expert Report...................................................81

H. Implied Covenant of Good Faith and Fair Dealing ...........................86

    1. The Parties' Arguments ........................................................86

    2. The Tribunal's Analysis.....................................................87

I. Damages...............................................................................................88

    1. Damages for Respondent's Breach of Section 2.4 of the Transaction Agreement...........................................................88

    2. Damages for Respondent's Breach of Section 2.3 of the Transaction Agreement...........................................................89

    3. Damages for Respondent's Breach of Section 5.2(a) and 5.2(b) of the Transaction Agreement ......................................89

    4. Punitive Damages .................................................................89

J. Interest.................................................................................................90

    1. The Parties' Arguments ........................................................90

    2. The Tribunal's Analysis.....................................................91

K. Costs....................................................................................................93

    1. The Parties' Arguments ........................................................93

    1. The Tribunal's Analysis.....................................................95

V. AWARD ...................................................................................................97

# I. BRIEF OVERVIEW OF THE ARBITRATION

1.      The above-referenced arbitration (the "Arbitration") concerns a dispute between Claimant Caroleng Investments Limited ("**Claimant**" or "**Caroleng**") and Respondent Bluestone Resources, Inc. ("**Respondent**" or "**Bluestone**") (together with Claimant, the "**Parties**") in relation to the Transaction Agreement dated 12 February 2015 (the "**Transaction Agreement**") entered into between the Parties in connection with the sale of certain coal-producing property and assets located in West Virginia that Claimant sold to Respondent.

2.      In the Transaction Agreement, in addition to a cash payment, Respondent agreed to make "Deferred Royalty Payments"[1] on the coal mined and sold from the acquired property.  As additional consideration for the sale, Respondent promised to make "Contingent Payments" in the event Respondent subsequently sold any property, assets or securities that Respondent acquired from Claimant under the Transaction Agreement.  The Contingent Payments to Claimant were to be equal to 12.5% of the "Value" Respondent received if the transaction occurred within five years of the execution of the Transaction Agreement and 10% of the Value received if the transaction occurred between five and ten years after the execution of the Transaction Agreement.

3.      Subsequently, on or about January 2017, Respondent sold certain properties and assets subject to the Transaction Agreement to CM Energy Holdings LP ("**CM Energy**") (the "**CM Sale**").

4.      Among other things, Claimant asserts that Respondent breached the Transaction Agreement by (a) failing to pay Claimant 12.5% of the Value that Respondent received in connection with the CM Sale, and (b) improperly withholding Deferred Royalty Payments that Respondent owes to Claimant under the Transaction Agreement.

5.      Respondent denies all of Claimant's allegations.  Respondent contends that it has already paid more than 12.5% of the Value received from the CM Sale and requests reimbursement from Claimant of the overpayment.

# II. THE ARBITRATION PROCEEDINGS

## A.      THE PARTIES AND THEIR LEGAL REPRESENTATIVES

6.      Claimant, Caroleng Investments Limited, is a company incorporated under the laws of the British Virgin Islands.

---

[1]      *See* paragraph 96 below for the full definition.  Capitalized terms not otherwise defined in this Award shall have the meanings given to them in the Transaction Agreement and/or the CM Agreement.

7.     Claimant's registered address is:

> Nerine Chambers
> PO Box 905, Road Town
> Tortola, British Virgin Islands

8.     Claimant is represented by:

> Mr. Joshua D.N. Hess
> Ms. Tharuni A. Jayaraman
> DECHERT LLP
> 1900 K Street, NW
> Washington, DC 20006
> United States of America
>
> Tel:     +1 202 261 3300
> Email:    joshua.hess@dechert.com
>            tharuni.jayaraman@dechert.com

9.     Respondent, Bluestone Resources, Inc. is a company duly organized under the laws of the State of Delaware, United States of America.

10.    Respondent's registered address is:

> Bluestone Resources, Inc.
> 302 S. Jefferson Street
> Roanoke, Virginia 24011
> United States of America

11.    Respondent is represented by:

> Mr. Richard A. Getty
> Ms. Danielle Harlan
> Mr. Matthew W. English
> THE GETTY LAW GROUP, PLLC
> 1900 Lexington Financial Center
> 250 West Main Street
> Lexington, Kentucky 40507
> United States of America
> Tel:     +1 859 259 1900
>
> Email:    rgetty@gettylawgroup.com
>            dharlan@gettylawgroup.com
>            astith@gettylawgroup.com
>
> Mr. Stephen W. Ball, Esq.
> General Counsel
> Bluestone Resources, Inc.

302 S. Jefferson Street
Roanoke, Virginia 24011
United States of America

**B.    THE ARBITRATION AGREEMENT AND APPLICABLE LAW**

12.    The arbitration agreement and governing law provisions are contained in Section 9.9 of the Transaction Agreement, which provides as follows:

> THIS AGREEMENT SHALL BE GOVERNED BY, AND ALL DISPUTES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE RESOLVED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK IN THE UNITED STATES OF AMERICA WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.
>
> All disputes arising out of or in connection with the present Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce ("ICC") by three arbitrators. Each party shall nominate in the Request and the Answer, respectively, one arbitrator. The two arbitrators so nominated shall, within thirty (30) days of the confirmation of the second arbitrator, nominate a third arbitrator, who shall be the chair of the Tribunal. If the two nominated arbitrators fail to nominate the third arbitrator within such thirty (30) days, the appointment of the chair shall be made by the ICC Court. The seat of the arbitration shall be the city of Paris, France. The language of the arbitration shall be English.

13.    Thus, in accordance with Section 9.9 of the Transaction Agreement, the Transaction Agreement is governed by New York law, and the seat of the Arbitration is Paris, France.

**C.    THE APPLICABLE PROCEDURAL RULES**

14.    In accordance with Section 9.9 of the Transaction Agreement and the terms of reference dated 9 August 2018 ("**Terms of Reference**"), the Rules of Arbitration of the International Chamber of Commerce ("**ICC**") in force as of 1 March 2017 are the applicable rules of the Arbitration (the "**ICC Rules**").

15.    In accordance with Procedural Order No. 1 dated 8 August 2018 ("**PO1**"), the IBA Rules on the Taking of Evidence in International Arbitration serve as general guidelines during the Arbitration to the extent the Tribunal considers it appropriate in the exercise of its overall procedural discretion.

## D. THE TRIBUNAL

16. Following Claimant's nomination, on 7 June 2018, the Secretary General of the ICC confirmed Mr. Joseph R. Profaizer as co-arbitrator.

17. Following Respondent's nomination, on 7 June 2018, the Secretary General of the ICC confirmed Ms. Jennifer M. Smith as co-arbitrator.

18. Following the joint nomination by the co-arbitrators, on 16 July 2018, the Secretary General of the ICC confirmed Dr. Dietmar W. Prager as President of the Arbitral Tribunal.

19. The relevant contact details of the members of the Tribunal are as follows:

> Dr. Dietmar W Prager
> Debevoise & Plimpton LLP
> 919 Third Avenue
> New York, New York 10022
> United States of America
>
> Tel:     +1 212 909 6243
> Email:  dwprager@debevoise.com

> Ms. Jennifer M. Smith
> Hogan Lovells US LLP
> 609 Main Street, Suite 4200
> Houston, Texas 77002
> United States of America
>
> Tel:     +1 713 632 1415
> Email:  Jennifer.smith@hoganlovells.com

> Mr. Joseph R Profaizer
> Paul Hastings LLP
> 875 15th Street, NW
> Washington, DC 20005
> United States of America
>
> Tel:     +1 202 551 1860
> Email:  joeprofaizer@paulhastings.com

## E. SUMMARY OF PROCEDURAL HISTORY

20. Because the Tribunal's procedural orders have been reduced to writing or appear in the transcript of the merits hearing that was held from 2-4 October 2019 (the "**Merits Hearing**"), and the Parties' correspondence to the Tribunal

forms part of the record in the Arbitration, the Tribunal does not describe the entirety of all correspondence over the course of this Arbitration. However, the Tribunal sets forth the key procedural milestones below.

21. On 10 April 2018, Claimant filed its Request for Arbitration. On 16 June 2018, Respondent filed its response to the Request for Arbitration.

22. On 8 August 2018, the Tribunal issued PO1. Among other dates agreed in the procedural timetable, the merits hearing was scheduled for July 2019.

23. On 9 August 2018, the Parties and the Tribunal signed the Terms of Reference.

24. On 20 September 2018, the Court fixed 31 October 2019 as the time limit for rendering the final award based upon the procedural timetable (Article 31(1)). The Court subsequently extended the time-limit for rendering the final award: (i) at its session of 3 October 2019, the Court extended the time limit for rendering the final award until 3 January 2020; (ii) at its session of 5 December 2019, the Court extended the time limit for rendering the final award until 6 March 2020; (iii) at its session of 5 March 2020, the Court extended the time limit for rendering the final award until 30 April 2020; and (iv) at its session of 2 April 2020, the Court extended the time limit for rendering the final award until 29 May 2020. (Article 31(2)).

25. On 11 January 2019, the Parties submitted a joint request to the Tribunal in which they requested that the procedural timetable in PO1 be amended to accommodate the continued production of documents by Respondent. The parties requested that, among other changes, the merits hearing dates be moved.

26. On 18 January 2019, the Tribunal issued Procedural Order No. 2 in response to the Parties' joint request dated 11 January 2019, re-scheduling the merits hearing date to 10 to 12 September 2019.

27. On 10 April 2019, the Parties submitted a second joint request to the Tribunal in which the Parties proposed a revised procedural timetable and new dates for the merits hearing due to continued delays in the Respondent's production of documents.

28. On 14 April 2019, the Tribunal issued Procedural Order No. 3, which further revised the procedural timetable in accordance with the Parties' joint request and re-scheduled the merits hearing date to 2 to 4 October 2019.

29. On 5 June 2019, Claimant submitted its Statement of Claim ("**SOC**"). The SOC was accompanied by exhibits, legal authorities and the witness statements of the following two individuals:

        a) Mr. Dmitry Sklyarov dated 4 June 2019 ("**Mr. Sklyarov**"); and

b) Ms. Laura M. Brank, Esq. dated 5 June 2018 ("**Ms. Brank**").

30.    On 23 July 2019, Respondent informed the Tribunal that it had appointed The Getty Law Group PLLC as its co-counsel. Based on this addition of co-counsel, Respondent requested an extension of its deadline to submit its Statement of Defense and a corresponding extension of the deadline for its Reply.

31.    On 24 July 2019, Claimant reluctantly agreed to Respondent's request for an extension.

32.    On 24 July 2019, the Tribunal issued Procedural Order No. 4, which granted Respondent's 23 July 2019 request.

33.    On 31 July 2019, Respondent submitted its Statement of Defense ("**SOD**").

34.    On 1 August 2019, Claimant requested relief from the Tribunal due to Respondent's failure to submit the exhibits, witness statement and expert reports referred to in the SOD and requested that the Tribunal either (i) bar Respondent from submitting any factual or expert evidence that it failed to submit with the SOD, or (ii) grant Respondent a short extension to submit the evidence and extend Claimant's deadline for its Reply.

35.    Later the same day, Respondent electronically submitted the exhibits, legal authorities and the witness statement of James C. Justice, III ("**Mr. Justice**") (dated 31 July 2019) as referenced in the "Index to Appendix" of the SOD. Respondent also submitted a revised version of the SOD with revised exhibit references.

36.    On 2 August 2019, the Tribunal granted Claimant one additional day to file its Reply (until 24 August 2019).

37.    Later on 2 August 2019, Claimant informed the Tribunal that Respondent had not filed any of the expert reports referred to in the SOD and reiterated its request in its 1 August 2019 letter.

38.    On 2 August 2019, Respondent informed the Tribunal that Respondent would provide the expert reports and demonstrative exhibits which the experts might utilize by "no later than 11 September 2019" and identified its experts as Dennis N. Kostic (value of the Pardee Lease) and Edsel Preece (value of Non-Mechel/Justice owned Equipment). Claimant opposed Respondent's request in an ensuing letter on 2 August 2019.

39.    On 4 August 2019, the Tribunal issued Procedural Order No. 5 in which it denied Respondent's request to submit expert reports on 11 September 2019. The Tribunal reminded the Respondent that, pursuant to PO1, its expert reports should have been submitted with its SOD on 31 July 2019 (a date which itself had been extended several times at Respondent's request). The

Tribunal concluded that "[f]iling expert reports on 11 September 2019, three weeks before the first day of the hearing, would be inconsistent with the terms of the established Procedural Orders and seriously prejudice Claimant because it would not leave sufficient time for Claimant to present submissions on the expert evidence, or to present any rebuttal expert reports and/or witness statements." Procedural Order No. 5 (a) granted Respondent an extension until 12 August 2019 to file its two expert reports as identified in its 2 August 2019 letter, (b) permitted Claimant to file supplemental written submissions in response to the expert reports that Respondent submitted in addition to any rebuttal document, expert report or witness statement and (c) rescheduled the Case Management Conference to 16 September 2019.

40.     On 8 August 2019, Respondent informed the Tribunal that Mr. Dennis N. Kostic ("**Mr. Kostic**") of Weir International Inc. ("**Weir International**"), working with Mr. Thomas E. Blandford III ("**Mr. Blandford**"), also of Weir International, would be submitting an expert report in place of an expert report from Mr. Edsel Preece.[2]

41.     On 12 August 2019, Respondent submitted the expert reports of:

> a) Mr. Kostic dated 12 August 2019 on the value of the Pardee Lease (the "**Kostic Expert Report**"); and

> b) Mr. Blandford dated 12 August 2019 on the value of the Non-Mechel Equipment (the "**Blandford Expert Report**").

42.     On 24 August 2019, Claimant submitted its Reply Memorial ("**Reply**"), accompanied by exhibits and legal authorities.

43.     On 30 August 2019, Claimant submitted its Supplementary Written Submissions and the rebuttal expert report of Mr. Edward G. Lee ("**Mr. Lee**") dated 30 August 2019, along with exhibits (the "**Lee Expert Rebuttal Report**").

44.     On 11 September 2019, Respondent submitted its Rejoinder Memorial ("**Rejoinder**"), accompanied by exhibits and legal authorities.

45.     On 11 September 2019, the Parties submitted their respective witness lists. Claimant indicated that it intended to call and cross-examine Mr. Justice, whose witness statement Respondent had submitted in support of its SOD, as well as the two experts whom Respondent had previously identified. Respondent indicated that it wished to examine at the hearing seven fact witnesses, along with both of the experts that Respondent had previously identified. Respondent also reserved the right to cross-examine any witnesses

---

[2]     Weir International, Inc. is a consulting company specializing in the mining and energy industry.

called by Claimant and "to call additional fact or rebuttal witnesses as it considers necessary for the Arbitration."

46.     On 12 September 2019, Claimant objected to Respondent's witness list, including the inclusion of six fact witnesses that Respondent sought to call in its case-in-chief because Respondent had not previously identified those witnesses nor submitted a witness statement from them.

47.     Subsequently, on 12 September 2019, Respondent submitted a revised witness list of only those witnesses it intended to cross-examine at the Merits Hearing and stated that it would discuss with Claimant "the fact witness issues" raised by its letter dated 12 September 2019.

48.     On 16 September 2019, the Tribunal conducted a telephonic Case Management Conference with the Parties to discuss issues related to the organization and conduct of the Merits Hearing scheduled to be held in Paris on 2-4 October 2019.

49.     On 17 September 2019, Claimant filed an "Application to Exclude and/or Strike" (i) Respondent's "WARN Act Deduction" claim, (ii) the Justice Equipment Report by Mr. Blandford, and (iii) the "WEIR Notes" that Respondent submitted as Exhibit R-22 to its Rejoinder ("**Claimant's Application to Exclude Certain Evidence**").

50.     On 18 September 2019, Respondent submitted an application to exclude and/or strike the witness statement of Mr. Dmitry Sklyarov ("**Respondent's Application to Exclude Certain Evidence**"), along with legal authorities to the application.  Respondent also submitted its global list of exhibits.

51.     On 19 September 2019, the Tribunal issued Procedural Order No. 6, which included the Tribunal's decision regarding certain issues raised during the Case Management Conference on 16 September 2019.

52.     On 20 September 2019, the Tribunal issued a revised Procedural Order No. 6, which corrected a typographical error regarding the Merits Hearing dates.

53.     On 20 September 2019, Claimant submitted its Opposition to Respondent's Application to Exclude Certain Evidence.  Claimant also submitted its global list of exhibits.

54.     On 20 September 2019, Respondent filed its Response to Claimant's Application to Exclude Certain Evidence with a new list of Legal Authorities.

55.     By letter dated 20 September 2019, Respondent raised three procedural issues with regard to Procedural Order No. 6 and asked the Tribunal for clarification and reconsideration of those procedural issues.  First, Respondent sought a clarification on the use of PowerPoint during its examination of its expert witness and/or for its experts to use.  Second, Respondent submitted that

Claimant's expert witness should be examined before Respondent's experts. Third, Respondent asked the Tribunal to reconsider its decision to permit ten minutes for direct examination and consider whether a 20-minute time limit was appropriate.

56.     On 23 September 2019, Claimant responded to Respondent's letter dated 20 September 2019 and addressed each of the three issues that Respondent raised. First, Claimant had no objection to Respondent's request to use PowerPoint presentations during the direct examination of its expert witnesses. Second, Claimant requested that the order of the witnesses remain as set forth in Procedural Order No. 6. Third, Claimant objected to Respondent's request to increase the time for direct examination from ten to 20 minutes.

57.     On 23 September 2019, the Tribunal issued Procedural Order No. 7 with respect to both the Applications from Claimant and Respondent to Exclude Certain Evidence. The Tribunal declined to exclude or strike the expert report submitted by Mr. Blandford, the witness statement of Mr. Sklyarov, or Exhibit R22 (the "**WEIR Notes**"). The Tribunal agreed to hear further argument, but not the presentation of new evidence, from the Parties at the forthcoming Merits Hearing as to whether Respondent may be entitled to a set-off or deduction of the WARN Act expenditures from any Contingent Payment that might ultimately be awarded to Claimant.

58.     On 23 September 2019, the Tribunal issued Procedural Order No. 8, which (a) permitted the use of PowerPoint presentations during the direct examination of experts, and (b) reaffirmed the order of the expert witness and the amount of time for direct testimony of Mr. Justice.

59.     On 25 September 2019, Claimant submitted its list of participants for the Merits Hearing.

60.     On 25 September 2019, the Parties jointly submitted the index to the joint hearing bundle for the Merits Hearing.

61.     On 26 September 2019, Respondent informed the Tribunal of an email it received from a collections manager for Cisco who dealt with legal collections for Chubb Insurance, whereby Chubb Insurance was seeking to collect deductibles of approximately US$750,000[3] from Respondent as "it holds (worthless) stock in Mechel [Bluestone Resources, Inc.] pursuant to the Transaction Agreement." Based on that correspondence, Respondent requested that the Tribunal, *inter alia,* permit Respondent to present its position on a new claim based on the letter from Chubb Insurance (the "**Chubb Insurance Claim**").

---

3       All currency figures with a "$" sign are United States Dollars.

62. On 26 September 2019, Claimant replied to Respondent's letter dated 26 September 2019, opposing Respondent's request to introduce the new Chubb Insurance Claim.

63. On 27 September 2019, Respondent responded to Claimant's letter dated 26 September 2019 regarding the Chubb Insurance Claim. Respondent requested that the Tribunal allow it the opportunity at the commencement of the Merits Hearing to present its position on two grounds. First, Respondent argued that the Chubb Insurance Claim should be considered as relevant, admissible evidence at the Merits Hearing. Second, Respondent argued that the Tribunal should include the Chubb Insurance Claim in its deliberations and determination of what amounts, if any, Claimant owes to Respondent. Respondent also requested that if the Tribunal determined that it could not address the Chubb Insurance Claim during the Merits Hearing, it should allow for a discussion on the issue.

64. On 29 September 2019, the Tribunal issued Procedural Order No. 9. Procedural Order No. 9 addressed Respondent's letter dated 26 September 2019, Claimant's response letter of the same date, and Respondent's reply letter dated 27 September 2019. The Tribunal, relying upon Article 23(4) of the ICC Rules, declined to grant leave to Respondent to make a new counterclaim based on the Chubb Insurance Claim, on the grounds that the new and yet undeveloped counterclaim was outside the scope of the Terms of Reference, was raised less than six days before the Merits Hearing, and would cause Claimant undue prejudice. The Tribunal also deemed it unnecessary for any discussion on the Chubb Insurance Claim at the Merits Hearing because it did not form part of the Arbitration.

65. On 1 October 2019, Claimant disclosed the demonstratives to be used by its expert, Mr. Lee.

66. From 2 October to 4 October 2019, the Merits Hearing was held in Paris.

67. The following persons were present at the Merits Hearing.

   (a) <u>The Tribunal:</u>

      Dr. Dietmar W. Prager (President);

      Ms. Jennifer M. Smith (Co-arbitrator); and

      Mr. Joseph R. Profaizer (Co-arbitrator).

   (b) <u>On behalf of Claimant</u>:

      Mr. Joshua D.N. Hess, Esq., Ms. Tharuni A. Jayaraman, Esq., and Ms. Anna Avilés-Alfaro of Dechert LLP;

Mr. Dimitry Sklyarov (Director of the Strategic Development and Mergers & Acquisitions Department, Mechel PAO), and Ms. Laura M. Brank, Esq. (fact witness and a partner at Dechert LLP); and

Mr. Edward G. Lee of Duff & Phelps.

(c) <u>On behalf of Respondent</u>:

Mr. Richard A. Getty, Esq., Ms. Danielle Harlan, Esq., and Ms. Ann M. Smith of The Getty Law Group PLLC;

Mr. Stephen W. Ball, Esq. (General Counsel of Bluestone Resources, Inc.);

Mr. James C. Justice, III (party representative/witness from Bluestone Resources, Inc.); and

Mr. Dennis N. Kostic and Mr. Thomas E. Blandford, III of WEIR International.

(d) <u>Court Reporter</u>:  Ms. Yvonne Vanvi.

(e) <u>Interpreters</u>: Ms. Julia Poger, Ms. Daria Gorbounova and Ms. Natalia Tvere.

68.     On the final day of the Merits Hearing, the Tribunal, after consultation with the Parties, directed the Parties to submit post-hearing briefs on 8 November 2019 and cost submissions on 22 November 2019.

69.     On 14 October 2019, Respondent submitted to the Tribunal an unsigned version of the lease between Pardee Minerals LLC ("**Pardee**") and CM Energy Properties, LP ("**CM Energy**") (the "**CM Pardee Lease**") and other relevant documents requested by the Tribunal during the Merits Hearing.

70.     On 21 October 2019, the Tribunal issued Procedural Order No. 10, which memorialized its decision at the end of the Merits Hearing regarding (i) the revised Merits Hearing transcripts, (ii) the Parties' post-hearing submissions, and (iii) the Parties' cost submissions.

71.     On 24 October 2019, Claimant submitted a soft copy of its opening presentation along with the demonstratives that Claimant's expert Mr. Lee used at the Merits Hearing.  On 28 October 2019, Respondent submitted a soft copy of its opening presentation.

72.     On 30 October 2019, the Parties submitted the final agreed-upon Merits Hearing transcripts along with redlines of the transcripts for reference.

73.     On 31 October 2019, Respondent submitted a letter to the Tribunal requesting a two-week extension of the deadline for the parties to submit their post-hearing briefs and cost submissions in light of Respondent's lead counsel (Mr. Getty) dealing with a medical emergency. Respondent also enclosed a copy of an email from Claimant consenting to the extension request.

74.     On 31 October 2019, the Tribunal granted Respondent's request for a two-week extension for the submission of the post-hearing briefs (until 22 November 2019) and the cost submissions (until 6 December 2019).

75.     On 1 November 2019, the Tribunal asked the Parties to submit the post-hearing submissions on 22 November 2019 before 5pm US EST.

76.     On 1 November 2019, the Parties acknowledged and confirmed the Tribunal's request that the post-hearing submissions would be submitted before 5pm US EST on 22 November 2019.

77.     On 14 November 2019, Respondent submitted a letter to the Tribunal requesting an additional two-week extension of the deadline for the Parties to submit their post-hearing briefs and cost submissions in light of the recent surgery of Respondent's lead counsel (Mr. Getty). Respondent enclosed a copy of an email from Claimant that consented to Respondent's extension request.

78.     On 14 November 2019, the Tribunal granted Respondent's request for a further two-week extension for the submission of the post-hearing briefs until 6 December 2019 and its cost submissions until 20 December 2019.

79.     On 4 December 2019, Respondent submitted a further letter to the Tribunal requesting another two-week extension of the deadline for the Parties to submit their post-hearing briefs and cost submissions in light of Respondent's lead counsel (Mr. Getty) having undergone another emergency surgical procedure.

80.     On 4 December 2019, Claimant objected to Respondent's third request for an additional two-week extension of the deadline for the Parties to submit their post-hearing briefs and cost submissions.

81.     On 5 December 2019, the Tribunal granted Respondent's request for an extension for the submission of the post-hearing briefs. The Tribunal granted the Parties a final extension to file the post-hearing submissions until 3 January 2020 and the cost submissions until 17 January 2020.

82.     On 3 January 2020, the Parties submitted their respective post-hearing briefs. On 17 January 2020, the Parties submitted their respective cost submissions.

83.     On 3 April 2020, in accordance with Article 27 of the ICC Rules, the Tribunal wrote to the Parties to declare the proceedings closed with respect to the matters to be decided in the award.

84.     On 1 May and 8 May 2020, the Parties agreed that the Final Award be notified to the Parties by the Secretariat by email only pursuant to Article 35 of the ICC Rules.


### III.     FACTUAL BACKGROUND

#### A.     THE PARTIES

85.     Caroleng is a company organized under the laws of the British Virgin Islands.[4] It was incorporated on May 6, 2009 under the name Caroleng Investments (SPV) LTD and changed its name to Caroleng Investments LTD on 2 February 2017.[5] Caroleng is an indirect subsidiary of Mechel PAO, a Russian mining and metals company ("**Mechel**").[6]

86.     Bluestone is a company organized under the laws of Delaware.[7] It is a privately held holding company in which members of the James Justice family (the "**Justice Family**") hold an interest.[8] The Justice Family also has mining operations in companies other than Bluestone (the "**Justice Companies**").[9] One of the Justice Companies is Dynamic Energy LLC ("**Dynamic**").

#### B.     HISTORY OF THE TRANSACTION AGREEMENT

##### 1.     The 2009 Transaction

87.     In 2009, Mechel acquired Bluestone's mining assets, equipment, reserves and other assets from the Justice Companies through a stock transaction whereby Mechel acquired 100 percent of the stock of Bluestone and its subsidiary companies (the "**2009 Transaction**").[10] One of the assets that Mechel

---

[4]     British Virgin Islands, Registrar of Corporate Affairs, Certificate of Change of Name for Caroleng Investments Ltd. dated 17 February 2017, Ex. C-41.

[5]     *Id.*

[6]     Tr. 104:18-20 (Vol. 1) (Brank).

[7]     Terms of Reference ¶ 3; Tr. 187:2-12 (Vol. 1) (Justice).

[8]     West Virginia Ethics Commission, Financial Disclosure Statement for James C. Justice II, Ex. C-43, pg.14; Tr. 187:2-12 (Vol.1) (Justice).

[9]     *Id.*

[10]     Tr. 181:4-7; 210:15 to 211:3 (Vol.1) (Justice).

acquired from the Justice Companies in the 2009 Transaction included an area commonly referred to as "Coal Mountain" in West Virginia, United States of America.[11] Ms. Brank, a partner with the Dechert law firm, assisted Mechel with the due diligence leading up to the 2009 Transaction, although she did not provide advice on the transaction itself.[12] Ms. Brank testified that Mechel paid "somewhere in the neighborhood of a billion dollars for these [Bluestone] assets, and that price was about $436 million in cash, plus there was certain preferred stock issued to the Justices, I think somehow some $636 million or somewhere around that, of preferred stock issued to it, and then there were certain contingent payments that were related to reserves that would be paid over to the Justices over time."[13]

88.    At some point after the 2009 Transaction closed, Mechel sued the Justice Family, Dynamic, and Weir International  in connection with the valuation of the reserves under the 2009 Transaction.  According to Ms. Brank, Mechel sued for fraud on the basis that the reserves had been inflated.[14]

## 2.    The 2015 Transaction Agreement

89.    Around 2014, Mechel decided to divest the Coal Mountain Assets[15] that they had acquired from the Justice Companies.[16]  Mechel again retained Ms. Brank to assist on the sale of those assets.[17]  According to Ms. Brank, Mechel was concerned about "getting out of this [Coal Mountain] asset" as coal prices had dropped and Mechel was losing money with high expenses and the difficulty of running the West Virginia business from its headquarters in Russia.[18]

90.    According to the President and CEO of Bluestone, Mr. Justice, Mechel was in financial trouble and the Justice Companies "were not in a very good financial position either.  You know the market was terrible and we lost a lot of money ourselves."[19]  Mechel was still indebted to the Justice Companies at the time

---

[11]    CM Agreement, Ex. C-33, at pg. 2.

[12]    Tr. 104:22 to 105:11 (Vol.1) (Brank).

[13]    Tr. 105:12-22 (Vol.1) (Brank).

[14]    Tr. 106:2-15 (Vol.1) (Brank).

[15]    The **Coal Mountain Assets** are located in Coal Mountain No. 1 Surface Mine and its associated assets and equipment and a coal preparation plant, loadout facility, and belt line in West Virginia, United States of America and are the subject matter of a purchase agreement between Dynamic and CM Energy.

[16]    Tr. 106:16-21 (Vol.1) (Brank).

[17]    Tr. 106:6 to 107:6 (Vol.1) (Brank).

[18]    Tr. 107:6 to 108:6 (Vol.1) (Brank).

[19]    Tr. 182:13-22 (Vol.1) (Justice).

Mechel began looking for a buyer for the Coal Mountain assets.  Mr. Justice testified that he believed the likelihood of collecting the estimated $175 million that Mechel owed the Justice Companies was "not good."[20]  Mr. Justice testified that the Justice Companies viewed the reacquisition of Bluestone as a potential avenue to get the debt that Mechel still owed the Justice Companies from the 2009 Transaction paid.[21]

91.     Mechel ultimately selected the Justice Companies as the buyer for Bluestone. The lawsuit between Mechel, the Justice Family, and Weir International was still pending at the time of the negotiations.[22]  Ms. Brank testified that the transaction was, in part, a settlement of the litigation.[23]  The negotiations led to the Transaction Agreement, through which the Justice Companies reacquired the assets that they had sold to Mechel in the 2009 Transaction.

92.     According to Ms. Brank, at the time Mechel sold Bluestone back to the Justice Companies, "there were a number of liabilities at the company" which was the reason that Mechel agreed to a $5 million initial purchase price.[24]  She testified that there was an option agreement entered into in December 2013, which laid out more than $100 million of the liabilities attached to what was being conveyed.  Bluestone had access to a data room that Mechel had established that included information about the company and its debts.  As a shareholder of Mechel, the Justice Companies also had access to financial statements setting forth all of the liabilities.[25]

93.     Mr. Justice agreed that at the time of the transaction, Bluestone had in excess of "a hundreds [sic] or so million dollars of liabilities that had to be paid."[26]  Mining operations had been discontinued.[27]  Mr. Justice further explained that Mechel, as a publicly-traded company, had to show that it received a fair price for the resale given that it has paid a billion dollars for the assets just a few years prior.  According to Mr. Justice, the structure of the transaction, consisting of a relatively small amount of cash upfront, but with the opportunity for Mechel to earn royalties from coal mined on the properties and

---

[20]    Tr. 183:1-13 (Vol.1) (Justice).

[21]    Tr. 183:1-8 (Vol.1) (Justice).

[22]    Tr. 107:6-16 (Vol.1) (Brank).

[23]    Tr. 131:12-14 (Vol.1) (Brank).

[24]    Tr. 116:17-25; 126:15-21 (Vol.1) (Brank).

[25]    Tr. 117:1-12; 127:6-9; 128:10-14 (Vol.1) (Brank).

[26]    Tr. 184:22 to 185:12 (Vol.1) (Justice).

[27]    Tr. 186:1-2 (Vol.1) (Justice).

a percentage of any future sale of the assets, was in part to assist Mechel with assigning an appropriate value to the transaction.[28]

## C.   RELEVANT TERMS OF THE 2015 TRANSACTION AGREEMENT BETWEEN CAROLENG AND BLUESTONE

94.    On 12 February 2015, Caroleng and Bluestone entered into the Transaction Agreement, under which Caroleng sold to Bluestone all of the outstanding equity of Mechel Bluestone, Inc.[29] The outstanding equity included coal producing property and assets in Wyoming County, West Virginia (the "**Mechel Property**") and equipment (the "**Mechel Equipment**") (collectively, the "**Mechel Assets**"). Coal Mountain was part of the property transferred.

95.    Under the Transaction Agreement, Bluestone made a cash payment of $5,000,000 to Caroleng.

96.    Under Section 2.3 of the Transaction Agreement, Bluestone also agreed to pay Caroleng royalties on coal mined and sold from those assets, up to $150 million (the "**Deferred Royalty Payments**"):

> As of the Closing Date, [Bluestone] grants and undertakes to pay to [Caroleng] an overriding royalty interest (the 'Royalty Interest') at the rate of three Dollars ($3.00) per Ton of coal (i) mined and sold from the operations conveyed hereunder through the Transfer of the Transferred Securities or in or to which the Purchased Companies otherwise have rights or interest, or (ii) sold from any existing stockpiles of the Purchased Companies . . . provided that for purposes of this Section 2.3 the term 'sold' shall include any type of disposition for value, whether directly or indirectly, including a sale, transfer, assignment, lease, or any other similar type of arrangement and shall be evidenced by the sale documents, including Contracts, entered into with the relevant purchaser of coal. The maximum amount of Royalty Interest payable to [Caroleng] shall be One Hundred and Fifty Million Dollars ($150,000,000) (the 'Maximum Royalty') . . . . The Deferred Royalty Payments that become due from [Bluestone] to [Caroleng] in accordance with this Section 2.3 shall be paid to [Caroleng] (or to its respective successors and/or assigns) on an accumulated basis on the 10th Business Day of each calendar month. The parties agree and acknowledge that the payment of Five Million Dollars ($5,000,000) required to be effected pursuant to Section 2.2 is not and shall not be treated for any purposes whatsoever as

---

[28]   Tr. 184:6-21 (Vol.1) (Justice).

[29]   Transaction Agreement, Ex. C-1, at 1 ("WHEREAS, Seller desires to sell . . . and Buyer desires to purchase and accept from Seller . . . all of the outstanding equity . . . of Mechel Bluestone Inc., a Delaware corporation.").

prepayment against any portion of the Deferred Royalty Payments, nor shall such amount (or any portion thereof) be set-off against any portion of the Deferred Royalty Payments.[30]

97.     Under Section 2.4 of the Transaction Agreement, Bluestone further agreed to pay Caroleng 12.5% of the transaction value of any subsequent sale of the assets to a third party within five years (the "**Contingent Payments**").[31]

> In the event that within the period commencing on the Closing Date and ending on the five (5) year anniversary of the Closing Date, [Bluestone] (or any [Bluestone]'s Affiliate) enters into one or several sale transactions to sell to an unaffiliated third party (i) any of the Transferred Securities (or any portion thereof) or an interest in any other Purchased Company (or any portion thereof), and/or (ii) any assets of any Purchased Company . . . [Bluestone] agrees and undertakes to pay to [Caroleng] . . . Twelve and one half percent (12.5%) of each such sale transaction Value . . . . All payments that become due from [Bluestone] (or its respective Affiliate) to [Caroleng] in accordance with this Section 2.4 . . . shall be payable in full to [Caroleng] within 10 Business Days after completion of each relevant sale transaction. In the event of a partial sale, Deferred Royalty Payments shall continue to be made on that portion of Transferred Securities or interest in any Purchased Company or their respective assets that has not been sold or otherwise Transferred until the Maximum Royalty has been paid or the remaining portion of Transferred Securities or interest in any Purchased Company or their respective assets or right to mine has been sold . . . . For the avoidance of doubt, the obligations of [Bluestone] and its Affiliates, as the case may be, pursuant to this Section 2.4 shall vest on the date when the relevant sale transaction is entered into in accordance with its terms and applicable Law, notwithstanding any deferred or contingent payment conditions or obligations (as and if applicable) of [Bluestone] and/or any of its Affiliates pursuant to the terms of any such sale transaction and relevant Contingent Payments shall be payable in full to [Caroleng] within 10 Business Days after completion of each relevant sale transaction. This Section 2.4 shall survive the termination of this Agreement and the consummation of the Closing until all of the obligations hereunder have been fully satisfied.[32]

---

[30]     *Id.* at § 2.3.

[31]     *Id.* at § 2.4.

[32]     *Id.* at § 2.4.

98.     "Value" is defined in the Transaction Agreement as:

> [W]ith respect to any transaction to which [Bluestone] or any of its Affiliates, as the case may be, are parties, the total amount of cash and the fair market value on the date which is five (5) days prior to the consummation of such transaction of all other property paid or payable directly or indirectly to [Bluestone] or any of its Affiliates, or any of their respective security holders in connection with such transaction, including (i) amounts paid to holders of any warrants or convertible securities of [Bluestone] or any of its Affiliates and to holders of any options or stock appreciation rights issued by [Bluestone] or any of its Affiliates, whether or not vested; and (ii) the total amount of indebtedness for borrowed money of [Bluestone] or any of its Affiliates repaid, retired, extinguished or assumed in connection with such transaction.[33]

99.     Under Section 9.13 of the Transaction Agreement, setoffs against any payments due are prohibited:

> <u>No Setoff; No Withholding</u>.  There shall be no right of setoff of counterclaim with respect to any claim, debt or obligation, against any payments to any of [Bluestone] or [Caroleng] or their respective Affiliates under this Agreement or the Ancillary Documents.  Notwithstanding anything to the contrary herein, any all payments made to [Caroleng] under this Agreement (including pursuant to Article II [which includes royalty payments]) shall be made free and clear of any deduction or withholding unless otherwise required by law.[34]

100.    Under Section 5.2, Bluestone was required to provide documentation to allow Caroleng to verify the payments due under the Transaction Agreement:

> Within the period commencing on the Closing Date and until the earlier to occur of (i) the Maximum Royalty having been paid in royalties in full to [Caroleng] . . . , or (ii) the sale transactions described in Section 2.4 have taken place such that all and not less than all Transferred Securities, interests in all other Purchased Companies, all assets of Purchased Companies and/or all rights to mine assets referred to in Section 2.3 held by Purchased Companies have been sold, and all payments due to [Caroleng] related thereto or arising therefrom have been made in full, [Bluestone] shall, and shall cause the Purchased Companies to, (a) upon reasonable notice from [Caroleng] to [Bluestone], afford

---

[33]    *Id.* at App. A.

[34]    *Id.* at § 9.13.

[Caroleng]'s officers and other authorized Representatives reasonable access to the properties, Books and Records and Contracts of the Purchased Companies and, during such period, [Bluestone] shall and shall cause the Purchased Companies to make available promptly to [Caroleng] all information concerning the operations of the Purchased Companies as [Caroleng] may reasonably request to ensure [Bluestone]'s compliance with its obligations to effect the Deferred Royalty Payments[,] Contingent Payments, [and Earn-Out Payments], and (b) within ten (10) Business Days upon conclusion of each of the sale transactions referred to in Section 2.4 [Bluestone] shall, and shall cause its respective Affiliates to, provide [Caroleng] and to [Caroleng]'s satisfaction the sale documents, including Contracts, entered into with the relevant purchaser of coal in full and in an accessible format so as to allow Caroleng to readily verify the Value of each relevant sale transaction.[35]

101.  Indemnifications given by both Caroleng and Bluestone in the Transaction Agreement were subject to limitations.  In particular, under Section 8.5 of the Transaction Agreement, Caroleng's indemnification obligations were limited to losses exceeding $1,500,000, with a total cap of $5,000,000.[36]  With regard to tax liabilities, Caroleng warranted to Bluestone that it had filed all tax returns, other than those "the failure of which to file would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect."[37]  "Material Adverse Effect," in turn, was defined as events which would result "in a damage, liability or loss for the Purchased companies in excess of $50,000,000."[38]

### D.  THE CM SALE

102.  On 27 January 2017, Bluestone sold certain equipment and property, including some of the Mechel Property and Mechel Equipment, to CM Energy ("**CM Agreement**").[39]  It is undisputed that the CM Sale triggered Bluestone's obligation under Section 2.4 of the Transaction Agreement to pay Caroleng the Contingent Payments.[40]

---

[35]  *Id.* at § 5.2.

[36]  *Id.* at § 8.5

[37]  *Id.* at § 3.7.

[38]  *Id.* at Definitions at A.4.

[39]  CM Agreement, Ex. C-33.

[40]  *Id.*, at 1 ("This AMENDED AND RESTATED PURCHASE AGREEMENT (including the Exhibits and Disclosure Schedules hereto, this 'Agreement') is made as of January 27, 2017, but effective as of December 22, 2016 (the 'Effective Date') . . . .").

103.   The purchase price agreed between Bluestone and CM Energy was
       $98,975,000 (the "**CM Purchase Price**"):

       The aggregate purchase price for the Business and the Assets shall
       be Ninety-Eight Million Nine Hundred Seventy-Five Thousand
       Dollars ($98,975,000), (the "Purchase Price"), plus the Earn-out
       Payments, if any, and the assumption of the Assumed Liabilities,
       less the Reverse Earn-out Payments, if any:[41]

104.   The CM Agreement provides for the possibility of "Earn-Out Payments" to be
       paid by CM Energy to Bluestone.  According to Bluestone, "[t]he [E]arn-[O]ut
       payments that run to [Bluestone] were included [in the CM Agreement] . . . as
       an inducement to [Bluestone] to reduce the price that it was willing to accept
       [from CM Energy]."[42]  Under the CM Agreement the calculation of the Earn-
       Out payment is as follows:

       [D]uring the five (5) year period beginning on the Closing Date
       (the 'Earn-out Period'), if the Net Average Realized Price during
       the fiscal quarter exceeds One Hundred Dollars ($100) per ton,
       [CM Energy] shall pay to [Bluestone] an amount equal to the
       following calculation (each an 'Earn-out Payment'):

       fifty percent (50%) x ((Net Average Realized Price for such fiscal
       quarter less One Hundred Dollars ($100) per ton) x tons of
       metallurgical coal actually sold by the Business to the met market
       for which payment is actually received during such quarter).[43]

105.   The CM Sale included equipment transferred by Bluestone to CM Energy that
       Mechel never owned, and therefore was not subject to the Contingent
       Payments (the "**Non-Mechel Equipment**" or "**Justice Equipment**").
       Specifically, the Disclosure Schedule appended to the CM Agreement lists a
       number of pieces of coal personalty such as trucks, tractors and loaders used in
       mining operations that Bluestone conveyed as part of the CM Sale.[44]  The
       Disclosure Schedule does not differentiate between Mechel and Justice
       Equipment, although the Parties do not dispute the equipment that was owned
       by Mechel and that which was not.  The Disclosure Schedule includes some
       information as to the equipment conveyed, such as a serial number, a brief

---

[41]   *Id.* at § 2.5.

[42]   Ex. C-40 ¶ 17 (Complaint in *Dynamic Energy, Inc. v. CM Energy Holdings*, LP, 1:19-cv-00265-
       LPS (D. Del. Feb. 7, 2019)); *see also id.* at ¶ 10 ("[Bluestone] and CM Energy eventually agreed
       on a purchase price for the assets of the Business of $150 million.  That amount was subsequently
       reduced by approximately $50 million.  A significant consideration for the reduction in the price
       was the opportunity afforded to [Bluestone] by the [E]arn-[O]ut [P]ayment provisions.").

[43]   CM Agreement, Ex. C-33, § 2.8(a).

[44]   *Id.* at Disclosure Schedule 3.15.

description of the property and, for some equipment, the number of "operating hours."[45] The Disclosure Schedule does not provide a value for the Justice Equipment.

106. The CM Sale also contemplated that Bluestone would convey to CM Energy certain leased real property.[46] The Disclosure Schedule appended to the CM Agreement includes, among other leases, a deed of lease between Pardee and Dynamic effective 1 January 2016 ("**Pardee Lease**")[47] to be assigned as part of the transaction with CM Energy.[48] It is undisputed that the Pardee Lease is non-Mechel property. It is also undisputed that Bluestone was not mining the Pardee Lease and did not have a permit to do so at the time of the CM Sale.[49]

107. Notwithstanding the fact that the CM Agreement lists the Pardee Lease as part of the property Bluestone conveyed to CM Energy at the time of the CM Sale, at the Merits Hearing, Mr. Justice testified that the Pardee Lease was terminated prior to the CM Sale closing. He testified that Bluestone never conveyed the Pardee Lease to CM Energy. Instead, CM Energy entered into a new lease with Pardee, to which Bluestone was not a party, the CM Pardee Lease.[50] CM Energy paid consideration for the CM Pardee Lease directly to the property owners and the terms of the new lease were not the same as the terms of the Pardee Lease.[51] Mr. Justice testified that he assisted in facilitating negotiations between CM Energy and Pardee, but that he was neither directly involved nor privy to the terms of the final CM Pardee Lease that was agreed upon.[52]

108. The CM Agreement similarly provides for the possibility of "Reverse Earn-Out Payments" to be paid by Bluestone to CM Energy as follows:

> As an additional inducement to the Purchaser to enter into this Agreement, during the two (2) year period beginning on the Closing Date (the "Reverse Earn-out Period"), if the Net Average Realized Price during a fiscal quarter is less than One Hundred Dollars ($100) per ton, the Seller shall pay to the Purchaser an amount equal to the following calculation (each a "Reverse Earn-

---

[45] *Id.* at Disclosure Schedule 3.15.

[46] *Id.* at § 2.1(a).

[47] Pardee Lease, Exh. C-38.

[48] *Id.* at Disclosure Schedule 3.14(a).

[49] Tr. 295:13-16; 300:24 to 301:9 (Vol. 2) (Justice).

[50] Tr. 283:4 to 284:6; 285:11 to 286:9; 287: 21 to 288:14 (Vol. 2) (Justice).

[51] Tr. 290:13 to 291:9; 293:13 to 294:14; 296:21-24 (Vol. 2) (Justice).

[52] Tr. 373:12-20, (Vol. 2) (Justice).

out Payment"):

> fifty percent (50%) x ((One Hundred Dollars ($100) per ton less the Net Average Realized Price for such fiscal quarter) x tons of metallurgical coal actually sold by the Business to the met market for which payment is actually received during such quarter).[53]

109. Section 2.11 provides that CM Energy and Bluestone would agree on an allocation of the purchase price among the various assets conveyed in the transaction.

> Allocation of Purchase Price. Within sixty (60) days following Closing, the Purchaser shall deliver to the Seller a schedule reasonably acceptable to the Seller setting forth the allocation of the Purchase Price (and all other capitalized costs) among the Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any similar provision of state, local, or non-U.S. Law, as appropriate).[54]

110. The CM Agreement provided that $11,500,000 be placed into escrow pursuant to an Indemnity Escrow Agreement.[55] In addition, CM Energy and Bluestone agreed to place in escrow (i) $6,973,927 for unpaid Seller Taxes pursuant to a Lien Escrow Agreement[56] and (ii) $ 1,985,000 for alterations, maintenance and/or corrective measures of certain assets pursuant to an Equipment Escrow Agreement.[57]

## E. HISTORY OF THE PAY-OUT CALCULATIONS

111. By letter dated 1 February 2017, Bluestone informed Caroleng that it had sold certain of the Mechel Assets to CM Energy for $98,975,000.[58]

112. In its 1 February 2017 letter, Bluestone stated that it had wired $7,853,438 to Caroleng on 27 January 2017 as the Contingent Payment due under the Transaction Agreement. Bluestone provided the following breakdown as to the CM Sale:

---

[53] CM Agreement, Ex. C-33, § 2.8(b).

[54] *Id.* at § 2.11.

[55] *Id.* at §§ 1(a), 2.5, Ex. H; Indemnity Escrow Agreement, Ex. R-9.

[56] *Id.* at § 6.3(e); Lien Escrow Agreement, Ex. R-5.

[57] *Id.* at § 6.3(i); Equipment Escrow Agreement, Ex. R-7.

[58] Letter from Dustin M. Deane (Associate General Counsel, Bluestone) to Savvas Poyiadjis (Caroleng) dated 1 February2017, Ex. C-4, at pg. 2.

| | |
|---|---|
| Sales Price | $98,975,000 |
| LESS: Indemnity Escrow | ($20,458,927) |
| LESS: Ancillary Guaranty Escrow | ($25,000,000) |
| Net Amount Proceeds | $53,516,073 |
| Contingent Payment at 12.5% | $6,689,509[59] |

113. In its 1 February 2017 letter, Bluestone also informed Caroleng that Bluestone had made an error in its initial wire payment to Caroleng and requested that Caroleng return $1,163,929 of the $7,853,438 previously wired to Bluestone.[60] Bluestone explained the basis of the error as "last minute changes at closing." Bluestone also represented to Caroleng that $25,000,000 was being held in an "ancillary guaranty escrow" and that "when and if the funds [in escrow] are released, Bluestone will pay the Contingent amount owed to Caroleng with respect to the cash that Bluestone receives."

114. Caroleng received the $7,853,438 wire payment on 6 February 2017.[61]

115. By letter dated 7 February 2017, Bluestone provided to Caroleng the following new itemization of its calculations:

| | |
|---|---|
| Sales Price | $91,523,640 |
| LESS: Indemnity Escrow | ($20,458,927) |
| LESS: Ancillary Guaranty Escrow | ($25,000,000) |
| Net Amount Proceeds | $46,064,713 |
| Contingent Payment at 12.5% | $5,758,089.16[62] |

116. In its 7 February 2017 letter, Bluestone informed Caroleng that Bluestone had overstated the CM Purchase Price by $7,451,360.[63] Bluestone did not elaborate on the change in purchase price other than to state that "there was an additional error in the letter sent February 1, 2017." Bluestone requested that Caroleng return $2,095,348.34.[64] Bluestone informed Caroleng that the

---

[59] *Id.*

[60] *Id.*

[61] Sklyarov Witness Statement, ¶ 15.

[62] Letter from Dustin M. Deane (Associate General Counsel, Bluestone) to Savvas Poyiadjis (Caroleng) dated 7 February 2017, Ex. C-5 at pg. 2.

[63] *Id.* at pg. 2.

[64] *Id.* at pgs. 2-3.

overpayment was due to "last minute changes at the closing." Bluestone again represented that "when and if the funds [in escrow] are released, Bluestone will pay the Contingent amount owed to Caroleng with respect to the cash that Bluestone receives."

117. In a 30 July 2017 letter, counsel for Bluestone informed Caroleng that the $7,451,360 difference between the CM Purchase Price set forth in its 1 February 2017 and 7 February 2017 letters represented $7,451,360 worth of equipment that was conveyed to CM Energy pursuant to the CM Agreement, but which had not previously belonged to Caroleng (*i.e.*, the Justice Equipment).[65] Bluestone described the reverse earn-out escrow as "a holdback for the Reverse Earn-out obligation/guaranty in the amount of $25 million dollars."

118. Bluestone continued to revise its itemization of the CM Purchase Price, deductions, and Continent Payment after Caroleng initiated the Arbitration in April 2018. In a 19 February 2019 letter, Bluestone stated that Caroleng owed Bluestone $662,742.38.[66] Bluestone calculated this amount as follows:

| | |
|---|---|
| Gross Sale Proceeds | $98,975,000.00 |
| LESS Mechel Equipment | ($13,125,756.00) |
| LESS Justice Equipment | ($8,990,360.00) |
| LESS Indemnity Escrow | ($11,500,000.00) |
| LESS Equipment Escrow | ($1,985,000.00) |
| LESS Tax Escrow | ($6,973,927.00) |
| Indemnity Escrow Received | $3,022,848.48 |
| Tax Escrow Received | $6,973,927.00 |
| Equipment Escrow Received | $1,985,000.00 |
| LESS Ancillary Guaranty Escrow | ($25,000,000.00) |
| Ancillary Guaranty – Actual (Reversal) | $22,945,924.67 |
| LESS Transaction Costs | ($2,075,000.00) |
| Net Value of Coal Mtn. Minus Equipment | $64,252,657.15 |

---

[65] Letter from Stephen W. Ball (General Counsel, Bluestone) to Joshua D.N. Hess (Counsel for Caroleng) dated 30 July 2017, Ex. C-10, at pgs. 1-2.

[66] Letter from James C. Justice III to Oleg V. Korzhor and Joshua D. N. Hess, dated 19 February 2019 Ex. C-31, at pg. 1 ("This leaves a net prepayment to [Caroleng] of our contingent obligations of $662,742.00 as of December 31, 2018.").

| | |
|---|---|
| Deduction for Pardee Mineral | $31,226,791.37 |
| Mechel Equipment | $13,125,756.00 |
| Minus Mechel Equipment Repairs | ($3,428,805.00) |
| Net Value of Mechel Assets | $40,923,742.37 |
| Contingent Payment Percentage | 0.125 |
| Contingent Payment Due to Mechel | $5,115,467.80 |
| Prepayment | $7,853,438.00 |
| Credit | $2,737,970.20 |
| Production Royalties | $2,075,227.82 |
| Remaining Credit to Justice | $662,742.38 |

119.  In its 19 February 2019 letter, Bluestone represented to Caroleng for the first time that 48.6% of the in-place coal reserves that Bluestone conveyed to CM Energy came from the Pardee Lease property that was not part of the Transaction Agreement.[67]  Bluestone also represented that the Justice Equipment was worth $8,990,360 (an increase from the $7,451,360 as set forth in its letter of 30 July 2017).[68]  In addition, Bluestone deducted the value of the assets not owned previously by Mechel from its new calculations.

120.  Bluestone further represented to Caroleng that the $45,458,927 held in escrow was being held in four different escrow accounts: (i) an "Ancillary Guaranty Escrow" ($25,000,000), (ii) an "Equipment Escrow" ($1,985,000), (iii) an "Indemnity Escrow" ($11,500,000), and (iv) a "Tax Escrow" ($6,973,927)."[69]  Bluestone stated that CM Energy had released to Bluestone and Bluestone had been paid (i) the full values of the Equipment Escrow and the Tax Escrow and (ii) $3,022,848.48 of the Indemnity Escrow (*i.e.*, a total of $11,981,775.48).[70]

121.  In its 19 February 2019 letter, Bluestone said that it was deducting from the CM Purchase Price the cost of the repairs and maintenance that Bluestone made to the Mechel Equipment while that equipment had been in Bluestone's use and possession as well as the transaction costs that Bluestone had incurred

---

[67]  Letter from James C. Justice III to Oleg V. Korzhor and Joshua D. N. Hess, dated 19 February 2019 Ex. C-31, at pg. 1.

[68]  *Id.* at pgs. 1, 3.

[69]  *Id.* at pg. 3.

[70]  *Id.* at pg. 1, ("Additionally, we have taken deductions for the full value of the indemnity escrow, the tax escrow, the equipment escrow, and the $25.0 million [ancillary escrow].  We have then added back the settlement value of the indemnity escrow, tax escrow, equipment escrow and the unclaimed [portion of the ancillary escrow] of $22,945,925.").

in conjunction with the CM Sale, which Bluestone represented were $3,428,805 and $2,075,000, respectively.[71]

122. Finally, in its 19 February 2019 letter, Bluestone informed Caroleng that there was $2,075,228 of production royalties owed to Caroleng, but that Bluestone was deducting the royalties from the gross sales proceeds, stating that "Bluestone should be entitled to recouping production royalties against this overpayment until such time as the credit is exhausted."[72]

123. In a letter dated 7 March 2019, Bluestone requested that Caroleng pay Bluestone $1,273,142.63, (an increase from the $662,742.38 previously requested), stating that:

> "In the [February 19, 2019 letter], we stated that 48.6% of the reserve base sold to [CM Energy] was acquired from [the Pardee Lease].  In reality, this number was 59% . . . leaving 41% of the reserves sold to CM Energy as having originated from [Caroleng]".[73]

124. In its 7 March 2019 letter, Bluestone allocated: (i) $64,252,657.15 of the CM Purchase Price to the in-place coal reserves that were conveyed to CM Energy;[74] (ii) 59% of the in-place coal reserves conveyed to CM Energy to the Pardee Lease;[75] and (iii) 59% of the $64,252,657.15 that it had allocated to the in-place coal reserves to the Pardee Lease ($37,909,067.72).[76]

125. In the 7 March 2019 letter, Bluestone also explained the "Ancillary Guaranty Escrow" as follows:

> "Pursuant to the CM Energy Agreement, the potential exists for payments to flow in either direction.  Initially, Bluestone estimated its potential exposure at $25,000,000.00 . . . .  [But] CM Energy claims the sum of $2,054,075.53 is due from Bluestone to CM Energy . . . ."[77]

---

[71] *Id.*

[72] *Id.*

[73] Letter from Stephen W. Ball to Laura Brank and Joshua D.N. Hess dated 7 March 2019, Ex. C-32 at pg. 2.

[74] *Id.* (assigning $64,252,657.15 to "Net Value of Coal Mtn. Minus Equipment").

[75] *Id.* at pg. 6, ("This results in 59% of the reserves being on the Pardee [L]ease and 41% being on property previously owned or controlled by Mechel.").

[76] *Id.*

[77] Letter from Stephen W. Ball to Laura Brank and Joshua D.N. Hess dated 7 March 2019, Ex. C-32 at pg. 5.

126. In its 31 July 2019 SOD, Bluestone calculated the Purchase Price and deductions (which it labeled as its "Final Calculations") as follows:

| | |
|---|---|
| CM Gross Sale Proceeds | $98,975,000.00 |
| Less Mechel Unpaid Taxes | ($4,751,038.17) |
| Less Reverse Earn-Out Payment | ($2,054,075.33) |
| Less Indemnity Escrow | ($8,477,151.52) |
| Less non-Mechel Equipment sold | ($8,990,360.00) |
| Less Pardee Lease | ($26,343,589.43) |
| Net CM Sale Price | $48,358,785.55 |
| 12.5% Contingent Payment | $6,044,848.19 |
| Less amount paid to Caroleng | ($7,853,438.00) |
| Less WARN Act costs/exposure | ($3,167,750.00) |

127. According to Bluestone, this resulted in an overpayment by Bluestone of $4,976,339.81.[78]

128. In its SOD, Bluestone withdrew its claim and the resulting deduction for the amounts it expended to repair and maintain the Mechel Equipment.[79]

129. Bluestone's Final Calculations, as set forth in its SOD were not, in fact, final. Bluestone continued to revise its calculations as to what Caroleng purported to owe Bluestone. In its Rejoinder, Bluestone provided the following calculations of the CM Purchase Price and deductions:

| | |
|---|---|
| CM Gross Purchase Price | $98,975,000.00 |
| LESS Mechel Unpaid Taxes | ($4,751,038.17) |
| LESS Reverse Earn-Out Payment | ($2,054,075.33) |
| LESS Indemnity Escrow | ($8,477,151.52) |
| Final CM Purchase Price | $83,692,734.98 |
| LESS Non-Mechel Equipment | ($9,963,285.00) |
| LESS Pardee Lease | ($41,414,300.65) |
| Value | $32,315,149.33 |
| Contingent Payment (12.5% of Value) | $4,039,393.67 |
| Initial Overpayment | $3,814,044.33 |

---

[78] SOD, ¶ 4.

[79] SOD, ¶ 12.

<table>
<tr><td>Total Overpayment</td><td>$6,981,794.33[80]</td></tr>
</table>

130. At the Merits Hearing, Bluestone provided the following calculations as to the CM Purchase price, deductions and allocations:

| | |
|---|---|
| CM Gross Purchase Price | $98,975,000.00 |
| Less: | |
| Mechel Unpaid Taxes | ($4,751,038.17) |
| Reverse Earn-Out Payment | ($2,054,075.33) |
| Indemnity Escrow | ($8,477,151.52) |
| Final CM Purchase Price | $83,692,734.98 |
| Less: | |
| Non-Mechel Equipment | ($9,963,285.00) |
| Pardee Lease | ($41,414,300.65) |
| Value | $32,315,149.33 |
| 12.5% of Value: | |
| Contingent Payment | $4,039,393.67 |
| Less: | |
| Payment to Caroleng | ($7,853,438.00) |
| Initial Overpayment | $3,814,044.33 |
| Credit for deferred royalties | ($2,075,228.00) |
| Due from Caroleng | $1,738,816.33[81] |

## IV. ANALYSIS AND DECISION

131. As is apparent from the history of the pay-out calculations set forth in Section III.E. above, the Parties dispute what amount Respondent owes Claimant under the Transaction Agreement as a result of Respondent's sale of the Mechel Assets to CM Energy under the CM Agreement.

132. Claimant asserts that the Transaction Agreement required Respondent to pay Claimant:

(i)     Contingent Payments of 12.5% of the CM Purchase Price of $98,975,000 for the sale of the Mechel Assets;

---

[80]    Rejoinder, ¶¶ 13-17.

[81]    Respondent's Handout at the Hearing.

(ii)     Contingent Payments of 12.5% of the Earn-out Payments that Respondent receives until 12 February 2020 and 10% of the Earn-out Payments that Respondent receives from 12 February 2020 to 12 February 2025; and

(iii)    Royalties on the coal mined and sold from the Mechel Assets; and

133.    Claimant further asserts that the Transaction Agreement required Respondent to provide Claimant with access to Respondent's books and accounts and with all information that Claimant could reasonably request regarding the royalty payments, earn-out payments and contingent payments.

134.    Claimant asserts that Respondent breached these obligations by withholding at a minimum $4,518,436.88 in Contingent Payments and $2,075,227.82 in royalty payments, as well as by failing to grant Claimant access to the books and records, and to provide Claimant with the information to which it is entitled under the Transaction Agreement.

135.     In the Terms of Reference, Claimant requested the following relief:

(i)      An award declaring that Respondent breached its obligations under the Transaction Agreement;

(ii)     Damages in an amount of not less than USD $6,711,610—which is Claimant's best estimate of the minimum amount owed to it based on the limited information currently available to it and which will likely need to be revised as additional information becomes available to Claimant—to compensate Claimant for Respondent's breaches of the Transaction Agreement, or such other amount as proven in this proceeding;

(iii)    Damages to compensate Claimant for Respondent's breaches of the implied covenant of good faith and fair dealing;

(iv)     Punitive Damages as the Tribunal deems appropriate;

(v)      An award of attorneys' fees and costs as provided by the ICC Rules;

(vi)     An award of pre- and post- award interest; and

(vii)    Any such relief that the Tribunal deems appropriate.

136.    In its SoC, Claimant requested the following relief:

(i)      An award declaring that Bluestone has breached its obligations under Sections 2.3, 2.4, 5.2(a), and 9.13 of the Transaction Agreement;

(ii)     An award declaring that Bluestone breached the implied covenant of good faith and fair dealing;

(iii)    Damages to compensate Claimant for Bluestone's breaches as follows:

| Damages Category | Amount |
|---|---|
| The Remainder of the Contingent Payment | $4,518,436.88 |
| The Deferred Royalty Payments that Bluestone has Admitted to Withholding | $2,075,227.82 |
| **Total Damages that Caroleng Can Quantify** | $6,593,665 |

(iv)     An award requiring Bluestone to pay pre-judgment interest on its damages;

(v)      An award requiring Bluestone to pay post-judgment interest on its damages;

(vi)     An award requiring Bluestone to immediately provide its internal calculations of Deferred Royalty Payments and of Earn-Out Payments;

(vii)    An award requiring Bluestone to pay Caroleng 12.5% of any Earn-Out Payments that Bluestone has already received and both pre-judgment and post-judgment interest on that money;

(viii)   An award requiring Bluestone to pay Caroleng 12.5% of any future Earn-Out Payments that Bluestone receives until February 12, 2020 within ten business days of Bluestone receiving them;

(ix)     An award requiring Bluestone to pay 10% of any future Earn-Out Payments that Bluestone receives between February 13, 2020 and February 12, 2025 within ten business days of Bluestone receiving them;

(x)      An award of attorneys' fees and costs, including the Tribunal's costs, as provided by the ICC Arbitral Rules;

(xi)     Punitive damages as the Tribunal deems appropriate; and

(xii)    Such other relief as the Tribunal deems appropriate.

137.    Claimant did not reiterate or modify its requests for relief in its Reply or Post-hearing Submission except that (i) in its Post-hearing Submission, Claimant asserted that it "is entitled to damages for Respondent's breach of Section 5.2

of the Transaction Agreement;"[82] and (ii) in its Cost Submission, Claimant claimed that the Tribunal "should further award Caroleng interest on the [legal fees, expenses, and costs that it incurred in bringing these proceedings] calculated at New York's statutory rate of nine percent per annum from the date that the Award in these proceedings is rendered until the date of full payment."[83]

138. Respondent asserts it was entitled to make certain deductions to the CM Purchase Price for purposes of determining the 12.5% Contingent Payment under the Transaction Agreement. These are:

(i)     $8,477,151.52 for an Indemnity Escrow;

(ii)    $4,751,038.17 for severance and other taxes on the Mechel Property that Mechel allegedly failed to pay;

(iii)   $2,054,075.33 in Reverse Earn Out Payments;

(iv)    $41,414,300.65 representing the value of the Pardee Lease, which was a not a Mechel Asset; and

(v)     $9,963,285.00 for the value of Non-Mechel Equipment transferred in the CM Sale.

139. Respondent asserts that it did not breach the Transaction Agreement because it paid Claimant Contingent Payments in the amount of $7,853,438.00 - which was $1,738,816.33 in excess even after $2,075,228.00 in deferred Royalty Payments are credited. Respondent also asserts that it provided Claimant with information regarding the royalty payments, earn-out payments and contingent payments and that the confidentiality obligations under the CM Agreement prevented it from providing Claimant with a full and unredacted copy of the CM Agreement. Respondent further represents that it will pay the Contingent Payments that Claimant is owed under the Transaction Agreement on any future Earn-out Payments that Respondent might receive from CM Energy.

140. In the Terms of Reference, Respondent requested the following relief:

(i)     Dismiss the Request for Arbitration with prejudice;

(ii)    Enter an award in favor of Respondent and against the Claimant;

(iii)   Award all costs, fees, and expenses to Respondent to the extent permitted by law or applicable arbitration rules; and

---

[82] Claimant's Post Hearing Brief ("**CPHB**"), ¶ 99; *see* ¶¶ 209, 372 of the Award.

[83] Claimant's Application for Costs dated 17 January 2020 ("**CSS**"), ¶ 49.

(iv)    Award such other relief as the Tribunal deems proper.

141.    In its SOD, Respondent requested the following relief:

(i)    That the Tribunal deny each and every claim for relief by Caroleng;

(ii)    That the Tribunal accept the Final Calculations set forth above and enter an Order awarding Bluestone the amount of $4,976,339.81;

(iii)    Its fees and costs expended in defending this action; and

(iv)    Such other and further relief that the Tribunal deems appropriate.

142.    In its Rejoinder, Respondent requested the following relief:

(i)    That the Tribunal deny each and every claim for relief presented by Caroleng;

(ii)    That the Tribunal accept Bluestone's arguments and calculations and enter an Order awarding Bluestone the amount of $4,906,566.33;

(iii)    Its fees and costs expended in defending this action; and

(iv)    Such other and further relief that the Tribunal deems appropriate.

143.    Respondent did not reiterate or modify its requests for relief in its Post-hearing Submission.

## A.    BURDEN OF PROOF

144.    It is undisputed that the CM Purchase Price was $98,975,000, and that Claimant received from Respondent a Contingent Payment of $7,853,438.00. The Parties, however, dispute whether Respondent was entitled to make deductions to the CM Purchase Price for purposes of determining the Contingent Payments and, if so, the value of these deductions.

145.    Before addressing the Parties' arguments, the Tribunal will first turn to the question of which Party bears the burden to prove Respondent's entitlement to the deductions and the value of the deductions.

146.    The Parties agree that, as a matter of principle, the party alleging a fact in support of its claim or defense bears the burden of proving it.[84] The Parties, however, differ on the application of that general principle to the present case. Claimant asserts that, since Respondent alleges it is entitled to take deductions from the CM Purchase Price, Respondent bears the burden to prove (i) that (it

---

[84]    CPHB, ¶ 3; Respondent's Post Hearing Brief ("**RPHB**"), pg. 17.

is entitled to that deduction and (ii) the value of that deduction.[85]  Respondent in turn asserts that, since Claimant alleges that Respondent breached the Transaction Agreement, the burden rests on Claimant to prove that the deduction values presented by Respondent are invalid and inaccurate.[86]

147.  The Tribunal notes that, in defense to the claims presented by Claimant, Respondent has taken the position that it is entitled to several deductions from the CM Purchase Price and has alleged facts in support of these deductions. Since the party alleging a fact in support of its claim or defense bears the burden of proving these facts, it is Respondent that bears the burden of proving its entitlement to each of the deductions as well as the amount of these deductions.

148.  In addressing the burden of proof, the Parties have also placed particular emphasis on Section 5.2 of the Transaction Agreement.  Section 5.2 grants Claimant access to Respondent's books and records and requires Respondent to provide Claimant with all relevant information it reasonably requests to ensure Respondent's compliance with the deferred purchase price payment obligations under the Transaction Agreement.  At the Merits Hearing, Claimant argued that Section 5.2 of the Transaction Agreement "shifts the burden to the Respondent to validate the value of the transaction's contingent payment."[87]  In its Post Hearing Brief, Respondent denies that Section 5.2 of the Transaction Agreement shifted the burden of proof to Respondent and asserts that instead "'normal' rules of contract interpretation should apply."[88]

149.  The purpose of Section 5.2 of the Transaction Agreement is to ensure transparency by allowing Claimant, at its option, to satisfy itself that the amount of Contingent Payments and deferred Royalty Payments paid by Respondent are accurate.  Section 5.2 also reflects the Parties' recognition that the information relevant to determine the correct amount of the Contingent Payments and deferred Royalty Payments is predominantly in the exclusive possession of the Respondent.  However, the Tribunal observes that Section 5.2 does not govern the fact-finding process in this international arbitration; and it neither confirms, nor shifts or alters the principle that the party alleging a fact in support of its claim or defense carries the burden of proving it.

---

[85]  CPHB, ¶ 4.

[86]  RPHB, pg. 17.

[87]  Tr. 21:6-9, 17; 22:4-7, (Vol 1) (Claimant's Counsel).

[88]  RPHB, pgs. 11 to 14.

## B. RESPONDENT'S DEDUCTIONS FOR ESCROWS

### 1.     Claimant's Arguments

150.     Claimant argues that Respondent breached Section 2.4 of the Transaction Agreement by deducting $45,458,927 from the CM Purchase Price on 27 January 2017 on the grounds that (i) $20,458,927 was held in an Indemnity Escrow (which Respondent later described as comprising an indemnity escrow, a tax escrow and an equipment escrow); and (ii) $25,000,000— comprising the upper limit for reverse earn-out payments under Section 2.8 of the CM Agreement—was held in an "Ancillary Guarantee Escrow" because it allegedly was at risk due to potential reverse earn-out payments that could be assessed in the following years."[89]

151.     Claimant asserts that Respondent was not entitled to make these deductions because under Section 2.4 of the Transaction Agreement, the Contingent Payments "vest" on the transaction date "notwithstanding any deferred or contingent payment conditions or obligations."[90]  Claimant points out that "[e]scrows, by definition, involve 'contingent payment conditions or obligations.'"[91]  Moreover, Contingent Payments are owed not only on "sums that have already been paid to Bluestone, but those sums that are payable at some future point."[92]

152.     Claimant further argues that, even if Respondent could withhold escrowed payments, the evidence confirms that some of the amounts that Respondent initially represented were placed in escrow were not, in fact, escrowed. Claimant asserts:

   a. First, despite Respondent's representations to the contrary, Respondent has actually received the $25,000,000 from CM Energy on 27 January 2017 and the funds were never placed in escrow.

   b. Second, Respondent also "has received all of the sums escrowed for tax liens."

   c. Third, Respondent has received part of the amount escrowed in indemnities.  The remaining $8,477,151.52 were returned from the indemnity escrow to CM Energy as part of a settlement but Respondent

---

[89]   CPHB, ¶ 18.

[90]   CPHB, ¶ 17.

[91]   SOC, ¶ 85.

[92]   Tr. 11:2-4, (Vol. 1) (Claimant's Counsel).

failed to establish what amount, if any, of that settlement payment covered liabilities that related to the CM Sale.[93]

## 2. Respondent's Arguments

153. Respondent argues that it did not breach Section 2.4 of the Transaction Agreement. Respondent contends that, although Respondent had "initially deducted from the Gross CM Sale Price amounts that were ultimately released to Bluestone," Respondent has accounted for the released amounts in calculating the Contingent Payment. Respondent did not remit these Contingent Payments to Claimant because "by the time those funds were released, Bluestone had determined that it had failed to account for the Pardee Lease and the non-Mechel equipment in its Contingent Payment calculations and had therefore overpaid Caroleng."[94]

154. Respondent asserts that it does not owe Contingent Payments on (i) $8,477,151.52 for the Indemnity Escrow, (ii) $4,751,038.17 for unpaid Mechel taxes, or (iii) $2,054,075.33 for Reverse Earn-out Payments demanded by CM Energy.

   a. First, the $8,477,151.52 paid to CM Energy from the Indemnity Escrow fund "was not value to or for the benefit of Bluestone."[95] It "would be inequitable to deny Bluestone any deduction for the indemnity escrow" as at least some of that amount "was withheld specifically to account for the repairs required to Mechel's faulty equipment."[96]

   b. Second, Respondent had to pay $4,751,038.17 to release tax liens for taxes that Mechel had failed to pay.[97] Since that amount was paid "for the benefit of Mechel," it did not constitute transaction Value on which Contingent Payments were due.[98]

   c. Third, CM Energy demanded $2,054,075.33 in Reverse Earn-out Payments for the years 2017 and 2018. These claimed Reverse Earn-out Payments, which Respondent is currently contesting in pending Delaware court proceedings, are "not value paid to or for the benefit of Bluestone"

---

[93] Rejoinder, pgs. 9-10.

[94] SOD, ¶ 45.

[95] Rejoinder, pg. 9.

[96] RPHB, pg. 18.

[97] Rejoinder, pg. 8; Tr. 53:20-22, (Vol. 1) (Respondent's Counsel).

[98] Rejoinder, pg.9; Tr. 53:20 to 54:2, (Vol. 1) (Respondent's Counsel).

and hence no Contingent Payments are owed by Respondent on that amount.[99]

### 3. The Tribunal's Analysis

155. Under Section 2.4 of the Transaction Agreement, Respondent agreed to pay Claimant, as Contingent Payments, 12.5% of the transaction Value of any sale by Respondent of the assets that Claimant had sold to it under the Transaction Agreement, *i.e.* the Mechel Assets, provided that such sale occurs within the first five years after the Closing Date of the Transaction Agreement. The term "Value" is defined as "the total amount of cash and the fair market value on the date which is five (5) days prior to the consummation of such transaction of all other property paid or payable directly or indirectly to Buyer or any of its Affiliates."[100] Contingent Payments are to be calculated "notwithstanding any deferred or contingent payments."

156. The Contingent Payments "vest on the date when the relevant sale transaction is entered into" and must be paid "within 10 business days" after completion of each relevant sales transaction.[101]

157. It follows that the Contingent Payments:

   a. Vest not only on payments to Respondent that are made, but also on payments to Respondent that are "deferred" and/or "payable," that is, payments that at the date of the Closing have not yet become due and/or have not yet been paid but that CM Energy, as the purchaser of the Mechel Assets, is required to make at a later point in time; and

   b. Vest on payments to Respondent that are "contingent," that is payments that are subject to certain conditions being met and that, as a result, are not certain as of the date of the Closing.

158. The Tribunal also notes that the relevant date to determine the Contingent Payments is five days "prior to the consummation of the transaction." It is not the date at which Respondent receives the payment. Consistent with the provision that the Contingent Payments vest at the date the sale transaction is entered into, "notwithstanding any deferred or contingent payments," the Agreement does not contain any provision providing for a readjustment of the Contingent Payments in the event that Respondent does not receive the payment.

---

[99] Rejoinder, pg. 9.

[100] Transaction Agreement, Ex. C-1, App. A.

[101] *Id.* at § 2.4.

159. Put simply, the Transaction Agreement seeks to ensure certainty and finality with regard to the Contingent Payment. Claimant was entitled to receive the Contingent Payment ten business days after the sales transaction has closed and Respondent is not entitled to withhold or later readjust parts of the Payment. Respondent assumed the risk that it ultimately might not receive the payment or value for which it had made the Contingent Payment, whether that be because the purchaser did not comply with its obligation to pay or because a condition for the payment was not met.

160. The Tribunal is of the view that the terms of the Transaction Agreement concerning the Contingent Payment are clear and unambiguous. Under New York law, when interpreting a contract, the Tribunal must confine itself to the four corners of the document and only consider extrinsic proof if the contract is ambiguous.[102] Where, as here, the contract is not ambiguous, it must be enforced according to the plain meaning of its terms.[103] As a result, the Tribunal sees no need to consider the witness evidence regarding the Parties' respective intent and understanding in negotiating the Contingent Payment provision.[104]

### (a) The $20,458,927 Deduction for Indemnity, Tax and Equipment Escrow

161. The Tribunal now turns to Claimant's argument that Respondent breached the Transaction Agreement when it deducted $20,458,927 from the CM Sales Price on the grounds that the amount was put into an indemnity escrow ($11,500,000),[105] a tax escrow ($6,973,927)[106] and an equipment escrow ($1,985,000).[107]

162. As the Tribunal has already observed, under Section 2.4 of the Transaction Agreement, Contingent Payments vest at the date of the transaction "notwithstanding any deferred or contingent payment conditions." The

---

[102] *See e.g.*, *R/S Assocs. v. New York Job Dev. Auth.*, 771 N.E.2d 240, 242 (2002), **Ex. CLA-4** ("We have long adhered to the 'sound rule in the construction of contracts, that where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language[.]'") (quoting *Springsteen v. Samson*, 32 N.Y. 703, 706 [1865]); *Luken v Luken*, 9 N.Y.S.3d 779, 782 (N.Y. Sup. Ct. 2015 (citing *Mid-State Indus., Ltd. v. State of New York*, 986 N.Y.S 2d 637 (3rd Dept 2014)); RPHB, pg. 19.

[103] *Luken v Luken*, 9 N.Y.S.3d 779, 782 (N.Y. Sup. Ct. 2015 (citing *Mid-State Indus., Ltd. v. State of New York*, 986 N.Y.S 2d 637 (3rd Dept 2014)); RPHB, pg. 19.

[104] See, e.g., Tr. 109:10-23, 134:16-21 (Vol.1) (Brank); Tr. 191:6 to 192:11, (Vol. 1) (Justice).

[105] Indemnity Escrow Agreement, Ex. R-9.

[106] Lien Escrow Agreement, Ex. R-5.

[107] Equipment Escrow Agreement, Ex. R-7.

Tribunal agrees with Claimant that escrows, by definition, involve payment obligations that are contingent and, if the conditions are met, deferred.[108]  As a result, pursuant to the clear terms of Section 2.4, Respondent was not entitled to withhold Contingent Payments on the $20,458,927 that it claims were put into escrow.

163.   Respondent asserts that it is entitled to deduct $8,477,151.52 of the Indemnity Escrow, which is the settlement amount it had to pay from the escrow account to CM Energy.  However, for purposes of calculating the Contingent Payment, it is irrelevant that Respondent ultimately agreed to pay to CM Energy that amount from the indemnity escrow.  The amounts of the CM Purchase price deposited in the indemnity escrow were subject to "contingent payment conditions."  Pursuant to the express terms of Section 2.4, Respondent owed 12.5% on these amounts to Claimant by 10 February 2017 even if Respondent ultimately did not receive the full amount of these payments.

164.   The Tribunal does not consider it relevant that part of the settlement payment released to CM Energy related to the "Prep Plant Agreement," which was an agreement between Respondent and CM Energy that was separate from the Transaction Agreement and did not involve the sale of Mechel Assets.  Even if the entire settlement payment released to CM Energy related to the Transaction Agreement, Respondent would still not have been entitled to readjust the Contingent Payments it owed Claimant by 10 February 2017 to account for these funds.

165.   Respondent further asserts that it would be "inequitable to deny Bluestone any deduction for the indemnity escrow given that at least some of that amount was withheld specifically to account for the repairs required to Mechel's faulty equipment."[109]  However, the Tribunal notes that it does not have authority to decide the case *ex aequo et bono*.[110]  It is the Tribunal's task to decide whether Respondent was in breach of the terms of the Transaction Agreement under the applicable law of the Agreement.  Moreover, the Tribunal observes that in its 19 February 2019 and 7 March 2019 letters, Respondent claimed a deduction of $3,428,805 for repairs to the Mechel Equipment[111] but then withdrew that deduction in its SOD.[112]

---

[108]   99 *Commercial St., Inc. v. Goldberg*, 811 F.Supp 900, 905 (S.D.N.Y. 1993) (citing *Silberstein v. Murdoch*, 216 A.D. 665, 215 N.Y.S. 657 (1st Dept. 1926), Ex. CLA – 7, (an escrow is "generally defined as a written instrument entrusted by a grantor to a third party agent or trustee who, in accordance with instructions, subsequently delivers the instrument to the grantee once certain conditions are met.").

[109]   RPHB, pg. 18.

[110]   Art. 21(3) of the ICC Rules.

[111]   Ex. C-31 pg. 3; Ex. C-32, pgs. 2 and 7.

[112]   SOD, ¶ 12.

166. Respondent further asserts that it was entitled to deduct $4.7 million in allegedly unpaid Mechel taxes from the CM Purchase Price. As an initial matter, the Tribunal notes that Respondent's position with respect to the $4.7 million has been inconsistent. In its Rejoinder, Respondent asserted that the $4.7 million corresponded to the tax liens "that could absolutely be attributed to Mechel."[113] At the Merits Hearing, in turn, Mr. Justice testified that the $4.7 million was the value of a global settlement with the state of West Virginia in 2015 for unpaid taxes.[114]

167. In any event, Respondent's position conflates Claimant's entitlement to Contingent Payments on the value of the CM Sale with indemnity claims that Respondent might have under the Transaction Agreement. Under Section 2.4, the Contingent Payments were due on the full amount of the tax escrow even though these funds were subject to "deferred or contingent payment conditions." Moreover, Respondent acknowledges that it has received all of the sums escrowed for tax liens.[115]

168. The Tribunal notes that the Transaction Agreement contains specific provisions for tax indemnity claims that Respondent might have against Claimant. Under the Transaction Agreement, Respondent assumed unpaid tax liabilities, and under Section 8.3 and 8.5 could seek, under certain conditions, indemnification from Claimant for the breach of the representations and warranties on taxes made in Section 3.7 within one year of the closing date of the Transaction.[116] Respondent did not bring a counterclaim in this Arbitration seeking indemnities for the breach of Claimant's warranties and representations on taxes.

169. The Tribunal therefore concludes that Respondent breached Section 2.4 of the Transaction Agreement by deducting $20,458,927 from the CM Purchase Price for purposes of calculating the Contingent Payment and failing to pay Claimant the corresponding amount of $2,557,365.88 in Contingent Payments by 10 February 2017.

### (b) The $25,000,000 Deduction for the Ancillary Guarantee Escrow

170. Claimant further argues that Respondent breached the Transaction Agreement when it deducted $25,000,000 from the CM Sales Price for an "Ancillary Guarantee Escrow." The amount of $25,000,000 corresponds to the cap for

---

[113] Rejoinder, ¶ 19.

[114] Tr. 351:12-18; 352:20-24 (Vol. 2) (Justice).

[115] Letter from Stephen W. Ball to Laura Brank and Joshua D.N. Hess dated 7 March 2019, Ex. C-32 at pgs. 4-5; Tr. 350:21-24, (Vol. 2) (Justice).

[116] Transaction Agreement, Ex. C-1, § 3.7, A-4, § 8.4.

Reverse Earn-out Payments that CM Energy might be entitled to claim from Respondent pursuant to Section 2.8 of the CM Agreement.

171. Respondent initially asserted that the $25,000,000 had been placed into escrow. In its 1 February 2017 letter, Respondent informed Claimant that the $25,000,000 was withheld as "Ancillary Guaranty Escrow." In its SOD, Respondent represented to the Tribunal that the "Ancillary Guaranty Escrow" related "to the reverse earn-out provisions in the CM Agreement."

172. At the Merits Hearing, however, Mr. Justice testified that the $25,000,000 was in fact never put into escrow and acknowledged that Respondent received the $25,000,000 in cash in its bank account.[117]

173. Since the $25,000,000 was cash paid as part of the CM Purchase Price, Respondent was under an obligation to pay Claimant 12.5% in Contingent Payments on that amount by 10 February 2017. Yet even if the amount had been escrowed, as Respondent initially had incorrectly represented, Respondent would have owed Contingent Payments on these amount, as they would have been subject to "deferred or contingent payment conditions."

174. The Tribunal therefore concludes that Respondent materially breached Section 2.4 by failing to pay Claimant 12.5% in Contingent Payments by 10 February 2017 on the $25,000,000 deducted for the "Ancillary Escrow Account."

C. THE EARN-OUT AND REVERSE EARN-OUT PAYMENTS

1. Claimant's Arguments

175. Claimant seeks an award requiring Respondent to pay Claimant (i) 12.5% of any Earn-out Payments that Respondent has already received and both pre-judgment and post-judgment interest on that money, (ii) 12.5% of any future Earn-out Payments that Respondent receives until 12 February 2020 within ten business days of Respondent receiving them, and (iii) 10% of any future Earn-out payments that Respondent receives between 13 February 2020 and 12 February 2025 within ten business days of Respondent receiving them.[118]

176. With regard to the $2,054,075.33 in Reverse Earn-out Payments claimed by CM Energy for the first two years after the closing of the transaction, Claimant asserts that Respondent has disputed these payments in the Delaware courts and so far has not paid this amount to CM Energy. As a result, Claimant should not have to "prepay" its 12.5% on the Reverse Earn-out Payments before the dispute between Bluestone and CM Energy is settled.[119]

---

[117] Tr. 337:4-11, (Vol. 2) (Justice).

[118] SOD ¶ 153 G, H, I.

[119] Tr. 43:11-17 (Vol. 1) (Claimant's Counsel).

### 2. Respondent's Arguments

177. Respondent argues that it is entitled to deduct the $2,054,075.33 in Reverse-Earn out Payments demanded from CM Energy from the CM Purchase Price. Respondent asserts that the Reverse Earn-out Payments were "not value paid to or for the benefit of Bluestone" and hence did not fall "within the definition of Value for purposes of calculating the Contingent Payment."

178. Respondent has further represented that it has not received any Earn-out Payments from CM Energy. Respondent also has repeatedly represented that "in the event that Dynamic succeeds in the Delaware Litigation" Respondent "will remit any amounts owed from its judgment to Caroleng."[120] Respondent also agrees that it owes Claimant 12.5% of Contingent Payments on any Earn-out Payments received until 12 February 2020, and 10% in Contingent Payments on any Earn-out Payments received until 12 February 2025.[121]

### 3. The Tribunal's Analysis

179. It is undisputed that the Earn-out Payments and the Reverse Earn-out Payments form part of the Purchase Price under the CM Agreement. Section 2.5 of the CM Agreement expressly provides that the "aggregate purchase price for the Business and Assets" was $98,975,000 "plus the Earn-out Payments, if any… less the Reverse Earn-out Payments, if any." Moreover, Section 2.8(a) provides that the Earn-out Payments are made "as an additional consideration for the Assets," and that Reverse Earn-out Payments were agreed as "[a]s an additional inducement to the Purchaser to enter into this Agreement."[122]

180. Since the Earn-out Payments and Reverse Earn-out Payments form part of the Purchase Price of the CM Sale, they are part of the "sale transaction Value" for purposes of Section 2.4 of the Transaction Agreement.

181. The Parties agree that under Section 2.4 of the Transaction Agreement, Respondent accordingly has an obligation to make Contingent Payments to Claimant on any Earn-out Payments Respondent receives: 12.5% of Contingent Payments on any Earn-out Payments received until 12 February 2020, and 10% in Contingent Payments on any Earn-out Payments received between 13 February 2020 and 12 February 2025. The Parties agree that these payments become due 10 business days after receipt by Respondent of the Earn-out Payment.[123]

---

[120]   SOD, ¶ 93; Rejoinder, pg. 9.

[121]   Tr. 82:22 to 83:8, (Vol. 1) (Respondent's Counsel).

[122]   CM Agreement, Ex. C-33, § 2.8(a).

[123]   SOC, ¶ 153 G, H, I.

182.    Conversely, under Section 2.5 of the CM Agreement, Reverse Earn-out Payments work to reduce the aggregate CM Purchase Price. As a result, Respondent would be entitled to receive a payment from Claimant in the amount of 12.5% (or if payment is made between 1 February 2020 and 31 January 2025 of 10%) of any amount that Respondent would have to pay in Reverse Earn-out Payments. Claimant does not appear to dispute this. At the Merits Hearing, counsel for Claimant asserted that, "if there were a reverse earn-out that was actually charged, then Bluestone could come back to us and put to us that we might owe them."[124]

### (a)    Respondent's $2,054,075.53 Deduction for Reverse Earn-out Payments Claimed by CM Energy

183.    The Tribunal will first address Respondent's argument that it is entitled to deduct the $2,054,075.33 in Reverse-Earn out Payments from the CM Purchase Price that CM Energy has demanded for the period of February 2017 through January 2019.

184.    The Tribunal does not agree that Respondent is entitled to deduct the Reverse Earn-out Payment from the CM Purchase Price. Respondent has acknowledged that it has not paid CM Energy the $2,054,075.33 in Reverse Earn-out Payments that CM Energy has claimed. Instead, Respondent disputes CM Energy's calculation of Reverse Earn-out Payments in Delaware court where it asserts that, under a proper application of the CM Agreement's Earn-out Payment provisions, Respondent is in fact entitled to receive Earn-out Payments for the period from 1 February 2017 through 31 January 2019.

185.    It will therefore depend on the outcome of the Delaware litigation between Respondent and CM Energy whether Respondent will, in fact, have to make in the aggregate any Reverse Earn-out Payments or whether Respondent will receive Earn-out Payments from CM Energy.

### (b)    Claimant's Request to Order Respondent to Pay Contingent Payments on Earn-out Payments Received and Future Earn-out Payments

186.    The Tribunal now turns to Claimant's request that it order Respondent to pay Contingent Payments on any Earn-out Payments Respondent has already received or will receive before 1 February 2025.

187.    Respondent represented at the Merits Hearing, and again in its 3 January 2020 Post-hearing submissions, that it has so far not received any Earn-out Payments.[125] CM Energy's Earn-out Statements for the years 2017 and 2018,

---

[124]    Tr. 43:5-8, (Vol. 1) (Claimant's Counsel).

[125]    RPHB, pg. 27; Tr. 140:8-10, (Vol. 1) (Respondent's Counsel).

which Respondent has submitted into the record, show that CM Energy assessed Earn-out Payments for the first and fourth quarter of 2018 but credited these Earn-out Payments against the amount of Reverse-Earn Out Payments it claims are owed from Respondent.[126] The Tribunal does not have any documents before it that would show whether CM Energy assessed Earn-out Payments for 2019.

188. Claimant points out that Respondent has not produced any of its internal calculations or documents regarding Earn-out Payments though it has admitted that it has such documents.[127] Claimant asserts that the Tribunal should infer from that failure to produce that Respondent's internal calculations show that CM Energy owes Respondent Earn-Out Payments and that Claimant is entitled to receive 12.5% of these Earn-out Payments.[128]

189. The Tribunal will address Respondent's failure to produce these documents in Section IV.D.3(b) below. The Tribunal sees no need to draw adverse inferences here, because the issue whether Respondent owes Reverse Earn-out Payments or is owed Earn-out Payments for the period of 1 February 2017 through 31 January 2019 is currently being litigated before Delaware courts.

190. The Tribunal notes that Respondent has repeatedly represented to the Tribunal that it would comply with Section 2.4 of the Transaction Agreement and make the Contingent Payments to Claimant on any Earn-out Payments it would receive.[129] Respondent's assurances specifically included any Earn-out Payments Respondent would receive as a result of a successful challenge to CM Energy's Reverse Earn-out Payment demands for the period of 1 February 2017 through 31 January 2019, as well as any Earn-out Payments Respondent receives for the period after 31 January 2019.

191. The Tribunal accordingly declares that Respondent must pay Claimant 12.5% of any Earn-out Payments it might have received by 12 February 2020, and 10% of any Earn-out Payments received between 13 February 2020 and 12 February 2025. Respondent must make the Contingent Payments to Claimant within 10 Business Days of receipt of the Earn-out Payments.

---

[126] CM Energy Earn-out Statements and Objection Letters, Ex. R-23.

[127] CPHB, ¶ 15.

[128] *Id.*

[129] SOD, ¶ 93; Rejoinder, pg. 9; Tr. 82:18 to 83:8, (Vol. 1) (Respondent's Counsel).

## D.   ACCESS TO DOCUMENTS

### 1.   Claimant's Arguments

192.   Claimant argues that Respondent breached Section 5.2(b) of the Transaction Agreement by not providing Claimant with the CM Agreement within ten business days of the CM Sale.[130]  Respondent withheld an unredacted copy of the CM Agreement "until it was compelled to provide it" in discovery in this Arbitration and in response to a federal court subpoena.  Respondent also did not provide other documents necessary to validate its claimed deductions to the CM Purchase Price.  According to Claimant, the fact that Respondent produced some of the documents in discovery in this Arbitration does not cure the Respondent's breach.

193.   Claimant further argues that Respondent breached Section 5.2(a) of the Transaction Agreement by failing to make available to Claimant "all information" that Claimant could "reasonably request" to verify Respondent's obligations to make Contingent Payments, Deferred Royalty Payments, and Earn-out Payments.[131]  Respondent failed to produce the documents necessary to validate its claimed deductions to the CM Purchase Price.[132]  Respondent also provided no documentation to support its claimed deduction of Reverse Earn-out Payments, and not all of the documents necessary for Caroleng to verify the value of Deferred Royalty Payments due.[133]

194.   Claimant asserts that as a result of Respondent's breaches of Section 5.2(a) and 5.2(b), Claimant "is entitled to damages."  Moreover, any "doubts that the Tribunal has as to damages owed should be resolved in Caroleng's favor" because Respondent's breaches prevented Claimant from "being able to quantify the precise amount of damages owed."[134]

### 2.   Respondent's Arguments

195.   Respondent asserts that it could not provide Claimant the CM Agreement when requested because it was a confidential document.[135]  Claimant was, however, permitted to view an unredacted version of the CM Agreement from CM Energy's counsel,  and received a copy of the unredacted CM Agreement

---

[130]   CPHB, ¶ 92.

[131]   *Id.*

[132]   CPHB, ¶ 93.

[133]   *Id.* at ¶¶ 94 and 95.

[134]   *Id.* at ¶ 99.

[135]   RPHB, pgs. 13 and 14.

from Respondent on 29 May 2017,[136] and it received "all the tax, the backup for the tax, unpaid taxes" and the "indemnity escrow documents."[137] Respondent also denies that Section 5.2(b) applies to Earn-out Payments. However, Respondent asserts that it has not withheld any documentation that "supports (or even refutes) its claims against CM Energy in the parties' pending litigation regarding the Reverse Earn-out Payments claimed by CM Energy because "[d]iscovery in that matter has not yet begun and there are no expert reports or even preliminary expert analysis."[138]

### 3. The Tribunal's Analysis

#### (a) Respondent's Obligation under Section 5.2(b) of the Transaction Agreement

196. Section 5.2(b) of the Transaction Agreement requires Respondent to provide Claimant within ten Business Days upon conclusion of each sales transaction on which Respondent owes Claimant Contingent Payment, "to [Claimant's] satisfaction the sale documents, including Contracts, entered into with the relevant purchaser of coal in full and in accessible format." As Section 5.2 makes clear, the purpose of the provision is to allow Claimant "to readily verify the Value of each relevant sale transaction."

197. Respondent accordingly was required to provide Claimant with the CM Agreement and any other relevant sales documents within ten days of the closing of the CM Agreement (*i.e.*, by 10 February 2017). It is undisputed that Respondent did not provide Claimant with a copy of the CM Agreement by that date. Instead, when Claimant requested Respondent to provide it with a copy of the CM Agreement, Respondent provided Claimant only with a heavily redacted version of the CM Agreement. In doing so, Respondent failed to comply with its obligation under Section 5.2(b), which required Respondent to provide Claimant with a "full" and hence un-redacted copy "in accessible format" by no later than 10 February 2017.

198. Nor did Respondent satisfy its obligations under Section 5.2(b) to provide documents by arranging for Ms. Brank to review the CM Agreement in the offices of counsel for CM Energy in late May 2017. It is uncontested that Ms. Brank was not even allowed to make any copies of the Agreement and that the review took place more than four months after the CM Sale had closed. Respondent failed to provide Claimant with a copy of the CM Agreement in a full and accessible format.

---

[136] SOD, ¶ 27.

[137] Tr. 94:15-17, (Vol. 1) (Respondent's Counsel).

[138] Rejoinder, ¶ 20.

199.	Respondent cannot excuse its failure to comply with Section 5.2(b) by invoking its confidentiality obligations under the CM Agreement. Respondent negotiated the CM Agreement after it had concluded the Transaction Agreement. Respondent was, or at least should have been, aware of its obligations to Claimant under Section 5.2(b) of the Transaction Agreement, in particular considering that Respondent was represented by the same counsel in the negotiations of both the Transaction Agreement and the CM Agreement.[139] Respondent hence should have taken the necessary steps to ensure that it complied with its obligations under Section 5.2 of the Transaction Agreement. This could have been achieved, for example, by including a pertinent exception in the confidentiality clause of the CM Agreement. As a result, Respondent cannot now use the confidentiality agreement in the CM Agreement, that it itself negotiated, as a shield to avoid or excuse its obligations under the Transaction Agreement.

200.	Respondent also did not cure its breach by providing an unredacted copy of the CM Agreement in discovery in this Arbitration and in response to a subpoena by a US federal court in aid of this Arbitration. Compliance with a discovery order or a subpoena is not compliance with the Transaction Agreement. Claimant should not be required to commence arbitration in order to gain access to a document to which it was entitled under the Transaction Agreement within ten business days after closing of the CM Sale.

201.	The Tribunal accordingly concludes that by failing to provide Claimant with a full and unredacted copy of the CM Agreement by 10 February 2017, Respondent materially breached Section 5.2(b) of the Transaction Agreement.

**(b)	Respondent's Obligation under Section 5.2(a) of the Transaction Agreement**

202.	Section 5.2(a) of the CM Agreement requires Respondent to provide "upon reasonable notice" Claimant with "reasonable access to the properties, Books and Records and Contracts of the Purchase Companies" and to "make available promptly to [Claimant] all information concerning the operations of the Purchased Companies as [Claimant] may reasonably request to ensure [Respondent's] compliance with its obligations to effect the Deferred Royalty Payments and Contingent Payments."

203.	Respondent provided Claimant with Royalty Reports that purport to show the volume of sale of tons of coal per month and the royalties due.[140] Claimant made several requests to Respondent to receive the information underlying these reports that would have allowed it to confirm the number of tons of coal

---

[139]	Tr. 168:8-15, (Vol.1) (Brank); 215:20-25, (Vol. 1) (Justice).

[140]	See, e.g., Bluestone Royalty Report dated 12 April 2019, Ex. C-29; Bluestone Royalty Report through 05-2019, Ex. R-13.

that were extracted.[141]  For example, in its 7 July 2017 letter, Claimant pointed out that it had been denied Respondent's records to confirm, among other things, "the accuracy of past payments" although "such a request has been made repeatedly by Caroleng directly or through its counsel."[142]

204. Claimant's request for information that would have allowed it to verify the annual volume of coal sold was reasonable because it would have allowed Claimant to satisfy itself that Respondent complied with its obligation under Section 2.3 of the Transaction Agreement to make the Deferred Royalty Payments.

205. In support of its assertion that the Reverse Earn-out Payments demanded by CM Energy should be deducted from the CM Purchase Price, Respondent provided Claimant with the Reverse-Earn out Payment assessments of CM Energy and Respondent's notices objecting to these payments.[143]  Given that Respondent opposed the Reverse Earn-out Payments and challenged them before Delaware courts, Claimant requested Respondent to provide it with the information necessary to evidence Respondent's own calculations of the Earn-out Payments, such as internal calculations.[144]  The Tribunal believes that this request was reasonable, in particular in light of Respondent's position that the Reverse-Earn out Payments should be deducted from the CM Purchase Price.

206. Respondent does not explain on what grounds it asserts that Section 5.2(a) does not apply to Earn-out Payments.  Section 5.2(a) entitled Claimant to access information that would allow it to ensure Respondent's compliance with its obligation to make Contingent Payments.  Respondent does not dispute that Contingent Payments are due on Earn-out Payments.  Hence, Section 5.2(a) entitled Claimant to request information regarding Respondent's own calculation of such Earn-out Payments.  The Tribunal also does not see the relevance of the fact that discovery in the Delaware proceedings has not yet begun given that Claimant was seeking access to Respondent's own internal calculations, which already are in Respondent's possession.

207. Finally, Claimant requested Respondent to produce documents necessary to validate Respondent's claimed deductions to the CM Purchase Price.[145]  This request, too, was reasonable because it would have allowed Claimant to verify

[141]  Tr. 383:4-11, (Vol. 2) (Sklyarov).

[142]  Letter from Joshua D.N. Hess (Counsel for Caroleng) to James C. Justice III (Bluestone) dated 7 July 2017, Ex. C-6.

[143]  CM Energy Earn Out statements and Objection letters, Ex. R-23.

[144]  SOC ¶¶ 76, 134.

[145]  Letter from Joshua D.N. Hess to James C. Justice III dated 7 July 2017, C-6;  Letter from Joshua D.N. Hess to James C. Justice III dated 12 October 2017, Ex. C-7.

the basis for Respondent's claimed deductions, if any. Respondent did not comply with that request.[146] As the Tribunal already observed above, the fact that Respondent provided some of these documents in discovery, after Claimant initiated this Arbitration, does not excuse Respondent's failure to comply with its obligations under Section 5.2(a). Moreover, as is apparent from the Tribunal's findings in other parts of this Award, even in this Arbitration, Respondent has failed to provide many of the key documents in support of its claimed deductions.

208. The Tribunal accordingly concludes that by failing to promptly provide Claimant with the documents it requested regarding the Royalty Payments, Earn-out Payments and Contingent Payments, Respondent has materially breached Section 5.2(a) of the Transaction Agreement.

209. In its Statement of Claim, Claimant requested the Tribunal render an award "requiring Bluestone to immediately provide its internal calculations of Deferred Royalty Payments and Earn-out Payments."[147] The Tribunal observes that in the course of the proceedings, Claimant abandoned the request for production of Respondent's internal calculations. In its Post-hearing Submissions, Claimant instead requested damages for Respondent's failure to provide the internal calculations and other documents in breach of Section 5.2 of the Transaction Agreement.[148] The Tribunal will address Claimant's request in Section IV.I below.

## E. DEFERRED ROYALTY PAYMENTS

### 1. Claimant's Arguments

210. Claimant asserts that Respondent has not disputed it has withheld Royalty payments in an amount of at least $2,075,227.82. If Respondent withheld these payments because it "believes that it can deduct Deferred Royalty Payments from amounts Respondent claims Caroleng owes it," then that would be nothing more than a setoff, which is not permitted pursuant to Section 9.3 of the Transaction Agreement. Otherwise, that "is nothing less than an admission of breach for which Caroleng is entitled to compensation."[149]

---

[146] Letter from Joshua D.N. Hess to Stephen W. and Thomas W. Ashton dated 20 March 2019, Ex. C26 at pg. 1.

[147] SOC, ¶ 153F.

[148] CPHB, ¶ 99.

[149] CPHB, ¶ 36.

### 2. Respondent's Arguments

211. In its SOD, Respondent asserted that it was entitled to withhold the deferred Royalty Payments of $2,075,228. In Respondent's view, "the equities simply favor Bluestone's decision to withhold Deferred Royalty Payments until such time as this Tribunal determines whether they are owed to Caroleng." In its Rejoinder, Respondent asserted that the Deferred Royalty Payments "should ultimately be credited back to Caroleng," a position that counsel for Respondent reiterated at the Merits Hearing.[150]

### 3. The Tribunal's Analysis

212. There is no dispute that Respondent owes Claimant at least $2,075,228 in Deferred Royalty Payments pursuant to Section 2.3 of the Transaction Agreement. The Parties disagree on whether Respondent was entitled to withhold these payments and credit them against the amounts that it has claimed Claimant owes.

213. Section 2.3 of the Transaction Agreement provides that Royalty payments must be paid "on an accumulated basis on the 10th Business Day of each calendar month." Section 9.13 of the Transaction Agreement provides that "there shall be no right to setoff or counterclaim with respect to any claim, debt or obligation, against payments to any of Buyer or Seller or their respective Affiliates under this Agreement." The Transaction Agreement further provides that "any and all payments made to [Claimant] under this Agreement (including pursuant to Article II) shall be made free and clear of any deduction or withholding unless otherwise required by law."[151]

214. Section 9.13 expressly prohibits Respondent from withholding any payments owed to Claimant. Consequently, Respondent was under an obligation to pay the Deferred Royalty Payments on the tenth Business Day of each calendar month. By failing to timely pay Claimant the Deferred Royalty Payments, Respondent materially breached Section 2.3 of the Transaction Agreement.

### F. THE PARDEE LEASE DEDUCTION

215. The Parties further dispute whether Respondent is entitled to a deduction to the CM Purchase Price with regard to the value of the Pardee Lease. The area referred to as the "Pardee Lease" is a property owned by Pardee that is located in Wyoming County, West Virginia. It is contiguous to the coal reserves area that Claimant transferred to Respondent under the Transaction Agreement (the "**Transaction Area**") and is located to its north-east.

---

[150] Rejoinder, ¶ 37; Tr. 408:1-11 (Vol. 2) (Sklyarov).

[151] Transaction Agreement, Ex. C-1, § 9.13.

## 1. Background

216. It is undisputed that the Pardee Lease did not form part of the assets transferred from Claimant to Respondent under the Transaction Agreement. Instead, Respondent (through its affiliate Dynamic) entered into the Pardee Lease with effect of 1 January 2016. The Pardee Lease granted Respondent the right to mine coal on approximately 4,178 acres owned by Pardee. The Pardee Lease was subject to a number of stringent conditions. For example, under the Pardee Lease Respondent was obligated to start mining operations by 1 June 2017 and to produce certain minimum tonnage of coal ranging from 250,000 to 500,000 ton per year. Respondent agreed to pay Pardee royalties in the amount of 5%-7% of the gross selling price of the coal mined; and to make certain minimum monthly rental payments. The Pardee Lease also granted Pardee a right of termination or non-renewal if Respondent failed to comply with the Pardee Lease requirements. At the time of the CM Sale, Respondent had yet to begin mining operations and did not yet have a permit to do so.

217. It is also undisputed that, as part of the CM Sale, CM Energy entered into the CM Pardee Lease with Pardee covering the same area. However, because Respondent retained underground mining rights for a coal seam known as the "**Gilbert Seam**," the CM Pardee Lease was limited to the seams located above the top split of the Gilbert Seam. Respondent, in turn, agreed to provide CM Energy with a partial release of the Pardee Lease with regard to the seams above the top split of the Gilbert Seam.[152]

218. At the Merits Hearing, Respondent's witness Mr. Justice testified that the Pardee Lease was an important focal point in the negotiations with CM Energy. He explained that CM Energy was looking for a 15-20 year mining plan. The reserves within the Transaction Area would have allowed CM Energy to mine coal only for "an additional seven or eight years." CM Energy "would not have bought the operation if we could only demonstrate … a seven or eight-year mine plan."[153] The addition of the Pardee Lease would allow CM Energy to continue its mining operations for the remainder of the 15 or 20 year mining plan. Mr. Justice testified that, as a result, "it was an all or none deal. If Pardee wasn't in the mix, they wouldn't have done the deal."[154]

219. As the history of the pay-out calculations in Section III.E. above shows, Respondent did not initially claim a deduction for the Pardee Lease. Respondent first claimed a deduction for the Pardee Lease on 19 February 2019—more than two years after the CM Sale. In its 19 February 2019 letter,

---

[152] Execution Version of Deed of Lease with Exhibits, pg. 3.

[153] Tr. 227:7-11, (Vol. 1) (Justice).

[154] Tr. 300:2-3, 4-11, (Vol. 2) (Justice).

Respondent asserted that it was entitled to a $31,226,791.37 deduction to account for the value of the Pardee Lease transaction.

220. Respondent subsequently revised the amount of the deduction to $26,343,589.43 in its 19 March 2019 letter and in its SOD. In its Rejoinder, and at the Merits Hearing, Respondent claimed a deduction of $41,414,300.65 for the Pardee Lease, which it based on Mr. Kostic's expert report.[155]

221. Claimant disputes that Respondent is entitled to any deduction for the Pardee Lease. Claimant argues, among other things, that: (a) Respondent acquired the Pardee Lease for $1 and cannot explain what additional value it added to the Pardee Lease so that CM Energy would pay in excess of $41 million for it; (b) the valuation determined by Respondent's expert, Mr. Kostic, is entitled to little credibility because Mr. Kostic (i) has demonstrated his bias against Claimant, (ii) did not provide a valuation analysis that considered economic factors, and (iii) based his conclusions on assumptions and facts that are not in evidence and are contradicted by an existing independent reserve study; and (c) Respondent's failure to seek a deduction for the value of the Pardee Lease for over two years after the CM Sale undermines its assertion that the Pardee Lease was a significant portion of the Value conveyed in the CM Sale.

## 2. The Tribunal's Analysis

### (a) The Pardee Lease Was Part of the Assets Purchased by CM Energy

222. The Pardee Lease was part of the assets that CM Energy purchased under the CM Agreement. Section 2.1 of the CM Agreement contains a broad definition of the assets sold. These include all of Respondent's "right, title and interest in, to and under all of the assets, properties, and rights of every kind and nature, whether real, personal or mixed, tangible or intangible, wherever located and whether now existing or hereafter acquired, which relate to, or are used or held for use in connection with, the Business" except for certain defined excluded Assets.

223. The sold Assets included all "Real Property and Leased Real Property" and "all right, title and interest" of Respondent "now or hereafter existing, in, to, and under all Leases." The Leased Property and leases expressly includes the Pardee Lease (dated 1 January 2016).[156] Likewise, the map attached as Annex A to Section 2.1(a) shows the Pardee Lease area.

224. That CM Energy entered into the CM Pardee Lease and paid Pardee consideration, instead of having the existing Pardee Lease assigned to it, does not alter the fact that the Pardee Lease was an asset transferred under the CM

---

[155] Rejoinder, pg. 11.

[156] Seller Disclosure Schedule, Sections 2.1 and 2.3; Section 3.14(a).

Agreement. As is apparent from the Preamble of the CM Pardee Lease, Respondent delivered to Pardee a partial release of the Pardee Lease, by which it "release[d] and surrender[ed] all of its interests" under the Pardee Lease with regard to the coal seams "above the top split of the Gilbert Seam."[157] By releasing its rights under the Pardee Lease to mine the surface seams, Respondent enabled CM Energy to enter into the CM Pardee Lease and assume the rights to mine the surface seams. Respondent thus effectively transferred its "rights, title and interest" with regard to the surface seams within the Pardee Lease area to CM Energy.

### (b) Claimant's Argument that the Record Shows the Value of the Pardee Lease Was Inconsequential

225.   Claimant has argued that the available record contradicts Respondent's assertion that the Pardee Lease was the most important part of the CM Sale. Claimant asserts that, instead, the record shows that the value of the Pardee Lease that Respondent transferred to CM Energy was inconsequential because (i) Respondent paid as consideration only $1 and cannot point to any additional value it added to the Pardee Lease;[158] (ii) CM Energy needed to negotiate with Pardee an extension for the commencement date of the mining operation and make significant payments to Pardee for that extension;[159] and (iii) substantive negotiations regarding the Pardee Lease did not occur until the week of the closing.

226.   The Tribunal is not persuaded that these facts provide evidence of the value of the Pardee Lease sufficient to give an indication as to whether the value transferred was inconsequential or significant.

227.   *First*, the Tribunal disagrees with Claimant that the $1 in compensation paid by Respondent to obtain the lease reflects the Pardee Lease's value or indicates that the value of the Pardee Lease was insignificant. As the terms of the Pardee Lease make clear, Pardee's compensation for granting Respondent rights to mine over 4,000 acres of its land under certain conditions was not limited to the $1 it received from Respondent when the Lease was executed. Instead, Respondent was obligated to pay Pardee minimum rental payments, payments to extend the commencement date for the mining, and significant royalty payments on any coal mined.

228.   *Second*, the fact that at the time of the CM Sale, Respondent was unable to meet the commencement date for mining operations within the Pardee Lease area, and that, as a result, CM Energy needed to negotiate with Pardee an extension for the commencement date and make significant payments to

---

[157]   CM Pardee Lease shared by Respondent on 14 October 2019.

[158]   CPHB, ¶ 49; Tr. 28:11-13, (Vol. 1) (Claimant's Counsel).

[159]   CPHB, ¶ 49.

Pardee for that extension,[160] is in the Tribunal's view not sufficient support for the proposition that Respondent "had very little to offer CM with respect to the Pardee Lease." It is reasonable to assume that CM Energy would not have made the extension payment if it believed that Pardee had no value or only insignificant value to it. The fact that the extension payment was made by CM Energy instead of Respondent may have impacted the value that CM Energy allocated to the Pardee Lease at the time of the CM Sale. However, the extension payment is not sufficient evidence that CM Energy allocated no value or only insignificant value to the Pardee Lease.

229. *Third*, the Tribunal is also not persuaded that the Pardee Lease was discussed only at the tail end of the negotiations suggests that it conveyed limited additional value from Respondent.[161] Mr. Justice testified that Respondent informed CM Energy of the existence of the Pardee Lease at the time negotiations started in March or April of 2016[162] and that CM Energy received the Pardee Lease document "probably [in] the fall of 2016."[163]

230. Claimant correctly points out that the limited number of email exchanges in the record shows that Bluestone, CM Energy and Pardee engaged in substantive negotiations over the terms of a renewed Pardee Lease during the final ten days of the negotiations.[164] The email exchanges make clear that CM Energy was concerned that it would not obtain mining rights at Pardee. For example, in a 20 January 2017 email, CM Energy pointed out that the Pardee Lease had a minimum annual tonnage requirement for the year 2017, although Respondent did not yet have a mining permit for the Pardee reserves. CM Energy was concerned that "this would seem to put the lease in serious jeopardy of getting cancelled in the short term" and alerted Respondent that this was "clearly a problem for us."[165] Moreover, as Claimant recognizes,[166]

---

[160] *Id.*

[161] SOC, ¶ 109; Reply, ¶ 24; Tr. 29:1-4, (Vol. 1) (Claimant's Counsel).

[162] Tr. 312:4-7 (Vol. 2) (Justice).

[163] Tr. 312:7-10 (Vol. 2) (Justice)

[164] CPHB, ¶ 40; Email from Stephen W. Ball to Rahman D'Argenio and James C. Justice III dated 20 January 2017, Ex. C-47; Email and attachment from Stephen W. Ball to Rahman D'Argenio dated 20 January 2017, Ex. C-48; Email from Andrew D. Walker to Stephen W. Ball dated 16 January 2017, Ex. C-49; Email from James C. Justice III to Rahman D'Argenio dated 19 January 2017, Ex. C-50; Email from James C. Justice III to Rahman D'Argenio dated 24 January 2017, Ex. C-51; Email from Andrew D. Walker and J. Thomas Lane dated 27 January 2017, Ex. C-52.

[165] Email from Stephen W. Ball to Rahman D'Argenio and James C. Justice III dated 20 January 2017, Ex. C-47.

[166] CPHB, ¶ 41.

the email exchanges also show that the execution of the new Pardee Lease was a condition for the closing of the CM Sale.[167]

231. The email exchanges accordingly confirm that the Pardee Lease had at least some value to CM Energy, although they do not provide any indication of what that value was.

### (c) The Allocation of the Purchase Price under Section 2.11 of the CM Agreement

232. The Tribunal is required to determine what part of the CM Purchase Price, if any, Respondent and CM Energy allocated to the Pardee Lease. The allocation of the Purchase Price has been addressed by the parties to the CM Agreement. Section 2.11 of the CM Agreement required CM Energy to deliver to Respondent within sixty days following Closing "a schedule reasonably acceptable to Seller setting forth the allocation of the Purchase Price (and all other capitalized costs) among the Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (any similar provision of state, local, or non-U.S. Law, as appropriate)." The parties further agreed that CM Energy and Respondent "and their respective Affiliates shall report, act and file Tax Returns … in all respects and for all Tax purposes consistent with the final Purchase Price allocation."

233. Purchase price allocations, such as that required under Section 2.11 of the CM Agreement, are common in sale and purchase transactions. As Claimant's expert Mr. Lee testified, "under U.S. accounting rules and under most international accounting rules," when "one company buys another, you are required to value all of the underlying assets and liabilities that have been acquired and put them on your opening balance sheet a fair value."[168]

234. In the Tribunal's view, the Parties' contemporaneous allocation of the purchase price among the assets acquired under the CM Sale would be cogent evidence of the value that the Parties allocated to the Pardee Lease at the time of the transaction. However, at the Merits Hearing, Mr. Justice testified that CM Energy had "never done" the allocation required under Section 2.11 of the CM Agreement.[169] He also did not recall whether Respondent ever requested CM Energy to do the allocation.[170] Mr. Justice added that "we obviously

---

[167] Email from J. Justice to R. D'Argenio of CM Energy of 19 January 2017, Ex. C-50 ("Pardee will get done tomorrow. I think we should direct our respective lawyers that we want everything A to Z finished and completed tomorrow. So that when we receive the EPA letter on Monday we can close. Agree?") Email dated 24 January 2017 from J. Justice to R. D'Argenio, Ex. C-51 ("Let's get the NRP, and Pardee docs cleaned up this evening and executed. So we can close this thing out tomorrow.")

[168] Tr. 661:20-25, (Vol. 3) (Lee).

[169] Tr. 211:25 to 212:3, (Vol. 1) (Justice).

[170] Tr. 214:8-15, (Vol. 1) (Justice).

have had to make our filings,"[171] and testified that "our audit firm has done their own allocation after the fact."[172] He further pointed out, "Bluestone is audited every year and we follow GAAP procedures. So I am sure that it had been done at some point."[173]

235. The Tribunal accordingly requested Respondent to produce the tax and accounting documents showing Respondent's and CM Energy's allocation of the purchase price. In response to the Tribunal's request, Respondent submitted, "the allocation submitted to the IRS by CM Energy" pursuant to IRS Form 8594. In a letter of 14 October 2019, Respondent asserts that it had obtained that form from the owners of CM Energy, Energy Capital Partners. CM Energy's IRS filing identifies a sale price of $129,302,891, which Respondent submits includes "the Coal Mountain preparation plant, Coal Mountain mining operations (both the Pardee and Transaction Area, and the Justice and Mechel Equipment), as well as some anticipated future earnout payments."[174] However, CM Energy's IRS filing does not identify any assets, and hence does also not include any allocation of the $129,302,891 sales price among assets.

236. The Tribunal observes that Respondent did not provide its own IRS Form 8594 related to the CM Sale. Respondent instead submitted what it asserted were "workpapers" of Bluestone's outside auditors (Hess Stewart & Campbell) related to the CM Purchase Transaction. Those workpapers consist of a single page document that is undated. The document shows deductions from the Purchase Price of $18,953,996.24 for Mineral Rights & Reserves; $2,371.111.46 for Machinery & Equipment; $3,047,990.13 for Mine Development Costs and $174,934.13 for asset retirement costs.

237. In its 15 October 2019 letter to the Tribunal, Respondent asserted that it "consider[s]" the remaining $58,266,947.33 "to be Pardee and the Justice owned equipment." The Tribunal notes that Respondent has not provided any particulars and evidence in support of its assertion. For example, Respondent did not explain why the deduction of $18,953,996.24 for "Mineral Rights & Reserves" did not include the right to mine Pardee, why the workpapers did not state that the remaining amount of $58,266,947.33 represented the Pardee Lease and the Justice Equipment, or how the $58,266,947.33 were allocated between the Pardee Lease and the Justice Equipment. The Tribunal is hence not persuaded by Respondent's wholly-unsupported assertion. If anything, the workpapers undermine Respondent's position as to the value of the Pardee

---

[171] Tr. 211:20-21 (Vol. 1) (Justice).

[172] Tr. 212:3 (Vol. 1) (Justice).

[173] Tr. 212:23 to 213:1 (Vol. 1) (Justice).

[174] Letter sent by Respondent to Tribunal dated 14 October 2019.

Lease as the total amount deducted for "Mineral Rights & Reserve" is substantially lower that Respondent's valuation of the Pardee Lease.

### (d) The Marshall Miller, Norwest and KPMG Reports Prepared for the CM Sale

238. At the Merits Hearing, Mr. Justice testified that in 2016, CM Energy requested Respondent to engage Marshall Miller and the engineering firm Norwest to prepare "independent reports" regarding the reserves in the Transaction Area and at Pardee.[175] In addition, CM Energy engaged KPMG to prepare an economic analysis. According to Mr. Justice, these reports were prepared "probably between about May and October of [20]16."[176] The reports "evaluated the economic viability" such as the "stripping ratio, haul distance" and the "physical tons-in-place."[177] Respondent and CM Energy shared the costs for the Marshall Miller and Norwest reports in equal parts.

239. The Tribunal notes that these reports would have provided important contemporaneous evidence as CM Energy would have relied on these reports in assessing and allocating the value of the Pardee Lease. However, Respondent did not submit these reports into the record.

240. Mr. Justice testified that Respondent no longer had access to these reports and that CM Energy would not release them.[178] Mr. Justice acknowledged that it "sound[ed] pretty illogical" that Respondent did not have access to the Marshall Miller and the Norwest reports although it had covered half of the costs for the preparation of these reports. Mr. Justice testified that CM Energy had insisted that Respondent waive its rights.[179] Mr. Justice also testified that "had we known we were going to be in this situation, we would have fought harder to retain the data."[180] However, the Tribunal observes that Mr. Justice should have been aware at that time that the reports would be important documents to determine the amount in Contingent Payments owed to Claimant under the Transaction Agreement.

241. When asked whether he attempted to obtain these documents from CM Energy, Mr. Justice said that he personally had not, but thought Respondent had "tried through different avenues to get those."[181] The Tribunal notes that

---

[175] Tr. 244:8-9, 18; 245:9 (Vol. 1) (Justice).

[176] Tr. 242:20 to 243:1, (Vol. 1) (Justice).

[177] Tr. 247:1-3 (Vol. 1) (Justice).

[178] Tr. 226:2-5 (Vol. 1) (Justice).

[179] Tr. 242:5-8 (Vol. 1) (Justice).

[180] Tr. 242:13-19 (Vol. 1) (Justice).

[181] Tr. 226:6-9 (Vol. 1) (Justice).

Respondent has not submitted any documents into the record that would confirm that Respondent made attempts to obtain copies of these reports for purposes of this Arbitration.

### (e)    The Bluestone Reserve Summary

242.    Instead, Respondent submitted into the record two sets of spreadsheets that purport to compare the tons of coal in-place in the Transaction Area with those in the Pardee Lease Area (the "**Bluestone Reserve Summary**"). As Respondent's expert (Mr. Kostic) explained, "tons of coal in-place" refers to the coal that is in the ground in a given area "without any deduction for mining recovery or preparation plant yield." The Tribunal will refer to the tons of coal in-place by the abbreviation "**TIP**" that is used in the Bluestone Reserve Summary.

243.    The spreadsheets comprising the Bluestone Reserve Summary do not identify its author, do not explain the purpose for which it was prepared, do not contain any narrative, and do not include any of the underlying data or calculations. One of the spreadsheets is dated 15 February 2016, which would indicate that the document was prepared almost a year before the CM Sale. At the Merits Hearing, Mr. Justice testified that the Bluestone Reserve Summary was based on "an internal calculation from our engineering department." He acknowledged that the calculation was "not fully vetted," at least until Respondent submitted Dr. Kostic's expert report in this Arbitration.[182] Mr. Justice also stated that the engineer who had prepared the Bluestone Reserve Summary was no longer with the company.[183]

244.    For the Transaction Area, the Bluestone Reserve Summary identifies: (i) 2,506,773 permitted TIP for the "CM Surface Mine;" (ii) a total of 7,692,461 TIP within the "Bens Creek" area subject to a permit application; and (iii) 17,444,419 permitted TIP for the "McDonald Fork" area.

245.    The Bluestone Reserve Summary identifies as a source for the TIP estimate of the CM Surface Mine and the Bens Creek area a "2009 Weir Report, JORC/SEC Report." Mr. Kostic, who is the CEO of Weir International, testified that no such "Weir Report 2009" existed. Instead, he stated that the Weir report of the relevant area was dated 30 June 2008 and subsequently updated in 2010.[184] Neither the 2008 Weir Report, nor the 2010 update to the Weir Report, were submitted into the record.

246.    The Bluestone Reserve Summary further states that the 17,444,419 TIP estimate for the "McDonald Fork" area was based on an "internal estimate."

---

[182]  Tr. 232:7-8 (Vol. 1) (Justice).

[183]  Tr. 234:3-7 (Vol. 1) (Justice).

[184]  Tr. 422:13-28 (Vol. 2) (Kostic).

Mr. Justice testified that he was sure the internal estimates were written down "in some form" but he did not "know exactly what the form is."[185] The Tribunal notes that Respondent did not submit the underlying data, in whatever form they were written down, into the record.

247. For the Pardee Area, the Bluestone Reserve Summary identifies (i) 3,474,945 TIP that were subject to a permit application, and (ii) an additional 25,788,237 TIP that were also subject to a permit application. The Bluestone Reserve Summary identifies as source for the 3,474,945 TIP as the Geological Reserve Evaluation of the Big Huff, George, Pardee Land, Reedy and Wittenberg Tracts of Pardee Resources Company Located in Wyoming County, West Virginia dated October 2013 prepared by Cardno MM&A ("**2013 Cardno SEC Report**").[186] The Tribunal observes that Respondent did in fact submit the 2013 Cardno SEC Report into the record, although certain of the maps and all the exhibits were omitted. However, an additional 25,788,237 TIP is again based on an "internal estimate" for which Respondent has not submitted any other underlying data.

248. The Tribunal also observes that Respondent itself has been inconsistent in interpreting the data contained in the Bluestone Reserve Summary when it determined the allocation of the Pardee Lease value. Mr. Justice testified that he relied on the Bluestone Reserve Summary when he informed Claimant in his 19 February 2019 letter that "48.6% of the reserve base sold to CM was acquired from Pardee."[187] It is not clear to the Tribunal how Mr. Justice arrived at that amount. A comparison of the surface mineable TIP identified in the spreadsheets as "permitted" or for which a permit was "in progress," in fact shows that 48.6% of the tons-in-place were in the Transaction Area and 51.4% in the Pardee area.

249. Two weeks later, in its 7 March 2019 letter, Respondent increased the allocation of the Pardee area, stating that 59% of the "reserves" were on the Pardee Lease and 41% in the Transaction Area. Respondent again appears to have relied on the Bluestone Reserve Summary, but this time compared the total amount of the estimated surface TIPs in the Transaction Area with the total amount of the estimated surface TIPs within the Pardee Lease area, regardless of whether the TIPs were permitted, subject to a permit application or not permitted at all.

250. The Tribunal concludes that the Bluestone Reserve Summary is not sufficiently reliable to serve as a starting point, let alone as the basis for determining the value of the Pardee Lease. *First*, Mr. Justice himself testified

---

[185] Tr. 233:14-17 (Vol. 1) (Justice).

[186] Cardno Report, Ex. DNK-2.

[187] Tr. 232:2 to 233:10 (Vol. 1) (Justice).

that the Reserve Summary was "not fully vetted."[188] CM Energy also seemingly did not rely on it, requesting instead Marshall Miller and the engineering firm Norwest to prepare "independent reports."

251. *Second*, Respondent has not submitted any supporting documents or data underlying the internal estimates, nor has it provided copies of the 2008 and 2010 Weir Reports or any explanation as to the methodology used to determine the estimates. The Tribunal has reason to believe that such documents exist, as Mr. Justice himself testified that he was sure that data underlying the Reserve Summary existed "in some form", and Respondent's expert Mr. Kostic testified that an "investigation with Bluestone in their files" yielded "long-range mining plans of the Pardee area."[189]

252. *Third*, Respondent has not presented any testimony from a witness who was involved in the preparation of the Bluestone Reserve Summary. Respondent's only fact witness, Mr. Justice, testified that he was not involved in the preparation of the Summary.

253. Without the benefit of the underlying data, or a fact witness who prepared or at least was involved in the preparation of the Bluestone Reserve Summary, neither Claimant, nor the Tribunal, were in a position to ascertain, let alone test, the methodologies with which the Summary was prepared and reach a conclusion as to the accuracy, or even the reasonableness, of Respondent's internal estimates.

(f)     **Mr. Kostic's Expert Report**

254. Respondent instead submitted an expert report by Mr. Kostic of Weir International to determine the reasonableness of the Bluestone Reserve Summary. While Mr. Kostic concluded that the Bluestone Reserve Summary was "reasonable," the numbers he arrived at suggest otherwise. Mr. Kostic determined that the TIP in the Transaction Area were 26,855,760, that is 17,444,419 TIP lower than in the Bluestone Reserve Summary, and the TIP in the Pardee Lease were 48,699,324, that is 12,890,413 TIP higher than in the Bluestone Reserve Summary. Mr. Kostic determined that only 35.53% of the TIP were in the Transaction Area and 64.46% in the Pardee Area.

(1)     **Mr. Kostic's Analysis**

255. Respondent gave Mr. Kostic two instructions: (i) "to determine the reasonableness of Bluestone's estimate of total coal tons in-place with the Pardee Lease" set forth in the Bluestone Reserve Summary and (ii) to provide

---

[188] Tr. 232:7-8 (Vol. 1) (Justice).

[189] Tr. 419:15-20 (Vol. 2) (Kostic).

his "professional opinion on the reasonableness of Bluestone's estimate of value for the Pardee Lease."[190]

256. *First*, to determine the reasonableness of the Bluestone Reserve Summary's estimate of TIP within the Pardee Lease area, Mr. Kostic summed up the TIP for each seam within the Pardee Lease. Mr. Kostic described his analysis as follows: he (i) obtained the Pardee Lease boundaries and drill hole data; (ii) "loaded the 2013 Cardno SEC Report seam maps into Minescape software;" (iii) verified the mining areas identified on the Bluestone Reserve Summary "based on the seam outcrops and previous mining shown on the 2013 Cardno SEC Report seam maps;" (iv) created "coal tonnage polygons" and estimated "acres for the mineable portions of the coal seams within the Pardee Lease."

257. Mr. Kostic further testified that, to calculate the TIP for each seam within the Pardee Lease, he multiplied the estimated coal seam acres by "Bluestone's average coal thickness" and subsequently by a coal density factor of 1,742 tons, which he opined was "the same density used by Bluestone and is considered an industry standard coal density relating to metallurgical coal seams in the Central Appalachian Basin." He then summed up the TIP for each seam and determined that the total TIP within the Pardee Lease was 48,699,324 million tons.[191]

258. Mr. Kostic testified that he also reviewed the mineable coal seams remaining in the Transaction Area at the time of the CM Sale. He (i) totaled the "in-place reserves and resources for mountain top, contour and highwall miner mining" from the 2010 update of the 2008 Weir Report; (ii) reviewed coal production data from the Mine Safety and Health Administration ("**MSHA**") data system for the Coal Mountain No.1 Surface Mine (MSHA ID No. 46-09062) from the second half of 2008 through 2016; and (iii) determined on the basis of the MSHA data that there remained 26,855,760 TIP in the Transaction Area.

259. *Second*, to determine the reasonableness of Respondent's estimate of value for the Pardee Lease, Mr. Kostic multiplied the 64.46% of TIP in the Pardee Area with what he called the "adjusted" sale proceeds of the CM Purchase of $64.243 million, resulting in a value of $41,414,300.65. Mr. Kostic determined the adjustment to the $98.975 million CM Purchase Price by making a series of adjustments in the total amount of $34,722,342.85, which he based on those included in Bluestone's 7 March 2019 letter[192].

---

[190]    Kostic Expert Report, ¶¶ 12-13; Tr. 512:9-12 (Vol. 2) (Kostic).

[191]    Kostic Expert Report, ¶¶ 16-20.

[192]    Letter from Steve Ball to Laura Bank dated 7 March 2019, Ex. R-10.

260.    To rebut the Kostic Expert Report, Claimant submitted an expert report by Mr. Lee of Duff & Phelps.  Claimant instructed Mr. Lee to comment on the Kostic Expert Report and not to perform an independent valuation of the Pardee Lease property.[193]

261.    Mr. Lee criticized that Mr. Kostic's "conclusion of the Pardee Lease value is highly reliant on the assumptions and information provided by Bluestone."  He stated that Mr. Kostic "undertook no review or critical analysis of the assumptions and information provided by Bluestone, despite the presence of contradictory information."[194]  Instead, Mr. Kostic "accepts the Bluestone tonnage estimates of the Mechel property without any verification or investigation" and failed to consider or investigate "any potential inconsistent methodologies or assumptions used by Bluestone in its estimates of the Mechel Property tons in-place."[195]  Mr. Kostic also "undertook no review or critical analysis of approximately 20% of the tons-in place at the Pardee Lease" suitable for high-wall-mining and contour mining.[196]

262.    Mr. Lee further testified that there was "a lack of supporting analysis or documentation to verify the reasonableness of the Weir conclusion."[197]  For example, there was "no reconciliation between Weir's tons in-place estimate based on the 2013 SEC Cardno Report and the tons in-place contained in the 2013 SEC Cardno Report itself" although there was a material difference between the TIP identified in the 2013 SEC Cardno Report and Mr. Kostic's report.[198]

263.    Finally, Mr. Lee stated that Mr. Kostic did "not attempt to corroborate [the] Pardee Lease valuation conclusions with a market approach or market perspectives from January 2017."[199]  In particular, Mr. Lee takes issue that Mr. Kostic failed to verify or corroborate the $41.4 million value for the Pardee Lease "based on acquisition multiples and trading multiples from transactions or market capitalizations of comparable assets or companies proximate to the valuation date."[200]

---

[193]    Lee Expert Rebuttal Report, ¶ 1.2.

[194]    *Id.* at ¶ 2.1.

[195]    *Id.* at ¶ 4.14.

[196]    *Id.* at ¶ 4.14(b).

[197]    *Id.* at ¶ 2.1.

[198]    *Id.* ¶ 4.16.

[199]    *Id.* at ¶ 2.1.

[200]    *Id.* at ¶ 4.18(a); Tr. 668:14-22 (Vol. 3) (Lee).

264. Mr. Lee further criticized Mr. Kostic's reliance on a TIP comparison without reference or consideration to potential different economics,[201] such as whether the TIP (i) were permitted or still subject to a current or future application for a permit, or (ii) were classified as "reserves" or "resources" in accordance with internationally accepted standards.[202] Mr. Kostic's allocation "completely ignored" the "difference between having cash generated today versus cash generated at some stage in the future."[203] Mr. Lee testified that Mr. Kostic could have used a "cash flow analysis which demonstrated the difference in value between the Mechel tons which are currently producing, generating revenues, and the Pardee Lease tons which don't have a permit, which have not yet been developed, which may need equipment and will be developed at some stage in the future."[204]

### (3) The "Weir Notes"

265. With its Rejoinder, Respondent submitted as an exhibit a document entitled the "Weir Notes." The document provides comments that rebut certain statements that Mr. Lee made in his expert report in response to (a) Mr. Kostic's report on the Pardee Lease, and (b) Mr. Blandford's report on the Justice Equipment.

266. The Tribunal notes that the "Weir Notes" are not signed by Mr. Kostic or Mr. Blandford and they do not identify them as authors. At the Merits Hearing, Mr. Kostic testified that the Weir Notes were drafted by counsel for Respondent on the basis of notes that Weir had submitted.[205] Ninety-nine percent of the Notes reflected the work of Weir with "a word here or a paragraph, or a lead-in" having been added by counsel for Respondent.[206] Mr. Kostic affirmed that he espoused and agreed with anything that counsel for Respondent had added to the Notes.[207] In light of the explanations given by Mr. Kostic at the Merits Hearing, the Tribunal has given careful consideration in its analysis to the statements contained in the Weir Notes.

---

[201] Lee Expert Rebuttal Report, ¶ 4.18; Tr. 666:13-17; 668:6-8 (Vol. 3) (Lee).

[202] *Id.* at ¶ 4.18.

[203] Tr. 669:6-9 (Vol. 3) (Lee).

[204] Tr. 668:23 to 669:5 (Vol. 3) (Lee).

[205] Tr. 442:8-13 (Vol. 2) (Kostic).

[206] Tr. 442:5-11 (Vol. 2) (Kostic).

[207] Tr. 444:2-5 (Vol. 2) (Kostic).

### (4)     The Tribunal's Analysis

267.    Like the Bluestone Reserve Summary, whose reasonableness Mr. Kostic was tasked to examine, Mr. Kostic's analysis is based on a comparison of TIP within the Transaction Area with TIP within the Pardee Lease area.

268.    The Tribunal agrees with Claimant that this analysis ignores important economic drivers of value. In particular, it does not consider important factors, such as (i) when CM Energy would start to mine in the Pardee Lease area, (ii) whether the TIP qualify as reserves under internationally accepted standards, (iii) whether the TIP were already permitted or subject to a pending or future permit application, (iv) what the quality and price of the coal is, (v) what costs would be needed to mine the coal, and (vi) what the risks were that the Pardee Lease would not be renewed or terminated. The Tribunal further finds that Mr. Kostic's analysis of the TIP is not sufficiently reliable because Mr. Kostic has failed to provide most of the documents and data underlying his analysis.

### i.     Consideration of Economic Factors

269.    As Mr. Lee testified, a typical valuation method would be a discounted cash flow analysis, or examination of comparable transactions of similar properties at approximately the time of the valuation. The Tribunal notes that, at the Merits Hearing, Mr. Kostic testified that for other valuations of coal reserves, he would typically perform a discounted cash flow analysis.[208]

270.    A discounted cash flow analysis discounts future cash flows by the time value of money and the weighted cost of capital.[209] As Mr. Justice, who has ample experience in the coal business, testified, "the reserves that you are mining tomorrow are worth the most and the last reserves are worth the least."[210]

271.    It is uncontested that CM Energy would not have mined within the Pardee Lease area immediately after the CM Sale was entered into. Mr. Justice testified that under CM Energy's 15-20 year mine plan,[211] CM Energy would continue to mine the Coal Mountain reserves and then move eastward to the Bens Creek and McDonald Fork area. Mr. Justice further testified that at some point, CM Energy would start mining the western part of the Pardee Lease reserves simultaneously with the McDonald Fork area because the boundary between the McDonald fork and the Pardee Lease areas "coincides

---

[208]    Tr. 475:1-4 (Vol. 2) (Kostic).

[209]    Tr. 475:9-14 (Vol. 2) (Kostic).

[210]    Tr. 248:2-5 (Vol. 1) (Justice).

[211]    Tr. 224:12-14 (Vol. 1) (Justice).

with the top of a mountain"[212] and the most efficient way of mining would be "to mine both sides of the mountain concurrently."[213]

272. Mr. Justice and Mr. Kostic provided inconsistent estimates as to how long it would take CM Energy to start mining coal within the Pardee Lease area. Mr. Justice said that, while he did not know exactly how long it would take CM Energy to reach Pardee, he "guessed" it would be within two to three years of the January 2017 closing of the CM Sale.[214] He testified that "if they are not mining on Pardee, they are very, very close. I would say they are within three months of mining if they are not already on Pardee."[215] Mr. Kostic, in turn, testified that, while he had not seen CM Energy's mine plan, he could estimate on the basis of CM Energy's target of producing 1.6 million tons by 2019 that "it will be four years or five years" or even six or seven years, before CM Energy would start mining the Pardee area."[216]

273. In sum, while it is uncertain when CM Energy would start mining at Pardee Lease—provided it obtains the requisite surface mining permit—both Mr. Justice and Mr. Kostic testified that the Pardee Lease area would not be in production for a number of years after the CM Sale. All other things being equal, the value of future cash flows from mining at Pardee, discounted by time, would thus be lower than the value of cash flows from mining the Transaction Area.

274. The Tribunal next notes that Mr. Kostic based the TIP in the Transaction Area on the 2008 Weir Report, which he testified had been prepared in accordance with the stringent Australasian Code for Reporting of Exploration Results, Mineral Resources and Ore Reserves standard ("**JORC Standard**"), whereas he estimated the TIP in the Pardee Lease Area without regard to the JORC Standard, or any other international standards for the classification of reserves.

275. Mr. Kostic testified that the JORC Standard was "very stringent" as "you can't report a ton if you don't control it" and unless it is "economically mineable.[217] Mr. Kostic acknowledged that his analysis of the Pardee Lease was not performed in accordance with the JORC Standard. In his view, it was not

---

212  Tr. 266:17-22 (Vol. 1) (Justice).

213  Tr. 266:20-21 (Vol. 1) (Justice).

214  Tr. 267:5-10 (Vol. 2) (Justice).

215  Tr. 269:1-8 (Vol. 2) (Justice).

216  Tr. 472:18-19, 474:6-9, 474:19-20, (Vol. 2) (Kostic); Tr. 576:2-12 (Vol. 3) (Kostic).

217  Tr. 572:8-25 (Vol. 3) (Kostic).

necessary for him to adhere to the JORC Standard as "we know that all those tons [at Pardee] are going to be reserves."[218]

276.   The Tribunal is not persuaded that all TIP in Mr. Kostic's analysis would qualify as reserves under JORC Standard. To start with, Mr. Kostic testified that he had not himself prepared or seen any feasibility study for the Pardee Lease area.[219] Mr. Kostic also acknowledged that CM Energy intends to perform further exploration work at Pardee. In fact, Section 15 of the 2017 Pardee Lease requires CM Energy, in advance of the mining operations, to "drill such core holes on the Leased Premises as are reasonably required to fully explore the Seams."

277.   CM Energy also received a prospecting permit for the "Reedy Branch Surface Mine" within the Pardee Lease.[220] Mr. Kostic testified that CM Energy hasn't "started the prospecting yet." He explained that, with the drill data, CM Energy expected to prepare "a geological model to determine, number one, the structure of the coal, the coal seam thickness, so they can determine exactly what type of mining process to do for their mountaintop mining, contour, highwall mining."[221] Finally, to determine whether the TIP qualify as reserves, other factors need to be considered, including mining permits, price and quality of the coal, costs and the risk of lease renewal.

278.   It is undisputed that at the time of the CM Sale, Respondent did not have a permit to mine on the Pardee Lease.[222] Conversely, in the Transaction Area, Respondent had a surface permit to mine the Coal Mountain and the McDonald fork areas[223] and mining operations were already underway.

279.   At the Merits Hearing, Mr. Justice testified that "unequivocally … a permitted ton you have today is going to be worth more than an unpermitted ton" because there was "a risk that you can't get the permit."[224] Mr. Lee likewise opined that "you will simply see higher multiples for tons in the ground for a producing mine than you will for a mine that has never been developed." This

---

[218]   Tr. 467:21-22 (Vol. 3) (Kostic).

[219]   Tr. 481:6-22, 482:7 (Vol. 2) (Kostic); Tr. 558:1-3 (Vol. 3) (Kostic).

[220]   Weir Notes, Ex. R-22 pg. 6.

[221]   Tr. 426:1-7 (Vol. 2) (Kostic).

[222]   Tr. 251:21-24 (Vol. 1) (Justice).

[223]   Tr. 251:15-20 (Vol. 1) (Justice); Weir Notes, Ex. R-22 pg. 6.

[224]   Tr. 250:4-10 (Vol. 1) (Justice); Tr. 262:5-11 (Vol. 2) (Justice).

was so "because of the avoided expense and the nearness of generating cash flow."[225]

280. Mr. Kostic testified that CM Energy had applied for a permit for part of the Pardee Lease area. Specifically, Mr. Kostic testified that CM Energy submitted an application for a surface mine permit ("**Surface Mine Application**" or "**SMA**") for the "Reedy Branch area."[226] Mr. Kostic testified that the prospecting permit covered an area of "only … roughly 500 acres of the total 800 acres or a thousand" of the Pardee Lease.[227] The Tribunal notes that, even if the SMA would be granted, the permit would not cover the whole Pardee Lease area, and CM Energy would need to seek one or more additional permits to mine the remaining part of the Pardee Lease.

281. It is further undisputed that it takes several years to obtain a surface mine permit. Mr. Justice testified that, in his experience, "a detailed permitting timeline takes a long, long time … it takes years and years and years to get a permit."[228] He later clarified that it would take "two or three years" for CM Energy to obtain a surface mine permit for the Pardee Lease area. Mr. Kostic testified that, in his experience, it typically takes between 18 months and two years to receive a permit, but that it might take three years to obtain a permit for a surface mine.[229]

282. The testimony further shows that mining permits are not granted as a matter of course, but that there is at least some risk that a SMA might be denied on environmental or other grounds. For example, an applicant for a surface mine permit in West Virginia must show compliance with provisions related to water quality and water flow. An applicant must submit six months' worth of water quality and groundwater flow data collected before the application is made. It must then continue to sample water quality at a minimum once a month until the surface mine permit is received. The applicant must also establish how, after completion of the mining, the water flow and quality will not change.[230]

283. Moreover, Mr. Justice testified that approximately 20-30% of the rock and soil are deposited in nearby valleys, and the "permitting ability for valley fills has been drastically reduced."[231] Mr. Kostic likewise testified that there is

---

[225] Tr. 706:3-14 (Vol. 3) (Lee).

[226] Tr. 423:20-21, 427:8-17, 428:3-5 (Vol. 2) (Kostic); Tr. 597:3-9 (Vol. 3) (Kostic).

[227] Tr. 424:18-22 (Vol. 2) (Kostic).

[228] Tr. 188:5-8 (Vol. 1) (Justice).

[229] Tr. 470:23 to 471:1 (Vol. 2) (Kostic).

[230] Tr. 419:21-25 (Vol. 2) (Kostic); Tr. 585:23 to 586:9, 587:11-15 (Vol. 3) (Kostic).

[231] Tr. 262:2511-22 (Vol. 2) (Justice).

enhanced scrutiny of surface mine applications because of valley fills. [232] These so-called "valley fills" are "the most costly part of mining and the most rules regulated."[233] They have become "a big issue in the U.S." because of environmental concerns.[234] Since the valley fills cannot cover up any watersheds, they must be "constructed properly" must have "an underdrain" and "no material that is selium producing."[235]

284. Mr. Justice believed, however, that there was not a "big danger" that CM Energy would be denied its SMA because CM Energy could have back-stacked the excess rock and soil from the Pardee Area deposits at the valley fills from the Transaction Area mining.[236] Yet even if Mr. Justice were correct that there was not a "big danger" for CM Energy of having its permit denied because of valley fills, there is at least some risk that the application would be rejected or that CM Energy would have to incur significant costs to satisfy the requirements for an approval.

285. In addition, the Tribunal observes that permits are granted "only for five-year periods," and the applicant must file a permit renewal application.[237] Hence, even if CM Energy obtained a surface mine permit, CM Energy would face at least some risk that the permit renewal might be denied. Mr. Kostic testified that, as long as the applicant follows the rules and was in good standing "there [was] no reason in the world the permit would be denied."[238] While the Tribunal has no reason to doubt the testimony of Mr. Kostic, there remains a risk that CM Energy might not comply with the applicable rules or that more stringent rules are being adopted that might make a permit renewal more difficult and/or costly to obtain.

286. Mr. Kostic's comparison of TIP between the Transaction and the Pardee Lease areas also did not consider differences in the quality of the coal. It is undisputed that in both the Transaction and the Pardee Lease areas there is metallurgical coal ("**Met Coal**") and steam coal. At its most basic, Met Coal has a higher quality than steam coal and can be used for steel making, whereas steam coal is largely used to produce power. As a result, Met Coal commands a higher price than steam coal.[239]

---

[232]  Tr. 473:1-6 (Vol. 2) (Kostic).

[233]  Tr. 588:18-19 (Vol. 3) (Kostic).

[234]  Tr. 588:7-10 (Vol. 3) (Kostic).

[235]  Tr. 588:11-20 (Vol. 3) (Kostic).

[236]  Tr. 262: 22 to 263:4 (Vol. 2) (Justice).

[237]  Tr. 480:15-17 (Vol. 2) (Kostic).

[238]  Tr. 481:2-5 (Vol. 2) (Kostic).

[239]  Tr. 248:13-15 (Vol. 1) (Justice).

287.  Mr. Kostic testified that "all the studies done in the past show that the quality" of coal in the Pardee Lease area "is going to be the same" as in the Transaction Area.[240] The Tribunal notes that Mr. Kostic did not, however, identify these studies, nor did he exhibit the relevant parts of these studies. The only reserve study available to the Tribunal, the 2013 Cardno SEC Report, observes with regard to the Reedy Branch area of the Pardee Lease that data was "typically insufficient to estimate surface mineable quality characteristics." The Report recommends "follow-up exploration" for an "accurate coal quality analysis."[241] As described above, CM Energy applied for an exploration permit, but there is nothing in the record to suggest what exploration work CM Energy has done or what the results of that exploration work were.

288.  Mr. Justice testified that the quality of coal was a "focal point" for CM Energy.[242] As part of their analysis, Marshall Miller and Norwest evaluated "what percentage of steam coal, what percentage of met coal" the reserves of the Transaction Area and those of the Pardee Lease had.[243] The two consulting firms concluded that the ratio between Met Coal and steam coal was 60:40.[244] It is, however, not clear from Mr. Justice's testimony whether that ratio was the same in both the Transaction Area and the Pardee Lease Area.

289.  Nor did Mr. Kostic consider the price of coal in his analysis. The Tribunal notes that Mr. Kostic himself testified that the price of Met Coal fluctuates. For example, while ten years ago, the price had been $300 per ton, at the time the CM Agreement was concluded it was "probably $200 a ton, or a little bit more, $240,"[245] and in 2019 it was hovering in the $150-170 per ton range.[246] On that basis alone, and all other things being equal, a ton of Met Coal that was produced and sold from a Transaction Area in 2017 was worth considerably more than a ton of coal that would have been produced from the Pardee Lease area in 2019. There is also at least some risk that, if coal prices further decrease, it might no longer be economical for CM Energy to produce at least some of the TIP of the Pardee Lease area.

290.  Next, Mr. Kostic's analysis also did not consider the costs and capital investments that were needed to mine the Pardee area. Mr. Justice testified

---

[240]  Tr. 501:24-25 (Vol. 2) (Kostic).

[241]  2013 Cardno SEC Report, ¶ 6.3.2.

[242]  Tr. 225:3-5 (Vol. 1) (Justice).

[243]  Tr. 248:23 to 249:3 (Vol. 1) (Justice).

[244]  Tr. 306:17-20 (Vol. 2) (Justice).

[245]  Tr. 489:5-8 (Vol. 2) (Kostic).

[246]  Tr. 488:9-25 (Vol. 2) (Kostic).

that the costs for the Transaction Area and those for the Pardee Lease Area were essentially the same because the Pardee Lease area was adjacent to the Transaction Area and CM Energy could simply continue operations with the same equipment.[247]  However, he also acknowledged that that obtaining a permit costs "hundreds of thousands of dollars"[248] and that extraction costs might change.[249]

291.    Moreover, the Tribunal observes that CM Energy had to make substantial royalty payments to Pardee under the terms of the CM Pardee Lease, in addition to monthly minimum payments and any payments to extend the Lease.  It is reasonable to assume that CM Energy had also to make royalty and other payments for the McDonald Fork under the Natural Resource Partners ("**NRP**") Lease, but the Tribunal has no means of assessing how these payments differed to those under the CM Pardee Lease because the Tribunal does not have a copy of the NRP Lease.  Mr. Kostic has not considered these payment obligations under both leases in comparing the value of the Pardee Lease with that of the Transaction Area.

292.    In a similar vein, Mr. Kostic's calculation also does not consider the risk that Pardee would terminate or not renew the CM Pardee Lease.  The CM Pardee Lease contains a covenant to mine, in which CM Energy agreed to commence actual mining of coal by 1 June 2017.[250]  To extend the commencement date, CM Energy agreed to make substantial extension payments but the CM Pardee Lease did not contain a right to extend the commencement date beyond June 2019.[251]  The CM Pardee Lease required CM Energy to produce every year in excess of 250,000 tons and, starting 1 January 2021, more than 500,000 tons.[252]  Pardee has the right to terminate the CM Pardee Lease, among other grounds, if CM Energy fails to produce these minimum requirements.[253]  The CM Pardee Lease expires on 1 January 2021 but can be renewed for additional mining periods up to 31 December 2035.[254]

293.    Both parties to the CM Pardee Lease might have commercial incentives to extend the duration of the lease, further extend the commencement date for the

---

[247]  Tr. 308:17 to 309:2 (Vol. 2) (Justice).

[248]  Tr. 262:1-4 (Vol. 2) (Justice).

[249]  Tr. 261:4-5 (Vol. 2) (Justice).

[250]  Execution Version of Deed of Lease, § 14.

[251]  *Id.*

[252]  *Id.*

[253]  Execution Version of Deed of Lease, section 26(c)(8).

[254]  Execution Version of Deed of Lease, pg. 9.

mining operations, or amend the lease's terms. Yet there still remains a risk that Pardee would not agree to do so, for example, if the cash flow generated by the Lease fell short of Pardee's expectations or CM Energy failed to comply with the applicable regulations. Comparable risks might exist with regard to the NRP Lease in the Transaction Area, but again, Mr. Kostic has not considered these risks in comparing the two reserves areas.

### ii. Reliability of the Assessment of TIP

294. The Tribunal further observes that, even without proper consideration of the economic factors discussed above, Mr. Kostic's comparison of TIPs in the Transaction Area and the Pardee Lease area is not sufficiently reliable because Mr. Kostic has failed to provide most of the documents and data underlying his analysis.

295. With regard to the Transaction Area, Mr. Kostic accepted the 26,855,760 TIP identified in the Bluestone Reserve Summary for surface and contour/HWM mining at the "CM Surface Mine" and "Bens Creek" areas. Mr. Kostic explained that he verified that Bluestone accurately portrayed the reserve and resource total of the 2010 Weir Report and then adjusted them on the basis of the MSHA coal production from the second half of 2008 through 2016.[255] However, Mr. Kostic did not provide a copy of the 2010 Weir Report and, except for a summary table of the MSHA data, also none of the data underlying that analysis. Consequently, neither the Claimant nor the Tribunal has been able to test the accuracy of Mr. Kostic's analysis.

296. Mr. Kostic also did not include the 17,444,419 TIP that Respondent had identified in the Bluestone Reserve Summary as belonging to the "McDonald Fork" area. He testified that Respondent had "double-counted" the tons-in-place of the McDonald Fork because the coal in the McDonald Fork area had already been included in Respondent's estimates for the CM Surface Mine and the Bens Creek area.[256]

297. The Tribunal notes that Mr. Kostic has provided two seemingly different explanations on how he reached that conclusion. The Weir Notes explain that Mr. Kostic reviewed the seam and pit in-place tonnages on an excel sheet entitled "Mc Donald Fork Evaluation.xlsx."[257] At the Merits Hearing, Mr. Kostic testified that he used a program called Minescape to re-model the area. In any event, neither the copy of the excel spreadsheet nor the data underlying the re-modeling of the Transaction Area were submitted into the record. The Tribunal has, accordingly, not been able to corroborate Mr. Kostic's testimony.

---

[255] Weir Notes, Ex. R-22 pg. 21.

[256] *Id.* at pg. 10; Tr. 431:8-20 (Vol. 2) (Kostic).

[257] Weir Notes, Ex. R-22.

298. As regards the Pardee Lease, Mr. Kostic determined that there were 48,699,324, TIP which consisted of 39,358,894 TIP based on Mr. Kostic's analysis of the seam maps of the 2013 Cardno SEC Report and an additional 9,340,430 TIP based on "Bluestone's Internal Estimate."

299. The Tribunal observes that Mr. Kostic again did not provide any of the underlying data for his analysis of the 2013 Cardno SEC Report seam maps, which has made it impossible to confirm his analysis. However, it is striking that Mr. Kostic's 39,358,894 TIP based on the 2013 Cardno SEC Report seams are more than eleven times higher than the 3,474,935 TIP that the Bluestone Reserve Summary identified as being based on the 2013 Cardno SEC Report. The 2013 Cardno SEC Report states that Reedy Branch, the area of CM Energy's SMA, had demonstrated reserves of 477,000 tons.

300. At the Merits Hearing, Mr. Kostic explained that this difference was due to the fact that the 2013 Cardno SEC Report "did not recognize mountaintop mining" and instead only considered "contour and basically highwall mining."[258] Mr. Kostic testified that when "we looked at the maps, there were considerable areas that could be mountaintopped and that were not included in the 2013 Cardno SEC Report for whatever reason."[259] As a result, he "added those areas" in his analysis, which resulted in an increase of TIP.[260]

301. The Tribunal observes that it is not apparent from the face of the 2013 SEC Cardno Report that mountaintop mining was not considered. The report states that it examines "surface mineable reserves" as well as "underground mineable resources." It defines "surface mineable criteria" as including "Area mining (MTR, PTR) and Contour Mining" with MTR referring to Mountain Top Removal. The Tribunal has found no suggestion in the text of the Cardno SEC Report that mountaintop removal was excluded. The Tribunal also notes that at the Merits Hearing Mr. Kostic acknowledged that he had not "read the whole [Cardno] report. I just looked at the maps."[261]

302. The Tribunal finds the estimated surface reserves within the Pardee Lease area identified in the 2013 Cardno SEC Report more reliable than Mr. Kostic's calculations. Unlike Mr. Kostic's analysis,[262] the 2013 Cardno SEC Report was prepared in accordance with the United States SEC Industry Guide 7.[263] Mr. Kostic agreed that this was "a well-known, accepted industry standard for

---

[258] Tr. 418:10-13, 419:3-4 (Vol. 2) (Kostic).

[259] Tr. 538:22 to 539:3, 541:11-3, 546:12-14 (Vol. 3) (Kostic).

[260] Tr. 539:4-5 (Vol. 3) (Kostic).

[261] Tr. 595:18-19 (Vol. 3) (Kostic).

[262] Tr. 549:6-8 (Vol. 3) (Kostic).

[263] Tr. 551:18-20 (Vol. 3) (Kostic).

coal reserves in the United States,"[264] which provides that a reserve cannot be reported "unless it is economically mineable at the time of the determination of the reserve."[265]

303.   In addition to the 39,358,894 TIP based on the seam maps of the 2013 Cardno SEC Report, Mr. Kostic included an additional 9,340,430 tons that his report identifies as being based on the "Bluestone Internal Estimate" for HWM and contour mining.  The "Weir Notes" succinctly suggest that an analysis of the 2013 Cardno seam maps showed that there were "sufficient seam thickness data and un-mined areas" for surface and high-wall mining.  But Mr. Kostic did not provide any further analysis nor any of the underlying data.  The Tribunal, therefore, is not persuaded that the Pardee Lease contained these additional 9,340,420 TIP.

304.   Having carefully considered Mr. Kostic's analysis and Respondent's arguments, the Tribunal accordingly concludes that, based on the entirety of the evidence in the record, the Tribunal cannot give any weight to Mr. Kostic's valuation of the Pardee Lease because Mr. Kostic has not considered any economic factors or sufficiently applied any well-accepted valuation methods, and he has failed to support his analysis with the underlying documents and data that would have allowed the Tribunal to test his analysis.

### iii.   Mr. Kostic's Independence

305.   Claimant also asserts that Mr. Kostic's testimony should be subject to "substantial doubt" given "the visceral testimony he gave confirming his bias against Caroleng and its parent, Mechel."[266]

306.   At the Merits Hearing, counsel for Claimant asked Mr. Kostic about his feelings toward Mechel, which had previously sued Mr. Kostic's firm (Weir International), alleging that Weir International had acted in concert with Respondent to inflate the amount of coal reserves in connection with the 2009 transaction by which Mechel purchased Coal Mountain from Respondent. The claims against Weir International in that lawsuit were dismissed without prejudice.  Mr. Kostic replied as follows:

> A. In fact, [the litigation] was a farce.  [Mechel] lied throughout the whole thing.  That was the most disgusting litigation I've been involved in.  And for Mechel to say what they say -- in fact I thought after this was done -- and it may have not been dismissed with prejudice, I was so mad about the whole thing, I was just lucky to get out of this case.  They lied, they made allegations

---

[264]   Tr. 551:11-15 (Vol. 3) (Kostic).

[265]   Tr. 572:21-23 (Vol. 3) (Kostic).

[266]   CPHB ¶¶ 52-55.

against my staff, me personally, against Weir.

In fact I called every single coal company that we worked for at the time, and I said "we are involved in this lawsuit." I called them at that point. These Russians are coming after us and trying to say that we were in cahoots with -- I was so mad, it cost me so much to get out of this lawsuit. I have no respect for that company at all, no respect at all, and I wanted to counter-sue them for libel. . . .

Being in a deposition and hearing what they accused Weir of, me of, and my employees of, was absolutely ridiculous, it was a slander, it's disgusting. And I'm sorry I'm mad, but that cuts into my professional integrity. I didn't like it.

Q. It sounds like you are pretty upset with my client.

A. I am upset, I am upset again now. I was upset then and I am upset now, yes, I am.[267]

307. Mr. Kostic nevertheless insisted that he had "never changed [his] independent position" and that his testimony set forth above "didn't compromise what I said in my report."[268]

308. Claimant further asserted that Mr. Kostic testified that he and his firm have a decades-long relationship with the Justice family and that he had engaged in numerous projects for Respondent and other Justice-affiliated companies since 2008.[269]

309. In light of the Tribunal's finding that it cannot give sufficient weight to Mr. Kostic's valuation for the reasons set forth above, the Tribunal does not find it necessary to decide whether Mr. Kostic demonstrated bias against Claimant or whether his alleged previous relationship with the Justice family has tainted his credibility. The Tribunal would like to emphasize, however, that Mr. Kostic's above statements and his prior work for Respondent have not influenced the Tribunal's findings with regard to the reliability of Mr. Kostic's expert evidence.

(g) **The Timing of Respondent's Claims for a Pardee Lease Deduction**

310. Claimant has repeatedly pointed out that Respondent had not claimed a deduction for the Pardee Lease for over two years after the CM Sale. It was

---

[267]   Tr. 450:10-451:15 (Vol. 3) (Kostic) (emphases added).

[268]   Tr. 451:19-21 (Vol. 2) (Kostic).

[269]   CPHB ¶ 55; Tr. 438:12-439:24 (Vol.2) (Kostic); Tr. 581:1-5, 591:9 to 593:5 (Vol. 3) (Kostic).

only after discussions between the Parties to resolve the dispute had failed that Mr. Justice on behalf of Respondent raised the Pardee Lease deduction for the first time in his 19 February 2019 letter. This was more than two years after the CM Sale had been completed and eight months after this Arbitration had been initiated. Even then, the amount of Respondent's deduction for the value of the Pardee Lease kept changing, from $ 31,226,791.37 in the 19 February 2019 letter, to $26,343,589.43 in its 19 March 2019 letter and the SOD, to $41,414,300.65 in its Rejoinder. Claimant has asserted that the timing at which the Pardee Lease deduction was asserted "seriously calls into question the legitimacy" of the deduction.[270]

311.  Respondent asserted that the failure to deduct the Pardee Lease from the outset was a "huge error" and "mistake" by its outside counsel.[271]  However, Claimant is correct in pointing out that the same people who had taken the lead in negotiating the CM Agreement on behalf of Respondent were also charged with determining the Contingent Payment owed to Claimant. These included not only Respondent's outside counsel,[272] but also Respondent's general counsel[273] who led the discussions and negotiations regarding the Contingent Payments with Claimant and personally represented Respondent in these proceedings.[274]

312.  While the Tribunal cannot discount the possibility that the failure to include a deduction for the Pardee Lease in Respondent's initial determination of the Contingent Payments was an "error" and "mistake," it is reasonable to assume that this error would not have gone unnoticed for over two years if the value of the Pardee Lease had been of the magnitude that Respondent has claimed in these proceedings. Respondent's substantial delay in claiming the deduction is, in the Tribunal's judgment, an additional indication that the Pardee Lease value was not as high as Respondent now asserts.

* * *

313.  Having carefully considered all of the evidence before it in the record and the Parties' arguments, the Tribunal concludes that Respondent has failed to establish the portion of the Purchase Price, if any, that should be attributed to the Pardee Lease. Consequently, the Tribunal holds that Respondent is not entitled to a deduction from the CM Purchase Price for the Pardee Lease.

---

[270]  CPHB, ¶ 43.

[271]  Tr. 72:7 to 73:12 (Vol. 1) (Respondent's Counsel); Tr. 193:2-12, 216:11-14 (Vol. 1) (Justice).

[272]  Tr. 143:21-23, 168:12-14, 179:25 to 180:4, 193:2-12; 215: 15 to 216:4 (Vol. 1) (Justice).

[273]  Tr. 218:24 to 219:3, 220:18-12 (Vol. 1) (Justice).

[274]  Tr. 220:18 to 221:4, 222:15-24 (Vol. 1) (Justice).

## G. THE JUSTICE EQUIPMENT DEDUCTION

314. The Parties further dispute whether Respondent is entitled to a deduction to the CM Purchase Price with regard to the value of the Justice Equipment.

315. It is uncontested that Respondent contributed certain surface mining equipment to the CM Sale that did not form part of the assets transferred by Mechel to Respondent under the Transaction Agreement.[275] In accordance with Respondent's 7 March 2019 letter,[276] the Justice Equipment comprises the following items:

| Equip # | S/N | Description | Value ($) |
|---------|-----|-------------|-----------|
| 399 | 9TC04612 | Caterpillar D8N Lg Track—Type Tractor | 135,000 |
| 2303 | 2YD00498 | Caterpillar D10N Lg Track—Type Tractor | 225,000 |
| 2307 | 3KR01008 | Caterpillar DIOR Lg Track—Type Tractor | 325,000 |
| 2413 | AAF00232 | Caterpillar D1 IRCD Lg Track-Type Tractor | 575,000 |
| 388 | 7PZ00474 | Caterpillar D1 1R Ripper | 602,360 |
| 5514 | 9337 | Atlas Copco DM45 Drill | 645,000 |
| | PID00126LDGD26316 | Warrior 2400 Screen | 325,000 |
| 7017 | 7HR00310 | Caterpillar 992G Wheel Loader | 769,000 |
| 1112 | BNH01439 | Caterpillar 988G Wheel Loader | 289,000 |
| 2-237 | 2BW00537 | Caterpillar 789C Mining Truck | 1,750,000 |
| | 1HVBBCFN6LH265139 | International Bus | 15,000 |
| 3209 | 7EK00565 | Caterpillar 789B Mining Truck | 1,650,000 |
| 3210 | 7EK00562 | Caterpillar 789B Mining Truck | 1,560,000 |
| 6015 | BKW00374 | Caterpillar 325 Excavator | 125,000 |
| | | **Total** | **8,990,360.00** |

316. At the Merits Hearing, Mr. Justice testified that the equipment "was owned by Justice at some other operations in Virginia and Kentucky." The Justice Equipment was brought into the CM Sale to supplement the Mechel Equipment so that Bluestone could demonstrate that the mine could produce

---

[275] Tr. 33:15-17 (Vol. 1) (Claimant's Counsel).

[276] Letter from Stephen W. Ball to Laura Brank and Joshua D.N. Hess dated 7 March 2019, Ex. C-32.

"at a level of 70 to 80 thousand tons per month."[277] Mr. Justice testified that, if Respondent had not brought in the Justice Equipment, "there wouldn't have been a deal."[278]

317. Respondent first raised the Justice Equipment deduction six months after the closing of the CM Sale, in its 30 July 2017 letter to counsel for Claimant.[279] In that letter, Respondent explained that its letter dated 1 February 2017[280] had "overlooked the fact that the Justice organization was required to include some if its (non-Bluestone) equipment as part of the same." Respondent attached to the letter a list of the equipment and represented that it had "a value of $7,451,360."

318. In its 19 February 2019 letter to Claimant, Respondent increased the value of the Justice Equipment to $8,990,360.[281] Mr. Justice explained at the Merits Hearing that the increase was the result of the addition to the Justice Equipment list of a Caterpillar 789C Mining Truck and a Caterpillar Excavator that Respondent had to repair after the CM Sale closed, as well as the removal from the list of a wheel loader that Respondent decided to keep.[282]

319. In its Rejoinder and at the Merits Hearing, Respondent claimed a deduction of $9,963,285 for the Justice Equipment, which it based on the expert report of Mr. Blandford.[283]

320. Claimant disputes that Respondent is entitled to any deduction for the value of the Justice Equipment. Claimant asserts that "Respondent cannot support its proffered value for the Justice Equipment."[284] Claimant argues that Respondent's internal valuation of the Justice Equipment was prepared after the CM Sale closed, when Respondent no longer had access to the Equipment. Claimant further argues that Respondent's valuation was unsupported by any documents.[285] Claimant asserts that Mr. Blandford's valuation was based

---

[277] Tr. 191:2-5; 224:15-21, 224:25 to 225:2 (Vol. 1) (Justice); Tr. 302:21-22 (Vol. 2) (Justice).

[278] Tr. 303:6-7 (Vol. 2) (Justice).

[279] Letter from Stephen W. Ball (General Counsel, Bluestone) to Joshua D.N. Hess (Counsel for Caroleng) dated 30 July 2017, Ex. C-10.

[280] Letter from Dustin M. Deane (Associate General Counsel, Bluestone) to Savvas Poyiadjis (Caroleng) dated 1 February 2017, Ex. C-4.

[281] Letter from James C. Justice III to Oleg V. Korzhor and Joshua D. N. Hess, dated 19 February 2019 Ex. C-31.

[282] Tr. 324:5-325:16 (Vol. 2) (Justice).

[283] Rejoinder at pg. 10.

[284] CPHB ¶ 37.

[285] CPHB ¶ 84.

entirely on assumptions supplied by Respondent and was inconsistent with Respondent's own prior valuation.[286]

### 1. The Justice Equipment Was Part of the Assets Purchased by CM Energy

321. It is undisputed that the Justice Equipment was part of the assets purchased by CM Energy under the CM Agreement. Section 2.1(e) of the CM Sale Agreement provides that the assets include all "fixtures, equipment, machinery, tools, vehicles, supplies, and other tangible personal property" including the "property described in Section 3.15 of the Seller Disclosure Schedule." Schedule 3.15 contains the Justice Equipment listed in paragraph 315 above.

### 2. The Purchase Price Allocation

322. As with the Pardee Lease, the most reliable evidence of the value that Claimant and Respondent attributed at the time of the CM Sale to the Justice Equipment would be a contemporaneous purchase price allocation. However, as already observed, CM Energy did not include a purchase price allocation in its IRS Form 8594 filing and Respondent did not produce its own IRS Form 8594 filing.

323. Instead, Respondent has provided the Tribunal with what it represented to be the undated "workpapers" of Respondent's outside auditors, Hess Stewart & Campbell, which according to Mr. Justice's testimony were prepared at some time after the CM Sale.[287] As observed above, Respondent asserts that it considers the balance of $58,266,947.33 identified on these worksheets to represent the value of "Pardee and the Justice owned equipment." However, the Tribunal places little to no weight on the figures, given the lack of any supporting documentation from the auditors that prepared the workpapers. Moreover, there is no evidence to suggest that the workpapers or figures were, in fact, utilized to prepare the Form 8594 filing. In the absence of any further particulars and evidence, the Tribunal is not persuaded by Respondent's assertion.

324. In fact, the workpapers specifically identify an amount of $2,371.111.46 for "Machinery & Equipment." The workpapers do not identify what part of that amount, if any, is allocated to the Justice Equipment. The workpapers nevertheless at least strongly suggest that Respondent's auditors attributed a value to the Justice Equipment that was significantly lower than $2,371.111.46, since the machinery and equipment transferred to CM Energy also comprised the Mechel Equipment and other machinery and equipment.

---

[286] CPHB ¶¶ 85 to 91.

[287] Tr. 212:2-3 (Vol. 1) (Justice).

### 3. Respondent's Internal Valuation of the Justice Equipment

325.    Respondent attached to its 30 July 2017 letter to counsel for Claimant a list of the Justice Equipment with a US Dollar value for each piece of equipment.[288] The document identifies a total value of $7,451,360 for the Justice Equipment.

326.    At the Merits Hearing, Mr. Justice explained that the document reflects Bluestone's internal valuation of the Justice Equipment.  Mr. Justice testified that he, together with Davis Stoneburner, a Bluestone employee, valued the Justice Equipment sometime in the spring of 2017 after the CM Sale had closed.[289]  According to Mr. Justice, on the basis of that valuation, Mr. Stoneburner then prepared the list that was attached to Respondent's 30 July 2017 letter.[290]

327.    Mr. Justice and Mr. Stoneburner valued the equipment by reference to a website called "Machinery Trader," which was "probably the most credible way to evaluate this machinery today."[291]  Mr. Justice testified that at the time of the internal valuation in 2017, Respondent still had access to the "equipment records," which allowed Respondent to consider factors such as which components of the equipment were new or worn out and the remaining engine life of the equipment.[292]

328.    Mr. Justice further testified at the Merits Hearing that he did not have the maintenance records because these were handed with the equipment to CM Energy, and Respondent did not keep a copy.[293]  Claimant asserts that this explanation "strains credulity" because "Respondent was able to produce 1,262 pages of documents concerning purported repairs to the Mechel Equipment."[294]  It is unclear to the Tribunal whether the "equipment records" that Mr. Justice testified Respondent had access to contained any maintenance information.  If Respondent did not, and it is correct that Respondent kept no copies of the maintenance records, the lack of access to maintenance data would have adversely impacted the accuracy of the valuation of the Justice Equipment.

---

[288]  Letter from Stephen W. Ball (General Counsel, Bluestone) to Joshua D.N. Hess (Counsel for Caroleng) dated 30 July 2017, Ex. C-10.

[289]  Tr. 315:15-16, 19-21 (Vol. 2) (Justice).

[290]  Tr. 315:3-10 (Vol. 2) (Justice).

[291]  Tr. 317:18-23; 318:6-8 (Vol. 2) (Justice).

[292]  Tr. 317:23-318:1; 318:2-4, 6-8 (Vol. 2) (Justice).

[293]  Tr. 322:17-25 (Vol. 2) (Justice).

[294]  CPHB n. 22; Letter from Thomas W. Ashton to Joshua D.N. Hess received on April 19, 2019, Ex. C-34.

329. Mr. Justice also testified that he did not consult the fixed asset ledgers, which is an internal accounting ledger that typically lists the original costs of fixed assets[295] and contains depreciation schedules of the equipment for the appropriate accounting and tax treatment.[296] Mr. Justice said that he was confident the ledgers were maintained by the Justice companies.[297] Respondent did not, however, submit the ledgers as evidence.

330. The Tribunal notes that Respondent has not provided any of the underlying documents for the valuation of the equipment done by Mr. Justice and Mr. Stoneburner. In particular, Respondent has not provided (i) any of the "equipment records" that Mr. Justice testified that he and Mr. Stoneburner had access to, (ii) any relevant excerpts from the "Machinery Trader" website, (iii) any of the fixed asset ledgers that were in the possession of the Justice companies, or (iv) any of Mr. Justice's or Mr. Stoneburner's working papers. Nor has Respondent provided the testimony of Mr. Stoneburner even though he still works for Bluestone.[298]

331. Claimant requests that the Tribunal draw adverse inferences from Respondent's failure to produce any of the underlying documents. Claimant points out that on 4 April 2019, the Tribunal ordered Respondent to produce "documents sufficient to validate the values assigned to each piece of 'Justice Equipment' listed on page 4 of Respondent's 7 March 2019 letter, but that Respondent failed to comply with the Tribunal's order.[299]

332. The Tribunal believes that there is no need to draw adverse inferences in this instance. Respondent possesses the burden of proving the value of the Justice Equipment. Respondent's failure to produce any of the documents that Mr. Justice and Mr. Stoneburner relied upon in preparing their valuation renders the valuation unreliable. Accordingly, the Tribunal cannot give any weight to Respondent's internal valuation in determining the value of the Justice Equipment.

### 4. The Southern Heavy Equipments Report

333. Respondent requested Southern Heavy Equipments, Inc. ("**SHE**") to prepare a valuation of the Justice Equipment. The report was prepared in August 2019, two years after the CM Sale closed. The 8 August 2019 cover letter to the report, which was attached to Mr. Blandford's expert report, states:

---

[295] Lee Expert Rebuttal Report, ¶5.10.

[296] Tr. 319:2-3; 11-13; 319:19 to 320:5 (Vol. 2) (Justice).

[297] Tr. 322:13-16 (Vol. 2) (Justice).

[298] Tr. 315:8, 325:22-24 (Vol. 2) (Justice).

[299] CPHB, ¶ 12.

"The following is our opinion on the value of the equipment referenced on attachment. Our figures are based on 30 years of experience as a dealer of used mining and construction equipment. This is not an appraisal and are values based on like equipment and actual auction and retail values as of August 7, 2019 listed in the attachment.

The valuation method used to determine the value was the Market Valuation Approach. This approach looks at recent transactions of machines that are similar to the subject assets being valued. It may also look at the offering prices of similar pieces of equipment as well. When exact machinery and equipment comparable are not found, adjustments are made to the selling or offering prices to equate them to the one being valued.

You will find attached the detail listing of the said asset. We have collaborated on these values and feel it has been completed to the best of our ability. If you have any questions regarding this Fair Market Value Assessment, please contact us."[300]

334. In the exhibit attached to Mr. Blandford's expert report, the cover letter is followed by three unnumbered pages that provide the "frame operating hours" of various pieces of the Justice Equipment and certain of their components. The attachment does not include any valuation or accompanying narrative.

335. Claimant argues that the cover letter from SHE expressly refers to an "opinion on the value of the equipment [i]n [the] attachment," but that Respondent failed to produce the attached valuation. Claimant accordingly argues that "[f]rom this failure, the Tribunal should conclude that SHE's valuation of the Justice Equipment did not align with Respondent's proffered valuation." [301]

336. The Tribunal observes that the SHE cover letter expressly states that SHE was providing an "opinion on the value of the equipment." The letter also makes repeated references to "values" and "valuation" of the equipment. Moreover, Respondent's witnesses have not denied that the SHE report contained a valuation. Mr. Justice testified that he did not know "if [SHE] did or didn't" provide a valuation of the equipment."[302] Mr. Blandford stated that SHE's "fair value assessment *also* listed the frame operating hours,"[303] and hence implicitly suggested that the full SHE report also contained information other than the frame operating hours. At the Merits Hearing, Mr. Blandford testified

---

[300] Blandford's expert report dated 12 August 2019 at pg. 19.

[301] CPHB at ¶ 13.

[302] Tr. 327:25 to 328:3 (Vol. 2) (Justice).

[303] Blandford's Presentation submitted during Merits Hearing, slide 7, emphasis added.

that he assumed there was a valuation, but also stated that he was not provided with it and that he "wasn't interested in that value."[304]

337. The Tribunal, accordingly, is persuaded that the SHE report did contain a valuation of the equipment and that Respondent chose not to submit the valuation into the record. The Tribunal again sees no need to draw adverse inferences as to the value stated in the portion of the SHE report that was not produced. Instead, the Tribunal concludes that Respondent's failure to submit the attachment renders Mr. Blandford's report unreliable because he, in turn, relied on an incomplete SHE valuation.

### 5.     The Blandford Expert Report

338. The Tribunal will now turn to Mr. Blandford's expert report. Respondent instructed Mr. Blandford to provide a professional opinion on the reasonableness of Respondent's internal valuation of the Justice Equipment.[305]

### (1)     Mr. Blandford's Assessment

339. Mr. Blandford explained that, to determine the reasonableness of Respondent's internal valuation of the Justice Equipment, he first obtained the list of the Bluestone-owned surface mining equipment sold to CM Energy that was attached to Respondent's 7 March 2019 letter. Mr. Blandford then "had discussions with Bluestone personnel on August 8, 2019," and was informed that (i) all of the surface mining equipment on the list "was in good working order and good conditions at the time of the CM Energy sale,"[306] and (ii) "the useful life of its surface equipment is 100,000 hours," which he determined to be "reasonable based on proper maintenance and regular component replacements."[307] Mr. Blandford was also provided with the SHE 8 August 2019 cover letter and the three pages of frame operating hours.

340. Mr. Blandford then determined the "fair value (FV)" of the Justice Equipment at the time of the CM Energy transaction.[308] To determine the fair value, he used the "Cost Approach or Depreciated Replacement Value," which "utilizes valuation techniques to determine the amount required to acquire or construct a substitute asset, adjusted for obsolescence."[309] Mr. Blandford explained that the fair value utilizing the Cost Approach is calculated "by multiplying the

---

[304] Tr. 637:8-12 (Vol. 3) (Blandford).

[305] Blandford Expert Report, ¶ 2.

[306] *Id.* at ¶ 14.

[307] *Id.*

[308] *Id.* at ¶ 22.

[309] *Id.* at ¶ 21.

current (new) cost of an asset by its percentage of remaining life," which in turn is determined "by dividing estimated remaining asset life by the assigned useful life of the asset."[310]

341.  Mr. Blandford determined the new cost by "using estimates for the cost of like equipment, purchased new as of January 2017." To determine the costs of like equipment, Mr. Blandford consulted "a combination of published equipment guides, including Mine & Mill Equipment Cost Guide 2017" and "WEIR's industry knowledge of mining equipment pricing."[311] Mr. Blandford then assumed, based on Respondent's representation, that the equipment was "in good condition and in working order" at the time of the CM Sale and that "the useful life" of the Justice Equipment was 100,000 hours, which he determined to be "reasonable based on proper maintenance and regular component replacements."[312] To determine the remaining life for each piece of equipment, Mr. Blandford deducted from the assumed 100,000 hours of useful life the frame operating hours he obtained from the SHE report.[313]

342.  Mr. Blandford concluded that the fair value of the Justice Equipment listed in Respondent's 7 March 2017 letter was $9,963,285 and that Respondent's internal valuation of $8,990,360 was reasonable.[314]

### (2)  Mr. Lee's Rebuttal Report

343.  In his rebuttal report, Mr. Lee states that "as with the Weir Pardee Lease Expert Report, the Weir Justice Equipment Expert Report scope and procedures undertaken by Weir are more akin to a high-level desktop review of selected documents with limited analysis, rather than a comprehensive valuation."[315]

344.  Mr. Lee observed that Mr. Blandford's conclusions rely "on assumptions and information provided by Bluestone that were not independently verified."[316] Weir "undertook no review or verification of the good working order and good condition of the Justice Equipment as of January 2017 asserted by Bluestone." Weir also "did not review the 'fixed assets subledger,'" which "might have informed Weir of the actual, historical costs incurred to purchase, maintain,

---

[310]  *Id.* at ¶ 23.

[311]  *Id.* at ¶ 26.

[312]  *Id.* at ¶ 14.

[313]  Tr. 641:9-24 (Vol. 3) (Blandford).

[314]  Blandford Expert Report, ¶ 29.

[315]  Lee Expert Rebuttal Report, ¶ 5.8

[316]  *Id.* at ¶ 5.9.

repair or enhance the specific assets, as well as whether the equipment was purchased new or used."[317]

345.    Mr. Lee further stated that "Weir undertook no review or verification of the 100,000 hour useful life estimate of the Justice Equipment provided by Bluestone."[318]  Based on Caterpillar's Performance Handbook (edition 29), the useful lives of certain Caterpillar equipment, which comprises approximately 50% of Weir's value conclusion, "were materially lower than Weir/Bluestone's 100,000 hour assumption."[319]

346.    According to Mr. Lee, Mr. Blandford's report also did not "contain any attempt to corroborate its Justice Equipment valuation conclusions with a market approach or market perspectives from January 2017."  In addition, Mr. Blandford's values for each piece of equipment "are materially different" from Bluestone's internal values "for most of the Caterpillar equipment."[320]

### (3)    The "Weir Notes"

347.    The Tribunal has further considered the Weir Notes submitted with Respondent's Rejoinder (see Section IV.F.2.f(3) above), which provide comments to rebut certain statements that Mr. Lee had made in his expert report.

### (4)    The Tribunal's Analysis

348.    The Tribunal notes at the outset that Mr. Blandford's valuation is based on a number of assumptions that Respondent provided to him without support or independent verification.  These include the assumptions that (i) the Justice Equipment was "in good condition and good working order," and (ii) each item of the Justice Equipment had a useful life of 100,000 hours.

349.    The assumption that the Justice Equipment was in "good condition and good working order" was central to Mr. Blandford's assessment.  At the Merits Hearing, Mr. Blandford testified that he based that assumption solely on a representation from Mr. Stoneburner.[321]  However, as the Tribunal already observed, Mr. Justice testified that Mr. Stoneburner had valued the Justice Equipment only after it had been sold to CM Energy and without having had access to the maintenance records.  There is also no indication in the record that Mr. Stoneburner inspected the equipment at the time of the CM Sale.

---

[317]    *Id.* at ¶ 5.10(a).

[318]    *Id.* at ¶ 5.10.

[319]    *Id.* at ¶ 5.10(b).

[320]    *Id.* at ¶ 5.21.

[321]    Tr. 628:16-23; 629:5-9  (Vol. 3) (Blandford).

350.   Mr. Blandford was also not provided with any evidence that would document and confirm that the Justice Equipment was in good working order.  Mr. Blandford testified that he had asked for the maintenance records and the fixed asset ledger for the Justice Equipment, which indicates that he believed that information to be relevant for his analysis.  However, he did not receive these documents.[322]  Mr. Blandford did not take any other steps to test whether the Justice companies properly maintained the Justice Equipment.[323]  He also did not determine whether CM Energy agreed that the equipment was conveyed in good condition and good working order.[324]

351.   Instead, there are indications that at least some pieces of equipment might not have been in good working order.  CM Energy filed a complaint against Respondent in the Superior Court of Delaware a year after the CM Sale closed.[325]  In the Complaint, CM Energy alleged that Respondent had transferred production equipment to CM Energy "in a state of disrepair, well below the quality warranted in the Purchase Agreement."  CM Energy specifically asserted, for example, that the Caterpillar D11R (serial number 7PZ00474), which forms part of the Justice Equipment analyzed by Mr. Blandford, was "simply beyond repair."[326]

352.   In the absence of any evidence about the condition of the Justice Equipment at the date of the CM Sale, the Tribunal does not consider Mr. Blandford's assumption that the equipment was in good condition and working order to be reliable.

353.   For the same reason, the Tribunal also cannot give any weight to Mr. Blandford's opinion that it was reasonable to assume the Justice Equipment had a useful life of 100,000 hours because Mr. Blandford based this opinion on the unproven assumption that the Justice Equipment was properly maintained and that there were "regular component replacements."[327]

354.   To determine the "frame operating hours" for all but one of the pieces of the Justice Equipment, Mr. Blandford adopted the "frame operating hours" attached to the SHE cover letter.  Mr. Blandford testified that he confirmed

---

[322]  Tr. 627:25-628:3; 630:15-16 (Vol. 3) (Blandford).

[323]  Tr. 627:22-24 (Vol. 3) (Blandford).

[324]  Tr. 629:5-9 (Vol. 3) (Blandford).

[325]  *CM Energy Holdings LP et al. v. Dynamic Energy, Inc. et al.*, N18C-02-054 (Del. Super. Ct. Feb. 8, 2018) (voluntarily dismissed with prejudice, June 2, 2018), Complaint, Ex. C-65.

[326]  *Id.* at ¶ 40.

[327]  Tr. 627:18-24 (Vol. 3) (Blandford).

that the SHE frame operating hours corresponded with the operating hours disclosed by Respondent to CM Energy in the CM Agreement.[328]

355.    Mr. Blandford then determined the remaining life of the equipment by deducting the frame operating hours from the assumed 100,000 hours of useful life.[329]  The Tribunal observes that in his report, Mr. Blandford explained that the "remaining life" of a piece of equipment is based "on the appraiser's judgment considering such factors as age, operating schedule, maintenance and ... obsolete."[330]  Mr. Blandford testified that he could not consider these factors because he lacked the information to consider them.  He would have used "years instead of hours" if he had had the age of the equipment;[331] he did not have the maintenance and the overhaul history;[332] and he could only assume that the equipment was still being used and had not become obsolete. The Tribunal notes that the lack of relevant data thus prevented Mr. Blandford from considering factors that he identified in his report as relevant for the determination of the remaining life of the Justice Equipment.

356.    Finally, the Tribunal observes that with regard to several pieces of equipment, Mr. Blandford's numbers significantly diverge from the numbers of Respondent's internal evaluation.  This is in particular the case with the five Crawler Tractors, where Mr. Blandford's values exceed those of Respondent's internal valuation by 467% (D8N model), 258% (D10N model), 190% (D10R model), 154% (D11R CD model) and 23% (D11R model).  For the Caterpillar Rock Trucks, in turn, Mr. Blandford's values are significantly lower, by 62% and 58% for the two 789B models, and 15% for the 789C model. Accordingly, the Tribunal does not find Mr. Blandford's conclusion credible that Respondent's internal valuation was reasonable.

357.    The Tribunal therefore concludes that in light of the lack of any credible evidence supporting the assumptions upon which Mr. Blandford based his report, Mr. Blandford's valuation of the Justice Equipment is not sufficiently reliable to determine that the Justice Equipment is worth any particular amount.

358.    In conclusion, having carefully considered the Parties' arguments and the entirety of the record before it, the Tribunal concludes that Respondent has failed to prove the value of the Justice Equipment.  As a result, the Tribunal must conclude that Respondent is not entitled to any deduction for the value of the Justice Equipment.

---

[328]   Tr. 658:15-24 (Vol. 3) (Blandford); CM Agreement, Ex. C-33 at pg. 000325-26BRI.

[329]   Tr. 641:16-24 (Vol. 3) (Blandford).

[330]   Blandford Expert Report, ¶ 25.

[331]   Tr. 642:20-21 (Vol. 3) (Blandford).

[332]   Tr. 643:1-4 (Vol. 3) (Blandford).

## H. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### 1. The Parties' Arguments

359. Claimant argues that Respondent breached the implied covenant of good faith and fair dealing, which is implicit in every contract under New York law.[333] Respondent did so, according to Claimant, "through its constant stonewalling and repeated misrepresentations."[334] Specifically, Claimant asserts that despite numerous requests from Claimant and its counsel over a two-and-a-half year period, Respondent and its counsel refused to cooperate and provide Claimant with its calculations of the Deferred Royalty Payments and Earn-out Payments. According to Claimant, Respondent's refusal to provide that information rendered it impossible for Claimant to verify the amounts due under the Transaction Agreement, which in turn "destroy[ed] Caroleng's right . . . to receive the fruits of the [Transaction Agreement] that it is due to receive."[335]

360. Claimant further argues that Respondent breached the implied covenant of good faith and fair dealing "by entering into the CM Agreement knowing that the attendant confidentiality obligations would prevent it from complying with its preexisting obligations under Section 5.2(b) of the Transaction Agreement."[336]

361. Respondent agrees with Claimant that "a covenant of good faith and fair dealing is implicit in every contract under New York law."[337] Respondent denies, however, that Respondent failed to cooperate, meet its promises, or honor its obligations under the Transaction Agreement.[338] In particular, Respondent asserts that it "has explained how and why its claims have evolved over the years" and has likewise "acknowledged when errors have been made."[339] Respondent asserts that it provided all required support for the claims and the unredacted CM Agreement, the Escrow Agreements, and the detailed description of the distribution of the sale proceeds.[340] Respondent observes it was "justified in withholding the Deferred Royalty Payments" and

---

[333] SoC, ¶ 142.

[334] SoC, ¶¶ 144-146.

[335] SoC, ¶ 146 (internal quotation marks omitted).

[336] SoC, ¶¶ 147-149.

[337] SoD, ¶ 142.

[338] SoD, ¶ 143.

[339] *Id.*

[340] SoD, ¶¶ 143, 147.

has "paid more than the 12.5% of the Value of the Net CM Sale Price in accordance with Section 2.4 of the Transaction Agreement."[341]

## 2. The Tribunal's Analysis

362. The Parties agree that a covenant of good faith and fair dealing is implicit in every contract under New York law. Under the covenant, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[342] In determining whether a party has breached its obligation of good faith and fair dealing, "a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties."[343] Moreover, "it is likewise implied in every contract that there is a duty of cooperation on the part of both parties."[344]

363. The Tribunal observes that Claimant premises its claim for breach of the implied covenant on the same allegations on which it bases its claims for breach of Section 5.2 of the Transaction Agreement. First, Claimant asserts that Respondent breached the implied covenant by refusing to cooperate and provide Claimant with Respondent's calculations of the Deferred Royalty Payments and Earn-out Payments.[345] Claimant has made the same allegations in support of its claim that Respondent breached Section 5.2(a) of the Transaction Agreement, and the Tribunal has concluded that Respondent breached Section 5.2(a)[346] as a result of its failure to provide Claimant, among other documents, with Respondent's calculations of the Deferred Royalty Payments and Earn-out Payments.[347]

364. Second, Claimant asserts that Respondent breached the implied covenant by entering into the CM Agreement knowing that the attendant confidentiality obligations would prevent Respondent from complying with its preexisting

---

[341] SoD, ¶¶ 144-145.

[342] *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291-92 (1995), Ex. CLA-22 at pg. 7 (quoting *Kirke La Shelle Co. v. Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163).

[343] *First Niagara Bank N.A. v. Mortg. Builder Software, Inc.*, No. 13-CV-592S, 2016 WL 2962817, Ex. CLA-23 at pg. 7 (W.D.N.Y. May 23, 2016), (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007)).

[344] *Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 770-71 (2d Cir. 1975), Ex. CLA-24 at pg. 4 (quoting *Rochester Park, Inc. v. City of Rochester*, 38 Misc.2d 714, 718, 238 N.Y.S.2d 822, 827 (Sup.Ct.), *aff'd*, 19 A.D.2d 776, 241 N.Y.S.2d 763 (4th Dep't 1963)).

[345] SoC, ¶ 143.

[346] *See* ¶ 208 of the Award.

[347] SoC, ¶ 132.

obligations under Section 5.2(b) of the Transaction Agreement.[348]  Here, too, Claimant has asserted, and the Tribunal has held, that by failing to timely provide a complete and unredacted copy of the CM Agreement, Respondent breached Section 5.2(b) of the Transaction Agreement,[349] and that Respondent could not rely on the confidentiality agreement as a defense because, when concluding the CM Agreement, Respondent should have taken the necessary steps to ensure that it could comply with its obligations under Section 5.2(b) of the Transaction Agreement.[350]

365.    Under New York law, where a claim of breach of the implied covenant of good faith and fair dealing is premised on the same allegations of fact as a claim for breach of contract, it is to be dismissed as duplicative.[351]  Since Claimant's allegations in support of its implied covenant claim duplicate those made in support of its claim for breach of Section 5.2, and the Tribunal has already held that Respondent breached Section 5.2(a) and 5.2(b), the Tribunal rejects Claimant's claims for breach of the implied covenant of good faith and fair dealing.

## I.    DAMAGES

366.     The Tribunal now addresses the damages that Respondent owes Claimant as a result of Respondent's breaches of Sections 2.3, 2.4, and 5.2 of the Transaction Agreement.

### 1.    Damages for Respondent's Breach of Section 2.4 of the Transaction Agreement

367.    It is undisputed that the CM Purchase Price was $98,975,000.[352]  The Tribunal has held that Respondent was not entitled to any deductions to the CM Purchase Price for purposes of determining the Contingent Payment.[353]

---

[348]  SoC, ¶ 143.

[349]  *See* ¶ 201 of the Award.

[350]  SoC, ¶ 149.

[351]  *JFK Holding Co. LLC v. City of New York,* 98 A.D.3d 273 (2012); *Harris v. Provident Life and Acc. Ins. Co.,* 310 F. 3d 73, 81 (2d Cir. 2002) (NY law does not "recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); *Dialcom, LLC v. AT & T Corp.,* 20 Misc. 3d 1111(A) 303 (2008) (a claim for breach of the implied covenant of good faith and fair dealing can be maintained, even though it arises from the same underlying transactions and occurrences as a breach of contract claim, where it contains allegations that "are not duplicative of [the] plaintiff['s] contract claims, but are claims that acts perpetrated by defendants deprived [the] plaintiff . . . of the fruits of the [] contract[]") (citing *A. Brod, Inc. v. Worldwide Dreams, LLC,* 4 Misc. 3d 1006[A] (2004)).

[352]  CM Agreement, Ex. C-33 at § 2.5.

[353]  *See* ¶¶ 169, 174 of the Award.

Accordingly, Claimant was entitled to receive a 12.5% Contingent Payment on the CM Purchase Price in the amount of $12,371,875 within 10 business days after completion of the CM Sale on 27 January 2017.

368.     It is further undisputed that Respondent paid Claimant $7,853,438 in Contingent Payments for the CM Sale on 6 February 2017.[354]

369.     As a result, the Tribunal holds that Claimant is entitled to, and Respondent must pay Claimant, an additional amount in Contingent Payments of <u>$4,518,437</u> in damages for Respondent's breach of Section 2.4 of the Transaction Agreement.

### 2.    Damages for Respondent's Breach of Section 2.3 of the Transaction Agreement

370.     Respondent does not dispute that it owes Claimant $2,075,228 in Deferred Royalty Payments pursuant to Section 2.3 of the Transaction Agreement.[355]

371.     The Tribunal accordingly holds that Claimant is entitled to, and Respondent must pay Claimant, <u>$2,075,228</u> in damages for Respondent's breach of Section 2.3 of the Transaction Agreement.

### 3.    Damages for Respondent's Breach of Section 5.2(a) and 5.2(b) of the Transaction Agreement

372.     Claimant asserts that as a result of Respondent's breaches of Article 5.2(a) and (b), Claimant "is entitled to damages."[356]  The Tribunal notes that Claimant did not particularize this claim for damages.  Claimant did not specify the amount of damages it allegedly incurred nor did Claimant provide any evidence in support of the quantification of the damages it asserts it suffered.

373.     Therefore, the Tribunal rejects Claimant's request for damages for Respondent's breach of Section 5.2(a) and (b).

### 4.    Punitive Damages

374.     Claimant also requests "punitive damages as the Tribunal deems appropriate."[357]

---

[354]   Letter from Dustin M. Deane (Associate General Counsel, Bluestone) to Savvas Poyiadjis (Caroleng) dated 1 February 2017, Ex. C-4, at pg. 2.

[355]   Rejoinder, ¶ 37; Tr. 408:1-11 (Vol. 2) (Sklyarov).

[356]   CPHB, ¶ 99.

[357]   SoC, ¶ 153 K.

375. The Tribunal observes that Claimant has neither particularized this claim nor specified the legal basis upon which it claims it is entitled to punitive damages. The Tribunal accordingly rejects Claimant's request for punitive damages.

## J.    INTEREST

### 1.    The Parties' Arguments

376. Claimant requests an award requiring Respondent to pay pre-judgment and post-judgment interest on damages awarded.[358] Claimant argues that New York law, which is the governing substantive law of the Transaction Agreement, imposes a statutory interest rate in breach of contract cases of nine percent per year. Claimant argues that "New York [law] awards (i) interest to verdict, report, or decision at a simple interest rate of nine percent per year and (ii) interest from verdict until judgment at a simple interest rate of nine percent per year but upon 'the total sum awarded, including interest to verdict, report, or decision.'"[359] Claimant thus asks the Tribunal to "use a nine percent per year rate when calculating interest due to Caroleng."[360]

377. Respondent argues that, "should the Tribunal determine that either party has breached the Transaction Agreement, and make a monetary award, pre-judgment interest is appropriate."[361] Respondent further states that under New York law, both "pre-judgment and post-judgment interest are established at nine percent by statute."[362]

378. Respondent further argues that, if Claimant is awarded damages, the Tribunal should exercise its discretion not to apply interest because Respondent had taken the deductions from the CM Purchase Price in good faith and Respondent was not attempting to "cheat" Claimant, or to evade its obligations under the Transaction Agreement.[363] Accordingly, an award of pre-judgment interest would unfairly and unnecessarily punish Respondent for actions it undertook in good faith, Respondent contends.[364]

---

[358] SoC, ¶¶ 153 D and E.

[359] CPHB, ¶ 102.

[360] CPHB, ¶ 101.

[361] RPHB, pg. 21.

[362] *Id.*

[363] *Id.* at pg. 22.

[364] *Id.* at pgs. 22 and 29.

## 2. The Tribunal's Analysis

379. The Tribunal concludes that Claimant is entitled to pre-award interest and post-award interest. The Parties agree that the Tribunal should, in the exercise of its discretion, apply the New York law statutory rate of nine percent per annum.[365] The Tribunal accordingly holds in the exercise of its discretion that pre-award and post-award interest shall accrue at a simple rate[366] of nine percent per annum.

380. The Tribunal is not persuaded by Respondent's argument that the Tribunal should deny interest because Respondent has allegedly acted in good faith. The Tribunal has concluded that Respondent has materially breached Sections 2.3, 2.4 and 5.2 of the Transaction Agreement[367] and that, as a result, Claimant is entitled to damages for breach of contract.[368] To make Claimant whole for the breach, Claimant is entitled to interest, irrespective of whether Respondent breached the Transaction Agreement in good or in bad faith, because pre-award interest is compensatory and not punitive.[369]

381. Under Section 2.4 of the Transaction Agreement, Contingent Payments must be paid "within 10 business days" after completion of each relevant sales transaction. The full Contingent Payment on the CM Purchase Price had to be paid by 10 February 2017. Interest on the $4,518,437 in damages awarded for breach of Section 2.4 accordingly starts to run on 11 February 2017 and runs until the date of the Award.

---

[365] N.Y. C.P.L.R. § 5001, Ex. CLA-26; N.Y. C.P.L.R. § 5002, Ex. CLA-27; N.Y. C.P.L.R. § 5004, Ex. CLA-29; *Kailuan (Hong Kong) Int'l Co. Ltd. v. Sino East Minerals Ltd.*, 2016 WL 3090574 ¶¶ 136-37 (S.D.N.Y.), Ex. CLA-53 (where underlying contract provides that the laws of the State of New York should apply, the arbitrators will be guided by the rate of interest as provided for under those provisions.).

[366] *Hilt Construction & Management Corporation v. Permanent Mission of Chad to United Nations in New York*, 16-cv-6421 (VB), 2019 WL 3564571, at *1 (S.D.N.Y. August 6, 2019) (New York's statutory rate of nine percent per annum "is calculated on a simple interest basis rather than at a compound rate.") (citing *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998) ("New York courts have held that in a breach of contract action…prejudgment interest must be calculated on a simple interest basis at the statutory rate of nine percent.")).

[367] *See* ¶¶ 169, 174, 201, 208 and 214 of the Award.

[368] *See* ¶¶ 369 and 371 of the Award.

[369] *See, e.g., Kailuan (Hong Kong) Int'l Co. Ltd. v. Sino East Minerals Ltd.*, 2016 WL 3090574 ¶¶ 136-37 (S.D.N.Y.) (Arbitration Award), Ex. CLA-53 ("Interest is compensatory and not punitive.").

382. The amount of pre-award interest accrued on the $4,518,437 in damages awarded for breach of Section 2.4 of the Transaction Agreement is $1,322,478.42.

383. Interest on the Deferred Royalty Payments starts to run as of the accrual date of the unpaid royalty payments. Under Section 2.3 of the Transaction Agreement, Respondent was required to make the monthly Deferred Royalty Payment by the tenth business day of the month. As a result, for each month that Respondent failed to make a Deferred Royalty Payment, pre-award interest begins to run on the eleventh business day of that month, in accordance with the table below, and runs until the date of the Award: [370]

| Month | Accrual Date | Amount | Days | Pre-Award Interest |
|---|---|---|---|---|
| 3/2017 | 3/17/2017 | $28,226.70 | 1,153 | $8,024.89 |
| 7/2017 | 7/18/2017 | $151,687.85 | 1,030 | $38,524.56 |
| 8/2017 | 8/18/2017 | $254,915.28 | 999 | $62,792.97 |
| 9/2017 | 9/18/2017 | $90,846.84 | 968 | $21,683.77 |
| 10/2017 | 10/17/2017 | $36,911.88 | 939 | $8,546.36 |
| 11/2017 | 11/17/2017 | $103,417.26 | 908 | $23,154.13 |
| 12/2017 | 12/15/2017 | $92,520.54 | 880 | $20,075.69 |
| 1/2018 | 1/24/2018 | $120,709.38 | 840 | $25,001.72 |
| 3/2018 | 3/21/2018 | $147,819.03 | 784 | $28,575.65 |
| 4/2018 | 4/17/2018 | $47,533.11 | 757 | $8,872.41 |
| 5/2018 | 5/18/2018 | $223,278.51 | 726 | $39,969.91 |
| 6/2018 | 6/19/2018 | $82,793.49 | 694 | $14,167.89 |
| 7/2018 | 7/18/2018 | $101,445.51 | 665 | $16,634.28 |
| 8/2018 | 8/20/2018 | $199,296.36 | 632 | $31,057.47 |
| 9/2018 | 9/18/2018 | $58,293.60 | 603 | $8,667.38 |
| 10/2018 | 10/16/2018 | $204,515.49 | 575 | $28,996.37 |
| 12/2018 | 12/17/2018 | $131,016.99 | 513 | $16,572.75 |
| **Total Admittedly Withheld** | | **$2,075,227.82** | | **$401,318.22** |

384. The amount of pre-award interest accrued on the Deferred Royalty Payments accordingly is $401,318.22.

385. The Tribunal therefore concludes that Respondent shall pay Claimant the total amount of $1,723,796.64 in pre-award interest. In addition, Respondent shall pay Claimant pre-award interest at the simple rate of 9% per annum on the

---

[370] CPHB, Appendix 2.

Contingent Payments Claimant is entitled to on any Earn-out Payments Respondent received before the date of the Award,[371] from the eleventh Business Day after Respondent's receipt of the Earn-out Payment until the date of the Final Award.

386. The Tribunal further holds that post-award interest at the simple rate of nine percent per annum starts to run on all amounts awarded as of the date of the Award (including the pre-award interest awarded)[372] and shall run until Claimant's receipt of payment of the Award in full.

387. Claimant argued that the Tribunal "should further award Caroleng interest on [the legal fees, expenses, and costs that it incurred in bringing these proceedings] calculated at New York's statutory rate of nine percent per annum from the date that the Award in these proceedings is rendered until the date of full payment."[373] The Tribunal agrees, in the exercise of its discretion, that post-award interest at the simple rate of nine percent per annum also runs on the amounts awarded in legal fees, expenses and costs.

## K. COSTS

### 1. The Parties' Arguments

388. In its 17 January 2020 Cost Submission, Claimant argues that, in exercising its discretion, the Tribunal should apply the well-recognized "costs follow the event" principle and require Respondent to pay Claimant the entirety of the legal fees, expenses and costs that Claimant incurred as a result of these proceedings.[374]

389. Claimant further argues that Respondent's conduct in these proceedings presents an additional justification for the Tribunal to order Respondent to pay Claimant its legal fees, expenses and costs. In particular, Claimant contends that Respondent drove up the costs of these proceedings by (i) repeatedly refusing to comply with the Tribunal's deadlines,[375] and (ii) initiating unnecessary motion practice on the eve of the Merits Hearing.[376] Respondent also did not arbitrate in good faith, for example, by repeatedly and intentionally misrepresenting both to Claimant and to the Tribunal the nature

---

[371] *See* ¶ 191 of the Award

[372] N.Y. C.P.L.R. § 5004, D. D. Siegel, Practice Commentaries, pg. 10, Ex. CLA-29

[373] CSS ¶ 49.

[374] CSS ¶ 3.

[375] CSS, ¶¶ 14-36.

[376] CSS, ¶¶ 37-39.

of the "Ancillary Guarantee Escrow"[377] and the author of the Weir Notes,[378] and by withholding the complete valuation of the Justice Equipment prepared by Southern Heavy Equipment, as well as other material documents.[379]

390.   In its 17 January 2020 Cost Submission, Claimant states that it incurred fees and costs of $1,973,593.98.[380]  On 24 February 2020, Claimant submitted an updated statement of fees and costs, in which it reduced the total amount of fees and costs by $19,539.40 to $1,954,054.58 to reflect a payment Claimant received from Respondent for Respondent's share of the hearing costs.[381]

391.   Claimant's updated statement of fees and costs is as follows:[382]

| Legal Fees | $1,407,441.56 |
|---|---|
| Dechert LLP | $1,269,818.56 |
| Young Conaway Stargatt & Taylor LLP | $7,423.00 |
| Internal | $130,200.00 |
| **Expenses** | **$324,113.02** |
| Dechert LLP | $107,198.36 |
| Young Conaway Stargatt & Taylor LLP | $634.32 |
| Expert (Duff & Phelps, LLC) | $215,541.64 |
| Internal | $738.70 |
| **ICC** | **$222,500** |
| **TOTAL** | **$1,954,054.58** |

392.   In its 17 January 2020 Cost Submission, Respondent informed the Tribunal that it has incurred the following fees and costs: (i) $252,506.11 in attorney fees and $49,898.17 in expenses for the Getty Group;[383] (ii) $4,177,38 for KLDiscovery;[384] (iii) $157,504.44 in fees and $28,409.32 in expenses for Weir International;[385] and (iv) $5,200 in travel expenses for Respondent.[386]

---

[377]   CSS, ¶ 42.

[378]   CSS, ¶ 43.

[379]   CSS, ¶ 44.

[380]   CSS, ¶ 49.

[381]   Updated Statement of Mr. Hess dated 24 February 2020, pg. A1.

[382]   *Id.*

[383]   Submission of Costs of Respondent dated 17 January 2020 at pg. 1

[384]   *Id.*

[385]   *Id.*

### 1. The Tribunal's Analysis

393.    The Tribunal has broad discretion under the ICC Rules in the allocation of the legal fees and expenses, and the costs of the arbitration.

394.    Article 38 of the ICC Rules provides, in relevant part, that

> 1.   The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scales in force at the time of the commencement of the arbitration, as well as the fees and expenses of any experts appointed by the arbitral tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.

> 2.   The Court may fix the fees of the arbitrators at a figure higher or lower than that which would result from the application of the relevant scale should this be deemed necessary due to the exceptional circumstances of the case.

> 3.   At any time during the arbitral proceedings, the arbitral tribunal may make decisions on costs, other than those to be fixed by the Court, and order payment.

> 4.   The final award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.

> 5.   In making decisions as to costs, the arbitral tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner.

> …

#### (a)    Allocation of the Legal Fees and Costs

395.    Having carefully reviewed the Parties' submissions on fees and costs and considered the outcome of these proceedings, the Tribunal concludes that Respondent should bear its own legal fees and costs and should reimburse Claimant for its legal fees and costs subject to the following determinations regarding specific fees and cost items.

396.    The Tribunal reaches this conclusion because Claimant has prevailed in this Arbitration. The Tribunal has found that Respondent breached Sections 2.3, 2.4 and 5.2 of the Transaction Agreement and awarded Claimant the entirety

---

[386]   *Id.*

of the damages claimed, $6,593,665. Conversely, the Tribunal has rejected all of Respondent's claimed deductions.

397. The Tribunal finds that Dechert's attorney fees and expenses are reasonable, in particular considering that the hearing had to be rescheduled twice largely as a result of delays in the document production phase that, in the Tribunal's view, are attributable to Respondent. The Tribunal further notes that, throughout these proceedings, Claimant has primarily been represented by one partner and one associate, which compares favorably with the sometimes much larger teams in comparable arbitrations. The Tribunal also finds that the fees and expenses of Claimant's expert were reasonable considering that Mr. Lee's expert report responded both to Mr. Kostic's and Mr. Blandford's expert reports.

398. The Tribunal notes that Claimant also included in its cost submission "internal" fees of $130,200 and internal costs of $738.70. However, Claimant has not provided any explanation as to the nature of these fees and costs or the basis upon which they were assessed. As a result, the Tribunal cannot determine whether these fees were reasonably incurred as alleged. The Tribunal therefore concludes that Claimant is not entitled to reimbursement for any of these fees and costs.

399. Claimant also included fees of $7,423 and expenses of $634.32 for services rendered by Young Conaway Stargatt & Taylor LLP in the 28 U.S.C. Section 1782 action that it brought in aid of these proceedings. Claimant did not explain why the fees and expenses incurred in the Section 1782 action should be awarded in this arbitration and the Tribunal accordingly declines to award these fees and costs.

400. The Tribunal therefore concludes, in accordance with Article 38 of the ICC Rules and in the exercise of its discretion, that Respondent shall reimburse Claimant for Claimant's legal fees and costs in the amount of $1,592,558.56.

### (b)  Allocation of the Costs of Arbitration

401. The costs of the arbitration have been fixed by the ICC Court on 23 April 2020 at $445,000. Claimant has paid $222,500 towards these costs, and Respondent has paid $222,500 towards the costs of the Arbitration.

402. For the reasons given above, the Tribunal concludes, in accordance with Article 38 of the ICC Rules and in the exercise of its discretion that the costs of the arbitration should be borne in their entirety by Respondent. As a result, Respondent shall reimburse Claimant for its advance on costs in the amount of $222,500.

# V.  AWARD

403.   For the above reasons, the Tribunal  HOLDS, DECLARES, DETERMINES and DIRECTS that:

    a.   Respondent has materially breached Sections 2.3, 2.4 and 5.2 of the Transaction Agreement;

    b.   Respondent shall pay Claimant the amount of $4,518,437 in damages for breach of Section 2.4 of the Transaction Agreement;

    c.   Respondent shall pay Claimant the amount of $2,075,228 in damages for breach of Section 2.3 of the Transaction Agreement;

    d.   Respondent shall pay Claimant 12.5% of any Earn-out Payments that Respondent might have received by 12 February 2020 and pre-award interest on that amount at a simple rate of 9% per annum from the eleventh Business Day of receipt until the date of the Final Award;

    e.   Respondent shall pay Claimant 10% of any Earn-out Payments that Respondent might have received between 13 February 2020 and the date of the Final Award and pre-award interest on that amount at a simple rate of 9% per annum from the eleventh Business Day of receipt until the date of the Final Award;

    f.   Respondent shall pay Claimant 10% of any Earn-out Payments that Respondent receives between the date of the Final  Award and 12 February 2025 within 10 Business Days of receipt;

    g.   Respondent shall reimburse Claimant for its legal fees and costs in the amount of $1,592,558.56 and for Claimant's advances towards the Arbitration costs in the amount of $222,500;

    h.   Respondent shall pay pre-award interest at a simple rate of 9% per annum on the amounts awarded in the total amount of $1,723,796.64;

    i.   Respondent shall pay post-award interest at a simple rate of 9% per annum on the sums awarded (including the pre-award interest and the fees, expenses and costs) from the date of the award until full payment; and

    i.   All other claims, defenses, and requests from either Party are hereby rejected.

Place of arbitration:  Paris, France.

Date:  13th May 2020.

The Arbitral Tribunal

Joseph R. Profaizer

Jennifer M. Smith

Dietmar W. Prager
(President)

# EXHIBIT 2

# FILED UNDER SEAL

TRANSACTION AGREEMENT

by and between

CAROLENG INVESTMENTS (SPV) LTD.

and

BLUESTONE RESOURCES INC.

Dated as of February 12, 2015

# TABLE OF CONTENTS

Page

Section 1.1.    Definitions Generally ...................................................................................1

Section 1.2.    Interpretation Generally.............................................................................1

Section 2.1.    Purchase.......................................................................................................2

Section 2.2.    Consideration...............................................................................................2

Section 2.3.    Deferred Royalty Payments.........................................................................2

Section 2.4.    Contingent Payments...................................................................................2

Section 2.5.    Release of Claims ........................................................................................3

Section 2.6.    Closing..........................................................................................................4

Section 2.7.    Deliveries by Seller .....................................................................................4

Section 2.8.    Deliveries by Buyer .....................................................................................4

Section 2.9.    Release of Escrow Funds.............................................................................4

Section 3.1.    Corporate Status. .........................................................................................5

Section 3.2.    Corporate Authorization. ............................................................................5

Section 3.3.    Binding Effect. .............................................................................................5

Section 3.4.    Capital Structure ..........................................................................................5

Section 3.5.    Financial Statements....................................................................................6

Section 3.6.    Legal Proceedings. ......................................................................................6

Section 3.7.    Taxes.............................................................................................................6

Section 3.8.    Labor and Employment Matters..................................................................6

Section 3.9.    Employee Benefit Plans. .............................................................................6

Section 3.10.   Insurance......................................................................................................6

Section 3.11.   Real Property. ..............................................................................................6

Section 3.12.   Equipment and Other Personalty.................................................................7

Section 3.13.   Contracts.......................................................................................................7

Section 3.14.   Compliance with the Foreign Corrupt Practices Act...................................7

Section 3.15.   Finders' Fees ................................................................................................7

Section 3.16.   Limitations on Representations and Warranties...........................................7

Section 4.1.    Organization and Qualification ...................................................................8

Section 4.2.    Corporate Authorization ..............................................................................8

Section 4.3.    Binding Effect ..............................................................................................8

Section 4.4.    Regulatory Approvals and Non-Governmental Consents ...........................8

i

Section 4.5.    Non-Contravention .................................................................................9

Section 4.6.    Finders' Fees .......................................................................................9

Section 4.7.    Litigation and Claims ..........................................................................9

Section 4.8.    Financial Capability.............................................................................9

Section 4.9.    Investment Representations..................................................................9

Section 5.1.    Recording of Royalty Interest ............................................................10

Section 5.2.    Access and Reports............................................................................11

Section 5.3.    Post Closing Filings...........................................................................11

Section 5.4.    Certain Consents Matters ..................................................................11

Section 5.5.    Public Disclosure; Confidentiality ....................................................12

Section 5.6.    Post Closing Covenants .....................................................................12

Section 5.7.    Infusion of Capital.............................................................................12

Section 5.8.    Directors' and Officers' Exculpation; Indemnification......................13

Section 5.9.    Delivery of Stock Certificate(s)........................................................14

Section 5.10.   Debt Restructuring.............................................................................14

Section 6.1.    Tax Returns .......................................................................................15

Section 6.2.    Transfer Taxes. ..................................................................................15

Section 6.3.    Buyer's Claiming, Receiving or Using of Refunds and Overpayments...........15

Section 6.4.    Assistance and Cooperation ..............................................................16

Section 6.5.    Maintenance of Buyer's Books and Records .....................................16

Section 6.6.    Release...............................................................................................16

Section 7.1.    Conditions to Mutual Obligations .....................................................17

Section 7.2.    Conditions to Obligations of Buyer....................................................17

Section 7.3.    Conditions to Obligations of Seller ...................................................18

Section 8.1.    Survival..............................................................................................18

Section 8.2.    Buyer Acknowledgment.....................................................................18

Section 8.3.    Indemnification by Seller. ..................................................................19

Section 8.4.    Indemnification by Buyer...................................................................20

Section 8.5.    Limitations on Indemnification .........................................................20

Section 8.6.    Adjustments to Losses .......................................................................22

Section 8.7.    Third-Party Claim Indemnification Procedures .................................22

**TABLE OF CONTENTS**
(continued)

Page

Section 8.8.     Direct Claim Indemnification Procedures ........................................................23

Section 8.9.     Investigation by Indemnifying Parties................................................................23

Section 9.1.     Notices .......................................................................................................24

Section 9.2.     Amendment; Waiver ....................................................................................25

Section 9.3.     No Assignment or Benefit to Third Parties .....................................................25

Section 9.4.     Entire Agreement; Inconsistency ...................................................................25

Section 9.5.     Satisfaction of Obligations ...........................................................................25

Section 9.6.     Equitable Relief...........................................................................................25

Section 9.7.     Expenses ....................................................................................................26

Section 9.8.     Schedules ...................................................................................................26

Section 9.9.     Governing Law. ..........................................................................................26

Section 9.10.    Waiver of Jury Trial ....................................................................................27

Section 9.11.    Counterparts ...............................................................................................27

Section 9.12.    Headings ....................................................................................................27

Section 9.13.    No Setoff; No Withholding ...........................................................................27

Section 9.14.    Severability.................................................................................................27

Section 9.15.    Non-Recourse .............................................................................................27

Section 9.16.    Service of Process........................................................................................28

Section 9.17.    Currency ....................................................................................................28

Section 9.18.    Legal Representation ...................................................................................28

# TABLE OF CONTENTS
(continued)

APPENDICES AND SCHEDULES

APPENDICES
Appendix A    &ndash;    Definitions

SCHEDULES
Schedule 3.6    &ndash;    Legal Proceedings
Schedule 3.7    &ndash;    Tax Matters
Schedule 3.8    &ndash;    Labor and Employment Matters
Schedule 3.11    &ndash;    Real Property
Schedule 3.12    &ndash;    Equipment and Other Personalty
Schedule 3.13    &ndash;    Contracts
Schedule 4.4(b)    &ndash;    Buyer Non-Governmental Consents
Schedule A    &ndash;    Subsidiaries
Schedule B    &ndash;    Form of Memorandum of Overriding Royalty Interest
Schedule C    &ndash;    Form of Mutual Releases
Schedule D    &ndash;    Seller Non-Governmental Consents
Schedule E    &ndash;    Form of Dismissals
Schedule F    &ndash;    Form of Assignment Agreement
Schedule G    &ndash;    Form of Direction Letter
Schedule H    &ndash;    Form of Indemnity Agreement
Schedule I    &ndash;    Form of Termination and Release Agreement

TRANSACTION AGREEMENT, dated as of February 12, 2015 (as it may be amended or supplemented from time to time in accordance with the terms hereof, this "Agreement"), between Bluestone Resources Inc., a corporation organized under the Laws of the State of Delaware ("Buyer") and Caroleng Investments (SPV) Ltd., a company organized under the Laws of the British Virgin Islands ("Seller").

W I T N E S S E T H:

WHEREAS, Seller desires to sell, convey, assign, transfer and deliver ("Transfer"), and Buyer desires to purchase and accept ("Purchase") from Seller, on the terms and conditions set forth herein, all of the outstanding equity (the "Transferred Securities") of Mechel Bluestone Inc., a Delaware corporation (the "Company");

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and undertakings contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE I

## DEFINITIONS; INTERPRETATION

Section 1.1.    Definitions Generally.  Defined terms in this Agreement and in the Appendices and Schedules to this Agreement, which may be identified by the capitalization of the first letter of each principal word thereof, have the meanings assigned to them in Appendix A to this Agreement.  Other terms may be defined elsewhere in the text of this Agreement and, unless otherwise indicated, shall have such meanings throughout this Agreement and the Appendices and Schedules hereto.

Section 1.2.    Interpretation Generally.  Unless the express context otherwise requires:

(a)    the words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(b)    the terms defined in the singular have a comparable meaning when used in the plural, and vice versa;

(c)    references herein to a specific Article, Section, Subsection or Schedule shall refer, respectively, to Articles, Sections, Subsections or Schedules of this Agreement;

(d)    wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation;"

(e)    reference to a "party" shall be to a party to this Agreement, unless specifically stated otherwise;

(f)    references herein to any gender includes each other gender;

(g)    the word "or" shall be inclusive and not exclusive (for example, the phrase "A or B" means "A or B or both," not "either A or B but not both"), unless used in conjunction with "either" or the like;

(h)     each reference to "days" shall be to calendar days;

(i)     each reference to any Contract shall be to such Contract as amended, supplemented, used, waived or otherwise modified from time to time;

(j)     each reference to a Law, statute, regulation or other government rule is to it as amended from time to time and, as applicable, is to corresponding provisions of successor Laws, statutes, regulations or other government rules; and

(k)     accounting terms which are not otherwise defined in this Agreement, or any Appendix or Schedule hereto, shall have the meanings given to them under GAAP.

## ARTICLE II

## THE TRANSACTION

Section 2.1.     Purchase. On the terms and subject to the conditions set forth in this Agreement, at the Closing, and effective as of 9:00 a.m. New York City time on the Closing Date, Seller shall Transfer to Buyer, and Buyer shall Purchase from Seller, Seller's right, title and interest in and to all of the Transferred Securities, free and clear of all Liens, other than Limited Transfer Liens.

Section 2.2.     Consideration. Buyer caused to be placed in escrow Five Million Dollars ($5,000,000), which shall be treated as part of the purchase price together with a deferred purchase price consisting of (a) the Deferred Royalty Payments, and (b) the Contingent Payments as set forth in Section 2.3 and Section 2.4, respectively.

Section 2.3.     Deferred Royalty Payments. As at the Closing Date, the Buyer grants and undertakes to pay to the Seller an overriding royalty interest (the "Royalty Interest") at the rate of three Dollars ($3.00) per Ton of coal (i) mined and sold from the operations conveyed hereunder through the Transfer of the Transferred Securities or in or to which the Purchased Companies otherwise have rights or interest, or (ii) sold from any existing stockpiles of the Purchased Companies (collectively, the "Deferred Royalty Payments"), provided that for purposes of this Section 2.3 the term "sold" shall include any type of disposition for value, whether directly or indirectly, including a sale, transfer, assignment, lease, or any other similar type of arrangement and shall be evidenced by the sale documents, including Contracts, entered into with the relevant purchaser of coal. The maximum amount of Royalty Interest payable to Seller shall be One Hundred and Fifty Million Dollars ($150,000,000) (the "Maximum Royalty"). The Parties agree that once (i) the Maximum Royalty has been paid in royalties, or (ii) a sale transaction as described in Section 2.4 have occurred such that all and not less than all of the Transferred Securities, interests in all other Purchased Companies, all assets of Purchased Companies and all rights to mine assets referred to in this Section 2.3 held by Purchased Companies have been sold, and all payments due to Seller related thereto or arising therefrom have been made in full, the Buyer will have no further obligations relating to the Deferred Royalty Payment. The Deferred Royalty Payments that become due from Buyer to Seller in accordance with this Section 2.3 shall be paid to Seller (or to its respective successors and/or assigns) on an accumulated basis on the 10th Business Day of each calendar month. The parties agree and acknowledge that the payment of Five Million Dollars ($5,000,000) required to be effected pursuant to Section 2.2 is not and shall not be treated for any purposes whatsoever as prepayment against any portion of the Deferred Royalty Payments, nor shall such amount (or any portion thereof) be set-off against any portion of the Deferred Royalty Payments.

Section 2.4.     Contingent Payments. In the event that within the period commencing on the Closing Date and ending on the five (5) year anniversary of the Closing Date, the Buyer (or any Buyer's

Affiliate) enters into one or several sale transactions to sell to an unaffiliated third party (i) any of the Transferred Securities (or any portion thereof) or an interest in any other Purchased Company (or any portion thereof), and/or (ii) any assets of any Purchased Company (other than in the ordinary course of business, or in a manner that generates Deferred Royalty Payments), Buyer agrees and undertakes to pay to Seller (or a Person designated by the Seller) Twelve and one half percent (12.5%) of each such sale transaction Value. In the event that within the period commencing on the next day after the five (5) year anniversary of the Closing Date and ending on the ten (10) year anniversary of the Closing Date, the Buyer (or any Buyer's Affiliate) enters into one or several sale transactions to sell to an unaffiliated third party (i) any of the Transferred Securities (or any portion thereof) or an interest in any other Purchased Company (or any portion thereof), and/or (ii) any assets of any Purchased Company (other than in the ordinary course of business in a manner that generates Deferred Royalty Payments), Buyer agrees and undertakes to pay to Seller Ten Percent (10%) of each such sale transaction Value. For purposes of this Section 2.4 the term "*sells*" or "*sale transaction*" shall also include any disposition of rights to mine any of the assets set forth in Section 2.3 held by Purchased Companies as of the Closing Date, including by way of leasing or subleasing the real property of the Purchased Companies, or transferring or assigning the leases of the Purchased Companies. In the event the sale transactions referred to in this Section 2.4 are entered into with an Affiliate of Buyer, Buyer shall ensure that such Affiliate purchaser becomes jointly and severally liable with Buyer for all obligations of Buyer to effect payments to Seller (or a Person designated by Seller) as set forth in Section 2.3 and this Section 2.4 and if any such Affiliate purchaser (acting as seller) subsequently enters into a sale transaction described herein with another Buyer's Affiliate, the provisions of this Section 2.4 shall apply, *mutatis mutandis*, to such sale transaction and all obligations of Affiliate buyer and Affiliate seller related thereto or arising thereunder. The Buyer further warrants and undertakes to ensure that Buyer shall, and shall cause its respective Affiliates to, at all times act in good faith when effecting the sale transactions referred to herein and to the extent such sale transactions are entered into with an unaffiliated third party, they shall and will be entered into on commercially reasonable arms-length terms. All payments that become due from Buyer (or its respective Affiliate) to Seller in accordance with this Section 2.4 shall be referred to as "Contingent Payments" and shall be payable in full to Seller within 10 Business Days after completion of each relevant sale transaction. In the event of a partial sale, Deferred Royalty Payments shall continue to be made on that portion of Transferred Securities or interest in any Purchased Company or their respective assets that has not been sold or otherwise Transferred until the Maximum Royalty has been paid or the remaining portion of Transferred Securities or interest in any Purchased Company or their respective assets or right to mine has been sold in accordance with the formula set forth above, being Twelve and one half percent (12.5%) of the sale transaction Value if such sale occurs on or prior to the five (5) year anniversary of the Closing Date, or Ten Percent (10%) of the sale transaction Value if such sale occurs after the five year anniversary but on or prior to the ten (10) year anniversary of the Closing Date. For the avoidance of doubt, the obligations of Buyer and its Affiliates, as the case may be, pursuant to this Section 2.4 shall vest on the date when the relevant sale transaction is entered into in accordance with its terms and applicable Law, notwithstanding any deferred or contingent payment conditions or obligations (as and if applicable) of Buyer and/or any of its Affiliates pursuant to the terms of any such sale transaction and relevant Contingent Payments shall be payable in full to Seller within 10 Business Days after completion of each relevant sale transaction. This Section 2.4 shall survive the termination of this Agreement and the consummation of the Closing until all of the obligations hereunder have been fully satisfied.

Section 2.5. Release of Claims. At Closing, the Seller, on the one hand, and the Buyer, on the other hand, shall, and shall cause their respective Affiliates to, dismiss with prejudice by way of execution and delivery of Mutual Releases and Dismissals all claims between them, effective as of the Closing Date, including any claims and counterclaims related to (i) the Drilling Program and the calculation of the contingent reserves (both as defined in the Merger Agreement) currently filed under Case No. 9218-VCL in the Court of Chancery of the State of Delaware (the "Delaware Case"), (ii) any and all claims arising out of the Merger Agreement whether currently in dispute or not, and (iii) any and all claims for payments

or amounts due or claimed to be due from trade or transactions undertaken, entered or executed between or among the Seller and Buyer, or their predecessor or successor companies and all of their Affiliates, and each of their officers, directors, employees, Representatives, and agents, at any time prior to the Closing Date (all claims set forth in this Section are referred to herein as the "Disputes").

Section 2.6.    Closing.  The closing of the Transfer and Purchase of the Transferred Securities (the "Closing") shall take place at the offices of Dechert LLP, 1900 K Street, N.W., Washington, D.C. (or at such other place and time as the parties may agree) on the Business Day on which the last of the conditions set forth in Article VII (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) to be satisfied or waived is so satisfied or waived (the "Closing Date").

Section 2.7.    Deliveries by Seller.  At the Closing, Seller shall deliver or cause to be delivered to Buyer the following:

      (a)     the certificate to be delivered pursuant to Section 7.2(c);

      (b)     originals of all Seller Non-Governmental Consents;

      (c)     the resignations of the directors of the Company and its Subsidiaries;

      (d)     Indemnity Agreement duly executed by the Seller;

      (e)     Termination and Release Agreement executed by Mechel Mining; and

      (f)     the Mutual Releases and the Dismissals, duly executed by all of the Seller and Seller's Affiliates who are parties to the Merger Agreement and/or the Delaware Case.

Section 2.8.    Deliveries by Buyer.  At the Closing, Buyer shall deliver to Seller (or, in case of clause (b) below, if applicable, to its designee(s)) the following:

      (a)     the certificate to be delivered pursuant to Section 7.3(c);

      (b)     originals of any regulatory approvals obtained pre-closing and Buyer Non-Governmental Consents;

      (c)     documentation terminating the Drilling Program Guarantee in form and content satisfactory to Seller, including a waiver of any claims thereunder;

      (d)     the Mutual Releases and the Dismissals, duly executed by all of the Buyer and Buyer's Affiliates who are parties to the Merger Agreement and/or the Delaware Case;

      (e)     Indemnity Agreement duly executed by the Buyer

      (f)     Termination and Release Agreement executed by all of the Buyer and Buyer's Affiliates who are parties thereto; and

      (g)     the executed Memorandum of Overriding Royalty Interest.

Section 2.9.    Release of Escrow Funds.  Upon fulfillment of obligations of Seller and Buyer pursuant to, respectively, Section 2.7 and Section 2.8, the parties shall procure that the following actions take place simultaneously:

(a)     Escrow Agent shall release the funds held in escrow to Seller in accordance with Seller's instructions; and

(b)     The Seller shall release and deliver the certificate(s) representing the Transferred Securities, which shall have been duly endorsed in blank or accompanied by stock power(s) duly endorsed in blank, to Buyer.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Schedules attached hereto, Seller hereby represents and warrants to Buyer as follows:

Section 3.1.     Corporate Status.  Each of Seller, the Company and each Subsidiary of the Company is a corporation, limited liability company or other entity duly organized and validly existing under the Laws of its governing jurisdiction and each (a) has all requisite corporate, or other entity power and authority to enter into each of the transaction documents to which it is a party and to carry on its business as it is now being conducted and (b) is duly qualified to do business in each of the jurisdictions in which the ownership, operation or leasing of its properties and assets and the conduct of the business requires it to be so qualified.  Seller has made available to the Buyer true and complete copies of the Articles of Incorporation, Certificate of Incorporation, Bylaws, or other organizational documents applicable to each of the Company and its Subsidiaries, as amended.

Section 3.2.     Corporate Authorization.  The execution and delivery by Seller of this Agreement and the other Ancillary Documents to which it is a party and the consummation by Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by the Seller and no other corporate proceedings are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.

Section 3.3.     Binding Effect.  This Agreement and each of the Ancillary Documents to which Seller is a party, when executed and delivered by the parties thereto, constitutes a valid and legally binding obligation of Seller enforceable against Seller in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, or moratorium Laws, other similar Laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies.

Section 3.4.     Capital Structure.  As of the date of this Agreement, the authorized capital stock of the Company consists of one hundred (100) shares of common stock, par value One Dollar ($1) per share, of which one hundred (100) shares are issued and outstanding. The Seller is the sole shareholder of the Company and the owner of all issued and outstanding shares as set forth on the Company's register. Schedule A sets forth each Subsidiary of the Company, its authorized and outstanding capital stock or other equity interests, its shareholders or members, and the percentage of its outstanding capital stock or other equity interests owned by each of its shareholders or members.  The shares of the Company and the Subsidiaries are duly authorized, validly issued, fully paid and non-assessable, not subject to and not issued in violation of any contract or preemptive or similar rights, not issued in violation of any applicable Law, and held beneficially and of record by Seller or the Company, as relevant, free and clear of Encumbrances.  The shares of the Company and Subsidiaries constitute all of the outstanding capital stock of the Company or the Subsidiaries, as relevant. There are no (i) outstanding obligations, options, warrants, convertible or exchangeable securities or other rights, agreements or commitments (written, oral, contingent or otherwise) relating to the capital stock or other equity interests of the Company or any

of the Subsidiaries, (ii) voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of shares of capital stock or other equity interests of the Company.

Section 3.5.    Financial Statements. Seller has made available to Buyer true and complete copies of the Financial Statements. The Financial Statements were prepared in accordance with past practice subject, in the case of the unaudited Financial Statements, to (i) normal and recurring year-end adjustments and (ii) contingent liabilities, as that term is defined in accordance with GAAP.

Section 3.6.    Legal Proceedings. Except as set forth in Schedule 3.6, there are no Actions with a value in excess of $1,000,000 pending by or against the Company or any Subsidiary of the Company, their properties or other assets, or any of their officers or directors in their capacity as such.

Section 3.7.    Taxes. Except as set forth in Schedule 3.7, the Company and each of its Subsidiaries has (a) filed all Tax Returns required to be filed by them, other than those Tax Returns the failure of which to file would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, (b) paid in full all Taxes shown to be due on such Tax Returns. Other than as set forth in Schedule 3.7, neither the Company nor any of its Subsidiaries has received any written notice of any audit, claim, assessment, levy or administrative or judicial proceeding with respect to Taxes of the Company or any of its Subsidiaries which have not been fully paid or finally settled, except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 3.8.    Labor and Employment Matters. Except as set forth in Schedule 3.8, to the Knowledge of Seller (i) none of the Company or its Subsidiaries is a party to any collective bargaining agreement or any other labor-related agreements with any labor union and (ii) there is no unfair labor practice charge or complaint filed against the Company or any Subsidiary of the Company which would be reasonably expected to have a Material Adverse Effect.

Section 3.9.    Employee Benefit Plans. Each of the Company benefit plans has been executed, managed and administered in material compliance with all applicable Laws, including but not limited to the applicable provisions of ERISA, the Code, and the regulations promulgated thereunder. There are no pending or, to the Knowledge of Seller, threatened claims by or on behalf of any Company benefit plan, by any employee, dependent or beneficiary covered under any such plan, or otherwise involving any such plan (other than routine claims for benefits), which would reasonably be expected to have a Material Adverse Effect.

Section 3.10.    Insurance. Seller has provided Buyer a true and complete list of all current policies or binders of insurance of any type (including any self-insurance policies or programs) maintained by the Company and its Subsidiaries.

Section 3.11.    Real Property. Schedule 3.11 sets forth a materially accurate and complete list of all real property owned by the Company or any of its Subsidiaries, including but not limited to mining and surface rights. Except as set forth in Schedule 3.11, the Company or its Subsidiaries own such real property, free and clear of Liens except Permitted Liens. Except as set forth in Schedule 3.11, with respect to each parcel of material real property owned, (i) there are no material contracts granting any Person (other than the Company or any of its Subsidiaries) the right of entry, use or occupancy of any portion of such parcel and (ii) there are no material outstanding rights of first refusal, rights of first offer or options to purchase such parcel or any interest therein. Schedule 3.11 sets forth an accurate and complete list of all material leases of the Company and the Subsidiaries (the "Material Company Leases") and all material leased real property (the "Material Leased Real Property") of the Company and the Subsidiaries. None of the Material Company Leases has been assigned, subleased, amended or otherwise

modified, except as set forth on Schedule 3.11. Except as set forth on Schedule 3.11, the Company's or its Subsidiaries' rights to the Material Leased Real Property are free and clear of Liens except Permitted Liens. Except as set forth in Schedule 3.11, (i) each Material Company Lease constitutes a valid and binding obligation of, and to the Seller's knowledge is in full force and effect against, the Company or the Subsidiary of the Company that is a party thereto, and (ii) to the Knowledge of Seller, no Purchased Company has received written notice that it is in breach or default under any Material Company Lease the failure to comply with which could reasonably be expected to have a Material Adverse Effect.

Section 3.12. <u>Equipment and Other Personalty</u>. The equipment, machinery, vehicles and other tangible personal property (other than inventories) used by the Company or its Subsidiaries in the Business is defined as the "<u>Coal Personalty</u>". Schedule 3.12 contains a list of all Coal Personalty owned or leased by the Company or any of its Subsidiaries with an individual book value of over $500,000 and indicates for each such item of Coal Personalty whether it is owned or leased. The Company and its Subsidiaries have good and marketable title to the owned Coal Personalty, free and clear of all Liens other than purchase money liens and Permitted Liens.

Section 3.13. <u>Contracts</u>. Except as set forth in Schedule 3.13, and except for any inter-company indebtedness of the Purchased Companies to their Affiliates, or as otherwise specifically referenced in any other schedule hereto, to the Knowledge of Seller, there are no current material outstanding obligations or material claims of non-performance under any (i) existing coal supply, or (ii) guarantee agreement entered into with a person that is not an Affiliate of Seller or any Purchased Company, to which the Company or any of its Subsidiaries is a party.

Section 3.14. <u>Compliance with the Foreign Corrupt Practices Act</u>. Neither the Company nor any of its Subsidiaries has violated the U.S. Foreign Corrupt Practices Act or the anticorruption laws of any jurisdiction where the Company or its Subsidiaries do business.

Section 3.15. <u>Finders' Fees</u>. Except for fees to Deutsche Bank Securities Inc., whose fees will be paid by Seller, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Seller or any of its Affiliates who might be entitled to any fee or commission from Seller or its Affiliates in connection with the transactions contemplated hereby.

Section 3.16. <u>Limitations on Representations and Warranties</u>. Except as expressly set forth in this <u>Article III</u> or in the officer's certificate delivered to Buyer pursuant to <u>Section 7.2(c)</u>, Seller does not make any representation or warranty, express or implied, at Law or in equity, with respect to itself, the Purchased Companies or any of their other Affiliates, or any of their respective assets, liabilities, businesses or operations (including in respect of the correctness, accuracy or completeness of any information, Contract or certificate furnished or made available, or to be furnished or made available (including by way of information included or referred to in the electronic data room or otherwise), or statement made, by Seller, any of its Affiliates or their respective Representatives in connection with the transactions contemplated herein), and any such other representations or warranties are hereby expressly disclaimed. The Buyer acknowledges that where brief particulars of a matter are set out or referred to in the schedules referred to in this <u>Article III</u>, full particulars of the matter are deemed to be disclosed and it is assumed that no further details are required. Where a document is referred to in this Article III but not attached, or a reference is made to a particular part only of such document in this Article III, the full contents of the document are deemed to be disclosed, unless otherwise stated, and the Buyer is deemed to require no further details. The Buyer is deemed to purchase with full knowledge and notice of, and of the effect of, all the contents and provisions of information and documentation referred to in this <u>Article III</u>. It is agreed that Buyer shall not be entitled to claim that any fact or matter has not been disclosed or known to it by reason of the information and material contained or referred to in this <u>Article III</u> either being or not being specifically related to any particular schedule (or a portion thereof) to this Agreement.

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

Section 4.1.  Organization and Qualification.  Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.  Buyer has all requisite corporate power and authority to own and operate its properties and assets and to carry on its business as currently conducted.  Buyer is duly qualified to do business and is in good standing in each jurisdiction where the ownership or operation of its properties and assets or the conduct of its business requires such qualification, except for failures to be so qualified or in good standing that would not, individually or in the aggregate, reasonably be expected to materially adversely affect Buyer's ability to execute, deliver or perform this Agreement or any Ancillary Documents, or to timely consummate the transactions contemplated hereby or thereby.

Section 4.2.  Corporate Authorization.  Buyer has full corporate power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Documents to which it is a party has been duly and validly authorized by Buyer and no additional corporate (or similar entity) authorization or consent by Buyer is required in connection therewith.  Each Buyer's Affiliate has full power and authority to execute all Ancillary Documents to which it is a party.

Section 4.3.  Binding Effect.  This Agreement and each of the Ancillary Documents to which Buyer or any of its Affiliates is a party, when executed and delivered by the parties thereto, constitutes a valid and legally binding obligation of Buyer or its Affiliates, as relevant, enforceable against Buyer or its Affiliates, as applicable, in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, or moratorium Laws, other similar Laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies.

Section 4.4.  Regulatory Approvals and Non-Governmental Consents.

(a)  No Governmental Authorization or filing is required to be obtained by Buyer with cooperation from Seller from, or to be given by Buyer to, or made by Buyer with, any Governmental Entity or securities exchange, as a result of the execution, delivery or performance by Buyer or its Affiliates of (i) its obligations under this Agreement or (ii) its material obligations under the Ancillary Documents, except for such Governmental Authorization or filings that if not obtained, given or made would not, individually or in the aggregate, reasonably be expected to materially adversely affect Buyer's or its Affiliates' ability to execute, deliver or perform this Agreement or any Ancillary Document, or to timely consummate the transactions contemplated hereby or thereby.

(b)  Except as set forth in Schedule 4.4(b) (the "Buyer Non-Governmental Consents" and, together with the Seller Non-Governmental Consents, the "Non-Governmental Consents"), no consent, approval, waiver or authorization is required to be obtained by Buyer from, or to be given by Buyer to, or made by Buyer with, any Person other than a Governmental Entity or securities exchange, as a result of the execution, delivery or performance by Buyer or its Affiliates of this Agreement and the Ancillary Documents, except for such consents, approvals, waivers or authorizations of which the failure to obtain

would not, individually or in the aggregate, reasonably be expected to materially adversely affect Buyer's or its Affiliates' ability to execute, deliver or perform this Agreement or any Ancillary Document, or to timely consummate the transactions contemplated hereby or thereby.

Section 4.5. <u>Non-Contravention</u>. The execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not (i) violate any provision of the Organizational Documents of Buyer, (ii) assuming the receipt of all Non-Governmental Consents, materially conflict with, or result in the material breach of, or constitute a material default under, or result in the termination, cancellation, material modification or acceleration (whether after the filing of notice or the lapse of time or both) of any material right or obligation of Buyer under, or result in a loss of any benefit to which Buyer is entitled under, any material Contract to which Buyer is a party or result in the creation of any Lien upon any of its assets or (iii) assuming the receipt of all Non-Governmental Consents, materially violate or result in a material breach of or constitute a material default under any Law or Governmental Authorization to which Buyer or its Affiliates are subject.

Section 4.6. <u>Finders' Fees</u>. There is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Buyer or any of its Affiliates who might be entitled to any fee or commission from Buyer or its Affiliates in connection with the transactions contemplated hereby.

Section 4.7. <u>Litigation and Claims</u>. There are no Litigations pending or, to Buyer's Knowledge, threatened against Buyer that, individually or in the aggregate, would affect Buyer's ability to execute, deliver or perform this Agreement or its or its Affiliates' ability to execute, deliver or perform any Ancillary Document, or to timely consummate the transactions contemplated hereby or thereby. Buyer is not subject to any order, writ, judgment, award, injunction or decree of any Governmental Entity of competent jurisdiction or any arbitrator or arbitrators that, individually or in the aggregate, would have a material adverse effect on Buyer's ability to execute, deliver or perform this Agreement or any Ancillary Document, or to timely consummate the transactions contemplated hereby or thereby.

Section 4.8. <u>Financial Capability</u>. Buyer has, and will have at Closing, immediately available sufficient funds and adequate financial resources to satisfy in full its monetary obligations under Section 5.7 and other obligations under this Agreement. Buyer acknowledges that the obligations of Buyer under this Agreement are not contingent upon or subject to any conditions regarding Buyer's, its Affiliates', or any other Person's ability to obtain financing for the consummation of the transactions contemplated hereby. The Buyer will and will cause the Company and its Subsidiaries (as applicable), to duly and timely effect the Deferred Royalty Payments and Contingent Payments in full as they become due and nothing prevents or will prevent or hinder the Buyer from effecting such payments in accordance with the terms of this Agreement.

Section 4.9. <u>Investment Representations</u>.

(a) Buyer is acquiring the Transferred Securities solely for investment purposes and not with a view to, or for sale in connection with, any distribution thereof in violation of any Law (including the Securities Act of 1933 (the "<u>Securities Act</u>) and Buyer is an "accredited investor" as defined in Rule 501(a) promulgated under the Securities Act.

(b) Buyer acknowledges the Transferred Securities are not registered under the Securities Act or any other applicable securities or "blue-sky" Laws, and that such Transferred Securities may not be transferred or sold except pursuant to the registration provisions of such Securities Act or pursuant to an applicable exemption therefrom and pursuant to any other applicable securities or "blue-sky" Laws.

(c)     Buyer understands that the acquisition of the Transferred Securities to be acquired by it pursuant to the terms of this Agreement involves substantial risk and that there is a limited market for the Transferred Securities. Buyer has experience as an investor in securities of issuers such as the securities being Transferred pursuant to this Agreement and acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that Buyer is capable of evaluating the merits and risks of its investment in the Transferred Securities to be acquired by it pursuant to the transactions contemplated hereby.  The overall commitment of Buyer to investments which are not readily marketable is not disproportionate to the net worth of Buyer, and Buyer's acquisition of the Transferred Securities will not cause such overall commitment to become excessive. In reaching an informed decision to purchase the Transferred Securities, Buyer has sufficient information to evaluate the merits and risks of an investment in the Transferred Securities and Buyer has had the opportunity to ask questions, and Representatives of the Purchased Companies have fully and satisfactorily answered such questions, which Buyer or duly authorized Representatives of Buyer desired to ask concerning the Purchased Companies or the Transferred Securities.  Buyer is not relying on any of the Purchased Companies, Seller, or any of its Affiliates with respect to the corporate tax, legal and economic considerations involved in its investment in the Purchased Companies.  Buyer acknowledges and agrees that it (i) has had reasonable access to (A) the Books and Records of the Purchased Companies and (B) the electronic data room maintained in connection with the transactions contemplated by this Agreement, and (ii) has conducted its own independent investigation of the Purchased Companies, their respective businesses and the transactions contemplated hereby, and has not relied on any representation, warranty or other statement by Seller, any of the Purchased Companies, or any of their respective Affiliates or Representatives, other than the representations and warranties of Seller expressly contained in Article III of this Agreement and that all other representations and warranties are specifically disclaimed.

(d)     Buyer acknowledges that the offer and sale of the Transferred Securities to be acquired by it in the transactions contemplated by this Agreement has not been accomplished by general solicitation or the publication of any advertisement, including any advertisement, article, notice or other communication published in any newspaper, magazine or similar media, or broadcast over television or radio, or any seminar or meeting whose attendees have been invited by any general solicitation or general advertising.

(e)     There are no existing Contracts pursuant to which Buyer will divest or otherwise dispose of the Transferred Securities or the assets of or equity in, or by any other manner, any Purchased Company.

## ARTICLE V

## COVENANTS

Section 5.1.    Recording of Royalty Interest.  Seller, on the one hand, and Buyer, on the other hand, shall, and shall cause their respective Affiliates to, use their respective best efforts to make the Royalty Interest recordable and to duly record and to cooperate in recording the Royalty Interest in a manner to ensure that the Royalty Interest attaches to the land owned, or to the extent permissible leased, as the case may be, by the Purchased Companies (including to all extensions, renewals or replacement leases of any kind that relate to the same) and remains at all times attached to such land notwithstanding any Transfer thereof unless and until the earlier to occur of (i) the Maximum Royalty having been paid in full to Seller (or its successors and/or assigns, as the case may be), or (ii) the sale transactions described in Section 2.4 have taken place such that all and not less than all Transferred Securities, interests in all other Purchased Companies, all assets of Purchased Companies and/or all rights to mine assets referred to in Section 2.3 held by Purchased Companies have been sold, and all payments due to Seller related thereto

or arising therefrom have been made in full. For these purposes, Buyer, acting in good faith, shall deliver or cause to be delivered to Seller at Closing a memorandum (one or several) of Royalty Interest in the form of Schedule B signed by all entities that own or otherwise hold the coal assets referred to in Section 2.3 in a recordable form that describes and sets forth the Royalty Interest (the "Memorandum of Overriding Royalty Interest"), provided that following the delivery of such memorandum, Buyer and Buyer's Affiliates shall continue to fully cooperate in recording of the Memorandum of Overriding Royalty Interest as set forth in this Section 5.1 and shall not take any action, or cause any Person to take action, to withdraw or otherwise invalidate the Memorandum of Overriding Royalty Interest or challenge its recording or delivery. Buyer and Seller believe that the Memorandum of Overriding Royalty Interest does not and will not violate the terms or cause a default or breach of any coal lease or sublease of the Company or its Subsidiaries. Notwithstanding the immediately preceding sentence, the Memorandum of Overriding Royalty Interest shall provide that it is not intended to be recorded on any lease or sublease that expressly prohibits the recording of such an instrument, provided further, however, that the Buyer shall at all times remain obligated to pay the Deferred Royalty Payments in accordance with the terms hereof notwithstanding any prohibition against the recording of the Memorandum of Overriding Royalty Interest against any leased or subleased property of the Purchased Companies or the absence of any Leased Real Property in the Memorandum of Overriding Royalty Interest.

Section 5.2. Access and Reports. Within the period commencing on the Closing Date and until the earlier to occur of (i) the Maximum Royalty having been paid in royalties in full to Seller (or its successors and/or assigns, as the case may be), or (ii) the sale transactions described in Section 2.4 have taken place such that all and not less than all Transferred Securities, interests in all other Purchased Companies, all assets of Purchased Companies and/or all rights to mine assets referred to in Section 2.3 held by Purchased Companies have been sold, and all payments due to Seller related thereto or arising therefrom have been made in full, Buyer shall, and shall cause the Purchased Companies to, (a) upon reasonable notice from Seller to Buyer, afford Seller's officers and other authorized Representatives reasonable access to the properties, Books and Records and Contracts of the Purchased Companies and, during such period, Buyer shall and shall cause the Purchased Companies to make available promptly to Seller all information concerning the operations of the Purchased Companies as Seller may reasonably request to ensure Buyer's compliance with its obligations to effect the Deferred Royalty Payments and Contingent Payments, and (b) within ten (10) Business Days upon conclusion of each of the sale transactions referred to in Section 2.4 the Buyer shall, and shall cause its respective Affiliates to, provide Seller and to Seller's satisfaction the sale documents, including Contracts, entered into with the relevant purchaser of coal in full and in an accessible format so as to allow Seller to readily verify the Value of each relevant sale transaction.

Section 5.3. Post Closing Filings. As soon as practicable after the Closing Date, Buyer shall, and shall cause each Purchased Company to, prepare and file all notices, reports, statements, applications and other filings as required by applicable Law or any Governmental Entity or as otherwise customary or advisable under applicable Law as a result of the consummation on the Closing Date of the transactions contemplated hereby.

Section 5.4. Certain Consents Matters.

(a) Buyer agrees that none of Seller or any other Person shall have any liability whatsoever to Buyer arising out of or relating to the failure to obtain any such regulatory approvals or Non-Governmental Consents that may be required in connection with the transactions contemplated by this Agreement or the Ancillary Documents or because of the termination of any Contract or Governmental Authorization solely as a result thereof. Buyer further agrees that no representation, warranty or covenant of Seller contained herein shall be breached or deemed breached as a result of (i) the failure to obtain any such Consent, (ii) any such termination or (iii) any Litigation commenced or threatened by or

on behalf of any Person arising out of or relating to the failure to obtain any such regulatory approvals or Non-Governmental Consents or any such termination.

Section 5.5.    Public Disclosure; Confidentiality.

(a)    Notwithstanding anything to the contrary contained in this Agreement, except as may be required to comply with the requirements of any applicable Law, from and after the date hereof, no party hereto shall make any press release or similar public announcement or communication relating to this Agreement unless specifically approved in advance by Buyer and Seller, which approval shall not be unreasonably withheld, conditioned or delayed.

(b)    From and after the date of this Agreement, each of Buyer and Seller shall, and shall cause each of their respective Affiliates to, keep confidential the terms of this Agreement and the Ancillary Documents and the negotiations relating thereto and all documents and information obtained by a party from another party in connection with the transactions contemplated hereby (collectively, the "Confidential Information") except (A) to the extent that any Confidential Information must be disclosed to obtain regulatory approvals or any other required regulatory approvals or consents relating to the transactions contemplated by this Agreement or any Ancillary Document, (B) for disclosures otherwise made in satisfaction of any of the obligations under this Agreement, (C) to the extent required by applicable Law, (D) as made public prior to the date of this Agreement by either party not in violation of this Agreement and (E) each of Buyer and Seller may disclose such information to such Person's equityholders or Affiliates, and their respective Representatives.

(c)    If for any reason whatsoever the transactions contemplated by this Agreement are not consummated, Buyer shall upon request from Seller promptly return to Seller all Books and Records (including all copies, if any, thereof) furnished or made available by Seller, or any of Seller's Representatives, and shall not use or disclose the information contained in such Books and Records for any purpose or make such information available to any other Person.

Section 5.6.    Post Closing Covenants.  Buyer shall, and shall causes its Affiliates to, (i) restore and maintain each Purchased Company for all purposes as a going concern, (ii) not dispose of any assets of the Purchased Companies (other than acting as a prudent operator in good faith and in the ordinary course of business in a manner that generates Deferred Royalty Payments), (iii) refrain from any act or omission reasonably likely to materially affect its ability to pay the Royalty Interest, or effect Deferred Royalty Payments, or Contingent Payments,  (iv) duly comply with the provisions of Section 5.1, including fully cooperating in recording of the Memorandum of Overriding Royalty Interest, (v) duly comply with the provisions of Section 5.7, (vi) not to pay or cause Purchased Companies to pay any dividends or otherwise transfer any funds out of the Purchased Companies, except in the ordinary course of business, or only to the extent of the Purchased Companies' profits after current obligations are met with respect to the Deferred Royalty Payments, and/or to the extent necessary for the full implementation of the provisions of Section 5.7; and (vii) take any and all such other reasonable actions to ensure that Seller will benefit from the terms hereof, all unless and until (a) the Maximum Royalty has been paid in full to Seller (or its successors and/or assigns, as the case may be), or (b) the sale transactions described in Section 2.4 have taken place such that all and not less than all Transferred Securities, interests in all other Purchased Companies, all assets of Purchased Companies and/or all rights to mine assets referred to in Section 2.3 held by Purchased Companies have been sold, and all payments due to Seller related thereto or arising therefrom have been made in full.

Section 5.7.    Infusion of Capital.  Buyer hereby agrees and undertakes to infuse for working capital purposes and by way of equity contribution or an extension of a loan, Twenty Million Dollars ($20,000,000) into the Purchased Companies within a reasonable period of time (in any event not to

exceed eighteen months) following the Closing Date. In the event the capital is infused via a loan transaction, the repayment of such loan, or any portion thereof shall at all times be subordinate to each of (i) the Deferred Royalty Payments, (ii) the Contingent Payments, or (iii) any other payment that becomes or may become due from Buyer to Seller under this Agreement or any Ancillary Document.

Section 5.8. Directors' and Officers' Exculpation; Indemnification.

(a) Buyer agrees that all rights to indemnification for acts or omissions occurring prior to the Closing now existing in favor of the current or former directors or officers (or persons holding similar positions) of Seller or any Purchased Company currently indemnified by any Purchased Company (collectively, the "Covered Persons") as provided in their respective Organizational Documents, indemnity or indemnification agreements or as provided pursuant to a resolution of the board of directors (or similar governing body) of Seller or any Purchased Company (and disclosed to Buyer as part of this Agreement), as applicable, shall survive the transactions contemplated by this Agreement or the Ancillary Documents and shall continue in full force and effect in accordance with their terms for a period of not less than six (6) years from the Closing. Without limiting the foregoing, for a period of not less than six (6) years from the Closing, Buyer shall not, and shall not permit any Purchased Company to, amend, modify or terminate any Organizational Document, Contract or resolution regarding or related to such indemnification matters.

(b) To the fullest extent permitted by applicable Law, Buyer shall, and shall cause each of the Purchased Companies to, honor all of the Purchased Companies' obligations to indemnify (including any obligations to advance funds for expenses) the Covered Persons for acts or omissions by such Covered Persons occurring prior to the Closing to the extent that such obligations of any of the Purchased Companies exist on the date of this Agreement, and are permitted by law, whether pursuant to Organizational Documents, indemnity or indemnification agreements, board (or similar governing body) resolutions or otherwise, and such obligations shall survive the Closing and shall continue in full force and effect in accordance with the terms of the Organizational Documents of any of the Purchased Companies, as the case may be, and such board (or similar governing body) resolutions or indemnity or indemnification agreements from the Closing until the expiration of the applicable statute of limitations with respect to any claims against such Covered Persons arising out of such acts or omissions.

(c) The Buyer shall direct and cause the Company and its Affiliates (determined after the Closing) and their respective successors, assigns, heirs, legatees and personal Representatives (collectively, the "Releasors"), not to institute any Litigation against any of the current or former officers or directors (or Persons holding similar positions) of Seller or any Purchased Company, in their capacities as such, with respect to any losses or other liabilities, actions or causes of action, judgments, claims and demands of any nature or description (consequential, compensatory, punitive or otherwise) arising from or relating to actions occurring prior to the Closing, including, for the avoidance of doubt, any restructuring, settlement, assignment, release, transfer or discharge of intercompany debt owed by any Purchased Company to any of its Affiliates, whether or not such Person would be entitled to indemnification by the Company under this Section 5.8; and, effective as of the Closing, each Releasor, to the fullest extent permitted by applicable Law, hereby releases and forever discharges Seller and its directors and officers (and Persons holding similar positions), equityholders, affiliates, agents, Representatives, successors and assigns (individually, a "Releasee" and collectively, "Releasees") from any and all damages, losses, charges, liabilities, claims, demands, actions, suits, judgments, settlements, costs and expenses (including reasonable attorneys' fees and disbursements) ("Covered Losses") by reason of, relating to or arising from any fact, and which the Releasors now have, have ever had or may hereafter have against the respective Releasees arising prior to the Closing whether or not relating to claims pending at, or asserted after, the Closing; provided, however, that nothing contained herein shall

operate to release any losses on account of, arising out of, relating to or under Buyer's rights under this Agreement.

(d) Buyer shall purchase, or shall reimburse Seller or its Affiliates for its or their purchase of (in each case at an annual cost of no more than 200% of the annual premium currently being paid by the applicable Person(s)), a three-year extended reporting period endorsement under the existing directors' and officers' liability insurance policies of such Person(s) (the "D&O Insurance"), providing that such endorsement shall extend the directors' and officers' liability coverage in force as of the date hereof for a period of three years from the Closing for any claims arising from events which occurred prior to the Closing. Buyer shall, and shall cause the applicable Purchased Companies to, (i) upon the request of Seller, make any claim for coverage under any such policy and take any action reasonably requested by Seller to obtain reimbursement for Covered Losses under any such policy or to otherwise enforce any such policy or any provision thereof, (ii) promptly inform Seller of any communication received by Buyer or any Purchased Company thereof from, or given by Buyer or any Purchased Company to, any Person issuing any such insurance policy, (iii) permit Seller to review any written communication from any such insurance provider and permit Seller to review, before submission, any written communication to such insurance provider, (iv) consult with Seller in advance of any meeting or conference with such insurance provider and, to the extent permitted by such insurance provider, give Seller the opportunity to attend and participate, and (v) upon Seller's request, promptly furnish to Seller certificates of insurance evidencing such policy.

(e) Notwithstanding anything to the contrary herein, (i) if any Covered Person is entitled to be reimbursed or indemnified by any Person (including Seller or its Affiliates) other than Buyer or any Purchased Company, such Covered Person shall not be required to recover from or be indemnified by, or to seek such recovery or indemnification from, any such other Person prior to or as a condition to being indemnified as described in this Section 5.8.

(f) The provisions of this Section 5.8 are (i) intended to be for the benefit of, and shall be enforceable by, each Covered Person and each other Person entitled to indemnification under this Section 5.8 and each such Person's heirs, legatees, Representatives, successors and assigns, it being expressly agreed that such Persons shall be third party beneficiaries of this Section 5.8, and (ii) in addition to, and not in substitution for, any other rights to indemnification or contribution that any such Person may have by Contract or otherwise. If Buyer or its successors or assigns (i) shall consolidate with or merge into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of its properties and assets to any Person, then, and in each such case, proper provisions shall be made so that the successors and assigns of Buyer shall assume all of the obligations of Buyer set forth in this Section 5.8.

Section 5.9. Delivery of Stock Certificate(s). Seller shall cause the certificate(s) representing the Transferred Securities to be delivered to Buyer at Closing subject to satisfaction of the conditions to Closing as set out in Section 7.1. The certificate(s) shall be either duly endorsed in blank or accompanied by stock power(s) duly endorsed in blank, in proper form for transfer to Buyer.

Section 5.10. Debt Restructuring. Seller shall cause the discharge, to the satisfaction of the Buyer, of the Mechel Bluestone Indebtedness and the Bluestone Coal Indebtedness, by way of execution and performance of the Assignment Agreement and the Direction Letter.

# ARTICLE VI

# TAX MATTERS

Section 6.1.    Tax Returns.

(a)    Seller shall cause the Purchased Companies to file when due all Tax Returns that are required to be filed by or with respect to the Purchased Companies on or before the Closing Date and shall cause the Purchased Companies to pay any Taxes shown as due with respect to such Tax Returns, provided, however, that the Buyer is aware, understands and acknowledges that, at Closing, Purchased Companies have certain unpaid tax liabilities described on Schedule 3.7 which will not be paid as of the Closing. Buyer shall file or cause to be filed when due all Tax Returns that are required to be filed by or with respect to the Purchased Companies after the Closing Date and shall remit any Taxes due with respect to such Tax Returns. All such Tax Returns shall be prepared in a manner consistent with past practices and applicable Law. Any taxes that are the result of this transaction shall be paid by Seller, to the extent that the same are the legal obligations of the Seller.

(b)    Buyer shall not, without the prior written consent of Seller: (i) file, amend, or request or permit the amendment of a Tax Return with respect to the Purchased Companies filed or required to be filed by Seller or which could affect the Tax liability of Seller (or any of Seller's direct or indirect owners); (ii) apply to any Taxing Authority for any binding or non-binding opinion, ruling or other determination in relation to any act, matter or transaction covered by any such Tax Returns or to any act, matter or transaction occurring on or before the Closing Date with respect to the Purchased Companies; or (iii) furnish to any Taxing Authority any information (in writing or otherwise) in relation to any such Tax Returns or to any act, matter or transaction occurring on or before the Closing Date with respect to the Purchased Companies, unless otherwise directed to do so by any Taxing Authority.

Section 6.2.    Transfer Taxes. Each of Buyer, on the one hand, and Seller, on the other hand, believe that this transaction involves the transfer of stock and is not subject to any local, foreign or other excise, sales, use, value added, transfer (including real property transfer or gains), stamp, documentary, filing, recordation and other similar taxes and fees that may be imposed or assessed as a result of the execution of this Agreement or the Ancillary Documents. PROVIDED, HOWEVER, that should and to the extent that any such tax or fee should arise or be imposed, it shall be borne equally by both the Buyer and the Seller.

Section 6.3.    Buyer's Claiming, Receiving or Using of Refunds and Overpayments. If, following the Closing, any Purchased Company, Buyer or any of their respective Affiliates (a) receive or enjoy any refund, credit, rebate, reduction in Taxes or similar benefit or (b) utilize the benefit of any overpayment or prepayment of Taxes, which, in either of the foregoing clauses (a) and (b), relate to either of (x) a Tax paid by Seller or any of its Affiliates (or to losses generated on or prior to the Closing Date that are used in taxable periods ending on or after the Closing Date), or (y) the Purchased Company Tax Deductions, Buyer shall promptly pay or transfer, or cause to be paid or transferred, to Seller (as it may specify) the entire amount of the refund, credit, rebate, reduction, payment or overpayment (including interest) received, enjoyed or utilized by Buyer or its Affiliates, but only to the extent such amount exceeds the amount of unpaid tax liabilities described on Schedule 3.7 and referred to in Section 6.1(a) above. Buyer agrees to notify Seller promptly of both the discovery of a right to claim any such refund, credit, rebate, reduction, payment or overpayment and the receipt of any such refund, credit, rebate, reduction, payment or utilization of any such overpayment. Buyer agrees to claim any such refund, credit, rebate, reduction, payment or to utilize any such overpayment as soon as possible and to furnish to Seller all information, records and assistance necessary to verify the amount of the refund, credit, rebate, reduction, payment or overpayment. Buyer shall permit Seller to control at Seller's expense the

prosecution of any such refund claim and shall cause the relevant entity to authorize by appropriate power of attorney such Persons as Seller shall designate to represent such entity with respect to such refund claim.

Section 6.4. <u>Assistance and Cooperation</u>. Following the Closing Date, each of Buyer and Seller shall cooperate fully in preparing any Tax Returns with respect to the Purchased Companies and in preparing for any audits of, inquiries by, or disputes with any Taxing Authorities regarding, any applicable Tax Returns with respect to the Purchased Companies and payments in respect thereof, including (a) providing timely notice to the other of any pending or proposed audits or assessments with respect to Taxes for which such other party or any of its Affiliates may have a liability under this Agreement or the Ancillary Documents, (b) furnishing the other with copies of all relevant correspondence received from any Taxing Authority (whether before, on, or after the Closing Date) in connection with any audit or information request with respect to any Taxes referred to in clause (a) of this Section and (c) making available to the other party during normal business hours, all Books and Records, Tax Returns or portions thereof (together with related paperwork and documents relating to rulings or other determinations by Taxing Authorities), proof of payment of Taxes, documents, files, officers or employees (without substantial interruption of employment) or other relevant information necessary or useful for such purposes, in each case, whether or not in existence as of the Closing Date.

Section 6.5. <u>Maintenance of Buyer's Books and Records</u>. Until the applicable statute of limitations (including periods of waiver) has run for any Tax Returns filed or required to be filed with respect to the Purchased Companies covering the periods up to and including the Closing Date, Buyer shall, and shall cause its Affiliates to, retain or cause to be retained all Books and Records in existence on the Closing Date and, following the Closing Date, shall provide Seller or its Representative access to such Books and Records and the equivalent Books and Records prepared following the Closing Date for inspection and copying by Seller and its Affiliates, or their agents upon reasonable request and upon reasonable notice. After the expiration of such period, no Books and Records shall be destroyed by Buyer without first advising Seller in writing and giving Seller a reasonable opportunity to obtain possession thereof, with any costs of transferring the Books and Records to be paid by Seller.

Section 6.6. <u>Release</u>. Other than as set forth in Section 2.3 and Section 2.4, if applicable, from and after the Closing, Seller, on behalf of itself and its Affiliates, hereby releases and forever discharges the Company and the Company's Subsidiaries (collectively, the "<u>Company Releasees</u>") from any and all claims, demands, actions, Contracts and Liabilities and Costs whatsoever, suspected or unsuspected, both at Law and in equity, which Seller or its Affiliates (other than the Company and its Subsidiaries) now has or has ever had against the respective Company Releasees arising prior to or contemporaneously with the Closing or on account of or arising out of any matter, cause or event occurring contemporaneously with or prior to the Closing. Seller shall provide Buyer at Closing with further documentation as Buyer may reasonably request to address any known and specific claims or liabilities as the parties may agree. Seller shall indemnify Buyer and its Affiliates, including the Company and its Subsidiaries, and hold them harmless from and against any and all reasonable Losses incurred or suffered by any of them arising out of any claim made by or on behalf of Mechel Carbon in respect of the Bluestone Coal Indebtedness and/or by or on behalf of Mechel International Holdings GmbH in respect of the Mechel Bluestone Indebtedness. The indemnification provided for in this <u>Section 6.6</u> shall not be subject to the limitations contained in <u>Section 8.5</u>.

**ARTICLE VII**

**CONDITIONS TO CLOSING**

Section 7.1. <u>Conditions to Mutual Obligations</u>. The respective obligations of Buyer and Seller to consummate the Closing are subject to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)     <u>No Injunction</u>. No Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order (whether temporary, preliminary or permanent) that lawfully prohibits or makes illegal the consummation of the transactions contemplated by <u>Article II</u> and such statute, rule, regulation, judgment, decree, injunction or other order is in effect.

(b)     <u>Debt Restructuring</u>. The Mechel Bluestone Indebtedness and the Bluestone Coal Indebtedness shall have been discharged to the satisfaction of the Buyer by way of execution and performance of the Assignment Agreement and the Direction Letter (one or several, as the case may be).

(c)     <u>Modification of Contracts</u>. The parties shall, and shall procure that their respective Affiliates or agents or counterparties, as the case may be, shall modify the Option Agreement and the Escrow Agreement (by way of rescission and re-execution, novation, amendment or otherwise, as the parties may reasonably agree to their mutual satisfaction, subject always to compliance with applicable Law) such that Mechel Mining is replaced therein by Seller.

(d)     <u>Discharge of Affiliated Debt</u>. Seller shall procure that all borrowings and indebtedness in the nature of borrowings owed to any of the Purchased Companies by any of Seller or any Seller Affiliates (other than by another Purchased Company) shall have been discharged to the mutual satisfaction of the parties.

Section 7.2. <u>Conditions to Obligations of Buyer</u>. The obligations of Buyer to consummate the Closing are also subject to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)     <u>Performance of Obligations of Seller</u>. Seller shall have performed or caused to be performed in all material respects all obligations that are required to be performed by it at or prior to the Closing Date.

(b)     <u>Representations and Warranties</u>. The representations and warranties of Seller contained in <u>Article III</u> shall be true and correct in all material respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(c)     <u>Officer's Certificate</u>. Buyer shall have received from Seller a certificate of an authorized senior officer of Seller certifying that the conditions set forth in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> have been satisfied.

(d)     <u>Deliverables</u>. Buyer shall have received from Seller the items to be delivered pursuant to <u>Section 2.7</u> duly executed by Seller and Seller's Affiliates (as applicable).

Section 7.3.   Conditions to Obligations of Seller.  The obligations of Seller to consummate the Closing are also subject to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)      Performance of Obligations of Buyer.  Buyer shall have performed in all material respects all obligations that are required to be performed by it under this Agreement at or prior to the Closing Date.

(b)      Representations and Warranties.  The representations and warranties of Buyer contained in Article IV shall be true and correct in all material respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(c)      Officer's Certificate.  Seller shall have received from Buyer a certificate of an authorized senior officer of Buyer certifying that the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied.

(d)      Deliverables.  Seller shall have received from Buyer the items to be delivered pursuant to Section 2.8 duly executed by Buyer and or Buyer's Affiliates (as applicable).

## ARTICLE VIII

## SURVIVAL; BUYER ACKNOWLEDGMENT

Section 8.1.   Survival.  The obligations of the Buyer (or its respective successors, assigns or Affiliates, as the case may be) to effect (i) the Deferred Royalty Payments as set out in Section 2.3 and (ii) the Contingent Payments pursuant to Section 2.4, shall survive the Closing and shall continue in full force and effect without any limitations, exceptions or exclusions until all such obligations have been performed in full.  The provisions of Section 5.1 and Section 5.5 shall survive the termination of this Agreement and the consummation of the Closing.  The representations and warranties contained in Article III and Article IV of this Agreement shall survive the Closing and will continue in full force and effect until the General Survival Date.  The covenants and agreements of Buyer and Seller that are required to be performed by any such Person prior to the Closing shall not survive the Closing.  The covenants and agreements of Buyer and Seller that are required to be performed by any such Person after the Closing shall survive the Closing in accordance with their respective terms.

Section 8.2.   Buyer Acknowledgment.

(a)      Buyer acknowledges and agrees, on behalf of itself and each of its Affiliates, that (i) it is reasonable for Buyer to rely solely on the representations or warranties of Seller specifically contained in this Agreement; (ii) none of Buyer or any of its Affiliates are affiliated with, related to, or have a fiduciary relationship with, Seller or any of its Affiliates; (iii) no third party is entitled to rely on or is otherwise intended to be a beneficiary of any representation made by or on behalf of Seller in or pursuant to this Agreement, or any of the statements or information contained herein or in any Appendix or Schedule hereto or otherwise furnished or made available to Buyer or any of its Representatives, investment bankers or other Persons; and (iv) Seller has not made, and does not make and specifically negates and disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present, or future, of, as to, concerning or with respect to (except as (and solely to the extent) specifically set forth in this Agreement):  (A) the nature, quality, quantity or condition (financial or otherwise) of the assets or

properties of the Purchased Companies; (B) the suitability of the assets or properties of the Purchased Companies for any and all activities and uses that Buyer may, or may cause any Purchased Company to, conduct therewith or thereon; (C) the compliance of or by the assets or properties of the Purchased Companies or their operation with any past, existing or future Laws; (D) the manner or quality of the construction or materials, if any, incorporated into the assets or properties of the Purchased Companies; (E) the manner, quality, state of repair or lack of repair of the assets or properties of the Purchased Companies; and (F) any other matter with respect to the physical condition of the assets or properties of the Purchased Companies.

(b)     Buyer acknowledges and agrees, on behalf of itself and its Affiliates, that it (i) has made or waived the opportunity to make its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Purchased Companies and (ii) has been furnished with or given adequate access to such information about the Purchased Companies as it has requested.

(c)     In connection with Buyer's investigation of the Purchased Companies, Buyer and its Representatives have received from Seller (individually or through their Representatives or the Purchased Companies) certain projections, estimates and other forecasts and certain business plan information (collectively, "Projections"). Buyer acknowledges that there are uncertainties inherent in attempting to make such Projections, that it is familiar with such uncertainties, that it is making its own evaluation of the adequacy and accuracy of all Projections so furnished or made available to it and any use of, or reliance by, it on such Projections shall be at its sole risk, and without limiting any other provisions in this Agreement or the Ancillary Documents, that it shall have no claim against any Person with respect thereto.  Buyer acknowledges that, except as expressly set forth in Article III of this Agreement, none of Seller or any of its Affiliates, nor any of their respective Representatives or direct or indirect equityholders or any other Person has made any representation or warranty, expressed or implied, as to the accuracy or completeness of any Projections, any written or oral information regarding any Purchased Company furnished or made available to Buyer or its Representatives or otherwise with respect to any of the Purchased Companies or their operations, business, financial condition, assets, liabilities or prospects, and none of Seller or Purchased Companies, any of their respective Representatives or direct or indirect equityholders or any other Person shall have or be subject to any liability to Buyer or any other Person resulting from the distribution to Buyer or its Representatives or Affiliates, or Buyer's or any of its Representative's or Affiliate's use of, any such Projections, written or oral information, or any information, documents or material made available to Buyer or its Representatives and Affiliates in any form.

Section 8.3.     Indemnification by Seller. Subject to the terms of this Article VIII, from and after the Closing, Seller shall indemnify Buyer and its Affiliates and their respective officers, directors, shareholders, members, employees, successors and permitted assigns (collectively, the "Buyer Indemnified Parties") and hold them harmless from and against any and all Losses incurred or suffered by a Buyer Indemnified Party resulting from or arising out of (a) any breach or inaccuracy of any representation or warranty made by Seller in this Agreement as of the Closing Date (except in the case of any representation or warranty that is made as of a specific date, the breach or inaccuracy of such representation or warranty to be true and correct as of such date) to the extent that a Buyer Indemnified Party provides written notice of such breach or inaccuracy (which notice shall describe the applicable breach or inaccuracy in reasonable detail, include copies of all available material written evidence thereof and indicate the estimated amount, if reasonably practicable, of Losses that have been or may be sustained by the applicable Buyer Indemnified Party in connection therewith) to Seller prior to the General Survival Date and (b) any breach of any covenant or agreement of Seller contained in this Agreement or any Ancillary Document to which it is a party that are required to be performed by it after the Closing.

Section 8.4.    Indemnification by Buyer.

(a)    Subject to the terms of this Article VIII, from and after the Closing, Buyer shall indemnify Seller and its Affiliates and their respective officers, directors, shareholders, members, employees, successors and permitted assigns (collectively, the "Seller Indemnified Parties") and hold them harmless from and against any and all Losses incurred or suffered by a Seller Indemnified Party resulting from or arising out of (a) any breach or inaccuracy of any representation or warranty made by Buyer in this Agreement as of the Closing Date (except in the case of any representation or warranty that is made as of a specific date, the breach or inaccuracy of such representation or warranty to be true and correct as of such date) to the extent that a Seller Indemnified Party provides written notice of such breach or inaccuracy (which notice shall describe the applicable breach or inaccuracy in reasonable detail, include copies of all available material written evidence thereof and indicate the estimated amount, if reasonably practicable, of Losses that have been or may be sustained by the applicable Seller Indemnified Party in connection therewith) to Buyer prior to the General Survival Date and (b) any breach of any covenant or agreement of Buyer contained in this Agreement or any Ancillary Document to which it is a party that are required to be performed by it after the Closing.

(b)    As of the Closing Date the Buyer undertakes to assume the Mechel Mining Guarantee and any and all obligations of Mechel Mining arising out of or related to the Severstal Litigation, whether existing as of the Closing Date or arising after Closing.  The Buyer shall indemnify on an ongoing basis the Seller Indemnified Parties and hold them harmless from and against any and all claims arising out of or in connection with the Mechel Mining Guarantee and/or the Severstal Litigation.

Section 8.5.    Limitations on Indemnification.

(a)    The indemnifications provided for in Section 8.3 and Section 8.4(a) are subject to the following limitations:

(i)    subject to Section 8.5(a)(ii), Seller shall not be liable to the Buyer Indemnified Parties for any Losses with respect to the matters described in Section 8.3 unless such Losses exceed an aggregate amount equal to $1,500,000 (One Million, Five Hundred Thousand Dollars) (the "Deductible Amount") and then only for Losses in excess of the Deductible Amount of up to $5,000,000 (Five Million Dollars) (the "Cap") in the aggregate for Seller with respect to Section 8.3;

(ii)    without limiting the generality of the foregoing, any Losses arising out of the same facts and circumstances shall not be entitled to indemnification under Section 8.3 and shall not be indemnifiable or counted toward satisfaction of the Deductible Amount;

(iii)    neither Seller nor Buyer shall have any obligations under or liabilities in respect of Section 8.3 or Section 8.4(a) from and after the General Survival Date; provided that any claim for indemnity made by a Buyer Indemnified Party or Seller Indemnified Party under Section 8.3 or Section 8.4(a), as the case may be, in accordance with the terms of this Article VIII prior to the expiration of the General Survival Date will survive beyond the General Survival Date until such claim is finally and conclusively resolved by arbitration in accordance with the terms of this Agreement;

(iv)    Seller shall not be liable for any Losses in respect of any claim pursuant to this Article VIII to the extent that the facts, matters or circumstances giving rise to such claim were known, as of the date of this Agreement, by any individual listed in the definition of "Buyer's Knowledge";

(v)     neither a Buyer Indemnified Party, nor the Buyer Indemnified Parties as a group or class, shall be entitled to recover from Seller pursuant to this Article VIII more than once in respect of the same Losses suffered; and neither a Seller Indemnified Party, nor the Seller Indemnified Parties as a group or class, shall be entitled to recover from Buyer pursuant to this Article VIII more than once in respect of the same Losses suffered;

(vi)     other than with respect to the Severstal Litigation, neither Seller nor Buyer shall be liable for any Losses in respect of any liability or Loss which is contingent unless and until such contingent liability or Loss becomes an actual liability or Loss and is due and payable;

(vii)     neither Seller nor Buyer shall be liable to pay any amount in discharge of a claim under this Article VIII unless and until the liability or Loss in respect of which the claim is made has become due and payable;

(viii)     each Buyer Indemnified Party and Seller Indemnified Party shall use its best efforts to mitigate any indemnifiable Loss, and in the event that either a Buyer Indemnified Party or Seller Indemnified Party fails to so mitigate an indemnifiable Loss, either Seller or Buyer (as the indemnifying Person) shall have no liability for any portion of such Loss that reasonably could have been avoided had the Buyer Indemnified Party or Seller Indemnified Party, as applicable, made such efforts; and

(ix)     Seller shall not be liable under this Article VIII for any Losses in respect of any claim or any matter, act, omission or circumstance (or any combination thereof) that would not have occurred but for:

(1)     any action taken or omitted to the extent required by this Agreement or otherwise at the request of or with the written approval of any Buyer Indemnified Party; and/or

(2)     any action taken or omitted by any Buyer Indemnified Party after the Closing (including any reorganization, transfer or sale of any Purchased Company or its business).

(b)     Notwithstanding anything to the contrary herein, except in the case of actual fraud and except as provided in Section 5.8 (Directors' and Officers' Exculpation; Indemnification), Article VI (Tax Matters) or Section 9.6 (Equitable Relief), the rights and remedies of Buyer and Seller, and any Buyer Indemnified Party and any Seller Indemnified Party (each Buyer Indemnified Party and Seller Indemnified Party is referred to herein as an "Indemnified Party"), under this Article VIII are exclusive and in lieu of any and all other rights and remedies which Buyer or Seller, or any Indemnified Party, may have under this Agreement or any Ancillary Document or otherwise against each other with respect to this Agreement or any Ancillary Document and with respect to the transactions contemplated hereby or thereby, and Buyer and Seller each expressly waives and releases and agrees to waive and release any and all other rights or causes of action it or its Affiliates may have against the other party or its Affiliates now or in the future under any Law with respect to the preceding matters.  In furtherance of the foregoing, each of the parties hereby waives, on behalf of itself and each of the other Indemnified Parties, to the fullest extent permitted under applicable Law, any and all rights, claims and causes of action (other than claims and causes of action based on actual fraud) that it may have against any other parties to this Agreement or any Ancillary Document with respect to this Agreement or any Ancillary Document or in respect of the transactions contemplated hereby or thereby arising under or based upon any applicable Law or otherwise (except pursuant to the indemnification provisions set forth in this

Article VIII, or the provisions of <u>Section 5.8</u> (Directors' and Officers' Exculpation; Indemnification), <u>Article VI</u> (Tax Matters) or <u>Section 9.6</u> (Equitable Relief)).

Section 8.6.    <u>Adjustments to Losses</u>.

(a)    No Indemnified Party shall have any right to assert any claim against any indemnifying party hereunder (an "<u>Indemnifying Party</u>") with respect to any Loss, cause of action or other claim to the extent such Loss, cause of action or claim is a Loss, cause of action or claim with respect to which such Indemnified Party or any of its Affiliates has taken action (or caused action to be taken) with the primary intent of accelerating the time period in which such matter is asserted or payable in order to cause a claim to be made prior to the General Survival Date.

(b)    For all purposes of this <u>Article VIII</u>, "Losses" shall be net of any amounts paid or payable to an Indemnified Party under any insurance policy or Contract in connection with the facts giving rise to the right of indemnification hereunder, and each Indemnified Party shall use its reasonable best efforts to recover all amounts payable from an insurer or other third party under any such insurance policy or Contract prior to seeking indemnification hereunder; <u>provided</u>, that the amount deemed to be paid under such insurance policies shall be net of (i) the deductible for such policies and (ii) any increase in the premium for such policies arising from such Losses.

Section 8.7.    <u>Third-Party Claim Indemnification Procedures</u>.

(a)    In the event that any written claim or demand for which an Indemnifying Party may have liability to any Indemnified Party hereunder, other than those relating to Taxes (which are the subject of <u>Article VI</u>), is asserted against or sought to be collected from any Indemnified Party by a third party (a "<u>Third-Party Claim</u>"), such Indemnified Party shall promptly, but in no event more than ten days following such Indemnified Party's receipt of a Third-Party Claim, notify the Indemnifying Party of such Third-Party Claim, the amount or the estimated amount of damages sought thereunder to the extent then ascertainable, any other remedy sought thereunder, any relevant time constraints relating thereto, a reasonably detailed explanation of the events giving rise to such Third-Party Claim and any other material details pertaining thereto (a "<u>Claim Notice</u>"); <u>provided</u> that the failure to timely give a Claim Notice shall not relieve the Indemnifying Party of its obligations hereunder, except to the extent that the Indemnifying Party shall have been actually and materially prejudiced by such failure. Thereafter, the Indemnified Party shall deliver to the Indemnifying Party, promptly following the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third-Party Claim.

(b)    In the event that the Indemnifying Party notifies the Indemnified Party that it elects to defend the Indemnified Party against a Third-Party Claim, the Indemnifying Party shall have the right to defend the Indemnified Party by appropriate proceedings and shall have the sole power to direct and control such defense at its expense; <u>provided</u> that if any Indemnifying Party defends against, negotiates, settles or otherwise handles such Third-Party Claim in accordance with this <u>Section 8.7</u>, the attorney's fees and other Losses incurred and paid by the Indemnifying Party in connection therewith shall reduce (by the amount thereof) the amount recoverable under this <u>Article VIII</u> by any such Buyer Indemnified Parties or Seller Indemnified Parties, as the case may be. Once the Indemnifying Party has made such election, the Indemnified Party shall have the right to participate in (but not control) any such defense and to employ separate counsel of its choosing at such Indemnified Party's expense. The Indemnifying Party shall not, without the prior written consent of the Indemnified Party, settle, compromise or offer to settle or compromise any Third-Party Claim if the terms of such settlement would result in (i) the imposition of a consent order, injunction or decree that would restrict the future activity or conduct of the Indemnified Party, or (ii) a finding or admission of a violation of Law by the Indemnified Party that

would have an adverse effect on the Indemnified Party. Whether or not the Indemnifying Party assumes the defense of a Third-Party Claim, the Indemnified Party shall not admit any liability with respect to, settle, compromise or discharge, such Third-Party Claim without the Indemnifying Party's prior written consent. If the Indemnifying Party assumes the defense of a Third-Party Claim and is in good faith contesting such Third-Party Claim, the Indemnified Party shall agree to any settlement, compromise or discharge of a Third-Party Claim that the Indemnifying Party may reasonably recommend and that by its terms (i) obligates the Indemnifying Party to pay the full amount of Losses in connection with such Third-Party Claim (other than with respect to any Losses (or portion thereof) that are not required to be paid as a result of such Losses being (or portion thereof) within the Deductible Amount or in excess of the Cap) and (ii) releases the Indemnified Party in connection with such Third-Party Claim.

(c)     The Indemnified Party and the Indemnifying Party shall cooperate in order to ensure the proper and adequate defense of a Third-Party Claim, including by providing reasonable access to each other's relevant Books and Records, and employees. Such cooperation shall include the retention and (upon the Indemnifying Party's request) the provision to the Indemnifying Party of Books and Records and information that are reasonably relevant to such Third-Party Claim, and making employees and Representatives available on a mutually convenient basis during normal business hours to provide additional information and explanation of any material provided hereunder. The Indemnified Party and the Indemnifying Party shall use reasonable commercial efforts to avoid production of confidential information (consistent with applicable Law), and to cause all communications among employees, counsel and others representing any party to a Third-Party Claim to be made so as to preserve any applicable attorney-client or work-product privileges.

Section 8.8.     Direct Claim Indemnification Procedures. Each Indemnified Party shall assert any claim on account of any Losses which do not result from a Third-Party Claim (a "Direct Claim") by giving the Indemnifying Party written notice thereof reasonably promptly (and, in any event, no later than 30 days following the Indemnified Party's discovery of the applicable Losses reasonably likely to give rise to a claim under this Article VIII). Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, include copies of all available material written evidence thereof and indicate the estimated amount, if reasonably practicable, of Losses that have been or may be sustained by the Indemnified Party; provided that the failure to timely give such notice shall not affect the rights of an Indemnified Party hereunder unless (i) such failure has a prejudicial effect on the defenses or other rights available to the Indemnifying Party with respect to such Direct Claim, (ii) the Indemnifying Party's or the Indemnified Party's ability to mitigate such Direct Claim, or (iii) the indemnification obligations are materially increased as a result of such failure.

Section 8.9.     Investigation by Indemnifying Parties. In connection with any claim pursuant to this Article VIII:

(a)     The Indemnified Parties shall allow, and shall cause their Affiliates to allow, the Indemnifying Party and its financial, accounting or legal advisers to investigate the fact, matter or circumstance alleged to (or which may) give rise to such claim and whether and to what extent any amount is or may be payable in respect of such claim.

(b)     The Indemnified Parties shall disclose to the Indemnifying Party all material information of which they are aware which relates to the claim and shall, and shall cause their Affiliates and all of their respective employees and financial, accounting and legal advisors to, provide such information and assistance as the Indemnifying Party or its financial, accounting or legal advisers shall reasonably request, including:

(i)     access to premises and personnel (including any employee with knowledge relating to the relevant facts, matters or circumstances or who can otherwise reasonably assist the Indemnifying Party); and

(ii)     the right to examine and copy or photograph any relevant assets, accounts, correspondence, documents and records.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1.    Notices.    All notices, consents, waivers, agreements or other communications hereunder shall be deemed effective or to have been duly given and made (and shall be deemed to have been duly given or made upon receipt) only if in writing and if (a) served by personal delivery upon the party for whom it is intended, (b) delivered by overnight air courier or (c) sent by facsimile transmission or email, with confirmation of transmission, in each case, to such party at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such party:

To Buyer:

> Bluestone Resources Inc.
> 302 S. Jefferson Street, #600, Roanoke, VA, 24011
> Telephone: +1 304 536 5326
> Facsimile No.: +1 304 536 49 47
> Attention: James C. Justice II

With a copy (which shall not constitute notice) to:

> Frost Brown Todd LLC
> 250 West Main Street, Suite 2800, Lexington, KY 40507
> Telephone: +1 859 231 0000
> Facsimile No.: +1 859 231 0011
> Attention: Paul E. Sullivan

To Seller:

> Caroleng Investments (SPV) Ltd.
> 2 Romanou Street, Tlais Tower, 5th Floor
> P.O. Box 28153, 2091, 1070 Nicosia, Cyprus
> Telephone: + 357 22 661155
> Facsimile No.: +357 22 667 143
> Attention: Erika Vitkute

With a copy (which shall not constitute notice) to:

> Dechert LLP
> 1900 K Street, NW, Washington, DC, 20006
> Telephone: +1 202 261 3484
> Facsimile No.: +1 202 261 3019
> Attention: Laura M. Brank

Section 9.2.  Amendment; Waiver.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by Buyer and Seller, or in the case of a waiver, by the party against whom such waiver is intended to be effective.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 9.3.  No Assignment or Benefit to Third Parties.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, legal representatives and permitted assigns.  Notwithstanding the foregoing, no party to this Agreement may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other party hereto and any purported assignment in violation of the foregoing shall be null and void, provided, however, that the Seller may assign any of its rights or delegate any of its obligations under this Agreement or any benefit conferred upon the Seller under this Agreement without the prior written consent of the Buyer, provided, however, that Seller shall not be relieved from any liability hereunder as a result of such assignment up to the General Survival Date when it shall no longer be liable hereunder, and in the event that Seller assigns the Royalty Interest (Section 2.3) or the Contingent Payments (Section 2.4), the assignee shall also take and be liable for the Seller's obligations and liabilities under this Agreement.  Buyer shall be entitled to assign this Agreement and its rights hereunder, in whole or in part, to any of its Affiliates without any consent from Seller, but Buyer shall not be relieved from any liability hereunder as a result of such assignment.  Any transfer or assignment in violation of this Section shall be void.  Except as expressly set forth in Section 5.6, Section 9.15, Section 9.18 or Article VIII, nothing in this Agreement, express or implied, is intended to confer upon any Person other than Buyer and Seller, and their respective successors, legal representatives and permitted assigns, any rights, benefits or remedies under or by reason of this Agreement.

Section 9.4.  Entire Agreement; Inconsistency.  This Agreement (including all Schedules and Appendices hereto) and the Ancillary Documents contain the entire agreement among the parties hereto with respect to the subject matter hereof and thereof, and supersede all prior agreements and understandings, oral or written, with respect to such matters.  In the event and to the extent that there shall be an inconsistency between the provisions of this Agreement and the provisions of the Confidentiality Agreement or an Ancillary Document, this Agreement shall prevail.  The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any party hereto irrespective of which party caused such provisions to be drafted.  Each of the parties hereto acknowledges that it has been represented by an attorney in connection with the preparation and execution of this Agreement, the Confidentiality Agreement and the Ancillary Documents.

Section 9.5.  Satisfaction of Obligations.  Any obligation of any party to any other under this Agreement, that is performed, satisfied or fulfilled completely by an Affiliate of such party shall be deemed to have been performed, satisfied or fulfilled by such party.

Section 9.6.  Equitable Relief.  The parties hereto agree that if any of the provisions of this Agreement were not to be performed by Buyer or Seller as required by their specific terms or were to be otherwise breached, irreparable damage will occur to Seller or Buyer, no adequate remedy at Law would exist and damages would be difficult to determine, and that Seller or Buyer shall be entitled to an injunction or injunctions to prevent breaches, and to specific performance of the terms, of this Agreement (including causing the transactions contemplated hereby to be consummated on the terms and subject to the conditions thereto set forth in this Agreement) without posting any bond and without proving that monetary damages would be inadequate, in addition to any other remedy at Law or equity.  Seller or Buyer, as the case may be, shall not oppose, argue, contend or otherwise be permitted to raise as a defense that an adequate remedy at Law exists or that specific performance or equitable or injunctive relief is

inappropriate or unavailable. If Seller or Buyer institutes a Litigation for injunctive relief or specific performance and a court of competent jurisdiction does not award injunctive relief or specific performance to Seller or Buyer in a final order, judgment, injunction or decree in accordance with this Section 9.6, then Seller or Buyer may institute a Litigation for monetary damages against offending party. Notwithstanding anything in this Agreement to the contrary, if Seller or Buyer is awarded injunctive relief or specific performance as a result of which the Closing actually occurs, such equitable relief shall be Seller's sole and exclusive remedy against the offending party under this Agreement solely with respect to the failure to consummate the Closing.

Section 9.7.    Expenses. Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses.

Section 9.8.    Schedules. The disclosure of any matter, or reference to any Contract, in any Schedule to this Agreement shall be deemed to be a disclosure of such matter or Contract for all purposes of this Agreement to which such matter or Contract could reasonably be expected to be pertinent, but shall not be deemed to constitute an admission by Buyer or Seller or to otherwise imply that any such matter or Contract is material for the purposes of this Agreement and shall not affect the interpretation of such term for the purposes of this Agreement. In particular, (a) certain matters may be disclosed on the Schedules that may not be required to be disclosed because of certain minimum thresholds or materiality standards set forth in this Agreement, (b) the disclosure of any such matter does not mean that it meets or surpasses any such minimum thresholds or materiality standards and (c) no disclosure in the Schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the listing of such matters in any Schedule be deemed or interpreted to expand the scope of Seller's representations and warranties contained in this Agreement. Each Schedule is qualified in its entirety by reference to specific provisions of the Agreement and does not constitute, and shall not be construed as constituting, representations, warranties or covenants of Buyer or Seller or their respective Affiliates, except as and to the extent provided in this Agreement. Matters reflected in a Schedule are not necessarily limited to matters or Contracts required by this Agreement to be disclosed in such Schedules. Regardless of the existence or absence of cross-references, the disclosure of any matter in any Schedule shall be deemed to be a disclosure for purposes of this Agreement and each Schedule to the extent that the relevance of such disclosure is readily apparent from its text. The section headings in the Schedules are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any information disclosed herein or any provision of this Agreement. All attachments to the Schedules are incorporated by reference into the Schedule in which they are directly or indirectly referenced. The information contained in the Schedules is in all events subject to Section 5.5 and the Confidentiality Agreement.

Section 9.9.    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND ALL DISPUTES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE RESOLVED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK IN THE UNITED STATES OF AMERICA WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. All disputes arising out of or in connection with the present Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce ("ICC") by three arbitrators. Each party shall nominate in the Request and the Answer, respectively, one arbitrator. The two arbitrators so nominated shall, within thirty (30) days of the confirmation of the second arbitrator, nominate a third arbitrator, who shall be the chair of the Tribunal. If the two nominated arbitrators fail to nominate the third arbitrator within such thirty (30) days, the appointment of the chair shall be made by the ICC Court. The seat of the arbitration shall be the city of Paris, France. The language of the arbitration shall be English.

Section 9.10.  Waiver of Jury Trial.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR ANY ANCILLARY DOCUMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY ANCILLARY DOCUMENT.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (c) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (d) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND EACH ANCILLARY DOCUMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11.  Counterparts.  This Agreement may be executed in one or more counterparts, each of which, including those received via facsimile transmission or email, shall be deemed an original, and all of which shall constitute one and the same Agreement.

Section 9.12.  Headings.  The heading references herein and the table of contents hereof are for convenience purposes only, and shall not be deemed to limit or affect any of the provisions hereof.

Section 9.13.  No Setoff; No Withholding.  There shall be no right of setoff or counterclaim with respect to any claim, debt or obligation, against payments to any of Buyer or Seller or their respective Affiliates under this Agreement or the Ancillary Documents.  Notwithstanding anything to the contrary herein, any and all payments made to Seller under this Agreement (including pursuant to Article II) shall be made free and clear of any deduction or withholding unless otherwise required by law.

Section 9.14.  Severability.  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 9.15.  Non-Recourse.  Notwithstanding anything that may be expressed or implied in this Agreement, any Ancillary Document or any document, certificate or instrument delivered in connection herewith or therewith, each party hereby acknowledges and agrees that it has no right of recovery against, and no personal liability shall attach to, the former, current or future direct or indirect equityholders, directors, officers, employees, incorporators, agents, attorneys, representatives, Affiliates, members, managers, general or limited partners or any former, current or future direct or indirect equityholder, director, officer, employee, incorporator, agent, attorney, representative, general or limited partner, member, manager, Affiliate, agent, assignee or representative of any of the foregoing (collectively (but not including Seller), the "Seller Affiliates"), through Seller or otherwise, whether by or through attempted piercing of the corporate, partnership, limited partnership or limited liability company veil, by or through a claim by or on behalf of Buyer against Seller or Seller Affiliate by the enforcement

of any assessment or by any legal or equitable Litigation, by virtue of any Law, or otherwise, except for Buyer's rights to recover from Seller (but not any of Seller Affiliates) under and to the extent provided for in this Agreement or any Ancillary Document, subject to the limitations described herein. Recourse against Seller under this Agreement (subject to the limitations described herein) shall be the sole and exclusive remedy of Buyer and any other Person against Seller or any Seller Affiliate in respect of any Losses, liabilities or obligations arising under, or in connection with, this Agreement, any Ancillary Document or any document, certificate or instrument delivered in connection herewith or therewith, or the transactions contemplated hereby or thereby. Buyer hereby covenants and agrees, on behalf of itself and its Affiliates and Representatives, that it and they shall not institute, and it and they shall cause their respective Affiliates not to institute, any Litigation or bring any other claim arising under, or in connection with, this Agreement, any Ancillary Document or any document, certificate or instrument delivered in connection herewith or therewith, or the transactions contemplated hereby or thereby against Seller or any Seller Affiliates except for claims against Seller under this Agreement or any Ancillary Document subject to the limitations described herein.

Section 9.16. <u>Service of Process</u>. Service upon a party of any notice, process, motion or other document in connection with Litigations relating in any way with or to this Agreement or the subject matter hereof may be effectuated by service upon such Party at the address set forth in <u>Section 9.1</u> hereof or such other address as provided to each other party in accordance with the notice provisions set forth in <u>Section 9.1</u> hereof at least ten (10) days prior to such change in address; <u>provided</u>, that if the Buyer or Seller changes its address and fails to provide notice as set forth in this <u>Section 9.16</u>, then service upon such party may be effected by (i) service upon such person or to such address, as may be specified by Buyer or Seller by notice to the other party hereto, or (ii) by personal service or in the same manner as notices are to be given pursuant to <u>Section 9.1</u> or any other manner permitted by Law. Each of the parties to this Agreement expressly and irrevocably agrees that service in accordance with this <u>Section 9.16</u> will be effective and sufficient service of process upon such party. Nothing herein shall affect the right to serve process in any other manner permitted by applicable Law; it being agreed and understood, however, that no Person shall be obligated to serve process in any other way than as provided herein.

Section 9.17. <u>Currency</u>. Notwithstanding anything to the contrary herein, all payments required to be made hereunder, or as a result of a breach or violation hereof, shall be made in United States dollars, and, when any amount is paid with respect to the foregoing such amount shall be the United States dollar amount thereof on the applicable date of funding regardless of the amount or type of currency necessary to be exchanged or converted in order to satisfy, pay or fund such amount in United States dollars.

Section 9.18. <u>Legal Representation</u>. Each of the parties to this Agreement acknowledges that Dechert LLP ("<u>Dechert</u>") currently serves as counsel to both (a) the Purchased Companies and (b) Seller, including in connection with the negotiation, preparation, execution and delivery of this Agreement, the Ancillary Documents and the consummation of the transactions contemplated by this Agreement. There may come a time, including after consummation of the transactions contemplated by this Agreement, when the interests of Seller and the Purchased Companies may no longer be aligned or when, for any reason, Seller, Dechert or the Purchased Companies believes that Dechert can't or should no longer represent both Seller and the Purchased Companies. The parties understand and specifically agree that Dechert may withdraw from representing the Purchased Companies and continue to represent Seller, even if the interests of Seller, and the interests of the Purchased Companies are or may be adverse, including in connection with any dispute arising out of or relating to this Agreement or the transactions contemplated by this Agreement, and even though Dechert may have represented the Purchased Companies in a matter substantially related to such dispute or may be handling ongoing matters for the Purchased Companies or any of its Affiliates, and Buyer and the Purchased Companies hereby consent thereto and waive any conflict of interest arising therefrom. Each of the parties further agrees that, as to all communications

among Dechert, the Purchased Companies and Seller, the attorney-client privilege, the expectation of client confidence and all other rights to any evidentiary privilege belong to Seller and shall not pass to or be claimed by the Purchased Companies or any of its Affiliates. In addition, if the transactions contemplated by this Agreement are consummated, the Purchased Companies shall have no right of access to or control over any of Dechert's records related to the transactions contemplated by this Agreement, which shall become the property of (and be controlled by) Seller. Furthermore, in the event of a dispute between Seller and the Purchased Companies arising out of or relating to any matter in which Dechert acted for them both, none of the attorney-client privilege, the expectation of client confidence or any other rights to any evidentiary privilege will protect from disclosure to Seller any information or documents developed or shared during the course of Dechert's joint representation of Seller and the Purchased Companies.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties have executed or caused this Agreement to be executed as of the date first written above.

CAROLENG INVESTMENTS (SPV) LTD.

By: _____
    Name:
    Title:

*Alexey G. IVANUSHKIN under Power of Attorney dated December 12, 2014*

BLUESTONE RESOURCES INC.

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties have executed or caused this Agreement to be executed as of the date first written above.

CAROLENG INVESTMENTS (SPV) LTD.

By: _____
    Name:
    Title:


BLUESTONE RESOURCES INC.

By: _____
    Name:
    Title:

30

APPENDIX A
DEFINITIONS

In this Appendix, and in the Agreement and the other Appendices and Schedules thereto, unless the context otherwise requires, the following terms shall have the meanings assigned below and the terms listed in the chart below shall have the meanings assigned to them in the Section set forth opposite to such term (unless otherwise specified, section references in this Appendix are to Sections of this Agreement):

| **Term:** | **Section:** |
| --- | --- |
| Agreement | Preamble |
| Buyer | Preamble |
| Buyer Indemnified Parties | Section 8.3 |
| Buyer Non-Governmental Consents | Section 4.4(b) |
| Cap | Section 8.5(a)(i) |
| Claim Notice | Section 8.7(a) |
| Closing | Section 2.6 |
| Closing Date | Section 2.6 |
| Company | Recitals |
| Confidential Information | Section 5.5(b) |
| Contingent Payments | Section 2.4 |
| Covered Losses | Section 5.8(c) |
| Covered Person | Section 5.8(a) |
| Dechert | Section 9.18 |
| Deductible Amount | Section 8.5(a)(i) |
| Deferred Royalty Payments | Section 2.3 |
| Delaware Case | Section 2.5 |
| Direct Claim | Section 8.8 |
| Disputes | Section 2.5 |
| D&O Insurance | Section 5.8(d) |
| ICC | Section 9.9 |
| Indemnified Party | Section 8.5(b) |
| Indemnifying Party | Section 8.6(a) |
| Material Company Leases | Section 3.11 |
| Material Leased Real Property | Section 3.11 |
| Maximum Royalty | Section 2.3 |
| Memorandum of Overriding Royalty Interest | Section 5.1 |
| Non-Governmental Consents | Section 4.4(b) |
| Projections | Section 8.2(c) |
| Purchase | Recitals |
| Releasee | Section 5.8(c) |
| Releasors | Section 5.8(c) |
| Royalty Interest | Section 2.3 |
| Securities Act | Section 4.9(a) |
| Seller | Preamble |
| Seller Affiliates | Section 9.15 |
| Seller Indemnified Parties | Section 8.4(a) |
| Third-Party Claim | Section 8.7(a) |
| Transfer | Recitals |
| Transfer Taxes | Section 6.2 |
| Transferred Securities | Recitals |

"Actions" means any judicial action or claim or governmental enforcement action arising directly therefrom, with the exception of administrative actions initiated by or on behalf of any Governmental Authority.

"Affiliate" means, with respect to any subject Person, any other Person directly or indirectly controlling, controlled by, or under common control with, or an heir, or beneficiary whether in testate, by trust, or otherwise, of such subject Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (for purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities or by contract or otherwise).

"Ancillary Documents" means, collectively, Memorandum of Overriding Royalty Interest, Mutual Releases, Dismissals, Confidentiality Agreement, Assignment Agreement(s), Direction Letter(s), Termination and Release and Indemnity Agreement.

"Assignment Agreement" means Assignment, Assumption, Novation and Release Agreement substantially in the form attached hereto as Schedule F.

"Bluestone Coal Indebtedness" means the indebtedness of Bluestone Coal Sales Corporation, a Virginia Corporation, under a Loan Agreement, dated October 28, 2012 (as amended or supplemented from time to time), in the principal amount of $176,276,448.43, together with any accrued but unpaid interest, owed to Mechel Carbon.

"Books and Records" means all books, ledgers, files, reports, plans, records, manuals and other materials (in any form or medium) of, or maintained for, the applicable Person. Unless the express context otherwise requires, the term "Books and Records" means the "Books and Records" of the Purchased Companies.

"Business Day" means a day other than any day on which banks are authorized or obligated by Law or executive order to close in New York, New York, Moscow, Russia, Tortola, BVI.

"Buyer's Knowledge" means the actual knowledge of any of the following individuals, after reasonable inquiry of such individual's direct reports: Mr. James C. Justice II, Mr. James C. Justice III, Mr. Steven Ball, Mr. Zachary Wright, Mr. Dale Wright, Mr. Tommy D. Lusk and Mr. Patrick Graham.

"Code" means the Internal Revenue Code of 1986.

"Competition/Investment Law" means and any Law that is designed or intended to prohibit, restrict or regulate foreign investment or mergers or acquisitions, antitrust, monopolization, restraint of trade or competition, including the HSR Act.

"Confidentiality Agreement" means the confidentiality agreement between Mechel Mining and Mr. Jay Justice on behalf of the Justice Corporation, dated November 22, 2014.

"Confidential Settlement Agreement" means the Confidential Settlement Agreement, dated January 11, 2013, between Mechel Mining and Bluestone Coal Sales Corporation and Mechel Bluestone, Inc. on the one hand, and SunCoke Energy, Inc., Indiana Harbor Coke Company, L.P.,

Haverhill Coke Company LLC, for itself and as successor in interest to Haverhill North Coke Company, and Severstal Dearborn, LLC formerly known as Severstal North America, Inc. on the other hand.

"Contracts" means all agreements, contracts, leases and subleases, purchase orders, arrangements, letters of credit, guarantees and commitments.

"Direction Letter" means the Direction Letter substantially in the form attached hereto as Schedule G.

"Dismissals" means those stipulation and proposed orders of dismissal with prejudice of the Delaware Case and all other claims between the Buyer and Mechel Mining and their respective predecessor or successor companies and all of their Affiliates as at Closing as set forth in Section 2.5 and in the form attached hereto as Schedule E.

"Dollars" or "$" means the lawful currency of the United States of America.

"Drilling Program Guarantee" means Limited Guarantee, dated as of May 6, 2009, by Mechel Mining in favor of James C. Justice Companies, Inc., a Delaware corporation, and James C. Justice II, James C. Justice III and Jillean L. Justice, and James C. Justice II, Trustee of James C. Justice II GRAT No.1, and James C. Justice II, Trustee of James C. Justice GRAT No.2.

"Escrow Agent" means McBrayer, McGinnis, Leslie & Kirkland, PLLC.

"Escrow Agreement" means the Escrow Agreement, entered into as of December 16, 2014 by and between Seller, Escrow Agent and James C. Justice Companies, Inc. and James C. Justice II.

"Financial Statements" means the unaudited consolidated balance sheet of the Purchased Companies as of September 30, 2014 and related consolidated statements of operations and cash flows, in each case, for the month ended September 30, 2014.

"GAAP" means United States generally accepted accounting principles, consistently applied during the periods involved.

"General Survival Date" means the date that is twelve (12) months from the Closing Date.

"Governmental Authorizations" means all licenses, permits, certificates, grants, franchises, waivers, consents and other similar authorizations or approvals issued by or obtained from a Governmental Entity or any securities exchange.

"Governmental Entity" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Indemnity Agreement" means the indemnity agreement pursuant to which Buyer agrees to indemnify Mechel Mining and its Affiliates under the Mechel Mining Guarantee as required pursuant to the provisions of Section 8.4(b) in the form attached hereto as Schedule H.

"IRS" means the U.S. Internal Revenue Service.

"Knowledge" means, in the case of the Buyer, Buyer's Knowledge, and in the case of the Seller, the actual knowledge of any of the following individuals: Roman Semenov and David Harrah.

"Law" means any constitution, law, statute, ordinance, rule, regulation, regulatory requirement, code, order, judgment, injunction or decree enacted, issued, promulgated, enforced or entered by a Governmental Entity or securities exchange.

"Lien" means any charge, mortgage, pledge, security interest, lien, or encumbrance, other than those that customarily arise under securities Laws in private transactions.

"Litigation" mean any civil, criminal or administrative action, suit, demand, claim, hearing, proceeding or investigation filed by or before any Governmental Entity, arbitral panel or mediator.

"Limited Transfer Liens" means restrictions on sale, transfer, assignment, pledge or hypothecation imposed by applicable securities Laws.

"Losses" means any damages, losses, charges, liabilities, claims, demands, actions, suits, judgments, settlements, awards, interest, penalties, fees, costs and expenses (including reasonable attorneys' fees and disbursements) (net of any Tax benefits or detriments actually realized by the applicable parties on or prior to the due date for filing the Tax Return in respect of the taxable period in which such Loss was reported); provided that "Losses" shall not include any consequential, indirect, incidental, special, unforeseen, exemplary or punitive damages, including diminution of value, loss of business reputation or opportunity, as a result of or in connection with the execution, delivery or performance (or failure to perform) this Agreement, any Ancillary Document or any document, certificate or instrument delivered in connection herewith or therewith, or the transactions contemplated hereby or thereby.

"Material Adverse Effect" means any change, effect, event, occurrence, state of facts or development that is materially adverse to the financial condition or results of operations of the Purchased Companies taken as a whole and, to the extent capable in assessment in monetary terms, such that results in a damage, liability or loss for the Purchased Companies in excess of $50,000,000.

"Mechel Bluestone Indebtedness" means the indebtedness of Mechel Bluestone, Inc., a Delaware corporation, under the Services Agreement, dated May 6, 2009 (as amended or supplemented from time to time), in the amount of $5,302,659.33, together with any accrued but unpaid interest, owed to Mechel International Holdings GmbH, a company established under Swiss Law.

"Mechel Carbon" means Mechel Carbon AG, a company incorporated under the Law of the Swiss Confederation.

"Mechel Mining" means Mechel Mining OAO, a company organized under the Law of the Russian Federation.

"Mechel Mining Guarantee" means the guarantee of Mechel Mining provided pursuant to the terms of the Confidential Settlement Agreement.

"Merger Agreement" means that certain Agreement and Plan of Merger, dated as of March 16, 2009 (as amended, supplemented or replaced, as applicable), entered into by and between

James C. Justice Companies, Inc. and James C. Justice II, James C. Justice III and Jillean L. Justice and James C. Justice II, Trustee of James C. Justice II GRAT No. 1, and of James C. Justice II GRAT No. 2, and Bluestone Industries, Inc., Dynamic Energy, Inc., JCJ Coal Group, LLC, Galenia Consulting Ltd, Caroleng Consulting Ltd, and Mechel Bluestone Inc., Bluestone Merger Co, Dynamic Merger Co. and New JCJ Merger Co.

"Mutual Releases" means release of all True Up Disputes and all other claims between the Buyer and Mechel Mining and their respective predecessor or successor companies and all of their Affiliates as set forth in Section 2.5 and in the form attached hereto as Schedule C, as well as the releases of obligations and matters described in Section 6.6.

"Option Agreement" means Option to Purchase, dated December 14, 2014, entered into by and between Mechel Mining on the one hand and James C. Justice Companies, Inc. and James C. Justice II on the other hand.

"Organizational Documents" means all certificates of incorporation, articles, by-laws or other organizational documents of any Person.

"Permitted Liens" means (a) any Lien for Taxes not yet due or delinquent or, if delinquent, being contested in good faith by appropriate proceedings, (b) pledges and deposits made in the ordinary course of business in connection with workman's compensation, unemployment insurance and social security benefits, (c) pledges and deposits made in the ordinary course of business securing the performance of bids, trade contracts, leases, statutory obligations, surety, customs, reclamation and appeal bonds and other obligations which are not overdue of like nature incurred as or incidental to and in the ordinary course of business, (d) any Lien securing any indebtedness of the Purchased Companies, (e) any statutory Lien arising in the ordinary course of business by operation of Law with respect to a liability that is not yet due or delinquent, (f) any immaterial imperfection of title or similar immaterial Lien, and (g) easements, zoning restrictions, restrictions on assignments, rights-of-way, encroachments and similar encumbrances on real property imposed by law or arising in the ordinary course of business or which are necessary or desirable in connection with the business of the Purchased Companies or the development thereof in each case that do not, individually or in the aggregate, impair the continued use, occupancy, value or marketability of title of the property to which they relate or the business of the Purchased Companies.

"Person" means an individual, a corporation, a partnership, an association, a limited liability company, a Governmental Entity, a trust or other entity or organization.

"Purchased Companies" means, collectively, the Company and its Subsidiaries.

"Purchased Company Tax Deductions" means (a) any deductible payments resulting from the satisfaction of any indebtedness of any of the Purchased Companies in connection with the transactions contemplated by this Agreement (including the amount (for U.S. federal income tax purposes) of any unamortized debt issuance costs, unpaid original issue discount or PIK interest, or deferred reorganization costs of any of the Purchased Companies as of the Closing Date), (b) the portion of the Transaction Related Expenses that Seller identifies as are deductible for U.S. federal income tax purposes, and (c) the amount of any indebtedness owing to any of the Purchased Companies that is deemed by Seller or any of its Affiliates to be uncollectible prior to Closing.

"Representative" or "Representatives" means, with respect to a particular Person, any director, member, limited or general partner, equityholder, officer, employee, agent, consultant, advisor or other representative of such Person, including outside legal counsel, accountants and financial advisors.

"**Seller Non-Governmental Consents**" means those consents, approvals, waivers or authorizations as set forth on <u>Schedule D</u>.

"**Severstal**" means AK Steel Corporation, as successor of Severstal Dearborn, LLC.

"**Severstal Litigation**" means the litigation between AK Steel Corporation and Mechel North America Sales Corporation, Mechel Bluestone, Inc. in the US District Court for the Northern District of Illinois Eastern Division, case # 1:14-cv-03286, arising out of the Confidential Settlement Agreement.

"**Subsidiaries**" means all of those subsidiaries of the Company as set forth on <u>Schedule A</u>.

"**Tax Returns**" means any report, return, computation, declaration, claim, claim for refund, or information return or statement with respect to Taxes.

"**Taxes**" means all federal, state or local and all foreign taxes, including income, gross receipts, windfall profits, value added, severance, property, production, sales, use, duty, license, excise, franchise, employment, withholding or similar taxes, together with any interest, additions or penalties with respect thereto and any interest with respect to such additions or penalties.

"**Taxing Authority**" means any Governmental Entity responsible for the imposition of any Tax (foreign or domestic).

"**Termination and Release Agreement**" means the agreement on termination of the Drilling Program Guarantee in the form attached hereto as <u>Schedule I</u>.

"**Ton**" means a unit of mass equal to 2,000 pounds (907.18474 kg).

"**Transaction Related Expenses**" means the sum of (a) the amount of sale bonuses, change in control bonuses, retention bonuses or similar bonuses that become payable upon, and solely by reason of, the consummation of the transactions contemplated by this Agreement, and (b) the amount of any investment banking, accounting, attorney or other professional fees incurred by any of the Purchased Companies or Seller on or prior to Closing with respect to the transactions contemplated by this Agreement.

"**True Up Disputes**" means any and all claims and disputes between Affiliates of Buyer and Affiliates of Seller, including Mechel Mining, arising out of the Merger Agreement.

"**Value**" means, with respect to any transaction to which the Buyer or any of its Affiliates, as the case may be, are parties, the total amount of cash and the fair market value on the date which is five (5) days prior to the consummation of such transaction of all other property paid or payable directly or indirectly to Buyer or any of its Affiliates, or any of their respective security holders in connection with such transaction, including (i) amounts paid to holders of any warrants or convertible securities of Buyer or any of its Affiliates and to holders of any options or stock appreciation rights issued by Buyer or any of its Affiliates, whether or not vested; and (ii) the total amount of indebtedness for borrowed money of Buyer or any of its Affiliates repaid, retired, extinguished or assumed in connection with such transaction.

## SCHEDULE C

## FORM OF MUTUAL RELEASES

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged,

James C. Justice Companies, Inc., James C. Justice, II, James C. Justice, III, Jillean L. Justice, and James C. Justice II, as Trustee of the James C. Justice II Grat No. 1 and of the James C. Justice II Grat No. 2, each on their own behalf and on behalf of their present and former parents, subsidiaries, affiliates, predecessors, successors, assigns, heirs, executors, personal representatives and administrators (all of which shall be hereinafter referred to as "Justice Releasors"), intending to be legally bound, hereby release, acquit, and forever discharge Mechel Bluestone Inc. and Mechel Mining OAO, and each of their respective present and former parents, subsidiaries, affiliates, divisions, predecessors, successors and assigns, directors, officers, principals, employees, agents, servants and attorneys, and their respective representatives, heirs, executors, personal representatives, administrators, and assigns, and any and all persons, natural or corporate, in privity with them or any one of them, or acting in concert with them or any one of them (collectively, hereinafter referred to as "Mechel Releasees"), of and from any and all actions, claims, causes of action, suits, debts, dues, sums of money, accounts, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, and demands or obligations of any kind or nature whatsoever, matured or unmatured, liquidated or unliquidated, absolute or contingent, known or unknown, present or future, at law, admiralty or equity, which the Justice Releasors ever had, now have, or hereafter can, shall or may have as of the date of this agreement, including but not limited to the following: the action styled *Mechel Bluestone Inc. v. James C. Justice Companies, Inc.*, C.A. No. 9218-VCL (Delaware Court of Chancery); the action styled *Bluestone Coal Corporation v. Chestnut Land Holdings, LLC*, C.A. No. 14-C-45 (Circuit Court of McDowell County, West Virginia, Business Court Division); other claims or causes of actions arising from or relating to the Agreement and Plan of Merger Dated as of March 16, 2009 among James C. Justice Companies, Inc., the Individual Shareholders and Trustees identified therein, Bluestone Industries, Inc., Dynamic Energy, Inc. JCJ Coal Group, LLC, Galenia Consulting LTD, Caroleng Consulting LTD, Mechel Bluestone Inc., Bluestone Merger Co., Dynamic Merger Co., and New JCJ Merger Co., including any "True-Up" claims); or any other unresolved claim that any party to this agreement has against another party hereto as of the date on which this agreement is executed (together "Disputes"); provided that the foregoing releases shall not (i) terminate any provisions of, (ii) release any party from any obligations under, or (iii) release any right or claim arising from that certain Transaction Agreement, dated as of the date hereof, by and between Caroleng Investments (SPV) Ltd. and Bluestone Resources Inc. (the "Transaction Agreement").

Mechel Bluestone Inc. and Mechel Mining OAO, each on their own behalf and on behalf of their present and former parents, subsidiaries, affiliates, predecessors, successors, assigns, heirs, executors, personal representatives and administrators (all of which shall be hereinafter referred to as "Mechel Releasors"), intending to be legally bound, hereby release, acquit, and forever discharge James C. Justice Companies, Inc., James C. Justice, II, James C. Justice, III, Jillean L. Justice, and James C. Justice II, as Trustee of the James C. Justice II Grat No. 1 and of the James C. Justice II Grat No. 2, and each of their respective present and former parents, subsidiaries, affiliates, divisions, predecessors, successors and assigns, directors, officers, principals, employees, agents, servants and attorneys, and their respective representatives, heirs, executors, personal representatives, administrators, and assigns, and any and all persons, natural or corporate, in privity with them or any one of them, or acting in concert with them or any one of them (collectively, hereinafter referred to as "Justice Releasees"), of and from any and all actions, claims, causes of action, suits, debts, dues, sums of money, accounts, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, and demands or obligations of any kind or nature whatsoever, matured or unmatured, liquidated or unliquidated, absolute or contingent, known or

unknown, present or future, at law, admiralty or equity, which the Mechel Releasors ever had, now have, or hereafter can, shall or may have as of the date of this agreement, including but not limited to the Disputes; provided that the foregoing releases shall not (i) terminate any provisions of, (ii) release any party from any obligations under, or (iii) release any right or claim arising from the Transaction Agreement.

These Mutual Releases shall be governed by, and construed in accordance with, the laws of the State of New York without regard to New York's rules governing conflicts of laws.

These Mutual Releases may not be changed orally.

The undersigned have caused these Mutual Releases to be executed by either themselves or by their duly authorized officer effective as of February 12, 2015.

JAMES C. JUSTICE COMPANIES, INC.

By: _____

Name:

Title:

JAMES C. JUSTICE II

By: _____

Name:

Title:

JAMES C. JUSTICE III

By: _____

Name:

Title:

JILLEAN L. JUSTICE

By: _____

Name:

Title:

JAMES C. JUSTICE II, AS TRUSTEE OF THE
JAMES C. JUSTICE II GRAT NO. 1 AND OF
THE JAMES C. JUSTICE II GRAT NO. 2

By: _____

Name:

Title:

MECHEL BLUESTONE INC.

By: _____

Name:

Title:

MECHEL MINING OAO

By: _____

Name:

Title:

**SCHEDULE E**

**FORMS OF DISMISSALS**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MECHEL BLUESTONE, INC. AND MECHEL MINING OAO,<br><br>        Plaintiffs and<br>        Counterclaim-Defendants,<br><br>V.<br><br>JAMES C. JUSTICE COMPANIES, INC., JAMES C. JUSTICE II, JAMES C. JUSTICE III, JILLEAN L. JUSTICE, AND JAMES C JUSTICE II, AS TRUSTEE OF THE JAMES C. JUSTICE GRAT NO. 1 AND OF THE JAMES C. JUSTICE II GRAT NO. 2,<br><br>        Defendants and<br>        Counterclaimants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 9218-VCL<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**STIPULATION AND [PROPOSED] ORDER OF
DISMISSAL WITH PREJUDICE**

       The parties to the above-captioned action, by and through their undersigned attorneys, hereby stipulate and agree, pursuant to Court of Chancery Rule 41(a)(1)(ii), and subject to the approval of the Court, to the dismissal of the above-captioned action with prejudice and with each party to bear his, her or its own attorneys' fees and costs.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP    RICHARDS, LAYTON & FINGER, P.A.

_____

Jay N. Moffitt (#4742)
Lauren K. Neal (#5940)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
*Attorneys for Plaintiffs*

_____

Raymond J. DiCamillo (#3188)
Susan M. Hannigan (#5342)
Rachel E. Horn (#5906)
920 N. King Street
Wilmington, DE 19801
(302) 651-7700

*Attorneys for Defendants*

OF COUNSEL:

OF COUNSEL:

Mark R. Robeck
KELLEY DRYE & WARREN LLP
Washington Harbour, Suite 400
3050 K Street, NW
Washington, DC 20007
(202) 342-8400

David B. Tulchin
William H. Wagener
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

Brian Glasser
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301

Emil J. Barth
BAKER BOTTS LLP
The Warner
1299 Pennsylvania Avenue, NW
Washington, D.C. 20004
(202) 639-7750

SO ORDERED this _____ day of _____, 2014.

_____
Vice Chancellor

## IN THE CIRCUIT COURT OF MCDOWELL COUNTY, WEST VIRGINIA
## BUSINESS COURT DIVISION

BLUESTONE COAL CORPORATION,    )
    )
    Plaintiff,    )
    )    Civil Action No. 14-C-45
v.    )    Presiding Judge: James J. Rowe
    )    Resolution Judge: James H. Young
CHESTNUT LAND HOLDINGS, LLC,    )
    )
    Defendant.    )
    )

## AGREED ORDER OF DISMISSAL

All parties to this action, by their respective counsel, have announced to this Court that the claims in this matter have been resolved and thus jointly moved this Court, pursuant to Rule 41 of the West Virginia Rules of Civil Procedure, for an Order dismissing this action in its entirety with prejudice.

For good cause shown, and there being no objection thereto, this case shall be, and is hereby, DISMISSED WITH PREJUDICE.

The Court hereby directs the Clerk to send certified copies of this Order to counsel of record.

IT IS SO ORDERED this _____ day of _____, 2013.


_____
Honorable James J. Rowe
Circuit Court of McDowell County
Business Court Division


Submitted by:


_____
Benjamin L. Bailey (WVSB #200)
Brian A. Glasser (WVSB # 6597)
Michael B. Hissam (WVSB #11526)

Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110
bbailey@baileyglasser.com
bglasser@baileyglasser.com
mhissam@baileyglasser.com
  *Counsel for Plaintiff Bluestone Coal Corporation (and*
*Third Party Defendant Mechel Bluestone Inc.)*

_____

Roger D. Hunter, Esquire
300 West Main Street
White Sulphur Springs, WV  24986
  *Counsel for Defendant (and Third Party Plaintiff)*
*Chestnut Land Holdings, LLC*

0117369.0568351  4823-7803-0369v2

# EXHIBIT 3

# FILED UNDER SEAL

**CAROLENG INVESTMENTS LIMITED**

**(British Virgin Islands)**

Claimant

vs/

**BLUESTONE RESOURCES, INC.**

**(U.S.A.)**

Respondent

# TERMS OF REFERENCE

## 1.   THE PARTIES

*Claimant*

1.   The Claimant is **CAROLENG INVESTMENTS LIMITED**, a company duly
incorporated under the laws of the British Virgin Islands, with its address at:

> NERINE CHAMBERS,
> PO BOX 905, ROAD TOWN
> TORTOLA, BVI

2.   Claimant is represented in this arbitration by:

> Joshua D. N. Hess
> Tharuni A. Jayaraman
> DECHERT LLP
> 1900 K STREET, NW
> WASHINGTON, DC 20006
> U.S.A.
> Tel:      +1 202 261 3300
> Email:   joshua.hess@dechert.com
>          Tharuni.jayaraman@dechert.com

*Respondent*

3.   The Respondent is **BLUESTONE RESOURCES, INC.**, a company duly organized
under the laws of Delaware U.S.A., with its address at:

> Bluestone Resources, Inc.
> 302 S. Jefferson Street
> Roanoke, VA 24011
> U.S.A.

4.   Respondent is represented in this arbitration by:

> Stephen W. Ball, General Counsel
> BLUESTONE RESOURCES, INC.
> 302 S. Jefferson Street
> Roanoke, VA 24011
> U.S.A.
> Tel:      +1 540-759-4802
> Email:   steve.ball@bluestoneindustries.com

## 2. THE ARBITRAL TRIBUNAL

*Co-Arbitrator confirmed upon Claimant's nomination*

5.  Pursuant to Article 13(2) of the ICC Rules of Arbitration in force as of 1 March 2017 (the "ICC Rules"), which govern these proceedings, on 7 June 2018 the Secretary General confirmed as Co-Arbitrator nominated by Claimant:

> Joseph R. Profaizer
> PAUL HASTINGS LLP
> 875 15th Street, NW
> Washington, DC 20005
> U.S.A.
> Tel:    +1 202 551 1860
> Email:  joeprofaizer@paulhastings.com

*Co-Arbitrator confirmed upon Respondent's nomination*

6.  Pursuant to Article 13(2) of the ICC Rules, on 7 June 2018 the Secretary General confirmed as Co-Arbitrator nominated by Respondent:

> Jennifer M. Smith
> HOGAN LOVELLS US LLP
> 609 Main Street, Suite 4200
> Houston, TX 77002
> U.S.A.
> Tel.: + 1 713 632 1415
> Email: jennifer.smith@hoganlovells.com

*President confirmed upon joint nomination by Co-Arbitrators*

7.  Pursuant to Section 9.9 of the Transaction Agreement dated 12 February 2015 and Article 12(5) of the ICC Rules, the two Co-Arbitrators had 30 days from 7 June 2018, the date of the confirmation of the Co-Arbitrators, to nominate jointly a President of the Arbitral Tribunal.

8.  On 22 June 2018, the Co-Arbitrators wrote jointly to the Parties regarding the nomination of the President of the Arbitral Tribunal. The Co-Arbitrators invited general views from the Parties by 27 June 2018 on the selection of the President and specific views on three possible candidates, including Dietmar Prager. The Claimant responded with no objection to any of the three. No objection was received from the Respondent.

9.  On 3 July 2018, the Co-Arbitrators informed the ICC Secretariat that they had agreed to nominate jointly:

Dr. Dietmar W. Prager
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
U.S.A.
Tel.:     +1 212 909 6243
Email:    dwprager@debevoise.com

10. On 5 July 2018, the ICC Secretariat invited the Parties to provide their comments on the disclosure made by Dr. Prager by 12 July 2018. On 13 July 2018, the ICC Secretariat informed the Parties that, as no comments from the Parties had been received within the time limit granted, it understood that the Parties did not object to **Dr. Prager's confirmation.**

11. On 16 July 2018, pursuant to Article 13(2) of the ICC Rules, the Secretary General confirmed Dr. Prager as President of the Arbitral Tribunal upon the joint nomination of the Co-Arbitrators.

*ICC Case Management Team*

12. The team in charge of the file at the ICC International Court of Arbitration is:

| | |
|---|---|
| Marek Krasula, Counsel | + 1 646 699 5704 |
| Mary Kate Wagner, Deputy Counsel | + 1 646 699 5707 |
| Pedro Arcoverde, Deputy Counsel | + 1 646 699 5706 |
| Camille M. Ng, Deputy Counsel | +1 646 699 5709 |
| Chelsea Flanagan, Assistant | + 1 646 699 5716 |
| Liman Oseni, Assistant | + 1 646 699 5709 |
| Fatima Elmansy, Assistant | +1 646 699 5712 |
| Email: | ica9@iccwbo.org |

13. The address of the ICC Secretariat (North America Office) is:

140 East 45th Street, Suite 14C
New York, NY 10017, USA

## 3.   SUMMARY OF THE PARTIES' RESPECTIVE CLAIMS

14. On 10 April 2018, Claimant submitted its Request for Arbitration, which was received by the Secretariat on the same day and notified to Respondent by the Secretariat on 16 April 2018. Respondent submitted its Answer to the Request for Arbitration on 16 June 2018.

15. The purpose of the following summary is to satisfy the requirements of Article 23(1)(c) of the Rules, without prejudice to any other or further allegations, arguments or contentions contained in the pleadings or submissions already filed and in such further pleadings or submissions as will be made in the course of the arbitration. By signing these Terms of Reference, neither Party is deemed to have agreed to the other Party's claims as set forth below. Nothing in these Terms of Reference shall affect the Arbitral Tribunal's discretion under Article 23(4) of the Rules.

### 3.1 Claimant's allegations

16. <u>Breach of Contract</u>:  On or about 12 February 2015, Claimant sold certain coal-producing property and assets located in West Virginia to Respondent pursuant to the Transaction Agreement.  In consideration of that sale, Respondent promised to make certain "Contingent Payments" and "Earn-Out Payments" in the event it sold any of the property and assets conveyed in the Transaction Agreement and "Deferred Royalty Payments" on coal sold from that property for a period of five (5) years.  On or about January 2017, Respondent sold certain of the property and assets subject to the Transaction Agreement to CM Energy Holdings LP (the "Bluestone Sale").  Respondent has breached the Transaction Agreement in at least four respects:

> (1) In contravention of Section 2.3 of the Transaction Agreement, Respondent has failed to pay all of the "Deferred Royalty Payments" due to Claimant. Upon information and belief, as of August 2018, this breach has cost Claimant at least USD $2,193,173.  However, due to Respondent's withholding of all documentation related to the Bluestone Sale, Claimant cannot verify the exact amount due. Further, as of July 2018, Respondent has implicitly admitted to withholding USD $2,095,348 in such Deferred Royalty Payments.

> (2) In contravention of Section 2.4 of the Transaction Agreement, Respondent has impermissibly and indefinitely withheld Claimant's portion (i.e., 12.5%) of USD $45,458,927 from the Bluestone Sale proceeds from Claimant. Section 2.4 of the Transaction Agreement required the payment of Contingent Payments *in full* within ten (10) business days of the close of the Bluestone Sale "notwithstanding any deferred or contingent payment conditions or obligations (as and if applicable) of [Respondent] pursuant to the terms of any such sale transaction."

> (3) In contravention of Section 2.4 of the Transaction Agreement, Respondent has refused to provide Claimant with 12.5% of the Earn-Out Payments that Respondent is to receive from CM Energy pursuant to the Bluestone Sale. Upon information and belief, this breach has cost Claimant substantial

sums, likely in the millions of U.S. dollars as such payments likely accrue on a quarterly basis. However, due to Respondent's withholding of all documentation evidencing the amount, Claimant cannot verify either the exact sum due or the accrual period.

(4) In contravention of Section 5.2 of the Transaction Agreement, Respondent has refused to provide Claimant with the transaction documents underlying the Bluestone Sale or any other documentation necessary for Claimant to account for the Deferred Royalty Payments, the Contingent Payments, and the Earn-Out Payments due to it.

17. <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>: Respondent has breached the implied covenant of good faith and fair dealing inherent to the Transaction Agreement as follows:

(1) Claimant reasonably understood the Transaction Agreement to include a promise that Respondent would not enter into subsequent agreements or arrangements that would prevent Respondent from being able to perform its obligations under the Transaction Agreement.

(2) Respondent has represented to Claimant that as a result of the Bluestone Sale, Respondent is not able to perform several of its obligations under the Transaction Agreement.

18. Claimant further submits that it has met all of its obligations under the Transaction Agreement.

### 3.2 Respondent's allegations

19. On or about February 12, 2015 Respondent purchased certain assets from Claimant located in West Virginia pursuant to the Transaction Agreement. As part of the consideration for that sale, Respondent agreed to make Contingent Payments in the event it sold any of the property, assets or securities acquired from Claimant under the Transaction Agreement. The Contingent Payments are to be equal to 12.5% of the Value received if the transaction occurs prior to the five-year anniversary of the closing of the Transaction Agreement. In addition to the Contingent Payments Respondent agreed to make Deferred Royalty Payments on coal sold from the acquired property in the amount of $3.00 per ton.

20. On or about January 2017 Respondent sold what is generally known as the Coal Mountain Surface Mine to CM Energy Holdings LP. On or about January 27th, 2017 Respondent wired Claimant $7,853,438 representing the Contingent Payment due Claimant as a result of the transaction. Respondent later determined the amount wired to Claimant was in error and should have totaled $5,758,089.16, representing an overpayment to Claimant of $2,095,348.

21. Respondent has provided Claimant with access to the CM Energy Holdings LP transaction documents so that Claimant can satisfy itself with the value received as part of said transaction.

22. Claimant alleges that Respondent has not provided Claimant with 12.5% of the Earn-Out Payments received by Respondent from CM Energy Holdings LP. Respondent asserts that no such Earn-Out Payments have been received by Respondent and in fact CM Energy Holdings LP has made claims for Reverse Earn-Out payments to be made by Respondent to CM Energy Holdings LP in every quarter since the closing of the CM Energy Holdings LP transaction. Just as an Earn-Out Payment would increase the value received by Respondent for the Coal Mountain sale, these Reverse Earn-Out Payments would decrease the value received by Respondent for the Coal Mountain sale.

23. As a result of the overpayment made by Respondent, Respondent has advised Claimant that such overpayment is to be treated as a pre-payment of Deferred Royalty Payments. As a result of such pre-payment Respondent has a credit toward Deferred Royalty payments and asserts that all amounts owed to Claimant under the Transaction Agreement have been paid. Claimant has refused to appropriately provide the benefit of such credit to Respondent.

24. Respondent further submits that it has met all of its obligations under the Transaction Agreement, including but not limited to payment of the appropriate amount of Contingent Payments, payment of Deferred Royalties, and cooperating with Claimant in providing Claimant with reasonable access to the CM Energy Holdings LP transaction documents.


### 3.3 Relief sought by Claimant

25. Claimant requests that the Tribunal award relief as follows:

    (1) An award declaring that Respondent breached its obligations under the Transaction Agreement.

    (2) Damages in an amount of not less than USD $6,711,610—which is Claimant's best estimate of the minimum amount owed to it based on the limited information currently available to it and which will likely need to be revised as additional information becomes available to Claimant—to compensate Claimant for Respondent's breaches of the Transaction Agreement, or such other amount as proven in this proceeding.

    (3) Damages to compensate Claimant for Respondent's breaches of the implied covenant of good faith and fair dealing.

(4) Punitive Damages as the Tribunal deems appropriate.

(5) An award of attorneys' fees and costs as provided by the ICC Rules.

(6) An award of pre- and post- award interest.

26. Claimant further requests any such relief that the Tribunal deems appropriate.


### 3.4 Relief sought by Respondent

27. Respondent requests that the Tribunal award relief as follows:

(1) Dismiss the Request for Arbitration with prejudice;

(2) Enter an award in favor of Respondent and against the Claimant;

(3) Award all costs, fees, and expenses to Respondent to the extent permitted by law or applicable arbitration rules; and

(4) Award such other relief as the Tribunal deems proper.


## 4. ISSUES TO BE DETERMINED BY THE ARBITRAL TRIBUNAL

28. The Tribunal shall decide upon the list of issues necessary to resolve the claims for relief of the Parties as finally submitted to the Tribunal in accordance with the ICC Rules (including Articles 19 and 23(4) of the ICC Rules). More specifically, the questions of fact or law to be resolved by the Tribunal in order to resolve the Parties' claims and defenses shall be all relevant questions appearing in the Parties' submissions, statements and pleadings and, in addition, any further questions which the Tribunal, in its discretion, may consider it necessary or appropriate to determine after hearing the Parties for the purpose of resolving the Parties' disputes.

## 5. QUANTIFICATION OF THE PARTIES' CLAIMS

29. Claimant alleges that, "*at minimum*, the value of Claimant's claims is **$6,711,610**." According to Claimant,

(1) "The minimum value of the Contingent Payments that Respondent has withheld is **USD $4,518,437**.

a) On February 1, 2017, Respondent represented to Claimant that the sale price of the Bluestone Sale was USD $98,975,000.

Claimant is therefore due to receive 12.5% of USD $98,975,000, which is USD $12,371,875.

b) Of this USD $12,371,875, Respondent has thus far paid Claimant USD $7,853,438.

c) Claimant is therefore due to receive USD $4,518,437.

(2) Upon information and belief, the minimum value of the Deferred Royalty Payments that Respondent has withheld to date is **USD $2,193,173**."

30. Claimant further states that "due to Respondent's withholding of documentation, Claimant is unable to quantify the value of the Earn-Out Payments due to it. Upon information and belief, the value of the Earn-Out Payments is likely in the millions of U.S. dollars and is likely growing on a quarterly basis."

## 6.    ARBITRATION AGREEMENT

31. Section 9.9 of the Transaction Agreement provides in relevant part that:

> All disputes arising out of or in connection with the present Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce ("ICC") by three arbitrators. Each party shall nominate in the Request and the Answer, respectively, one arbitrator. The two arbitrators so nominated shall, within thirty (30) days of the confirmation of the second arbitrator, nominate a third arbitrator, who shall be the chair of the Tribunal. If the two nominated arbitrators fail to nominate the third arbitrator within such thirty (30) days, the appointment of the chair shall be made by the ICC Court. The seat of the arbitration shall be the city of Paris, France. The language of the arbitration shall be English.

## 7.    SEAT OF THE ARBITRATION

32. Section 9.9 of the Transaction Agreement provides that the seat of this arbitration shall be Paris, France.

33. The Parties agree that the Tribunal may hold case management conferences and other procedural hearings by telephone conference call, if the Tribunal considers it appropriate. The Parties further agree that, pursuant to Article 18(2) of the ICC Rules, the Tribunal may, after consultation with the Parties, conduct hearings and meetings at any location it considers appropriate unless otherwise agreed by the Parties. Such meetings, hearings and communications, wherever held, shall not affect Paris, France, as the place of arbitration.

34. The Parties further agree that all awards and procedural orders in this arbitration shall be treated as having been made in Paris, France, but may be signed by the arbitrators elsewhere than in Paris, France. No Party shall seek to challenge any award or procedural order on the ground that it has not in fact been signed in Paris, France.

## 8. APPLICABLE SUBSTANTIVE LAW

35. Section 9.9 of the Transaction Agreement provides that:

> THIS AGREEMENT SHALL BE GOVERNED BY, AND ALL DISPUTES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE RESOLVED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK IN THE UNITED STATES OF AMERICA WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAW.

## 9. LANGUAGE

36. In accordance with Section 9.9 of the Transaction Agreement, the arbitration shall be conducted in the English language.

## 10. PARTICULARS OF THE PROCEDURAL RULES

37. The Parties agree that, subject to any mandatory provisions of the laws of France relating to an international arbitration with a seat in Paris, France, the procedure to be followed will be governed by the ICC Arbitration Rules in force as of 1 March 2017 and where those Rules are silent, as may be determined by the Tribunal in their discretion having taken account of the views of the Parties.

38. The Parties agree to use as guidelines: (a) the International Bar Association's Rules on the Taking of Evidence in International Commercial Arbitration ("IBA Rules"); and (ii) the International Bar Association's Guidelines on Party Representation in International Arbitration 2013. The Parties and the Tribunal also recall the proviso in the IBA Rules that the IBA Rules are not intended to limit the flexibility that is inherent in, and an advantage of, international arbitration, and agree that the Parties may seek to take evidence through methods not specifically stated in the IBA Rules, subject to the approval of the Tribunal and for good cause shown.

39. The duration and conduct of hearings shall be subject to the control of the Tribunal, having taken account of the views of the Parties.

40. The Tribunal shall, after consultation with the Parties, establish in a separate document the procedural timetable that it intends to follow for the conduct of the arbitration and shall communicate it to the ICC International Court of Arbitration and the Parties.

41.	Subject to the ICC Rules and these Terms of Reference, the Tribunal is authorised to issue such procedural orders and other procedural direction or instructions as it deems appropriate.

42.	Unless either Party requests otherwise, the President may, after consultation with the co-arbitrators, solely issue orders, including in relation to routine matters such as extensions of time and procedural motions of an emergency nature.

43.	The Tribunal reserves the right to decide any issue in a partial or interim award or in its final award.

## 11.	COMMUNICATIONS

44.	The primary means of communication is by email with a Portable Document Format ("**PDF**") file attachment.

45.	A copy of a communication sent by a Party to the Tribunal, and by the Tribunal to a Party, shall be sent to the other Parties and the ICC Secretariat simultaneously.

46.	Any communication to a Party or the Tribunal is valid if sent to the representative of that Party named in these Terms of Reference: (i) by email to the address(es) shown above; and (ii) by delivery against receipt, registered post or courier to the address shown above.

47.	The Parties, their representatives and the Tribunal shall notify all Parties, all signatories of these Terms of Reference and the ICC Court of any changes of name, description, address, telephone or email address. In the absence of any such notification, communications sent in accordance with these Terms of Reference shall be valid.

48.	All deadlines in any order or direction by the Tribunal shall be complied with by 8pm New York time on the date specified. Communications that are received after this time are deemed to have been received the next business day.

## 12.	OTHER MATTERS

49.	The Parties agree that any change or addition to a Party's legal representation as set out in Section 1, above, after the date of these Terms of Reference must be notified to the other Parties and to the Tribunal. The Parties agree that, in order to ensure the integrity of the proceedings, the Tribunal may refuse to permit the appearance of a new legal representative on behalf of a Party, where the appearance of such legal representative may otherwise require the recusal of one or more members of the Tribunal.

50.	In the event that a Party does not appear at a hearing or meeting, or defaults on an obligation imposed on it by these Terms of Reference, an order of the Tribunal, the

Rules, or any provision of law or rule governing this arbitration, the Tribunal shall deal with such non-appearance or default as it sees fit.

## 13. ACKNOWLEDGMENTS OF THE PARTIES

51. By signing these Terms of Reference, the Parties agree that the Tribunal has been properly constituted in accordance with Section 9.9 of the Transaction Agreement, the ICC Rules and the governing law.

52. Furthermore, by signing these Terms of Reference and pursuant to Article 40 of the Rules, the Parties agree that a party which proceeds with the arbitration without raising promptly its objection to a failure to comply with any provision of the Rules, or of any other rules applicable to the proceedings, any direction given by the Tribunal, or any requirement under the arbitration agreement relating to the constitution of the Tribunal or the conduct of the proceedings, shall be deemed to have waived its right to object.

53. The person signing these Terms of Reference on behalf of each Party hereby represents and warrants that he/she has the authority to execute this document on behalf of that Party.

**Place of arbitration:** Paris, France

**Date:** __ August 2018

<u>**Signatures of Arbitrators and Parties:**</u>

For the Claimant:

..........................................

Joshua D. N. Hess
Tharuni A. Jayaraman
DECHERT LLP

For the Respondent:

..........................................

Stephen W. Ball
BLUESTONE
RESOURCES, INC.

The Arbitral Tribunal

..........................................
Joseph R. Profaizer

..........................................
Jennifer M. Smith

..........................................
Dietmar W. Prager

**Place of arbitration:** Paris, France

**Date:** __ August 2018

**Signatures of Arbitrators and Parties:**

For the Claimant:

.........................................

Joshua D. N. Hess
Tharuni A. Jayaraman
DECHERT LLP

For the Respondent:

.........................................

Stephen W. Ball
BLUESTONE
RESOURCES, INC.

The Arbitral Tribunal

......... .........................................

Joseph R. Profaizer

.........................................

Jennifer M. Smith

...................................

Dietmar W. Prager

**Place of arbitration:** Paris, France

**Date:** 9 August 2018

Signatures of Arbitrators and Parties:

For the Claimant:

.........................................

Joshua D. N. Hess
Tharuni A. Jayaraman
DECHERT LLP

For the Respondent:

.........................................

Stephen W. Ball
BLUESTONE
RESOURCES, INC.

The Arbitral Tribunal

Joseph R. Profaizer

Jennifer M. Smith

Dietmar W. Prager

13

# EXHIBIT 4

# FILED UNDER SEAL

INTERNATIONAL | INTERNATIONAL | LEADING DISPUTE
COURT OF | CENTRE | RESOLUTION
ARBITRATION® | FOR ADR | WORLDWIDE

# ARBITRATION RULES

# MEDIATION RULES



ICC INTERNATIONAL
CHAMBER
OF COMMERCE



International Chamber of Commerce (ICC)
33-43 avenue du Président Wilson
75116 Paris, France
**www.iccwbo.org**

Copyright © 2011, 2013, 2016
International Chamber of Commerce (ICC)

All rights reserved

ICC holds all copyright and other intellectual property
rights in this collective work. No part of this work may be
reproduced, distributed, transmitted, translated or adapted
in any form or by any means except as permitted by law
without the written permission of ICC. Permission can be
requested from ICC through copyright.drs@iccwbo.org.

This publication exists in various languages. The English
version of the Rules is the original text. The latest editions of
all versions are available online at www.iccarbitration.org.

ICC, the ICC logo, CCI, International Chamber of Commerce
(including Spanish, French, Portuguese and Chinese
translations), World Business Organization, International
Court of Arbitration and ICC International Court of
Arbitration (including Spanish, French, German, Arabic
and Portuguese translations) are all trademarks of ICC,
registered in several countries.

Date of publication: December 2017

# ARBITRATION RULES

# MEDIATION RULES

*This booklet contains two discrete but complementary dispute resolution procedures offered by the International Chamber of Commerce (ICC). Arbitration under the ICC Arbitration Rules is a formal procedure leading to a binding decision from a neutral arbitral tribunal, susceptible to enforcement pursuant to both domestic arbitration laws and international treaties such as the 1958 New York Convention. Mediation under the ICC Mediation Rules is a flexible procedure aimed at achieving a negotiated settlement with the help of a neutral facilitator. The two sets of Rules are published together in this booklet in answer to the growing demand for a holistic approach to dispute resolution techniques.*

*Each set of Rules defines a structured, institutional framework intended to ensure transparency, efficiency and fairness in the dispute resolution process while allowing parties to exercise their choice over many aspects of procedure. Arbitration is administered by the International Court of Arbitration and mediation by the International Centre for ADR. These are the only bodies empowered to administer proceedings under their respective Rules, thereby affording parties the benefit of the experience, expertise and professionalism of a leading international dispute resolution provider.*

*Drafted by dispute resolution specialists and users representing a wide range of legal traditions, cultures and professions, these Rules provide a modern framework for the conduct of procedures and respond to the needs of international trade today. At the same time, they remain faithful to the ethos and essential features of ICC dispute resolution and, in particular, its suitability for use in any part of the world in proceedings conducted in any language and subject to any law.*

### Arbitration

*The Arbitration Rules are those of 2012, as amended in 2017. They are effective as of 1 March 2017.*

*The most significant of the 2017 amendments is the introduction of an expedited procedure providing for a streamlined arbitration with a reduced scale of fees. This procedure is automatically applicable in cases where the amount in dispute does not exceed US$ 2 million, unless*

the parties decide to opt out. It will apply only to arbitration agreements concluded after 1 March 2017.

*One of the important features of the Expedited Procedure Rules is that the ICC Court may appoint a sole arbitrator, even if the arbitration agreement provides otherwise.*

The expedited procedure is also available on an opt-in basis for higher-value cases, and will be an attractive answer to users' concerns over time and cost.

To further enhance the efficacy of ICC arbitrations, the time limit for establishing Terms of Reference has been reduced from two months to one month, and there are no Terms of Reference in the expedited procedure.

Under the 2017 Rules, ICC arbitrations will become even more transparent, for the Court will now provide reasons for a wide range of important decisions, if requested by one of the parties. Article 11(4) has been amended to that effect.

### *Mediation*

The Mediation Rules, in force from 2014, reflect modern practice and set clear parameters for the conduct of proceedings, while recognizing and maintaining the need for flexibility. Like the ADR Rules, which they replace, they can be used for conducting other procedures or combinations of procedures that are similarly aimed at an amicable settlement of the dispute, such as conciliation or neutral evaluation.

Parties wishing to have recourse to ICC arbitration, mediation, or both, are encouraged to include an appropriate dispute resolution clause in their agreements. For this purpose, each set of Rules is followed by model clauses, together with guidance on their use and how they may be adjusted to particular needs and circumstances. The recommended clauses include multi-tiered clauses providing for a combination of techniques as well as clauses contemplating a single technique.

Both the Rules and the model clauses are available for use by parties, whether or not members of the ICC. For the convenience of users, they have been translated into several languages and can be downloaded from the ICC website.

## TABLE OF CONTENTS

### ARBITRATION RULES 07

#### Introductory Provisions 08

Article 1    International Court of Arbitration     08
Article 2    Definitions     09
Article 3    Written Notifications or Communications;
             Time Limits     09

#### Commencing the Arbitration 11

Article 4    Request for Arbitration     11
Article 5    Answer to the Request; Counterclaims     12
Article 6    Effect of the Arbitration Agreement     14

#### Multiple Parties, Multiple Contracts and Consolidation 17

Article 7    Joinder of Additional Parties     17
Article 8    Claims Between Multiple Parties     18
Article 9    Multiple Contracts     18
Article 10   Consolidation of Arbitrations     19

#### The Arbitral Tribunal 20

Article 11   General Provisions     20
Article 12   Constitution of the Arbitral Tribunal     21
Article 13   Appointment and Confirmation of
             the Arbitrators     23
Article 14   Challenge of Arbitrators     24
Article 15   Replacement of Arbitrators     25

#### The Arbitral Proceedings 26

Article 16   Transmission of the File to
             the Arbitral Tribunal     26
Article 17   Proof of Authority     26
Article 18   Place of the Arbitration     26
Article 19   Rules Governing the Proceedings     26
Article 20   Language of the Arbitration     27
Article 21   Applicable Rules of Law     27
Article 22   Conduct of the Arbitration     27
Article 23   Terms of Reference     28
Article 24   Case Management Conference and
             Procedural Timetable     29
Article 25   Establishing the Facts of the Case     30
Article 26   Hearings     31
Article 27   Closing of the Proceedings and Date
             for Submission of Draft Awards     32
Article 28   Conservatory and Interim Measures     32

# TABLE OF CONTENTS

Article 29  Emergency Arbitrator                                          33
Article 30  Expedited Procedure                                           35

## Awards                                                                 **36**

Article 31  Time Limit for the Final Award                                36
Article 32  Making of the Award                                           36
Article 33  Award by Consent                                              36
Article 34  Scrutiny of the Award by the Court                            37
Article 35  Notification, Deposit and
            Enforceability of the Award                                   37
Article 36  Correction and Interpretation of
            the Award; Remission of Awards                                38

## Costs                                                                  **39**

Article 37  Advance to Cover the Costs of
            the Arbitration                                               39
Article 38  Decision as to the Costs of the Arbitration   40

## Miscellaneous                                                          **42**

Article 39  Modified Time Limits                                          42
Article 40  Waiver                                                        42
Article 41  Limitation of Liability                                       42
Article 42  General Rule                                                  42

## Appendix I – Statutes of the International
## Court of Arbitration                                                   **43**

Article 1   Function                                                      43
Article 2   Composition of the Court                                      43
Article 3   Appointment                                                   43
Article 4   Plenary Session of the Court                                  44
Article 5   Committees                                                    44
Article 6   Confidentiality                                               44
Article 7   Modification of the Rules of Arbitration      45

## Appendix II – Internal Rules of the International
## Court of Arbitration                                                   **46**

Article 1   Confidential Character of the Work of
            the International Court of Arbitration                        46
Article 2   Participation of Members of the
            International Court of Arbitration in
            ICC Arbitration                                               47
Article 3   Relations Between the Members
            of the Court and the ICC National
            Committees and Groups                                         48

| Article 4 | Committee of the Court | 48 |
| Article 5 | Court Secretariat | 49 |
| Article 6 | Scrutiny of Arbitral Awards | 50 |

**Appendix III – Arbitration Costs and Fees** **51**

| Article 1 | Advance on Costs | 51 |
| Article 2 | Costs and Fees | 53 |
| Article 3 | Scales of Administrative Expenses and Arbitrator's Fees | 55 |

**Appendix IV – Case Management Techniques** **62**

**Appendix V – Emergency Arbitrator Rules** **64**

| Article 1 | Application for Emergency Measures | 64 |
| Article 2 | Appointment of the Emergency Arbitrator; Transmission of the File | 66 |
| Article 3 | Challenge of an Emergency Arbitrator | 67 |
| Article 4 | Place of the Emergency Arbitrator Proceedings | 67 |
| Article 5 | Proceedings | 68 |
| Article 6 | Order | 68 |
| Article 7 | Costs of the Emergency Arbitrator Proceedings | 69 |
| Article 8 | General Rule | 70 |

**Appendix VI – Expedited Procedure Rules** **71**

| Article 1 | Application of the Expedited Procedure Rules | 71 |
| Article 2 | Constitution of the Arbitral Tribunal | 71 |
| Article 3 | Proceedings | 72 |
| Article 4 | Award | 73 |
| Article 5 | General Rule | 73 |

**ARBITRATION CLAUSES** **75**

**TABLE OF CONTENTS**

## MEDIATION RULES                                        79

Article 1    Introductory Provisions                      80
Article 2    Commencement Where there is
             an Agreement to Refer to the Rules           81
Article 3    Commencement Where there is No Prior
             Agreement to Refer to the Rules              82
Article 4    Place and Language(s) of the Mediation       83
Article 5    Selection of the Mediator                    83
Article 6    Fees and Costs                               85
Article 7    Conduct of the Mediation                     86
Article 8    Termination of the Proceedings               86
Article 9    Confidentiality                              87
Article 10   General Provisions                           88

## Appendix – Fees and Costs                              90

Article 1    Filing Fee                                   90
Article 2    Administrative Expenses                      90
Article 3    Mediator's Fees and Expenses                 91
Article 4    Prior ICC Arbitration                        92
Article 5    Currency, VAT and Scope                      92
Article 6    ICC as Appointing Authority                  93

## MEDIATION CLAUSES                                      95

# ARBITRATION RULES

**Rules of Arbitration of the International Chamber of Commerce**

In force as from 1 March 2017



## ARTICLE 1

### International Court of Arbitration

1  The International Court of Arbitration (the "Court") of the International Chamber of Commerce (the "ICC") is the independent arbitration body of the ICC. The statutes of the Court are set forth in Appendix I.

2  The Court does not itself resolve disputes. It administers the resolution of disputes by arbitral tribunals, in accordance with the Rules of Arbitration of the ICC (the "Rules"). The Court is the only body authorized to administer arbitrations under the Rules, including the scrutiny and approval of awards rendered in accordance with the Rules. It draws up its own internal rules, which are set forth in Appendix II (the "Internal Rules").

3  The President of the Court (the "President") or, in the President's absence or otherwise at the President's request, one of its Vice-Presidents shall have the power to take urgent decisions on behalf of the Court, provided that any such decision is reported to the Court at its next session.

4  As provided for in the Internal Rules, the Court may delegate to one or more committees composed of its members the power to take certain decisions, provided that any such decision is reported to the Court at its next session.

5  The Court is assisted in its work by the Secretariat of the Court (the "Secretariat") under the direction of its Secretary General (the "Secretary General").

## ARTICLE 2

### Definitions

In the Rules:

(i)  "arbitral tribunal" includes one or more arbitrators;

(ii) "claimant" includes one or more claimants, "respondent" includes one or more respondents, and "additional party" includes one or more additional parties;

(iii) "party" or "parties" include claimants, respondents or additional parties;

(iv)  "claim" or "claims" include any claim by any party against any other party;

(v)  "award" includes, *inter alia*, an interim, partial or final award.

## ARTICLE 3

### Written Notifications or Communications; Time Limits

1  All pleadings and other written communications submitted by any party, as well as all documents annexed thereto, shall be supplied in a number of copies sufficient to provide one copy for each party, plus one for each arbitrator, and one for the Secretariat. A copy of any notification or communication from the arbitral tribunal to the parties shall be sent to the Secretariat.

2  All notifications or communications from the Secretariat and the arbitral tribunal shall be made to the last address of the party or its representative for whom the same are intended, as notified either by the party in question or by the other party. Such notification or communication may be made by delivery against receipt, registered post, courier, email, or any other means of telecommunication that provides a record of the sending thereof.

3   A notification or communication shall be deemed to have been made on the day it was received by the party itself or by its representative, or would have been received if made in accordance with Article 3(2).

4   Periods of time specified in or fixed under the Rules shall start to run on the day following the date a notification or communication is deemed to have been made in accordance with Article 3(3). When the day next following such date is an official holiday, or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall commence on the first following business day. Official holidays and non-business days are included in the calculation of the period of time. If the last day of the relevant period of time granted is an official holiday or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall expire at the end of the first following business day.

## ARTICLE 4

### Request for Arbitration

1  A party wishing to have recourse to arbitration under the Rules shall submit its Request for Arbitration (the "Request") to the Secretariat at any of the offices specified in the Internal Rules. The Secretariat shall notify the claimant and respondent of the receipt of the Request and the date of such receipt.

2  The date on which the Request is received by the Secretariat shall, for all purposes, be deemed to be the date of the commencement of the arbitration.

3  The Request shall contain the following information:

a) the name in full, description, address and other contact details of each of the parties;

b) the name in full, address and other contact details of any person(s) representing the claimant in the arbitration;

c) a description of the nature and circumstances of the dispute giving rise to the claims and of the basis upon which the claims are made;

d) a statement of the relief sought, together with the amounts of any quantified claims and, to the extent possible, an estimate of the monetary value of any other claims;

e) any relevant agreements and, in particular, the arbitration agreement(s);

f) where claims are made under more than one arbitration agreement, an indication of the arbitration agreement under which each claim is made;

g) all relevant particulars and any observations or proposals concerning the number of arbitrators and their choice in accordance with the provisions of Articles 12 and 13, and any nomination of an arbitrator required thereby; and

h) all relevant particulars and any observations or proposals as to the place of the arbitration, the applicable rules of law and the language of the arbitration.

The claimant may submit such other documents or information with the Request as it considers appropriate or as may contribute to the efficient resolution of the dispute.

4    Together with the Request, the claimant shall:

a) submit the number of copies thereof required by Article 3(1); and

b) make payment of the filing fee required by Appendix III ("Arbitration Costs and Fees") in force on the date the Request is submitted.

In the event that the claimant fails to comply with either of these requirements, the Secretariat may fix a time limit within which the claimant must comply, failing which the file shall be closed without prejudice to the claimant's right to submit the same claims at a later date in another Request.

5    The Secretariat shall transmit a copy of the Request and the documents annexed thereto to the respondent for its Answer to the Request once the Secretariat has sufficient copies of the Request and the required filing fee.

## ARTICLE 5

### Answer to the Request; Counterclaims

1    Within 30 days from the receipt of the Request from the Secretariat, the respondent shall submit an Answer (the "Answer") which shall contain the following information:

a) its name in full, description, address and other contact details;

b) the name in full, address and other contact details of any person(s) representing the respondent in the arbitration;

c) its comments as to the nature and circumstances of the dispute giving rise to the claims and the basis upon which the claims are made;

d) its response to the relief sought;

e) any observations or proposals concerning the number of arbitrators and their choice in light of the claimant's proposals and in accordance with the provisions of Articles 12 and 13, and any nomination of an arbitrator required thereby; and

f) any observations or proposals as to the place of the arbitration, the applicable rules of law and the language of the arbitration.

The respondent may submit such other documents or information with the Answer as it considers appropriate or as may contribute to the efficient resolution of the dispute.

2   The Secretariat may grant the respondent an extension of the time for submitting the Answer, provided the application for such an extension contains the respondent's observations or proposals concerning the number of arbitrators and their choice and, where required by Articles 12 and 13, the nomination of an arbitrator. If the respondent fails to do so, the Court shall proceed in accordance with the Rules.

3   The Answer shall be submitted to the Secretariat in the number of copies specified by Article 3(1).

4   The Secretariat shall communicate the Answer and the documents annexed thereto to all other parties.

5   Any counterclaims made by the respondent shall be submitted with the Answer and shall provide:

a) a description of the nature and circumstances of the dispute giving rise to the counterclaims and of the basis upon which the counterclaims are made;

b) a statement of the relief sought together with the amounts of any quantified counterclaims and, to the extent possible, an estimate of the monetary value of any other counterclaims;

c) any relevant agreements and, in particular, the arbitration agreement(s); and

d) where counterclaims are made under more than one arbitration agreement, an indication of the arbitration agreement under which each counterclaim is made.

The respondent may submit such other documents or information with the counterclaims as it considers appropriate or as may contribute to the efficient resolution of the dispute.

6   The claimant shall submit a reply to any counterclaim within 30 days from the date of receipt of the counterclaims communicated by the Secretariat. Prior to the transmission of the file to the arbitral tribunal, the Secretariat may grant the claimant an extension of time for submitting the reply.

## ARTICLE 6

### Effect of the Arbitration Agreement

1   Where the parties have agreed to submit to arbitration under the Rules, they shall be deemed to have submitted *ipso facto* to the Rules in effect on the date of commencement of the arbitration, unless they have agreed to submit to the Rules in effect on the date of their arbitration agreement.

2   By agreeing to arbitration under the Rules, the parties have accepted that the arbitration shall be administered by the Court.

3   If any party against which a claim has been made does not submit an Answer, or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement or concerning whether all of the claims made in the arbitration may be determined together in a single arbitration, the arbitration shall proceed and any question of jurisdiction or of whether the claims may be determined together in that arbitration shall be decided directly by the arbitral tribunal, unless the Secretary General refers the matter to the Court for its decision pursuant to Article 6(4).

4   In all cases referred to the Court under Article 6(3), the Court shall decide whether and to what extent the arbitration shall proceed. The arbitration shall proceed if and to the extent that the Court is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In particular:

(i)   where there are more than two parties to the arbitration, the arbitration shall proceed between those of the parties, including any additional parties joined pursuant to Article 7, with respect to which the Court is *prima facie* satisfied that an arbitration agreement under the Rules that binds them all may exist; and

(ii)  where claims pursuant to Article 9 are made under more than one arbitration agreement, the arbitration shall proceed as to those claims with respect to which the Court is *prima facie* satisfied (a) that the arbitration agreements under which those claims are made may be compatible, and (b) that all parties to the arbitration may have agreed that those claims can be determined together in a single arbitration.

The Court's decision pursuant to Article 6(4) is without prejudice to the admissibility or merits of any party's plea or pleas.

5   In all matters decided by the Court under Article 6(4), any decision as to the jurisdiction of the arbitral tribunal, except as to parties or claims with respect to which the Court decides that the arbitration cannot proceed, shall then be taken by the arbitral tribunal itself.

6   Where the parties are notified of the Court's decision pursuant to Article 6(4) that the arbitration cannot proceed in respect of some or all of them, any party retains the right to ask any court having jurisdiction whether or not, and in respect of which of them, there is a binding arbitration agreement.

7   Where the Court has decided pursuant to Article 6(4) that the arbitration cannot proceed in respect of any of the claims, such decision shall not prevent a party from reintroducing the same claim at a later date in other proceedings.

8   If any of the parties refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such refusal or failure.

9   Unless otherwise agreed, the arbitral tribunal shall not cease to have jurisdiction by reason of any allegation that the contract is non-existent or null and void, provided that the arbitral tribunal upholds the validity of the arbitration agreement. The arbitral tribunal shall continue to have jurisdiction to determine the parties' respective rights and to decide their claims and pleas even though the contract itself may be non-existent or null and void.

## ARTICLE 7

### Joinder of Additional Parties

1   A party wishing to join an additional party to the arbitration shall submit its request for arbitration against the additional party (the "Request for Joinder") to the Secretariat. The date on which the Request for Joinder is received by the Secretariat shall, for all purposes, be deemed to be the date of the commencement of arbitration against the additional party. Any such joinder shall be subject to the provisions of Articles 6(3)–6(7) and 9. No additional party may be joined after the confirmation or appointment of any arbitrator, unless all parties, including the additional party, otherwise agree. The Secretariat may fix a time limit for the submission of a Request for Joinder.

2   The Request for Joinder shall contain the following information:

    a)  the case reference of the existing arbitration;

    b)  the name in full, description, address and other contact details of each of the parties, including the additional party; and

    c)  the information specified in Article 4(3), subparagraphs c), d), e) and f).

    The party filing the Request for Joinder may submit therewith such other documents or information as it considers appropriate or as may contribute to the efficient resolution of the dispute.

3   The provisions of Articles 4(4) and 4(5) shall apply, *mutatis mutandis*, to the Request for Joinder.

4   The additional party shall submit an Answer in accordance, *mutatis mutandis*, with the provisions of Articles 5(1)–5(4). The additional party may make claims against any other party in accordance with the provisions of Article 8.

## ARTICLE 8

### Claims Between Multiple Parties

1   In an arbitration with multiple parties, claims may be made by any party against any other party, subject to the provisions of Articles 6(3)–6(7) and 9 and provided that no new claims may be made after the Terms of Reference are signed or approved by the Court without the authorization of the arbitral tribunal pursuant to Article 23(4).

2   Any party making a claim pursuant to Article 8(1) shall provide the information specified in Article 4(3), subparagraphs c), d), e) and f).

3   Before the Secretariat transmits the file to the arbitral tribunal in accordance with Article 16, the following provisions shall apply, *mutatis mutandis*, to any claim made: Article 4(4) subparagraph a); Article 4(5); Article 5(1) except for subparagraphs a), b), e) and f); Article 5(2); Article 5(3) and Article 5(4). Thereafter, the arbitral tribunal shall determine the procedure for making a claim.

## ARTICLE 9

### Multiple Contracts

Subject to the provisions of Articles 6(3)–6(7) and 23(4), claims arising out of or in connection with more than one contract may be made in a single arbitration, irrespective of whether such claims are made under one or more than one arbitration agreement under the Rules.

## ARTICLE 10

### Consolidation of Arbitrations

The Court may, at the request of a party, consolidate two or more arbitrations pending under the Rules into a single arbitration, where:

a) the parties have agreed to consolidation; or

b) all of the claims in the arbitrations are made under the same arbitration agreement; or

c) where the claims in the arbitrations are made under more than one arbitration agreement, the arbitrations are between the same parties, the disputes in the arbitrations arise in connection with the same legal relationship, and the Court finds the arbitration agreements to be compatible.

In deciding whether to consolidate, the Court may take into account any circumstances it considers to be relevant, including whether one or more arbitrators have been confirmed or appointed in more than one of the arbitrations and, if so, whether the same or different persons have been confirmed or appointed.

When arbitrations are consolidated, they shall be consolidated into the arbitration that commenced first, unless otherwise agreed by all parties.

## ARTICLE 11

### General Provisions

1   Every arbitrator must be and remain impartial and independent of the parties involved in the arbitration.

2   Before appointment or confirmation, a prospective arbitrator shall sign a statement of acceptance, availability, impartiality and independence. The prospective arbitrator shall disclose in writing to the Secretariat any facts or circumstances which might be of such a nature as to call into question the arbitrator's independence in the eyes of the parties, as well as any circumstances that could give rise to reasonable doubts as to the arbitrator's impartiality. The Secretariat shall provide such information to the parties in writing and fix a time limit for any comments from them.

3   An arbitrator shall immediately disclose in writing to the Secretariat and to the parties any facts or circumstances of a similar nature to those referred to in Article 11(2) concerning the arbitrator's impartiality or independence which may arise during the arbitration.

4   The decisions of the Court as to the appointment, confirmation, challenge or replacement of an arbitrator shall be final.

5   By accepting to serve, arbitrators undertake to carry out their responsibilities in accordance with the Rules.

6   Insofar as the parties have not provided otherwise, the arbitral tribunal shall be constituted in accordance with the provisions of Articles 12 and 13.

## ARTICLE 12

### Constitution of the Arbitral Tribunal
### Number of Arbitrators

1   The disputes shall be decided by a sole arbitrator or by three arbitrators.

2   Where the parties have not agreed upon the number of arbitrators, the Court shall appoint a sole arbitrator, save where it appears to the Court that the dispute is such as to warrant the appointment of three arbitrators. In such case, the claimant shall nominate an arbitrator within a period of 15 days from the receipt of the notification of the decision of the Court, and the respondent shall nominate an arbitrator within a period of 15 days from the receipt of the notification of the nomination made by the claimant. If a party fails to nominate an arbitrator, the appointment shall be made by the Court.

### Sole Arbitrator

3   Where the parties have agreed that the dispute shall be resolved by a sole arbitrator, they may, by agreement, nominate the sole arbitrator for confirmation. If the parties fail to nominate a sole arbitrator within 30 days from the date when the claimant's Request for Arbitration has been received by the other party, or within such additional time as may be allowed by the Secretariat, the sole arbitrator shall be appointed by the Court.

### Three Arbitrators

4   Where the parties have agreed that the dispute shall be resolved by three arbitrators, each party shall nominate in the Request and the Answer, respectively, one arbitrator for confirmation. If a party fails to nominate an arbitrator, the appointment shall be made by the Court.

5 Where the dispute is to be referred to three arbitrators, the third arbitrator, who will act as president of the arbitral tribunal, shall be appointed by the Court, unless the parties have agreed upon another procedure for such appointment, in which case the nomination will be subject to confirmation pursuant to Article 13. Should such procedure not result in a nomination within 30 days from the confirmation or appointment of the co-arbitrators or any other time limit agreed by the parties or fixed by the Court, the third arbitrator shall be appointed by the Court.

6 Where there are multiple claimants or multiple respondents, and where the dispute is to be referred to three arbitrators, the multiple claimants, jointly, and the multiple respondents, jointly, shall nominate an arbitrator for confirmation pursuant to Article 13.

7 Where an additional party has been joined, and where the dispute is to be referred to three arbitrators, the additional party may, jointly with the claimant(s) or with the respondent(s), nominate an arbitrator for confirmation pursuant to Article 13.

8 In the absence of a joint nomination pursuant to Articles 12(6) or 12(7) and where all parties are unable to agree to a method for the constitution of the arbitral tribunal, the Court may appoint each member of the arbitral tribunal and shall designate one of them to act as president. In such case, the Court shall be at liberty to choose any person it regards as suitable to act as arbitrator, applying Article 13 when it considers this appropriate.

## ARTICLE 13

### Appointment and Confirmation of the Arbitrators

1   In confirming or appointing arbitrators, the Court shall consider the prospective arbitrator's nationality, residence and other relationships with the countries of which the parties or the other arbitrators are nationals and the prospective arbitrator's availability and ability to conduct the arbitration in accordance with the Rules. The same shall apply where the Secretary General confirms arbitrators pursuant to Article 13(2).

2   The Secretary General may confirm as co-arbitrators, sole arbitrators and presidents of arbitral tribunals persons nominated by the parties or pursuant to their particular agreements, provided that the statement they have submitted contains no qualification regarding impartiality or independence or that a qualified statement regarding impartiality or independence has not given rise to objections. Such confirmation shall be reported to the Court at its next session. If the Secretary General considers that a co-arbitrator, sole arbitrator or president of an arbitral tribunal should not be confirmed, the matter shall be submitted to the Court.

3   Where the Court is to appoint an arbitrator, it shall make the appointment upon proposal of a National Committee or Group of the ICC that it considers to be appropriate. If the Court does not accept the proposal made, or if the National Committee or Group fails to make the proposal requested within the time limit fixed by the Court, the Court may repeat its request, request a proposal from another National Committee or Group that it considers to be appropriate, or appoint directly any person whom it regards as suitable.

4   The Court may also appoint directly to act as arbitrator any person whom it regards as suitable where:

a)  one or more of the parties is a state or may be considered to be a state entity;

b) the Court considers that it would be appropriate to appoint an arbitrator from a country or territory where there is no National Committee or Group; or

c) the President certifies to the Court that circumstances exist which, in the President's opinion, make a direct appointment necessary and appropriate.

5 The sole arbitrator or the president of the arbitral tribunal shall be of a nationality other than those of the parties. However, in suitable circumstances and provided that none of the parties objects within the time limit fixed by the Court, the sole arbitrator or the president of the arbitral tribunal may be chosen from a country of which any of the parties is a national.

## ARTICLE 14

### Challenge of Arbitrators

1 A challenge of an arbitrator, whether for an alleged lack of impartiality or independence, or otherwise, shall be made by the submission to the Secretariat of a written statement specifying the facts and circumstances on which the challenge is based.

2 For a challenge to be admissible, it must be submitted by a party either within 30 days from receipt by that party of the notification of the appointment or confirmation of the arbitrator, or within 30 days from the date when the party making the challenge was informed of the facts and circumstances on which the challenge is based if such date is subsequent to the receipt of such notification.

3 The Court shall decide on the admissibility and, at the same time, if necessary, on the merits of a challenge after the Secretariat has afforded an opportunity for the arbitrator concerned, the other party or parties and any other members of the arbitral tribunal to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

## ARTICLE 15

### Replacement of Arbitrators

1   An arbitrator shall be replaced upon death, upon acceptance by the Court of the arbitrator's resignation, upon acceptance by the Court of a challenge, or upon acceptance by the Court of a request of all the parties.

2   An arbitrator shall also be replaced on the Court's own initiative when it decides that the arbitrator is prevented *de jure* or *de facto* from fulfilling the arbitrator's functions, or that the arbitrator is not fulfilling those functions in accordance with the Rules or within the prescribed time limits.

3   When, on the basis of information that has come to its attention, the Court considers applying Article 15(2), it shall decide on the matter after the arbitrator concerned, the parties and any other members of the arbitral tribunal have had an opportunity to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

4   When an arbitrator is to be replaced, the Court has discretion to decide whether or not to follow the original nominating process. Once reconstituted, and after having invited the parties to comment, the arbitral tribunal shall determine if and to what extent prior proceedings shall be repeated before the reconstituted arbitral tribunal.

5   Subsequent to the closing of the proceedings, instead of replacing an arbitrator who has died or been removed by the Court pursuant to Articles 15(1) or 15(2), the Court may decide, when it considers it appropriate, that the remaining arbitrators shall continue the arbitration. In making such determination, the Court shall take into account the views of the remaining arbitrators and of the parties and such other matters that it considers appropriate in the circumstances.

## ARTICLE 16

### Transmission of the File to the Arbitral Tribunal

The Secretariat shall transmit the file to the arbitral tribunal as soon as it has been constituted, provided the advance on costs requested by the Secretariat at this stage has been paid.

## ARTICLE 17

### Proof of Authority

At any time after the commencement of the arbitration, the arbitral tribunal or the Secretariat may require proof of the authority of any party representatives.

## ARTICLE 18

### Place of the Arbitration

1   The place of the arbitration shall be fixed by the Court, unless agreed upon by the parties.

2   The arbitral tribunal may, after consultation with the parties, conduct hearings and meetings at any location it considers appropriate, unless otherwise agreed by the parties.

3   The arbitral tribunal may deliberate at any location it considers appropriate.

## ARTICLE 19

### Rules Governing the Proceedings

The proceedings before the arbitral tribunal shall be governed by the Rules and, where the Rules are silent, by any rules which the parties or, failing them, the arbitral tribunal may settle on, whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration.

## ARTICLE 20

### Language of the Arbitration

In the absence of an agreement by the parties, the arbitral tribunal shall determine the language or languages of the arbitration, due regard being given to all relevant circumstances, including the language of the contract.

## ARTICLE 21

### Applicable Rules of Law

1 The parties shall be free to agree upon the rules of law to be applied by the arbitral tribunal to the merits of the dispute. In the absence of any such agreement, the arbitral tribunal shall apply the rules of law which it determines to be appropriate.

2 The arbitral tribunal shall take account of the provisions of the contract, if any, between the parties and of any relevant trade usages.

3 The arbitral tribunal shall assume the powers of an *amiable compositeur* or decide *ex aequo et bono* only if the parties have agreed to give it such powers.

## ARTICLE 22

### Conduct of the Arbitration

1 The arbitral tribunal and the parties shall make every effort to conduct the arbitration in an expeditious and cost-effective manner, having regard to the complexity and value of the dispute.

2 In order to ensure effective case management, the arbitral tribunal, after consulting the parties, may adopt such procedural measures as it considers appropriate, provided that they are not contrary to any agreement of the parties.

3   Upon the request of any party, the arbitral tribunal may make orders concerning the confidentiality of the arbitration proceedings or of any other matters in connection with the arbitration and may take measures for protecting trade secrets and confidential information.

4   In all cases, the arbitral tribunal shall act fairly and impartially and ensure that each party has a reasonable opportunity to present its case.

5   The parties undertake to comply with any order made by the arbitral tribunal.

## ARTICLE 23

### Terms of Reference

1   As soon as it has received the file from the Secretariat, the arbitral tribunal shall draw up, on the basis of documents or in the presence of the parties and in the light of their most recent submissions, a document defining its Terms of Reference. This document shall include the following particulars:

   a) the names in full, description, address and other contact details of each of the parties and of any person(s) representing a party in the arbitration;

   b) the addresses to which notifications and communications arising in the course of the arbitration may be made;

   c) a summary of the parties' respective claims and of the relief sought by each party, together with the amounts of any quantified claims and, to the extent possible, an estimate of the monetary value of any other claims;

   d) unless the arbitral tribunal considers it inappropriate, a list of issues to be determined;

   e) the names in full, address and other contact details of each of the arbitrators;

   f) the place of the arbitration; and

g) particulars of the applicable procedural rules and, if such is the case, reference to the power conferred upon the arbitral tribunal to act as *amiable compositeur* or to decide *ex aequo et bono.*

2   The Terms of Reference shall be signed by the parties and the arbitral tribunal. Within 30 days of the date on which the file has been transmitted to it, the arbitral tribunal shall transmit to the Court the Terms of Reference signed by it and by the parties. The Court may extend this time limit pursuant to a reasoned request from the arbitral tribunal or on its own initiative if it decides it is necessary to do so.

3   If any of the parties refuses to take part in the drawing up of the Terms of Reference or to sign the same, they shall be submitted to the Court for approval. When the Terms of Reference have been signed in accordance with Article 23(2) or approved by the Court, the arbitration shall proceed.

4   After the Terms of Reference have been signed or approved by the Court, no party shall make new claims which fall outside the limits of the Terms of Reference unless it has been authorized to do so by the arbitral tribunal, which shall consider the nature of such new claims, the stage of the arbitration and other relevant circumstances.

## ARTICLE 24

### Case Management Conference and Procedural Timetable

1   When drawing up the Terms of Reference or as soon as possible thereafter, the arbitral tribunal shall convene a case management conference to consult the parties on procedural measures that may be adopted pursuant to Article 22(2). Such measures may include one or more of the case management techniques described in Appendix IV.

2   During or following such conference, the arbitral tribunal shall establish the procedural timetable that it intends to follow for the conduct of the arbitration. The procedural timetable and any modifications thereto shall be communicated to the Court and the parties.

3   To ensure continued effective case management, the arbitral tribunal, after consulting the parties by means of a further case management conference or otherwise, may adopt further procedural measures or modify the procedural timetable.

4   Case management conferences may be conducted through a meeting in person, by videoconference, telephone or similar means of communication. In the absence of an agreement of the parties, the arbitral tribunal shall determine the means by which the conference will be conducted. The arbitral tribunal may request the parties to submit case management proposals in advance of a case management conference and may request the attendance at any case management conference of the parties in person or through an internal representative.

## ARTICLE 25

### Establishing the Facts of the Case

1   The arbitral tribunal shall proceed within as short a time as possible to establish the facts of the case by all appropriate means.

2   After studying the written submissions of the parties and all documents relied upon, the arbitral tribunal shall hear the parties together in person if any of them so requests or, failing such a request, it may of its own motion decide to hear them.

3   The arbitral tribunal may decide to hear witnesses, experts appointed by the parties or any other person, in the presence of the parties, or in their absence provided they have been duly summoned.

4   The arbitral tribunal, after having consulted the parties, may appoint one or more experts, define their terms of reference and receive their reports. At the request of a party, the parties shall be given the opportunity to question at a hearing any such expert.

5   At any time during the proceedings, the arbitral tribunal may summon any party to provide additional evidence.

6   The arbitral tribunal may decide the case solely on the documents submitted by the parties unless any of the parties requests a hearing.

## ARTICLE 26

### Hearings

1   When a hearing is to be held, the arbitral tribunal, giving reasonable notice, shall summon the parties to appear before it on the day and at the place fixed by it.

2   If any of the parties, although duly summoned, fails to appear without valid excuse, the arbitral tribunal shall have the power to proceed with the hearing.

3   The arbitral tribunal shall be in full charge of the hearings, at which all the parties shall be entitled to be present. Save with the approval of the arbitral tribunal and the parties, persons not involved in the proceedings shall not be admitted.

4   The parties may appear in person or through duly authorized representatives. In addition, they may be assisted by advisers.

## ARTICLE 27

### Closing of the Proceedings and Date for Submission of Draft Awards

As soon as possible after the last hearing concerning matters to be decided in an award or the filing of the last authorized submissions concerning such matters, whichever is later, the arbitral tribunal shall:

a) declare the proceedings closed with respect to the matters to be decided in the award; and

b) inform the Secretariat and the parties of the date by which it expects to submit its draft award to the Court for approval pursuant to Article 34.

After the proceedings are closed, no further submission or argument may be made, or evidence produced, with respect to the matters to be decided in the award, unless requested or authorized by the arbitral tribunal.

## ARTICLE 28

### Conservatory and Interim Measures

1   Unless the parties have otherwise agreed, as soon as the file has been transmitted to it, the arbitral tribunal may, at the request of a party, order any interim or conservatory measure it deems appropriate. The arbitral tribunal may make the granting of any such measure subject to appropriate security being furnished by the requesting party. Any such measure shall take the form of an order, giving reasons, or of an award, as the arbitral tribunal considers appropriate.

2   Before the file is transmitted to the arbitral tribunal, and in appropriate circumstances even thereafter, the parties may apply to any competent judicial authority for interim or conservatory measures. The application of a party to a judicial authority for such measures or for the implementation of any such measures ordered by an arbitral tribunal shall not be deemed to be an infringement or a waiver of the arbitration agreement and shall not affect the relevant powers reserved to the arbitral tribunal.

Any such application and any measures taken by the judicial authority must be notified without delay to the Secretariat. The Secretariat shall inform the arbitral tribunal thereof.

## ARTICLE 29

### Emergency Arbitrator

1   A party that needs urgent interim or conservatory measures that cannot await the constitution of an arbitral tribunal ("Emergency Measures") may make an application for such measures pursuant to the Emergency Arbitrator Rules in Appendix V. Any such application shall be accepted only if it is received by the Secretariat prior to the transmission of the file to the arbitral tribunal pursuant to Article 16 and irrespective of whether the party making the application has already submitted its Request for Arbitration.

2   The emergency arbitrator's decision shall take the form of an order. The parties undertake to comply with any order made by the emergency arbitrator.

3   The emergency arbitrator's order shall not bind the arbitral tribunal with respect to any question, issue or dispute determined in the order. The arbitral tribunal may modify, terminate or annul the order or any modification thereto made by the emergency arbitrator.

4   The arbitral tribunal shall decide upon any party's requests or claims related to the emergency arbitrator proceedings, including the reallocation of the costs of such proceedings and any claims arising out of or in connection with the compliance or non-compliance with the order.

5   Articles 29(1)–29(4) and the Emergency Arbitrator Rules set forth in Appendix V (collectively the "Emergency Arbitrator Provisions") shall apply only to parties that are either signatories of the arbitration agreement under the Rules that is relied upon for the application or successors to such signatories.

6   The Emergency Arbitrator Provisions shall not apply if:

   a) the arbitration agreement under the Rules was concluded before 1 January 2012;

   b) the parties have agreed to opt out of the Emergency Arbitrator Provisions; or

   c) the parties have agreed to another pre-arbitral procedure that provides for the granting of conservatory, interim or similar measures.

7   The Emergency Arbitrator Provisions are not intended to prevent any party from seeking urgent interim or conservatory measures from a competent judicial authority at any time prior to making an application for such measures, and in appropriate circumstances even thereafter, pursuant to the Rules. Any application for such measures from a competent judicial authority shall not be deemed to be an infringement or a waiver of the arbitration agreement. Any such application and any measures taken by the judicial authority must be notified without delay to the Secretariat.

## ARTICLE 30

### Expedited Procedure

1   By agreeing to arbitration under the Rules, the parties agree that this Article 30 and the Expedited Procedure Rules set forth in Appendix VI (collectively the "Expedited Procedure Provisions") shall take precedence over any contrary terms of the arbitration agreement.

2   The Expedited Procedure Rules set forth in Appendix VI shall apply if:

   a) the amount in dispute does not exceed the limit set out in Article 1(2) of Appendix VI at the time of the communication referred to in Article 1(3) of that Appendix; or

   b) the parties so agree.

3   The Expedited Procedure Provisions shall not apply if:

   a) the arbitration agreement under the Rules was concluded before the date on which the Expedited Procedure Provisions came into force;

   b) the parties have agreed to opt out of the Expedited Procedure Provisions; or

   c) the Court, upon the request of a party before the constitution of the arbitral tribunal or on its own motion, determines that it is inappropriate in the circumstances to apply the Expedited Procedure Provisions.

## ARTICLE 31

### Time Limit for the Final Award

1   The time limit within which the arbitral tribunal must render its final award is six months. Such time limit shall start to run from the date of the last signature by the arbitral tribunal or by the parties of the Terms of Reference or, in the case of application of Article 23(3), the date of the notification to the arbitral tribunal by the Secretariat of the approval of the Terms of Reference by the Court. The Court may fix a different time limit based upon the procedural timetable established pursuant to Article 24(2).

2   The Court may extend the time limit pursuant to a reasoned request from the arbitral tribunal or on its own initiative if it decides it is necessary to do so.

## ARTICLE 32

### Making of the Award

1   When the arbitral tribunal is composed of more than one arbitrator, an award is made by a majority decision. If there is no majority, the award shall be made by the president of the arbitral tribunal alone.

2   The award shall state the reasons upon which it is based.

3   The award shall be deemed to be made at the place of the arbitration and on the date stated therein.

## ARTICLE 33

### Award by Consent

If the parties reach a settlement after the file has been transmitted to the arbitral tribunal in accordance with Article 16, the settlement shall be recorded in the form of an award made by consent of the parties, if so requested by the parties and if the arbitral tribunal agrees to do so.

## ARTICLE 34

### Scrutiny of the Award by the Court

Before signing any award, the arbitral tribunal shall submit it in draft form to the Court. The Court may lay down modifications as to the form of the award and, without affecting the arbitral tribunal's liberty of decision, may also draw its attention to points of substance. No award shall be rendered by the arbitral tribunal until it has been approved by the Court as to its form.

## ARTICLE 35

### Notification, Deposit and Enforceability of the Award

1 Once an award has been made, the Secretariat shall notify to the parties the text signed by the arbitral tribunal, provided always that the costs of the arbitration have been fully paid to the ICC by the parties or by one of them.

2 Additional copies certified true by the Secretary General shall be made available on request and at any time to the parties, but to no one else.

3 By virtue of the notification made in accordance with Article 35(1), the parties waive any other form of notification or deposit on the part of the arbitral tribunal.

4 An original of each award made in accordance with the Rules shall be deposited with the Secretariat.

5 The arbitral tribunal and the Secretariat shall assist the parties in complying with whatever further formalities may be necessary.

6 Every award shall be binding on the parties. By submitting the dispute to arbitration under the Rules, the parties undertake to carry out any award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made.

## ARTICLE 36

### Correction and Interpretation of the Award; Remission of Awards

1   On its own initiative, the arbitral tribunal may correct a clerical, computational or typographical error, or any errors of similar nature contained in an award, provided such correction is submitted for approval to the Court within 30 days of the date of such award.

2   Any application of a party for the correction of an error of the kind referred to in Article 36(1), or for the interpretation of an award, must be made to the Secretariat within 30 days of the receipt of the award by such party, in a number of copies as stated in Article 3(1). After transmittal of the application to the arbitral tribunal, the latter shall grant the other party a short time limit, normally not exceeding 30 days, from the receipt of the application by that party, to submit any comments thereon. The arbitral tribunal shall submit its decision on the application in draft form to the Court not later than 30 days following the expiration of the time limit for the receipt of any comments from the other party or within such other period as the Court may decide.

3   A decision to correct or to interpret the award shall take the form of an addendum and shall constitute part of the award. The provisions of Articles 32, 34 and 35 shall apply *mutatis mutandis*.

4   Where a court remits an award to the arbitral tribunal, the provisions of Articles 32, 34, 35 and this Article 36 shall apply *mutatis mutandis* to any addendum or award made pursuant to the terms of such remission. The Court may take any steps as may be necessary to enable the arbitral tribunal to comply with the terms of such remission and may fix an advance to cover any additional fees and expenses of the arbitral tribunal and any additional ICC administrative expenses.

## ARTICLE 37

### Advance to Cover the Costs of the Arbitration

1   After receipt of the Request, the Secretary General may request the claimant to pay a provisional advance in an amount intended to cover the costs of the arbitration

   a) until the Terms of Reference have been drawn up; or

   b) when the Expedited Procedure Provisions apply, until the case management conference.

   Any provisional advance paid will be considered as a partial payment by the claimant of any advance on costs fixed by the Court pursuant to this Article 37.

2   As soon as practicable, the Court shall fix the advance on costs in an amount likely to cover the fees and expenses of the arbitrators and the ICC administrative expenses for the claims which have been referred to it by the parties, unless any claims are made under Article 7 or 8 in which case Article 37(4) shall apply. The advance on costs fixed by the Court pursuant to this Article 37(2) shall be payable in equal shares by the claimant and the respondent.

3   Where counterclaims are submitted by the respondent under Article 5 or otherwise, the Court may fix separate advances on costs for the claims and the counterclaims. When the Court has fixed separate advances on costs, each of the parties shall pay the advance on costs corresponding to its claims.

4   Where claims are made under Article 7 or 8, the Court shall fix one or more advances on costs that shall be payable by the parties as decided by the Court. Where the Court has previously fixed any advance on costs pursuant to this Article 37, any such advance shall be replaced by the advance(s) fixed pursuant to this Article 37(4), and the amount of any advance previously paid by any party will be considered as a partial payment by such party of its share of the advance(s) on costs as fixed by the Court pursuant to this Article 37(4).

5   The amount of any advance on costs fixed by the Court pursuant to this Article 37 may be subject to readjustment at any time during the arbitration. In all cases, any party shall be free to pay any other party's share of any advance on costs should such other party fail to pay its share.

6   When a request for an advance on costs has not been complied with, and after consultation with the arbitral tribunal, the Secretary General may direct the arbitral tribunal to suspend its work and set a time limit, which must be not less than 15 days, on the expiry of which the relevant claims shall be considered as withdrawn. Should the party in question wish to object to this measure, it must make a request within the aforementioned period for the matter to be decided by the Court. Such party shall not be prevented, on the ground of such withdrawal, from reintroducing the same claims at a later date in another proceeding.

7   If one of the parties claims a right to a set-off with regard to any claim, such set-off shall be taken into account in determining the advance to cover the costs of the arbitration in the same way as a separate claim insofar as it may require the arbitral tribunal to consider additional matters.

## ARTICLE 38

### Decision as to the Costs of the Arbitration

1   The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scales in force at the time of the commencement of the arbitration, as well as the fees and expenses of any experts appointed by the arbitral tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.

2   The Court may fix the fees of the arbitrators at a figure higher or lower than that which would result from the application of the relevant scale should this be deemed necessary due to the exceptional circumstances of the case.

3   At any time during the arbitral proceedings, the arbitral tribunal may make decisions on costs, other than those to be fixed by the Court, and order payment.

4   The final award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.

5   In making decisions as to costs, the arbitral tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner.

6   In the event of the withdrawal of all claims or the termination of the arbitration before the rendering of a final award, the Court shall fix the fees and expenses of the arbitrators and the ICC administrative expenses. If the parties have not agreed upon the allocation of the costs of the arbitration or other relevant issues with respect to costs, such matters shall be decided by the arbitral tribunal. If the arbitral tribunal has not been constituted at the time of such withdrawal or termination, any party may request the Court to proceed with the constitution of the arbitral tribunal in accordance with the Rules so that the arbitral tribunal may make decisions as to costs.

## ARTICLE 39

### Modified Time Limits

1   The parties may agree to shorten the various time limits set out in the Rules. Any such agreement entered into subsequent to the constitution of an arbitral tribunal shall become effective only upon the approval of the arbitral tribunal.

2   The Court, on its own initiative, may extend any time limit which has been modified pursuant to Article 39(1) if it decides that it is necessary to do so in order that the arbitral tribunal and the Court may fulfil their responsibilities in accordance with the Rules.

## ARTICLE 40

### Waiver

A party which proceeds with the arbitration without raising its objection to a failure to comply with any provision of the Rules, or of any other rules applicable to the proceedings, any direction given by the arbitral tribunal, or any requirement under the arbitration agreement relating to the constitution of the arbitral tribunal or the conduct of the proceedings, shall be deemed to have waived its right to object.

## ARTICLE 41

### Limitation of Liability

The arbitrators, any person appointed by the arbitral tribunal, the emergency arbitrator, the Court and its members, the ICC and its employees, and the ICC National Committees and Groups and their employees and representatives shall not be liable to any person for any act or omission in connection with the arbitration, except to the extent such limitation of liability is prohibited by applicable law.

## ARTICLE 42

### General Rule

In all matters not expressly provided for in the Rules, the Court and the arbitral tribunal shall act in the spirit of the Rules and shall make every effort to make sure that the award is enforceable at law.

ICC ARBITRATION RULES
APPENDIX I – STATUTES OF THE INTERNATIONAL
COURT OF ARBITRATION

## ARTICLE 1

### Function

1   The function of the International Court of Arbitration of the International Chamber of Commerce (the "Court") is to ensure the application of the Rules of Arbitration of the International Chamber of Commerce, and it has all the necessary powers for that purpose.

2   As an autonomous body, it carries out these functions in complete independence from the ICC and its organs.

3   Its members are independent from the ICC National Committees and Groups.

## ARTICLE 2

### Composition of the Court

The Court shall consist of a President, Vice-Presidents, and members and alternate members (collectively designated as members). In its work it is assisted by its Secretariat (Secretariat of the Court).

## ARTICLE 3

### Appointment

1   The President is elected by the ICC World Council upon the recommendation of the Executive Board of the ICC.

2   The ICC World Council appoints the Vice-Presidents of the Court from among the members of the Court or otherwise.

3   Its members are appointed by the ICC World Council on the proposal of National Committees or Groups, one member for each National Committee or Group. On the proposal of the President of the Court, the World Council may appoint members in countries and territories where there is no National Committee or Group.

4   On the proposal of the President of the Court, the World Council may appoint alternate members.

5   The term of office of all members, including, for the
purposes of this paragraph, the President and Vice-
Presidents, is three years. If a member is no longer
in a position to exercise the member's functions, a
successor is appointed by the World Council for the
remainder of the term. Upon the recommendation
of the Executive Board, the duration of the term of
office of any member may be extended beyond
three years if the World Council so decides.

## ARTICLE 4

### Plenary Session of the Court

The Plenary Sessions of the Court are presided over by
the President or, in the President's absence, by one of
the Vice-Presidents designated by the President. The
deliberations shall be valid when at least six members
are present. Decisions are taken by a majority vote, the
President or Vice-President, as the case may be, having
a casting vote in the event of a tie.

## ARTICLE 5

### Committees

The Court may set up one or more Committees and
establish the functions and organization of such
Committees.

## ARTICLE 6

### Confidentiality

The work of the Court is of a confidential nature which
must be respected by everyone who participates in
that work in whatever capacity. The Court lays down the
rules regarding the persons who can attend the
meetings of the Court and its Committees and who are
entitled to have access to materials related to the work
of the Court and its Secretariat.

## ARTICLE 7

### Modification of the Rules of Arbitration

Any proposal of the Court for a modification of the Rules is laid before the Commission on Arbitration and ADR before submission to the Executive Board of the ICC for approval, provided, however, that the Court, in order to take account of developments in information technology, may propose to modify or supplement the provisions of Article 3 of the Rules or any related provisions in the Rules without laying any such proposal before the Commission.

## ARTICLE 1

### Confidential Character of the Work of the International Court of Arbitration

1   For the purposes of this Appendix, members of the Court include the President and Vice-Presidents of the Court.

2   The sessions of the Court, whether plenary or those of a Committee of the Court, are open only to its members and to the Secretariat.

3   However, in exceptional circumstances, the President of the Court may invite other persons to attend. Such persons must respect the confidential nature of the work of the Court.

4   The documents submitted to the Court, or drawn up by it or the Secretariat in the course of the Court's proceedings, are communicated only to the members of the Court and to the Secretariat and to persons authorized by the President to attend Court sessions.

5   The President or the Secretary General of the Court may authorize researchers undertaking work of an academic nature to acquaint themselves with awards and other documents of general interest, with the exception of memoranda, notes, statements and documents remitted by the parties within the framework of arbitration proceedings.

6   Such authorization shall not be given unless the beneficiary has undertaken to respect the confidential character of the documents made available and to refrain from publishing anything based upon information contained therein without having previously submitted the text for approval to the Secretary General of the Court.

7   The Secretariat will in each case submitted to arbitration under the Rules retain in the archives of the Court all awards, Terms of Reference and decisions of the Court, as well as copies of the pertinent correspondence of the Secretariat.

8 Any documents, communications or correspondence submitted by the parties or the arbitrators may be destroyed unless a party or an arbitrator requests in writing within a period fixed by the Secretariat the return of such documents, communications or correspondence. All related costs and expenses for the return of those documents shall be paid by such party or arbitrator.

## ARTICLE 2

### Participation of Members of the International Court of Arbitration in ICC Arbitration

1 The President and the members of the Secretariat of the Court may not act as arbitrators or as counsel in cases submitted to ICC arbitration.

2 The Court shall not appoint Vice-Presidents or members of the Court as arbitrators. They may, however, be proposed for such duties by one or more of the parties, or pursuant to any other procedure agreed upon by the parties, subject to confirmation.

3 When the President, a Vice-President or a member of the Court or of the Secretariat is involved in any capacity whatsoever in proceedings pending before the Court, such person must inform the Secretary General of the Court upon becoming aware of such involvement.

4 Such person must be absent from the Court session whenever the matter is considered by the Court and shall not participate in the discussions or in the decisions of the Court.

5 Such person will not receive any material documentation or information pertaining to such proceedings.

## ARTICLE 3

### Relations Between the Members of the Court and the ICC National Committees and Groups

1 By virtue of their capacity, the members of the Court are independent of the ICC National Committees and Groups which proposed them for appointment by the ICC World Council.

2 Furthermore, they must regard as confidential, vis-à-vis the said National Committees and Groups, any information concerning individual cases with which they have become acquainted in their capacity as members of the Court, except when they have been requested by the President of the Court, by a Vice-President of the Court authorized by the President of the Court, or by the Court's Secretary General to communicate specific information to their respective National Committees or Groups.

## ARTICLE 4

### Committee of the Court

1 In accordance with the provisions of Article 1(4) of the Rules and Article 5 of Appendix I, the Court hereby establishes a Committee of the Court.

2 The members of the Committee consist of a president and at least two other members. The President of the Court acts as the president of the Committee. In the President's absence or otherwise at the President's request, a Vice-President of the Court or, in exceptional circumstances, another member of the Court may act as president of the Committee.

3 The other two members of the Committee are appointed by the Court from among the Vice-Presidents or the other members of the Court. At each Plenary Session the Court appoints the members who are to attend the meetings of the Committee to be held before the next Plenary Session.

4 The Committee meets when convened by its president. Two members constitute a quorum.

5　(a) The Court shall determine the decisions that may be taken by the Committee.

(b) The decisions of the Committee are taken unanimously.

(c) When the Committee cannot reach a decision or deems it preferable to abstain, it transfers the case to the next Plenary Session, making any suggestions it deems appropriate.

(d) The Committee's decisions are brought to the notice of the Court at its next Plenary Session.

6　For the purpose of expedited procedures and in accordance with the provisions of Article 1(4) of the Rules and Article 5 of Appendix I, the Court may exceptionally establish a Committee consisting of one member. Articles 4(2), 4(3), 4(4), 4(5), subparagraphs b) and c), of this Appendix II shall not apply.

## ARTICLE 5

### Court Secretariat

1　In the Secretary General's absence or otherwise at the Secretary General's request, the Deputy Secretary General and/or the General Counsel shall have the authority to refer matters to the Court, confirm arbitrators, certify true copies of awards and request the payment of a provisional advance, respectively provided for in Articles 6(3), 13(2), 35(2) and 37(1) of the Rule, as well as to take the measure provided for in Article 37(6).

2　The Secretariat may, with the approval of the Court, issue notes and other documents for the information of the parties and the arbitrators, or as necessary for the proper conduct of the arbitral proceedings.

3　Offices of the Secretariat may be established outside the headquarters of the ICC. The Secretariat shall keep a list of offices designated by the Secretary General. Requests for Arbitration may be submitted to the Secretariat at any of its offices, and the Secretariat's functions under the Rules may be carried out from any of its offices, as instructed by the Secretary General, Deputy Secretary General or General Counsel.

**ARTICLE 6**

**Scrutiny of Arbitral Awards**

When the Court scrutinizes draft awards in accordance with Article 34 of the Rules, it considers, to the extent practicable, the requirements of mandatory law at the place of the arbitration.

## ARTICLE 1

### Advance on Costs

1   Each request to commence an arbitration pursuant to the Rules must be accompanied by a filing fee of US$ 5,000. Such payment is non-refundable and shall be credited to the claimant's portion of the advance on costs.

2   The provisional advance fixed by the Secretary General according to Article 37(1) of the Rules shall normally not exceed the amount obtained by adding together the ICC administrative expenses, the minimum of the fees (as set out in the scales hereinafter) based upon the amount of the claim and the expected reimbursable expenses of the arbitral tribunal incurred with respect to the drafting of the Terms of Reference or the holding of the case management conference. If such amount is not quantified, the provisional advance shall be fixed at the discretion of the Secretary General. Payment by the claimant shall be credited to its share of the advance on costs fixed by the Court.

3   In general, the arbitral tribunal shall, in accordance with Article 37(6) of the Rules, proceed only with respect to those claims or counterclaims in regard to which the whole of the advance on costs has been paid.

4   The advance on costs fixed by the Court according to Articles 37(2) or 37(4) of the Rules comprises the fees of the arbitrator or arbitrators (hereinafter referred to as "arbitrator"), any arbitration-related expenses of the arbitrator and the ICC administrative expenses.

5   Each party shall pay its share of the total advance on costs in cash. However, if a party's share of the advance on costs is greater than US$ 500,000 (the "Threshold Amount"), such party may post a bank guarantee for any amount above the Threshold Amount. The Court may modify the Threshold Amount at any time at its discretion.

6   The Court may authorize the payment of advances on costs, or any party's share thereof, in instalments, subject to such conditions as the Court thinks fit, including the payment of additional ICC administrative expenses.

7   A party that has already paid in full its share of the advance on costs fixed by the Court may, in accordance with Article 37(5) of the Rules, pay the unpaid portion of the advance owed by the defaulting party by posting a bank guarantee.

8   When the Court has fixed separate advances on costs pursuant to Article 37(3) of the Rules, the Secretariat shall invite each party to pay the amount of the advance corresponding to its respective claim(s).

9   When, as a result of the fixing of separate advances on costs, the separate advance fixed for the claim of either party exceeds one half of such global advance as was previously fixed (in respect of the same claims and counterclaims that are the subject of separate advances), a bank guarantee may be posted to cover any such excess amount. In the event that the amount of the separate advance is subsequently increased, at least one half of the increase shall be paid in cash.

10  The Secretariat shall establish the terms governing all bank guarantees which the parties may post pursuant to the above provisions.

11  As provided in Article 37(5) of the Rules, the advance on costs may be subject to readjustment at any time during the arbitration, in particular to take into account fluctuations in the amount in dispute, changes in the amount of the estimated expenses of the arbitrator, or the evolving difficulty or complexity of arbitration proceedings.

12  Before any expertise ordered by the arbitral tribunal can be commenced, the parties, or one of them, shall pay an advance on costs fixed by the arbitral tribunal sufficient to cover the expected fees and expenses of the expert as determined by the arbitral tribunal. The arbitral tribunal shall be responsible for ensuring the payment by the parties of such fees and expenses.

13  The amounts paid as advances on costs do not yield interest for the parties or the arbitrator.

## ARTICLE 2

### Costs and Fees

1  Subject to Article 38(2) of the Rules, the Court shall fix the fees of the arbitrator in accordance with the scales hereinafter set out or, where the amount in dispute is not stated, at its discretion.

2  In setting the arbitrator's fees, the Court shall take into consideration the diligence and efficiency of the arbitrator, the time spent, the rapidity of the proceedings, the complexity of the dispute and the timeliness of the submission of the draft award, so as to arrive at a figure within the limits specified or, in exceptional circumstances (Article 38(2) of the Rules), at a figure higher or lower than those limits.

3  When a case is submitted to more than one arbitrator, the Court, at its discretion, shall have the right to increase the total fees up to a maximum which shall normally not exceed three times the fees of one arbitrator.

4  The arbitrator's fees and expenses shall be fixed exclusively by the Court as required by the Rules. Separate fee arrangements between the parties and the arbitrator are contrary to the Rules.

5  The Court shall fix the ICC administrative expenses of each arbitration in accordance with the scales hereinafter set out or, where the amount in dispute is not stated, at its discretion. Where the parties have agreed upon additional services, or in exceptional circumstances, the Court may fix the ICC administrative expenses at a lower or higher figure than that which would result from the application of such scale, provided that such expenses shall normally not exceed the maximum amount of the scale.

6  At any time during the arbitration, the Court may fix as payable a portion of the ICC administrative expenses corresponding to services that have already been performed by the Court and the Secretariat.

7  The Court may require the payment of administrative expenses in addition to those provided in the scale of administrative expenses as a condition for holding an arbitration in abeyance at the request of the parties or of one of them with the acquiescence of the other.

8    If an arbitration terminates before the rendering of a final award, the Court shall fix the fees and expenses of the arbitrators and the ICC administrative expenses at its discretion, taking into account the stage attained by the arbitral proceedings and any other relevant circumstances.

9    Any amount paid by the parties as an advance on costs exceeding the costs of the arbitration fixed by the Court shall be reimbursed to the parties having regard to the amounts paid.

10   In the case of an application under Article 36(2) of the Rules or of a remission pursuant to Article 36(4) of the Rules, the Court may fix an advance to cover additional fees and expenses of the arbitral tribunal and additional ICC administrative expenses and may make the transmission of such application to the arbitral tribunal subject to the prior cash payment in full to the ICC of such advance. The Court shall fix at its discretion the costs of the procedure following an application or a remission, which shall include any possible fees of the arbitrator and ICC administrative expenses, when approving the decision of the arbitral tribunal.

11   The Secretariat may require the payment of administrative expenses in addition to those provided in the scale of administrative expenses for any expenses arising in relation to a request pursuant to Article 35(5) of the Rules.

12   When an arbitration is preceded by proceedings under the ICC Mediation Rules, one half of the ICC administrative expenses paid for such proceedings shall be credited to the ICC administrative expenses of the arbitration.

13   Amounts paid to the arbitrator do not include any possible value added tax (VAT) or other taxes or charges and imposts applicable to the arbitrator's fees. Parties have a duty to pay any such taxes or charges; however, the recovery of any such charges or taxes is a matter solely between the arbitrator and the parties.

14   Any ICC administrative expenses may be subject to value added tax (VAT) or charges of a similar nature at the prevailing rate.

## ARTICLE 3

### Scales of Administrative Expenses and Arbitrator's Fees

1   The scales of administrative expenses and arbitrator's fees set forth below shall be effective as of 1 January 2017 in respect of all arbitrations commenced on or after such date, irrespective of the version of the Rules applying to such arbitrations.

2   To calculate the ICC administrative expenses and the arbitrator's fees, the amounts calculated for each successive tranche of the amount in dispute must be added together, except that where the amount in dispute is over US$ 500 million, a flat amount of US$ 150,000 shall constitute the entirety of the ICC administrative expenses.

3   The scales of administrative expenses and arbitrator's fees for the expedited procedure set forth below shall be effective as of 1 March 2017 in respect of all arbitrations commenced on or after such date, irrespective of the version of the Rules applying to such arbitrations. When parties have agreed to the expedited procedure pursuant to Article 30(2), subparagraph b), the scales for the expedited procedure will apply.

4   All amounts fixed by the Court or pursuant to any of the appendices to the Rules are payable in US$ except where prohibited by law or decided otherwise by the Court, in which case the ICC may apply a different scale and fee arrangement in another currency.

## SCALES OF ADMINISTRATIVE EXPENSES AND ARBITRATOR'S FEES

### A  Administrative Expenses

| Amount in dispute (in US Dollars) | Administrative expenses* |
| --- | --- |
| up to 50,000 | $5,000 |
| from 50,001 to 100,000 | 1.53% |
| from 100,001 to 200,000 | 2.72% |
| from 200,001 to 500,000 | 2.25% |
| from 500,001 to 1,000,000 | 1.62% |
| from 1,000,001 to 2,000,000 | 0.788% |
| from 2,000,001 to 5,000,000 | 0.46% |
| from 5,000,001 to 10,000,000 | 0.25% |
| from 10,000,001 to 30,000,000 | 0.10% |
| from 30,000,001 to 50,000,000 | 0.09% |
| from 50,000,001 to 80,000,000 | 0.01% |
| from 80,000,001 to 500,000,000 | 0.0123% |
| over 500,000,000 | $150,000 |

* For illustrative purposes only, the table on page 57 indicates the resulting administrative expenses in US$ when the proper calculations have been made.

### B  Arbitrator's Fees

| Amount in dispute (in US Dollars) | Fees** | |
| --- | --- | --- |
|  | minimum | maximum |
| up to 50,000 | $3,000 | 18.0200% |
| from 50,001 to 100,000 | 2.6500% | 13.5680% |
| from 100,001 to 200,000 | 1.4310% | 7.6850% |
| from 200,001 to 500,000 | 1.3670% | 6.8370% |
| from 500,001 to 1,000,000 | 0.9540% | 4.0280% |
| from 1,000,001 to 2,000,000 | 0.6890% | 3.6040% |
| from 2,000,001 to 5,000,000 | 0.3750% | 1.3910% |
| from 5,000,001 to 10,000,000 | 0.1280% | 0.9100% |
| from 10,000,001 to 30,000,000 | 0.0640% | 0.2410% |
| from 30,000,001 to 50,000,000 | 0.0590% | 0.2280% |
| from 50,000,001 to 80,000,000 | 0.0330% | 0.1570% |
| from 80,000,001 to 100,000,000 | 0.0210% | 0.1150% |
| from 100,000,001 to 500,000,000 | 0.0110% | 0.0580% |
| over 500,000,000 | 0.0100% | 0.0400% |

** For illustrative purposes only, the table on page 58 indicates the resulting range of fees in US$ when the proper calculations have been made.

## SCALES OF ADMINISTRATIVE EXPENSES AND ARBITRATOR'S FEES

| Amount in Dispute | A Administrative Expenses* | |
|---|---|---|
| (in US Dollars) | (in US Dollars) | |
| up to 50,000 | 5,000 | |
| from 50,001 to 100,000 | 5,000 | + 1.53% of amt. over 50,000 |
| from 100,001 to 200,000 | 5,765 | + 2.72% of amt. over 100,000 |
| from 200,001 to 500,000 | 8,485 | + 2.25% of amt. over 200,000 |
| from 500,001 to 1,000,000 | 15,235 | + 1.62% of amt. over 500,000 |
| from 1,000,001 to 2,000,000 | 23,335 | + 0.788% of amt. over 1,000,000 |
| from 2,000,001 to 5,000,000 | 31,215 | + 0.46% of amt. over 2,000,000 |
| from 5,000,001 to 10,000,000 | 45,015 | + 0.25% of amt. over 5,000,000 |
| from 10,000,001 to 30,000,000 | 57,515 | + 0.10% of amt. over 10,000,000 |
| from 30,000,001 to 50,000,000 | 77,515 | + 0.09% of amt. over 30,000,000 |
| from 50,000,001 to 80,000,000 | 95,515 | + 0.01% of amt. over 50,000,000 |
| from 80,000,001 to 500,000,000 | 98,515 | + 0.0123% of amt. over 80,000,000 |
| over 500,000,000 | 150,000 | |

* See page 56.

**SCALES OF ADMINISTRATIVE EXPENSES AND ARBITRATOR'S FEES**

| Amount in Dispute (in US Dollars) | B Arbitrator's Fees** (in US Dollars) | |
| --- | --- | --- |
| | Minimum | Maximum |
| up to 50,000 | 3,000 | 18.0200% of amount in dispute |
| from 50,001 to 100,000 | 3,000 + 2.6500% of amt. over 50,000 | 9,010 + 13.5680% of amt. over 50,000 |
| from 100,001 to 200,000 | 4,325 + 1.4310% of amt. over 100,000 | 15,794 + 7.6850% of amt. over 100,000 |
| from 200,001 to 500,000 | 5,756 + 1.3670% of amt. over 200,000 | 23,479 + 6.8370% of amt. over 200,000 |
| from 500,001 to 1,000,000 | 9,857 + 0.9540% of amt. over 500,000 | 43,990 + 4.0280% of amt. over 500,000 |
| from 1,000,001 to 2,000,000 | 14,627 + 0.6890% of amt. over 1,000,000 | 64,130 + 3.6040% of amt. over 1,000,000 |
| from 2,000,001 to 5,000,000 | 21,517 + 0.3750% of amt. over 2,000,000 | 100,170 + 1.3910% of amt. over 2,000,000 |
| from 5,000,001 to 10,000,000 | 32,767 + 0.1280% of amt. over 5,000,000 | 141,900 + 0.9100% of amt. over 5,000,000 |
| from 10,000,001 to 30,000,000 | 39,167 + 0.0640% of amt. over 10,000,000 | 187,400 + 0.2410% of amt. over 10,000,000 |
| from 30,000,001 to 50,000,000 | 51,967 + 0.0590% of amt. over 30,000,000 | 235,600 + 0.2280% of amt. over 30,000,000 |
| from 50,000,001 to 80,000,000 | 63,767 + 0.0330% of amt. over 50,000,000 | 281,200 + 0.1570% of amt. over 50,000,000 |
| from 80,000,001 to 100,000,000 | 73,667 + 0.0210% of amt. over 80,000,000 | 328,300 + 0.1150% of amt. over 80,000,000 |
| from 100,000,001 to 500,000,000 | 77,867 + 0.0110% of amt. over 100,000,000 | 351,300 + 0.0580% of amt. over 100,000,000 |
| over 500,000,000 | 121,867 + 0.0100% of amt. over 500,000,000 | 583,300 + 0.0400% of amt. over 500,000,000 |

** See page 56.

## SCALES OF ADMINISTRATIVE EXPENSES AND ARBITRATOR'S FEES FOR THE EXPEDITED PROCEDURE

### A Administrative Expenses

| Amount in dispute (in US Dollars) | Administrative expenses* |
|---|---|
| up to 50,000 | $5,000 |
| from 50,001 to 100,000 | 1.53% |
| from 100,001 to 200,000 | 2.72% |
| from 200,001 to 500,000 | 2.25% |
| from 500,001 to 1,000,000 | 1.62% |
| from 1,000,001 to 2,000,000 | 0.788% |
| from 2,000,001 to 5,000,000 | 0.46% |
| from 5,000,001 to 10,000,000 | 0.25% |
| from 10,000,001 to 30,000,000 | 0.10% |
| from 30,000,001 to 50,000,000 | 0.09% |
| from 50,000,001 to 80,000,000 | 0.01% |
| from 80,000,001 to 500,000,000 | 0.0123% |
| over 500,000,000 | $150,000 |

* For illustrative purposes only, the table on page 60 indicates the resulting administrative expenses in US$ when the proper calculations have been made.

### B Arbitrator's Fees

| Amount in dispute (in US Dollars) | Fees** | |
|---|---|---|
| | minimum | maximum |
| up to 50,000 | $2,400 | 14.4160% |
| from 50,001 to 100,000 | 2.1200% | 10.8544% |
| from 100,001 to 200,000 | 1.1448% | 6.1480% |
| from 200,001 to 500,000 | 1.0936% | 5.4696% |
| from 500,001 to 1,000,000 | 0.7632% | 3.2224% |
| from 1,000,001 to 2,000,000 | 0.5512% | 2.8832% |
| from 2,000,001 to 5,000,000 | 0.3000% | 1.1128% |
| from 5,000,001 to 10,000,000 | 0.1024% | 0.7280% |
| from 10,000,001 to 30,000,000 | 0.0512% | 0.1928% |
| from 30,000,001 to 50,000,000 | 0.0472% | 0.1824% |
| from 50,000,001 to 80,000,000 | 0.0264% | 0.1256% |
| from 80,000,001 to 100,000,000 | 0.0168% | 0.0920% |
| from 100,000,001 to 500,000,000 | 0.0088% | 0.0464% |
| over 500,000,000 | 0.0080% | 0.0320% |

** For illustrative purposes only, the table on page 61 indicates the resulting range of fees in US$ when the proper calculations have been made.

**SCALES OF ADMINISTRATIVE EXPENSES AND
ARBITRATOR'S FEES FOR THE EXPEDITED PROCEDURE**

| Amount in Dispute (in US Dollars) | A Administrative Expenses* (in US Dollars) | |
|---|---|---|
| up to 50,000 | 5,000 | |
| from 50,001 to 100,000 | 5,000 | + 1.53% of amt. over 50,000 |
| from 100,001 to 200,000 | 5,765 | + 2.72% of amt. over 100,000 |
| from 200,001 to 500,000 | 8,485 | + 2.25% of amt. over 200,000 |
| from 500,001 to 1,000,000 | 15,235 | + 1.62% of amt. over 500,000 |
| from 1,000,001 to 2,000,000 | 23,335 | + 0.788% of amt. over 1,000,000 |
| from 2,000,001 to 5,000,000 | 31,215 | + 0.46% of amt. over 2,000,000 |
| from 5,000,001 to 10,000,000 | 45,015 | + 0.25% of amt. over 5,000,000 |
| from 10,000,001 to 30,000,000 | 57,515 | + 0.10% of amt. over 10,000,000 |
| from 30,000,001 to 50,000,000 | 77,515 | + 0.09% of amt. over 30,000,000 |
| from 50,000,001 to 80,000,000 | 95,515 | + 0.01% of amt. over 50,000,000 |
| from 80,000,001 to 500,000,000 | 98,515 | + 0.0123% of amt. over 80,000,000 |
| over 500,000,000 | 150,000 | |

* See page 59.

### SCALES OF ADMINISTRATIVE EXPENSES AND ARBITRATOR'S FEES FOR THE EXPEDITED PROCEDURE

## Amount in Dispute

(in US Dollars)

## B Arbitrator's Fees**

(in US Dollars)

| Amount in Dispute (in US Dollars) | Minimum | Maximum |
|---|---|---|
| up to 50,000 | 2,400 | 14.4160% of amount in dispute |
| from 50,001 to 100,000 | 2,400 + 2.1200% of amt. over 50,000 | 7,208 + 10.8544% of amt. over 50,000 |
| from 100,001 to 200,000 | 3,460 + 1.1448% of amt. over 100,000 | 12,635 + 6.1480% of amt. over 100,000 |
| from 200,001 to 500,000 | 4,605 + 1.0936% of amt. over 200,000 | 18,783 + 5.4696% of amt. over 200,000 |
| from 500,001 to 1,000,000 | 7,886 + 0.7632% of amt. over 500,000 | 35,192 + 3.2224% of amt. over 500,000 |
| from 1,000,001 to 2,000,000 | 11,702 + 0.5512% of amt. over 1,000,000 | 51,304 + 2.8832% of amt. over 1,000,000 |
| from 2,000,001 to 5,000,000 | 17,214 + 0.3000% of amt. over 2,000,000 | 80,136 + 1.1128% of amt. over 2,000,000 |
| from 5,000,001 to 10,000,000 | 26,214 + 0.1024% of amt. over 5,000,000 | 113,520 + 0.7280% of amt. over 5,000,000 |
| from 10,000,001 to 30,000,000 | 31,334 + 0.0512% of amt. over 10,000,000 | 149,920 + 0.1928% of amt. over 10,000,000 |
| from 30,000,001 to 50,000,000 | 41,574 + 0.0472% of amt. over 30,000,000 | 188,480 + 0.1824% of amt. over 30,000,000 |
| from 50,000,001 to 80,000,000 | 51,014 + 0.0264% of amt. over 50,000,000 | 224,960 + 0.1256% of amt. over 50,000,000 |
| from 80,000,001 to 100,000,000 | 58,934 + 0.0168% of amt. over 80,000,000 | 262,640 + 0.0920% of amt. over 80,000,000 |
| from 100,000,001 to 500,000,000 | 62,294 + 0.0688% of amt. over 100,000,000 | 281,040 + 0.0464% of amt. over 100,000,000 |
| over 500,000,000 | 97,494 + 0.0080% of amt. over 500,000,000 | 466,640 + 0.0320% of amt. over 500,000,000 |

** See page 59.

The following are examples of case management techniques that can be used by the arbitral tribunal and the parties for controlling time and cost. Appropriate control of time and cost is important in all cases. In cases of low complexity and low value, it is particularly important to ensure that time and costs are proportionate to what is at stake in the dispute.

a) Bifurcating the proceedings or rendering one or more partial awards on key issues, when doing so may genuinely be expected to result in a more efficient resolution of the case.

b) Identifying issues that can be resolved by agreement between the parties or their experts.

c) Identifying issues to be decided solely on the basis of documents rather than through oral evidence or legal argument at a hearing.

d) Production of documentary evidence:

(i) requiring the parties to produce with their submissions the documents on which they rely;

(ii) avoiding requests for document production when appropriate in order to control time and cost;

(iii) in those cases where requests for document production are considered appropriate, limiting such requests to documents or categories of documents that are relevant and material to the outcome of the case;

(iv) establishing reasonable time limits for the production of documents;

(v) using a schedule of document production to facilitate the resolution of issues in relation to the production of documents.

e) Limiting the length and scope of written submissions and written and oral witness evidence (both fact witnesses and experts) so as to avoid repetition and maintain a focus on key issues.

f) Using telephone or video conferencing for procedural and other hearings where attendance in person is not essential and use of IT that enables online communication among the parties, the arbitral tribunal and the Secretariat of the Court.

g) Organizing a pre-hearing conference with the arbitral tribunal at which arrangements for a hearing can be discussed and agreed and the arbitral tribunal can indicate to the parties issues on which it would like the parties to focus at the hearing.

h) Settlement of disputes:

(i) informing the parties that they are free to settle all or part of the dispute either by negotiation or through any form of amicable dispute resolution methods such as, for example, mediation under the ICC Mediation Rules;

(ii) where agreed between the parties and the arbitral tribunal, the arbitral tribunal may take steps to facilitate settlement of the dispute, provided that every effort is made to ensure that any subsequent award is enforceable at law.

Additional techniques are described in the ICC publication entitled "Controlling Time and Costs in Arbitration".

## ARTICLE 1

### Application for Emergency Measures

1 A party wishing to have recourse to an emergency arbitrator pursuant to Article 29 of the Rules of Arbitration of the ICC (the "Rules") shall submit its Application for Emergency Measures (the "Application") to the Secretariat at any of the offices specified in the Internal Rules of the Court in Appendix II to the Rules.

2 The Application shall be supplied in a number of copies sufficient to provide one copy for each party, plus one for the emergency arbitrator, and one for the Secretariat.

3 The Application shall contain the following information:

a) the name in full, description, address and other contact details of each of the parties;

b) the name in full, address and other contact details of any person(s) representing the applicant;

c) a description of the circumstances giving rise to the Application and of the underlying dispute referred or to be referred to arbitration;

d) a statement of the Emergency Measures sought;

e) the reasons why the applicant needs urgent interim or conservatory measures that cannot await the constitution of an arbitral tribunal;

f) any relevant agreements and, in particular, the arbitration agreement;

g) any agreement as to the place of the arbitration, the applicable rules of law or the language of the arbitration;

h) proof of payment of the amount referred to in Article 7(1) of this Appendix; and

i) any Request for Arbitration and any other submissions in connection with the underlying dispute, which have been filed with the Secretariat by any of the parties to the emergency arbitrator proceedings prior to the making of the Application.

The Application may contain such other documents or information as the applicant considers appropriate or as may contribute to the efficient examination of the Application.

4 The Application shall be drawn up in the language of the arbitration if agreed upon by the parties or, in the absence of any such agreement, in the language of the arbitration agreement.

5 If and to the extent that the President of the Court (the "President") considers, on the basis of the information contained in the Application, that the Emergency Arbitrator Provisions apply with reference to Article 29(5) and Article 29(6) of the Rules, the Secretariat shall transmit a copy of the Application and the documents annexed thereto to the responding party. If and to the extent that the President considers otherwise, the Secretariat shall inform the parties that the emergency arbitrator proceedings shall not take place with respect to some or all of the parties and shall transmit a copy of the Application to them for information.

6 The President shall terminate the emergency arbitrator proceedings if a Request for Arbitration has not been received by the Secretariat from the applicant within 10 days of the Secretariat's receipt of the Application, unless the emergency arbitrator determines that a longer period of time is necessary.

## ARTICLE 2

### Appointment of the Emergency Arbitrator; Transmission of the File

1   The President shall appoint an emergency arbitrator within as short a time as possible, normally within two days from the Secretariat's receipt of the Application.

2   No emergency arbitrator shall be appointed after the file has been transmitted to the arbitral tribunal pursuant to Article 16 of the Rules. An emergency arbitrator appointed prior thereto shall retain the power to make an order within the time limit permitted by Article 6(4) of this Appendix.

3   Once the emergency arbitrator has been appointed, the Secretariat shall so notify the parties and shall transmit the file to the emergency arbitrator. Thereafter, all written communications from the parties shall be submitted directly to the emergency arbitrator with a copy to the other party and the Secretariat. A copy of any written communications from the emergency arbitrator to the parties shall be submitted to the Secretariat.

4   Every emergency arbitrator shall be and remain impartial and independent of the parties involved in the dispute.

5   Before being appointed, a prospective emergency arbitrator shall sign a statement of acceptance, availability, impartiality and independence. The Secretariat shall provide a copy of such statement to the parties.

6   An emergency arbitrator shall not act as an arbitrator in any arbitration relating to the dispute that gave rise to the Application.

## ARTICLE 3

### Challenge of an Emergency Arbitrator

1   A challenge against the emergency arbitrator must be made within three days from receipt by the party making the challenge of the notification of the appointment or from the date when that party was informed of the facts and circumstances on which the challenge is based if such date is subsequent to the receipt of such notification.

2   The challenge shall be decided by the Court after the Secretariat has afforded an opportunity for the emergency arbitrator and the other party or parties to provide comments in writing within a suitable period of time.

## ARTICLE 4

### Place of the Emergency Arbitrator Proceedings

1   If the parties have agreed upon the place of the arbitration, such place shall be the place of the emergency arbitrator proceedings. In the absence of such agreement, the President shall fix the place of the emergency arbitrator proceedings, without prejudice to the determination of the place of the arbitration pursuant to Article 18(1) of the Rules.

2   Any meetings with the emergency arbitrator may be conducted through a meeting in person at any location the emergency arbitrator considers appropriate or by videoconference, telephone or similar means of communication.

## ARTICLE 5

### Proceedings

1   The emergency arbitrator shall establish a procedural timetable for the emergency arbitrator proceedings within as short a time as possible, normally within two days from the transmission of the file to the emergency arbitrator pursuant to Article 2(3) of this Appendix.

2   The emergency arbitrator shall conduct the proceedings in the manner which the emergency arbitrator considers to be appropriate, taking into account the nature and the urgency of the Application. In all cases, the emergency arbitrator shall act fairly and impartially and ensure that each party has a reasonable opportunity to present its case.

## ARTICLE 6

### Order

1   Pursuant to Article 29(2) of the Rules, the emergency arbitrator's decision shall take the form of an order (the "Order").

2   In the Order, the emergency arbitrator shall determine whether the Application is admissible pursuant to Article 29(1) of the Rules and whether the emergency arbitrator has jurisdiction to order Emergency Measures.

3   The Order shall be made in writing and shall state the reasons upon which it is based. It shall be dated and signed by the emergency arbitrator.

4   The Order shall be made no later than 15 days from the date on which the file was transmitted to the emergency arbitrator pursuant to Article 2(3) of this Appendix. The President may extend the time limit pursuant to a reasoned request from the emergency arbitrator or on the President's own initiative if the President decides it is necessary to do so.

5   Within the time limit established pursuant to Article 6(4) of this Appendix, the emergency arbitrator shall send the Order to the parties, with a copy to the Secretariat, by any of the means of communication permitted by Article 3(2) of the Rules that the emergency arbitrator considers will ensure prompt receipt.

6    The Order shall cease to be binding on the parties upon:

   a) the President's termination of the emergency arbitrator proceedings pursuant to Article 1(6) of this Appendix;

   b) the acceptance by the Court a challenge against the emergency arbitrator pursuant to Article 3 of this Appendix;

   c) the arbitral tribunal's final award, unless the arbitral tribunal expressly decides otherwise; or

   d) the withdrawal of all claims or the termination of the arbitration before the rendering of a final award.

7    The emergency arbitrator may make the Order subject to such conditions as the emergency arbitrator thinks fit, including requiring the provision of appropriate security.

8    Upon a reasoned request by a party made prior to the transmission of the file to the arbitral tribunal pursuant to Article 16 of the Rules, the emergency arbitrator may modify, terminate or annul the Order.

## ARTICLE 7

### Costs of the Emergency Arbitrator Proceedings

1    The applicant must pay an amount of US$ 40,000, consisting of US$ 10,000 for ICC administrative expenses and US$ 30,000 for the emergency arbitrator's fees and expenses. Notwithstanding Article 1(5) of this Appendix, the Application shall not be notified until the payment of US$ 40,000 is received by the Secretariat.

2    The President may, at any time during the emergency arbitrator proceedings, decide to increase the emergency arbitrator's fees or the ICC administrative expenses taking into account, *inter alia*, the nature of the case and the nature and amount of work performed by the emergency arbitrator, the Court, the President and the Secretariat. If the party which submitted the Application fails to pay the increased costs within the time limit fixed by the Secretariat, the Application shall be considered as withdrawn.

3    The emergency arbitrator's Order shall fix the costs of the emergency arbitrator proceedings and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.

4    The costs of the emergency arbitrator proceedings include the ICC administrative expenses, the emergency arbitrator's fees and expenses and the reasonable legal and other costs incurred by the parties for the emergency arbitrator proceedings.

5    In the event that the emergency arbitrator proceedings do not take place pursuant to Article 1(5) of this Appendix or are otherwise terminated prior to the making of an Order, the President shall determine the amount to be reimbursed to the applicant, if any. An amount of US$ 5,000 for ICC administrative expenses is non-refundable in all cases.

## ARTICLE 8

### General Rule

1    The President shall have the power to decide, at the President's discretion, all matters relating to the administration of the emergency arbitrator proceedings not expressly provided for in this Appendix.

2    In the President's absence or otherwise at the President's request, any of the Vice-Presidents of the Court shall have the power to take decisions on behalf of the President.

3    In all matters concerning emergency arbitrator proceedings not expressly provided for in this Appendix, the Court, the President and the emergency arbitrator shall act in the spirit of the Rules and this Appendix.

## ARTICLE 1

### Application of the Expedited Procedure Rules

1 Insofar as Article 30 of the Rules of Arbitration of the ICC (the "Rules") and this Appendix VI do not provide otherwise, the Rules shall apply to an arbitration under the Expedited Procedure Rules.

2 The amount referred to in Article 30(2), subparagraph a), of the Rules is US$ 2,000,000.

3 Upon receipt of the Answer to the Request pursuant to Article 5 of the Rules, or upon expiry of the time limit for the Answer or at any relevant time thereafter and subject to Article 30(3) of the Rules, the Secretariat will inform the parties that the Expedited Procedure Provisions shall apply in the case.

4 The Court may, at any time during the arbitral proceedings, on its own motion or upon the request of a party, and after consultation with the arbitral tribunal and the parties, decide that the Expedited Procedure Provisions shall no longer apply to the case. In such case, unless the Court considers that it is appropriate to replace and/or reconstitute the arbitral tribunal, the arbitral tribunal shall remain in place.

## ARTICLE 2

### Constitution of the Arbitral Tribunal

1 The Court may, notwithstanding any contrary provision of the arbitration agreement, appoint a sole arbitrator.

2 The parties may nominate the sole arbitrator within a time limit to be fixed by the Secretariat. In the absence of such nomination, the sole arbitrator shall be appointed by the Court within as short a time as possible.

## ARTICLE 3

### Proceedings

1   Article 23 of the Rules shall not apply to an arbitration under the Expedited Procedure Rules.

2   After the arbitral tribunal has been constituted, no party shall make new claims, unless it has been authorized to do so by the arbitral tribunal, which shall consider the nature of such new claims, the stage of the arbitration, any cost implications and any other relevant circumstances.

3   The case management conference convened pursuant to Article 24 of the Rules shall take place no later than 15 days after the date on which the file was transmitted to the arbitral tribunal. The Court may extend this time limit pursuant to a reasoned request from the arbitral tribunal or on its own initiative if it decides it is necessary to do so.

4   The arbitral tribunal shall have discretion to adopt such procedural measures as it considers appropriate. In particular, the arbitral tribunal may, after consultation with the parties, decide not to allow requests for document production or to limit the number, length and scope of written submissions and written witness evidence (both fact witnesses and experts).

5   The arbitral tribunal may, after consulting the parties, decide the dispute solely on the basis of the documents submitted by the parties, with no hearing and no examination of witnesses or experts. When a hearing is to be held, the arbitral tribunal may conduct it by videoconference, telephone or similar means of communication.

## ARTICLE 4

### Award

1   The time limit within which the arbitral tribunal must render its final award is six months from the date of the case management conference. The Court may extend the time limit pursuant to Article 31(2) of the Rules.

2   The fees of the arbitral tribunal shall be fixed according to the scales of administrative expenses and arbitrator's fees for the expedited procedure set out in Appendix III.

## ARTICLE 5

### General Rule

In all matters concerning the expedited procedure not expressly provided for in this Appendix, the Court and the arbitral tribunal shall act in the spirit of the Rules and this Appendix.

# ARBITRATION CLAUSES



It is recommended that parties wishing to make reference to ICC arbitration in their contracts use the standard clause below.

### Standard ICC Arbitration Clause
*All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules.*

Parties are free to adapt the clause to their particular circumstances. For instance, they may wish to stipulate the number of arbitrators, given that the ICC Arbitration Rules contain a presumption in favour of a sole arbitrator. Also, it may be desirable for them to stipulate the place and language of the arbitration and the law applicable to the merits. The ICC Arbitration Rules do not limit the parties' free choice of the place and language of the arbitration or the law governing the contract.

When adapting the clause, care must be taken to avoid any risk of ambiguity. Unclear wording in the clause will cause uncertainty and delay and can hinder or even compromise the dispute resolution process.

Parties should also take account of any factors that may affect the enforceability of the clause under applicable law. These include any mandatory requirements that may exist at the place of arbitration and the expected place or places of enforcement.

### ICC Arbitration Without Emergency Arbitrator
If the parties wish to exclude any recourse to the Emergency Arbitrator Provisions, they must expressly opt out by adding the following wording to the clause above:

*The Emergency Arbitrator Provisions shall not apply.*

### Expedited Arbitration
The ICC Arbitration Rules provide for use of an expedited procedure in lower-value cases. If parties wish to exclude the application of the Expedited Procedure Provisions, they must expressly opt out by adding the following wording to the clause above:

*The Expedited Procedure Provisions shall not apply.*

Parties wishing to avail themselves of the expedited procedure in higher-value cases should expressly opt in by adding the following wording to the clause above:

*The parties agree, pursuant to Article 30(2)(b) of the Rules of Arbitration of the International Chamber of Commerce, that the Expedited Procedure Rules shall apply irrespective of the amount in dispute.*

If parties wish the ceiling for the application of the Expedited Procedure Rules to be higher than that specified in those Rules, the following wording should be added to the clause above:

*The parties agree, pursuant to Article 30(2)(b) of the Rules of Arbitration of the International Chamber of Commerce, that the Expedited Procedure Rules shall apply, provided the amount in dispute does not exceed US$ [specify amount] at the time of the communication referred to in Article 1(3) of the Expedited Procedure Rules.*

### Multi-Tiered Clauses

ICC arbitration may be used as the forum for final determination of a dispute following an attempt at settlement by other means such as mediation. Parties wishing to include in their contracts a tiered dispute resolution clause combining ICC arbitration with ICC mediation should refer to the standard clauses relating to the ICC Mediation Rules (see pages 96-99).

Other combinations of services are also possible. For instance, arbitration may be used as a fallback to expertise or dispute boards. Also, parties who resort to ICC arbitration may wish to provide for recourse to the ICC International Centre for ADR for the proposal of an expert if an expert opinion is required in the course of the arbitration.

Standard clauses for these and other combinations of services are available in several languages at **www.iccarbitration.org.**

# MEDIATION RULES

Mediation Rules of the International
Chamber of Commerce

In force as from 1 January 2014



## ARTICLE 1

### Introductory Provisions

1    The Mediation Rules (the "Rules") of the International Chamber of Commerce (the "ICC") are administered by the ICC International Centre for ADR (the "Centre"), which is a separate administrative body within the ICC.

2    The Rules provide for the appointment of a neutral third party (the "Mediator") to assist the parties in settling their dispute.

3    Mediation shall be used under the Rules unless, prior to the confirmation or appointment of the Mediator or with the agreement of the Mediator, the parties agree upon a different settlement procedure or a combination of settlement procedures. The term "mediation" as used in the Rules shall be deemed to cover such settlement procedure or procedures and the term "Mediator" shall be deemed to cover the neutral who conducts such settlement procedure or procedures. Whatever settlement procedure is used, the term "Proceedings" as used in the Rules refers to the process beginning with its commencement and ending with its termination pursuant to the Rules.

4    All of the parties may agree to modify any of the provisions of the Rules, provided, however, that the Centre may decide not to administer the Proceedings if, in its discretion, it considers that any such modification is not in the spirit of the Rules. At any time after the confirmation or appointment of the Mediator, any agreement to modify the provisions of the Rules shall also be subject to the approval of the Mediator.

5    The Centre is the only body authorized to administer Proceedings under the Rules.

## ARTICLE 2

### Commencement Where there is an Agreement to Refer to the Rules

1  Where there is an agreement between the parties to refer their dispute to the Rules, any party or parties wishing to commence mediation pursuant to the Rules shall file a written Request for Mediation (the "Request") with the Centre. The Request shall include:

   a) the names, addresses, telephone numbers, email addresses and any other contact details of the parties to the dispute and of any person(s) representing the parties in the Proceedings;

   b) a description of the dispute including, if possible, an assessment of its value;

   c) any agreement to use a settlement procedure other than mediation, or, in the absence thereof, any proposal for such other settlement procedure that the party filing the Request may wish to make;

   d) any agreement as to time limits for conducting the mediation, or, in the absence thereof, any proposal with respect thereto;

   e) any agreement as to the language(s) of the mediation, or, in the absence thereof, any proposal as to such language(s);

   f) any agreement as to the location of any physical meetings, or, in the absence thereof, any proposal as to such location;

   g) any joint nomination by all of the parties of a Mediator or any agreement of all of the parties as to the attributes of a Mediator to be appointed by the Centre where no joint nomination has been made, or, in the absence of any such agreement, any proposal as to the attributes of a Mediator;

   h) a copy of any written agreement under which the Request is made.

2   Together with the Request, the party or parties filing the Request shall pay the filing fee required by the Appendix hereto in force on the date the Request is filed.

3   The party or parties filing the Request shall simultaneously send a copy of the Request to all other parties, unless the Request has been filed jointly by all parties.

4   The Centre shall acknowledge receipt of the Request and of the filing fee in writing to the parties.

5   Where there is an agreement to refer to the Rules, the date on which the Request is received by the Centre shall, for all purposes, be deemed to be the date of the commencement of the Proceedings.

6   Where the parties have agreed that a time limit for settling the dispute pursuant to the Rules shall start running from the filing of a Request, such filing, for the exclusive purpose of determining the starting point of the time limit, shall be deemed to have been made on the date the Centre acknowledges receipt of the Request or of the filing fee, whichever is later.

## ARTICLE 3

### Commencement Where there is No Prior Agreement to Refer to the Rules

1   In the absence of an agreement of the parties to refer their dispute to the Rules, any party that wishes to propose referring the dispute to the Rules to another party may do so by sending a written Request to the Centre containing the information specified in Article 2(1), subparagraphs a)-g). Upon receipt of such Request, the Centre will inform all other parties of the proposal and may assist the parties in considering the proposal.

2   Together with the Request, the party or parties filing the Request shall pay the filing fee required by the Appendix hereto in force on the date the Request is filed.

3   Where the parties reach an agreement to refer their dispute to the Rules, the Proceedings shall commence on the date on which the Centre sends written confirmation to the parties that such an agreement has been reached.

4   Where the parties do not reach an agreement to refer their dispute to the Rules within 15 days from the date of the receipt of the Request by the Centre or within such additional time as may be reasonably determined by the Centre, the Proceedings shall not commence.

## ARTICLE 4

### Place and Language(s) of the Mediation

1   In the absence of an agreement of the parties, the Centre may determine the location of any physical meeting of the Mediator and the parties or may invite the Mediator to do so after the Mediator has been confirmed or appointed.

2   In the absence of an agreement of the parties, the Centre may determine the language(s) in which the mediation shall be conducted or may invite the Mediator to do so after the Mediator has been confirmed or appointed.

## ARTICLE 5

### Selection of the Mediator

1   The parties may jointly nominate a Mediator for confirmation by the Centre.

2   In the absence of a joint nomination of a Mediator by the parties, the Centre shall, after consulting the parties, either appoint a Mediator or propose a list of Mediators to the parties. All of the parties may jointly nominate a Mediator from the said list for confirmation by the Centre, failing which the Centre shall appoint a Mediator.

3    Before appointment or confirmation, a prospective Mediator shall sign a statement of acceptance, availability, impartiality and independence. The prospective Mediator shall disclose in writing to the Centre any facts or circumstances which might be of such a nature as to call into question the Mediator's independence in the eyes of the parties, as well as any circumstances that could give rise to reasonable doubts as to the Mediator's impartiality. The Centre shall provide such information to the parties in writing and shall fix a time limit for any comments from them.

4    When confirming or appointing a Mediator, the Centre shall consider the prospective Mediator's attributes, including but not limited to nationality, language skills, training, qualifications and experience, and the prospective Mediator's availability and ability to conduct the mediation in accordance with the Rules.

5    Where the Centre appoints a Mediator, it shall do so either on the basis of a proposal by an ICC National Committee or Group, or otherwise. The Centre shall make all reasonable efforts to appoint a Mediator having the attributes, if any, which have been agreed upon by all of the parties. If any party objects to the Mediator appointed by the Centre and notifies the Centre and all other parties in writing, stating the reasons for such objection, within 15 days of receipt of notification of the appointment, the Centre shall appoint another Mediator.

6    Upon agreement of all of the parties, the parties may nominate more than one Mediator or request the Centre to appoint more than one Mediator, in accordance with the provisions of the Rules. In appropriate circumstances, the Centre may propose to the parties that there be more than one Mediator.

## ARTICLE 6

### Fees and Costs

1   The party or parties filing a Request shall include with the Request the non-refundable filing fee required by Article 2(2) or Article 3(2) of the Rules, as set out in the Appendix hereto. No Request shall be processed unless accompanied by the filing fee.

2   Following the receipt of a Request pursuant to Article 3, the Centre may request that the party filing the Request pay a deposit to cover the administrative expenses of the Centre.

3   Following the commencement of the Proceedings, the Centre shall request the parties to pay one or more deposits to cover the administrative expenses of the Centre and the fees and expenses of the Mediator, as set out in the Appendix hereto.

4   The Centre may stay or terminate the Proceedings under the Rules if any requested deposit is not paid.

5   Upon termination of the Proceedings, the Centre shall fix the total costs of the Proceedings and shall, as the case may be, reimburse the parties for any excess payment or bill the parties for any balance required pursuant to the Rules.

6   With respect to Proceedings that have commenced under the Rules, all deposits requested and costs fixed shall be borne in equal shares by the parties, unless they agree otherwise in writing. However, any party shall be free to pay the unpaid balance of such deposits and costs should another party fail to pay its share.

7   A party's other expenditure shall remain the responsibility of that party, unless otherwise agreed by the parties.

## ARTICLE 7

### Conduct of the Mediation

1   The Mediator and the parties shall promptly discuss the manner in which the mediation shall be conducted.

2   After such discussion, the Mediator shall promptly provide the parties with a written note informing them of the manner in which the mediation shall be conducted. Each party, by agreeing to refer a dispute to the Rules, agrees to participate in the Proceedings at least until receipt of such note from the Mediator or earlier termination of the Proceedings pursuant to Article 8(1) of the Rules.

3   In establishing and conducting the mediation, the Mediator shall be guided by the wishes of the parties and shall treat them with fairness and impartiality.

4   Each party shall act in good faith throughout the mediation.

## ARTICLE 8

### Termination of the Proceedings

1   Proceedings which have been commenced pursuant to the Rules shall terminate upon written confirmation of termination by the Centre to the parties after the occurrence of the earliest of:

a) the signing by the parties of a settlement agreement;

b) the notification in writing made to the Mediator by any party, at any time after it has received the Mediator's note referred to in Article 7(2), that such party has decided no longer to pursue the mediation;

c) the notification in writing by the Mediator to the parties that the mediation has been completed;

d) the notification in writing by the Mediator to the parties that, in the Mediator's opinion, the mediation will not resolve the dispute between the parties;

e) the notification in writing by the Centre to the parties that any time limit set for the Proceedings, including any extension thereof, has expired;

f) the notification in writing by the Centre to the parties, not less than seven days after the due date for any payment by one or more parties pursuant to the Rules, that such payment has not been made; or

g) the notification in writing by the Centre to the parties that, in the judgment of the Centre, there has been a failure to nominate a Mediator or that it has not been reasonably possible to appoint a Mediator.

2   The Mediator shall promptly notify the Centre of the signing of a settlement agreement by the parties or of any notification given to or by the Mediator pursuant to Article 8(1), subparagraphs b)–d), and shall provide the Centre with a copy of any such notification.

**ARTICLE 9**

**Confidentiality**

1   In the absence of any agreement of the parties to the contrary and unless prohibited by applicable law:

a) the Proceedings, but not the fact that they are taking place, have taken place or will take place, are private and confidential;

b) any settlement agreement between the parties shall be kept confidential, except that a party shall have the right to disclose it to the extent that such disclosure is required by applicable law or necessary for purposes of its implementation or enforcement.

2   Unless required to do so by applicable law and in the absence of any agreement of the parties to the contrary, a party shall not in any manner produce as evidence in any judicial, arbitral or similar proceedings:

a)  any documents, statements or communications which are submitted by another party or by the Mediator in or for the Proceedings, unless they can be obtained independently by the party seeking to produce them in the judicial, arbitral or similar proceedings;

b)  any views expressed or suggestions made by any party within the Proceedings with regard to the dispute or the possible settlement of the dispute;

c)  any admissions made by another party within the Proceedings;

d)  any views or proposals put forward by the Mediator within the Proceedings; or

e)  the fact that any party indicated within the Proceedings that it was ready to accept a proposal for a settlement.

## ARTICLE 10

### General Provisions

1   Where, prior to the date of the entry into force of the Rules, the parties have agreed to refer their dispute to the ICC ADR Rules, they shall be deemed to have referred their dispute to the ICC Mediation Rules, unless any of the parties objects thereto, in which case the ICC ADR Rules shall apply.

2   Unless all of the parties have agreed otherwise in writing or unless prohibited by applicable law, the parties may commence or continue any judicial, arbitral or similar proceedings in respect of the dispute, notwithstanding the Proceedings under the Rules.

3   Unless all of the parties agree otherwise in writing, a Mediator shall not act nor shall have acted in any judicial, arbitral or similar proceedings relating to the dispute which is or was the subject of the Proceedings under the Rules, whether as a judge, an arbitrator, an expert or a representative or advisor of a party.

4   Unless required by applicable law or unless all of the parties and the Mediator agree otherwise in writing, the Mediator shall not give testimony in any judicial, arbitral or similar proceedings concerning any aspect of the Proceedings under the Rules.

5   The Mediator, the Centre, the ICC and its employees, the ICC National Committees and Groups and their employees and representatives shall not be liable to any person for any act or omission in connection with the Proceedings, except to the extent such limitation of liability is prohibited by applicable law.

6   In all matters not expressly provided for in the Rules, the Centre and the Mediator shall act in the spirit of the Rules.

## ARTICLE 1

### Filing Fee

Each Request pursuant to the Rules must be accompanied by a filing fee of US$ 3,000. The filing fee is non-refundable and shall be credited towards the deposit of the party or parties having filed the Request.

## ARTICLE 2

### Administrative Expenses

1   The administrative expenses of the ICC for the proceedings shall be fixed at the Centre's discretion depending on the tasks carried out by the Centre and shall normally not exceed the following:

| | |
|---|---|
| US$ 5,000 | for amounts in dispute up to and including US$ 200,000 |
| US$ 10,000 | for amounts in dispute between US$200,001 and US$ 2,000,000 |
| US$ 15,000 | for amounts in dispute between US$ 2,000,001 and US$ 10,000,000 |
| US$ 20,000 | for amounts in dispute between US$ 10,000,001 and US$ 50,000,000 |
| US$ 25,000 | for amounts in dispute between US$ 50,000,001 and US$ 100,000,000 |
| US$ 30,000 | for amounts in dispute over US$ 100,000,000 |

2   Where the amount in dispute is not stated, the administrative expenses may be fixed by the Centre at its discretion, taking into account all the circumstances of the case, including indications regarding the value of the dispute, but they shall normally not exceed US$ 20,000.

3   In exceptional circumstances, the Centre may fix the administrative expenses at a higher figure than that which would result from the application of the above scale, provided that the Centre shall inform the parties of such possibility beforehand and shall normally not exceed the maximum amount for administrative expenses foreseen in the scale.

4   The Centre may require the payment of administrative expenses in addition to those provided in the scale described in Article 2(1) of this Appendix as a condition for holding the proceedings in abeyance at the request of the parties or of one of them with the acquiescence of the other. Such abeyance fee shall normally not exceed US$ 1,000 per party per year.

## ARTICLE 3

### Mediator's Fees and Expenses

1   Unless otherwise agreed by the parties and the Mediator, the fees of the Mediator shall be calculated on the basis of the time reasonably spent by the Mediator in the proceedings. These fees shall be based on an hourly rate fixed by the Centre when appointing or confirming the Mediator and after having consulted the Mediator and the parties. The hourly rate shall be reasonable in amount and shall be determined in light of the complexity of the dispute and any other relevant circumstances.

2   If agreed by the parties and the Mediator, the Centre may fix the Mediator's fees on the basis of a single fixed fee for the whole proceedings, rather than an hourly rate. The single fixed fee shall be reasonable in amount and shall be determined in light of the complexity of the dispute, the amount of work that the parties and the Mediator anticipate will be required of the Mediator, and any other relevant circumstances. The Centre, at its discretion, may increase or decrease the amount of the single fixed fee based upon a reasoned request of a party or the Mediator. Prior to increasing or decreasing the single fixed fee, the Centre shall invite observations from all parties and the Mediator.

3   The amount of reasonable expenses of the Mediator shall be fixed by the Centre.

4   The Mediator's fees and expenses shall be fixed exclusively by the Centre as required by the Rules. Separate fee arrangements between the parties and the Mediator are not permitted by the Rules.

## ARTICLE 4

### Prior ICC Arbitration

When a mediation is preceded by the submission of a request for arbitration pursuant to the ICC Rules of Arbitration concerning the same parties and the same or parts of the same dispute, the filing fee paid for such arbitration proceedings shall be credited to the administrative expenses of the mediation, if the total administrative expenses paid with respect to the arbitration exceed US$ 7,500.

## ARTICLE 5

### Currency, VAT and Scope

1   All amounts fixed by the Centre or pursuant to any Appendix to the Rules are payable in US$ except where prohibited by law, in which case the ICC may apply a different scale and fee arrangement in another currency.

2   Amounts paid to the Mediator do not include any possible value added tax (VAT) or other taxes or charges and imposts applicable to the Mediator's fees. Parties have a duty to pay any such taxes or charges; however, the recovery of any such taxes or charges is a matter solely between the Mediator and the parties.

3   Any ICC administrative expenses may be subject to value added tax (VAT) or charges of a similar nature at the prevailing rate.

4   The above provisions on the costs of proceedings shall be effective as of 1 January 2018 in respect of all proceedings commenced on or after such date under the present Rules or the ICC ADR Rules.

## ARTICLE 6

### ICC as Appointing Authority

Any request received for an authority of the ICC to appoint a Mediator will be treated in accordance with the ICC Rules for the Appointment of Experts and Neutrals and shall be accompanied by a non-refundable filing fee of US$ 3,000 per Mediator. No request shall be processed unless accompanied by the said filing fee. For additional services, the ICC may at its discretion fix ICC administrative expenses, which shall be commensurate with the services provided and shall normally not exceed the maximum amount of US$ 10,000.

# MEDIATION CLAUSES



Parties wishing to use proceedings under the ICC Mediation Rules should consider choosing one of the clauses below, which cover different situations and needs. Parties are free to adapt the chosen clause to their particular circumstances. For instance, they may wish to specify the use of a settlement procedure other than mediation. Further, they may wish to stipulate the language and place of any mediation and/or arbitration proceedings.

The notes below each clause are intended to help parties select the clause that best meets their specific requirements.

At all times, care must be taken to avoid any risk of ambiguity in the drafting of the clause. Unclear wording causes uncertainty and delay and can hinder or even compromise the dispute resolution process.

When incorporating any of these clauses in their contracts, parties are advised to take account of any factors that may affect their enforceability under applicable law.

### Clause A: Option to Use the ICC Mediation Rules

*The parties may at any time, without prejudice to any other proceedings, seek to settle any dispute arising out of or in connection with the present contract in accordance with the ICC Mediation Rules.*

**Notes:** By including this clause, the parties acknowledge that proceedings under the ICC Mediation Rules are available to them at any time. This clause does not commit the parties to do anything, but the presence of the clause is designed to remind them of the possibility of using mediation or some other settlement procedure at any time. In addition, it can provide a basis for one party to propose mediation to the other party. One or more parties may also ask the ICC International Centre for ADR for its assistance in this process.

### Clause B: Obligation to Consider the ICC Mediation Rules

*In the event of any dispute arising out of or in connection with the present contract, the parties agree in the first instance to discuss and consider referring the dispute to the ICC Mediation Rules.*

**Notes:** This clause goes a step further than Clause A and requires the parties, when a dispute arises, to discuss and consider together referring the dispute to proceedings under the ICC Mediation Rules. One or more parties may ask the ICC International Centre for ADR for its assistance in this process.

This clause may be appropriate where the parties do not wish to commit to referring a dispute to proceedings under the Rules at the outset but prefer to retain flexibility as to whether to use mediation to try and settle a dispute.

### Clause C: Obligation to Refer Dispute to the ICC Mediation Rules While Permitting Parallel Arbitration Proceedings if Required

*(x) In the event of any dispute arising out of or in connection with the present contract, the parties shall first refer the dispute to proceedings under the ICC Mediation Rules. The commencement of proceedings under the ICC Mediation Rules shall not prevent any party from commencing arbitration in accordance with sub-clause y below.*

*(y) All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules.*

**Notes:** This clause creates an obligation to refer a dispute to proceedings under the ICC Mediation Rules. It is designed to ensure that when a dispute arises, the parties will attempt to settle the dispute using proceedings under the Rules.

The clause also makes it clear that the parties do not need to conclude the proceedings under the ICC Mediation Rules, or wait for an agreed period of time, before commencing arbitration proceedings. This is also the default position under Article 10(2) of the Rules.

The clause provides for ICC arbitration as the forum for final determination of the dispute. If desired, the clause can be adapted to provide instead for a different form of arbitration, or for judicial or other similar proceedings.

### Clause D: Obligation to Refer Dispute to the ICC Mediation Rules, Followed by Arbitration if Required

*In the event of any dispute arising out of or in connection with the present contract, the parties shall first refer the dispute to proceedings under the ICC Mediation Rules. If the dispute has not been settled pursuant to the said Rules within [45] days following the filing of a Request for Mediation or within such other period as the parties may agree in writing, such dispute shall thereafter be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules of Arbitration.*

**Notes:** Like Clause C, this clause creates an obligation to refer a dispute to proceedings under the ICC Mediation Rules.

Unlike Clause C, this clause provides that arbitration proceedings may not be commenced until an agreed period has elapsed following the filing of a Request for Mediation. The lapse of time suggested in the model clause is 45 days, but parties should select a period that they consider to be appropriate for the contract in question.

Clause D changes the default position under Article 10(2) of the ICC Mediation Rules allowing judicial, arbitral or similar proceedings to be commenced in parallel with proceedings under the ICC Mediation Rules.

Like Clause C, Clause D provides for ICC arbitration as the forum for final determination of the dispute. If desired, the clause can be adapted to provide instead for a different form of arbitration, or for judicial or other similar proceedings.

### Specific Issues Concerning the Emergency Arbitrator Provisions

The parties should determine whether they wish to have recourse to the Emergency Arbitrator Provisions under Clauses C and D.

**Clauses C and D**

If the parties wish to exclude any recourse to the Emergency Arbitrator Provisions, the following wording should be added to Clause C or D as applicable:

*The Emergency Arbitrator Provisions shall not apply.*

**Clause D**

1   If the parties wish to have recourse to the Emergency Arbitrator Provisions, and want that recourse expressly to be available prior to expiry of the 45-day or other agreed period following filing of the Request for Mediation, the following wording should be added to Clause D:

   *The requirement to wait [45] days, or any other agreed period, following the filing of a Request for Mediation, before referring a dispute to arbitration shall not prevent the parties from making an application, prior to expiry of those [45] days or other agreed period, for Emergency Measures under the Emergency Arbitrator Provisions in the Rules of Arbitration of the International Chamber of Commerce.*

2   If the parties wish to have recourse to the Emergency Arbitrator Provisions, but only after expiry of the 45-day or other agreed period following filing of the Request for Mediation, the following wording should be added to Clause D:

   *The parties shall not have the right to make an application for Emergency Measures under the Emergency Arbitrator Provisions in the Rules of Arbitration of the International Chamber of Commerce prior to expiry of the [45] days or other agreed period following the filing of a Request for Mediation.*

For further information on drafting clauses providing for ICC arbitration, see pages 76–77 above.

**ICC International Court of Arbitration®**
www.iccarbitration.org
arb@iccwbo.org
T +33 (0)1 49 53 29 05
F +33 (0)1 49 53 29 33

**ICC International Centre for ADR**
www.iccadr.org
adr@iccwbo.org
T +33 (0)1 49 53 29 03
F +33 (0)1 49 53 30 49



ICC Publication 880-4 ENG
ISBN 978-92-842-0425-0

**EXHIBIT 5**

**FILED UNDER SEAL**



1900 K Street, NW
Washington, DC 20006-1110
+1 202 261 3300 Main
+1 202 261 3333 Fax
www.dechert.com

**JOSHUA D.N. HESS**

joshua.hess@dechert.com
+1 202 261 3438 Direct
+1 415 262 4555 Fax

May 18, 2020

**ELECTRONIC MAIL**

Steven W. Ball, Esq.
General Counsel
Bluestone Resources, Inc.
302 S. Jefferson Street
Roanoke, VA 24011
steve.ball@bluestone industries.com

Richard A. Getty, Esq.
Danielle Harlan, Esq.
The Getty Law Group, PLLC
1900 Lexington Financial Center
250 W. Main Street
Lexington, KY 40507
rgetty@gettylawgroup.com
dharlan@gettylawgroup.com

*Re:  Caroleng Investments Ltd. v. Bluestone Resources, Inc., ICC Case No. 23546/MK*

Dear Counsel:

I write on behalf of our client, Caroleng Investments Ltd. ("Caroleng"), the Claimant in the above-referenced arbitration.  Pursuant to the Final Award issued by the Tribunal in those proceedings on May 13, 2020 (enclosed herewith), Caroleng demands payment of $10,132,520.20 (which represents the awarded damages, fees, expenses, and pre-judgment interest as of May 13, 2020) within 15 calendar days of the date of this letter.  Please use the following wiring instructions:

**Correspondent bank**

Swift: RZBAATWW
RAIFFEISEN BANK INTERNATIONAL AG, AT, VIENNA, AM STADTPARK 9

**Beneficiary bank**
Coalmetbank JSC
Swift UGZARU55



**Beneficiary**

Caroleng Investments Ltd.
Nerine Chambers, P.O. Box 905,
Road Town, Tortola, British Virgin Islands
Acc. 40807 840 5000 4000 0047

Please confirm that you will make this payment in writing to me by no later than May 22, 2020. If we do not receive such confirmation, Caroleng will institute formal proceedings to enforce the Final Award and seek costs for such proceedings from Bluestone, any accrued post-award interest, and any other costs and damages available to it.

Thank you in advance for your cooperation in this matter.

Sincerely,


*/s/ Joshua D.N. Hess*
Joshua D.N. Hess

Enclosure

# EXHIBIT 6

# FILED UNDER SEAL



# DECISION AND ADDENDUM ON COSTS

**CHAMBRE DE COMMERCE INTERNATIONALE — INTERNATIONAL CHAMBER OF COMMERCE (ICC)**
**COUR INTERNATIONALE D'ARBITRAGE — INTERNATIONAL COURT OF ARBITRATION**

www.iccarbitration.org

HEADQUARTERS
33-43 avenue
du Président Wilson
75116 Paris, France
**T** +33 (0)1 49 53 28 28
**F** +33 (0)1 86 26 67 43
**E** arb@iccwbo.org

ASIA OFFICE (HKSAR)
Room 102, 1/F., West Wing,
Justice Place, 11 Ice House
Street, Central, Hong Kong
**T** +852 3607 5600
**F** +852 2523 1619
**E** ica8@iccwbo.org

NORTH AMERICA OFFICE
in affiliation with SICANA, Inc.
140 East 45th Street, Suite 14C
New York, NY 10017, USA
**T** +1 646 699 5704
**F** +1 646 737 9467
**E** ica9@iccwbo.org

BRAZIL OFFICE
in affiliation with SCIAB LTDA.
rua Surubim, 504, Brooklin Novo
CEP 04571-050, Sao Paulo
Brazil
**T** +55 11 3040 8830
**E** ica10@iccwbo.org

SINGAPORE OFFICE
in affiliation with SICAS
28 Maxwell Road #02-01,
Maxwell Chambers Suites,
Singapore 069120
**T** +65 6971 1000
**E** ica11@iccwbo.org

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 23546/MK/PDP

CAROLENG INVESTMENTS LIMITED

(British Virgin Islands)

**vs/**

BLUESTONE RESOURCES, INC.

(U.S.A.)

This document is an original of the decision and addendum on costs rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

**INTERNATIONAL CHAMBER OF COMMERCE**
**INTERNATIONAL COURT OF ARBITRATION**

**ICC ARBITRATION CASE NO.  23546/MK/PDP**


**IN THE MATTER OF AN INTERNATIONAL ARBITRATION**

- between –

**CAROLENG INVESTMENTS LIMITED**

(Claimant)

- and -

**BLUESTONE RESOURCES, INC.**

(Respondent)


---

**DECISION ON RESPONDENT'S APPLICATION**
**FOR CLARIFICATION OF FINAL AWARD**
**AND ADDENDUM ON COSTS**

---


**The Arbitral Tribunal**

Ms. Jennifer M. Smith
Mr. Joseph R. Profaizer
Dr. Dietmar W. Prager (President)


**Date: 12 August 2020**

# **TABLE OF CONTENTS**

**Page**

I.    PROCEDURAL BACKGROUND ................................................................. 1

    A.    The Parties and Their Legal Representatives ...................................... 1

    B.    The Arbitral Tribunal ........................................................................ 2

    C.    Summary of Procedural History ........................................................ 3

II.    THE PARTIES' ARGUMENTS ................................................................ 4

    A.    Respondent's Arguments ................................................................... 4

    B.    Claimant's Arguments ....................................................................... 5

III.    THE TRIBUNAL'S ANALYSIS ................................................................ 6

IV.    COSTS ....................................................................................................... 10

V.    DECISION ................................................................................................. 10

# I. PROCEDURAL BACKGROUND

## A. THE PARTIES AND THEIR LEGAL REPRESENTATIVES

1. Claimant, Caroleng Investments Limited, is a company incorporated under the laws of the British Virgin Islands.[1]

2. Claimant's registered address is:

> Nerine Chambers
> PO Box 905, Road Town
> Tortola, British Virgin Islands

3. Claimant is represented by:

> Mr. Joshua D.N. Hess
> Ms. Tharuni A. Jayaraman
> DECHERT LLP
> 1900 K Street, NW
> Washington, DC 20006
> United States of America
>
> Tel:     +1 202 261 3300
> Email:  joshua.hess@dechert.com
>          tharuni.jayaraman@dechert.com

4. Respondent, Bluestone Resources, Inc. is a company duly organized under the laws of the State of Delaware, United States of America.

5. Respondent's registered address is:

> Bluestone Resources, Inc.
> 302 S. Jefferson Street
> Roanoke, Virginia 24011
> United States of America

6. Respondent is represented by:

> Mr. Richard A. Getty
> Ms. Danielle Harlan
> Mr. Matthew W. English
> THE GETTY LAW GROUP, PLLC
> 1900 Lexington Financial Center
> 250 West Main Street

---

[1] Capitalized terms not otherwise defined in this Decision on Respondent's Application for Clarification of Final Award and Addendum on Costs (the "Decision and Addendum on Costs") shall have the meanings given to them in the Final Award dated 13 May 2020.

Lexington, Kentucky 40507
United States of America
Tel:      +1 859 259 1900

Email:     rgetty@gettylawgroup.com
dharlan@gettylawgroup.com
astith@gettylawgroup.com

Mr. Stephen W. Ball, Esq.
General Counsel
Bluestone Resources, Inc.
302 S. Jefferson Street
Roanoke, Virginia 24011
United States of America

**B.**    **THE ARBITRAL TRIBUNAL**

7.    The relevant current contact details of the members of the Tribunal are as follows:

Dr. Dietmar W Prager
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
United States of America

Tel:     +1 212 909 6243
Email:   dwprager@debevoise.com

Ms. Jennifer M. Smith
Hogan Lovells US LLP
609 Main Street, Suite 4200
Houston, Texas 77002
United States of America

Tel:     +1 713 632 1415
Email:   Jennifer.smith@hoganlovells.com

Mr. Joseph R Profaizer
Paul Hastings LLP
2050 M Street, NW
Washington, DC 20036
United States of America

Tel:     +1 202 551 1860
Email:   joeprofaizer@paulhastings.com

### C. SUMMARY OF PROCEDURAL HISTORY

8.  On 13 May 2020, the Tribunal issued its Final Award. On the same date, the ICC Secretariat notified the Final Award to the Parties by email pursuant to the Parties' agreement that the award be notified by email only.

9.  On 12 June 2020, Respondent submitted an "Application for Clarification of May 13, 2020 Final Award" (the "**Application**"). The Application was received within the 30-day time-limit under Article 36(2) of the 2017 ICC Rules for an application for the correction and/or interpretation of the Award as the Parties had received the Final Award on 13 May 2020.

10. On 15 June 2020, the ICC Secretariat acknowledged receipt of an electronic version of the Application under Article 36 of the Rules and informed the Parties that the ICC Court "will examine whether to fix an advance on costs to cover the additional fees and expenses of the arbitral tribunal and additional ICC administrative expenses…."

11. Also on 15 June 2020, the Tribunal confirmed receipt of the Application and invited Claimant to respond by 24 June 2020.

12. On 18 June 2020, Claimant submitted its Response to Respondent's Application for Clarification of May 13, 2020 Final Award (the "**Response**").

13. Also on 18 June 2020, Respondent applied for leave to submit a short reply to the Response. On the same date, the Tribunal granted Respondent leave to file a short reply by 22 June 2020.

14. On 18 June 2020, the ICC Court fixed an additional advance of US$23,000 to be paid by Respondent, subject to later readjustments, to cover additional fees and expenses of the Tribunal and ICC administrative expenses, subject to any subsequent reimbursement. Respondent was granted until 29 June 2020 to pay the additional advance.

15. On 22 June 2020, Respondent submitted its Reply in further support of Application for Clarification of May 13, 2020 Final Award ("**Reply**").

16. On 8 July 2020, the ICC Secretariat extended the time limit for Respondent to pay the additional advance of US$23,000 until 15 July 2020.

17. On 16 July 2020, the ICC Secretariat acknowledged receipt from the Respondent of the payment of US$23,000 for the additional advance on costs.

18. On 13 July 2020, the Tribunal submitted the draft Decision and Addendum on Costs to the ICC Court within 30 days following the expiration of the time limit for the receipt of any comments from Claimant in accordance with Article 36(2) of the ICC Rules.

19.    On 6 August 2020, the ICC approved the draft Decision and Addendum on Costs and fixed US$23,000 as the costs for the procedure.

20.    On 6 August and 10 August 2020 respectively, the Parties agreed that the Decision and Addendum on Costs be notified by the Secretariat by email only pursuant to Article 35 of the ICC Rules.

## II.    THE PARTIES' ARGUMENTS

### A.    RESPONDENT'S ARGUMENTS

21.    In the Application, Respondent requests "clarification and interpretation" of paragraphs 241, 245, 262, 263, 268, 276, 290, 297, 301, 303, 304, 313, 337, 358, 367, 381 and 400 of the Final Award, "which led to the conclusion that neither the Pardee Lease Area nor the Justice Equipment should be assigned any value."[2]

22.    Respondent submits that "to value these assets at zero is … contrary to the substantial evidence in the record."[3]  Respondent asserts that it "amply demonstrated" that

> First, Respondent met its burden of proving that the Pardee Lease Area that was included in the CM Energy transaction was not part of the earlier transaction between Respondent and Claimant, and that the value of that property was therefore properly deducted from the CM Energy transaction price in determining the amount owed to Mechel.  Second, Respondent demonstrated that the value of the Pardee Lease Area was $41,414,300.65.  Third, it is undisputed that Respondent was entitled to deduct the value of the Justice Equipment from the CM Energy transaction price and, finally, Respondent demonstrated that the value of the Justice Equipment was $9,963,285.00.[4]

23.    Respondent thus requests "that the Tribunal revisit those findings and assign some value to each" of the Pardee Lease and the Justice Equipment.[5]  Respondent requests that the Tribunal use the values assigned by Respondent's experts "in modifying the Award."[6]  Respondent further submits that, at a minimum, "*some* value should be assigned to each of these items,

---

2    Application pg. 1,7-25.

3    *Id.* pg. 25.

4    *Id.*

5    *Id.* pg. 28.

6    *Id.*

that Messrs. Kostic and Blandford provided accurate, well-supported values for the Pardee Lease Area and the Justice Equipment, respectively, and that the Award should be clarified and modified accordingly."[7]

24.     Respondent further "requests that the Tribunal clarify and/or vacate its award of attorney's fees."[8]  Respondent argues that "the Tribunal's award of attorney's fees falls outside its jurisdiction, which is created entirely by the parties' agreement."[9]  It argues that "New York statutory authority clearly prohibits an award of attorney fees in an arbitration proceeding if the agreement does not provide for such an award."[10]  Respondent asserts that "there is no provision in the Transaction Agreement which permits recovery of attorney's fees."[11]  Respondent further asserts that "the ICC Rules are directly contrary to the statutory and case law of New York."[12]

## B.     CLAIMANT'S ARGUMENTS

25.     Claimant asserts that Respondent's Application "has absolutely no support under the ICC Rules and is an affront to the model of efficient and streamlined litigation those Rules were crafted to create."[13]  According to Claimant, Respondent "seeks nothing less than a wholesale repudiation of the Final Award and a re-litigation of the merits of this arbitration.  Article 36 prohibits such efforts to seek substantive reconsideration of the merits."[14]

26.     Claimant further argues that Respondent "was afforded the full opportunity to present all evidence that supported its asserted value of both the Pardee Lease and the Justice Equipment, including extensive live testimony by its expert witnesses, who were closely questioned live by the Tribunal."[15]  Claimant states that "for the reasons the Tribunal explained in detail in its Final Award, notwithstanding this presentation, Respondent failed to meet its burden of proof in establishing any reliable value for these items."[16]  Any "'struggle' the

---

[7]     *Id.*

[8]     *Id.*

[9]     *Id.* pg. 27-28; *see also* Reply.

[10]    *Id.* pg. 26; *see also* Reply.

[11]    *Id.* pg. 27.

[12]    *Id.*

[13]    Response ¶ 2.

[14]    *Id.*

[15]    *Id.* ¶ 8.

[16]    *Id.*

-5-

Tribunal may have had with Respondent's arguments is entirely the fault of the Respondent and its counsel, not the Tribunal."[17]

27. Claimant further argues that "Respondent should also not be heard on its latter-day complaint about the award of attorneys' fees to Caroleng."[18] Such a complaint "is not permitted under Article 36."[19] Claimant asserts that, in addition, Respondent's complaint was undercut by "Respondent's own conduct in this matter."[20] "Respondent actually submitted an (unauthorized) opposition to Caroleng's Application for Costs that sought to strike many aspects of that application, but did not claim that such costs were unavailable under applicable law. Respondent also notably sought its own attorneys' fees in the cost submission it filed in this matter."[21] Moreover, "an award of attorneys' fees here is not only supported under ICC rules, but also under New York law."[22]

28. Claimant seeks "an additional award of the fees and costs associated with its response to Respondent's impermissible 'Application,' the amount and verification of which it will submit at the direction of the Tribunal."[23]

## III.  THE TRIBUNAL'S ANALYSIS

29. A basic tenet of the ICC Rules is that a tribunal's award is final and binding. Article 35(6) of the ICC Rules provides that

> Every award shall be binding on the parties. By submitting the dispute to arbitration under the Rules, the parties undertake to carry out any award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made.

30. Article 36 of the ICC Rules provides for two narrow exceptions to the basic rule of finality. *First*, a Tribunal may, on its own initiative, or at the request of a party, "correct a clerical, computational or typographical error, or any errors of similar nature."[24] The purpose of the correction "consists in correcting

---

[17]  *Id.*

[18]  *Id.* ¶ 10.

[19]  *Id.*

[20]  *Id.*

[21]  *Id.*

[22]  *Id.*

[23]  *Id.* ¶ 12.

[24]  ICC Rules, Art. 36(1) and (2).

-6-

unintended errors in the tribunal's expression of the relief it has granted in the award, as opposed to modifying the tribunal's reasoning or altering its findings."[25]

31. *Second*, a party may request the interpretation of an award. In contrast to a correction, "an interpretation or clarification of an award does not alter the previous award's statements or calculations, but instead more clearly explains what such statements were intended to mean, without altering them."[26]

32. The Secretariat's Guide to ICC Arbitration ("**Secretariat's Guide**") states that

> In practice, applications for interpretation (as opposed to correction) are rarely accepted. Most arbitral tribunals find that to be admissible a request for interpretation must seek to clarify the meaning of an operative part of the arbitral tribunal's decision. Therefore, requests for interpretation should generally target the dispositive section of the award or other parts that directly affect the dispositive section or the parties' rights and obligations. Most such ambiguities will normally have been identified by the Court during the scrutiny process.[27]

33. As the Secretariat's Guide further notes, Article 36(2) "does not provide a means of appeal. It does not permit the arbitral tribunal to review the substance of its reasoning or deal with additional claims or arguments."[28] The Secretariat's Guide observes that

> [m]any applications for interpretation amount to attempted appeals aimed at altering the meaning of an award, raising an additional issue or attempting to have the arbitration tribunal reconsider its decision or the evidence. Article [36](2) does not empower an arbitral tribunal to revise the outcome or reasoning of its award. Attempted appeals accordingly do not fall within the scope of Article [36](2).[29]

---

[25] Gary B. Born, *International Commercial Arbitration* (2nd ed. 2014), **Ex. CLA-62**, pg. 3138.

[26] *Id.* pg. 3142.

[27] J. Fry, S. Greenberg, F. Mazza, The Secretariat's Guide to ICC Arbitration, at 3-1275 (referring to Article 35(2) of the 2012 ICC Rules, which became Article 36(2) under the 2017 ICC Rules); *see also* Gary B. Born, *International Commercial Arbitration* (2nd ed. 2014), **Ex. CLA-62**, p. 3142 ("In practice, it is very rare for interpretations to be either sought or granted.)"

[28] Secretariat's Guide, at 3-1265.

[29] Secretariat's Guide, at 3-1276; *see also* Gary B. Born, *International Commercial Arbitration* (2nd ed. 2014), **Ex. CLA-62**, pg. 3148 ("A request for an interpretation may not be used to challenge the tribunal's reasoning or dispositions;" and citing ICC Case 11451, Procedural Order of 6 January 2003 ("As to the scope of 'interpretation,' which might be regarded as broader than the

34.     Respondent's Application does not meet the narrow requirements for a correction or interpretation of the Final Award. The Application does not request the Tribunal to correct any "clerical, computational or typographical error, or any errors of similar nature." Nor does Respondent allege that any provisions in or related to the dispositive section of the Final Award are sufficiently ambiguous and unclear to require clarification as to what they mean to enable Respondent to comply with the Final Award.

35.     Instead, Respondent requests the Tribunal to reconsider and revise several key findings and holdings of the Final Award. Specifically, Respondent takes issue with the Tribunal's holding that Respondent failed to establish the portion of the Purchase Price, if any, that for purposes of determining the Contingent Payments should be attributed to the Pardee Lease and the Justice Equipment.

36.     Respondent faults the Tribunal for allegedly failing to understand the evidence. Respondent claims that the Tribunal "lacked sufficient knowledge of the coal mining industry."[30] It asserts that the Tribunal "struggled to understand certain aspects of the evidence as well as standards generally accepted in the coal mining industry,"[31] "did not fully understand the various types of mining operations that are undertaken in the removal of coals"[32] and lacked "a fundamental understanding of tons-in-place analysis."[33]

37.     Respondent also alleges that the Tribunal "ignored testimony"[34] that it should have credited and gave credit to evidence that it should have ignored,[35] failed to access or review the documents provided by its expert[36], "did not look

---

'correction' feature, there is virtual unanimity that an application of that sort cannot be used to seek revision, reformulation or additional explanations of a given decision.")).

[30]  Application, pg. 8-9.

[31]  *Id.*, pg. 6.

[32]  *Id.*, pg. 18.

[33]  *Id.* pg. 14.

[34]  *Id.* pg. 7; *see also id.* at 21.

[35]  *Id.* pg. 10-11.

[36]  *Id.* pg. 14. Respondent can rest assured that the Tribunal accessed all the documents provided by Mr. Kostic and reviewed them carefully.

closely" at others,[37] and purportedly reached conclusions that were "not supported by any evidence admitted in this proceeding."[38]

38.     Respondent thus requests the Tribunal to "clarify," "revisit" and "modify" its findings, accept the "the extensive, unrefuted evidence" of Respondent's experts, "and assign some value" to each of the Pardee Lease and the Justice Equipment.[39]  Yet this request to the Tribunal to review, reconsider and revise its findings and holdings, purportedly based upon the evidence that Respondent presented (and failed to present) in the course of the Arbitration, is precisely the kind of appeal that Article 36 of the ICC Rules prohibits.  The Tribunal's decisions in its Final Award, including the Tribunal's decisions with regard to the Pardee Lease and the Justice Equipment,[40] are final and binding.

39.     Respondent also requests that the Tribunal "clarify and/or vacate its award of attorney's fees" on the basis that the Final Award is contrary to the terms of the Transaction Agreement, is not in accordance with the laws of the State of New York, and "exceeds the Tribunal's authority."[41]  Respondent had ample opportunity to make these arguments in the arbitration proceedings but affirmatively chose a different approach.  Respondent not only did not make these arguments, but, on the contrary, affirmatively and repeatedly requested an award of its own fees and costs, including specifically quantifying its demand for fees and costs.[42]  The Tribunal's award on costs and fees is final and binding and the Tribunal will not, and cannot, revisit its decision.[43]

40.     For the above reasons, the Tribunal rejects Respondent's Application in its entirety.

---

[37]     *Id.*, pg. 8.

[38]     *Id.* pg. 19.

[39]     *Id.*, pg. 28.; *see also id.* at 25 ("In light of these factors, Respondent seeks clarification from the Tribunal to properly assign value to these assets and permit their deduction from the purchase price.").

[40]     *See* Final Award, at 215-313 (Pardee Lease Deduction); and 314-358 (Justice Equipment Deduction).

[41]     *Id.*, pg. 28.

[42]     SoD ¶ 158.c and Rejoinder ¶ 38.c; Submission of Costs of Respondent dated 17 January 2020 at pg. 1; Final Award, ¶ 392.

[43]     *See* Final Award, Section K, at 388-402; and 403(g).

## IV.    COSTS

41.    On 18 June 2020, the ICC Court fixed an additional advance of US$23,000.00, subject to later readjustments to cover additional fees and expenses of the Tribunal and ICC administrative expenses related to the Respondents' Application.  On 6 August 2020, the ICC Court fixed the costs of the procedure at US$23,000.00.

42.    Since the Tribunal rejected Respondent's Application in its entirety, the Respondent shall bear the above costs in full.

43.    Finally, Claimant seeks "an additional award of the fees and costs associated with its response to Respondent's impermissible 'Application,' the amount and verification of which it will submit at the direction of the Tribunal."[44] Although the Tribunal rejects Respondent's Application as without merit, given the limited amount of briefing related to the Application, the Tribunal does not believe that cost submissions and an award of attorney fees would be warranted.  The Tribunal, in the exercise of its discretion under Article 38 of the ICC Rules, accordingly decides that each Party should bear its own attorney fees and costs associated with the Application.

## V.    DECISION

44.    For the above reasons, the Tribunal  HOLDS, DECLARES, DETERMINES and DIRECTS that:

a.    Respondent's Application is rejected in its entirety;

b.    Respondent shall bear the costs of Respondent's Application; and

c.    Each Party shall bear its own legal fees and costs.

---

[44]    Response ¶ 12.

Place of arbitration: Paris, France

Date: 12 August 2020

The Arbitral Tribunal

Joseph R. Profaizer

Jennifer M. Smith

Dietmar W. Prager
(President)