# EXHIBIT 1

# BOOK IV – ARBITRATION[*]

## Title II – International Arbitration[1]

### Article 1504

An arbitration is international when international trade interests are at stake.

### Article 1505

In international arbitration, and unless otherwise stipulated, the judge acting in support of the arbitration shall be the President of the *Tribunal de grande instance* of Paris when:

(1) the arbitration takes place in France; or

(2) the parties have agreed that French procedural law shall apply to the arbitration; or

(3) the parties have expressly granted jurisdiction to French courts over disputes relating to the arbitral procedure; or

**(4) one of the parties is exposed to a risk of a denial of justice.**

### Article 1506

Unless the parties have agreed otherwise, and subject to the provisions of the present Title, the following Articles shall apply to international arbitration:

(1) 1446, 1447, 1448 (paragraphs 1 and 2) and 1449, regarding the arbitration agreement;

(2) 1452 through 1458 and 1460 regarding the constitution of the arbitral tribunal and the procedure governing application to the judge acting in support of the arbitration;

(3) 1462, 1463 (paragraph 2), 1464 (paragraph 3), 1465 through 1470 and 1472 regarding arbitral proceedings;

(4) 1479, 1481, 1482, 1484 (paragraphs 1 and 2), 1485 (paragraphs 1 and 2) and 1486 regarding arbitral awards;

(5) 1502 (paragraphs 1 and 2) and 1503 regarding means of recourse other than appeals or actions to set aside.

---

[*]   Translated by Emmanuel Gaillard, Nanou Leleu-Knobil and Daniela Pellarini of Shearman & Sterling LLP. Thanks go to Charles Kaplan of Herbert Smith LLP for his valuable comments.

[1]   Provisions relating to domestic arbitration that apply to international arbitration are shown in boxed text. All text shown in bold indicates mandatory provisions.

## CHAPTER I – INTERNATIONAL ARBITRATION AGREEMENTS

**Article 1507**

An arbitration agreement shall not be subject to any requirements as to its form.

**Article 1446**

Parties may submit their dispute to arbitration even where proceedings are already pending before a court.

**Article 1447**

An arbitration agreement is independent of the contract to which it relates. It shall not be affected if such contract is void.

If an arbitration clause is void, it shall be deemed not written.

**Article 1448 (paragraphs 1 and 2)**

When a dispute subject to an arbitration agreement is brought before a court, such court shall decline jurisdiction, except if an arbitral tribunal has not yet been seized of the dispute and if the arbitration agreement is manifestly void or manifestly not applicable.

A court may not decline jurisdiction on its own motion.

**Article 1449**

The existence of an arbitration agreement, insofar as the arbitral tribunal has not yet been constituted, shall not preclude a party from applying to a court for measures relating to the taking of evidence or provisional or conservatory measures.

> Subject to the provisions governing conservatory attachments and judicial security, application shall be made to the President of the Tribunal de grande instance or of the Tribunal de commerce who shall rule on the measures relating to the taking of evidence in accordance with the provisions of Article 1452 and, where the matter is urgent, on the provisional or conservatory measures requested by the parties to the arbitration agreement.

### Article 1508

An arbitration agreement may designate the arbitrator(s) or provide for the procedure for their appointment, directly or by reference to arbitration rules or to procedural rules.

### Article 1452

If the parties have not agreed on the procedure for appointing the arbitrator(s):

(1) Where there is to be a sole arbitrator and if the parties fail to agree on the arbitrator, he or she shall be appointed by the person responsible for administering the arbitration or, where there is no such person, by the judge acting in support of the arbitration;

(2) Where there are to be three arbitrators, each party shall appoint an arbitrator and the two arbitrators so appointed shall appoint a third arbitrator.  If a party fails to appoint an arbitrator within one month following receipt of a request to that effect by the other party, or if the two arbitrators fail to agree on the third arbitrator within one month of having accepted their mandate, the person responsible for administering the arbitration or, where there is no such person, the judge acting in support of the arbitration, shall appoint the third arbitrator.

### Article 1453

If there are more than two parties to the dispute and they fail to agree on the procedure for constituting the arbitral tribunal, the person responsible for

---

² Article 145 provides as follows: If, before legal proceedings commence, there is a legitimate reason to preserve or establish evidence upon which the resolution of a dispute may depend, measures relating to the taking of evidence may be ordered, upon the request of any concerned party, by way of a petition to a court or expedited proceedings.

administering the arbitration or, where there is no such person, the judge acting in support of the arbitration, shall appoint the arbitrator(s).

### Article 1454

Any other dispute relating to the constitution of an arbitral tribunal shall be resolved, if the parties cannot agree, by the person responsible for administering the arbitration or, where there is no such person, by the judge acting in support of the arbitration.

### Article 1455

If an arbitration agreement is manifestly void or manifestly not applicable, the judge acting in support of the arbitration shall declare that no appointment need be made.

### Article 1456

The constitution of an arbitral tribunal shall be complete upon the arbitrators' acceptance of their mandate. As of that date, the tribunal is seized of the dispute.

Before accepting a mandate, an arbitrator shall disclose any circumstance that may affect his or her independence or impartiality. He or she also shall disclose promptly any such circumstance that may arise after accepting the mandate.

If the parties cannot agree on the removal of an arbitrator, the issue shall be resolved by the person responsible for administering the arbitration or, where there is no such person, by the judge acting in support of the arbitration to whom application must be made within one month following the disclosure or the discovery of the fact at issue.

### Article 1457

Arbitrators shall carry out their mandate until it is completed, unless they are legally incapacitated or there is a legitimate reason for them to refuse to act or to resign.

If there is disagreement as to the materiality of the reason invoked, the matter shall be resolved by the person responsible for administering the arbitration or,

where there is no such person, by the judge acting in support of the arbitration to whom application must be made within one month following such incapacity, refusal to act or resignation.

### Article 1458

An arbitrator may only be removed with the unanimous consent of the parties. Where there is no unanimous consent, the provisions of the final paragraph of Article 1456 shall apply.

### Article 1460

**Application to the judge acting in support of the arbitration shall be made either by a party or by the arbitral tribunal or one of its members.**

**Such application shall be made, heard and decided as for expedited proceedings (*référé*).**

**The judge acting in support of the arbitration shall rule by way of an order against which no recourse can be had.  However, such order may be appealed where the judge holds that no appointment need be made for one of the reasons stated in Article 1455.**

## CHAPTER II – ARBITRAL PROCEEDINGS AND AWARDS

### Article 1509

An arbitration agreement may define the procedure to be followed in the arbitral proceedings, directly or by reference to arbitration rules or to procedural rules.

Unless the arbitration agreement provides otherwise, the arbitral tribunal shall define the procedure as required, either directly or by reference to arbitration rules or to procedural rules.

### Article 1510

**Irrespective of the procedure adopted, the arbitral tribunal shall ensure that the parties are treated equally and shall uphold the principle of due process.**

**Article 1462**

A dispute shall be submitted to the arbitral tribunal either jointly by the parties or by the most diligent party.

**Article 1463 (paragraph 2)**

The statutory or contractual time limit may be extended by agreement between the parties or, where there is no such agreement, by the judge acting in support of the arbitration.

**Article 1464 (paragraph 3)**

Both parties and arbitrators shall act diligently and in good faith in the conduct of the proceedings.

**Article 1465**

The arbitral tribunal has exclusive jurisdiction to rule on objections to its jurisdiction.

**Article 1466**

A party which, knowingly and without a legitimate reason, fails to object to an irregularity before the arbitral tribunal in a timely manner shall be deemed to have waived its right to avail itself of such irregularity.

**Article 1467**

The arbitral tribunal shall take all necessary steps concerning evidentiary and procedural matters, unless the parties authorise it to delegate such tasks to one of its members.

The arbitral tribunal may call upon any person to provide testimony.  Witnesses shall not be sworn in.

If a party is in possession of an item of evidence, the arbitral tribunal may enjoin that party to produce it, determine the manner in which it is to be produced and, if necessary, attach penalties to such injunction.

### Article 1468

The arbitral tribunal may order upon the parties any conservatory or provisional measures that it deems appropriate, set conditions for such measures and, if necessary, attach penalties to such order. However, only courts may order conservatory attachments and judicial security.

The arbitral tribunal has the power to amend or add to any provisional or conservatory measure that it has granted.

### Article 1469

If one of the parties to arbitral proceedings intends to rely on an official (*acte authentique*) or private (*acte sous seing privé*) deed to which it was not a party, or on evidence held by a third party, it may, upon leave of the arbitral tribunal, have that third party summoned before the President of the *Tribunal de grande instance* for the purpose of obtaining a copy thereof (*expédition*) or the production of the deed or item of evidence.

**Articles 42 through 48 shall determine which *Tribunal de grande instance* has territorial jurisdiction in this regard.**

**Application shall be made, heard and decided as for expedited proceedings (*référé*).**

**If the president considers the application well-founded, he or she shall order that the relevant original, copy or extract of the deed or item of evidence be issued or produced, under such conditions and guarantees as he or she determines, and, if necessary, attach penalties to such order.**

**Such order is not readily enforceable.**

**It may be appealed within fifteen days following service (*signification*) of the order.**

### Article 1470

Unless otherwise stipulated, the arbitral tribunal shall have the power to rule on a request for verification of handwriting or claim of forgery in accordance with Articles 287 through 294 and Article 299.

Where an incidental claim of forgery of official documents is raised, Article 313 shall apply.

**Article 1472**

Where necessary, the arbitral tribunal may stay the proceedings. The proceedings shall be stayed for the period of time set forth in the stay order or until such time as the event prescribed in the order has occurred.

The arbitral tribunal may, as the circumstances require, lift or shorten the stay.

**Article 1511**

The arbitral tribunal shall decide the dispute in accordance with the rules of law chosen by the parties or, where no such choice has been made, in accordance with the rules of law it considers appropriate.

In either case, the arbitral tribunal shall take trade usages into account.

**Article 1512**

The arbitral tribunal shall rule as *amiable compositeur* if the parties have empowered it to do so.

**Article 1513**

Unless the arbitration agreement provides otherwise, the award shall be made by majority decision.  It shall be signed by all the arbitrators.

However, if a minority among them refuses to sign, the others shall so state in the award.

If there is no majority, the chairman of the arbitral tribunal shall rule alone. Should the other arbitrators refuse to sign, the chairman shall so state in the award, which only he or she shall sign.

An award made under the circumstances described in either of the two preceding paragraphs shall have the same effect as if it had been signed by all the arbitrators or made by majority decision.

**Article 1479**

The arbitral tribunal's deliberations shall be confidential.

**Article 1481**

The arbitral award shall state:

(1)      the full names of the parties, as well as their domicile or corporate headquarters;

(2)      if applicable, the names of the counsel or other persons who represented or assisted the parties;

(3)      the names of the arbitrators who made it;

(4)      the date on which it was made;

(5)      the place where the award was made.

**Article 1482**

The arbitral award shall succinctly set forth the respective claims and arguments of the parties.

The award shall state the reasons upon which it is based.

**Article 1484 (paragraphs 1 and 2)**

As soon as it is made, an arbitral award shall be *res judicat*a with regard to the claims adjudicated in that award.

The award may be declared provisionally enforceable.

**Article 1485 (paragraphs 1 and 2)**

Once an award is made, the arbitral tribunal shall no longer be vested with the power to rule on the claims adjudicated in that award.

However, on application of a party, the arbitral tribunal may interpret the award, rectify clerical errors and omissions, or make an additional award where it failed to rule on a claim.  The arbitral tribunal shall rule after having heard the parties or having given them the opportunity to be heard.

**Article 1486**

Applications under Article 1485, paragraph 2, shall be filed within three months of notification of the award.

Unless otherwise agreed, the decision amending the award or the additional award shall be made within three months of application to the arbitral tribunal. This time limit may be extended in accordance with Article 1463, paragraph 2.

The decision amending the award or the additional award shall be notified in the same manner as the initial award.

## CHAPTER III – RECOGNITION AND ENFORCEMENT OF ARBITRAL AWARDS MADE ABROAD OR IN INTERNATIONAL ARBITRATION

### Article 1514

An arbitral award shall be recognised or enforced in France if the party relying on it can prove its existence and if such recognition or enforcement is not manifestly contrary to international public policy.

### Article 1515

The existence of an arbitral award shall be proven by producing the original award, together with the arbitration agreement, or duly authenticated copies of such documents.

If such documents are in a language other than French, the party applying for recognition or enforcement shall produce a translation. The applicant may be requested to provide a translation by a translator whose name appears on a list of court experts or a translator accredited by the administrative or judicial authorities of another Member State of the European Union, a Contracting Party to the European Economic Area Agreement or the Swiss Confederation.

### Article 1516

An arbitral award may only be enforced by virtue of an enforcement order (*exequatur*) issued by the *Tribunal de grande instance* of the place where the award was made or by the *Tribunal de grande instance* of Paris if the award was made abroad.

*Exequatur* proceedings shall not be adversarial.

Application for *exequatur* shall be filed by the most diligent party with the Court Registrar, together with the original award and arbitration agreement, or duly authenticated copies of such documents.

**Article 1517**

**The enforcement order shall be affixed to the original or, if the original is not produced, to a duly authenticated copy of the arbitral award, as per the final paragraph of Article 1516.**

**Where an arbitral award is in a language other than French, the enforcement order shall also be affixed to the translation produced as per Article 1515.**

**An order denying enforcement of an arbitral award shall state the reasons upon which it is based.**

## CHAPTER IV – RECOURSE

### SECTION 1 – AWARDS MADE IN FRANCE

**Article 1518**

**The only means of recourse against an award made in France in an international arbitration is an action to set aside.**

**Article 1519**

**An action to set aside shall be brought before the Court of Appeal of the place where the award was made.**

**Such recourse can be had as soon as the award is rendered.  If no application is made within one month following notification of the award, recourse shall no longer be admissible.**

The award shall be notified by service (*signification*), unless otherwise agreed by the parties.

**Article 1520**

An award may **only** be set aside **where:**

(1) **the arbitral tribunal wrongly upheld or declined jurisdiction; or**
(2) **the arbitral tribunal was not properly constituted; or**
(3) **the arbitral tribunal ruled without complying with the mandate conferred upon it; or**
(4) **due process was violated; or**
(5) **recognition or enforcement of the award is contrary to international public policy.**

11

### Article 1521

**The first president or, once the matter is referred to him or her, the judge assigned to the case (*conseiller de la mise en état*) may grant enforcement (*exequatur*) of the award.**

### Article 1522

By way of a specific agreement the parties may, at any time, expressly waive their right to bring an action to set aside.

**Where such right has been waived, the parties nonetheless retain their right to appeal an enforcement order on one of the grounds set forth in Article 1520.**

**Such appeal shall be brought within one month following notification of the award bearing the enforcement order**.  The award bearing the enforcement order shall be notified by service (*signification*), unless otherwise agreed by the parties.

### Article 1523

**An order denying recognition or enforcement of an international arbitral award made in France may be appealed.**

**The appeal shall be brought within one month following service (*signification*) of the order.**

**If the order is appealed, and if one of the parties so requests, the Court of Appeal shall rule on an action to set aside** unless the parties have waived the right to bring such action **or the time limit to bring such action has expired.**

### Article 1524

**No recourse may be had against an order granting enforcement of an award, except as provided in Article 1522, paragraph 2.**

**However, an action to set aside an award shall be deemed to constitute recourse against the order of the judge having ruled on enforcement or shall bring an end to said judge's jurisdiction, as regards the parts of the award which are challenged.**

**Article 1502 (paragraphs 1 and 2)**

Application for revision of an arbitral award may be made in the circumstances provided in Article 595 for court judgments,[3] and under the conditions set forth in Articles 594, 596, 597 and 601 through 603.

Application shall be made to the arbitral tribunal.

**Article 1503**

**No *opposition*[4] may be filed against an arbitral award, nor may the Cour de Cassation be petitioned to quash the award.**

SECTION 2 – AWARDS MADE ABROAD

**Article 1525**

**An order granting or denying recognition or enforcement of an arbitral award made abroad may be appealed.**

**The appeal shall be brought within one month following service (*signification*) of the order.**

However, the parties may agree on other means of notification when an appeal is brought against an award bearing an enforcement order.

**The Court of Appeal may only deny recognition or enforcement of an arbitral award on the grounds listed in Article 1520.**

---

[3]   Article 595 provides as follows:
An application for revision of a judgment may be made only where:
1.   it comes to light, after the judgment is handed down, that it was obtained fraudulently by the party in whose favour it was rendered;
2.   decisive evidence that had been withheld by another party is recovered after the judgment was handed down;
3.   the judgment is based on documents that have since been proven or have been held by a court to be false;
4.   the judgment is based on affidavits, testimonies or oaths that have been held by a court to be false.
In all four cases, an application for revision shall be admissible only where the applicant was not able, through no fault of his or her own, to raise such objection before the judgment became *res judicata*.

[4]   *Opposition* is a form of recourse under French law, available when a judgment is rendered by default because a defendant was not properly notified of a hearing.  The defendant can then "oppose" the judgment.

SECTION 3 – AWARDS MADE IN FRANCE AND ABROAD – COMMON PROVISIONS

**Article 1526**

**Neither an action to set aside an award nor an appeal against an enforcement order shall suspend enforcement of an award.**

**However, the first president ruling in expedited proceedings (*référé*) or, once the matter is referred to him or her, the judge assigned to the matter (*conseiller de la mise en état*), may stay or set conditions for enforcement of an award where enforcement could severely prejudice the rights of one of the parties.**

**Article 1527**

**Appeals against orders granting or denying enforcement and actions to set aside awards shall be brought, heard and decided in accordance with the rules applicable to adversarial proceedings set forth in Articles 900 through 930-1.**

**A decision denying an appeal or application to set aside an award shall be deemed an enforcement order of the arbitral award or of the parts of the award that were not overturned by the court.**

# EXHIBIT 2

Copies exécutoires
délivrées aux parties le :

# RÉPUBLIQUE FRANÇAISE
AU NOM DU PEUPLE FRANÇAIS

## COUR D'APPEL DE PARIS

### Pôle 5 - Chambre 16

**ARRÊT DU 30 JUIN 2020**
RECOURS EN ANNULATION D'UNE SENTENCE ARBITRALE

(n° 27/2020, 10 pages)

Numéro d'inscription au répertoire général : **N° RG 19/09729 - N° Portalis 35L7-V-B7D-B75DC**

Décision déférée à la Cour : sentence arbitrale (affaire n°) rendue le 27 Décembre 2018 par le tribunal arbitral sous l'égide de la Cour Internationale d'Arbitrage de la Chambre de Commerce Internationale de PARIS, composé de Monsieur(), Arbitre unique.


## DEMANDEUR AU RECOURS :

**M. Z.**
né le (...) , de nationalité(...) demeurant:

*Représenté par Me (...), avocat au barreau de PARIS, toque :et ayant pour avocat plaidant Me (...) , avocate inscrite au barreau de Carpentras,*


## DÉFENDERESSE AU RECOURS :

**AXON ENTERPRISE, INC. (anciennement dénommée TASER INTERNATIONAL INC)**
**Société de droit américain,**
Ayant son siège social: 17800 N. 85th Street, Scottsdale, Arizona - ETATS-UNIS

*Représentée par Me (...) , avocat au barreau de PARIS, toque :*
*Ayant pour avocat plaidant Me (...), avocat au barreau de PARIS, toque :*


## COMPOSITION DE LA COUR :

En application :

- de l'article 4 de la loi n° 2020-290 du 23 mars 2020 d'urgence pour faire face à l'épidémie de covid-19;
- de l'ordonnance n° 2020-304 du 25 mars 2020 portant adaptation des règles applicables aux juridictions de l'ordre judiciaire statuant en matière non pénale et aux contrats de syndic de copropriété, notamment ses articles 1er et 8 ;
- de l'ordonnance n° 2020-306 du 25 mars 2020 modifiée relative à la prorogation des délais échus pendant la période d'urgence sanitaire et à l'adaptation des procédures pendant cette même période ;

   L'affaire a été retenue selon la procédure sans audience, les avocats y ayant consenti expressément.


La cour composée comme suit en a délibéré :

François ANCEL, Président

Fabienne SCHALLER, Conseillère
Laure ALDEBERT, Conseillère

**Greffière,** lors des débats : Clémentine GLEMET

**ARRÊT :**

      - CONTRADICTOIRE
      - par mise à disposition de l'arrêt au greffe de la Cour, les parties en ayant été préalablement avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure civile.
      - signé par François ANCEL, Président et par Clémentine GLEMET, Greffière à qui la minute a été remise par le magistrat signataire.

**I – FAITS ET PROCÉDURE:**

1. Monsieur Z. se présente comme le gérant de la société SMP TECHNOLOGIES, société de droit français spécialisée dans les travaux d'installation électrique.

2. La société AXON ENTERPRISE Inc. (ci-après « la société AXON ») se présente comme une société de droit américain, anciennement dénommée « TASER INTERNATIONAL », fabriquant et commercialisant des pistolets à impulsion électrique, arme de quatrième catégorie, sous la marque « Taser » et principalement destinés aux forces de l'ordre.

3. La société TASER INTERNATIONAL (devenue "AXON") a confié à la société SMP TECHNOLOGIES par un premier contrat en date des 4 et 5 février 2005 la distribution exclusive des produits Taser pour la France, puis par un second contrat en date des 1er et 15 septembre 2010 la distribution exclusive des produits Taser dans neuf pays africains (Algérie, Maroc, Gabon, Togo, Niger, Burkina- Faso, Mali, Cameroun, Guinée-Conakry).

4. Les 1er et 2 septembre 2010, un contrat de services professionnels a également été conclu entre la société TASER INTERNATIONAL et « Z., SMP technologies » en qualité de « Consultant ». Au terme de ce contrat, il est stipulé que *« le Consultant sera rémunéré sur la base de commissions pour le développement de nouvelles affaires/comptes en France pour la période commençant en janvier 2010 et se terminant au 31 décembre 2011, au taux de 8 pour cent (8%) sur toutes les ventes réalisées et facturées par la Société aux comptes acquis et servis en France ».* L'article 9 comporte une clause compromissoire visant le règlement de la Chambre de Commerce Internationale à Paris et désignant Paris comme siège de l'arbitrage.

5. Estimant que la société AXON lui devait des commissions au titre de ce contrat, M. Z. a saisi le 5 avril 2016, la Cour Internationale d'Arbitrage de la Chambre de Commerce Internationale de Paris sur le fondement de l'article 9 du contrat, sollicitant la condamnation de cette société à lui verser la somme de 884 574 euros en paiement de commissions, 93 118 euros pour frais d'avocat ainsi que la prise en charge de la totalité du coût de la procédure.

6. En réponse, la société AXON a sollicité le rejet des demandes de M. Z., 20 000 euros de dommages et intérêts pour procédure abusive, 64 202 euros pour frais d'avocat et la prise en charge par M. Z. de la totalité du coût de la procédure.

7. Le 27 décembre 2018, après avoir rendu une première sentence partielle le 13 septembre 2017, pour confirmer sa compétence, le Tribunal arbitral de la Chambre de Commerce Internationale a rejeté les demandes de Monsieur Z. et l'a condamné à payer à la société

AXON la somme de 17 000 dollars américains pour frais et honoraires du tribunal arbitral et des frais administratifs restant dus, ainsi que la somme de 38 534,20 euros au titre des « frais raisonnables exposés par cette dernière pour sa défense ».

8. Cette sentence a fait l'objet d'une ordonnance d'exequatur le 8 mars 2019 par le Président du tribunal de grande instance de Paris.

9. La sentence arbitrale et l'ordonnance d'exequatur ont été signifiées à Monsieur Z. selon exploit d'huissier du 2 avril 2019.

10. Le 2 mai 2019, M. Z. a saisi la cour d'un recours en annulation contre la sentence arbitrale du 27 décembre 2018 et l'ordonnance d'exequatur du 8 mars 2019.

11. Par une ordonnance en date du 19 novembre 2019, le conseiller de la mise en état a rejeté la demande de M. Z. de l'arrêt de l'exécution provisoire de la sentence arbitrale du 27 décembre 2018 et de l'ordonnance d'exequatur du 8 mars 2019.

12. Interrogés sur un recours à la procédure sans audience en application de l'article 8 de l'ordonnance n°2020-304 du 25 mars 2020, les parties ont chacune, le 12 mai 2020, accepté de manière expresse que l'affaire soit jugée selon la procédure sans audience.

13. Les parties ont été avisées le 29 mai 2020 que la décision serait rendue, conformément au calendrier fixé dans le cadre du protocole de procédure applicable devant la chambre commerciale internationale, le 30 juin 2020 par les juges sus-mentionnés.

## II – PRÉTENTIONS DES PARTIES :

**14. Aux termes de ses dernières conclusions communiquées par voie électronique le 29 avril 2020, M. Z.** demande à la Cour de bien vouloir :

- Annuler la sentence arbitrale rendue par la Cour internationale d'arbitrage de la Chambre de Commerce Internationale de PARIS en date du 27 décembre 2018 ;

- Annuler l'ordonnance sur requête d'exequatur rendue le 8 mars 2019 par Monsieur le Président du Tribunal de grande Instance de PARIS ;

- Renvoyer les parties devant la Cour Internationale d'Arbitrage de la Chambre de Commerce Internationale de PARIS autrement composée ;

- Condamner la société (« Corporation ») de droit Américain AXON ENTERPRISE, INC à payer à Monsieur Z. la somme de 30 000 € au titre de l'article 700 du Code de Procédure Civile ;

- Débouter la société AXON INTERPRISE de l'intégralité de ses prétentions.

**15. Aux termes de ses dernières conclusions communiquées par voie électronique le 7 mai 2020, la société AXON** demande à la cour, au visa de l'article 1520, 3° et 5° du code de procédure civile, de :

- Débouter Monsieur Z. de l'ensemble de ses demandes ;

- Rejeter le recours en annulation formé par M. Z. à l'encontre de la sentence arbitrale rendue le 27 décembre 2018 par la Cour Internationale d'Arbitrage de la Chambre de Commerce Internationale (CCI) de Paris ;

- Condamner Monsieur Z. à payer à la société AXON ENTERPRISE, Inc. la somme de 20 000 euros à titre de dommages-intérêts pour procédure abusive ;

- Condamner Monsieur Z. à payer à la société AXON ENTERPRISE, Inc. la somme de 30 000 euros en application de l'article 700 du Code de procédure civile.

### III – MOYENS DES PARTIES :

**16. M. Z. considère** en premier lieu que le tribunal arbitral a statué sans se conformer à la mission qui lui avait été confiée en ce qu'il a méconnu son obligation de motivation. Il fait valoir qu'il existe en effet une contradiction de motifs entre la sentence partielle du 13 septembre 2017 qui lui reconnaît la qualité de partie au contrat de services professionnels et la sentence définitive du 27 décembre 2018 qui reconnaît que seule la société SMP Technologies est créancière de la commission de 8%. Il ajoute que cette contradiction ressort aussi dans la motivation de la sentence. Il rappelle que la contradiction des motifs équivaut à une absence de motif. Il ajoute que la motivation des décisions découle de l'ordre public procédural et que le juge de l'annulation peut annuler une sentence pour vice de motivation en cas de contradiction entre ses motifs et son dispositif, dès lors que cette contradiction ressort de la sentence.

17. M. Z. considère en outre que la méconnaissance par l'arbitre de sa mission ressort également de ce que le tribunal arbitral s'est abstenu d'appliquer les règles de l'*International Bar Association* relatives à l'administration de la preuve dans l'arbitrage international, en particulier son article 9.5, qu'il avait pourtant déclaré applicable en ne tirant aucune conséquence du refus opposé par la société AXON à sa demande de voir communiquer le montant réel des ventes réalisées en France en 2010 et 2011 tout en ayant considéré que le recourant n'était pas fondé à réclamer le paiement de quelconques commissions à la société AXON.

18. M. Z. soutient ensuite que la sentence est contraire à l'ordre public international en raison :

- de la méconnaissance par le tribunal arbitral d'une fraude au cours du déroulement de la procédure arbitrale. Il fait valoir que la production de faux documents emporte violation de l'ordre public international de procédure et que dans le cadre de la communication de pièces lors de la procédure arbitrale, un email falsifié a été produit par la société AXON, ce qui aurait dû conduire le tribunal arbitral à écarter cette pièce, ce qu'il n'a pas fait ;

- de la méconnaissance du principe d'exécution de bonne foi des conventions. Il fait valoir que la société AXON a été de mauvaise foi en produisant un exemplaire falsifié de l'email du 27 juillet 2010 et, après des mois de procédure et de demande de communication de relevés trimestriels certifiés par un commissaire aux comptes, en produisant un tableau réalisé par un salarié interne à la société, s'obstinant à ne faire aucun effort d'objectivation des chiffres ainsi produits ;

- du déséquilibre significatif existant entre les parties. Il fait valoir que les dispositions du code de commerce ont été reconnues comme relevant en France de l'ordre public économique, et qu'il résulte de l'économie du contrat que M. Z. en était la partie faible, ce déséquilibre se retrouvant dans la clause d'arbitrage sur laquelle il n'a eu aucune prise ;

- de la privation du droit d'accès au juge. M. Z. soutient qu'en tant que partie faible au contrat de services professionnels, il s'est vu imposer la procédure arbitrale par le biais de la clause compromissoire dont les coûts sont disproportionnés à ceux de la procédure devant les juridictions étatiques à laquelle ses adversaires l'ont conduit à déroger.

19. **En réponse, la société AXON fait valoir** que la contradiction de motifs entre la sentence partielle du 13 septembre 2017 et la sentence définitive du 27 décembre 2018 et

---

au sein de cette même sentence alléguée par M. Z., qui au demeurant n'est pas établie, est une critique de la sentence au fond, qui échappe au contrôle du juge de l'annulation. Elle soutient à ce titre que la contradiction de motifs ne constitue pas une absence de motivation.

20. La société AXON ajoute que la mission du tribunal arbitral est délimitée par la convention d'arbitrage, l'acte de mission et les prétentions des parties. Elle estime qu'en l'espèce M. Z. ne précise pas en quoi le tribunal arbitral ne se serait pas conformé à sa mission telle qu'elle résulte de la clause d'arbitrage stipulée à l'article 9 du contrat de services professionnels, de l'acte de mission signé par les deux parties, ni des prétentions des parties.

21. S'agissant du grief tiré de l'inapplication des règles d'administration de la preuve édictées par l'IBA, la société AXON souligne qu'aux termes de l'ordonnance de procédure n°5 du 14 décembre 2017, le tribunal arbitral a décidé qu'il « s'inspirera » desdites règles mais n'a jamais déclaré qu'il les appliquerait. Elle ajoute que le tribunal arbitral a admis qu'elle avait justifié d'une « raison satisfaisante » au sens de l'article 9.5 desdites et rappelle que le contenu de la motivation de la sentence échappe au pouvoir du juge de l'annulation.

22. S'agissant du moyen d'annulation tiré de la violation de l'ordre public international, la société AXON considère que la reconnaissance et l'exécution de la sentence du 27 décembre 2018 qui a débouté M. Z. de ses demandes en paiement de commissions et l'a par ailleurs condamné à rembourser partiellement ses frais d'avocat et une partie du coût de la procédure arbitrale, ne heurte aucun des principes essentiels du droit français.

23. Elle rappelle que cette violation doit être « flagrante, effective et concrète » et considère que les griefs présentés par M. Z. sur ce fondement sont inopérants.

24. Elle fait notamment valoir que la fraude alléguée par M. Z. n'est pas caractérisée alors que le courriel adressé le 27 juillet 2010 par M. Z. à Mr S., Président de la société *Taser International* n'est pas falsifié étant précisé que le tribunal arbitral a considéré dans la sentence finale qu'aucune des parties ne rapportait la preuve que les emails produits aux débats par l'autre partie constitueraient des pièces falsifiées et a débouté les deux parties de leur demande respective de rejet de pièces. La société AXON fait de plus valoir que la sentence arbitrale ne se fonde pas sur ce courriel pour débouter M. Z. de ses demandes.

25. La société AXON ajoute que la méconnaissance alléguée du principe d'exécution de bonne foi des conventions fondée sur le courriel précité qui n'est pas falsifié ne permet pas de caractériser une contrariété à l'ordre public international qui s'apprécie uniquement au regard de la reconnaissance et l'exécution d'une sentence au sens de l'article 1520, 5° du code de procédure civile.

26. Elle précise enfin que le grief fondé sur le déséquilibre significatif entre les parties dans la rédaction et l'exécution du contrat de services professionnels de septembre 2010 ne peut être un fondement du recours en annulation dans le cadre de l'application de l'article 1520 (5°) du code de procédure civile et que la privation alléguée du droit d'accès au juge n'est pas méconnu par l'exécution de la sentence le condamnant à rembourser partiellement les frais d'avocat adverse et rappelle que s'agissant d'un contrat international, la clause d'arbitrage est d'usage et qu'elle a en outre institué le siège du tribunal arbitral en France et non en Arizona, ceci en faveur du distributeur français.

## VI - MOTIFS DE LA DÉCISION :

**Sur le moyen d'annulation tiré de la méconnaissance par le tribunal arbitral de sa mission (article 1520 (3°) du code de procédure civile) ;**

27. En application de l'article 1509 du code de procédure civile, « *la convention d'arbitrage peut, directement ou par référence à un règlement d'arbitrage ou à des règles de procédure, régler la procédure à suivre dans l'instance arbitrale. / Dans le silence de la convention d'arbitrage, le tribunal arbitral règle la procédure autant qu'il est besoin, soit directement, soit par référence à un règlement d'arbitrage ou à des règles de procédure* ».

28. En l'espèce, la convention d'arbitrage insérée dans le contrat de services professionnels stipule que « *Toutes controverses ou réclamations émanant du présent contrat (...) seront soumises à arbitrage, selon les règles de la Chambre de commerce internationale (...)* » (ou sa version anglaise dans le contrat « Any controversy or claim arising out of or relating to this agreement (...) shall be submitted to arbitration before and in accordance with the rules of the International chamber of Commerce, International Court of Arbitration in Paris, France (...) »).

29. Le règlement d'arbitrage de la Chambre de commerce Internationale (2012) est ainsi applicable à l'instance arbitrale et son article 31 dispose que la « sentence doit être motivée ».

30. Ce faisant, l'exigence de motivation de la sentence était comprise dans la mission de l'arbitre de sorte que si cette motivation fait défaut, la sentence est susceptible d'encourir l'annulation sur le fondement de l'article 1520, 3° du code de procédure civile, étant précisé que le contrôle du juge de l'annulation ne porte que sur l'existence et non sur la pertinence des motifs de la sentence.

*Sur le grief de méconnaissance de la mission par l'arbitre du fait d'une contradiction de motifs :*

31. En l'espèce, il convient de relever que M. Z. ne soutient nullement que l'arbitre a méconnu sa mission telle que délimitée par l'objet du litige déterminé par les prétentions des parties mais plus précisément que la sentence serait entachée d'une contradiction de motifs, laquelle équivaudrait selon lui, à une absence de motif de nature à faire encourir l'annulation à la sentence.

32. Cependant, le grief tiré d'une contradiction de motifs de la sentence arbitrale, qui ne peut être assimilé à une absence de motivation, constitue nécessairement une critique de la sentence au fond qui échappe au pouvoir du juge de l'annulation hors les cas, définis par l'article 1520 du code de procédure civile, de violation de l'ordre public international.

33. A cet égard, il convient de relever que le tribunal arbitral a effectivement motivé sa décision aux termes de ses paragraphes 177 et suivants pour juger que si M. Z. pouvait être considéré comme une partie au contrat de services professionnels, justifiant qu'il puisse se prévaloir de la clause d'arbitrage et ainsi de la compétence du tribunal arbitral pour statuer sur ses réclamations, ce tribunal, après s'être expressément interrogé sur le « créancier de la commission de 8% » (cf. paragraphe 188), a néanmoins considéré, au terme d'une motivation résultant de ses paragraphes 189 à 208, que seule la société SMP Technologies était créancière des commissions dont M. Z. a sollicité le paiement à son profit.

34. Ainsi, l'existence de cette motivation permet de rejeter le grief.

*Sur le grief de méconnaissance de la mission par l'arbitre du fait d'un non*

---

*respect par l'arbitre des règles procédurales applicables :*

35. Si la méconnaissance par le tribunal arbitral de la procédure applicable devant lui choisie par les parties est susceptible d'exposer sa sentence à l'annulation, encore faut-il que cette méconnaissance soit établie.

36. En l'espèce, il ressort de la sentence que le tribunal arbitral, amené à trancher notamment une demande formée par M. Z. pour voir contraindre la société AXON à produire des relevés des ventes réalisées en 2010 et 2011, a décidé de s'inspirer des règles de l'*International Bar Association*, les parties, consultées sur ce point, n'ayant pas formé d'objection, ainsi que cela ressort du paragraphe 32 de la sentence qui rappelle que cette décision a été prise par ordonnance de procédure n°5 du 14 décembre 2017 et qu'elle concernait les demandes de production de documents « respectives du demandeur et de la défenderesse dans le cadre du présent arbitrage ».

37. Il ressort en outre de la sentence que par ordonnance n° 6 en date du 28 février 2018, le tribunal arbitral a ordonné à la société AXON de communiquer à M. Z. « *un relevé trimestriel des produits vendus en France et de ceux livrés en France avec indication de la date de la commande par le client et la date de facturation par Taser International, certifié par un commissaire aux comptes ou un statutory auditor* ».

38. Il n'est pas contesté que si des relevés ont été produits, ces documents n'étaient pas « certifiés par un commissaire aux comptes ou un statutory auditor » comme indiqué dans l'ordonnance de procédure de telle sorte que M. Z. a demandé au tribunal arbitral de faire application de la règle de la présomption défavorable de l'article 9.5 des règles de l'IBA (« adverse inference ») selon laquelle « *Si une Partie, sans raison satisfaisante, ne produit pas tout Document à l'égard duquel une autre Partie a formulé une Demande de production et à laquelle elle n'a pas formulé d'objection dans le délai imparti ou ne produit pas tout Document dont la production a été ordonnée par le Tribunal Arbitral, le Tribunal Arbitral peut en déduire que ce Document est contraire aux intérêts de cette Partie* ».

39. M. Z. a en effet soutenu devant l'arbitre que faute pour la société AXON d'avoir satisfait à son obligation, le calcul des sommes dues devaient être faites sur des « projections ».

40. Cependant, loin de ne pas appliquer la procédure qu'il s'était fixé en accord avec les parties, il convient de relever au contraire que le tribunal arbitral s'est livré à une appréciation sur son application à l'espèce.

41. Le tribunal arbitral a en effet considéré que le fait que les documents produits n'aient pas été certifiés par un commissaire aux comptes n'était pas de nature à justifier la conséquence souhaitée par M. Z. dès lors que la société AXON avait justifié « *être dans l'impossibilité de fournir des documents certifiés par son commissaire aux comptes* ».

42. Ainsi dans le paragraphe 216 de sa sentence, le tribunal arbitral indique qu'il « *résulte en effet de la consultation juridique produite aux débats par la Défenderesse (consultation du cabinet américain SNELL & WILMER, Pièce Défenderesse n°42) que la réglementation américaine interdit aux commissaires aux comptes de fournir des services d'expert pour les sociétés qu'ils contrôlent dans le cadre de procédures (article 2-01(c) (4) de la réglementation de la SEC). La Défenderesse justifie, dès lors, avoir été dans l'impossibilité de faire certifier ses relevés trimestriels de ventes par son commissaire aux comptes, étant précisé que la demande de fourniture de relevés trimestriels certifiés par « un commissaire aux comptes » vise nécessairement le commissaire aux comptes de la société contrôlée (en l'espèce AXON ENTERPRISE, INC.) et non tout cabinet d'expertise comptable quel qu'il soit* ».

43. En l'état de ces éléments, le tribunal arbitral a apprécié l'exécution par une partie de l'injonction qui lui avait été faite de communiquer des documents au regard des pièces

---

finalement produites par celle-ci, et il n'appartient pas au juge de l'annulation de remettre en cause cette décision sous couvert d'un grief tiré de la méconnaissance de sa mission, de telle sorte que le moyen d'annulation sera rejeté.

**Sur le moyen d'annulation tiré de la contrariété à l'ordre public international (article 1520 (5°) du code de procédure civile) ;**

44. En application de l'article 1520,5° du code de procédure civile le recours en annulation est ouvert si la reconnaissance ou l'exécution de la sentence est contraire à l'ordre public international.

45. Le contrôle de la cour doit porter non sur l'appréciation que l'arbitre a fait des droits des parties mais sur la solution donnée au litige par le tribunal arbitral, l'annulation de la sentence étant encourue si sa reconnaissance ou son exécution heurte la conception française de l'ordre public international, qui au sens de l'article 1520,5° précité, s'entend de l'ensemble des règles et des valeurs dont l'ordre juridique français ne peut souffrir la méconnaissance, même dans des situations à caractère international.

*Sur la contrariété à l'ordre public international à raison de la fraude alléguée :*

46. M. Z. soutient que la sentence doit être annulée dès lors que la société AXON a produit durant la procédure « un email falsifié » (email daté du 27 juillet 2010) et que le tribunal arbitral l'a débouté de sa demande de rejet de cette pièce.

47. Il convient de rappeler que si la fraude procédurale peut en effet être sanctionnée au regard de l'ordre public international, elle suppose notamment que des faux documents aient été produits, que des témoignages mensongers aient été recueillis ou que des pièces intéressant la solution du litige aient été frauduleusement dissimulées aux arbitres, de sorte que la décision de ceux-ci a été surprise.

48. En l'espèce, il ressort des pièces versées que lors de l'instance arbitrale, un débat s'est noué entre les parties sur l'authenticité de l'email litigieux du 27 juillet 2010, chacune des parties accusant l'autre de produire une version falsifiée de cet email.

49. Le tribunal arbitral aux termes du paragraphe 154 de sa sentence, a considéré « *qu'aucune des parties ne rapporte la preuve que les emails produits aux débats par l'autre partie constitueraient des pièces falsifiées* » et a en conséquence débouté les parties de leurs demandes respectives de rejet de ces pièces.

50. Le caractère prétendument falsifié de ces documents ayant fait l'objet d'un débat contradictoire au cours de l'instance arbitrale, la décision du tribunal n'a pas été surprise par une fraude mais procède d'une appréciation de l'exactitude et de la portée des documents qui lui étaient soumis, appréciation qu'il n'appartient pas à la cour de réviser.

51. Le grief sera en conséquence rejeté.

*Sur la contrariété à l'ordre public international à raison de la méconnaissance du principe d'exécution de bonne foi des conventions :*

52. A supposer même qu'une sentence qui donne effet à un contrat exécuté en violation du principe de bonne foi, puisse caractériser une violation de l'ordre public international, ce qui n'est nullement étayé, il convient de relever qu'en l'espèce le grief invoqué ne porte pas tant sur le principe de méconnaissance de l'exécution de bonne foi d'une convention mais sur l'attitude procédurale reprochée à la société AXON par le recourant du fait de la production alléguée d'une pièce falsifiée et d'une production tardive de pièces, jugée incomplète.

53. Cependant, comme indiqué ci-dessus, la preuve de la production d'une pièce falsifiée n'est pas établie et aucune déloyauté de la société AXON n'est caractérisée, dans la production de ses pièces dont le tribunal a pu apprécier la pertinence pour statuer sur les demandes qui lui ont été faites.

54. Ce grief sera en conséquence rejeté.

   *Sur la contrariété à l'ordre public international à raison de l'existence d'un déséquilibre significatif entre les parties :*

55. Le déséquilibre significatif de la relation commerciale, dont il n'est nullement établi qu'il puisse être contraire à l'ordre public international, et qui résulterait selon M. Z. de l'économie générale du contrat, ne saurait en tout état de cause être caractérisé par la seule référence au contenu de la clause compromissoire alors que pour être caractérisé un tel déséquilibre suppose une appréciation concrète et globale du contrat à laquelle M. Z. ne s'est nullement livré.

56. Ce grief sera en conséquence rejeté.

   *Sur la contrariété à l'ordre public international à raison de la privation de l'accès à un juge :*

57. Par ce grief, M. Z. émet, sous couvert d'une violation de l'ordre public international, une contestation sur la validité de la clause compromissoire et, par conséquent, celle de la compétence de l'arbitre, exception qu'il n'avait pas soulevée devant le tribunal arbitral et qu'il n'a pas non plus expressément formée et articulée dans le cadre de ce recours en annulation.

58. En outre, il convient de relever que la procédure arbitrale a été initiée par M. Z. en 2016 et qu'une sentence partielle sur la compétence a été rendue par le tribunal arbitral le 13 septembre 2017 qui a sur ce point donné raison à M. Z. qui soutenait bien la compétence de ce tribunal arbitral pour statuer sur ses demandes et donc nécessairement la validité de la clause compromissoire.

59. En l'état de ces éléments, le grief sera rejeté.

60. L'ensemble des moyens invoqués au titre de l'annulation de la sentence, et par voie de conséquence de l'ordonnance d'exequatur, étant rejeté, il convient de débouter M. Z. de ses

demandes.

**Sur la demande reconventionnelle de la société AXON ;**

61. L'exercice d'une action en justice constitue par principe un droit et ne dégénère en abus pouvant donner naissance à des dommages et intérêts qu'en cas de faute susceptible d'engager la responsabilité civile de son auteur.

62. En l'espèce, la société AXON sera déboutée de sa demande à ce titre, à défaut pour elle de rapporter la preuve d'une quelconque faute ou légèreté blâmable de la part de M. Z., qui a pu légitimement se méprendre sur l'étendue de ses droits et d'établir l'existence d'un préjudice autre que celui subi du fait des frais exposés pour sa défense.

**Sur les frais et les dépens ;**

63. Il y a lieu de condamner M. Z., partie perdante, aux dépens.

64. En outre, il doit être condamné à verser à la société AXON, qui a dû exposer des frais irrépétibles pour faire valoir ses droits, une indemnité au titre de l'article 700 du code de procédure civile qu'il est équitable de fixer à la somme de 30 000 euros.

**IV – DISPOSITIF :**

**Par ces motifs, la cour :**

1 – Rejette le recours en annulation formé par M. Z. ;

2 - Déboute la société AXON ENTERPRISE Inc. de sa demande formée au titre de la procédure abusive ;

3 - Condamne M. Z. à payer à la société AXON ENTERPRISE Inc. la somme de 30 000 euros au titre de l'article 700 du code de procédure civile ;

4- Condamne M. Z. aux dépens.

*La greffière*                                                                                     *Le président*

*C. GLEMET*                                                                                      *F. ANCEL*

# EXHIBIT 3



# CA Paris, 1, 1, 26-05-2015, n° 14/21345, Confirmation

Grosses délivrées RÉPUBLIQUE FRANÇAISE aux parties le AU NOM DU PEUPLE FRANÇAIS
COUR D'APPEL DE PARIS Pôle 1 - Chambre 1
ARRÊT DU 26 MAI 2015 (n°, 3 pages)
Numéro d'inscription au répertoire général 15/06910
Décision déférée à la Cour Ordonnance du 19 Mars 2015 rendue par Madame la conseillère chargée de la mise en état du Pôle 1 Chambre 1 de la Cour d'appel de PARIS - RG n° 14/21345

DEMANDERESSE AU DÉFÉRÉ
S.A. AERO VENTURES LLC société de droit américain
prise en la personne de ses représentants légaux
Perpetual Drive
Odessa Florida
USA
représentée par Me Nicolas FLACHET VON CAMPE, avocat au barreau de PARIS, toque P0572
DÉFENDERESSE AU DÉFÉRÉ
S.A. MIDEX AIRLINES LLC société de droit emirati
prise en la personne de ses représentants légaux
PO Box 9636 Dubaï
UNITED ARAB EMIRATES
représentée par Me Olivier BERNABE, avocat postulant du barreau de PARIS, toque B0753
assistée de Me Marc JOBERT, avocat plaidant du barreau de PARIS, toque C 912

COMPOSITION DE LA COUR
L'affaire a été débattue le 14 avril 2015, en audience publique, le rapport entendu, devant la Cour composée de Monsieur ACQUAVIVA, Président Madame DALLERY, Conseillère
Madame BOZZI, Présidente, appelée à compléter la cour conformément aux dispositions de l'ordonnance portant organisation des services du 19 décembre 2014 rendue par Madame le premier président de la cour d'appel de PARIS qui en ont délibéré
Greffier, lors des débats Madame PATE
ARRÊT - CONTRADICTOIRE
- prononcé par mise à disposition de l'arrêt au greffe de la Cour, les parties en ayant été préalablement avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure civile.
- signé par Monsieur ACQUAVIVA, président et par Madame PATE, greffier présent lors du prononcé.

En janvier 2011, la société américaine Aero Ventures LLC, spécialisée dans la vente et la réparation d'équipements d'aéronefs, a conclu un contrat de vente de turboréacteurs avec la société émiratie Midex Airlines LLC.
A la suite d'un litige commercial entre les deux parties, le 31 janvier 2012 la sociétéMidex Airlines LLC a, en vertu de la clause compromissoire stipulée au contrat, saisi la Chambre de Commerce Internationale("CCI") d'une demande d'arbitrage.
Une sentence a été rendue le 6 mai 2014 à Paris par M. ..., arbitre unique, qui a condamné la société émiratie MIDEX AIRLINES (MIDEX) à payer à la société américaine AERO VENTURES LLC la somme de 724.000 USD.
Un recours en annulation a été formé par MIDEX le 24 octobre 2014.
Par des conclusions du 11 février et du 3 mars 2015, AERO VENTURES a saisi le conseiller de la mise en état d'un incident à l'effet de voir déclarer le recours irrecevable comme tardif.

Par ordonnance du 19 mars 2015, AERO VENTURES a été déboutée de son incident.

Par requête déposée et signifiée par RPVA le 2 avril 2015, AERO VENTURES a déféré cette ordonnance à la cour, sollicitant son infirmation, l'application à MIDEX d'une amende civile de 3.000 euros en application de l'article 559 du Code de procédure civile et l'allocation d'une somme de 10.000 euros en application de l'article 700 du Code de procédure civile.

Elle fait valoir que les parties ont, ainsi que l'article 1509 du Code de procédure civile leur en réserve la faculté, souhaité très précisément exclure l'application du droit processuel français à l'instance arbitrale, en renvoyant expressément dans l'acte de mission qu'elles ont signé le 23 octobre 2012 aux règles d'arbitrage de la CCI dans leur version du 1er janvier 2012 ; que par application des stipulations de ce Règlement d'arbitrage, la sentence a fait l'objet de notifications par coursier international à la diligence de la CCI ; que celle-ci a été faite le 12 mai 2014 pour la Société Midex Airlines LLC à l'adresse de son conseil Maître Marc ... et que le recours n'a été introduit que le 24 octobre 2014 soit après l'expiration du délai d'un mois prévu par l'article 1519 du Code de procédure civile.

Pour sa part, MIDEX par conclusions signifiées par RPVA le 9 avril 2015 a demandé à la cour la confirmation de l'ordonnance déférée et l'allocation d'une somme de 3.000 euros en application de l'article 700 du Code de procédure civile.


SUR QUOI,

Considérant que si les parties à un arbitrage international ont le choix des règles de procédure applicables à l'instance arbitrale, en revanche, les conditions d'exercice du recours contre la sentence sont régies par le code de procédure civile ;

Considérant que si, aux termes de l'article 1519 du Code de procédure civile dans sa rédaction issue du décret du 13 janvier 2011, applicable en la cause, les parties peuvent écarter par convention le principe de la notification de la sentence par voie de signification, une telle dérogation, s'agissant d'une formalité destinée à préserver les droits des parties, doit résulter de stipulations qui manifestent sans équivoque la volonté de celles-ci de renoncer à cette garantie;

qu'en l'espèce, une telle intention ne peut être déduite de la décision des parties de se soumettre au Règlement d'arbitrage de la CCI dans sa version du 1er janvier 2012 dans la mesure où si celui-ci énonce en son article 3, les modalités et délais des notifications et communications écrites des parties, du Secrétariat et du tribunal arbitral, la notification de la sentence aux parties après sa reddition, effectuée en application de ce texte par le Secrétariat de la CCI, n'a d'autre portée, sauf à ce que les parties aient expressément décidé de lui donner d'autres effets, que de libérer l'institution d'arbitrage de son obligation contractuelle de délivrance de la sentence après règlement des frais ;

que la volonté non équivoque des parties de renoncer à la signification ne peut davantage résulter de leur décision d'écarter, aux termes de l'acte de mission, l'application du droit procédural du lieu de l'arbitrage, cette stipulation qui ne manifeste que le libre choix réservé aux parties par l'article 1509 du Code de procédure civile, de régler la procédure à suivre dans l'instance arbitrale laquelle s'achève par la reddition de la sentence qui dessaisit le tribunal arbitral, ne pouvant être regardée comme emportant convention expresse de renoncer pour l'exercice des voies de recours aux règles du Code de procédure civile lesquelles imposent, d'ailleurs, pour faire courir valablement ces délais, que soient mentionnées les voies de recours ouvertes et indiqué les délais auxquels celles-ci sont soumises;

Considérant que dès lors, l'ordonnance qui a écarté la fin de non-recevoir tirée la forclusion, en l'absence de signification régulière de la sentence, doit être confirmée ;

Considérant que Aero Ventures qui succombe ne peut bénéficier des dispositions des articles 559 et 700 du code de procédure civile et sera condamnée sur ce dernier fondement à payer à MIDEX la somme de 3.000 euros ;


PAR CES MOTIFS,

Confirme l'ordonnance déférée ;

Déboute la société AERO VENTURES LLC de ses demandes ;

Condamne AERO VENTURES LLC aux dépens de l'incident et au paiement à MIDEX AIRLINES LLC de la somme de 3.000 euros en application de l'article 700 du code de procédure civile.

LA GREFFIÈRE LE PRÉSIDENT

Copyright Lexbase

# EXHIBIT 4






**COUR D'APPEL DE PARIS**

## Protocol relating to procedural rules
## applicable to the International Chamber of the Court of Appeal of Paris

———

*En présence de* Mrs. Nicole BELLOUBET, *garde des sceaux*, Minister of Justice,

The First President of the Paris Court of Appeal,

The Public Prosecutor of the Paris Court of Appeal,

The Paris Bar, represented by its President,

Have concluded the following:

### *Preamble*

The Paris Court of Appeal has created a new Chamber specialised in disputes relating to international commercial contracts, whether they are governed by French law or by the law of another country.

This new Chamber is designed to meet the expectations of economic actors who wish to benefit from an attractive judicial system.

The purpose of the present Protocol is to organise the proceedings by which cases will be heard and judged before this new Chamber, providing for the use of the English language to a significant extent and for testimonial evidence.

With respect to the substance, the Chamber will apply French law or any other rules of foreign law applicable to the cause.

**Article 1: <u>Jurisdiction of the International Chamber of the Paris Court of Appeal</u>**

**1.1**    The International Chamber of the Court of Appeal of Paris (ICCP) has jurisdiction over disputes that involve international commercial interest, which include, in particular, disputes related to:

- Commercial contracts and the termination of commercial relations
- Transport
- Unfair competition
- Actions for damages arising from anti-competitive commercial practices
- Operations on financial instruments, standard master agreement, and financial contracts, instruments, and products

More generally, this chamber's jurisdiction concerns appeals made against decisions rendered in relation to international economic and commercial disputes, as well as decisions rendered in the field of international arbitration.

**1.2**    The jurisdiction of the chamber may result from a contractual clause conferring jurisdiction to the courts located within the Paris Court of Appeal's judicial authority.

**1.3**    In addition, the ICCP has jurisdiction on appeal over decisions rendered in the first instance by the International Chamber of the Paris Commercial Court.

**1.4.**   When no pre-trial judge (*conseiller de la mise en état*) has been appointed, in particular when applying article 905 of the French Code of Civil Procedure, the functions conferred upon him are hereinafter exercised by the President of the ICCP, or by any other judge specifically appointed by the First President.

**Article 2   <u>Languages of the proceedings</u>**

**2.1.**   Procedural acts are drafted in French.

**2.2.**   Written submissions in English may be given by without translation.

**2.3.**   Pleadings are conducted in French, without prejudice to what is stated in section 2.4 hereinafter.

**2.4.**   Parties appearing before the judge, as well as witnesses and any specialist witnesses,

including experts, and parties' foreign legal counsel who are authorised to plead before the Paris Court of Appeal, may express themselves in English if they wish to do so.

**Article 3: <u>Translations</u>**

3.1. In case of disagreement between the parties with regard to the translation of documentary evidence freely provided by one of the parties in its submissions, the pre-trial judge (*conseiller de la mise en état*) may order a sworn translation of all or part of the documentary evidence, at the provisional expense paid by the party chosen by the judge (article 269 of the French Code of Civil Procedure).

3.2. With the Court's agreement, oral proceedings held in French may be subject to a simultaneous interpretation, for the convenience of one of the parties, by an interpreter chosen by that party with advanced costs.

3.3. When a party, an expert or a witness wishes to express themselves in a foreign language, a simultaneous interpretation is carried out by a translator chosen by mutual agreement of the parties, with costs advanced by the party that requested the testimony. In case of disagreement between the parties on the choice of the translator within the time limit set by the pre-trial judge (*conseiller de la mise en état*), this judge will appoint the translator.

**Article 4: <u>Case management</u>**

**4.1. <u>Conference acknowledging the parties' agreement that the case be heard and judged pursuant to the present protocol</u>**

**4.1.1**. Upon his designation, pre-trial judge (*conseiller de la mise en état*) must convene without delay the parties for a first hearing to record their agreement that the dispute be heard and judged in accordance with the proceedings contained in the present Protocol.

**4.1.2**. This first hearing does not interrupt the time limit provided for by article 909 of the French Code of Civil Procedure regarding submission of the respondant's brief.

**4.2. <u>Conference on the judicial submissions of evidence</u>**

**4.2.1.** After having considered the appellant's first brief and the respondant's brief in response, the pre-trial judge (*conseiller de la mise en état*), may invite the parties to appear in person at the hearing.

**4.2.2.**     The pre-trial judge (*conseiller de la mise en état*) hears the parties' requests, if any, for witness or expert oral testimony; he sets the time frame in which the appellant then the defendant must provide, if applicable, the list of persons whose testimony they intend to request.

**4.2.3.**     After having heard parties' requests, the pre-trial judge (*conseiller de la mise en état*) renders an order specifying, if applicable, whether such measures will be conducted before him or before the Court, as well as the location, the day, and the time at which such measures will proceed and, finally, the time limit in which witnesses must submit written statements on the basis of which they will be examined (see section 5.4.2 below).

The pre-trial judge (*conseiller de la mise en état*) must justify any decision denying a Party's request.

### **4.3.     Mandatory procedural timetable**

**4.3.1.**     After ruling on any requests on judicial evidentiary issues, the pre-trial judge (conseiller de la mise en état) sets a mandatory procedural timetable which shall provide for, in particular:

- the dates on which parties must exchange their briefs, other than those referred to in articles 909 and 910 of the French Code of Civil Procedure which, presumably, will already have been notified;
- the date(s) on which the parties will be invited to appear in person;
- the date(s) on which the parties shall submit the written statement of the witnesses they have requested the testimony of, on the basis of which those witnesses will be heard;
- the date(s) on which any witness or expert's testimony will take place;
- the date(s) on which legal counsels will state their oral arguments;
- the date of the closing of the pre-trial examination ;
- the date on which the decision of the Court on the merits will be rendered.

**4.3.2.**     The procedural timetable may be modified pending the proceedings, in particular, in the event of a motion (*incident*) or additional requests that may delay the review on the merits of the case.

**4.4.**  **Preparation of oral proceedings**

**4.4.1.**  Before closing the pre-trial examination, the judge (conseiller de la mise en état), convenes the parties for a last hearing which aims to organise, by agreement with the parties, the oral part of the trial.

**4.4.2.**  The procedural judge (conseiller de la mise en état) specifies, on this occasion, the measures for simultaneous translation that must be put in place, to guarantee the publicity of the trial and establish the minutes of hearings recording the statements made by the parties and the witnesses in a language other than French (articles 194 and 219 of the French Code of Civil Procedure.

**4.5.**  **Participative Procedural Agreement**

The rules set out at in sections 4.1 to 4.4 above do not preclude the parties from entering into a participative procedural agreement as set forth in articles 1544 and seq. of the French Code of Civil Procedure. In such a case, the parties may have recourse to an expert who may pursue his task and communicate with them in the English language.

**Article 5: Rules on judicial submissions of evidence**

**5.1**  **Compulsory production of documents held by a party or by a third party**

**5.1.1.**  Requests  for compulsory production of  documents held by a party or by a third  party are examined by the pre-trial judge (*conseiller de la mise en état*), pursuant to the rules set forth in articles 11 and 138 to 142 of the French Code of Civil Procedure.

**5.1.2.**  Parties may request the production of categories of documents that are specifically identified.

**5.2**  **Personal appearance of the Parties**

**5.2.1.**  Personal appearance of the parties takes place under the conditions set forth in articles 184 to 198 of the French Code of Civil Procedure. The judge carries out the examination of the parties, by asking questions he deems relevant to the facts that are supported by legally admissible evidence. Each party may thereafter be invited by the judge to answer to the questions that the other parties wish to ask.

**5.2.2.**  The  personal  appearance  of  a  legal  entity  means  the  appearance  of  a  party's  legal

representative or of any corporate officer (mandataire social) or employee of the legal entity pursuant to a specific power of attorney.

**5.3**      **Third parties' written statements**

5.3.1      Written statements issued by third parties to the proceedings take the form of affidavits (attestations) meeting the requirements set forth in article 202 of the French Code of Civil Procedure.

5.3.2      As an exception to article 202 of the French Code of Civil Procedure, third parties' statements may be in typewritten form, the parties waiving their right to claim any procedural defect on that basis.

**5.4**      **Witnesses' examination (articles 199 and seq. of the French Code of Civil Procedure)**

5.4.1.      Any person may be heard as a witness, upon the decision of the pre-trial judge (*conseiller de la mise en état*), or of the Court, as the case may be, ruling on its own initiative or at the request of a party, as stated in section 4.2 above.

5.4.2.      In accordance with what is indicated in section 4.2.3 above, witnesses' examination or testimony (third parties, knowledgeable parties, etc.) proposed by a party will take place on the basis of a written statement, which may be typewritten, and which shall contain the information provided for by article 202 of the French Code of Civil Procedure.

5.4.3.      Witnesses' examination is conducted in accordance with articles 206 and seq. of the French Code of Civil Procedure. In accordance with articles 206 and 207 of the French Code of Civil Procedure, whoever is legally compelled to testify must do so, under penalty of a civil fine.

5.4.4.      The judge carries out the examination of witnesses, by asking questions he deems relevant to the facts that are supported by legally admissible evidence. Witnesses may then be invited by the judge to answer the questions that the parties wish to ask.

5.4.5.      The pre-trial judge (conseiller de la mise en état), or the Court, as the case may be, is free to take into consideration the written statement of a witness who, for a legitimate reason,

did not appear, and to draw any conclusion resulting from a non-appearance for which there is no legitimate reason.

**5.4.6.**     Each party shall ensure the summons of the witnesses whose party requests their hearing and shall advance payment of those witnesses' costs.

**5.5**     **Expert witnesses' examination (articles 245 and 283 of the French Code of Civil Procedure)**

**5.5.1**     The pre-trial judge (*conseiller de la mise en état*), or the Court depending on the case, orders the examination of judicially appointed expert witnesses, when requested by the parties, unless he or she makes such an order on its own initiative.

**5.5.2**     The pre-trial judge (*conseiller de la mise en état*) or the Court, as the case may be, uses its discretion to grant requests for the examination of expert witnesses designated by the parties. In support of their requests, parties produce the report prepared by the specialist witness who they wish to hear, as well as his last name, first name and address.

**5.5.3**     Proceedings provided for in sections 5.4.2 to 5.4.6 above apply, to the extent relevant, to expert witnesses whose examination is organised.

**Article 6: Oral Proceedings**

**6.1.**     Oral proceedings are public, unless the Court decides otherwise pursuant to article 435 of the French Code of Civil Procedure.

**6.2.**     In order for the Court to decide upon the allocation of the costs and fees of the proceedings (frais et dépens), the Court shall ensure that the parties have the time to provide all relevant facts and data that they consider to be appropriate to support their requests.

**6.3.**     Upon conclusion of oral proceedings, and unless particular circumstances dictate otherwise, the Court shall declare the hearings closed and adjourn the decision on the date set by the procedural timetable.

**Article 7: Court's judgment**

The judgement of the Court shall be drafted in French accompanied with a sworn

translation in English.

**Article 8: <u>Entry into force</u>**

The present protocol applies to proceedings referred to the Court of Appeal from March 1st 2018.


Paris, _____ 2018

In two original copies

# EXHIBIT 5

# Doors open for First Hearing of International Chamber at Paris Court of Appeal

*Written by Duncan Fairgrieve (BIICL;Université de Paris Dauphine) and Solenn Le Tutour (avocat, Barreau de Paris)*

When the French Government announced in February this year plans to launch an "English" Commercial court in Paris, eyebrows were raised and, it is fair to say, an element of skepticism expressed in the common law world as to whether such a development would really prove to be a serious competitor to the Commercial Courts on Fetter Lane in London. In what some might say was an uncharacteristically pragmatic fashion, collective judicial sleeves in Paris were pulled up however and the project taken forward with some alacrity. With broad support from the legal and political class given what is seen as re-shuffling of cards post-Brexit, the project was accelerated to such an extent that the first hearing of the new Chamber took place yesterday afternoon. The Court, which is an International Chamber of the Paris Court of Appeal, will hear appeals from the international chamber of the first instance Commercial court in Paris which has been in operation – albeit rather discretely – for almost a decade.

Setting aside the PR and legal spin, the procedural innovations of the new International Chamber are in fact quite radical. The headline-grabbing change is of course the use of English. Proceedings can take place in languages other than French, including English, and indeed it has recently been confirmed by the Court that non-French lawyers will also be granted rights of audience to appear before the International Chamber, as long as accompanied by a lawyer called to the Paris Bar. This is of course a major change in a normally very traditional French institution, though it is interesting to note that written submissions and pleadings as well as the resultant judgments will be in French (and officially translated into English).

Case management is to be stream-lined as well. Gone will be the rather languorous meandering French appellate procedure and in will be ushered a new highly case-managed equivalent with the parties and judge settling a timetable at

the outset with fixed dates for filing written submissions, as well as – strikingly – the actual date of the ultimate judgment being set in stone, usually within 6 months of the first case-management hearing.

A minor revolution has also occurred in terms of the hearing. The approach will mean that the hearings will be more detailed, with the Court placing an emphasis on oral submissions, over and above the traditionally document-based approach where the judicial dossier takes precedence. There is even provision for the cross-examination of witnesses and experts during the hearing, something that rarely occurs in France outside the criminal arena.

Indications are also that there might even be a more fundamental change in the style of judicial judgments handed down by the International Chamber. At a recent seminar at the Paris Bar, the first judge assigned to the Chamber noted that there would be a deliberate attempt to ensure the judgments set out in more detail the reasoning of the Court, and a greater attention to legal certainty in terms of following previous case law – itself a very interesting potential shift in a legal system which has not traditionally adhered to any form of judicial precedent.

Some have also talked of allowing a more expansive approach to the judicially-sanctioned disclosure of documents – a simplified form of discovery where litigating parties are forced to communicate inconvenient files to the other side – which is all the more surprising as often lampooned by French commentators as one of the misdeeds of "American" style litigation.

Whilst this might not all add up to a complete judicial revolution, the changes in France are significant, and along with similar announcements in Amsterdam, Frankfurt, and Brussels, it is clear that there is an attempt across Europe – albeit only an attempt at this stage – to challenge the hegemony of English courts in international commercial litigation.

# Kluwer Arbitration Blog (http://arbitrationblog.kluwerarbitration.com/)

 (http://www.wolterskluwer.com)

𝗳 (https://www.facebook.com/wolterskluwer) 𝕏 (https://twitter.com/wolters_kluwer)

𝗶𝗻 (https://www.linkedin.com/company/wolters-kluwer) ▶ (https://www.youtube.com/user/WoltersKluwerComms) 🔍

COMMERCIAL COURT OF PARIS (HTTP://ARBITRATIONBLOG.KLUWERARBITRATION.COM/CATEGORY/COMMERCIAL-COURT-OF-PARIS/),
COMMERCIAL LAW (HTTP://ARBITRATIONBLOG.KLUWERARBITRATION.COM/CATEGORY/COMMERCIAL-LAW/),
FRANCE (HTTP://ARBITRATIONBLOG.KLUWERARBITRATION.COM/CATEGORY/FRANCE/),
SPECIALISED CHAMBER (HTTP://ARBITRATIONBLOG.KLUWERARBITRATION.COM/CATEGORY/SPECIALISED-CHAMBER/)

## Specialised Chambers for International Commercial Disputes: Paris in the Spotlight (http://arbitrationblog.kluwerarbitration.com/2018/02/14/specialised-chambers-international-commercial-disputes-paris-spotlight/)

Ioana Knoll-Tudor (http://arbitrationblog.kluwerarbitration.com/author/ioana-knoll-tudor/) (Jeantet (http://www.jeantet.fr/)) / February 14, 2018 (http://arbitrationblog.kluwerarbitration.com/2018/02/14/specialised-chambers-international-commercial-disputes-paris-spotlight/) / 1 Comment (http://arbitrationblog.kluwerarbitration.com/2018/02/14/specialised-chambers-international-commercial-disputes-paris-spotlight/#comments)
Jeantet (http://arbitrationblog.kluwerarbitration.com/arbitration/groups/?gID=894)

In 2010, the Commercial Court of Paris created a specialised international and European court chamber in order to judge all international complex commercial cases in the first instance. Although French procedural rules continue to apply before this court chamber, evidence and oral debates can take place in a foreign language, if the judges and the parties so agree. Judges of this special chamber are competent, both linguistically and substantially, to adjudicate complex international commercial cases. Parties cannot elect this special chamber to hear their dispute, they can only chose the Commercial Court of Paris as the competent jurisdiction. Once the dispute is submitted to the Commercial Court, it is distributed among the different court chambers. Disputes with an international character are more likely to be heard by the international chamber (although in practice it is difficult to predict if that will be the case). If the decision in first instance is appealed, the ordinary procedure designates the Paris Court of Appeal as competent to hear the case since no international chamber exists at the Court of Appeal.

**Background**

On 7 March 2017, the French Minister of Justice asked the High Legal Committee of the financial market of Paris (HLCP) to prepare a report on the opportunity of creating court chambers specialised in hearing international commercial litigation disputes within the Paris Court of Appeal.

This initiative aimed at increasing French jurisdictions' international visibility, especially for those businesses choosing London to solve their disputes. The success of the Commercial Court of London with foreign companies is a reality: **each year, 80% of the cases submitted have at least one foreign party and in almost 50% of these cases both parties are foreign companies (http://conflictoflaws.net/2017/the-justice-initiative-frankfurt-am-main-2017-law-made-in-frankfurt)**. Moreover, in the UK, the market of commercial litigation legal services, represented a total of 16 billion euros in 2016. The success of London in the field of commercial litigation is justified, among others, by the UK's access to the mechanisms of mutual recognition of awards among the Member States of the European Union. This access will certainly be modified once the UK will no longer be part of the EU.

**The report of the HLCP was rendered on 15 May 2017    (https://news.whitecase.com/email_handler.aspx?sid=b181a99c-2a8e-43d3-bf62-e216fe81a33a&redirect=https%3a%2f%2fnews.whitecase.com%2f60%2f10970%2fdownloads%2frapport-chambres-internationales.pdf)** and proposed the creation of specialised court chambers competent to judge all international commercial disputes, including the recourses against international arbitral awards.[1)]

The agreements creating an international court chamber within the Paris Court of Appeal (the « International Chamber ») have been signed on 7 February 2018 and define the procedure applicable before these specialised court chambers, both in first and second instance.

**What Are the Cases Judged by the International Chamber?**

The International Chamber will be competent for hearing appeals introduced against decisions rendered by the international court chamber of the Commercial Court of Paris, between a French and a foreign entity as well as between two foreign entities, or whenever a foreign law is applicable to the dispute.

The competence of these international court chambers should be automatic whenever at least one of the parties is a foreign entity or a foreign law is applicable to the dispute. If either of these two criteria is fulfilled, the contractual designation of the Commercial Court of Paris should be sufficient to have the case heard by these international court chambers. Parties can also make a specific reference to these court chambers in the contract.

**What Are the Particularities of the International Chamber?**

The creation of the International Chamber allows France to have two degrees of jurisdiction in front of which international commercial disputes can be heard according to adapted procedural rules, partly in English and by experienced and highly qualified judges.

- The use of English or of another foreign language during the procedure

In front of the International Chamber, in accordance with the agreement of the parties:
– all documentary evidence can be presented in the language chosen by the parties without need for a translation,
– witnesses, experts, parties and foreign lawyers will be able to intervene orally in the chosen language[2)],
– all procedural acts will be drafted in French,
– the award will be drafted in French, with a sworn translation in English.
The possibility to chose English in front of these court chambers will not only save time and expenses – because the parties will no longer have to produce sworn translations – but will also give access to a larger pool of international lawyers and experts.

- Qualified judges

The specialised court chambers will be composed of permanent judges, experienced in commercial, financial and economic cases, with a knowledge of the main foreign applicable laws but also able to use English during the procedures. In addition to these permanent judges, the possibility of having highly qualified part-time judges is currently under discussion.

- Adapted procedure

The procedure in front of the specialised courts will be shorter and more efficient, with, for example, time extensions more difficult to obtain than in front of ordinary courts. Judges will define procedural timetables in close cooperation with the parties and their representatives.

A large place will be given to testimonial evidence: witnesses and experts can be called to testify in court, to answer questions by the judges, and be cross-examined by the parties' counsels (which is currently not a common feature of French commercial litigation).

- Recognition and enforcement of French decisions

In the context of Brexit, the fact that France will continue to benefit from the automatic recognition and enforcement of the French decision in all Member States is an advantage. The UK's exit from the European Union will also mean that it will no longer be integrated in the EU legal system. In practice, all decisions rendered in London will have to be submitted to the exequatur procedures of each Member State, in order to be recognised and enforced.

- Start of the operations

The International Chamber will be operational as soon as its President and his/her two advisers will be appointed by the Superior Council of Magistrates. All procedures initiated after 1 March 2018 will be heard by the International Chamber.

- An increased choice of French law

The International Chamber will judge cases in which a foreign law is applicable to a dispute, but also cases in which French law has been chosen by the Parties, whenever at least one party is not French. The authorities expect that once these specialised court chambers become operational and popular with the Parties, French law will be chosen more frequently as the governing law of international contracts.

**Similar European Initiatives**

The French initiative to set up court chambers specialised in international commercial litigation in which English can be used is not unique. Similar projects are ongoing in different EU countries. The Irish bar is in talks with large solicitor firms in Dublin and the solicitors' professional body in order to see how to best market the Irish legal system abroad. In the Netherlands, the new Netherlands Commercial Court is due to open in 2018 with English and Dutch as the languages of the proceedings, specialised Dutch judges and effective and shorter proceedings. The Brussels International Business Court should be operational in 2018, with proceedings and judgements in English, no appeal possible and a procedure inspired by international arbitration. Finally, also in 2018, the regional court of Frankfurt will establish an English-speaking chamber for commercial matters, in front of which – if the parties so request – the dispute can be litigated in English. France hopes to benefit from the eminent place it already occupies in international arbitration and litigation. The ICC and its Arbitration Court are based in Paris and the only ICSID hearing facilities outside of Washington D.C. are in Paris. The market of legal services counts an important number of law firms offering strong international arbitration and litigation practices and court costs remain rather modest compared to the high quality of services delivered. The success of these different European specialised court chambers will depend on the procedural features offered to the Parties, but most importantly on the trends that will emerge from the case law and which will allow international litigators to make an informed choice.

# LEXOLOGY®

## The International Chambers of the Paris Courts: A Flexible and Efficient Approach to Resolve International Commercial Disputes

**France** | April 5 2019

The Paris courts feature international chambers ("International Chambers") that offer litigants attractive conditions for the resolution of their international commercial disputes:

- Inexpensive application fee (maximum €235)

- Possibility to produce exhibits and conduct oral debates in English

- Flexibility in the administration of evidence

The Paris International Chambers should be considered a first-rate alternative for international clients whose pending or future disputes do not appear suited for resolution by an arbitral tribunal or by the courts of states from which the parties originate.

Here is the standard jurisdiction clause for the Paris International Chambers:

> All disputes arising out of or relating to this contract, including issues relating to the performance, interpretation, validity, breach or termination thereof, shall be subject to the [exclusive] jurisdiction of the International Chamber of the Paris Court of First Instance (Tribunal de commerce de Paris), and all appeals from any decision of such court shall be subject to the [exclusive] jurisdiction of the International Chamber of the Paris Court of Appeals. The parties hereby unconditionally agree on the protocols which set out the terms pursuant to which the cases will be examined and adjudicated before these chambers.

The procedure before these International Chambers is set out in detail below.

On February 7, 2018, two international jurisdictions were set up within the Paris Commercial Court and the Paris Court of Appeal, following the adoption by the Paris Bar Association and the relevant courts of two protocols designed to offer litigants a set of innovative and flexible procedural rules for the resolution of their international commercial disputes.

The creation of these two international jurisdictions aims to confirm Paris as an attractive jurisdictional forum for foreign parties involved in disputes of an economic or commercial nature.

For that purpose, the protocols provide for an innovative application of French civil procedure rules that allows for more flexibility in the conduct of the proceedings, especially regarding the use of a foreign language, and places greater emphasis on evidence and oral testimonies, as prescribed under a common law approach.

In fact, many of the innovations brought about by the Protocols are already common practice in international arbitration.

**The International Chamber of the Paris Commercial Court (first instance court)**

Its composition and jurisdiction

The International Chamber of the Paris Commercial Court is composed of ten English-speaking judges who, because of their professional backgrounds as former company executives, have a thorough understanding of commercial and financial issues.

This chamber has jurisdiction to hear disputes of an economic and commercial nature with an international dimension and disputes that are governed by provisions of European law or foreign law.

More specifically, it has jurisdiction to hear disputes regarding international commercial contracts and the termination of commercial relationships, transportations, unfair competition, and actions for damages arising from anti-competitive practices, as well as disputes related to transactions on financial instruments and products.

The International Chamber of the Paris Commercial Court's jurisdiction may derive from a contractual clause that broadly refers to the Paris courts as the competent jurisdictions. However, parties can also choose to specifically refer to the sole jurisdiction of the International Chamber of the Paris Commercial Court in their contract (see standard clause above).

Its procedural rules

For the sake of efficiency, the proceedings before the International Chamber of the Paris Commercial Court are organized in close cooperation with the parties.

During a preliminary hearing, the parties may submit to the pre-trial judge a certain number of requests regarding the conduct of the proceedings, such as requests to hear witnesses or experts or requests for mandatory production of documents held by a party or third party. The pre-trial judge may then establish a procedural timetable in accordance with these requests and in agreement with the parties (Article 3).

The parties are thus entitled to debate before the pre-trial judge and agree beforehand on some pre-trial procedural matters, such as:

- The language used during the proceedings

- The translation of exhibits and oral debates

- The administration of evidence

- The calendar of the proceedings

*The language used during the proceedings* (Article 2): Although all procedural documents (i.e., writ of summons, submissions) must be drafted in French, parties may produce exhibits in English without having to provide any translation, which will save time and expenses.

In addition, the protocol provides that the parties, witnesses, technical specialists (including experts), and foreign counsels—provided that the latter are qualified to plead before this tribunal—may speak and argue in English.

*The translation of exhibits and oral debates* (Article 6): The protocol addresses the various issues that could arise with respect to the translation of exhibits and oral debates:

- Although it should be recalled that exhibits in English may be disclosed without any translation, exhibits produced in any other languages require a translation. In this respect, the protocol provides that if one of

Case 1:20-cv-01793-RGA Document 37-1 Filed 02/22/21 Page 48 of 161 PageID #: 792

the parties challenges the translation of an exhibit disclosed by the other party, the pre-trial judge may order a sworn translation of this exhibit at the expense (advanced costs) of the party he chooses.

- Oral debates can take place in English. Debates taking place in French, including any expert or witness testimonies, may be subject to a simultaneous translation for the convenience of one of the parties and with costs advanced by that party. In such a case, the translator will be appointed by the tribunal upon the advice of the party requesting such translation.

- Should a party, its counsel, an expert, or a witness wish to speak in a foreign language (i.e., other than French), a simultaneous translation may be arranged at one of the parties' request. The translator should be appointed by mutual agreement of the parties, such appointment being at the expense (advanced costs) of the party who wishes to speak in a foreign language. If the parties fail to agree on a translator, the latter will be appointed by the pre-trial judge.

Additionally, even though the protocol does not provide for it, the parties may agree on resorting to a stenographer, at their expense.

It should also be noted that the tribunal's decision or the pre-trial judge's orders are delivered with a copy of a sworn English translation, which the tribunal's clerk undertakes to provide and the cost of which is included in the cost of the proceedings.

*The administration of evidence* (Article 4): Inspired by the common law procedure, the protocol places great emphasis on evidence and provides parties with various procedural tools to secure evidence:

- Requests for mandatory production of documents held by a party or by a third party

- Parties' oral testimonies

- Third parties' written statements

- Witnesses' testimonies

- Experts' testimonies

The pre-trial judge may order ex officio, or at a party's request, that a witness, party, or expert be called to testify. Witness and expert hearings shall take place on the basis of a written statement from them that may be typed. If a witness or expert has a legitimate reason not to attend the hearing, his or her written statement may still be considered by the judge. If not, the judge may draw adverse inferences from his or her absence. Each party will ensure that witnesses or experts requested to attend the hearing are given sufficient notice and will advance any of those witnesses' or experts' costs.

The pre-trial judge carries out the hearing of parties, witnesses, or experts by asking any questions he or she deems relevant about all the legally admissible factual evidence. Based on the common law procedure of witness examination and cross-examination by the opposing counsel, the protocol also provides that the parties, witnesses, or experts may be invited by the pre-trial judge to answer questions that the parties wish to ask them. Decisions rendered in the first instance by the International Chamber of the Paris Commercial Court may then be appealed before the International Chamber of the Paris Court of Appeal.

**The International Chamber of the Paris Court of Appeal**

Its composition and jurisdiction

Case 1:20-cv-01793-RGA Document 37-1 Filed 02/22/21 Page 49 of 161 PageID #: 793

The new International Chamber of the Paris Court of Appeal is composed of panels of three English-speaking judges who have prior experience in adjudicating international commercial disputes.

Just like the International Chamber of the Paris Commercial Court, it has jurisdiction to hear disputes of an economic and commercial nature with an international dimension. In fact, it is the appellate jurisdiction for decisions rendered in the first instance by the International Chamber of the Paris Commercial Court.

This chamber also has jurisdiction to adjudicate disputes regarding international arbitration, such as appeals and actions to set aside arbitral awards rendered in Paris and appeals regarding the recognition or enforcement of an international arbitration award made in France or abroad (Article 1).

Its jurisdiction may derive from a contractual clause that broadly refers to the Paris courts as the competent jurisdiction. However, parties can also choose to specifically refer to the jurisdiction of the International Chamber of the Paris Court of Appeal in their contract (see example of contractual clause above).

Its procedural rules

The procedural rules concerning the language used during the proceedings, the translation of exhibits and oral debates, and the administration of evidence are identical to those outlined above, which govern the proceedings before the International Chamber of the Paris Commercial Court.

However, greater emphasis is placed before this chamber on the preliminary phase designed to coordinate pre-trial procedural matters before the case is heard by the court. Such a preliminary phase is conducted by a pre-trial judge (referred to as the "Conseiller de la mise en état") and requires at least three procedural hearings:

1. The first hearing aims at securing the parties' agreement that the dispute be heard and adjudicated in accordance with the procedural rules laid down in the February 7, 2018 Protocol;

2. During a second procedural hearing, which takes place once the pre-trial judge has reviewed the initial briefs filed by the claimant and respondent, the parties may submit requests for witnesses' or experts' examination. After having ruled on these requests, the pre-trial judge establishes a procedural timetable; and

3. The pre-trial judge then summons the parties to a final procedural hearing, the purpose of which is to organize the oral phase of the trial and, in particular, discuss the translation measures that should be implemented.

Although similar international chambers have been recently set up in other European Union ("EU") jurisdictions, such as Brussels, Amsterdam, and Frankfurt, the International Chambers should stand out since they offer litigants a double degree of jurisdiction—the International Chamber of the Paris Court of Appeal being the only appellate jurisdiction in the EU for international commercial matters—and at a particularly low cost, with a maximum application fee of €235.

These two new International Chambers should also benefit from the prominent position that Paris already holds in international arbitration.

**K&L Gates LLP** - Valence Borgia and Claire Morat-Levrin

Powered by

LEXOLOGY.

ELAWS REVIEWS

# The International Arbitration Review: France

[Valentine Chessa](), [Marina Matousekova]() and [Nataliya Barysheva]()

*[Castaldi Mourre & Partners]()*

03 August 2020

## Introduction

French arbitration law is codified under Articles 1442 to 1527 of the French Code of Civil Procedure (CCP) reformed by Decree No. 2011-48 of 13 January 2011. French law provides for a dualistic approach separating domestic and international arbitration. Provisions on international arbitration are embodied under Articles 1504 to 1527 CCP. Article 1506 CCP sets forth several articles related to domestic arbitration that are also applicable to international arbitration.

French law on international arbitration provides for no specific formal requirement in relation to arbitration agreements. French law affirms both the positive and negative effects of the compétence-compétence principle: arbitral tribunals have exclusive jurisdiction to rule on objections to their jurisdiction; and when a dispute subject to an arbitration agreement is brought before a court, such court shall decline jurisdiction, except if an arbitral tribunal has not yet been seized of the dispute and if the arbitration agreement is manifestly void or manifestly not applicable.

French courts have the power to assist arbitration during the constitution of an arbitral tribunal through the supporting judge both in the taking of evidence and by ordering interim measures.

The confidentiality provisions are only applicable to domestic arbitration; they do not apply to international arbitration. Hence, if parties want to make sure that their proceedings remain confidential, they have to make an express provision to that effect.

Disputes related to arbitration at the setting aside stage are submitted to the Paris Court of Appeal. The time limit to submit an application to set aside an award rendered in France is one month from the service (signification), unless otherwise agreed by the parties. An award may be set aside on the basis of one of the following grounds:

a. the arbitral tribunal wrongly upheld or declined jurisdiction;

b. the arbitral tribunal was not properly constituted;

c. the arbitral tribunal ruled without complying with the mandate conferred upon it; due process was violated; or

d. recognition or enforcement of the award is contrary to international public policy.

The enforcement of international arbitral awards is sought before the Tribunal judiciaire for awards rendered abroad or in Paris.

The parties can also apply for the revision of an award before the arbitral tribunal.

Historically, French courts have adopted a pro-arbitration stance significantly contributing to the evolution and codification of law and practice with their profuse jurisprudence. Therefore, France is traditionally considered to be one of the most-preferred places for arbitration. However, as explained in the previous edition and below, some recent trends in case law might have brought about a change to this state of things.

The International Court of Arbitration of the International Chamber of Commerce is based in Paris, which means that disputes between parties and the institution are submitted to the French local courts.

The local arbitration institutions include, among others, the Centre of Mediation and Arbitration of Paris, the French Arbitration Association and the International Arbitration Chamber of Paris.

## The year in review

### i   Developments affecting international arbitration

The French system has witnessed recent modifications to the definition of the arbitration agreement, as well as the introduction of provisions related to the immunity of assets of foreign states in France that set a requirement of a prior court authorisation, and a limited number of cases in which it can be granted, to enforce or take interim measures against the property of foreign states.

As explained in the previous edition, 2018 was particularly marked by the creation of the International Chamber of the Paris Court of Appeal (CICAP). The CICAP was set up to hear international trade disputes, which include cases related to international arbitration. The CICAP also has jurisdiction to hear appeals of decisions of the International Chamber of the Paris Commercial Court in the first instance. The procedure before this new Chamber is tailored to be adapted to international commerce and to improve the efficiency of proceedings. Thus, exhibits can be submitted without being translated into French and pleadings can be conducted in English. There is also the possibility to hear witnesses and experts in English. However, parties' submissions are still to be drafted in French. While cases related to set aside proceedings and enforcement proceedings were traditionally allocated to the Paris Court of Appeal Pole 1 Chamber 1, as of March 2018, it appears that new cases in these matters are systematically referred to the CICAP (Pole 5 Chamber 16). 2019 was marked by the first decisions rendered by the CICAP.

**Arbitration developments in local courts**

Judicial activity in France was greatly affected by the covid-19 pandemic in the first semester of 2020. Hearings and the issuances of judgments scheduled before 11 May 2020 before the Paris Court of Appeal in set aside proceedings and appeals on recognition and enforcement matters have been postponed. The affected cases are yet to be rescheduled, from September 2020 onwards. Consequently, the total number of decisions rendered in 2020 will drop significantly.

**Jurisdiction and admissibility of claims**

Jurisdiction is one of the five grounds under Article 1520 CCP to set aside an arbitral award in France.

One of the first decisions of the newly established CICAP concerned the ground of jurisdiction and more specifically the issue of the enforceability of arbitration agreements. The dispute originated in a business relationship dating back to the 1980s between a German company and a French company for the distribution of seeds in France. The French company brought an action before the Paris Court of Appeal, and the defendant raised jurisdictional objections. The question before the Court was whether the arbitration clause stipulated in Article 87.1 of the Rules and Practices of the International Seed Federation, which were referenced in the confirmations of the company's orders, was binding on the French company. Since the orders' confirmations systematically referred to the Rules and Practices of the Federation, a custom that could not be ignored by the French company having been a professional in the field in question for over 30 years, the Court found that it was bound by the arbitration clause incorporated 'by reference'. The Court subsequently recalled that, under Articles 1448 and 1506 of the CCP, in the absence of a finding of the manifest invalidity or unenforceability of an arbitration clause, it is for the arbitrators alone to rule on their own jurisdiction. Here, the existence of a dispute as to the whether the clause required the parties to go to arbitration or simply gave them the faculty to do so did not constitute a ground of manifest nullity or inapplicability of the clause; thus, the Court had no jurisdiction to interpret the clause and concluded that the case fell within the jurisdiction of an arbitral tribunal.

**Independence and impartiality of arbitrators**

The grounds of independence and impartiality of arbitrators were thoroughly considered in the previous edition. In particular, the requirement of prompt disclosure by arbitrators of any circumstance of such nature as to affect their independence or impartiality was extensively discussed in the Court of Appeal decision of 27 March 2018 in the *Audi Volkswagen* case. The case concerned agreements for the distribution of Audi and Volkswagen vehicles and spare parts by the Qatari company, as well as other related customer services. The Paris Court of Appeal set aside the ICC award on the basis that the arbitral tribunal was not properly constituted, since the arbitrator had failed to disclose existing links between his legal firm and entities of the Volkswagen group, these circumstances being

likely to create a reasonable doubt as to his independence and impartiality. If the services rendered by the arbitrator's firm in the past were considered a well-known fact, which was accessible to the parties at the start of the proceedings, it cannot reasonably be imposed on the parties to continue to research and monitor all publicly available information likely to concern the arbitrator. Accordingly, the arbitrator should have disclosed such information in the course of the proceedings. On 3 October 2019, the French Court of Cassation upheld the Court of Appeal decision. The Court confirmed that, although arbitrators have a general duty to disclose any circumstance that is likely to affect their independence or impartiality, they have no obligation to disclose notorious facts at the beginning of an arbitration (as those notorious facts can easily be retrieved by the parties themselves). The Court then established that, nonetheless, arbitrators have the duty to inform the parties of any fact or circumstance occurring during the course of proceedings, even if notorious, which is likely to affect their independence or impartiality. The Court of Cassation, in line with the traditional strict and subjective standard imposed on arbitrators in assessing their duty of disclosure, hence, confirmed Court of Appeal's reasoning as regards the restriction introduced to the notorious facts exception to an arbitrator's duty of disclosure, which places a further burden on arbitrators to update their disclosures during the course of an arbitration.

The CICAP also issued a decision in early 2020 on grounds of the independence and impartiality of arbitrators regarding the scope of arbitrators' duty of disclosure of any circumstance of such nature as to affect their independence or impartiality. The case dealt with a dispute between three Brazilian companies parties to an offshore oil exploitation consortium in Brazil governed by a joint operating agreement (JOA) that led to the exclusion of one of the consortium members and prevented it from selling its stake in the JOA. The excluded member initiated arbitration in Paris under the aegis of the LCIA to challenge the validity of the JOA's clauses and obtain compensation for the damage suffered. On 24 September 2018, the arbitral tribunal rendered a Phase I award. On 2 November 2018, a new lawyer was added to the team of one of the defendants, which resulted in an actualisation of the arbitrators' declaration of independence, revealing new information. After an unsuccessful challenge of one of the arbitrators, the claimant brought an action to set aside the arbitral award on the ground that the arbitrator chosen by one of the defendants failed to disclose personal links with a law firm that had as its client the majority shareholder of that party, and that this omission was such as to cast doubt on the arbitrator's independence and impartiality from the standpoint of a reasonable observer. The defendant argued that such links constituted notorious facts that the arbitrator had no obligation to disclose.

The Court of Appeal had to consider whether the information at stake could be considered notorious and, if not, whether the undisclosed links did amount to a lack of independence and impartiality. First, the Court of

Appeal held, on a circumstantial assessment of the facts, that the information was accessible only after a careful review and consultation of the arbitrator's website, requiring, for instance, the opening of several links before the law firm in question could be cited. These several successive operations were similar to investigative measures, which excluded the notion that the information be considered easily accessible and, accordingly, notorious. Therefore, the arbitrator should have revealed those links in his statement. However, the Court of Appeal then found that the undisclosed information was not such as to cast reasonable doubt in the parties' minds as to the arbitrator's independence and impartiality since it had no impact on the outcome of the case. While the relationship had ceased two-and-a-half years before the commencement of the arbitration, and this could not be considered a sufficient period of time to overcome the duty of disclosure, there was no objective evidence that the arbitrator's activity had given rise to any material, intellectual or business relationship between the defendant's shareholder and the arbitrator. As a result, the arbitrator's omission did not, on the facts, constitute sufficient ground for annulment of the award.

**Compliance with the mandate**

Violation of the mandate is another ground under Article 1520 CCP to set aside an arbitral award in France.

A case rendered by the CICAP last year dealt with the issue of breach of the arbitrator's mandate, in particular when interpreting the law applicable to the merits of the case. On 14 December 2007 and 21 January 2008, the Democratic Republic of Congo (DRC) entered into contracts for the sharing of production of hydrocarbon resources with a consortium of South African companies. Divine Inspiration Group Ltd, one of the consortium members, initiated arbitration proceedings against the DRC since the contracts had not been approved by the President of the DRC. On 7 November 2018, the arbitral tribunal ordered the DRC to pay compensation for the damage suffered by the claimant. Upon the DRC's application, the case was referred to the Paris Court of Appeal on the ground that the arbitral tribunal had breached its mandate, in violation of Article 1520 3° CCP, by failing to apply the case law of the Congolese Supreme Court that interpreted the Congolese Constitution as conferring discretionary power to the President in the approval of oil production contracts. The Court ruled out the action for annulment by considering that the arbitral tribunal had rightfully ruled on the grounds of the applicable law to the contracts, and considered and interpreted the case law. Hence, according to the Court, the arbitral tribunal did not depart from its mandate engaging in this interpretation. In other words, it is not for the Court of Appeal to assess the application of the law by an arbitral tribunal. By doing so, it would engage in a revision on the merits of the award, which is not permitted under French law.

**International public policy**

**Enforcement of international arbitral awards**

International public policy has probably been one of the most debated grounds for setting aside in recent years. In the previous edition, it was extensively discussed due to the notable decisions in the *Belokon, MK Group, Democratic Republic of Congo* and *Alstom* cases. The decisions rendered since then by the Paris Court of Appeal on the ground of international public policy are in line with the previous case law.

There were important developments concerning the *Alstom* case, dealing with the dispute between Alstom Transport SA, Alstom Network UK Ltd (collectively, Alstom) and the Hong Kong consulting company, Alexander Brothers Ltd (ABL), in relation to three contracts in the railway sector in China that were eventually awarded to Alstom. In December 2013, ABL initiated arbitration proceedings against Alstom in Geneva to obtain payment of outstanding amounts under the contracts, pursuant to the ICC arbitration clause contained in the contracts. Following the award issued in January 2016 ordering Alstom to pay the outstanding amounts, plus interest and costs, the latter filed a set aside application on the ground of corruption before the Federal Court of Lausanne, which was dismissed, as well as an application to annul the exequatur obtained in France by ABL before the Paris Court of Appeal. In the first decision dated 10 April 2018, the Court of Appeal set out a list of red flags to be considered to prove the existence of corruption. Considering that the parties had not had the opportunity to discuss these elements, the Court ordered the reopening of the proceedings and compelled the production of relevant evidence by Alstom, inviting the parties to discuss the existence of a contract procured by corruption. At the outset, the Court of Appeal considered that it had the power to investigate all factual and legal elements necessary to determine whether recognition or enforcement of an award would violate international public policy in a manifest, effective and concrete way, and in doing so, that it is bound neither by the findings of an arbitral tribunal nor by the applicable law chosen by the parties. Moreover, the Court of Appeal considered that it was not concerned with whether the contractual provisions, and particularly the compliance rules, had been correctly performed, a question which fell outside the scope of control of the enforcement judge. The Court of Appeal carried out a detailed red flags analysis on the basis of the evidence produced, and concluded that there were serious, precise and consistent indications that ABL, without its knowledge, was involved in corruption activities of public officials which is prohibited as a matter of international public policy. In particular, the Court of Appeal took into account that both the Minister of Railways and the Deputy Chief Engineer of that Ministry were sentenced to life imprisonment at that time, and information that Alstom acknowledged under the 2013 and 2014 agreements with the US Department of Justice having been involved in some corrupt practices. The Court of Appeal went on to refuse the enforcement of the award on the ground that it infringed the French conception of international public policy, thereby confirming its proactive approach to corruption and increasing control over arbitral awards when corruption allegations are put forward by the parties.

**Investor–state disputes**

Another interesting decision on this ground of annulment concerned the recognition and enforcement in France of international arbitral awards that have been previously annulled in their country of origin. The case at hand originated in a dispute between the Egyptian national gas company, NATGAS, and the public entity in charge of gas and oil activities, named the Egyptian General Petroleum Corporation (EGPC), concerning a natural gas supply contract in Egypt. Following an arbitration application by NATGAS before the Regional Commercial Arbitration Centre in Cairo pursuant to the arbitration clause in the contract, the arbitral tribunal issued an award on 12 September 2009 ordering EGPC to pay compensation for the damage suffered by the claimant. NATGAS had obtained the exequatur of the award in France on 19 May 2010, but the award was subsequently annulled in Egypt on 27 May 2010 on the ground that the arbitration clause did not receive ministerial approval in violation of Egyptian public policy. An appeal against the exequatur was filed by EGCP leading to several successive proceedings before the French courts. In the decision under scrutiny, the Paris Court of Appeal, to which the case was referred for a third judgment, maintained the decision to grant the exequatur. After recalling that French provisions on recognition of arbitral awards shall apply to both domestic and international arbitral awards issued abroad, the Court of Appeal qualified the current arbitration as international on the ground that the transaction had implications that were not limited to Egypt (a foreign shareholder of NATGAS was involved in the contract as a technical partner, and an Italian bank as well as Italian suppliers were involved in the financing of the project). Therefore, Egyptian public policy cannot prevent the enforcement of an arbitral award in France. Moreover, the annulment of the award in Egypt was irrelevant since, pursuant to Article VII, 1 of the New York Convention and French case law, the annulment of an arbitral award at the place of the arbitration does not constitute a ground for refusing the recognition and enforcement in France of a foreign award. This issue has given rise to an extremely divisive debate since the famous *Putrabali* case, and even before. However, it is to be noted that the decision taken by the Paris Court of Appeal on 21 May 2019 deals with a slightly different situation as both parties were Egyptian entities, the contract was to be performed in Egypt, Egyptian law was applicable to the merits, the place of the arbitration was in Egypt and the case was administered by a an Egyptian institution.

As mentioned above, the French legislator introduced new provisions on the immunity of foreign states. A decision of the Court of Cassation of 10 January 2018 ruled that, notwithstanding the fact that the new provisions do not apply to enforcement measures made prior to their entry into force, they should nevertheless be taken into account.

A first noteworthy decision was rendered by the CICAP following a request for stay of enforcement lodged by a foreign state. The case originates from the arbitration proceedings based on the bilateral investment treaty (BIT) of 27 November 1998 concluded between the Russian Federation and Ukraine. Russia brought an action for annulment of the arbitral award of 26

November 2018 and requested from the pre-trial judge a stay of enforcement of the award under Article 1526 CCP, claiming there was a risk that enforcement attempts in various countries that do not guarantee adequate protection of its state immunity from execution would harm its rights. The Court of Appeal recalled that, under Article 1526 2° CCP, the benefit of a stay or adjustment of the enforcement of an award should be subject to a strict case-by-case assessment of the seriousness of the damage to rights, which the enforcement of an award was likely to cause, and that such risk must be sufficiently characterised on the day on which the court rules. The Court of Appeal then dismissed Russia's request, considering that the circumstance that enforcement proceedings could possibly be initiated did not constitute a relevant ground for ruling in favour of the stay of enforcement. Nor did the alleged absence of a state immunity's sufficient protection by certain foreign laws constitute a relevant ground: the merits of this alleged risk depend on the assessment of the circumstances of enforcement under the applicable foreign law in that country, which falls under the exclusive jurisdiction of the foreign judge where enforcement is sought. Finally, the Court of Appeal found that it was not established that the enforcement of the award was of such nature as to jeopardise the financial sustainability of the Russian Federation, in relation to the amount of the pecuniary convictions, and that the risk of the non-refunding of the payment of damages in the case of annulment of the award was not established.

A recent decision of the Paris Court of Appeal Pole 1 - Chamber 1 clarified, under a step-by-step approach, the scope of sovereign immunity from execution for state entities in relation to a state's diplomatic assets. The case under scrutiny arose from an award rendered on 22 March 2013 under the aegis of the Cairo Regional Centre for International Commercial Arbitration between Mohammed Abdel Mohsen Al-Kharafi (Al-Kharafi), a Kuwaiti company, and the Libyan government, which had concluded a rental contract as part of a large-scale tourism project in Tripoli. The Kuwaiti company sought enforcement of the award in France. The French courts issued an order of exequatur of the award and, pursuant to these decisions, Al-Kharafi had several enforcement measures carried out against the assets of the Libyan Investment Authority (LIA), and its wholly owned subsidiary, the Libyan Arab Foreign Investment Company (Lafico). On 11 October 2013, the LIA and it subsidiary challenged the enforcement measures before the former Tribunal de Grande Instance of Paris, which finally ordered their release on 10 July 2018 on the grounds that the Libyan state had not made an express and special waiver of its immunity from execution. Upon Al-Kharafi's application, the case was referred to the Paris Court of Appeal, which had to decide whether (1) the state wealth funds qualified as Libyan state entities, and accordingly were entitled to sovereign immunity from execution, and (2) if so, whether the Libyan state had waived its immunity, or (3) in the absence of a waiver, whether the seized assets were allocated and supposed to be used for non-commercial public service purposes and somehow linked to the party in the arbitration, which would thus be covered by the benefit of the immunity.

At the outset, the Court of Appeal specified that the new provisions on immunity from execution issued under the Law No. 2016-1961 (see above) shall be taken into account by the Court of Appeal even if not *ratione temporis* applicable to the proceedings at hand, thus confirming the above-mentioned approach of the French Court of Cassation. Following a circumstantial analysis, the Court of Appeal then decided that the LIA, and its subsidiary Lafico, qualified as state entities on the ground that they lacked the necessary organisational independence from the Libyan government. Consequently, they were in principle entitled to sovereign immunity from execution. However, the Court of Appeal considered that the immunity from execution was waived concerning the seized assets. Such waiver should be express but not necessarily specific. In addition, the seized assets did not fulfil a twofold condition as to their nature. On the one hand, the assets were clearly linked with the entity against which the action was brought since they belonged to such state entity. On the other hand, because they were financial products and sums of money deposited in a commercial bank, the assets were specifically used or intended to be used by the state for purposes other than non-commercial public service purposes. The Paris Court of Appeal consequently upheld Al-Kharafi's appeal and authorised enforcement over the targeted assets.

France has ratified 115 BITs. Following the CJEU's *Achmea* decision, which ruled that intra-EU BITs were incompatible with EU law, and a declaration of the Member States of 15 January 2019, 23 Member States, including France, signed an agreement on 5 May 2020 for the termination of intra-EU BITs concluded to date (termination agreement). The termination agreement lists the BITs terminated. It also provides that the sunset clauses contained in intra-EU BITs are terminated and are devoid of legal effect, and arbitration clauses contained in the affected intra-EU BITs with a date of commencement of 1 January 2007 are void and inapplicable. Concluded investment treaty arbitrations proceedings are not prejudiced by the termination agreement; nor are affected agreements to settle a dispute amicably that are subject to arbitration proceedings initiated prior to 6 March 2018. However, pending disputes between an investor and a Member State shall be resolved via 'structured dialogue' overseen by an impartial facilitator within six months from the termination of the BIT in question or by bringing proceedings in national courts and invoking national judicial remedies. The termination agreement will come into force 30 days after the date of deposit of its instrument of ratification, approval or acceptance for each party. It remains to be seen whether the framework provided by the termination agreement proves to be practical, in particular concerning the structured dialogue option, and thus offers a satisfactory legal protection to EU investors making an investment in another Member State.

In 2019, no ICSID proceedings were initiated against France, and only one case has been initiated by a French investor against Croatia.

This year, case law developments particularly concern the jurisdiction of arbitral tribunals in investment arbitration disputes.

A first noteworthy decision concerned the Paris Court of Appeal's referral to the European Court of Justice for clarification of the notion of investment under the Energy Charter Treaty (ECT). The facts of the case originated in a long-running dispute in relation to agreements between Energoalians (subsequently Komstroy), a Ukrainian company, and a Moldavian public company, under which Energoalians was to supply electricity to the latter through an intermediary company, Derimen. Having failed to pay the intermediary contract, the Moldavian company's debt was contractually assigned to Energoalians, which initiated arbitration proceedings to obtain payment of the debt. An award issued in Paris in 2013 on the basis of the ECT condemned the state to pay compensation to the Ukrainian investor. In its decision dated 12 April 2016, the Paris Court of Appeal Pole 1 - Chamber 1 set aside the award on the ground that the tribunal had wrongfully upheld its jurisdiction, given that the debt in this case could not constitute an investment within the meaning of the ECT. The decision having been quashed by the French Court of Cassation, the question was sent back to the lower courts. Hearing the case once again, the Court of Appeal, by a judgment of 24 September 2019, decided to stay the proceedings and refer three questions for preliminary ruling to the CJEU on the interpretation of the notion of investment under the ECT, which, pursuant to Article 26(1) ECT, is relevant in ascertaining the jurisdiction of the arbitral tribunal. In fact, the Court considered that since the ECT was an international agreement concluded between the EU (and its Member States), and thus third states fell within the category of 'acts of the institutions' of the Union, the CJEU had jurisdiction to interpret its provisions under Article 267 TFEU. The awaited CJEU decision shall have a significant impact on the scope of future ECT-based investment arbitration proceedings, should the CJEU accept its jurisdiction to hear the matter.

Another decision worth reporting was rendered in the context of set aside proceedings related to an investment arbitration award against the Republic of Poland. The facts of the case date back to 1994 when the claimants, an American citizen and two American companies, Schooner Capital LLC and Atlantic Investment Partners LLC, acquired shares in three Polish companies. They later formed a Polish company to collect commissions paid by the three Polish companies for management services. Following tax controls by the Polish tax authorities on the reality of the services, tax adjustments were ordered that led to one of the Polish companies going bankrupt in 2003. The claimants brought arbitration proceedings against Poland based on an alleged violation of the BIT concluded between the United States and Poland. In an arbitral award rendered on 17 November 2015, the tribunal declared it had no jurisdiction, as the dispute concerned tax issues rather than the performance of the investment contract. An action to set aside the award was filed before the Paris Court of Appeal, in particular on the ground that the arbitral tribunal had wrongly denied its jurisdiction, since Poland did not act in good faith when exercising its tax adjustment, and breached the mission entrusted to it by failing to declare itself competent on the basis of the BIT's most-favoured-nation clause. However, these objections had not been invoked by

the claimants before the arbitral tribunal during the arbitration proceedings. By a decision dated 2 April 2019, the Paris Court of Appeal refused to set aside the arbitral award. In particular, the Court held that the claimants' arguments were inadmissible because they had not been raised in the course of the arbitration. Notably, the Court held for the first time that Article 1466 of the French CCP, which provides that 'a party which, knowingly and without a legitimate reason, fails to object to an irregularity before the arbitral tribunal in a timely manner shall be deemed to have waived its right to avail itself of such irregularity', is not limited to procedural irregularities, but also applies to irregularities or arguments on the merits of a case that could have been raised in an arbitration. The Court specified that the only exception concerns substantive international public policy-based objections, which can always be raised during annulment proceedings.

## Outlook and conclusions

The year under review was marked by the first decisions rendered by the CICAP, which is hearing set aside applications and appeals over exequatur decisions. The decisions of the International Chamber of the Paris Court of Appeal seem so far to be in line with the previously established case law. It remains to be seen whether the decisions of the new chamber on issues such as corruption and fraud will follow the dominant approach in favour of judicial intervention.

The year under review was also affected by the covid-19 pandemic. However, the real impact of the pandemic on judicial activity within the framework of the setting aside, recognition and enforcement of proceedings remains to be seen.

Valentine Chessa

Author

vchessa@castaldipartners.com

| View full biography |
| --- |

Marina Matousekova

Author

mmatousekova@castaldipartners.com

| View full biography |
| --- |

Nataliya Barysheva

Author

nbarysheva@castaldipartners.com

| View full biography |
| --- |

| **Buy this book** |
| --- |

*Get more from TLR*

*Sign up to our email alert*

**Sign up**

# EXHIBIT 6

# FRENCH INTERNATIONAL ARBITRATION LAW REPORTS

# 1963 – 2007

## Thomas Clay
## Philippe Pinsolle
*General Editors*

## Thomas Voisin
*Assistant Editor*

**JURIS**

Éléments sous droits d'auteur

**Questions About This Publication**

For assistance with shipments, billing or other customer service
matters, please call our Customer Services Department at:

1-631-350-2100

To obtain a copy of this book, call our Sales Department:

1-631-351-5430
Fax: 1-631-351-5712

Toll Free Order Line:

1-800-887-4064 (United States & Canada)

See our web page about this book:
www.arbitrationlaw.com

COPYRIGHT 2014

by JurisNet, LLC

———————————

All Rights Reserved
Printed in the United States of America
ISBN: 978-1-937518-37-0
ISSN: 2161-2277

JurisNet, LLC
71 New Street
Huntington, New York 11743
USA
www.arbitrationlaw.com

Éléments sous droits d'auteur

*COUR DE CASSATION*, FIRST CIVIL CHAMBER
6 January 1987
Appeal Denied.
Petition No. 84-17274
Mr. Fabre, Presiding judge
Mr. Ponsard, Judge
Mr. Charbonnier, Advocate General
Counsel, SCP Lyon-Caen, Fabiani and Liard and SCP Boré et
Xavier, counsel

| ORIGINAL | TRANSLATION |
|---|---|
| REPUBLIQUE FRANCAISE | REPUBLIC OF FRANCE |
| AU NOM DU PEUPLE FRANÇAIS | ON BEHALF OF THE FRENCH PEOPLE |

Attendu, selon les énonciations de l'arrêt attaqué (Paris, 12 juillet 1984), que la Southern Pacific Properties Ltd (SPP) et la Southern Pacific Properties (Middle East) Ltd (SPPME), sociétés dont le siège est à Hong-Kong, ont, le 12 décembre 1974, signé un contrat avec un organisme public égyptien, Egyptian General Organization for Tourism and Hotels (EGOTH), en vue de la création de deux centres touristiques, dont l'un situé à proximité du site des pyramides de Gizeh, contrat portant, outre la signature des parties, celle du ministre égyptien du tourisme, précédée de la mention "approved, agreed and ratified" ; que par la suite, le plateau des pyramides fut classé par l'autorité administrative compétente dans le domaine public des antiquités, ce qui entraîna l'arrêt des travaux et l'annulation du projet ; .

Attendu que, se prévalant de la clause compromissoire inscrite au contrat, la SPP et la SPPME ont saisi la Cour d'arbitrage de la Chambre de commerce internationale (CCI) ; que l'acte de

Whereas, according to the findings of the challenged decision (Paris, 12 July 1984), Southern Pacific Properties Ltd (SPP) and Southern Pacific Properties (Middle East) Ltd (SPPME), having their headquarters in Hong Kong, entered into a contract on 12 December 1974 with an Egyptian public entity, Egyptian General Organization for Tourism and Hotels (EGOTH), with a view to create two tourist complexes, one of which was to be situated near the pyramids in Giza. The contract was signed by the parties as well as by the Egyptian Minister for Tourism, whose signature was preceded by the expression "approved, agreed and ratified". Later, the pyramids' plateau, as a site of antiquities, was declared by the authorities to be public property, which led to the suspension of the construction works and the termination of the project;

Whereas availing itself of the arbitration agreement included in the contract, SPP and SPPME petitioned the Court of Arbitration of the International Chamber of Commerce; the terms of references,

Éléments sous droits d'auteur

**FRENCH INTERNATIONAL ARBITRATION LAW REPORTS**

| ORIGINAL | TRANSLATION |
|---|---|
| mission, établi le 3 mai 1980 conformément au règlement de cette cour d'arbitrage, a précisé que le siège de l'arbitrage serait à Paris et a constaté les réserves expresses de la République d'Egypte au sujet de la compétence du tribunal arbitral ; que, cependant, par une sentence du 13 février 1983, ce tribunal a écarté l'exception soulevée et, mettant hors de cause EGOTH, a condamné la République d'Egypte à payer à la SPPME la somme de 12 500 000 dollars des Etats-Unis à titre de dommages-intérêts ; | drawn up on 3 May 1980 in compliance with the rules of the Court of Arbitration, specified that Paris would be the seat of the arbitration and noted the express reservations of Republic of Egypt regarding the arbitral tribunal's jurisdiction; however, by an award rendered on 13 February 1983, the tribunal ruled out the jurisdictional objection raised and, exonerating EGOTH from liability, order the Republic of Egypt to pay SPPME US\$ 12,500,000 in damages; Whereas the Court of Appeal, faced with a request to set aside an award on the grounds set out at Article 1504 of the New Code of Civil Procedure, as well as Article 1502 para. 1, of the same code, held that the award was rendered in the absence of an arbitration agreement with the Arab Republic of Egypt, and set aside the award; |
| Attendu que la cour d'appel, saisie du recours en annulation prévu par l'article 1504 du nouveau Code de procédure civile, combiné avec l'article 1502, 1°, du même Code, et retenant que la sentence avait été prononcée sans compromis à l'égard de la République arabe d'Egypte, a annulé cette sentence ; | |
| Sur le premier moyen : | On the first argument: |
| Attendu que la SPP et la SPPME soutiennent que la cour d'appel, saisie d'un recours en annulation fondé sur l'absence de convention d'arbitrage, ne pouvait contrôler que la violation ouverte ou la dénaturation de cette convention, la juridiction arbitrale restant souveraine pour interpréter celle-ci, et que ladite cour d'appel ne pouvait donc remettre en cause cette interprétation pour apprécier elle-même s'il avait été statué hors compromis ; | Whereas SPP and SPPME maintain that the Court of Appeal, hearing a request to set aside an award based on the absence of an arbitration agreement, could merely check whether there had been open breach or distortion of the arbitration agreement, the arbitral tribunal having nonetheless sole power to interpret it, and that said Court of Appeal could not call such interpretation into question in order to ascertain whether the tribunal had decided the dispute in the absence of an arbitration agreement; |
| Mais attendu que, si la mission de la cour d'appel, saisie en vertu des articles 1502 et 1504 du nouveau Code de | But whereas although the mandate of the Court of Appeal, seized on the basis of Articles 1502 and 1504 of the New |

Éléments sous droits d'auteur

*COUR DE CASSATION*, **FIRST CIVIL CHAMBER**
**6 January 1987**
**Appeal Denied.**
**Petition No. 84-17274**
**Mr. Fabre, Presiding judge**
**Mr. Ponsard, Judge**
**Mr. Charbonnier, Advocate General**
**Counsel, SCP Lyon-Caen, Fabiani and Liard and SCP Boré et Xavier, counsel**

| ORIGINAL | TRANSLATION |
|---|---|
| procédure civile, est limitée à l'examen des vices énumérés par ces textes, aucune limitation n'est apportée au pouvoir de cette juridiction de rechercher en droit et en fait tous les éléments concernant les vices en question ; qu'en particulier, il lui appartient d'interpréter le contrat pour apprécier elle-même si l'arbitre a statué sans convention d'arbitrage ; que le moyen n'est donc pas fondé ; | Code of Civil Procedure, is limited to examining the flaws listed in these texts, there is no limitation on the Court's power to seek out all elements of fact and law concerning these flaws. In particular, the Court has the duty to interpret the contract in order to ascertain for itself whether the arbitrators decided the dispute in the absence of an arbitration agreement; the argument is, therefore, not founded; |
| Sur le deuxième moyen, pris en ses deux branches : | On the two prongs of the second argument: |
| Attendu qu'il est reproché à la cour d'appel d'avoir dénaturé l'acte de mission des arbitres, aux termes duquel, selon le moyen, la République d'Egypte n'avait décliné l'arbitrage que jusqu'à la sentence finale, ce qui signifierait qu'elle n'entendait pas remettre en cause la décision des arbitres statuant sur leur propre compétence, et de n'avoir pas répondu aux conclusions des sociétés faisant valoir que cet acte de mission constituait un compromis sur la compétence, et non sur le fond ; | Whereas the Court of Appeal decision is alleged to have distorted the arbitrators' terms of reference, stating, according to the argument, that the Republic of Egypt only declined arbitration up until the final award, which implies that it did not intend to question the arbitrators' determination of their own jurisdiction. The Court of Appeal is also alleged to have failed to reply to the companies' submissions stating that the terms of reference constituted a submission agreement on jurisdiction, and not on the merits; |
| Mais attendu que la cour d'appel, répondant ainsi aux conclusions, a estimé, sans dénaturation, d'une part, que la convention d'arbitrage ne pouvait être constituée que par la clause compromissoire insérée au contrat du 12 décembre 1974, et non par l'acte de mission dont l'objet était seulement de définir les points litigieux et, d'autre | But whereas the Court of Appeal, thus replying to the submissions, held, without any distortion, firstly that only the arbitration clause contained in the contract of 12 December 1974 and not the terms of reference, which merely defined the disputed points, constituted an arbitration agreement; and, secondly that the terms of reference in which the |

Éléments sous droits d'auteur

**FRENCH INTERNATIONAL ARBITRATION LAW REPORTS**

## ORIGINAL

part, que l'acte de mission, dans lequel la République d'Egypte soutenait qu'il n'y avait pas de convention d'arbitrage, ne pouvait tenir la place de celle-ci ; qu'en aucune de ses branches le moyen n'est donc fondé ;

Sur le troisième moyen :

Attendu que les deux sociétés reprochent encore à la cour d'appel, qui a dénié à la signature du ministre égyptien du Tourisme précédée de la mention "approved, agreed and ratified", apposée sur le contrat du 12 décembre 1974, la valeur d'un engagement de l'Etat égyptien, de n'avoir pas tiré les conséquences légales de ses constatations au regard des principes et usages du commerce international ;

Mais attendu qu'il n'appartient pas à la Cour de Cassation de contrôler l'existence et l'application des principes et usages du commerce international ; que le moyen n'est donc pas recevable ;

Et sur le quatrième moyen, pris en ses deux branches :

Attendu que le pourvoi reproche enfin à la cour d'appel de n'avoir pas recherché si, dans le même contrat du 12 décembre 1974, EGOTH, à la supposer dotée d'une personnalité juridique autonome, n'avait pas agi en représentation de l'Etat égyptien, ce qui constituerait à la fois une violation du contrat, qui employait le mot "ratified", et un défaut de réponse à conclusions ;

## TRANSLATION

Republic of Egypt claimed that here was no arbitration agreement, could not be a substitute for such arbitration agreement; therefore, neither prong of this argument is founded;

On the third argument:

Whereas the two companies also challenge the Court of Appeal's decision, which denied that the signature of the Egyptian Minister for Tourism preceded by the expression "approved, agreed and ratified" on 12 December 1974 had any binding value on the Egyptian State, for having failed to draw the legal conclusions from its findings relative to the principles and usage international trade customs;

But whereas the court is not expected to check whether the principles and customs of international trade had been complied with, the argument is therefore not admissible;

On the two prongs of the fourth argument:

Whereas the petition, lastly, alleges that the court did not check whether in the contract of 12 December 1974 EGOTH, assumed to be an autonomous legal entity, had acted on behalf of the Egyptian State, which would constitute both a breach of the contract, in which the word "ratified" was used, as well as a failure to reply to the submissions;

*COUR DE CASSATION*, **FIRST CIVIL CHAMBER**
**6 January 1987**
**Appeal Denied.**
**Petition No. 84-17274**
**Mr. Fabre, Presiding judge**
**Mr. Ponsard, Judge**
**Mr. Charbonnier, Advocate General**
**Counsel, SCP Lyon-Caen, Fabiani and Liard and SCP Boré et Xavier, counsel**

### ORIGINAL

Mais attendu que le passage invoqué des conclusions ne soutenait pas clairement la thèse présentée aujourd'hui à la Cour de Cassation et n'appelait pas de réponse sur cette prétendue volonté de représenter l'Etat égyptien ; que l'ambiguïté des termes précédant la signature du ministre appelait une interprétation, que la cour d'appel a donnée en disant qu'il s'agissait seulement de l'intervention d'une autorité de tutelle ; qu'ainsi, en aucune de ses branches, ce moyen ne peut pas davantage être accueilli ;

### TRANSLATION

But whereas the excerpt of the submissions invoked did not clearly support the theory presented before the Cour de Cassation today and did not require a response on the alleged wish to represent the Egyptian State; the ambiguous nature of the expression preceding the Minster for Tourism's signature called for interpretation, which the Court of Appeal provided when stating that it merely constituted the approval of a supervisory authority; thus, none of the prongs of this argument are admissible either;

**PAR CES MOTIFS :**

REJETTE le pourvoi

**FOR THESE REASONS,**

DENIES the petition.

Éléments sous droits d'auteur

# EXHIBIT 7



## CA Paris, 1, 1, 16-01-2018, n° 15/21703, Infirmation

Ordre public

Arbitre

Accomplissement d'une condition suspensive

Ordre juridique

Loi de police

Grosses délivrées RÉPUBLIQUE FRANÇAISE aux parties le : AU NOM DU PEUPLE FRANÇAIS

COUR D'APPEL DE PARIS Pôle 1 - Chambre 1

ARRÊT DU 16 JANVIER 2018 (n°, 8 pages)

Numéro d'inscription au répertoire général 15/21703

Décision déférée à la Cour : Sentence rendue à Paris le 13 octobre 2015 par le tribunal arbitral composé de MM. ... et ..., arbitres, et de M. ..., président

DEMANDERESSE AU RECOURS :

Société MK GROUP
prise en la personne de ses représentants légaux

Leontievsky Pereulok, bldg. 7/1

125009 Moscou

FÉDÉRATION DE RUSSIE
représentée par Me Luca DE MARIA de la SELARL PELLERIN - DE MARIA - GUERRE, avocat postulant du barreau de PARIS, toque L0018

assistée de Me Marie VALENTINI, avocat plaidant du barreau de PARIS, toque P438

DÉFENDERESSES AU RECOURS

S.A.R.L. ONIX
prise en la personne de ses représentants légaux

7/9 rue Schorsa

Kiev

UKRAINE

représentée par Me Anne GRAPPOTTE-BENETREAU de la SCP GRAPPOTTE BENETREAU, avocats associés, avocat postulant du barreau de PARIS, toque K0111

assistée de Me Antoine ADELINE, avocat plaidant du barreau de PARIS, toque P443

Société FINANCIAL INITIATIVE
prise en la personne de ses représentants légaux

7/9 rue Schorsa

Kiev

UKRAINE

représentée par Me Anne GRAPPOTTE-BENETREAU de la SCP GRAPPOTTE BENETREAU, avocats associés, avocat postulant du barreau de PARIS, toque K0111

assistée de Me Antoine ADELINE, avocat plaidant du barreau de PARIS, toque P443

COMPOSITION DE LA COUR

L'affaire a été débattue le 23 novembre 2017, en audience publique, devant la Cour composée de

Mme Dominique GUIHAL, présidente

Mme Dominique SALVARY, conseillère

M. Jean LECAROZ, conseiller

qui en ont délibéré

Greffier, lors des débats Mme Mélanie PATE

ARRÊT :- CONTRADICTOIRE

- par mise à disposition de l'arrêt au greffe de la Cour, les parties en ayant été préalablement avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure civile.

- signé par Mme Dominique GUIHAL, présidente et par Mme Mélanie PATE, greffier présent lors du prononcé.

La société laotienne Dao Lao a été constituée en 2003 entre la société russe MK Group, détentrice de 70 % des titres et la société laotienne Lao Geo Consultant détentrice de 30 % des titres. Elle avait pour objet la mise en oeuvre d'un contrat conclu le 9 juin 2003 avec le gouvernement de la République démocratique populaire lao portant sur la prospection, l'exploration et l'exploitation de mines d'or.

Le 29 octobre 2010 MK Group a conclu un pacte de cession d'une partie de ses actions à la société ukrainienne Onix

Le 19 juillet 2011, la banque ukrainienne Financial Initiative a déclaré son intention de financer à hauteur de 20 millions USD pour les années 2012 et 2013 les travaux d'exploration de Dao ....

Le 6 octobre 2011 MK Group, Lao Geo Consultant, ..., ainsi que le ministère du Plan et de l'Investissement et le ministère des Ressources naturelles et de l'Environnement ont conclu un protocole d'accord (Memorandum of understanding : MOU) qui entérinait les décisions et les conventions précédentes.

Des différends étant survenus entre les parties, MK Group a déposé le 21 février 2014 auprès de la C.C.I. une requête d'arbitrage fondée sur la clause compromissoire stipulée par le pacte d'actionnaires du 29 octobre 2010. Elle demandait au tribunal arbitral de constater que les 60 % de parts qu'elle détenait dans Dao ... n'avaient pas été transmis à Onix, faute par celle-ci d'avoir fourni le financement convenu de 12,5 millions USD, et de condamner Onix et Financial Initiative à l'indemniser des préjudices résultant de la violation de leurs obligations de financement.

La clause compromissoire ne déterminait pas la loi applicable au fond du litige. La sentence indique que les parties ont

convenu qu'il s'agissait du droit laotien, et dans le silence de celui-ci, du droit français (sentence, § 7).

Par une sentence rendue à Paris le 13 octobre 2015, le tribunal arbitral composé de MM. ... et ..., arbitres, et de M. Henry, président a :

- déclaré à l'unanimité qu'il était compétent à l'égard de Financial Initiative,

- déclaré à la majorité que MK Group avait transféré à Onix la participation de 60 % dans Dao ... conformément au pacte d'actionnaires du 29 octobre 2010 et que Onix était donc propriétaire légitime de ces parts,

- ordonné à la majorité à MK Group de rembourser aux parties adverses les frais de la C.C.I. à hauteur de 275.000 USD,

- rejeté à la majorité les autres demandes des parties.

Le 13 novembre 2015, MK Group a formé un recours contre la sentence.

Par des conclusions notifiées le 17 novembre 2017, elle demande à la cour d'en prononcer l'annulation, de débouter les parties adverses de leurs demandes et de les condamner à lui payer la somme de 100.000 euros en application de l'article 700 du code de procédure civile. Elle invoque, en premier lieu, la méconnaissance par les arbitres de leur mission résultant, d'une part, de l'absence de motivation de la sentence sur certains chefs de demandes, d'autre part, du fait que les arbitres n'ont pas appliqué la loi laotienne choisie par les parties et, en second lieu, la violation par la sentence de l'ordre public international tenant, d'une part, à ce que la décision des arbitres a été surprise par la production de faux documents, d'autre part, à ce que la sentence viole les lois de police laotiennes.

Par des conclusions notifiées le 16 novembre 2017, Onix et Financial Initiative demandent à la cour de rejeter le recours et de condamner MK Group à leur payer 50.000 euros de dommages-intérêts pour procédure abusive et 90.000 euros en application de l'article 700 du code de procédure civile.

SUR QUOI

Sur le moyen d'annulation tiré de la violation de l'ordre public international (article 1520, 5° du code de procédure civile) :

MK Group soutient, en premier lieu, que la sentence a été rendue sur la base de documents faux. Elle expose que le 6 octobre 2011, elle-même, Lao Geo Consultant, ..., ainsi que le ministère du Plan et de l'Investissement et le ministère des Ressources naturelles et de l'Environnement ont conclu un protocole d'accord (Memorandum of understanding, ci-après MOU) relatif au transfert d'une partie de ses actions à Onix; que ce document a été produit devant les arbitres en deux versions dont l'une faisait de la réalisation d'un investissement de 12,5 millions USD par Onix une condition suspensive du transfert tandis que l'autre, qui ne le prévoyait pas, était un faux; qu'un certificat du greffe du ministère de la Justice en date du 11 janvier 2011 selon lequel Onix était propriétaire de 60 % des titres était également un faux ; que la falsification de ces deux pièces était établie par un jugement du tribunal de Vientiane du 22 avril 2016, et par une décision des autorités judiciaires laotiennes du 6 juillet 2016; que la décision des arbitres ayant été surprise par la production de ces fausses pièces, la sentence encourt l'annulation.

En second lieu, MK Group, en se fondant, d'une part, sur la loi laotienne sur les investissements étrangers du 8 juillet 2009 qui prévoit en termes généraux que ces investissements sont gérés de manière centralisée par le Gouvernement et que la mise en oeuvre des accords d'investissement fait l'objet d'une inspection, d'autre part, sur sa version du protocole d'accord du 6 octobre 2011, soutient que le transfert des titres de Dao ... était subordonné par les autorités laotiennes à un investissement préalable par Onix de 12,5 millions de dollars; qu'en passant outre cette condition et en imposant un partenaire à l'Etat laotien au mépris de sa réglementation sur l'investissement étranger, la sentence méconnaît les principes nécessaires à l'équilibre des relations économiques et financières du Laos avec l'extérieur, et porte atteinte à la souveraineté de cet Etat sur ses ressources naturelles; que, ce faisant, elle viole l'ordre public international; que, du reste, les juridictions laotiennes ont refusé pour ce motif de lui accorder l'exequatur.

Sur le moyen pris en ses deux branches :

Considérant que si la mission de la cour d'appel, saisie en vertu de l'article 1520 du code de procédure civile, est

Copyright Lexbase

limitée à l'examen des vices énumérés par ce texte, aucune limitation n'est apportée au pouvoir de cette juridiction de rechercher en droit et en fait tous les éléments concernant les vices en question;

Considérant que l'ordre public international au regard duquel s'effectue le contrôle du juge de l'annulation s'entend de la conception qu'en a l'ordre juridique français, c'est-à-dire des valeurs et des principes dont celui-ci ne saurait souffrir la méconnaissance même dans un contexte international; que ce n'est que dans cette mesure que des lois de police étrangères peuvent être regardées comme relevant de l'ordre public international, de sorte qu'il est en principe indifférent que la sentence soumise au juge français ait fait l'objet d'un refus d'exequatur pour violation de l'ordre public dans l'Etat dont les dispositions de police s'appliquent au contrat litigieux;

Considérant que le 14 décembre 1962, l'Assemblée générale des Nations Unies a adopté une résolution qui déclare :

' 1. Le droit de souveraineté permanent des peuples et des nations sur leurs richesses et leurs ressources naturelles doit s'exercer dans l'intérêt du développement national et du bien-être de la population de l'Etat intéressé.

2. La prospection, la mise en valeur et la disposition de ces ressources ainsi que l'importation de capitaux étrangers nécessaires à ces fins devraient être conformes aux règles et conditions que les peuples et nations considèrent en toute liberté comme nécessaires ou souhaitables pour ce qui est d'autoriser, de limiter ou d'interdire ces activités.

3. Dans les cas où une autorisation sera accordée, les capitaux importés et les revenus qui en proviennent seront régis par les termes de cette autorisation, par la loi nationale en vigueur et par le droit international. Les bénéfices obtenus devront être répartis dans la proportion librement convenue, dans chaque cas, entre les investisseurs et l'Etat où ils investissent, étant entendu qu'on veillera à ne pas restreindre, pour un motif quelconque, le droit de souveraineté dudit Etat sur ses richesses et ses ressources naturelles.

4. La nationalisation, l'expropriation ou la réquisition devront se fonder sur des raisons ou des motifs d'utilité publique, de sécurité ou d'intérêt national, reconnus comme primant les simples intérêts particuliers ou privés, tant nationaux qu'étrangers. Dans ce cas, le propriétaire recevra une indemnisation adéquate, conformément aux règles en vigueur dans l'Etat qui prend ces mesures dans l'exercice de sa souveraineté et en conformité du droit international. Dans tout cas où la question de l'indemnisation donnerait lieu à une controverse, les voies de recours nationales de l'Etat qui prend lesdites mesures devront être épuisées. Toutefois, sur accord des États souverains et autres parties intéressées, le différend devrait être soumis à l'arbitrage ou à un règlement judiciaire international';

Considérant que cette résolution exprime un consensus international sur le droit des États de subordonner à une autorisation préalable l'exploitation des ressources naturelles situées sur leur territoire et de soumettre à leur contrôle les investissements étrangers dans ce domaine; que les dispositions par lesquelles, dans le respect du droit international, les États expriment leur souveraineté sur leurs ressources naturelles relèvent donc de l'ordre public international;

Considérant qu'en l'espèce, il résulte de la sentence que l'exploration des ressources aurifères du district de Sanakham a fait l'objet d'un premier contrat le 9 juin 2003 entre le Gouvernement laotien et les sociétés russe, MK Group, et laotienne, Lao Geo ..., associées au sein d'une co-entreprise de droit laotien, Dao ..., dans laquelle la première détenait 70 % du capital et la seconde 30 %; que le 24 novembre 2009 un nouveau contrat de prospection et d'exploration aurifères a été conclu entre Dao ... et le Gouvernement laotien qui prévoyait une phase de prospection en 2010/2011, une phase d'exploration en 2011/2014 et une phase d'étude de faisabilité en 2014/2015;

Considérant que le 21 juillet 2010, MK Group, qui avait déjà investi 4,5 millions USD dans le projet, a conclu un protocole d'accord pour la cession de 60 % des titres de Dao ... à une société polonaise Geo Expert qui s'engageait à investir 12,5 millions USD sur trois ans; que Geo Expert ayant cédé ses droit à la société ukrainienne Onix un pacte d'actionnaires a été conclu le 29 octobre 2010 entre MK Group et Onix qui prévoyait que la première céderait 60 % du capital social de Dao ... à la seconde à la condition que celle-ci verse 100 USD (cent dollars US) au cédant, qu'elle finance les travaux d'exploration au cours de la saison 2010/2011, que, dans l'hypothèse où elle déciderait de financer la phase suivante, le montant de son investissement ne soit pas inférieur à 12.500.000 USD et que, si elle décidait de ne pas financer le projet en 2012/2015, elle s'engage à restituer les parts de Dao ...;

Considérant que le 17 juin 2011, Dao ... a déposé auprès du ministère du Plan et de l'investissement, d'une part, une demande d'autorisation de coopération avec Onix sur la base de 60 % de son capital à Onix, 30 % à ... Geo et 10 % à MK Group, d'autre part, un plan de travail pour 2011/2014 estimant à 22.018.000 USD le coût des travaux sur cette période;

Considérant que le 29 juin 2011 les statuts de Dao ... ont été modifiés pour refléter le pacte d'actionnaires;

Considérant que le 27 septembre 2011 a été délivrée à Dao ... par le ministère des Ressources nationales et de la

Protection de l'Environnement une licence d'exploration de ressources minérales expirant le 25 novembre 2014 qui reprenait les termes du plan de travail de juin 2011 et le montant de 22.018.000 USD à investir sur cette période;

Considérant que le 6 octobre 2011 MK Group, Lao Geo Consultant, ..., ainsi que le ministère du Plan et de l'Investissement et le ministère des Ressources naturelles et de l'Environnement ont conclu un protocole d'accord (Memorandum of understanding, ci-après MOU) relatif au transfert des parts de MK Group à Onix;

Considérant qu'à compter de septembre 2012, Onix, qui avait jusque-là investi environ 1.800.000 USD dans les travaux de prospection, a subordonné l'apport de nouveaux fonds au dépôt d'un rapport sur la rentabilité du projet et à la désignation d'un contrôleur financier de son choix, ce qui a été refusé par ses partenaires; qu'il s'est ensuivi un différend relatif aux droits de vote des différentes parties au sein de l'assemblée générale et, par conséquent, à la réalité du transfert des parts de MK Group à Onix, différend qui a été porté devant le tribunal arbitral;

Considérant que celui-ci a décidé, à la majorité, qu'Onix était titulaire de 60 % du capital de Dao ..., en retenant :

- que l'apport de fonds n'était pas une condition suspensive du transfert des actions, lequel avait été opéré par le seul versement du prix de vente de cent dollars,

- que ce transfert ne heurtait pas le droit laotien,

- qu'Onix s'était conformée à son obligation de financer les travaux d'exploration, ou plus exactement, de prospection, pour la saison 2010/2011 à hauteur de 750.000 USD,

- qu'Onix avait également satisfait aux obligations d'investissement contractées pour la période d'exploration de 2011 à 2013 de sorte qu'il ne pouvait y avoir lieu à restitution des titres,

- enfin que les changements de contrôle d'Onix n'avaient eu aucun effet sur la propriété des titres;

Considérant que, pour interpréter la volonté des parties, le tribunal arbitral s'est essentiellement fondé sur le pacte d'actionnaires du 29 octobre 2010; qu'il n'a examiné les actes subséquents que pour s'assurer qu'ils ne contredisaient pas cette analyse; qu'en ce qui concerne le MOU du 6 octobre 2011, il a eu connaissance des deux versions de cette pièce produites par les parties, et que, d'une analyse de l'économie générale du document, il a déduit que cet acte n'avait pas eu pour effet de modifier les stipulations du pacte d'actionnaires;

Mais considérant qu'il résulte de la sentence (§ 94) que la version qui a été produite par MK Group était ainsi rédigée :

' - Conformément au Contrat de Prospection et d'Exploration aurifère dans le District de Sanakham, Province de Vientiane, conclu avec Geo ... et MK Group, en date du 26 novembre 2009;

- Conformément au Contrat de coentreprise entre Onix Limited Ukraine et Dao Lao Co, ..., en date du 29 octobre 2010;

- Conformément à l'Annonce du Cabinet du Gouvernement n° 502/GO, en date du 29 septembre 2011;

Le 06/10/2011, le Département de la Promotion de l'Investissement, Ministère du Plan et de l'Investissement, et le département de Géologie, Ministère des Ressources Naturelles et de l'Environnement, et trois actionnaires : Onix Limited Ukraine, Lao Goe Consultant Ltd. Et MK Group Co. Ltd (Dao Lao ...., Ltd) ont conclu le présent protocole d'accord pour confirmer la reconnaissance de l'entrée d'un actionnaire au capital de Dao Lao ...., Ltd et de la modification de la quote-part des actionnaires dans le Projet de prospection et d'exploration d'or dans le District de Sanakham, Province de Vientiane, ainsi que les points détaillés ci-dessous :

I. Transfert d'actions

1. MK Group Co., Ltd. (Russie) est autorisée à transférer une participation de 60 % qu'elle détient dans le capital de Dao Lao ...., Ltd. à Onix Limited Ukraine (une fois que celle-ci aura exécuté son obligation d'investir 12.500.000 USD / douze millions et demie USD dans ce projet, conformément aux statuts en date de juillet 2011).

II. Actionnariat de la société

* Précédents actionnaires de Dao Lao ...., Ltd :

1. ... Geo Consultant Ltd (société à responsabilité limitée laotienne) détenait 30 % des actions;

Copyright Lexbase

2. La société MK Group (Russie) détenait 70 % des actions. * Actionnaires actuels de Dao Lao ...., Ltd :

1. Lao Geo Consultant ....(société à responsabilité limitée laotienne) détient 30 % des actions;

2. MK Group Ltd détient 10 % des actions;

3. Onix Limited Ukraine détient 60 % des actions. III. Effectivité du MOU :

Le présent Protocole d'Accord est signé en laotien et en anglais, en quatre originaux. Toutes les parties en ont pris connaissance, en comprennent le contenu et considèrent ce MOU comme faisant partie intégrante du Contrat de Prospection et d'exploration Aurifère dans le district de Sanakham, province de Vientiane, signé entre le Gouvernement de la République démocratique populaire lao et la coentreprise Laos-Russie (Dao Lao ...., Ltd.) le 26 novembre 2009.";

Considérant que, suivant la sentence (§ 95), la version d'Onix ne contenait pas le membre de phrase qui figure entre parenthèses dans le paragraphe I du document précité, le savoir : 'MK Group Co., Ltd. (Russie) est autorisée à transférer une participation de 60 % qu'elle détient dans le capital de Dao Lao ...., Ltd. À Onix Limited Ukraine (une fois que celle-ci aura exécuté son obligation d'investir 12.500.000 USD / douze millions et demie USD dans ce projet conformément aux statuts en date de juillet 2011)';

Considérant que, contrairement à ce que soutient MK Group, l'infraction de faux n'est établie ni par le jugement du tribunal de Vientiane du 22 avril 2016, rendu en matière commerciale, qui se borne, dans son dispositif, à annuler le pacte d'actionnaires du 29 octobre 2010, ainsi que le permis d'investissement et l'enregistrement de la concession, ni par le mandat de comparaître du chef de faux, délivré le 6 juillet 2016 par le bureau du procureur du peuple de Vientiane à l'encontre de M. ..., dirigeant de Dao ..., et ancien dirigeant et propriétaire d'Onix avant le changement d'actionnariat de cette société au cours des années 2011/2012 ;

Considérant qu'il se déduit de la sentence que les deux versions du MOU du 6 octobre 2011, ne contiennent pas de faux matériel - c'est-à-dire, d'interpolation pour l'une ou d'oblitération pour l'autre -, du membre de phrase relatif à l'investissement préalable de 12,5 millions USD; qu'en réalité, le MOU a été, dès l'origine, établi par les dirigeants de Dao ... en deux originaux rédigés dans des termes différents, l'un en langue anglaise, reflétant la réalité de l'accord entre les parties, qui, conformément au pacte d'actionnaires, ne faisait pas de cet investissement une condition suspensive du transfert de parts, l'autre, en laotien, destiné à accréditer la thèse inverse auprès des autorités laotiennes;

Qu'il convient, du reste, de relever la même discordance entre les deux originaux des statuts de Dao ... modifiés le 29 juin 2011, dont la version anglaise énonce, selon la sentence (sentence, § 79) :

'7.2 Conformément au Contrat relatif au transfert d'actions dans le capital social de la Société en date du 29.10.2010, conclu entre la société MK Group (Moscou, Fédération de Russie) et Onix Ltd. (Kiev, Ukraine), lasociété MK Group (Moscou, Fédération de Russie) transfère ses titres représentant 60 % du capital social à Onix Ltd. (Kiev, Ukraine).

Onix Ltd. (Kiev, Ukraine) a l'obligation, d'autre part, de financer les autres phases de travaux de prospection géologique pour un montant d'au moins 12 500 000 USD en 2012-2015.

Ainsi, les actions de la Société sont actuellement réparties comme suit :

* Onix Ltd. (Kiev, Ukraine) - 60 % des actions dans le capital de la Société;

* la société Lao Geo Consultant (Vientiane Laos) - 30 % des actions dans le capital social de la Société;

* la société MK Group (Moscou, Fédération de Russie) - 10 % des actions dans le capital social de la Société';

tandis que la version laotienne énonce (sentence § 79) :

'7.2 Onix Ltd (Onix) (Kiev, Ukraine) devra investir son capital dans des travaux de prospection géologique - d'étude, pour un montant d'au moins 12 500 000 USD avant tout - (conformément au Contrat de cession d'actions dans le capital social de la Société, en date du 29 octobre 2010, signé entre MK Group (Moscou, Fédération de Russie) et Onix Ltd. (Onix) (Kiev, Ukraine) et approuvé par ... Geo (Vientiane, République démocratique populaire lao) avant de permettre à Onix Ltd. (Onix) (Kiev, Ukraine) de détenir 60 % des titres.

Les actions seront réparties comme suit :

Copyright Lexbase

- Onix Ltd. = 60 %

- ... Geo Ltd = 30 %

- MK Group = 10 %' ;

Considérant que les manoeuvres ainsi employées par le dirigeant de Dao Lao - qui était alors aussi celui d'Onix -, pour convaincre le Gouvernement laotien de ce que le financement des travaux de prospection et d'exploration à concurrence d'au moins 12.500.000 USD était une condition suspensive et non pas résolutoire de l'entrée d'Onix au capital de Dao ..., démontrent qu'il s'agissait pour les autorités laotiennes d'une condition substantielle ;

Considérant que la sentence, qui a pour effet de conférer à Onix un titre juridiquement protégé dans l'ordre international sur un investissement réalisé grâce à l'obtention frauduleuse d'une autorisation administrative à laquelle la législation de la République du Laos subordonnait l'exploitation des ressources naturelles sur son territoire, viole de manière manifeste, effective et concrète l'ordre public international et doit donc être annulée;

Sur la demande de dommages-intérêts pour procédure abusive :

Considérant qu'eu égard au sens de l'arrêt, cette demande sera rejetée; Sur l'article 700 du code de procédure civile :

Considérant qu'Onix et Financial Initiative, qui succombent, ne sauraient bénéficier des dispositions de l'article 700 du code de procédure civile et seront condamnées in solidum sur ce fondement à payer la somme de 100.000 euros;


PAR CES MOTIFS

Annule la sentence rendue à Paris entre les parties le 13 octobre 2015.

Rejette la demande de dommages-intérêts pour procédure abusive.

Condamne in solidum les sociétés Onix et Financial Initiative aux dépens et au paiement à lasociété MK Group de la somme de 100.000 euros en application de l'article 700 du code de procédure civile.

LA GREFFIÈRE LA PRÉSIDENTE

8

Copyright Lexbase

# EXHIBIT 8

# Concise International Arbitration

**Second edition**

Edited by:
**Loukas A. Mistelis**



Published by Kluwer Law International,
P.O. Box 316, 2400 AH Alphen aan den Rijn, The Netherlands
sales@kluwerlaw.com
http://www.wklawbusiness.com

Sold and distributed in North, Central and South America by
Aspen Publishers, Inc.,
7201 McKinney Circle, Frederick, MD 21704, USA

Sold and distributed in all other countries by
Turpin Distribution Services Ltd.,
Stratton Business Park,
Pegasus Drive, Biggleswade,
Bedfordshire SG18 8TQ, United Kingdom

Suggested citation:
[Author name], in Mistelis, *Concise Int'l Arbitration*, [Document name] …,
art. …, note …

Disclaimer:
The chapters do not necessarily reflect the views of the contributors' law firms.

© 2015 Kluwer Law International
ISBN 978-90-411-5968-7

All rights reserved. No part of this publication may be reproduced, stored in a retrieval
system, or transmitted in any form or by any means, mechanical, photocopying,
recording or otherwise, without prior written permission of the publishers.

Permission to use this content must be obtained from the copyright owner.
Please apply to Permissions Department, Wolters Kluwer Legal, 111 Eighth
Avenue, 7th Floor, New York, NY 10011-5201, United States of America.
E-mail: permissions@kluwerlaw.com

Printed in the United Kingdom

French Code of Civil Procedure (Book IV), art. 1524

**5. Grounds for appeal.** Where the appeal bears upon an order that refuses to recognise or enforce an award in France, the Court of Appeal will only review whether the President of the First Instance Court reasoned his decision and correctly refused enforcement or recognition because the decision is not an award or because the enforcement of the award would manifestly be contrary to French international public policy (see art. 1514). Where the appeal bears upon an order that recognises or enforces an international award – be it a foreign award or an international award rendered in France (see arts. 1518 to 1524) – the only grounds available for appeal are set forth in art. 1520.

**[Setting aside of international awards rendered in France]**

**Article 1518**

**The arbitral award rendered in France in an international arbitration may only be subject to an action to set aside.**

**Article 1519**

**The action to set aside shall be brought before the court of appeal with jurisdiction over where the award was rendered.**

**Such recourse is admissible as from the rendering of the award. It is no longer admissible if not filed within one month from notification of the award.**

**Notification shall be made by service (bailiff) unless otherwise agreed by the parties.**

**Article 1524**

**The order granting enforcement is not subject to any recourse except in the case foreseen in the second paragraph of Article 1522.**

**However, the action to set aside the award shall, as of right and within the limits of the court's mission, either constitute recourse against the order of the judge who decided on the enforcement, or shall end that judge's mission.**

**1. General.** Arts. 1518, 1519 and 1524 only apply to international awards rendered in France. In principle, international awards rendered in France may only be the subject of an action to set aside before the Court of Appeal with jurisdiction (setting aside is also sometimes referred to as 'annulment'). Art. 1518 only allows the setting aside of an international award rendered in France on the grounds provided under art. 1520. Unless the parties expressly waive their right to request the setting aside of an international award rendered in France (see art. 1522), it is not possible to appeal decisions granting recognition and enforcement on such awards (art. 1524). Indeed, pursuant to art. 1522, parties may expressly waive their right to ask for the setting

aside of an international award rendered in France. In such cases, the parties may then appeal the enforcement order granted on the award. Foreign awards may not be set aside by the French courts. It is, however, possible to appeal decisions granting enforcement of foreign awards.

**2. Court with jurisdiction.** Art. 1519 makes clear that the action to set aside an international award rendered in France must be brought before the Court of Appeal having jurisdiction over the place where the award was rendered.

**3. Timing.** The action to set aside an international award rendered in France may be brought by any party named in the award as from the date of the award; that is to say even before an enforcement order has been made with respect to the award (see art. 1524). The action is admissible until one month after the award is served by bailiff on the moving party. When the party upon whom the award has been served is domiciled outside France, that time limit may be extended by two more months. Parties may however waive the service by bailiff requirement (see art. 1525, note 4).

**[Waiver of the action to set aside an international award rendered in France]**

**Article 1522**

By way of a specific agreement, the parties may at any time expressly waive their right to file an action to set aside.

In such a case, they may nevertheless appeal the enforcement order on one of the grounds set forth in Article 1520.

The appeal shall be filed within one month from service of the award bearing the enforcement order.

Notification shall be made by service (by bailiff), unless otherwise agreed by the parties.

**Article 1523**

The decision refusing recognition or enforcement (*exequatur*) of an international arbitration award rendered in France may be appealed.

The appeal shall be filed within one month from service (by bailiff) of the decision.

In such a case, the court of appeal shall decide, at a party's request, on the action to set aside the award, unless such party has either waived the right to initiate such action, or the time-limit for filing such action has expired.

**1. General.** Arts. 1522 to 1523 only apply to international awards rendered in France. As a general rule, parties may always appeal a decision refusing enforcement of an international award (arts. 1523 and 1525). In principle,

the only action available in France against an international award rendered in France is for the setting aside of the award (see art. 1518). However, parties may appeal an enforcement order made on an international award rendered in France if they have expressly waived their right to request the setting aside of the award under art. 1522. Art. 1522 is a new feature of French international arbitration law introduced by the 2011 decree (see Introductory remarks, note 1) and only applies to awards rendered by tribunals constituted since 1 May 2011. The waiver of the parties' right to request the setting aside of an international award rendered in France under art. 1522 still allows a party to oppose the enforcement of the award in France on the same grounds (see art. 1520, note 2). However, in the case of such a waiver, there will be no possibility for either party to obtain the setting aside (or annulment) of the award at the place where the award was rendered.

**2. Court with jurisdiction.** The appeal against an enforcement order decision is to be filed with the Court of Appeal with jurisdiction over the judge who made that decision (see arts. 1525, note 2 and 1527).

**3. Timing.** The appeal against a decision on the enforcement order may be brought by any party named in the award within the month following either the date upon which the refusal to recognise or enforce the award was notified (art. 1523) or the date upon which the award bearing the enforcement order was notified (see also art. 1527). In the latter case, parties may waive the requirement of service by bailiff (see art. 1525, note 4). When the party upon whom the decision has been served is domiciled outside France, the one-month time limit may be extended by two more months.

**4. Effect on the enforcement order of the filing of an action to set aside.** According to art. 1524, second paragraph, when an action to set aside an international award rendered in France is filed after the enforcement order was made on the award, it has, for all practical purposes, the same effect as an appeal on the enforcement order, were the appeal allowed (which it is not). Where a request for an enforcement order has been filed but not yet decided, the filing of an action to set aside the award deprives the enforcement judge of jurisdiction to make the order. Should a party then nevertheless wish to obtain the enforcement order on the award pending the decision on the setting aside, that party must file its request for an enforcement order before the President of the Court of Appeal with jurisdiction (see arts. 1516 and 1521, note 4), unless the appointment of the judge in charge of the procedure (juge de la mise en état) has been notified to the parties, in which case the request must be made directly to that judge.

**[Grounds for setting aside and for appeal of an enforcement order]**

**Article 1520**

**The action to set aside is only available where:**
**(1°) the arbitral tribunal has wrongly retained or denied jurisdiction,**

*Bensaude*                    1175

**(2°) the arbitral tribunal was improperly constituted,**

**(3°) the arbitral tribunal ruled without complying with the mission conferred upon it,**

**(4°) the principle of due process was not complied with, or**

**(5°) recognition or enforcement of the award is contrary to international public policy.**

**1. General.** The exclusive grounds for appeal of an enforcement order and for the setting aside of an international award rendered in France are set forth under art. 1520. There are no other grounds for appeal of an enforcement order or for the setting aside of an international award rendered in France.

**2. Identity of the grounds for setting aside and appeal of an enforcement order.** The grounds mentioned in art. 1520 are interpreted and applied in exactly the same way for the setting aside of international arbitration awards rendered in France and for appeals of enforcement orders on international awards. Thus, circumstances that would lead the Court of Appeal to sustain or reject an appeal on the enforcement order of an international award under art. 1520 would also lead the Court of Appeal to sustain or reject an action to set aside an international award rendered in France. Thus, if in principle no appeal is available in France against the enforcement order of an international award rendered in France (see however arts. 1524 and 1522), a party may still escape enforcement of that award in France by having the award set aside on the same grounds.

**3. Grounds for appeal or setting aside of an award may not be modified.** The grounds set forth in art. 1520 are limitative. For example, the allegation that an enforcement order was granted on a poor translation of the award is not a ground for appeal of that order (Cour d'appel Paris, 21 January 2014, *Dakin*). The parties may not agree to expand these grounds. For example, where an arbitration agreement provides that the award shall be subject to appeal before a national court, then that provision of the arbitration agreement will be considered null and void by the French courts without affecting the arbitration agreement in any other manner (Cour de cassation, 13 March 2007, *Chefaro*, and Cour d'appel Paris, 4 November 2010, *Dyncorp*). Parties may also not agree to further restrict the grounds for appeal in art. 1520. Having said this, a party's conduct in the course of the arbitration may be considered, by the French courts, as amounting to a waiver of that parties' right to appeal against the enforcement order or to request the setting aside of an award upon certain grounds provided for in art. 1520 (see art. 1466, note 5).

**4. The setting aside or suspension of a foreign award at the seat of arbitration.** Under French international arbitration law, all international awards are international judicial decisions that are not in and of themselves related to any national legal order (Cour de cassation, 29 June 2007, *Putrabali*).

Accordingly, French courts consider that the validity of an international award should be examined in light of the rules applicable at the place where its recognition and enforcement are sought. As a consequence, the setting aside of a foreign award by a court at the seat of arbitration is not, in and of itself, a ground for denying enforcement of that award in France (Cour d'appel Paris, 24 November 2011, *EGPC*). A foreign award set aside at the seat of arbitration may still be recognised and enforced in France (Cour de cassation, 9 October 1984, *Norsolor* and Cour de cassation, 23 March 1994, *Hilmarton*), or not (Cour de cassation, 26 June 2013, *EGPC*). Moreover, once the enforcement order granted in France of such an award is res judicata in France, a new award rendered between the same parties with regard to the same matter will not be recognised or enforced in France (Cour de cassation, 29 June 2007, *Putrabali*). Similarly, the filing of an action to set aside a foreign award at the seat of arbitration does not affect the recognition and enforcement of that award in France. In the same vein, the suspension of a foreign award at its seat of arbitration is not a ground for non-enforcement of that award in France (Cour de cassation, 10 March 1993, *Polish Ocean Lines*).

**5. Timely objection and waiver.** In order for an action based on any of the grounds provided in art. 1520(1) to (4) to be admissible before the Court of Appeal, the moving party must have raised appropriate objections as soon as possible during the arbitration proceedings (see art. 1466). Otherwise, that party may be deemed to have waived its right to complain before the Court of Appeal. For example, the participation of a party in an arbitration without objection amounts to a waiver of that party's right to claim that the arbitration clause is null and void (Cour de cassation, 21 November 2002, *Gromelle*). In the same manner, a party that starts an arbitration without objecting to jurisdiction is estopped from later raising a claim that no arbitration agreement exists (Cour de cassation, 6 July 2005, *Golshani*). By contrast, the signing of terms of reference indicating that a party objects to jurisdiction does not constitute any such waiver (Cour de cassation, 6 January 1987, *SPP*). In the same vein, the failure of a party to timely object that the tribunal was irregularly constituted amounts to a waiver of that party's right to later complain that it was so constituted (Cour d'appel Paris, 11 July 2002, *Beugnet Acquitaine*). Likewise, the failure to timely object that an arbitrator lacked independence also amounts to a waiver (see art. 1456, and Cour d'appel Paris, 22 February 2007, *Worms,* and Cour de cassaiton, 25 June 2014, *Tecnimont*). Similarly, a party that participates in the arbitration without objecting that the time limit for rendering the award has expired waives its right to later complain on that basis (Cour de cassation, 6 July 2005, *Al Amiouny*). Having said this, a party may only waive its rights under art. 1520 by failing to object, if that party had knowledge of the fact justifying its complaint (Cour d'appel Paris, 6 May 2004, *Malecki*) and if the rules applicable to the arbitration procedure would have afforded an opportunity to remedy the alleged irregularity. Where the rules would not have afforded any such opportunity, a party's failure to object does not constitute a waiver for the purposes of art. 1520 (Cour d'appel Paris,

21 January 1997, *Nu Swift*). With respect to actions based upon art. 1520(5) on the grounds that enforcement of an international award would be contrary to French international public policy, waiver by non-objection is only possible in part. The right to act against an international award rendered in France, or appeal an enforcement order, based on alleged violations of procedural French international public policy may be waived for lack of timely objection during the arbitration (see art. 1466). However, the right to act against an international award rendered in France, or appeal an enforcement order, based on allegations that enforcement of the award would violate substantive French international public policy cannot be waived, and a party is under no obligation to have raised its substantive international public policy concerns with the arbitral tribunal in order to be able to appeal the enforcement order, or request the setting aside of an international award rendered in France, on such ground before the Court of Appeal (Cour d'appel Paris, 14 June 2001, *Tradigrain*, Cour d'appel Paris, 18 November 2004, *Thalès*, Cour d'appel Paris, 22 October 2009, *Linde*).

**6. The Court of Appeal will not review an award's reasoning.** Appeal of international awards is not available under French international arbitration law. Hence, French courts regularly dismiss applications filed under art. 1520, where the complaining party relies on alleged deficiencies in the arbitral tribunal's reasoning in the award. Such arguments are simply inadmissible before the Courts of Appeal (Cour d'appel Paris, 18 January 2007, *France Animation*). Unless the rules applicable to the arbitration procedure provide that the award shall be reasoned, the failure to reason an international award is not, in and of itself, a ground to refuse enforcement of a foreign award in France (see art. 1482 note 1, and Cour de cassation, 22 November 1966, *Gerstlé*). Unless the parties agree the award does need to be reasoned, the French courts will merely verify that the award is reasoned, without regard to what the quality of the reasoning may be. Indeed, erroneous or internally inconsistent reasoning does not render an award unenforceable or invalid in France (Cour de cassation, 14 June 2000, *IAIGC*).

**7. Extent of the Court of Appeal's review.** In deciding upon the setting aside of an award, or upon the appeal of an enforcement order under art. 1520, the Court of Appeal has the power to examine any evidence and factual or legal submissions that it considers relevant to determine whether the action should succeed on any of the grounds specified in art. 1520. Moreover, the Court of Appeal has the power to review de novo any issue that may provide a basis for action under art. 1520 regarding jurisdiction (Cour de cassation, 6 January 1987, *SPP*), the regular constitution of the tribunal, as well as alleged violations of procedural international public policy (Cour d'appel Paris, 23 March 2006, *SNF*) or substantial international public policy (Cour d'appel Paris, 4 March 2014, *Gulf Leaders*). Having said this, the Court of Appeal tends to give deference to findings of arbitral tribunals, particularly

with respect to questions of fact (Cour de cassation, 12 February 2014, *M. Schneider*).

**8. Extent of the Court of Appeal's powers.** In deciding upon the setting aside of an award or upon the appeal of an enforcement order under art. 1520, the court may not add to the award or otherwise alter its content in any way (Cour de cassation, 11 September 2013, *CEPA*). The Court of Appeal may not order payment of interest (see art. 1514, note 8; and Cour d'appel Paris, 15 May 2003, *Central Timber Business*). If the claim for interest is based on contractual provisions, it will be for the tribunal to decide the issue. If post-award interest is claimed after the award was rendered, on the basis of French legal provisions applicable to post-judgment interest, it will be for the First Instance Court with jurisdiction, sitting with a single judge to decide (Cour d'appel Paris, 18 January 2001, *BAII*). Finally, pending the Court of Appeal's decision, the First President of the Court of Appeal or as soon as in charge, the judge in charge of the procedure (juge de la mise en état) before the Court of Appeal may make orders affecting the execution of the award within certain limits and under strict conditions (see art. 1526).

**9. Sanctions for abuse of rights.** In recent years, the Paris Court of Appeal increasingly sanctions parties who frivolously seek to block enforcement or recognition of international awards under art. 1520 (21 January 1997, *Nu Swift*, and 6 May 2004, *Babel Production*), or file claims under this provision that are found to be clearly inadmissible and filed for the sake of generating adverse publicity (Cour d'appel Paris, 18 February 1986, *Ojjeh*).

**[Article 1520(1)]**

**10. Scope of art. 1520(1).** Art. 1520(1) provides that a party may obtain the setting aside of an award, or the annulment of the enforcement order, where the arbitral tribunal has wrongly retained or denied jurisdiction. This may be the case where the Court of Appeal finds that the arbitration agreement is null and void, does not exist, or where the arbitration agreement excludes the dispute settled in the award from the arbitral tribunal's jurisdiction. Alternatively, it may be the case where the tribunal wrongfully declined jurisdiction.

**11. Separability and form of the arbitration agreement.** Under French international arbitration law, an arbitration agreement does not need to be in writing, does not need to be signed by the parties to the arbitration (see also art. 1507), and is separable from the main contract that contains, or refers to it (see art. 1447).

**12. No law applicable to the existence and efficiency of an arbitration agreement.** When evaluating an appeal or a request for setting aside based on art. 1520(1), the Court of Appeal will not refer to any national law other than the mandatory rules of French law and French international public policy (Cour de cassation, 30 March 2004, *Uni-Kod*). The Court of Appeal will only

have created a reasonable doubt as to the independence or impartiality of the arbitrator in the mind of the parties (Cour de cassation, 10 October 2012, *Tecso*).

**[Article 1520(3)]**

**16. Failure to comply with the tribunal's mission.** Art. 1520(3) allows for appeal against an order enforcing a foreign award, or the setting aside of an award rendered in France, where the arbitral tribunal has rendered an award without complying with the mission conferred upon it by the parties. An arbitral tribunal may fail to comply with its mission in a variety of ways. The arbitral tribunal may fail to follow the rules agreed by the parties to govern the arbitration procedure. For example, if the rules agreed upon by the parties require that the award be reasoned, an arbitral tribunal that fails to produce a reasoned award fails to fulfil its mission (Cour d'appel Paris, 14 January 1997, *Chromalloy*). Similarly, an arbitral tribunal vested with powers of amiable compositeur that does not use those powers, fails to fulfil its mission (Cour de cassation, 18 October 2001, *Eurovia*, and Cour d'appel Paris, 17 December 2009, *Gothaer*). A tribunal not vested with powers of amiable compositeur that orders payment an interest rate that was not claimed by the parties, and is neither the legal nor the contractual rate, necessarily acts as amiable compositeur and therefore fails to comply with its mission (Cour de cassation, 12 October 2011, *Groupe Antoine Tabet II*). A tribunal that fails to render its award within the applicable deadline, if any, also fails to comply with its mission (see art. 1463). Where the parties have agreed that certain rules of law shall apply to the merits of their dispute, art. 1520(3) may come into play where the arbitral tribunal entirely disregards those rules of law when making its award. In this regard, it is not necessary for the arbitral tribunal to make reference to the particular legal provisions upon which it relies in reaching its decisions (Cour d'appel Paris, 11 December 1997, *Consavio International*). In practice, it is usually sufficient for the arbitral tribunal merely to make reference to the applicable rules of law in its award. In no event will the Court of Appeal examine whether the applicable rules of law were correctly applied by the arbitral tribunal (Cour de cassation, 22 October 1991, *Cementos Portland*).

**17. Infra petita and ultra petita.** An arbitral tribunal may also fail to fulfil its mission because it fails to decide all of the claims before it (infra petita), or decides matters beyond those submitted by the parties (ultra petita). Awards that are infra petita do not run foul of art. 1520(3), because in such a situation, the claim may be again submitted to the tribunal (see art. 1485 and 1486). Moreover, the tribunal's failure to decide upon each and every legal or factual argument raised by the parties in the course of an arbitration is not sufficient to trigger the application of art. 1520(3). Awards that are ultra petita do provide a basis under art. 1520(3) for appeal of an order of enforcement of a foreign award or the setting aside of an international award rendered

in France, but only with respect to that part of the award that is ultra petita (Cour d'appel Paris, 28 May 1993, *SGI*). The arbitral tribunal's substantive mission is defined by the subject matter of the parties' dispute, which is itself determined by the parties' submissions during the course of the arbitration (Cour d'appel Paris, 29 September 2011, *Techman Head*). As a consequence, claims that are not expressly set out in terms of reference do not necessarily fall outside the arbitrators' mission (Cour de cassation, 20 June 2012, *Chaudronnerie Mécanique Algéroise*, and Cour de cassation, 6 March 1996, *Farhat Trading*).

**18. Breach of the duty of collegiality.** A principle of collegiality, not expressly mentioned in the CPC, generally requires that all arbitrators composing the arbitral tribunal be afforded the opportunity to participate in any and all of the tribunal's deliberations (Cour d'appel Paris, 1 July 1997, *Comilog*, Cour d'appel Paris, 16 January 2003, *Intelcam*). A violation of this principle may serve as a basis under art. 1520(3) and (5) to appeal the enforcement order of a foreign award (Cour d'appel Paris, 6 May 2004, *Malecki*) or set aside an international award rendered in France. The party relying on a breach of the duty of collegiality must show evidence of such breach (Cour de cassation, 29 June 2011, *Papillon*).

## [Article 1520(4)]

**19. Failure of the tribunal to comply with due process.** Art. 1520(4) allows appeal against enforcement orders on awards and the setting aside of international awards rendered in France where due process was not complied with during the arbitration procedure (see art. 1510). Because due process forms part of French international public policy, an alleged denial of due process may also provide grounds for appeal of an enforcement order, or the setting aside of an international award rendered in France for violation of international procedural public policy under art. 1520(5) (see notes 20 and 21). A tribunal that grants a claim for grounds other than those put forward by the parties in the arbitration, without inviting the parties to comment upon these grounds, breaches due process and violates its mission (Cour d'appel Paris, 3 September 2013, *Albata*).

## [Article 1520(5)]

**20. French international public policy: general.** Pursuant to art. 1520(5), a party may appeal an enforcement order on a foreign award, or request the setting aside of an international award rendered in France, where recognition or enforcement of the award would be contrary to French international public policy (see art. 1514, notes 4 and 5). This article thus addresses both violations of French substantive international public policy and French procedural international public policy. The laws of the seat of the arbitration and the rules of law applicable to the merits of the dispute are irrelevant to the Court

# EXHIBIT 9

Dossier n° 40795

**PELLERIN – DE MARIA – GUERRE**
Avocats associés à la Cour d'appel de Paris
20, rue du Pont Neuf
75001 PARIS

---

**Déclaration de recours en annulation à l'encontre, d'une part, d'une sentence arbitrale intitulée « Final Award » datée du 13 mai 2020 et, d'autre part, d'une sentence arbitrale intitulée « Decision on Respondent's Application for Clarification of Final Award and Addendum on Costs » datée du 12 août 2020, rendues toutes deux à Paris sous l'égide de la Cour internationale d'arbitrage de la Chambre de commerce internationale (n° ICC 23546/MK), par Monsieur Dietmar W. Prager, Président, Monsieur Joseph R. Profaizer et Madame Jennifer M. Smith, co-arbitres**

---

AU NOM DE :

**SOCIETE BLUESTONE RESOURCES INC**
**Société de droit de l'Etat du delaware**
**Ayant son siège social 302 S. Jefferson Street**
**Roanoke, Virginia 24011**
**ETATS UNIS**
**agissant poursuites et diligences en la personne de son représentant légal ou statutaire domicilié en cette qualité audit siège**

Ayant pour avocats :

Me Emmanuel GAILLARD
Me Benjamin SIINO
Me François BORDES
Avocats au Barreau de Paris
Cabinet SHEARMAN & STERLING  LLP
7 Rue Jacques Bingen, 75017 Paris
Qui l'assistent devant la Cour d'appel de Paris dans le cadre du recours en annulation

Et

La SELARL PELLERIN - DE MARIA - GUERRE
Avocats associés au Barreau de Paris
Agissant par Me Luca DE MARIA
20 rue du Pont Neuf, 75001 Paris

Qui se constitue pour elle devant la Cour d'appel de Paris et déclare former le recours en annulation au nom de la société Bluestone Resources Inc, avec élection de domicile en son cabinet,

A L'ENCONTRE DE :

**SOCIETE CAROLENG INVESTMENTS LIMITED**
**Société de droit des Îles Vierges Britanniques**
**Ayant son siège social Nerine Chambers,**
**PO Box 905, Road Town**
**Tortola**
**ILES VIERGES BRITANNIQUES**

devant la Cour d'appel de PARIS

Le recours en annulation tend à obtenir l'annulation, d'une part, de la sentence arbitrale intitulée « Final Award » datée du 13 mai 2020 et, d'autre part, d'une sentence arbitrale intitulée « Decision on Respondent's Application for Clarification of Final Award and Addendum on Costs » datée du 12 août 2020, rendues toutes deux à Paris sous l'égide de la Cour internationale d'arbitrage de la Chambre de commerce internationale (n° ICC 23546/MK), par Monsieur Dietmar W. Prager, Président, Monsieur Joseph R. Profaizer et Madame Jennifer M. Smith, co-arbitres, dans toutes ses dispositions qui font grief à la demanderesse au recours désignée ci-dessus selon les moyens qui seront développés dans les conclusions.

Le 7 décembre 2020

Luca DE MARIA

# EXHIBIT 10



*Liberté · Égalité · Fraternité*
RÉPUBLIQUE FRANÇAISE

<table>
<tr><td>

COUR D'APPEL DE PARIS
GREFFE CIVIL

</td><td>

**Paris, le** 14 Décembre 2020

</td></tr>
</table>

Accès : 10, bd du Palais
Tél :01.44.32.52.52

Accueil du lundi au vendredi
de 9 heures à 17 heures

Référence du dossier : N° RG 20/17927 - N° Portalis
35L7-V-B7E-CCY4H
Pôle 5 - Chambre 16

> **La SELARL SELARL PELLERIN - DE
> MARIA - GUERRE**
>
> **20 RUE DU PONT NEUF
> 75001 PARIS**

## AVIS DE SAISINE

### RÉFÉRENCES DE L'AFFAIRE :

**Société BLUESTONE RESOURCES INC agissant poursuites et diligences en la personne de
son représentant légal ou statutaire domicilié en cette qualité audit siège,**
**-** représenté par Me Benjamin SIINO du LLP SHEARMAN & STERLING LLP, avocat au barreau
de PARIS, toque : J006,
- représentée par Me Luca DE MARIA de la SELARL SELARL PELLERIN - DE MARIA -
GUERRE, avocat au barreau de PARIS, toque : L0018 - N° du dossier 40795,
- représenté par Me François GAILLARD, avocat au barreau de PARIS, toque : E0898,
représentée par Me François BORDES, avocat au barreau de PARIS.

**C/**

**SOCIETE CAROLENG INVESTMENTS LIMITED**
Nerine Chambers, PO Box 905, Road Town
Tortola
.   ILES VIERGES BRITANNIQUES

### N° RG 20/17927 - N° Portalis 35L7-V-B7E-CCY4H

Autres saisines de la juridiction à la diligence des parties
Recours en annulation ou appel d'une sentence arbitrale datée du 13 Mai 2020

La Société Bluestone Resources Inc. forme un recours en annulation par déclaration tendant à
obtenir l'annulation, d'une part, de la sentence arbitrale intitulée « Final Award » datée du 13 mai
2020 et, d'autre part, d'une sentence arbitrale intitulée « Decision on Respondent¿s Application for
Clarification of Final Award and Addendum on Costs » datée du 12 août 2020, rendues toutes deux
à Paris sous l'égide de la Cour internationale d'arbitrage de la Chambre de commerce internationale
(n° ICC 23546/MK), par Monsieur Dietmar W. Prager, Président, Monsieur Joseph R. Profaizer et
Madame Jennifer M. Smith, co-arbitres, dans toutes ses dispositions qui font grief à la
demanderesse au recours désignée ci-dessus selon les moyens qui seront développés dans les
conclusions.

Saisine reçue le 07 Décembre 2020
Enregistrée le 14 Décembre 2020

J'ai l'honneur de vous aviser de la saisine de la cour d'appel de Paris dans l'affaire référencée ci-
dessus.

Cette affaire a été distribuée au **Pôle 5 - Chambre 16**.

**P/LE DIRECTEUR DES
SERVICES DE GREFFE
JUDICIAIRES**,

*si vous avez des difficultés de mobilité, nous vous invitons à prendre attache avec le service*

**CA
Adresse postale
34,quai des Orfèvres
75055 Paris Cedex 01**

# EXHIBIT 11

**COUR D'APPEL DE PARIS**
**Pôle 5 - Chambre 16**

*Paris, le 08 Janvier 2021*

**Accès : 10, bd du Palais**
**Tél : 01.70.60.09.16**

**Référence du dossier : N° RG 20/17927 - N° Portalis
35L7-V-B7E-CCY4H**

**Pôle 5 - Chambre 16
Chambre commerciale internationale CCIP-CA**

**Nature de l'acte de saisine :** Autres saisines de la juridiction à la diligence des parties
**Date de l'acte de saisine :** 07/12/2020
**Date de saisine :** 14/12/2020
**Nature de l'affaire :** Demande en exécution d'un accord de conciliation, d'un accord sur une recommandation de médiateur, d'une sentence arbitrale, ou tendant à sanctionner leur inexécution
**Décision attaquée :**

**Appelantes** :
 **Société BLUESTONE RESOURCES INC agissant poursuites et diligences en la personne de son représentant légal ou statutaire domicilié en cette qualité audit siège**
, représentée par Me Benjamin SIINO du LLP SHEARMAN & STERLING LLP, avocat au barreau de PARIS, toque : J006, représentée par Me Luca DE MARIA de la SELARL SELARL PELLERIN - DE MARIA - GUERRE, avocat au barreau de PARIS, toque : L0018 - N° du dossier 40795, représentée par Me Emmanuel GAILLARD, avocat au barreau de PARIS, toque : J006, représentée par Me François BORDES, avocat au barreau de PARIS

**Intimées** :
 **Société CAROLENG INVESTMENTS LIMITED**

## CONVOCATION

### conférence de recueil de l'accord des parties ("conférence n°1")
*Article 4-1 du protocole relatif à la procédure devant la chambre internationale de la cour d'appel de Paris*

Maître,

Conformément au protocole signé le 07 février 2018 portant création de la chambre internationale de la cour d'appel de Paris, l'affaire susvisée, qui met en jeu les intérêts du commerce international lui a été transmise pour attribution. Dans ce cadre, je vous invite à vous présenter le:

**Mardi 09 Mars 2021 à 13 H 00(créneaux horaires à respecter),
salle de l'ex- 6ème chambre du TJ de Paris - Escalier A, RDC**

❏   pour conférer de l'affaire et vérifier l'échange des conclusions et pièces

❏   pour recueillir votre accord pour que l'affaire soit examinée et jugée conformément au protocole dont le lien suit:

*protocoles_signes_creation_juridiction_commerciale_internationale_1.pdf*

(pour plus d'information: Lien vers le site de la chambre commerciale internationale )

>   en cas d'accord, les parties pourront demander, en application du Protocole, les mesures à envisager (auditions des parties, de témoins ou d'experts et langue).

>   en cas de désaccord, l'affaire se poursuivra suivant la procédure habituelle.

**Votre présence est impérative. En cas d'indisponibilité à cette date ou à cette heure, je vous invite à en informer la chambre par RPVA dans les cinq jours du présent avis.**

**Cette procédure n'interrompt pas les délais fixés aux articles 908 et suivants du code de procédure civile.**

Le magistrat en charge de la mise en état,

*si vous avez des difficultés de mobilité, nous vous invitons à prendre attache avec le service*

*Cour d'Appel de Paris*
*34 Quai des Orfèvres*
*75055 PARIS CEDEX 01*

# EXHIBIT 12

# COUR D'APPEL
# DE PARIS
34, Quai des Orfèvres
75055 PARIS CEDEX 01
Tél : 01.44.32.52.52
Fax : 01.44.32.68.71

---

**Dossier N° RG 20/17927 - N° Portalis 35L7-V-B7E-CCY4H**
Pôle 5 - Chambre 16

Déclaration d'appel N°
**enregistrée le** 14 Décembre 2020

AVIS D'AVOIR A SIGNIFIER
Article 902 du Code de procédure civile

Par bulletin

la **SELARL SELARL PELLERIN - DE MARIA - GUERRE**
20 RUE DU PONT NEUF
75001 PARIS - N° du dossier 40795

Affaire :
**Société BLUESTONE RESOURCES INC agissant poursuites et diligences en la personne de son représentant légal ou statutaire domicilié en cette qualité audit siège**

contre
**Société CAROLENG INVESTMENTS LIMITED**

Le greffier de la cour d'appel vous avise :

☐ L'intimé **Société CAROLENG INVESTMENTS LIMITED** n'a pas constitué avocat dans le délai prescrit, merci de procéder par voie de signification conformément à l'article 902 du Code de Procédure Civile

En conséquence, le greffier vous invite à procéder à la signification de la déclaration d'appel dans le mois du présent avis, conformément à l'article 902 du code de procédure civile, (augmenté des délais prévus à l'article 911-2 du CPC) sous peine de caducité de la déclaration d'appel ; cependant si entre-temps, l'intimé à constitué avocat avant la signification de la déclaration d'appel, il est procédé par voie de notification à son avocat.
L'acte de signification devra indiquer à l'intimé que faute pour lui de constituer avocat dans le délai de quinze jours à compter de celle-ci, il s'expose à ce qu'un arrêt soit rendu contre lui sur les seuls éléments fournis par son adversaire, et que faute de conclure dans le délai de trois mois à compter de la notification des conclusions de l'appelant, il s'expose à ce que ses écritures soient d'office déclarées irrecevables.

Fait le 19 Janvier 2021

Le Greffier

---

**Article 902 du code de procédure civile :**

*Le greffier adresse aussitôt à chacun des intimés, par lettre simple, un exemplaire de la déclaration avec l'indication de l'obligation de constituer avocat.*
*En cas de retour au greffe de la lettre de notification ou lorsque l'intimé n'a pas constitué avocat dans un délai d'un mois à compter de l'envoi de la lettre de notification, le greffier en avise l'avocat de l'appelant afin que celui-ci procède par voie de signification de la déclaration d'appel.*
*A peine de caducité de la déclaration d'appel relevée d'office, la signification doit être effectuée dans le mois de l'avis adressé par le greffe ; cependant si, entre-temps, l'intimé a constitué avocat avant la signification de la déclaration d'appel, il est procédé par voie de notification à son avocat.*
*A peine de nullité, l'acte de signification indique à l'intimé, que faute de constituer avocat dans un délai de quinze jours à compter de celle-ci, il s'expose à ce qu'un arrêt soit rendu contre lui sur les seuls éléments fournis par son adversaire et que, faute de conclure dans le délai mentionné à l'article 909, il s'expose à ce que ses écritures soient déclarées d'office irrecevables.*

# EXHIBIT 13



## CA Paris, 3, 5, 19-01-2021, n° 18/04465, Infirmation

Location

Résiliation d'un contrat

Arbitrage

Violation des obligations contractuelles

Défaut d'indépendance

Copies exécutoires REPUBLIQUE FRANCAISE

délivrées aux parties le : AU NOM DU PEUPLE FRANCAIS

COUR D'APPEL DE PARIS

Pôle 3 - Chambre 5

ARRET DU 19 JANVIER 2021

(n° , 7 pages)

Numéro d'inscription au répertoire général : N° RG 18/04465 - N° Portalis 35L7-V-B7C-B5FFZ

Décision déférée à la Cour : Sentence du 28 Janvier 2018 rendue dans l'arbitrage CCI n°22048/TO composé de M. Aa Ab, arbitre unique,

DEMANDERESSE AU RECOURS :

Société ROTANA JET Limited liability company incorporated

prise en la personne de ses représentants légaux

Building 48, A Ac Ad

B DABI-EMIRATS ARABES UNIS

représentée par Me François TEYTAUD de l'AARPI TEYTAUD-SALEH, avocat postulant du barreau de PARIS, toque : J125

assistée de Me Louis-Marie PILLEBOUT, avocat plaidant du barreau de PARIS, toque : P502

DEFENDERESSE AU RECOURS :

SAS HOP!

prise en la personne de ses représentants légaux

24-26, rue de Villeneuve

Copyright Lexbase

Immeuble Caracas

SILIC 193 - 94563 RUNGIS CEDEX

représentée par Me Laurent MORET de la SELARL LM AVOCATS, avocat postulant du barreau du VAL-DE-MARNE, toque : PC 427

assistée de Me Camille de TUGNY substituant Me Vy-Loan HUYNH-OLIVIERI, avocat plaidant du barreau de PARIS, toque : P132

COMPOSITION DE LA COUR :

En application des dispositions des articles 805 et 907 du code de procédure civile, l'affaire a été débattue le 01 Décembre 2020, en audience publique, les avocats des parties ne s'y étant pas opposés, devant Mme Marie-Catherine GAFFINEL, conseillère, chargée du rapport.

Ce magistrat a rendu compte des plaidoiries dans le délibéré de la Cour, entendu en son rapport, composée de :

Mme Anne BEAUVOIS, présidente de chambre

M. François MELIN, conseiller

Mme Marie-Catherine GAFFINEL, conseillère

Greffier, lors des débats : Mme Mélanie PATE

- contradictoire

- par mise à disposition de l'arrêt au greffe de la Cour, les parties en ayant été préalablement avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure civile.

- signé par Mme Anne BEAUVOIS, présidente de chambre et par Mme Mélanie PATE, greffière, présente lors de la mise à disposition.

Le 9 avril 2014, la société Hop !, filiale du groupe Air France, (ci-après désignée Hop!), et la société Rotana Jet (ci-après désignée Rotana Jet) qui est une compagnie aérienne régionale basée à Abu Dhabi aux Emirats Arabes Unis ont conclu un contrat de location d'une durée de 36 mois (en anglais, et ci-après, « Lease Agreement ») par lequel Hop ! a donné en location à Rotana Jet un Embraer 145 MP en contrepartie du paiement par Rotana Jet de mensualités et autres montants. Le contrat est soumis au droit anglais et comporte une clause d'arbitrage CCI.

En raison des défaillances de paiement de Rotana Jet, Hop ! a résilié le contrat le 5 novembre 2015 et repris possession de l'avion en février 2016.

Le 22 juin 2016, conformément à l'article 16 du Lease Agreement, Hop ! a saisi la Cour Internationale de la Chambre de Commerce Internationale d'une demande d'arbitrage.

Les parties s'étant mises d'accord sur le principe d'un arbitre unique, M. Aa Ab a été désigné en qualité d'arbitre.

Le tribunal arbitral a rendu, le 28 janvier 2018, une sentence au terme de laquelle il a retenu la responsabilité de Rotana Jet pour violation de ses obligations contractuelles découlant du Lease Agreement et l'a condamnée à payer à Hop ! les sommes en principal de 1 469 914,40 USD et 792 994 euros.

Par déclaration du 27 février 2018, Rotana Jet a formé un recours en annulation de la sentence du 28 janvier 2018.

Par dernières conclusions notifiées le 10 février 2020, Rotana Jet demande à la cour de :

A titre principal,

Copyright Lexbase

- sur le fondement des articles 1520-2° et 5° du code de procédure civile, au titre du défaut d'impartialité et d'indépendance de l'arbitre, annuler la sentence arbitrale CCI n°22048/TO du 28 janvier 2018 en toutes ses dispositions,

Subsidiairement,

- sur le fondement de l'article 1520-4° du code de procédure civile, au titre de la violation du principe de la contradiction, et sur le fondement de l'article 1520-5° du CPC, au titre de la fraude, annuler la sentence arbitrale CCI n°22048/TO du 28 janvier 2018 en ce qu'elle a condamné Rotana Jet au paiement des sommes de (i) 506.680 euros au titre des divers frais de vérification, maintenance et réparation de l'avion (ii) 59.700 euros au titre des frais de peinture (iii) 1.381.318 dollars américains au titre des frais de réparation des moteurs (iv) 24.562 euros au titre des frais de voyage (v) 90.039 euros au titre des frais d'avocat liés à la restitution de l'avion (vi) 105.000 euros au titre des frais de stockage de l'avion et (vii) 3.700 euros au titre des cotisations d'assurance,

- condamner la société HOP ! aux entiers dépens de l'instance, dont distraction au profit de Maître François Teytaud, avocat aux offres de droit,

- condamner la société HOP ! à verser à Rotana Jet la somme de 40.000 euros au titre de l'article 700 du code de procédure civile,

En toute hypothèse,

- débouter la société HOP ! de sa demande reconventionnelle de condamnation de Rotana Jet pour procédure abusive.

Par dernières conclusions notifiées le 25 février 2020, Hop! demande à la cour de débouter Rotana Jet de toutes ses demandes, la condamner à lui payer la somme de 20 000 euros pour procédure abusive en application des articles 32-1 du code de procédure civile et 1240 du code civil, outre 25 000 euros au titre de l'article 700 du code de procédure civile et la condamner aux entiers dépens.

Il est expressément renvoyé pour un plus ample exposé des faits et prétentions des parties à la décision entreprise et aux écritures susvisées, conformément à l'article 455 du code de procédure civile.

MOTIFS

Sur le premier moyen d'annulation totale tiré du défaut d'impartialité et d'indépendance de l'arbitre (article 1520, 2° et 1520, 5° du code de procédure civile)

Moyens des parties

Rotana Jet soutient que l'arbitre unique a omis de révéler la nature des liens qu'il entretient avec HOP ! et plus généralement le groupe Air France KLM au travers des fonctions qu'il occupe au sein de la « European Regions airline association (ERAA) ». Elle expose que l'arbitre aurait dû faire connaître aux parties qu'il siégeait au « board » de cette association, au même titre notamment que trois représentants de filiales d'Air France-KLM. Elle indique qu'elle n'a pas été en mesure de récuser l'arbitre, n'ayant pas obtenu ces informations en temps utile et qu'en tout état de cause, il ne peut se déduire de la qualité de directeur que l'arbitre siégeait au « board » de l'association. Elle considère que le défaut d'indépendance et d'impartialité de l'arbitre constitue tout à la fois un vice dans la constitution du tribunal arbitral et une violation de l'ordre public international.

HOP ! soutient que Rotana Jet était informée des liens de l'arbitre unique avec l'ERAA. Elle fait valoir que dans son curriculum vitae transmis aux parties en même temps que sa déclaration, l'arbitre avait mentionné ses liens avec l'European Regions airline association en précisant qu'il en était «legal advisor ». Elle invoque également un mail adressé par l'arbitre le 28 septembre 2017 relatif à la date de l'audience aux termes duquel il indiquait être un directeur de l'ERAA en même temps que son conseil juridique. Elle prétend en tout état de cause, que la participation de l'arbitre au board de l'ERAA ne crée par de situation de conflit d'intérêt nouvelle alors qu'il avait déjà informé les parties qu'il en était le conseil juridique.

Elle prétend également que Rotana Jet ayant renoncé à récuser l'arbitre dans le délai imparti par le règlement d'arbitrage applicable est présumé avoir renoncé à se prévaloir de l'irrégularité relative à la composition du tribunal arbitral.

Elle rappelle enfin que l'ERAA étant une association incontournable dans le secteur aéronautique européen, ses adhérents sont tout à la fois des partenaires et des concurrents de sorte que l'adhésion à l'ERAA ne constitue pas une preuve d'une connivence de nature à aliéner l'indépendance de ses membres.

Réponse de la cour

Selon l'article 1520, 2°et 5° du code de procédure civile, le recours en annulation est ouvert si le tribunal arbitral a été irrégulièrement constitué ou si la reconnaissance ou l'exécution de la sentence est contraire à l'ordre public international.

Aux termes de l'article 1456, alinéa 2 du code de procédure civile, applicable à l'arbitrage international en vertu de l'article 1506 du même code, « Il appartient à l'arbitre, avant d'accepter sa mission, de révéler toute circonstance susceptible d'affecter son indépendance. Il lui est également fait obligation de révéler sans délai toute circonstance de même nature qui pourrait naître après l'accomplissement de sa mission ».

L'arbitre doit ainsi révéler aux parties toute circonstance de nature à affecter son jugement et à provoquer dans l'esprit des parties un doute raisonnable sur ses qualités d'impartialité et d'indépendance, qui sont l'essence même de la fonction arbitrale.

Le lien de confiance avec l'arbitre et les parties devant être préservé continûment, celles-ci doivent être informées pendant toute la durée de l'arbitrage des relations qui pourraient avoir à leurs yeux une incidence sur le jugement de l'arbitre et qui seraient de nature à affecter son indépendance.

Toutefois, en application de l'article 1466 du code de procédure civile, « la partie qui, en connaissance de cause et sans motif légitime, s'abstient d'invoquer en temps utile une irrégularité devant le tribunal arbitral est réputée avoir renoncé à s'en prévaloir ».

Dans son curriculum vitae attaché à la déclaration d'indépendance remise à la CCI, l'arbitre a mentionné à la rubrique « activités professionnelles et fonctions actuelles », qu'il était « legal advisor de l'European Regions Airlines Association ». De même, dans son curriculum vitae libre, dont il n'est pas contesté qu'il a été adressé aux parties, l'arbitre expose être « legal counsel » de l'ERAA depuis janvier 2014.

Rotana Jet considère que cette information était incomplète dès lors que l'arbitre siégeait en qualité de directeur au « board » de l'association aux cotés de représentants de filiales d'Air France KLM.

Toutefois, si tant est que la nature de l'intervention de l'arbitre au sein de l'ERAA - en qualité de conseil ou de directeur - modifie la nature de ses liens avec ses membres, il est établi que dès le 28 septembre 2017, les parties ne pouvaient ignorer que l'arbitre était également directeur de l'ERAA. En effet, dans un mail adressé aux parties, dans le cadre de la recherche d'une date pour l'arbitrage, l'arbitre indiquait « ' je souhaite demander aux parties si elles seraient prêtes à reporter l'audience à la semaine du 6 novembre. Cette requête est formée à titre purement personnel, afin de me permettre de participer à l'assemblée générale annuelle et au comité de direction de l'ERAA, la date du 19 ayant été omise dans mon agenda pour une raison inconnue. Comme vous le savez sans doute, je suis un directeur et le conseil juridique de l'ERAA ».

Ainsi, dès avant l'audience, Rotana Jet était informée que l'arbitre était non seulement conseil de l'ERAA mais également directeur. Il ne peut être retenu, comme le prétend Rotana Jet, que la fonction de directeur n'implique pas nécessairement d'être au board de l'association. En effet, assurer une fonction de directeur dans une association induit de participer aux organes décisionnels dont « le board » fait partie. De surcroît, la teneur du courriel adressé par l'arbitre fait expressément référence à sa participation aux organes décisionnels. Ainsi, Rotana Jet était avertie de la nature des liens qui unissaient l'arbitre à l'ERAA.

Par ailleurs, il ne peut être soutenu que Ae Jet n'était pas informée que des membres du groupe Air France siégeait au « board » de l'ERAA alors que cette association a pour vocation de réunir un grand nombre d'acteurs de l'aéronautique et que tant la liste de ses membres que des membres des organes décisionnels est accessible sur internet.

Or, Rotana Jet qui disposait, en vertu de l'article 8 du règlement d'arbitrage de la CCI, d'un délai de 30 jours à compter de la révélation de l'élément pouvant justifier une demande de récusation, (notamment si la révélation est postérieure à la constitution du tribunal) s'est abstenue de solliciter la récusation de l'arbitre, tant au cours de l'audience qui s'est

tenue les 19 et 20 octobre qu'ultérieurement, étant relevé que la clôture a été prononcée par l'arbitre le 27 novembre 2017. Rotana Jet n'a d'ailleurs même pas sollicité l'arbitre afin d'être plus amplement informée de son rôle au sein de l'association.

En s'abstenant de solliciter la récusation de l'arbitre conformément à l'article 8 du règlement CCI et d'invoquer cette irrégularité devant le tribunal arbitral, Rotana Jet est réputée avoir renoncé à se prévaloir du moyen d'annulation tiré du défaut d'impartialité et d'indépendance de l'arbitre.

Le moyen fondé sur l'article1520, 2° et 5° du code de procédure civile donc rejeté.

Sur le deuxième moyen d'annulation partielle tiré du défaut du respect du principe du contradictoire (article 1520, 4° du code de procédure civile)

Moyens des parties

Rotana Jet sollicite l'annulation partielle de la sentence des chefs qui sont affectés par la violation du contradictoire. Elle soutient non seulement que les parties n'ont pas participé aux opérations d'expertise par quelques moyens que cela soit mais également que le rapport d'expertise ne leur a pas été communiqué avant la sentence. Or, elle fait valoir que l'arbitre unique s'est appuyé sur les conclusions de l'expert ' en les entérinant- portant ainsi atteinte au principe de la contradiction, lequel doit toujours s'appliquer et ce même si les parties n'ont pas demandé que l'expert soit entendu le jour de l'audience.

En réplique, HOP ! soutient que Rotana Jet a accepté les modalités de l'expertise, sans présence de l'expert à l'audience et que l'arbitre unique a explicitement indiqué aux parties, sans être contesté, qu'une fois sa décision prise sur la question des responsabilités, il inviterait l'expert à lui fournir son avis sur le quantum des demandes qu'il intégrerait à la sentence.

Réponse de la cour

Selon l'article 1520, 2° du code de procédure civile, le recours en annulation est ouvert si le principe de la contradiction n'a pas été respecté.

Le principe de la contradiction exige seulement que les parties aient pu faire connaître leurs prétentions de fait et de droit et discuter celles de leur adversaire de telle sorte que rien de ce qui a servi à fonder la décision des arbitres n'ait échappé à leur débat contradictoire. Le tribunal arbitral n'a pas l'obligation de soumettre au préalable l'argumentation juridique qui étaye sa motivation à la discussion des parties.

Il n'est pas contesté par les parties qu'elles n'ont pas eu connaissance du rapport de l'expert avant le prononcé de la sentence.

Il n'est pas non plus contesté que les parties se sont accordées pour que l'expert n'assiste pas à l'audience qui s'est tenue les 19 et 20 octobre 2017.

Contrairement à ce que soutient Hop !, l'article 25 du règlement d'arbitrage de la CCI qui prévoit que le tribunal arbitral peut nommer un expert, définir sa mission et recevoir son rapport n'exclut pas qu'en vertu du principe de la contradiction, les parties aient communication dudit rapport afin de faire valoir leurs moyens de défense, même si cela n'est pas expressément précisé par cet article. Le choix des parties de ne pas faire entendre l'expert lors de l'audience, ne valait pas renonciation à la communication du rapport sur lequel le tribunal arbitral entendait se fonder pour statuer les chefs des demandes des parties. Ainsi, Hop ! ne peut soutenir qu'en renonçant à faire entendre l'expert lors de l'audience, Rotana Jet a renoncé au principe de la contradiction, alors que ce principe essentiel à la procédure doit être appliqué et respecté le cas échéant sans audience, par une communication écrite du rapport aux parties.

Par ailleurs, rien dans les échanges des parties avec l'expert ne permet d'affirmer que Rotana Jet a renoncé à avoir connaissance, préalablement à la sentence, du rapport d'expertise.

Il convient en conséquence d'accueillir ce moyen et d'annuler partiellement les chefs de la sentence affectés par la violation du contradictoire, à savoir la condamnation de Rotana Jet au paiement des sommes de (i) 506.680 euros au titre des divers frais de vérification, maintenance et réparation de l'avion (ii) 59.700 euros au titre des frais de peinture (iii) 1.381.318 dollars américains au titre des frais de réparation des moteurs (iv) 24.562 euros au titre des frais de voyage (v) 90.039 euros au titre des frais d'avocat liés à la restitution de l'avion (vi) 105.000 euros au titre des frais de stockage de l'avion et (vii) 3.700 euros au titre des cotisations d'assurance,

Dès lors que le moyen tiré de la violation du contradictoire est accueilli, il n'y a pas lieu d'examiner le moyen tiré de la fraude qui tend également à l'annulation partielle des mêmes chefs de condamnation de la sentence.

Sur la demande de dommages-intérêts

Moyens des parties

HOP ! soutient que Ae Af est de mauvaise foi et a introduit le recours en annulation dans l'unique but de faire obstacle à l'exécution de la sentence et de lui nuire.

Rotana Jet soutient que Hop ! ne caractérise pas la faute qu'elle aurait commise.

Réponse de la cour

Alors qu'il est partiellement fait droit aux demandes de Rotana Jet, Hop ! ne démontre pas qu'elle serait la faute commise par Rotana Jet. Elle est déboutée de sa demande.

Sur les autres demandes

Succombant à l'instance, Hop ! est condamnée aux dépens dont distraction au profit du conseil de Rotana Jet.

En équité, compte tenu de l'annulation partielle de la sentence, Hop ! est condamnée à verser à Rotana Jet la somme de 25.000 euros au titre de l'article 700 du code de procédure civile.

PAR CES MOTIFS

Rejette le moyen d'annulation tiré du défaut d'impartialité et d'indépendance de l'arbitre,

Annule la sentence rendue à Paris le 28 janvier 2018 dans l'arbitrage CCI n°22048/TO par le tribunal arbitral composé de M. Aa Ab, arbitre unique, en ce qu'elle a condamné Rotana Jet au paiement des sommes de (i) 506.680 euros au titre des divers frais de vérification, maintenance et réparation de l'avion (ii) 59.700 euros au titre des frais de peinture (iii) 1.381.318 dollars américains au titre des frais de réparation des moteurs (iv) 24.562 euros au titre des frais de voyage (v) 90.039 euros au titre des frais d'avocat liés à la restitution de l'avion (vi) 105.000 euros au titre des frais de stockage de l'avion et (vii) 3.700 euros au titre des cotisations d'assurance,

Déboute la société Hop ! de sa demande de dommages-intérêts,

Condamne la société Hop ! à payer à la société Rotana Jet une indemnité de 25 000 euros au titre de l'article 700 du code de procédure civile,

Condamne la société Hop ! aux dépens dont distraction au profit du conseil de la société Rotana Jet.

LA GREFFIERE LA PRESIDENTE

Copies exécutoires
délivrées aux parties le
:

# REPUBLIQUE FRANCAISE
AU NOM DU PEUPLE FRANCAIS

### COUR D'APPEL DE PARIS

**Pôle 5 - Chambre 16
Chambre commerciale internationale**

**ARRÊT DU 01ᵉʳ DECEMBRE 2020**

(n°    /2020, 13 pages)

Numéro d'inscription au répertoire général : **N° RG 19/09347 - N° Portalis 35L7-V-B7D-B7374** et par jonction :**N° RG 19/09352 - N° Portalis 35L7-V-B7D-B74AZ, N° RG 19/09554 - N° Portalis 35L7-V-B7D-B74TU et N° RG 19/09725 - N° Portalis 35L7-V-B7D-B75C4**

<u>Décision déférée à la Cour</u> : sentence rendue le 23 Juillet 2018 à Paris sous l'égide de la cour permanente d'arbitrage par le tribunal arbitral composé de M. Le juge X, arbitre-président, M. Le professeur X et M. Le juge X.

## DEMANDERESSE AU RECOURS:

**GOUVERNEMENT X**
Ayant son siège social:
Pris en la personne de ses représentants légaux,

*Représenté par, avocat au barreau de PARIS*

## DÉFENDERESSE AU RECOURS:

**SOCIETE Y
Société de droit américain**
Ayant son siège social: [...] Washington DC (ETATS-UNIS)
Prise en la personne de ses représentants légaux,

*Représentée par, avocat au barreau de PARIS, toque :*

## COMPOSITION DE LA COUR :

L'affaire a été débattue le 19 Octobre 2020, en audience publique, devant la Cour composée de :
M. François ANCEL, Président
Mme Fabienne SCHALLER, Conseillère
Mme Laure ALDEBERT, Conseillère
qui en ont délibéré, un rapport a été présenté à l'audience par Monsieur François ANCEL dans les conditions prévues par l'article 804 du code de procédure civile.

**Greffière,** lors des débats **:** Mme Clémentine GLEMET

**ARRET :**

- CONTRADICTOIRE
- par mise à disposition de l'arrêt au greffe de la Cour, les parties en ayant été

préalablement avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure civile.
      - signé par François ANCEL, Président et par Clémentine GLEMET, Greffière à qui la minute a été remise par le magistrat signataire.

## I – FAITS ET PROCÉDURE

1-Le 8 octobre 2002, la société Y, société de droit américain ayant une activité de banque d'affaires, investisseur en fonds propres, et de cabinet de conseil financier international, a conclu un contrat avec le Gouvernement de la République X, portant sur la privatisation notamment de trois entreprises chimiques en dans le pays X, l'entreprise A, l'entreprise B et l'entreprise C ainsi que de plusieurs de leurs filiales (les sociétés D, E, F et G).

2-Ce contrat devait être réalisé en deux phases. La première phase portait sur l'évaluation du projet de privatisation (dit « élaboration de scénarii de privatisation », soit l'analyse de l'environnement juridique, les diagnostics technico-économiques, opérationnels et financiers, audit financier, analyse du marché, …) et la deuxième phase portait sur la préparation, l'exécution et la finalisation de l'opération de privatisation de chacune des trois entreprises.

3-Les conditions particulières du contrat prévoyaient que la République X verserait une rémunération fixe (la « Rémunération Fixe ») à la société Y et une rémunération variable (la « Rémunération Variable »), cette dernière étant versée selon l'article 6.1.2 « *pour les services rendus au client dans le cadre de la mission définie au Contrat. Elle est liée à la réalisation effective de la vente des participations de capital dans les entreprises concernées* ».

4-Le contrat prévoyait que l'ensemble des prestations de privatisation devait être finalisé dans un délai de 9 mois suivant la date de son entrée en vigueur (article 2.3). En cas de retards indépendants de la volonté des parties, il était convenu que les parties se concerteraient sur la suite à y donner.

5-A l'issue des 9 mois, la privatisation desdites entreprises n'a pu avoir lieu et les parties ne se sont pas accordées pour proroger le contrat.

6-La République X a confié la privatisation à d'autres prestataires, à savoir au cabinet de conseils V et au Centre U.

7-Les sociétés D, G, F et E ont été privatisées postérieurement à leurs interventions.

8-La société Y a émis un certain nombre de factures au titre de la rémunération fixe et de la rémunération variable.

9-La République X n'ayant procédé à aucun des paiements sollicités, la société Y a initié une procédure arbitrale devant la Cour Permanente d'Arbitrage conformément au règlement CNUDCI de 1976, sur le fondement de l'article 7.2 des conditions particulières du contrat.

10-Le tribunal arbitral, composé de M. le juge K (Président), du Pr. M (co-arbitre) et de M. le juge F (co-arbitre), siégeant à Paris, a rendu une sentence arbitrale le 23 juillet 2018 ayant :

(i) A l'unanimité, condamné la République X à payer à la société Y au titre de la rémunération fixe la somme de 522.980,90 US$ augmentée des intérêts simples au taux LIBOR annuel en dollars américains, plus trois points, a compter du 23 octobre 2018 jusqu'au jour du paiement,

(ii) A l'unanimité, condamné la République X à payer à la société Y au titre de la rémunération variable relative à la privatisation de la société D la somme de 108 000 US$

augmentée des intérêts simples au taux LIBOR annuel en dollars américains, plus trois points, à compter du 23 octobre 2018 jusqu'au jour du paiement,

(iii) A la majorité, condamné la République X à payer à la société Y au titre de la rémunération variable relative à la privatisation des sociétés G, F et E la somme de 2.205.091,30 US$ augmentée des intérêts simples au taux LIBOR annuel en dollars américains, plus trois points, à compter du 23 octobre 2018 jusqu'au jour du paiement ;

(iv) à l'unanimité, décidé de mettre les frais de l'arbitrage (sauf les frais de représentation) à la charge de la République X et en conséquence ordonné à cette dernière de rembourser à la société Y les montants qu'elle a versés pour couvrir les frais de l'arbitrage à hauteur de la somme de 30.221,56 US$.

(iv) à l'unanimité, décidé que chacune des parties aura la charge de ses propres frais de représentation.

11-Par ordonnance en date du 26 novembre 2018, le Président du tribunal de grande instance de Paris a déclaré la sentence exécutoire et la société Y a procédé à sa signification par acte du 1er février 2019.

12-Les 28 avril 2019, 1er et 2 mai, la République X a introduit des recours en annulation contre cette sentence, respectivement enrôlés sous les numéros de RG 19/09352, 19/09347, 19/09554 et 19/09725.

13-La clôture a été ordonnée pour chaque affaire le 6 octobre 2020.

## II – PRÉTENTIONS DES PARTIES

**14-Aux termes de ses dernières conclusions communiquées par voie électronique le 13 mai 2020 (pour les dossiers enregistrées sous les numéros RG 19/09347, 19/09352 et RG 19/09554), et le 14 mai 2020 (pour le dossier enregistré sous le numéro RG 19/09725), la République X demande à la Cour, au visa des articles 1496 et 1520 du code de procédure civile, de :**

- La déclarer recevable et bien fondée en son recours en annulation ;

- A titre principal: annuler la sentence arbitrale de la cour permanente d'Arbitrage du 23 juillet 2018 dans toutes ses dispositions ;

- A titre subsidiaire : annuler la sentence en ce qu'elle a condamné la République X au versement de la rémunération variable aux points (ii) et (iii) de son dispositif pour des montants de 108.000 US$ et 2.205.091 US$ relatifs à la privatisation des entreprises D, E, F et G, augmentés des intérêts simples aux taux LIBOR annuel en dollars américain, plus trois points ;

- A titre plus subsidiaire : annuler la sentence en ce qu'elle a condamné la République X au versement de la rémunération variable au point (iii) de son dispositif d'un montant de 2.205.091,30 US$ relatif à la privatisation des entreprises D, E, F et G, augmentés des intérêts simples aux taux LIBOR annuel en dollars américain, plus trois points ;

- Condamner la société Y à lui payer la somme de 50 000 euros au titre de l'article 700 du code de procédure civile.

**15-Aux termes de ses dernières conclusions communiquées par voie électronique le 29 septembre 2020, la société Y demande à la Cour, au visa des articles 1520 et 700 du code de procédure civile, de :**

- Juger que le tribunal arbitral n'a pas usurpé le pouvoir d'amiable compositeur et s'est conformé à la mission qui lui a été confiée,

- Juger que le tribunal arbitral n'a pas violé le principe du contradictoire,

En conséquence,

- Juger la  République X mal  fondée  en l'ensemble de ses demandes,

- Rejeter le recours en annulation  ;

- Condamner la République X à lui payer la somme de 50 000 euros sur le fondement de l'article 700 du code de procédure civile ainsi qu'aux entiers dépens.

## III – MOYENS DES PARTIES ET MOTIFS DE LA DECISION

### Sur la jonction des procédures ;

16-Il est conforme à une bonne administration de la justice de joindre les affaires enregistrées sous les numéros RG 19/09347, 19/09352, 19/09554  et 19/09725.

### Sur le moyen d'annulation tiré de la violation par le tribunal arbitral du principe de la contradiction (article 1520 4° du code de procédure civile)

17-En application de l'article 1520, 4° du code de procédure civile le recours en annulation est ouvert si le principe de la contradiction n'a pas été respecté.

#### Sur la violation du principe du contradictoire du fait du défaut de communication préalablement à l'audience par la société Y d'un document Powerpoint présenté à l'audience

**18-La République X** fait valoir que le déroulement de l'audience démontre une violation flagrante du principe du contradictoire dans la mesure où la société Y y a présenté un document PowerPoint qui ne lui a pas été communiqué avant l'audience et dont elle n'a pas eu connaissance, n'y ayant pas comparu et n'y étant pas représentée. Elle ajoute que le document PowerPoint étant un support visuel, le seul enregistrement audio de l'audience ne peut pallier le défaut de communication de ce document.

**19-En réponse, la société Y** fait valoir que le document PowerPoint n'était qu'une pièce illustrative se bornant à reprendre les arguments développés dans les mémoires déposés au cours de la procédure arbitrale, qu'il n'était accompagné d'aucune pièce, comme en atteste l'enregistrement audio, et qu'elle était autorisée à le produire en vertu de l'ordonnance de procédure n°1 du 30 juillet 2016. Elle ajoute que ce document a bien été transmis à la République X après l'audience, le 1er février 2017, qui disposait par ailleurs de l'enregistrement audio de l'audience et du pouvoir de présenter ses observations jusqu'au 27 février 2017, conformément à la lettre du secrétariat de la Cour Permanente d'Arbitrage du 10 février  2017.

### Sur ce,

20-Le principe de la contradiction fait obstacle à ce qu'une décision soit rendue sans que chaque partie ait été en mesure de faire valoir ses prétentions de fait et de droit, de connaître les prétentions de son adversaire et de les discuter. Il interdit également que des écritures ou des documents soient portés à la connaissance du tribunal arbitral sans être

Cour d'Appel de Paris
**Pôle 5 - Chambre 16**                          ARRET DU 01 DECEMBRE 2020
N °   R G   1 9 / 0 9 3 4 7 - N °   P o r t a l i s
35L7-V-B7D-B7374- 4ème page

également communiqués à l'autre partie, et que des moyens de fait ou de droit soient soulevés d'office sans que les parties aient été appelées à les commenter.

21-En l'espèce, la clause compromissoire insérée à l'article 7.2 des conditions particulière du contrat conclu entre la République X et la société Y renvoie à un « *arbitrage conformément aux règles de procédure d'arbitrage de la Commission des Nations Unies pour le Droit Commercial (CNUDCCI) en vigueur à la date du présent contrat* ».

22-Conformément à l'article 22 du Règlement d'Arbitrage de la Commission des Nations Unies pour le droit commercial international en vigueur à la date du contrat litigieux (version de 1976) selon lequel « *Le tribunal arbitral décide quelles sont, outre la requête et la réponse, les autres pièces écrites que les parties doivent ou peuvent lui présenter ; il fixe le délai dans lequel ces pièces doivent être communiquées* », le tribunal arbitral a, par ordonnance de procédure n°1 en date du 30 juillet 2016, indiqué que si « *Aucune nouvelle preuve ne peut être présentée à l'audience, sauf avec l'autorisation du Tribunal (…) des pièces illustratives peuvent être présentées en utilisant des documents déposés précédemment, conformément à la présente Ordonnance* ».

23-Le document litigieux, qui est communiqué en pièce n°10 dans la présente procédure, dont il a été fait usage lors de l'audience à laquelle la République X n'a pas comparu, est un Powerpoint intitulé « *Exposé oral des arguments par la demanderesse* », qui précise que « *cette présentation est uniquement fondée sur les informations contenues dans la requête et le mémoire en réplique soumis par la demanderesse* » et qui contient plusieurs diapositives résumant la position de la société Y.

24-Il ne peut être tiré du seul usage de ce document une violation du principe de la contradiction alors d'une part, qu'il n'est pas contesté que la République X avait été régulièrement invitée à comparaître à cette audience du 30 janvier 2017 et qu'elle a fait le choix de ne pas s'y rendre.

25-D'autre part, au terme de son paragraphe 35, le tribunal précise dans sa sentence que « *par lettre de la CPA du 10 février 2017, le tribunal a : i) transmis l'enregistrement audio de l'audience aux parties ; ii) invité les parties à présenter toute observation supplémentaire sur les questions soulevées à l'audience (…)* » et par ailleurs invité les parties « *à présenter toute observation supplémentaire sur les questions soulevées à l'audience au plus tard le lundi 27 février 2017* ».

26-Il en résulte que la République X, qui ne précise nullement en quoi le document illustratif litigieux, contiendrait des arguments qui ne figuraient pas dans le mémoire de la société Y dont elle avait pu avoir connaissance antérieurement, a pu en tout état de cause avoir connaissance de celui-ci par l'enregistrement audio de l'audience qui lui a été transmis après l'audience, ainsi que de la possibilité de faire valoir toutes observations au tribunal arbitral.

27-En l'état de ces éléments, le principe de la contradiction n'a pas été méconnu par le tribunal arbitral.

28-Ce grief sera en conséquence rejeté.

### Sur la violation du contradictoire dans le cadre de la demande de production de documents postérieurement à l'audience

**29-La République X** expose qu'à la suite de l'audience, le tribunal arbitral lui a adressé par lettre du 10 février 2017 une liste de questions comprenant une demande de communication de pièces relatives aux modalités de recrutement des consultants V et du centre U et lui reproche d'avoir violé le principe du contradictoire en appliquant l'article 9(5) des règles de l'IBA sans qu'aucune procédure contradictoire n'ait été respectée au

préalable, contrairement à ce qu'exige l'article 3.5 de ces règles.

30-Elle explique, s'appuyant aussi sur l'opinion dissidente de l'un des arbitres, que suivant ces règles, si le tribunal arbitral demande à une partie de lui fournir des pièces, cette partie a le droit de le refuser selon une procédure contradictoire et que ce n'est qu'en cas de refus que le tribunal pourra ordonner cette production. Elle ajoute que ce n'est que dans la mesure où le tribunal « ordonne » une production de pièce que l'article 9(5) peut s'appliquer, et non, comme en l'espèce, pour une demande de communication de pièces accompagnant une liste de questions.

31-Elle en conclut que le tribunal arbitral qui s'est basé sur le défaut de production de documents, alors que cette production n'a pas été ordonnée et n'a pas fait l'objet d'un débat contradictoire, pour appliquer l'article 9(5) des règles de l'IBA, a violé le principe du contradictoire.

**32-En réponse, la société Y** explique que le tribunal arbitral a rendu une ordonnance de procédure n°3 statuant sur sa demande de production de documents, puis, postérieurement à l'audience des plaidoiries du 30 janvier 2017, adressé le 10 février 2017 à la République X une demande de production de documents complémentaires, avec une liste de question. Elle fait valoir que le tribunal arbitral avait bien ordonné - et non simplement demandé- à la République X de produire lesdits documents et que le tribunal arbitral n'étant pas une partie, la notion de production « demandée » par le tribunal n'existe pas, celui-ci ne pouvant qu'« ordonner ».

33-Elle ajoute que la distinction opérée par la République X entre « demander » et «ordonner» est de toute manière inopérante dans le cas d'espèce puisque la correspondance du tribunal en date du 10 février 2017 était claire en ce qui concerne l'injonction de produire des documents. Elle fait valoir que, si la République X considérait que le tribunal lui avait simplement demandé de produire des pièces elle aurait dû s'y opposer et tel n'a pas été le cas.

34-La société Y conclut en indiquant que le tribunal arbitral a valablement ordonné la production desdits documents selon les formes requises et conformément aux règles acceptées par les parties et que ces règles n'imposaient aucunement au tribunal d'attirer l'attention de la République X sur les conséquences de son refus de produire les documents requis.

**Sur ce,**

35-Il convient de relever en premier lieu que l'application des règles de l'IBA à la procédure arbitrale n'est en l'espèce pas contestée, le litige portant sur les conditions de mise en œuvre de ces règles dont la République X considère qu'elles n'ont pas été appliquées correctement par le tribunal arbitral, ce dont il résulterait une violation du pricipe de la contradiction.
36-A cet égard, il convient de rappeler qu'il n'entre pas dans les pouvoirs du juge de l'annulation de sanctionner une mauvaise application des règles de procédure choisies par les parties, sauf à ce que l'application alléguée comme étant erronée emporte une violation du principe de la contradiction.

37-En l'espèce, il est constant qu'il a été demandé à la République X de produire plusieurs documents au cours de la procédure arbitrale.

38-Ainsi, d'une part, faisant suite à une demande émanant de la société Y, et sous réserve d'un engagement de confidentialité signé par cette dernière, le tribunal arbitral, après avoir pris en compte l'objection de la République X fondée sur le caractère confidentiel des documents, a ordonné à cette dernière aux termes d'une ordonnance de procédure n°3 du 10 février 2017 de produire « *tout extrait de tout rapport du Conseil des Participations de*

---

**Cour d'Appel de Paris**
**Pôle 5 - Chambre 16**                                      ARRET DU 01 DECEMBRE 2020
                                             N °   R G   1 9 / 0 9 3 4 7   -   N °   P o r t a l i s
                                             **35L7-V-B7D-B7374**- 6ème page

*l'État ou de tout autre organisme de l'État X indiquant le montant des contreparties financières à payer par les investisseurs pour leur entrée dans le capital des entreprises publiques D, E, F et G, y compris les engagements qui ont été faits en (i) augmentation de capital, souscription d'actions, primes d'émission, et tout autre engagement financier (investissement, dépenses de restructuration sociale etc.) ».*

39-D'autre part, par lettre du 10 février 2017, à laquelle était jointe l'ordonnance de procédure n°3 précitée, le tribunal arbitral a également adressé à la République X une « *liste de questions que le tribunal [lui] aurait posées si [celle-ci] avait comparu à l'audience* » et par laquelle il l'invite *"à y répondre dans le cadre de ses observations sur les questions soulevées à l'audience ».*

40-Ce document intitulé « Liste de questions au défendeur » précise à son point 4 que « *à la page 21 de son Mémoire en défense, le Défendeur porte à la connaissance du tribunal que les filiales E, F, D et G ont été privatisées « avec l'assistance d'autres consultants internationaux ». Le Défendeur est prié de fournir au tribunal de plus amples informations, avec pièce à l'appui, sur les modalités de recrutement de ces consultants internationaux, et notamment les copies des contrats et des termes de référence du mandat de ces consultants. Le Défendeur est également prié de préciser, avec pièces à l'appui, si les investisseurs participants au capital des filiales privatisées sont ceux que la Demanderesse avait suggérés dans ses rapports».*

41-S'il est exact que cette seconde demande de communication de pièces à la République X ne recouvre pas exactement le champ des documents dont la production a été expressément ordonnée aux termes de l'ordonnance n°3 de sorte que la société Y ne peut feindre de considérer que ces deux demandes n'en feraient qu'une, il est néanmoins constant que la République X ne pouvait ignorer que, conformément à l'ordonnance de procédure n°1 rendue le 30 juillet 2016, le tribunal arbitral avait indiqué aux parties, sans que ce point ne fût contesté, d'une part, que le « *tribunal peut également ordonner d'office la production de documents* » et d'autre part, que « *Outre les dispositions relatives à la production de documents ci-dessus, le tribunal peut utiliser, comme lignes directrices supplémentaires, les Règles de l'IBA sur l'administration de la preuve dans l'arbitrage international de 2010 lors de l'examen des questions de preuve* », et donc, en ce compris le mécanisme de déduction défavorable, que ce soit en lien avec l'absence de production de pièces en conséquence de l'ordonnance de procédure n°3 et/ou de sa demande formée par lettre du 10 février 2017.

42-Ainsi, ce mécanisme était nécessairement dans les débats sans qu'il soit nécessaire que l'une ou l'autre des parties s'en prévale expressément ni que le tribunal invite l'une d'elle à s'expliquer sur son application.

43-A cet égard, il ressort du paragraphe n°38 de la sentence que la République X en avait parfaitement conscience dès lors que le tribunal mentionne que le 27 février 2017 (date à laquelle les réponses des parties étaient attendues), « *le Défendeur a déposé ses réponses aux questions du Tribunal en date du 10 février 2017 (…) ainsi que dix-sept documents communiqués à la fois en réponse aux questions du tribunal et conformément à l'ordonnance de procédure n°3* ».

44-En outre, contrairement à ce que soutient la République X, le tribunal arbitral ne s'est pas uniquement fondé sur l'application de la déduction défavorable pour condamner cette dernière au paiement d'une rémunération variable.

45-En effet, s'interrogeant sur le fait de savoir si les quatre filiales privatisées l'avaient été sur la base des travaux et services rendus par la société Y (§ 271), le tribunal arbitral prend soin de détailler dans les paragraphes 272 à 278 de sa sentence les raisons pour lesquelles il considère que cette preuve est rapportée et ce en considération notamment des éléments suivants :

---

-s'agissant de la privatisation de l'entreprise D, le tribunal constate que « *le rapport du centre U de novembre 2014 reconnaissait que ce dossier avait déjà connu plusieurs rounds de négociations avec les repreneurs potentiels* » qu'il existait ainsi, avec d'autres éléments détaillées dans les paragraphes 273, 277, 279 et 280 à 283, « *une forte présomption que les travaux de la Demanderesse, y compris ses recherches d'acquéreurs potentiels, ont été utilisés dans le cadre de la privatisation de a filiale D*» (§ 274).

-s'agissant des autres filiales, le tribunal indique que si « *rien n'indique que la demanderesse ait identifié ou entamé des négociations avec les acheteurs éventuels (…). Néanmoins d'autres éléments de fait suggèrent que les travaux de la demanderesse ont été utilisés aux fins de privatisation de ces trois filiales* » et le tribunal de relever « *en particulier* » des « *éléments de fait suivants* » qu'il détaille dans son paragraphe 277 et qui portent notamment sur les nombreux rapports remis effectivement par la société Y à la République X dont le défendeur « *n'a pu apporter ni preuve, ni argument pouvant mettre en cause leur qualité* » ; le fait que les « *nouveaux consultants du défendeur – V et le centre U– précisent dans leurs correspondances et rapports, qu'ils ont consulté les documents préexistants se rapportant à E (et D)* » ; le fait que les rapports produit par V et le centre U « *témoignent du fait que leur mandat était moins large que celui de la demanderesse* » ; que les délais applicables aux travaux de V « *semblent avoir été ostensiblement plus courts que ceux imposés par le contrat avec la demanderresse* » et qu'ainsi le délai total convenu de 4 semaines pour les travaux portant sur la filiale E à V « *ne permettait pas à ce dernier d'identifier un repreneur et de finaliser la privatisation de ladite entreprise sans tirer parti des travaux de la demanderesse* » ; ou encore le fait que «*V et le Centre U n'ont effectué aucun travail en lien avec la privatisation de la filiale F*».

46-Ainsi, le tribunal arbitral en déduit en son paragraphe 278 que les « *éléments de fait énumérés ci-dessus, pris dans leur ensemble, établissent la présomption que les filiales E, F et G ont été privatisées sur la base des services rendus par la Demanderesse au Défendeur* ».

47-Ce n'est qu'après avoir procédé à l'analyse de ces éléments que le tribunal arbitral s'appuie, au surplus, sur l'absence de réponse à sa demande de production de documents complémentaires par la République X pour conforter sa position et constater que si la République X lui avait fournis des « *informations sur les modalités de recrutement de V et du centre U, notamment les copies de leurs contrats avec le défendeur et des termes de référence encadrant leurs prestations* », ces documents lui aurait « *notamment permis de vérifier l'étendue du mandat des nouveaux consultants et donc de déterminer s'il leur avait été demandé de refaire tout ou partie des travaux déjà accomplis par la demanderesse* » et pouvaient « *renforcer ou affaiblir la présomption selon laquelle le défendeur aurait utilisé les travaux de la demanderesse pour la privatisation des entreprise concernées* » (§ 279).

48-Ayant constaté que « *le défendeur [avait] manqué de fournir les documents et informations demandés au tribunal, et ce, sans expliquer clairement les raisons de ce défaut* », le tribunal indique, en application de l'article 9 (5) des règles de l'IBA, qu'en « *l'espèce, le Défendeur n'ayant donné aucune raison satisfaisante pour la non-production des contrats et des termes de référence de V et du centre U, le Tribunal en déduit que le contenu de ces documents serait contraire aux intérêts du défendeur* » (§ 280), non sans avoir pris soin de rappeler que la règle de la conclusion défavorable ne « *s'impose pas, mais doit être librement appréciée sur la base de toutes les preuves et éléments du dossier soumis au tribunal* » et considéré que «*A l'analyse, un faisceau d'indices concordants, pris séparément ou ensemble, conforte la conviction qu'il est raisonnable de conclure à un manque de diligence due de la part du défendeur pour n'avoir pas produit les documents requis par le tribunal, sans doute parce qu'ils lui seraient potentiellement nuisibles* » (§ 282).

49-C'est ainsi que le tribunal arbitral indique dans le paragraphe 283 de sa sentence que

*« En définitive, la conclusion défavorable de la non-production des documents demandés par le tribunal n'est pas seulement liée au contenu même des documents que le défendeur est requis de fournir ; elle est aussi cohérente avec la présomption initiale qui naissait déjà des preuves disponibles, même en l'absence des documents produits »* et dans son paragraphe 284 que *« La non-production de ces documents par le défendeur renforce donc la présomption en faveur de l'utilisation par le défendeur des travaux de la demanderesse dans le cadre de la privatisation des filiales E, F et G».*

50-Au regard de l'ensemble de ces éléments, rien de ce qui a servi à fonder la décision du tribunal arbitral n'a pu échapper au débat contradictoire, dès lors d'une part, que les parties avaient consenti à l'application potentielle de la règle de la déduction défavorable, d'autre part que le tribunal a pu constater que le refus de la République X de produire certains documents n'était fondé sur « aucune raison satisfaisante » et qu'enfin ce tribunal ne s'est pas uniquement fondé sur ce mécanisme pour faire droit aux demandes de la société Y puisqu'il s'est aussi appuyé sur les documents effectivement produits et versés aux débats pour statuer en ce sens.

51-Le moyen tiré de la violation du principe de la contradiction sera en conséquence rejeté.

**Sur le moyen tiré du non respect par le tribunal arbitral de sa mission pour avoir statué en amiable compositeur (art. 1520 3° du code de procédure civile)**

**52-La République X** fait valoir que le tribunal arbitral n'a pas respecté sa mission et a statué en amiable compositeur, au lieu de se prononcer sur la base du droit X applicable en vertu de l'article 1.2 des conditions particulières du contrat, et notamment des articles 106 et 111 du code civil X qui imposent une application stricte des termes du contrat lorsqu'ils sont clairs.

53-Elle fait ainsi grief au tribunal arbitral d'avoir jugé que la société Y avait droit à la « Rémunération Variable » prévue dans le contrat après avoir pourtant constaté que les conditions de son octroi n'étaient pas réunies, tel qu'il ressort du paragraphe 285 de la sentence.

54-La République X expose que le contrat prévoyait clairement que la Rémunération Variable était une prime de succès dont l'octroi dépendait de la réalisation d'une obligation de résultat consistant dans la réalisation effective des privatisations des sociétés ou de celle de les mettre en état de l'être, la réalisation de la phase 2 étant déterminante, au regard de l'article 3.6 des conditions contractuelles, selon lequel la prime de succès *« sera payée chaque fois lorsque l'ouverture de capital ou la privatisation de chacune des entreprises identifiées sera réalisée et terminée ».*

55-Elle souligne à cet égard que les articles 6.1.1 et 6.1.2 des conditions particulières du contrat relatifs au montant et à la nature de la rémunération variable ne prévoient rien à cet égard et que leur interprétation à l'aune des articles 2.6.3 et 3.7 de ces conditions révèle au contraire que la volonté des parties n'était pas de prévoir une Rémunération Variable au prorata des efforts fournis par la société Y mais à l'accomplissement des privatisations. Elle conclut que rien dans le contrat ni la loi ne justifiait le paiement d'une Rémunération Variable en fonction des efforts fournis.

56-Elle ajoute que le tribunal s'est fondé sur le fait que la République X se serait servi des rapports réalisés par la société Y pour finaliser les privatisations ultérieures alors même que la propriété de ces travaux lui avait déjà été transmise en vertu de l'article 3.7 des conditions générales du contrat qui prévoit que les rapports deviendraient et demeureraient sa propriété.

57-Elle souligne que l'arbitre Fatsah Ougergouz a relevé dans son opinion partiellement

---

dissidente que cette rémunération au prorata n'était justifiée que par des considérations d'équité et que le tribunal a relevé lui-même dans sa sentence qu'il « privilégi(ait) l'équité » et fixait « un barème de l'équité » (paragraphe 289 de la sentence).

**58-En réponse, la société Y** fait valoir que la nature et le contenu de ses obligations sont définies à l'Annexe A du contrat, prévoyant deux phases, sans que le contrat ne mette à sa charge l'obligation d'une privatisation effective des sociétés concernées. Elle fait valoir que c'est donc par la stricte application du droit X et du contrat que le tribunal arbitral a pu conclure que celui-ci ne mettait pas à la charge de la société Y une obligation de résultat quant à la privatisation des sociétés concernées, mais une obligation de mettre en état de privatisation ces sociétés et que c'est sans modifier la nature de ses obligations qu'il a recherché si, et dans quelle mesure, elle mis la République X en état de lancer les privatisations, avant de juger fondé son droit à rémunération.

59-Elle ajoute que la décision de privatisation des sociétés ne tenait qu'à la République X et que c'est de son fait qu'elle n'a pas été lancée immédiatement après la réalisation des prestations de la société Y et qu'en tout état de cause, le montant de la rémunération variable ne pouvait dépendre du lancement des privatisations puisque cet événement étant le fait des autorités X, cette condition aurait été potestative donc nulle.

60-La société y fait ensuite valoir qu'elle a réalisé ses obligations conformément aux obligations contractuelles mises à sa charge dans le cadre des deux phases de travaux, et soutient que le tribunal arbitral a justifié son droit à Rémunération Fixe par l'analyse des travaux réalisés dans le cadre du contrat et des stipulations contractuelles.

61-Elle ajoute que c'est au regard de l'article 6.1.1 des Conditions Particulières du Contrat et de l'analyse par le tribunal arbitral des conséquences financières de la réalisation de ses prestations que le tribunal arbitral a jugé justifié son droit à une Rémunération Variable. Elle souligne qu'il a notamment retenu que c'est bien sur la base de ses prestations et de ses rapports, et non sur la seule base des travaux réalisés par V et le centre U que les privatisations ont été effectuées.

62-Elle conclut qu'elle a fourni toutes les prestations qui lui incombaient dans le délai contractuel de 9 mois et précise que même si la République X ne conteste pas la Rémunération Fixe, elle n'a pas pour autant procédé à son règlement ce qui traduit qu'elle n'a jamais eu l'intention de s'acquitter des sommes dont elle est débitrice, à quelque titre que ce soit.

***Sur ce,***

63-En application de l'article 1520, 3° du code de procédure civile le recours en annulation est ouvert si le tribunal arbitral a statué sans se conformer à la mission qui lui avait été confiée.

64-Aux termes de l'accord sur les modalités de désignation du tribunal signé par les parties les 27 juin et 10 juillet 2016, à la rubrique « droit applicable » il est renvoyé à l'article 1.2 des Conditions Générales du Contrat qui stipule que « le Contrat, sa signification, son interprétation, et les relations entre les parties seront soumis au Droit Applicable » et à l'article 1.2 des Conditions Particulières du Contrat prévoit que « le droit applicable est le droit X des marchés publics ainsi que les lois et règlements requis en X».

65-Le siège de l'arbitrage a été fixé à Paris.

66-Aucune mission d'amiable composition n'a été confiée au tribunal arbitral.

67-Pour fonder sa décision de faire droit en partie à la demande de la société Y au paiement d'une rémunération variable, le tribunal arbitral mentionne dans sa sentence qu'il a « *d'abord examiné si, en principe, le consultant pouvait, aux termes du contrat, avoir droit à une rémunération variable pour des transactions de privatisation pour lesquelles il aurait effectué un travail préalable dans le cadre du contrat, mais qui auraient été finalisées après la fin du contrat* » (§ 268) et a considéré que cela était possible aux motifs que « *aucune clause contractuelle ne stipulait que, pour donner droit à la rémunération variable, les privatisations devaient être finalisées pendant la durée du contrat* » et que le « *contraire eut été illogique, puisque la finalisation des privatisations allait nécessairement dépendre de décisions gouvernementales* » (§ 268). Le tribunal arbitral en conclut que « *Il était envisageable que les éléments nécessaires aux privatisations soient mis en place pendant la durée du contrat, mais que ces dernières soient réalisées après sa fin. Cela ne devait pas priver le consultant de sa rémunération* » (§ 268).

68-Il est constant que le tribunal arbitral a considéré dans le paragraphe 285 de sa sentence que « *les services prévus au contrat n'ont pas été rendus dans leur totalité par [la société Y]. Notamment s'agissant des filiales E, F et G (et contrairement au cas de D), la [société Y] n'a pas fourni les services relatifs à l'identification et aux négociations avec les repreneurs potentiels (...). La question se pose donc de savoir si malgré ce caractère non complètement exécuté des travaux, tels que définis dans le contrat, [la société Y] a pourtant droit à la Rémunération Variable* ».

69-Pour répondre favorablement à cette question, le tribunal arbitral considère que « *la réponse est fournie par l'article 6.1.2 du contrat, deuxième alinéa qui dispose : « La Rémunération Variable est la partie qui rémunère le Consultant pour les services rendus au client dans le cadre de la mission définie au Contrat. Elle est liée à la réalisation effective de la vente des participations de capital dans les entreprises concernées. »* (§ 286).

70-Analysant cette clause, le tribunal arbitral considère que la Rémunération Variable est « *non pas une prime de résultat, mais plutôt une prime de services rendus par le consultant (…) pour aboutir à la vente des participations de capital, c'est à dire à la privatisation effective* » (§ 286).

71-Le tribunal poursuit en précisant que « *cette conception du succès, synonyme de résultat, comme aboutissement de services rendus au défendeur par la demanderesse est confirmé par l'intention des parties elles-mêmes, telle que traduite dans les termes du contrat (...)* » et notamment à l'article 6.2.1 qui fixe les pourcentages pour la réalisation des travaux par la société Y. Ainsi le tribunal considère que « *si les services rendus par le consultant sont proches de la privatisation, mais que celle-ci n'a jamais eu lieu, le*

---

*consultant ne peut prétendre à la rémunération variable (…). Par contre, si les services rendus par le consultant au client sont loin du résultat de vente des participations de capital, mais que cette vente (c'est à dire, la privatisation), a finalement lieu, le consultant a droit à une rémunération variable pour les services rendus (article 6.1.2, deuxième alinéa, première phrase)* ».

72-C'est sur le fondement de cette interprétation des clauses du contrat que le tribunal a considéré que « *ce qui importe en l'occurrence est moins la présence du consultant lors de cette vente, ici [la société Y], que les services [qu'elle] a rendus au client et le degré d'utilité de ces services pour l'obtention dudit succès* ».

73-Il ressort de ces éléments, que loin de statuer en équité pour examiner le principe d'une rémunération variable due, le tribunal arbitral s'est appuyé sur le contrat dont il a interprété les clauses contractuelles pour admettre le droit de la société Y au bénéfice d'une telle rémunération, sans nullement modifier l'économie du contrat en substituant aux obligations contractuelles des obligations nouvelles ne répondant pas à l'intention commune des parties.

74-A cet égard, la République X, ne saurait considérer que le tribunal arbitral s'est ainsi comporté en amiable compositeur alors que ce comportement ne saurait à lui seul résulter d'une interprétation du contrat dont elle considère qu'elle n'est pas conforme à sa thèse au risque de sanctionner sous couvert du non respect de la mission par l'arbitre, une mauvaise appréciation des termes du contrat et donc un mal jugé par le tribunal arbitral.

75-En revanche, si sur le principe de l'attribution d'une rémunération variable, le tribunal arbitral ne s'est pas comporté en amiable compositeur, il a manifestement endossé une telle mission pour évaluer le montant de la rémunération due.

76-En effet, au paragraphe 289 de sa sentence le tribunal arbitral indique que « *dans la mesure où [la société Y] a effectué seulement une partie des travaux définis dans le contrat, le tribunal estime qu'il serait inique vis à vis du défendeur d'accorder à [la société Y] l'intégralité de la rémunération variable pour les quatre entreprises. Dès lors le tribunal privilégie l'équité, car il serait illogique et injuste d'accorder à la demanderesse la totalité de la rémunération variable pour un résultat qui n'a pas été atteint uniquement grâce à sa contribution* ».

77-La sentence mentionne ensuite que « *pour fixer le barème de l'équité, en l'occurrence, le tribunal s'est fondé sur l'esprit du contrat et l'intention des parties, tels que consignés dans le contrat lui-même, qui permettent de mesurer les proportions dans lesquels les services rendus au défendeur par la demanderesse, et non pas les efforts de cette dernière, ont pu contribuer à l'obtention du résultat ou du succès de la privatisation des quatre entreprises* ».

78-Il ressort de ces paragraphes que le tribunal s'est délibérément et expressément fondé sur l'équité pour évaluer le montant de la rémunération variable dont il a admis précédemment le principe en faveur de la société Y et qu'il a dès lors méconnu sa mission.

79-En conséquence, la sentence encourt l'annulation en ce qu'elle a condamné la République X au versement de la rémunération variable aux points (ii) et (iii) de son dispositif pour des montants de 108.000 US$ et 2.205.091 US$ relatifs à la privatisation des entreprises D, E, D et G, augmentés des intérêts simples aux taux LIBOR annuel en dollars américain, plus trois points.

**Sur les frais et dépens ;**

80- Les parties succombant partiellement, chacune d'elle conservera la charge de ses propres dépens.

81- Pour les mêmes motifs, l'équité commande de débouter les parties de leurs demandes fondées sur l'article 700 du code de procédure civile.

**IV- PAR CES MOTIFS**

La cour,

1-Ordonne la jonction des dossiers enregistrés sous les numéros RG 19/09347, 19/09352 et RG 19/09554, et RG 19/09725 ;

2-Annule la sentence arbitrale du 23 juillet 2018 uniquement en ce qu'elle a condamné la République X au versement de la rémunération variable aux points (ii) et (iii) de son dispositif pour des montants de 108.000 US$ et 2.205.091 US$ relatifs à la privatisation des entreprises D, E, F et G, augmentés des intérêts simples aux taux LIBOR annuel en dollars américain, plus trois points ;

3-Rejette le recours en annulation pour le surplus ;

4-Déboute les parties de leurs demandes fondées sur l'article 700 du code de procédure civile ;

5-Dit que chaque partie conservera les dépens par elle exposés.


*La greffière*                                    *Le Président*


*C. GLEMET*                                       *F. ANCEL*

Cour d'Appel de Paris
**Pôle 5 - Chambre 16**                          ARRET DU 01 DECEMBRE 2020
                                                 N °   R G   1 9 / 0 9 3 4 7 -  N °  P o r t a l i s
                                                 **35L7-V-B7D-B7374**- 13ème page



## Jurisprudence : CA Paris, 1, 1, 30-06-2020, n° 17/22494, Infirmation

## **CA Paris, 1, 1, 30-06-2020, n° 17/22494, Infirmation**

Article, 688, CPC

Article, 1520, 4°, CPC

Article, 688, alinéa 2, 3°, CPC

Article, 1520,4°, CPC

Huissier

Convention d'une haye

Double exemplaire

Mise en état

Constitution d'avocat

Copies exécutoires REPUBLIQUE FRANCAISE

délivrées aux parties le : AU NOM DU PEUPLE FRANCAIS

COUR D'APPEL DE PARIS

Pôle 1 - Chambre 1

ARRET DU 30 JUIN 2020

(n° , 6 pages)

Numéro d'inscription au répertoire général : N° RG 17/22494 - N° Portalis 35L7-V-B7B-B4TOC

Décision déférée à la Cour : Sentence rendue le 17 novembre 2017 à Paris par le tribunal arbitral composé de M. Aa Ab et de M. Ac Ad Ae, co-arbitres, et de M. François-Xavier Train, président,

DEMANDERESSE AU RECOURS :

SAS SOUFLET NEGOCE

prise en la personne de ses représentants légaux

Quai du Général Sarrail

10400 NOGENT SUR SEINE

représentée par Me Patricia HARDOUIN de la SELARL 2H Avocats à la cour, avocat postulant du barreau de PARIS, toque : L0056

assistée de Me Claude VAILLANT, avocat plaidant du barreau de PARIS, toque P 257

DÉFENDERESSE AU RECOURS :

Société EGYPTIAN INTERNATIONAL FACTORY FOR SPLITTING

prise en la personne de ses représentants légaux

Industrial Zone NR 3

6th October City

GIZA - EGYPTE

assignée le 14 mars 2018

non représentée

COMPOSITION DE LA COUR :

En application des dispositions des articles 805 et 907 du code de procédure civile, l'affaire a été débattue le 10 mars 2020, en audience publique, l'avocat de la demanderesse ne s'y étant pas opposé, devant Mme Anne BEAUVOIS, présidente de chambre et Mme Marie-Catherine GAFFINEL,

conseillère, chargées du rapport.

Ces magistrats ont rendu compte des plaidoiries dans le délibéré de la Cour, entendu en son rapport, composée de :

Mme Anne BEAUVOIS, présidente de chambre

M. Jean LECAROZ, conseiller

Mme Marie-Catherine GAFFINEL, conseillère

Greffier, lors des débats : Mme Mélanie PATE

- par défaut

- par mise à disposition de l'arrêt au greffe de la Cour, le délibéré ayant été prorogé à ce jour sans que les parties aient pu en être avisées en raison de l'état d'urgence sanitaire.

- signé par Mme Anne BEAUVOIS, présidente de chambre et par Mme Mélanie PATE, greffière.

Par un contrat n° 5.011602 du 16 janvier 2015, la société Soufflet Négoce, ci-après la société Soufflet, spécialisée dans le négoce international de céréales, a vendu 6.500 tonnes métriques de graines de féveroles alimentaires (faba beans) à la société Egyptian international Factory for splitting, ci-après EIF.

Ce contrat prévoyait des modalités de paiement, en particulier une avance de 50% du montant du prix payable avant la livraison et la soumission à la Formule Incograin n° 12 (contrat-type d'achat et de vente adapté au commerce des matières premières agricoles) prévoyant le recours à l'arbitrage de la Chambre Arbitrale Internationale de Paris en cas de litige.

Le 13 mai 2015, le contrat n° 5.011602 a été modifié en contrat n° 5.011602 A, prévoyant :

- une livraison pour juillet 2015, au choix du vendeur ;

- la faculté pour la société Soufflet de conserver et de déduire du prix du contrat n° 5.011602 A une somme remise en

garantie par la société EIF à l'occasion d'une précédente opération entre les parties.

Parallèlement, en date du 18 mai 2015, la société Soufflet a livré, avec le navire « MV TK ROTTERDAM », en exécution d'un précédent contrat conclu entre les parties (n°5.050502), près de 5.300 tonnes de féveroles alimentaires à la société EIF, laquelle n'a jamais acquitté le montant de la facture, malgré de nombreuses relances, pour un montant de 1.614.073,48 USD.

La société EIF s'est également abstenue de payer l'acompte de 50% prévu par le contrat n° 5.011602 mais a accepté de reporter l'exécution de ce contrat.

A la suite d'un rencontre intervenue le 5 octobre 2015 entre les parties, celles-ci sont parvenues à un accord, aux termes duquel selon le compte-rendu établi par M. Af, adressé par courriel aux sociétés le 12 octobre 2015, elles se sont accordées pour subordonner l'exécution, par la société Soufflet du contrat n° 5.011602 à l'apurement de la dette antérieure de la société EIF, au titre du contrat n° 5.050502, avant le 8 novembre 2015. En cas d'inexécution par la société EIF, non imputable à un cas de force majeure, la société Soufflet avait la faculté d'appliquer à son profit, la différence entre le prix du contrat et le prix du marché au jour du défaut, en vertu des stipulations de l'article XVI de la Formule Incograin n°12.

La société Soufflet a réclamé l'exécution de cet accord, en vain, auprès de la société EIF dès le 17 décembre 2015.

Ultérieurement, le 7 juillet 2016, la société Soufflet a notifié son défaut à la société EIF et son intention de se prévaloir de la possibilité de voir appliquer l'article XVI de la Formule Incograin n°12, à savoir la facturation de la différence du prix du contrat et du prix du marché au jour du défaut. Par courrier du 13 juillet 2016, la société Soufflet a présenté la facture correspondante, d'un montant de 1.114.750,00 USD, et adressé une relance le 19 juillet 2016, exigeant un paiement avant le 21 juillet 2016 sous la menace du dépôt d'une requête en arbitrage.

Le 28 juillet 2016, à défaut de paiement, la société Soufflet a déposé une requête auprès de la Chambre Arbitrale Internationale de Paris qui l'a notifiée à la société EIF, sur le fondement de la clause compromissoire insérée dans le contrat n° 5.011602, les deux autres contrats n° 5.011602 A et 5.050502 contenant la même clause. La société EIF n'a pas participé à la procédure arbitrale.

Par une sentence rendue le 17 novembre 2017 à Paris, le tribunal arbitral composé de M. Aa Ab et de M. Ac Ad Ae, co-arbitres, et de M. François-Xavier Train, président, s'est déclaré compétent, a condamné la société EIF à payer à la société Soufflet la somme de 406.640,00 USD en réparation du préjudice subi par celle-ci, au lieu de celle réclamée de 1.114.750 USD, augmentée des intérêts légaux au taux prévu par le droit français à compter du 17 décembre 2015 et jusqu'à complet paiement, outre une indemnité de 1 500 euros au titre de l'article 700 du code de procédure civile et à supporter la totalité des frais de l'arbitrage.

Par déclaration du 8 décembre 2017, la société Soufflet a formé un recours en annulation à l'encontre de la sentence arbitrale.

Par conclusions du 22 février 2018, elle demande à la cour d'annuler la sentence arbitrale rendue le 17 novembre 2017 en ce qu'elle viole les dispositions de l'article 1520-3° et 1520-4° du code de procédure civile et de condamner la société Egyptian International Factory à lui payer la somme de 10.000 € au titre de l'article 700 du code de procédure civile et aux entiers dépens dont distraction conformément aux dispositions de l'article 699 du code de procédure civile. Elle soutient que le principe de la contradiction n'a pas été respecté et que le tribunal arbitral a statué sans se conformer à la mission qui lui avait été confiée.

La société Egyptian international Factory for splitting n'a pas constitué avocat.

MOTIFS :

La société Soufflet produit l'acte de l'huissier de justice en date du 14 mars 2018, attestant avoir accompli les formalités de transmission de la demande de signification ou de notification en Egypte, en adressant, selon les formalités prévues par la Convention de La Haye du 15 novembre 1965, par courrier recommandé international avec

avis de réception, au ministère de la Justice au Caire (Egypte) le formulaire spécifique et l'acte en double exemplaire contenant assignation devant la cour d'appel de Paris avec signification des conclusions.

En outre, sur la demande qui lui a été faite par le conseiller de la mise en état conformément à l'article 688 du code de procédure civile, alinéa 2, 3°, la société Soufflet a produit une réponse du Consulat général de France au Caire, en date du 2 juillet 2018, selon laquelle « le ministère égyptien des affaires étrangères a avisé ce Consulat général que la demande de notification à la société international Factory for splitting a pu aboutir', accompagné des copies du courrier de réponse du ministère égyptien des affaires étrangères portant la date du 16 mai 2018 et du procès-verbal de notification annexé, les deux documents rédigés en arabe, ainsi que de la traduction de la seule réponse du ministère égyptien des affaires étrangères dont il résulte que « les autorités égyptiennes ont mentionné que la notification a eu lieu par l'administration concernée comme indiqué au procès-verbal en annexe ».

Il est ainsi établi l'accomplissement des formalités exigées par la Convention de La Haye du 15 novembre 1965 et des démarches effectuées conformément aux dispositions de l'article 688 du code de procédure civile, permettant de retenir que la société EIF a été régulièrement attraite à la procédure, même si elle n'a pas constituée avocat, sans cependant qu'il puisse être affirmée que la signification a été faite à personne.

Le présent arrêt sera donc rendu par défaut.

Sur le premier moyen d'annulation tiré du non-respect du principe de la contradiction (article 1520,4° du code de procédure civile)

La société Soufflet fait valoir essentiellement qu'en décidant d'évaluer le préjudice subi à hauteur du manque à gagner du fait de l'inexécution par son cocontractant de ses obligations contractuelles, sans que les parties n'aient été en mesure de présenter leurs observations, le tribunal arbitral ne s'est pas contenté de modifier l'évaluation du préjudice mais s'est livré incontestablement à une substitution pure et simple du fondement de sa réclamation indemnitaire en violation des dispositions de l'article 1520, 4° du code de procédure civile.

Le principe de la contradiction exige que les parties aient pu faire connaître leurs prétentions de fait et de droit et discuter celles de leur adversaire de telle sorte que rien de ce qui a servi à fonder la décision des arbitres n'ait échappé à leur débat contradictoire. Les arbitres doivent en toutes circonstances, faire observer et observer eux-mêmes ce principe, même s'ils n'ont pas à soumettre au préalable l'argumentation juridique qui étaye leur motivation à la discussion des parties.

La société Soufflet a demandé au tribunal arbitral de condamner la société EIF à lui payer la somme de 1.114.750,00 USD, plus les intérêts au taux légal, réclamant l'application de la différence entre le prix du contrat et le prix du marché au jour du défaut, au motif que la société EIF n'ayant payé ni le solde du précédent contrat avant le terme du 8 novembre 2015 sur lequel les parties s'étaient accordées le 5 octobre 2015, ni l'avance de 50 % du montant du prix du contrat n° 5.011002, celle-ci était en défaut (pièce n°10).

Après l'audience préliminaire du 20 juin 2017, le tribunal arbitral a rendu une ordonnance de procédure le 26 juin 2017. Le 8 septembre 2017, le tribunal arbitral a invité la société Soufflet à préciser les raisons pour lesquelles, selon elle, le recours au c) de l'article XVI du contrat Incograin n° 12 était justifié en l'espèce et de fournir une note explicative relative aux modalités du calcul ainsi que toute pièce pertinente.

La société Soufflet a répondu le 18 septembre 2017 sur ces deux points (pièce n°12).

Le tribunal arbitral a reconnu que « la société Soufflet est donc bien fondée à se prévaloir de l'application de la différence de prix, à son profit, entre le prix du contrat et le prix du marché au jour du défaut prévue par l'article XVI c) ».

S'agissant du montant de sa demande, la société Soufflet a expliqué qu'elle chiffrait à 171,50 USD par tonne, la différence entre le prix du contrat et le prix du marché au jour du défaut, résultant d'une part, du prix de la tonne prévu au contrat litigieux, comprenant le prix de la marchandise augmenté de ses divers accessoires (391,94 USD) ainsi que de la marge commerciale (62,56 USD), pour un total de 454,50 USD, et d'autre part, du prix du contrat n°5.092105A, de 283 USD par tonne, et qu'elle aboutissait donc en application de la clause, à sa réclamation de 1.114.750 USD (soit 171,50 x 6 500 tonnes). Elle a précisé que la fourniture de féveroles alimentaires à destination de l'Egypte n'était pas une activité très courante et qu'il n'y avait que quelques affaires similaires.

Il résulte de la sentence que le tribunal arbitral a pris acte de ce qu'il n'existait pas de cours du marché de la féverole alimentaire à destination de Damietta en Egypte, ce qui ne privait pas cependant la société Soufflet de toute indemnisation sur le fondement de l'article XVI c), a considéré que le contrat similaire n°5.092105A produit par la demanderesse était insuffisant, que le mode de calcul de la différence de prix proposé par la société Soufflet n'était

pas pertinent.

Pour fonder sa décision, retenant que « les éléments fournis par la demanderesse, en particulier les différents accessoires du prix brut de la marchandise, permettent au Tribunal Arbitral d'évaluer la marge commerciale qu'elle aurait réalisée sur cette opération qui correspond au manque à gagner qu'elle a subi du fait de la défaillance de la défenderesse », le tribunal a alors « en l'absence d'éléments suffisamment probants pour mettre en oeuvre le mécanisme d'évaluation du préjudice prévu par l'article XVI c) du contrat Incograin n°12 », évalué le préjudice subi par la demanderesse à hauteur du manque à gagner dont elle avait souffert du fait de l'inexécution par la défenderesse de ses obligations contractuelles, soit à la somme de 406 640 USD, correspondant à la marge commerciale à la tonne calculée par ses soins, multipliée par 6 500 tonnes.

Or, le tribunal arbitral ne pouvait, sans inviter les parties à s'en expliquer, écarter le mécanisme d'une clause d'évaluation contractuelle du préjudice dont elle a reconnu qu'il était applicable à la demande de la requérante à l'arbitrage, sanctionnant le défaut d'une partie en permettant à l'autre partie de bénéficier d'un avantage calculé sur la différence entre le prix du contrat et le prix de marché au jour du défaut, pour lui substituer une indemnisation calculée sur une perte de marge commerciale, en retenant ainsi un mode de réparation du préjudice qui n'avait fait l'objet d'aucun débat contradictoire.

En n'invitant pas la société Soufflet à s'expliquer avant de statuer sur ce point, le tribunal arbitral a méconnu le principe de la contradiction.

Cette méconnaissance emporte annulation de la sentence.

Sur les dépens et l'indemnité au titre de l'article 700 du code de procédure civile

Les dépens seront supportés par la société EIF qui succombe.

L'équité commande de la condamner à payer une indemnité de 10 000 € au titre de l'article 700 du code de procédure civile.

PAR CES MOTIFS :

Annule la sentence arbitrale rendue le 17 novembre 2017 à Paris par le tribunal arbitral composé de M. Aa Ab et de M. Ac Ad Ae, co-arbitres, et de M. François-Xavier Train, président,

Condamne la société Egyptian international Factory for splitting à payer à la société Soufflet Négoce une indemnité de 10 000 euros au titre de l'article 700 du code de procédure civile.

Condamne la société Egyptian international Factory for splitting aux dépens qui pourront être recouvrés directement conformément aux dispositions de l'article 699 du code de procédure civile.

LA GREFFIERE    LA PRESIDENTE



## Jurisprudence : CA Paris, 1, 1, 17-12-2020, n° 18/01504, Infirmation

# CA Paris, 1, 1, 17-12-2020, n° 18/01504, Infirmation

Article, 1520, CPC

Article, 1525, CPC

Article, 1520, 5°, CPC

Refus d'exequatur d'une sentence

Ordre public

Ordre juridique

Lettre d'engagement

Arbitre

Copies exécutoires REPUBLIQUE FRANCAISE

délivrées aux parties le : AU NOM DU PEUPLE FRANCAIS

COUR D'APPEL DE PARIS

Pôle 1 - Chambre 1

ARRET DU 17 DECEMBRE 2020

(n° , 7 pages)

Numéro d'inscription au répertoire général : N° RG 18/01504 - N° Portalis 35L7-V-B7C-B4224

Décision déférée à la Cour : Ordonnance du 20 novembre 2017 qui a conféré l'exequatur à la sentence arbitrale rendue le 31 mars 2016 à Tunis par le tribunal arbitral composé de M. A Aa et Mme Ab, arbitres, et de M. Houerbi, président

APPELANT

Monsieur Ac Ad Ae Af Ag B ou Ag B né le ... ... ... à

Building n°2,

Ah Ai Aj Ak, ... ...

... ... ... ...

...

représenté par Me Luca DE MARIA de la SELARL PELLERIN - DE MARIA - GUERRE, avocat postulant du barreau de PARIS, toque : L0018

assisté de Me Clément DUPOIRIER et Me Laurence FRANC-MENGET, avocats plaidant du barreau de PARIS, toque : J0O25

Copyright Lexbase

INTIMEE

SOCIETE D'ENTREPRISE ET DE GESTION-QATAR WLL

prise en la personne de ses représentants légaux

Financial Square - Al Emadi Centre Building 1 - Office 7

C-Ring Road BP 24469 Doha

QATAR

représentée par Me Matthieu BOCCON GIBOD de la SELARL LEXAVOUE PARIS-VERSAILLES, avocat postulant du barreau de PARIS, toque : C2477

assistée de Me Marwan SAKR et de Me Michel NASSAR, avocats au barreau de PARIS, toque : W16 et C1990


COMPOSITION DE LA COUR :

En application des dispositions de l'article 805 et 907 du code de procédure civile, l'affaire a été débattue le 22 octobre 2020, en audience publique, les avocats des parties ne s'y étant pas opposés, devant Mme Anne BEAUVOIS, présidente de chambre et M. François MELIN, conseiller, chargés du rapport.

Ce magistrats ont rendu compte des plaidoiries dans le délibéré de la Cour, composée de :

Mme Anne BEAUVOIS, présidente de chambre

M. François MELIN, conseiller

Mme Marie-Catherine GAFFINEL, conseillère

Greffier, lors des débats : Mme Mélanie PATE

ARRET :

- contradictoire

- par mise à disposition de l'arrêt au greffe de la Cour, les parties en ayant été préalablement avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure civile.

- signé par Mme Anne BEAUVOIS, présidente de chambre et par Mme Mélanie PATE, greffière, présente lors de la mise à disposition.


FAITS ET PROCÉDURE

M. Ac Ad Ae Af Ag B, ci-après M. Ag B, entrepreneur qatari, a conclu avec la Société d'Entreprise et de Gestion - Qatar (la SEGQ), société de droit gatari, des contrats ayant pour objet la construction de deux tours à Doha (Qatar).

Des différends étant nés portant sur l'exécution des contrats, deux lettres d'engagement contenant une clause compromissoire ont été signées le 3 avril 2008 par la SEGQ et M. Ag B. Cette clause est ainsi rédigée « « in case of dispute a local arbitrator(s) shall be assigned to resolve the conflict », en français « en cas de litige, un ou des arbitre(s) local(aux) sera(ont) nommé(s) afin de résoudre le conflit ».

De nouveaux différends étant survenus entre les parties, M. Ag B a introduit sa demande d'arbitrage devant le Centre d'arbitrage international du Qatar 'Qatar International Center for Arbitration (QICA)' par une lettre du 25 avril 2010. Il a désigné M. Al Am (ou Al Chata), alors secrétaire général de ce Centre d'arbitrage en qualité d'arbitre.

Copyright Lexbase

Le 4 mai 2010, la demande d'arbitrage a été transmise à SEGQ. Le 5 mai 2010, celle-ci, a contesté la compétence du QICA, en faisant valoir l'absence d'accord des parties sur le recours au Centre d'arbitrage, l'impossibilité de M. Am de cumuler ses fonctions de secrétaire général du QICA et d'arbitre dans un litige soumis au règlement de ce même Centre, mais a désigné Mme Ab en qualité d'arbitre. Les deux co-arbitres ont désigné M. An Ao en tant que président du tribunal arbitral. Le tribunal ainsi constitué a accepté sa mission le 28 juillet 2010.

Le 14 septembre 2010, ce tribunal arbitral s'est réuni au Caire (Egypte), et par ordonnance de procédure de ce jour, a convenu d'un arbitrage ad hoc, choisissant Tunis comme siège de l'arbitrage, précisant que les audiences se dérouleraient au Caire et qu'une audience procédurale serait tenue le 22 octobre suivant. M. Ag B a contesté cette décision par courrier du 6 octobre 2010.

M. Ag B a alors sollicité la récusation de M. Ao par le Centre d'arbitrage et l'a obtenue par décision du 13 mars 2011. Le 19 juin 2011, dans cette procédure arbitrale menée sous son égide, le Centre d'arbitrage a désigné M. Ap en qualité de président du tribunal arbitral. Par ailleurs, M. Am ayant démissionné le 19 octobre 2010 en invoquant des raisons personnelles, M. Ag B a désigné M. Af pour le remplacer. Saisi sur la demande de M. Ag B, le tribunal de première instance de Doha, par jugement du 26 novembre 2013, a autorisé le Centre d'arbitrage à désigner un nouvel arbitre, en remplacement de Mme Ab. M. Ag Aq a été désigné par le Centre d'arbitrage. M. Ag B a désigné M. C en remplacement de M. Af démissionnaire.

De son côté, invoquant l'impossibilité de saisir le juge d'appui tunisien compte tenu de la situation politique et sécuritaire en Tunisie, SEGQ a sollicité du juge d'appui libanais la désignation d'un arbitre en remplacement de M. Am, démissionnaire, puis après avoir fait rétracter la décision rendue par la juridiction libanaise, estimant que la situation sécuritaire en Tunisie le permettait, a saisi le juge d'appui tunisien aux mêmes fins. Par une décision du 28 janvier 2013, le juge d'appui tunisien, constatant que M. Ag B s'était abstenu de désigner un nouvel arbitre en remplacement de M. Am, a désigné M. A Aa.

A l'issue de ces diverses initiatives procédurales, la demande d'arbitrage initiale a abouti :

- d'une part, à une sentence rendue le 14 mars 2016 à Doha (la sentence QICA) par un tribunal arbitral administré sous l'égide du QICA, composé de MM. An C et Ar As X, arbitres, et de M. Ap, aux termes de laquelle la SEGQ est condamnée à payer à M. Ag B la somme d'environ 6 500 000 euros ;

- d'autre part, une sentence rendue, le 31 mars 2016 (la sentence Houerbi) à Tunis par un tribunal arbitral 'ad hoc', composé de M. A Aa et Mme Ab, arbitres, et de M. Houerbi, président aux termes de laquelle M. Ag B a été condamné à payer à la SEGQ la somme d'environ 22 millions d'euros.

La sentence QICA rendue le 14 mars 2016 a fait l'objet d'un recours de SEGQ en annulation devant le tribunal de première instance de Doha qui l'a rejeté le 27 février 2018.

La sentence Houerbi a fait l'objet d'un recours de M. Ag B devant la cour d'appel de Tunis qui l'a annulée par arrêt en date du 28 février 2017.

Le 20 novembre 2017, la SEGQ a obtenu auprès du président du tribunal de grande instance de Paris une ordonnance (l'ordonnance d'exequatur) rendant exécutoire la sentence arbitrale Houerbi du 31 mars 2016. L'ordonnance d'exequatur a été signifiée les 15 et 28 décembre 2017 à M. Ag B qui en a interjeté appel le 15 janvier 2018.

PRÉTENTIONS DES PARTIES

Par dernières conclusions notifiées le 17 septembre 2020, M. Ag B demande à la cour :

- d'infirmer l'ordonnance d'exequatur de la sentence arbitrale rendue le 31 mars 2016 à Tunis par le tribunal arbitral composé de Mme Ab et M. A Aa, co-arbitres, et M. Houerbi, président ;

- de juger que la sentence arbitrale rendue le 31 mars 2016 à Tunis par le tribunal arbitral composé de Mme Ab et M. A Aa, co-arbitres, et M. Houerbi, président, ne saurait recevoir l'exequatur en France ;

- condamner la Société d'Entreprise et de Gestion - Qatar aux dépens et à lui payer la somme de 50.000 euros au titre des frais irrépétibles non compris dans les dépens.

Copyright Lexbase

Par dernières conclusions notifiées le 22 janvier 2018, la Société d'Entreprise et de Gestion - Qatar demande à la cour de :

- débouter M. Ag B de sa demande d'infirmation de l'ordonnance d'exequatur du 20 novembre 2017 rendant exécutoire la sentence arbitrale rendue à Tunis (Tunisie) le 31 mars 2016 ;

- confirmer l'ordonnance d'exequatur du président du tribunal de grande instance de Paris du 20 novembre 2017 ;

- condamner M. Ag B aux dépens et à lui payer la somme de 50 000 euros au titre de l'article 700 du code de procédure civile.

MOYENS DES PARTIES

M. Ag B soutient les moyens suivants :

- le tribunal Houerbi s'est déclaré à tort compétent (article 1520, 1° du code de procédure civile) aux motifs,

* que la demande d'arbitrage a été introduite devant le Centre d'arbitrage international du Qatar et que ce tribunal arbitral, autoproclamé ad hoc, n'était pas compétent pour statuer sur sa

demande d'arbitrage institutionnel,

* qu'il a en effet formulé une offre d'arbitrage institutionnel visant à pallier l'insuffisance de la

clause d'arbitrage que SEGQ a accepté partiellement dans la limite de la compétence qu'elle

entendait soulever, qu'elle a ratifié la compétence de ce même tribunal arbitral pour trancher

la question de sa propre compétence et qu'elle a confirmé le 22 octobre 2015 son accord pour l'application des règles QICA,

* que la clause d'arbitrage ne peut justifier la compétence d'un tribunal arbitral siégeant à

Tunis, le terme local, seul terme distinctif de la clause, s'analysant comme traduisant la

volonté commune des parties de se soumettre à un arbitrage interne au Qatar, et non comme

se référant à la nationalité des arbitres ;

- le tribunal Houerbi a été irrégulièrement constitué (article 1520, 2° du code de procédure civile), aux motifs,

* que la constitution du tribunal arbitral n'est pas conforme à la volonté des parties qu'aucun de ses membres n'a siégé conformément au règlement QICA alors que les parties ont accepté de s'y soumettre,

* que sa constitution a contrevenu au principe d'égalité des parties,

* que le tribunal arbitral n'a pas satisfait à l'exigence d'impartialité ;

- le tribunal arbitral a statué sans se conformer à sa mission (article 1520, 3° du code de procédure civile) en usurpant la mission confiée au tribunal QICA, en rendant sa sentence hors délai et en ne respectant pas les règles de procédure choisies par les parties ;

- le tribunal arbitral n'a pas respecté le principe du contradictoire (article 1520, 4° du code de procédure civile) en décidant unilatéralement du siège de l'arbitrage et de s'affranchir du QICA, en tranchant sur ses demandes au fond en violation des droits de la défense ;

- l'exequatur de la sentence est contraire à l'ordre public international (article 1520, 5° du code de procédure civile) en ce qu'elle méconnaît l'interdiction faite au tribunal de proroger les délais lui-même, qu'elle viole les principes du contradictoire et d'égalité des parties, autant d'éléments qui, tout en caractérisant des violations au titre des premiers alinéas de l'article 1520 du code de procédure civile, mettent en jeu la conception française de l'ordre public international.

La SEGQ réplique aux griefs de l'appelant en soutenant que :

- le tribunal Ao est le seul compétent aux motifs,

* que la clause d'arbitrage prévoit une procédure ad hoc et ne prévoit pas d'arbitrage

institutionnel, de sorte qu'elle n'a jamais considéré transformer un arbitrage institutionnel en

arbitrage ad hoc, qu'elle n'a jamais reconnu la compétence du tribunal arbitral constitué sous l'égide du QICA, que la seule interprétation possible de l'arbitre local est celle portant sur la

nationalité de l'arbitre mais que les parties ont renoncé à cette condition, que M. Ag B a saisi le Centre d'arbitrage en violation flagrante de la volonté des parties,

* que le siège de Tunis a valablement été choisi par le tribunal Houerbi dans le silence de la

clause d'arbitrage ;

- le tribunal arbitral a été régulièrement constitué aux motifs,

* qu'elle n'a jamais consenti à un arbitrage sous l'égide du QICA, ayant maintenu sa volonté de recourir à l'arbitrage tout en contestant le recours au QICA et n'ayant pas accepté même

tacitement la compétence de ce tribunal, que le QICA n'a jamais été désigné par les parties

comme Centre d'arbitrage,

* que la nomination de M. A Aa est régulière et a été confirmée par arrêt de la Cour de

cassation tunisienne le 27 novembre 2014, qu'elle a en effet été contrainte, pour éviter

l'immobilisme dans la procédure d'arbitrage, d'avoir recours au juge d'appui en raison du

refus de M. Ag B de nommer un arbitre en remplacement de M. Am,

* que le tribunal arbitral est indépendant et impartial, que toutes les parties étaient représentées à l'audience de procédure du 14 septembre 2010 ;

- le tribunal arbitral a statué conformément à sa mission, dans les délais qu'il a fixés dans son ordonnance et prolongés, M. Ag B ayant continué à participer à la procédure, et en respectant les règles de procédure choisies par les parties ;

- le tribunal arbitral a respecté le principe du contradictoire, M. Ag B ayant été invité à conclure mais ayant refusé de le faire et de se présenter à la plaidoirie ;

- l'exequatur de la sentence est conforme à l'ordre public international, le contrôle de l'ordre public international ne pouvant servir à déguiser une révision de la sentence au fond.

MOTIFS :

En application de l'article 1525 du code de procédure civile, la cour d'appel ne peut refuser l'exequatur d'une sentence arbitrale que dans les cas prévus à l'article 1520 du même code.

Sur le moyen pris de la violation de l'ordre public international (article 1520, 5° du code de procédure civile)

L'ordre public international au regard duquel s'effectue le contrôle du juge s'entend de la conception qu'en a l'ordre juridique français, c'est-à-dire des valeurs et des principes dont celui-ci ne saurait souffrir la méconnaissance même dans un contexte international.

Copyright Lexbase

Il est établi que :

- la clause compromissoire contenue dans les lettres d'engagement du 3 avril 2008 signées par la SEGQ et M. Ag B était ainsi rédigée « en cas de litige, un ou des arbitre(s) local(aux) sera(ont) nommé(s) afin de résoudre le conflit »,

- M. Ag B a saisi le Centre d'arbitrage international du Qatar 'Qatar International Center for Arbitration (QICA)' par une lettre du 25 avril 2010 formulant une offre d'arbitrage institutionnel,

- le Centre d'arbitrage a adressé cette offre d'arbitrage le 4 mai 2010 à SEGQ,

- SEGQ a répondu le 5 mai 2010 qu'en l'absence de clause d'arbitrage se référant au Centre ou à ses règles d'arbitrage, elle entendait se réserver le droit de contester la compétence de cette juridiction,

-le 6 juin 2010, SEGQ a réitéré ses réserves mais a désigné un arbitre par mesure de précaution, se réservant la faculté de contester la compétence du Centre d'arbitrage et du comité d'arbitrage,

- le 26 juillet 2010, SEGQ a sollicité du secrétaire général du Centre d'arbitrage des informations sur les mesures prises pour compléter la constitution du tribunal et la poursuite par ce dernier de la procédure,

- le tribunal arbitral constitué de MM. Am, arbitre désigné par M. Ag B et de Mme Ab, arbitre désignée par SEGQ, et de M. Houerbi, président désigné par les co-arbitres, a accepté sa mission le 28 juillet 2010,

- par décision du 14 septembre 2010, le tribunal arbitral, rappelant son accord pour prendre en charge la procédure d'arbitrage dans le litige qui lui est soumis par les parties, a fixé la première audience de procédure devant se dérouler au Caire le 22 octobre 2010, en présence du tribunal arbitral et des deux parties au litige, décidé que les audiences suivantes auraient lieu au Caire et que la sentence arbitrale serait rendue à Tunis, fixé les modalités de déroulement de la procédure et la durée de l'arbitrage à six mois.

Contrairement à ce prétend SEGQ, il résulte clairement des termes mêmes de cette décision du 14 septembre 2010, dont le contenu est rappelé au paragraphe 25 de la sentence, que le tribunal arbitral composé de ses trois membres s'est réuni hors la présence des parties et de leurs conseils, et que la décision a été prise sans que ceux-ci aient été préalablement consultés sur l'ensemble des points en cause.

Le 6 octobre 2010, M. Ag B a contesté cette décision du 14 septembre 2010 en faisant valoir que le tribunal arbitral ne pouvait sans l'accord des parties fixer le lieu de l'arbitrage au Caire et le siège de l'arbitrage à Tunis, soutenant 'qu'il n'y avait aucune preuve ni accord des parties pour permettre la conduite de l'arbitrage en dehors du Qatar'.

Aucune réunion du tribunal arbitral n'a eu lieu du fait de la démission de M. Am le 19 octobre 2010.

Le président du Centre a écrit le 2 décembre 2010 au président du tribunal arbitral, rappelant que le Centre était saisi de la demande d'arbitrage et que même si le litige soumis devait être un arbitrage ad hoc selon l'accord des parties, les mesures de procédure devaient être prises selon le règlement du Centre tant qu'il n'y avait pas d'accord des parties.

M. Ao a répondu le 9 décembre 2010, après avoir invoqué le secret absolu qui pèse sur les membres du tribunal arbitral :

*[...] De plus, votre Centre ne bénéficie d'aucun statut ou compétence lui permettant de s'adresser au tribunal arbitral puisqu'il va sans dire que toute compétence accordée à une institution arbitrale doit être stipulée par écrit et de façon claire dans la convention d'arbitrage ou par toute autre convention entre les parties.

Vous insistez sur la compétence de votre Centre dans l'administration de la présente affaire alors qu'il apparaît de manière évidente qu'il n'y a aucune clause d'arbitrage applicable en l'espèce ; il n'apparaît pas non plus dans les correspondances entre les parties que celles-ci aient désigné par commun accord votre Centre comme institution arbitrale à qui il reviendrait de conduire la procédure arbitrale dans la présente affaire. Au surplus, le défendeur a présenté une objection où il conteste fermement la compétence de votre Centre.

M. Ao et Mme Ab ont poursuivi leur mission d'arbitres sur la demande d'arbitrage de M. Ag B, malgré les décisions prises à leur égard, dans le cadre d'un arbitrage ad hoc, non soumis au réglement du Centre.

Il résulte de ce qui précède que le tribunal arbitral a été constitué sous l'administration du Centre d'arbitrage, à la demande de M. Ag B, avec l'accord donné par SEGQ, résultant de la désignation d'un arbitre et de la demande de poursuite de la désignation du tribunal arbitral, assorti des réserves manifestant en réalité sa volonté de soumettre à

ce tribunal ses contestations portant sur l'existence de la clause compromissoire, le recours au Centre d'arbitrage pour organiser l'arbitrage et la compétence du tribunal arbitral.

Or, le tribunal arbitral, ainsi constitué, a décidé de substituer à cet arbitrage institutionnel un arbitrage ad hoc en s'affranchissant de l'application du règlement du Centre d'arbitrage et en préjugeant du caractère international du litige en fixant le siège à Tunis, sans accord des parties et sans même avoir invité préalablement les parties à présenter leurs observations sur les règles procédurales qu'il entendait mettre en oeuvre et le déroulement de la procédure qu'il entendait établir, en méconnaissance du principe de la contradiction. Le tribunal arbitral a ainsi également préjugé en faveur de SEGQ de l'interprétation de la clause d'arbitrage et du bien fondé de sa contestation du recours à un arbitrage institutionnel, sans que M. Ag B ait été invité à faire valoir ses moyens et avant tout débat entre les parties, sans respecter le principe de la contradiction et l'obligation d'impartialité de l'arbitre.

L'exécution d'une telle sentence heurte de manière manifeste, effective et concrète les principes et valeurs compris dans l'ordre public international de procédure.

Il en résulte que l'ordonnance d'exequatur de la sentence arbitrale doit être infirmée, sans qu'il y ait besoin d'examiner les autres moyens d'infirmation.

Sur les dépens et l'indemnité au titre de l'article 700 du code de procédure civile

SEGQ qui succombe en ses prétentions doit être condamnée aux dépens et à payer à M. Ag B une indemnité de 50 000 euros au titre de l'article 700 du code de procédure civile.

PAR CES MOTIFS :

Infirme l'ordonnance du 20 novembre 2017 qui a conféré l'exequatur à la sentence arbitrale rendue le 31 mars 2016 à Tunis par le tribunal arbitral composé de M. A Aa et Mme Ab, arbitres, et de M. Houerbi, président ;

Statuant à nouveau :

Rejette la demande tendant à voir conférer l'exequatur à ladite sentence ;

Condamne la Société d'Entreprise et de Gestion - Qatar à payer à M. Ac Ad Ae Af Ag B une indemnité de 50 000 euros au titre de l'article 700 du code de procédure civile.

Condamne la Société d'Entreprise et de Gestion - Qatar aux dépens.

LA GREFFIERE LA PRESIDENTE

Copyright Lexbase



## Jurisprudence : CA Paris, 1, 1, 13-02-2018, n° 15/17137, Infirmation

# CA Paris, 1, 1, 13-02-2018, n° 15/17137, Infirmation

Article, 1520, CPC

Article, 3°, CPC

Article, 4°, CPC

Principe de contradiction

Arbitre

Engagement de non-concurrence

Nullité du contrat

Débat contradictoire

Grosses délivrées RÉPUBLIQUE FRANÇAISE aux parties le : AU NOM DU PEUPLE FRANÇAIS

COUR D'APPEL DE PARIS Pôle 1 - Chambre 1

ARRÊT DU 13 FÉVRIER 2018 (n°, 6 pages)

Numéro d'inscription au répertoire général 15/17137

Décision déférée à la Cour : Ordonnance du 10 juillet 2015 rendue par le président du tribunal de grande instance de Paris qui a conféré l'exequatur à une sentence partielle rendue à Bruxelles le 11 juin 2015 par le tribunal composé de MM ... et ..., arbitres, et de M. ..., président

APPELANTE

Société STRUBE GmbH & Co KG

prise en la personne de ses représentants légaux

Sollingen

Amtsgericht Braunschweig, HRA 200906

ALLEMAGNE

représentée par Me Véronique DE LA TAILLE de la SELARL RECAMIER AVOCATS ASSOCIÉS, avocat postulant du barreau de PARIS, toque K0148

assistée de Me Mélina ..., Emmanuel ... et Emmanuel ..., avocats plaidant du barreau de PARIS, toque R020

INTIMÉE

Société SESVANDERHAVE SA/NV
prise en la personne de ses représentants légaux

Industriepark 15

3300 TIENEN

BELGIQUE

représentée par Me Luca DE MARIA de la SELARL SELARL PELLERIN - DE MARIA-GUERRE, avocat postulant du barreau de PARIS, toque L0018

assistée de Me François MULLER, avocat plaidant du barreau de PARIS, toque R 021

COMPOSITION DE LA COUR

L'affaire a été débattue le 07 décembre 2017, en audience publique, devant la Cour composée de

Mme Dominique GUIHAL, présidente

Mme Dominique SALVARY, conseillère

M. Jean LECAROZ, conseiller

qui en ont délibéré, un rapport a été présenté à l'audience dans les conditions prévues par l'article 785 du code de procédure civile.

Greffier, lors des débats Mme Mélanie PATE

ARRÊT :

- CONTRADICTOIRE

- par mise à disposition de l'arrêt au greffe de la Cour, les parties en ayant été préalablement avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure civile.

- signé par Mme Dominique GUIHAL, présidente et par Mme Mélanie PATE, greffier présent lors du prononcé.

La société de droit allemand Strube GmbH &Co. KG (Strube) et la société de droit belge SESVanderHave, actives dans le développement de nouvelles variétés de betteraves sucrières ainsi que dans la production et la commercialisation de semences de betteraves sucrières ont conclu un contrat de coopération en 1957, puis, de nouveau, en 1977, en 1997 et en 2006.

La nouvelle politique sucrière de la Communauté européenne a conduit les parties à renégocier leur convention. Faute d'accord, le 5 juillet 2011, SESVanderHave a informé Strube qu'elle résiliait le contrat avec un préavis de six ans. Strube, faisant valoir que le contrat de 2006 était contraire au droit européen de la concurrence, a cessé d'exécuter ses obligations contractuelles. SESVanderHave en a fait autant. Le 9 octobre 2013, les parties ont conclu une convention d'arbitrage pour régler leurs différends sous l'égide du Centre belge d'arbitrage et de médiation, l'arbitrage étant en droit et la loi belge s'appliquant au fond du litige.

Par une sentence partielle rendue à Bruxelles le 11 juin 2015, le tribunal composé de MM ... et ..., arbitres, et de M. Callens, président :

- a condamné Strube au paiement des redevances échues et de dommages-intérêts pour un montant supérieur à 115 millions d'euros,

- lui a interdit d'utiliser le matériel génétique (germoplasme) et de commercialiser les variétés développées à partir de ce matériel,

- a estimé que le germoplasme et la technologie étant présumés appartenir à SESVanderHave, Strube devait les restituer intégralement sauf à faire la preuve contraire,

Copyright Lexbase

- a imposé à SESVanderHave l'obligation d'accorder à Strube sur sa demande pour tout germoplasme ou technologie en sa possession une licence non exclusive sur les améliorations apportées par Strube,

- a imposé à Strube de transférer à SESVanderHave les autorisations de mise sur le marché des variétés de semences enregistrées à son nom.

La sentence a été revêtue de l'exequatur par une ordonnance du président du tribunal de grande instance de Paris du 10 juillet 2015 dont Strube a interjeté appel le 12 août 2015.

Par une ordonnance du 31 mars 2016, le conseiller de la mise en état a rejeté la demande d'arrêt de l'exécution de la décision prononçant l'exequatur.

Par des conclusions notifiées le 16 novembre 2017, Strube demande à la cour d'infirmer l'ordonnance du 10 juillet 2015, de rejeter la demande d'exequatur, subsidiairement, de solliciter l'avis de l'Autorité de la concurrence sur l'impact de la sentence sur la structure du marché européen du germoplasme des semences de betteraves sucrières et des marchés français de commercialisation des semences certifiées, enfin de condamner SESVanderHave à lui payer la somme de 10.000 euros en application de l'article 700 du code de procédure civile.

Elle soutient que la sentence n'est pas susceptible d'exequatur, que le tribunal arbitral a statué ultra petita, que la sentence n'est pas obligatoire au sens de l'article V (1) (e) de la convention de New York, enfin que sa reconnaissance ou son exécution sont contraires à l'ordre public international.

Par des conclusions notifiées le 28 novembre 2017, SESVanderHave demande à la cour de rejeter l'ensemble des prétentions de Strube, de confirmer l'ordonnance d'exequatur et de condamner Strube à lui payer 1.000.000 euros pour procédure abusive et 100.000 euros en application de l'article 700 du code de procédure civile.

SUR QUOI

Sur les moyens tirés de la méconnaissance par les arbitres de leur mission et de la violation du principe de la contradiction (article 1520, 3° et 4° du code de procédure civile) :

Strube expose que les arbitres, après avoir constaté que la clause de restitution du germoplasme et la clause de non-concurrence étaient contraires à l'article 101 du Traité sur le fonctionnement de l'Union européenne (TFUE) en ont déduit, non pas la nullité du contrat - qu'elle demandait -, mais l'exécution de celui-ci assortie de l'obligation pour SESVanderHave de lui consentir une licence non-exclusive sur les améliorations qu'elle avait apportées au germoplasme et aux semences, ce qu'aucune des parties ne sollicitait, et ceci, au terme d'une analyse de l'article 15.5 du contrat qui n'avait pas donné lieu à un débat contradictoire.

Considérant que les parties ont conclu un contrat de coopération en 1957, puis, de nouveau, le 17 1977, le 27 octobre 1997 et le 29 septembre 2006; que ce dernier contrat à durée indéterminée prévoyait que Strube pouvait développer de nouvelles variétés de betteraves sucrières avec le germoplasme, c'est-à-dire, un ensemble de gênes, de cellules, de plantes ou parties de plantes, mis à sa disposition par SESVanderHave; que les semences ainsi développées, de même que toutes les améliorations apportées au matériel génétique devenaient la propriété de SESVanderHave en contrepartie du versement à Strube d'une compensation pour ses activités de développement; que Strube, moyennant le paiement d'une redevance, pouvait produire, distribuer et commercialiser les semences ainsi obtenues sous sa propre dénomination;

Considérant que l'article 15.1 (clause de non-concurrence) interdisait à Strube d'exercer, seule ou en collaboration avec des tiers, des activités de sélection ou de commercialisation concurrentes, en dehors du cadre contractuel, sans l'accord de SESVanderHave; que cette prohibition demeurait aussi longtemps que le contrat était en vigueur et, par conséquent, y compris, en cas de résiliation, pendant la période de préavis d'une durée conventionnelle de six années;

Considérant qu'en vertu des articles 3.4, 3.5, 13.2, 13.5 et 13.6 (clause de retour), Strube renonçait à tout droit sur le germoplasme et sur la technologie développés dans le cadre du contrat; qu'en cas de résiliation régulière, elle devait

les restituer intégralement à SESVanderHav et pouvait seulement poursuivre la commercialisation des variétés qu'elle commercialisait déjà, enfin, qu'en cas de résolution pour inexécution, elle devait restituer immédiatement, outre le germoplasme et la technologie, toutes les semences commerciales et semences prometteuses de nouvelles variétés à prix coûtant;

Considérant que des négociations engagées entre les parties pour réaménager leurs relations contractuelles ayant échoué, SES VanderHave a notifié à Strube le 5 juillet 2011 qu'elle résiliait le contrat avec un préavis de six ans;

Que Strube, alléguant que le contrat était contraire au droit de la concurrence, a cessé de payer les redevances et de partager avec SESVanderHave les résultats de ses activités de sélection;

Considérant que devant le tribunal arbitral, SESVanderHave demandait, en substance, que soit prononcée la résolution du contrat aux torts de Strube, que soit ordonnée la restitution du germoplasme, de la technologie, des semences, des plantes et des résultats de recherche, que soit diligentée une expertise pour identifier les éléments à restituer, enfin, que Strube soit condamnée à payer l'arriéré de redevances ainsi que des dommages-intérêts;

Considérant que Strube sollicitait le rejet des demandes principales et, à titre reconventionnel (sentence, § 132 et s.), principalement, l'annulation du contrat, subsidiairement, l'annulation de la clause de licence en retour (article 3.4), de la clause de renonciation (article 3.5), de la clause de licence (article 5.2), de la clause de redevance (article 6.1.1), de la clause de redevance minimum (article 6.1.2), de la clause de transfert (article 13.2) et de la clause de non-concurrence (article 15.1), enfin, la condamnation de SESVanderHave à restituer les sommes payées en vertu du contrat annulé;

Considérant que les arbitres, après avoir estimé que la collaboration entre les parties avait eu des effets pro-concurrentiels sur les deux marchés pertinents à savoir, celui du commerce du matériel de sélection et celui de la commercialisation des semences de betteraves sucrières, et que le grief tiré de la violation du droit de la concurrence n'était donc pas fondé à l'égard du contrat dans son ensemble, a examiné chacune des clauses dont Strube invoquait séparément la nullité;

Qu'il a écarté les moyens de nullité des clauses de licence et de redevance; qu'en revanche, il a retenu, d'une part, que la clause de non-concurrence, si elle était acceptable tant que les parties travaillaient ensemble, avait pour effet, en cas de résiliation et pendant la période de préavis de six ans, d'empêcher Strube de négocier une collaboration avec des tiers afin de poursuivre son activité de sélection, d'autre part, que la clause de retour privait Strube, à compter de la cessation de la coopération, de la possibilité d'exploiter les améliorations qu'elle avait apportées au germoplasme et/ou aux variétés de semence, même sur une base non exclusive et à des conditions justes et raisonnables; que le tribunal en a déduit que l'effet combiné de ces deux stipulations rendrait très difficile le maintien de Strube sur le marché après la cessation de la collaboration;

Considérant qu'ayant estimé que ces deux clauses entraînaient une restriction sensible de la concurrence et qu'elles ne bénéficiaient pas de l'exemption prévue par l'article 101 (3) du TFUE, le tribunal arbitral a jugé qu'elles étaient partiellement invalides au regard des dispositions d'ordre public de l'article 101 de ce Traité;

Que pour retenir qu'une invalidité partielle était permise et, le cas échéant, imposée par le contrat, le tribunal s'est fondé sur l'article 15.5 selon lequel :

'Aucun terme du présent Contrat ne saurait être analysé comme exigeant la réalisation d'un acte contraire à la loi, et en cas de conflit entre une stipulation du présent Contrat et une législation ou une réglementation substantielle prise en application d'une loi ou d'une ordonnance, ces dernières prévaudront. Dans ce cas, les prévisions du Contrat seront réduites et limitées mais ce, exclusivement dans la mesure nécessaire pour les rendre conformes aux exigences légales, et lesdites prévisions réduites et limitées, ainsi que l'ensemble des autres stipulations du présent Contrat, conserveront pleinement leur portée et leurs effets conformément à ses prévisions.';

Considérant que le tribunal arbitral a appliqué ce principe d'invalidité partielle de la façon suivante :

- il a décidé que Strube avait violé les stipulations du contrat du 29 septembre 2006 en refusant d'acquitter les redevances, en refusant de restituer le germoplasme ainsi que les résultats du travail de sélection, et en annonçant à des tiers que sa coopération avec SESVanderHave avait cessé,

- il a prononcé la dissolution du contrat du fait de ces violations,

- il a condamné Strube à payer les redevances non réglées, ainsi que des dommages-intérêts,

- il a ordonné la restitution du germoplasme, de la technologie, du savoir-faire, des résultats de recherche avec les

limitations suivantes :

* la restitution ne porte pas sur le germoplasme et la technologie dont Strube démontre qu'ils lui appartenaient avant l'entrée en vigueur du contrat de 1977, ou qu'ils ont été acquis auprès de tiers, ou qu'ils ont été mis au point en dehors du contrat,

* la restitution est sans préjudice de l'obligation pour SESVanderHave d'accorder à Strube, sur sa demande une licence non exclusive d'exploitation, sur la base de conditions équitables et raisonnables, des améliorations apportées par Strube au germoplasme et aux variétés de semences dans le cadre de la coopération entre les parties;

Considérant que les arbitres, saisis de demandes réciproques d'exécution du contrat et d'annulation de certaines clauses en raison de leur contrariété à l'ordre public, pouvaient, sans excéder leur mission, assortir la condamnation à exécution des obligations contractuelles d'aménagements propres à rendre celle-ci compatible avec les règles invoquées au soutien de la demande d'annulation;

Considérant, toutefois, qu'ils ne pouvaient procéder ainsi sans inviter les parties à s'expliquer sur de tels aménagements, dès lors que ceux-ci n'étant pas virtuellement contenus dans les demandes qui leur étaient soumises, n'étaient pas raisonnablement prévisibles pour les parties;

Considérant que le mémoire de Strube devant le tribunal arbitral soutenait que même si le contrat n'était pas, en son entier, contraire au droit de la concurrence, l'invalidité des clauses prises individuellement touchait à la substance de la convention qui, en pratique ne pouvait s'appliquer sans elles (mémoire du 18 novembre 2014, § 473); qu'il ne résulte d'aucune pièce versée au débats qu'une alternative pratique à l'annulation totale ou partielle ait été discutée au cours de l'instance arbitrale; qu'en particulier, les modalités de mise en oeuvre de l'article 15.5 imposant de réduire ou limiter les stipulations illicites dans la seule mesure nécessaire au respect des dispositions d'ordre public n'ont pas été débattues;

Considérant que, contrairement à ce que soutient SESVanderHave, la demande subsidiaire d'annulation de certaines clauses seulement du contrat n'impliquait pas nécessairement un dispositif tel que celui choisi par les arbitres, à savoir l'exécution de ces clauses, assortie de limitations relatives aux éléments de germoplasme extérieurs au contrat et de l'obligation pour SESVanderHave de consentir à Strube une licence non exclusive sur les améliorations apportées au germoplasme; qu'il ne peut davantage être retenu que cette disposition, qui ne serait qu'une faculté offerte à Strube, ne lui ferait pas grief, alors qu'il s'agit d'un réaménagement des équilibres contractuels non consenti par les parties; enfin, qu'il ne peut pas plus être admis que l'octroi d'une licence non exclusive serait implicitement contenue dans les demandes parce qu'elle serait prévue par le contrat en cas de résiliation sans faute, alors que les prétentions de SESVanderHave n'étaient pas formées dans ce cadre, qu'elles portaient sur une résolution pour inexécution et qu'il n'est pas allégué qu'elles aient fait allusion à l'éventualité d'une licence;

Considérant qu'en décidant d'apporter à l'exécution de stipulations contractuelles dont la validité était contestée des aménagements qui n'étaient pas demandés par les parties et qui n'avaient pas été soumis à leur discussion, le tribunal arbitral a méconnu le principe de la contradiction; que l'ordonnance qui a conféré l'exequatur à la sentence doit donc être infirmée;

Sur la demande de dommages-intérêts pour procédure abusive :

Considérant qu'eu égard au sens de l'arrêt, cette demande sera rejetée; Sur l'article 700 du code de procédure civile :

Considérant que SESVanderHave qui succombe, ne saurait bénéficier des dispositions de l'article 700 du code de procédure civile et sera condamnée, sur ce fondement à payer à Strube la somme de 10.000 euros;


PAR CES MOTIFS

Infirme l'ordonnance du président du tribunal de grande instance de Paris du 10 juillet 2015 qui a revêtu de l'exequatur la sentence arbitrale rendue entre les parties à Bruxelles le 11 juin 2015.

Rejette la demande de dommages-intérêts pour procédure abusive.

Condamne la société SESVanderHave SA/NV aux dépens et au paiement à lasociété Strube GmbH & Co. KG de la somme de 10.000 euros en application de l'article 700 du code de procédure civile.

Copyright Lexbase

LA GREFFIÈRE LA PRÉSIDENTE



Jurisprudence : CA Paris, 1, 1, 23-10-2018, n° 16/24374, Infirmation

## CA Paris, 1, 1, 23-10-2018, n° 16/24374, Infirmation

Article, 1154, C. civ.

Loi, 31-12-1975

Article, 11531153-1, C. civ.

Intérêts de retard

Principe de contradiction

Taux légal

Intérêts

Intérêt de droit

Copies exécutoires RÉPUBLIQUE FRANÇAISE délivrées aux parties le : AU NOM DU PEUPLE FRANÇAIS

COUR D'APPEL DE PARIS

Pôle 1 - Chambre 1

ARRÊT DU 23 OCTOBRE 2018

(n°, 6 pages)

Numéro d'inscription au répertoire général N° RG 16/24374 - N° Portalis 35L7-V-B7A-B2EUW

Décision déférée à la Cour : Sentence rendue à Paris le 18 Octobre 2016 par un arbitre unique

DEMANDERESSE AU RECOURS

SAS CABINET MAITRISE D'OEUVRE C.M.O

prise en la personne de ses représentants légaux

SAINT FARGEAU PONTHIERRY
représentée et assistée par Me Luca DE MARIA de la SELARL SELARL PELLERIN - DE MARIA - GUERRE, avocat postulant et plaidant du barreau de PARIS, toque L0018

assistée de Me Jean-David COHEN, avocat plaidant du barreau de PARIS, toque G673

DÉFENDERESSE AU RECOURS

SNC LAVALIN INTERNATIONAL

prise en la personne de ses représentants légaux

IVRY SUR SEINE

représentée par Me Matthieu BOCCON GIBOD de la SELARL LEXAVOUE PARIS-VERSAILLES, avocat postulant du barreau de PARIS, toque C2477

assistée de Me Jasmine BEN substituant Me Pierre ..., avocat plaidant du barreau de PARIS, toque P372

COMPOSITION DE LA COUR

L'affaire a été débattue le 20 septembre 2018, en audience publique, devant la Cour composée de

Mme Dominique GUIHAL, présidente de chambre

M. Jean LECAROZ, conseiller Madame Nadège BOSSARD, conseillère, magistrat appelée pour compléter la cour conformément aux dispositions de l'ordonnance de roulement portant organisation des services rendue par Madame le premier président en date du 31 août 2018.

qui en ont délibéré, un rapport a été présenté à l'audience dans les conditions prévues par l'article 785 du code de procédure civile.

Greffier, lors des débats Mme Mélanie PATE

ARRÊT :

- CONTRADICTOIRE

- par mise à disposition de l'arrêt au greffe de la Cour, les parties en ayant été préalablement avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure civile

- signé par Dominique GUIHAL, présidente de chambre et par Mélanie PATE, greffière présente lors du prononcé.

Le groupe canadien SNC-Lavalin Inc. exerce une activité internationale dans le domaine de l'ingéniérie et de la construction d'infrastructures. En 2011 et 2012, l'une de ses filiales françaises, la SNC Lavalin International (ci-après SLI) a conclu avec la SARL Cabinet de Maîtrise d'Oeuvre (ci-après CMO), exerçant une activité de consultant en bâtiments et infrastructures, cinq contrats d'assistance technique pour des opérations immobilières réalisées à Casablanca par divers maîtres d'ouvrage.

Le 23 décembre 2013, SLI a informé CMO de la résiliation des relations commerciales avec l'ensemble du groupe SNC-Lavalin.

En application de la clause compromissoire stipulée par les cinq contrats de Casablanca, CMO a saisi la Chambre de commerce internationale d'une demande d'arbitrage en juillet 2014.

Par une sentence partielle rendue à Paris le 2 juin 2015, Mme ..., arbitre unique, a jugé que le droit français était applicable au fond du litige.

Par une sentence rendue à Paris le 18 octobre 2016, l'arbitre unique a condamné SLI au paiement de factures impayées, pour un montant total de l'ordre de 300.000 euros, outre intérêts au taux légal français, rejeté la demande de CMO tendant à la production de déclarations fiscales afférentes à ces factures, rejeté les demandes de CMO au titre de l'intéressement et de la gestion des comptes prorata, déclaré que la résiliation des contrats par SLI était fautive, rejeté la demande de dommages-intérêts de CMO au titre de cette rupture fautive, rejeté la demande de dommages-intérêts de CMO au titre de la mauvaise foi et de la résistance abusive de SLI à appliquer la loi du 31 décembre 1975 sur la sous-traitance, rejeté l'ensemble des demandes reconventionnelles de SLI, partagé par moitié les frais de l'arbitrage, liquidés à la somme de 49.100 USD, et laissé à chaque partie la charge des frais exposés pour sa défense.

Le 2 décembre 2016, CMO a formé un recours en annulation partielle de cette dernière sentence.

Copyright Lexbase

Par une ordonnance du 14 mars 2017, le conseiller de la mise en état a fait droit à la demande de CMO d'exequatur de la sentence en ce qu'elle condamnait SLI au paiement des factures.

Par des conclusions notifiées le 13 mars 2018, CMO demande à la cour de prononcer l'annulation de la sentence, mais seulement en ce qu'elle a rejeté ses demandes de dommages-intérêts au titre de la résiliation abusive et de la résistance abusive et en ce qu'elle a assorti la condamnation au paiement de factures du taux d'intérêt légal français. CMO invoque la violation du principe de la contradiction (article 1520, 4° du code de procédure civile), la méconnaissance par l'arbitre de sa mission (article 1520, 3° du code de procédure civile), ainsi que la violation de l'ordre public international (article 1520, 5° du code de procédure civile).

Par des conclusions notifiées le 30 mai 2018, SLI demande à la cour de rejeter le recours en annulation, de débouter CMO de ses demandes et de la condamner à lui payer la somme de 35.000 euros en application de l'article 700 du code de procédure civile.

SUR QUOI

Sur le moyen d'annulation dirigé contre la condamnation aux intérêts de retard et tiré de la violation du principe de la contradiction (article 1520, 4° du code de procédure civile) :

CMO fait valoir qu'en substituant au taux de refinancement de la Banque centrale européenne augmenté de 10 points, qui était demandé et qui n'était pas contesté en défense, le taux d'intérêt légal français, sans inviter les parties à s'en expliquer, l'arbitre a violé le principe de la contradiction.

Considérant qu'il résulte de la sentence que CMO avait demandé la condamnation de SLI au paiement des 'intérêts de droit au taux de refinancement de la Banque Centrale Européenne plus dix points, à compter du lendemain de l'échéance indiquée sur chaque facture et à tout le moins de la mise en demeure du 18 janvier 2014" (sentence, § 77 et § 333), et que 'SLI n'a pas présenté de demande d'intérêts, ni contesté celle de CMO' (sentence, § 335);

Considérant qu'aux termes du paragraphe 337 de la sentence : 'L'Arbitre unique considère qu'il est approprié d'appliquer le droit français à cette question étant donné que le droit français est applicable aux Contrats 1 à 5 et que Paris (France) est le siège de cet arbitrage.';

Qu'après avoir rappelé les dispositions des articles 1153, 1153-1 et 1154 du code civil français, la sentence énonce : 'Le principe en droit français est d'accorder des intérêts au taux légal. En l'espèce, CMO ne justifie pas sa demande d'intérêts au taux de refinancement de la Banque Centrale Européenne plus dix points. L'Arbitre unique décide donc de l'application du taux légal français.' (Sentence, § 343 et 344) ;

Considérant qu'il ne résulte d'aucune énonciation de la sentence ni des pièces de la procédure arbitrale, et qu'il n'est d'ailleurs pas allégué, que l'arbitre unique ait invité les parties à s'expliquer sur ce point;

Considérant que, contrairement à ce que prétend SLI, le moyen ne soutient pas que la décision sur les intérêts ne serait pas motivée, ou que la motivation serait juridiquement erronée, mais seulement, et à juste titre, que dès lors qu'il était demandé un certain taux d'intérêt que la partie adverse ne contestait pas, l'arbitre ne pouvait, sans solliciter les observations des parties, en appliquer un autre;

Considérant qu'il convient, par conséquent, d'annuler la sentence en ce qu'elle assortit la condamnation au paiement des factures des intérêts au taux légal français;

Sur le moyen dirigé contre le rejet de la demande d'indemnisation de la résiliation fautive et tiré de la méconnaissance par l'arbitre de sa mission, ainsi que de la violation de l'ordre public international (article 1520, 3° et 5° du code de procédure civile):

CMO soutient que l'arbitre, ayant constaté l'existence d'une résiliation fautive et d'un dommage subséquent, ne pouvait, sans méconnaître l'étendue de sa mission ni commettre un déni de justice, et ainsi, violer l'ordre public international, refuser d'évaluer le préjudice qui en résultait.

Considérant qu'il résulte de la sentence que CMO demandait la condamnation de SLI à lui payer la somme de 632.128

Copyright Lexbase

euros 'en indemnisation de son préjudice résultant de la rupture anticipée et fautive des contrats' (sentence, § 156);

Considérant qu'après avoir analysé les griefs de SLI, l'arbitre énonce :'Qu'ils soient pris individuellement ou de façon groupée, aucun des manquements allégués par SLI, même à les supposer tous avérés, ne caractérise un comportement d'une gravité suffisante pour justifier une résiliation unilatérale des Contrats 1 à 5. En conséquence, l'Arbitre unique qualifie la résiliation anticipée des Contrats 1 à 5 de fautive.' (sentence, § 267);

Considérant qu'après avoir relevé que le préjudice résultant de la résiliation fautive consistait dans les gains dont CMO avait été privée par cette rupture anticipée (sentence, § 272); le tribunal arbitral analyse le fichier Excel produit par la demanderesse qui est censé exposer les honoraires que le gérant de CMO aurait perçus 'dans l'hypothèse où les contrats actuels viendraient à être étalés sur 42 mois' (sentence, § 274 à 277); qu'il relève que cette pièce est entachée d'insuffisances et de contradictions et qu'il en déduit que 'La pièce produite par CMO au soutien de sa prétention ne met donc pas l'Arbitre unique en mesure d'évaluer si l'évaluation de l'indemnisation sollicitée est, ou non, fondée.' (sentence, § 277); qu'il ajoute : 'De même les avenants au Contrat 1 ne permettent pas à l'Arbitre unique d'évaluer le montant de l'indemnisation sollicitée par CMO. Ainsi, CMO n'a pas justifié du montant qu'elle sollicite. Enfin, non seulement CMO ne démontre pas les montants qu'elle sollicite au titre des contrats 1 à 5 mais elle ne présente pas plus les éléments permettant le calcul des mensualités dues. En outre, elle ne démontre pas la marge qu'elle escomptait faire ni même le montant des coûts relatifs aux services qu'elle aurait été amenée à fournir. En effet, un prix contractuel (réparti ou non en mensualités), fût-il forfaitaire, n'est dû qu'en cas d'exécution du contrat. Or aucun argument n'a été avancé par CMO à ce titre, ni aucune pièce produite. Ainsi, quand bien même les autres pièces produites permettraient à l'Arbitre unique de déterminer le montant des sommes qui auraient été perçues si les Contrats 1 à 5 avaient été poursuivis, CMO n'a pas mis en mesure l'Arbitre unique de déterminer le montant des gains manqués. Au vu de ce qui précède, l'Arbitre unique rejette la demande d'indemnisation de CMO au titre de la résiliation fautive des Contrats 1 à 5." (sentence, § 278 à 282);

Considérant que si le tribunal arbitral rejette la demande de dommages-intérêts en énonçant qu'il n'est pas en mesure d'évaluer les gains manqués, il apparaît qu'en réalité c'est l'existence même du préjudice qui ne lui a pas paru établie, dès lors que CMO ne lui a fourni ni explication ni justification sur ce que lui aurait coûté l'exécution de ses prestations dans l'hypothèse où les contrats se seraient poursuivis jusqu'à leur terme;

Que c'est donc à tort que CMO fait grief à l'arbitre d'avoir refusé d'évaluer son préjudice, et qu'il convient d'écarter les moyens dirigés contre le rejet de la demande de dommages-intérêts pour rupture abusive;

Sur le moyen dirigé contre le rejet de la demande de dommages-intérêts pour résistance abusive et tiré de la méconnaissance par l'arbitre de sa mission, ainsi que de la violation de l'ordre public international (article 1520, 3° et 5° du code de procédure civile):

CMO allègue que l'arbitre, en refusant d'appliquer la loi du 31 décembre 1975 sur la sous-traitance, alors qu'il avait décidé dans sa sentence partielle que le droit français était applicable au litige a porté atteinte à l'autorité de chose jugée par cette sentence, en violation de sa mission et de l'ordre public international. Elle soutient qu'il convient de distinguer le domaine et les conditions d'application de la loi et que la question du domaine ayant été définitivement résolue par la sentence partielle, l'arbitre ne pouvait y revenir dans la sentence finale et écarter la loi du 31 décembre 1975 pour un motif tiré de la localisation des ouvrages au Maroc.

Considérant que la sentence partielle du 2 juin 2015 énonce : 'Ainsi, que soient utilisées la règle de conflit de lois du siège de l'arbitrage, les règles de conflit de lois des pays intéressés au litige et/ou une règle de conflit de lois en vigueur dans de nombreux États, le droit français est désigné comme applicable aux contrats 1 à 5. En conséquence, l'Arbitre unique décide que le droit français est applicable aux Contrats 1 à 5" (sentence, § 104);

Considérant que la sentence finale énonce, en ce qui concerne la demande de dommages-intérêts fondée sur le refus de SLI d'appliquer la loi du 31 décembre 1975 sur la sous-traitance que si cette loi 'a fait l'objet d'un important débat doctrinal, l'esprit de ce texte confirme que son champ territorial est limité aux ouvrages sis en France. Ainsi qu'il ressort de l'avis de l'Avocat Général sur l'arrêt de la chambre mixte de la Cour de cassation du 30 novembre 2007, c'est 'lorsque l'ouvrage est exécuté sur le territoire national que la loi de 1975 doit recevoir application, que le sous-traitant soit français ou étranger' car cette loi a pour but d'assurer une concurrence loyale sur le territoire français. L'Arbitre unique ratifie une telle conclusion. En conséquence, la loi du 31 décembre 1975 relative à la sous-traitance ne s'applique pas à la relation entre CMO et SLI, les travaux étant situés au Maroc.' (sentence, § 295 et 296) ;

Considérant que la sentence partielle ne s'est pas prononcée spécifiquement sur la loi du 31 décembre 1975 et que, contrairement à ce que soutient CMO, le choix qu'elle a fait de l'application du droit français au fond du litige n'avait pas pour effet d'évincer la question du champ d'application d'une loi de police française particulière; qu'en résolvant cette question par la mise en œuvre des règles françaises de conflit de lois, l'arbitre s'est conformé au parti qui avait

Copyright Lexbase

été arrêté par la sentence partielle;

Que les moyens dirigés contre le rejet de la demande de dommages-intérêts pour mauvaise foi et résistance abusive ne sont donc pas fondés;

Considérant qu'il résulte de tout ce qui précède que la sentence finale sera annulée, mais seulement en ce qu'elle se prononce sur les intérêts qui assortissent la condamnation au paiement des factures; que le recours sera rejeté pour le surplus;

Sur l'article 700 du code de procédure civile :

Considérant que l'équité ne commande pas de faire bénéficier l'une ou l'autre des parties des dispositions de l'article 700 du code de procédure civile;

Sur les dépens :

Considérant que chacune des parties succombant partiellement, il sera fait masse des dépens dont la charge sera supportée par moitié par chacune d'elles;


PAR CES MOTIFS

Annule la sentence rendue à Paris entre les parties le 18 octobre 2016 mais seulement en ce qu'elle se prononce sur les intérêts qui assortissent la condamnation au paiement des factures.

Rejette le recours pour le surplus.

Rejette les demandes formées en application de l'article 700 du code de procédure civile.

Fait masse des dépens et dit que leur charge sera supportée par moitié par chacune des parties.

LA GREFFIÈRE LA PRÉSIDENTE

Copyright Lexbase



## CA Paris, 1, 1, 15-03-2016, n° 14/19164, Infirmation

Article, 1520, CPC

Article, 4°, CPC

Capacité de travail

Force majeure

Mise en demeure

Contrat d'assurance

Arbitre

Grosses délivrées RÉPUBLIQUE FRANÇAISE aux parties le AU NOM DU PEUPLE FRANÇAIS

COUR D'APPEL DE PARIS Pôle 1 - Chambre 1 ARRÊT DU 15 MARS 2016 (n°, 7 pages)

Numéro d'inscription au répertoire général 14/19164

Décision déférée à la Cour Sentence rendue à Paris le 29 août 2014 par le tribunal arbitral constitué d'un arbitre unique, M. ...

DEMANDERESSE AU RECOURS EN ANNULATION

RÉPUBLIQUE DE MADAGASCAR représentée par son président en exercice

BP 955 Palais d'Ambohitsirohitra 101

ANTANANARIVO

MADAGASCAR

représentée par Me ... ... ... substituant Me Stephan MARX de la SELEURL Cabinet Stéphan MARX, avocat au barreau de PARIS, toque E1922

INTERVENANTE VOLONTAIRE

S.A. CEBELEC

prise en la personne de ses représentants légaux

Industrielaan 5 A

BELGIQUE

représentée par Me Bruno REGNIER de la SCP REGNIER - BEQUET - MOISAN, avocat postulant du barreau de PARIS, toque L0050

assistée de Me Charles DUMONT de CHASSART, avocat plaidant de BRUXELLES

DÉFENDEURS AU RECOURS EN ANNULATION

Monsieur ... ... ...

79 Kapelstraat

1700 DILBEEK

BELGIQUE

représenté par Me Sandrine ROUBIN, avocat au barreau de PARIS, toque C1206

Monsieur ... ... ...

13 Patersveld

9880 AALTER

BELGIQUE

représenté par Me Sandrine ROUBIN, avocat au barreau de PARIS, toque C1206

S.A. DS 2 société de droit luxembourgeois

prise en la personne de ses représentants légaux

80 rue des Romains

LUXEMBOURG

représentée par Me Sandrine ROUBIN, avocat au barreau de PARIS, toque C1206

S.A.R.L. POLO GARMENTS MAJUNGA société de droit malgache
prise en la personne de ses représentants légaux
Route d'Antananarivo
401 MAHAJANGA
MADAGASCAR
représentée par Me Sandrine ROUBIN, avocat au barreau de PARIS, toque C1206


COMPOSITION DE LA COUR
En application des dispositions des articles 786 et 910 du code de procédure civile, l'affaire a été débattue le 16 février 2016, en audience publique, le rapport entendu, les avocats des parties ne s'y étant pas opposé, devant Madame GUIHAL, conseillère, faisant fonction de présidente et Madame DALLERY, conseillère, chargées du rapport.
Ces magistrats ont rendu compte des plaidoiries dans le délibéré de la Cour, composée de
Madame GUIHAL, conseillère, faisant fonction de présidente
Madame DALLERY, conseillère
Madame NICOLETIS, conseillère, appelée pour compléter la cour conformément aux dispositions de l'ordonnance de roulement portant organisation des services rendue le 15 décembre 2015 par Madame le premier président de la cour d'appel de PARIS
Greffier, lors des débats Madame PATE Mélanie
ARRÊT
- CONTRADICTOIRE
- prononcé par mise à disposition de l'arrêt au greffe de la Cour, les parties en ayant été préalablement avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure civile.
- signé par Madame GUIHAL, conseillère, faisant fonction de présidente et par Madame PATE, greffier présent lors du prononcé.


La SARL POLO GARMENTS MAJUNGA (PGM) est une société de droit malgache qui exerce une activité de fabrication d'articles textiles sur le territoire de la RÉPUBLIQUE DE MADAGASCAR. Son capital est détenu par M. ... ... ..., ressortissant belge, ainsi que par la société luxembourgeoise (DS)2, elle-même détenue par MM ... et ... DE SUTTER
PGM, dont l'usine a été pillée et incendiée en janvier 2009, s'est adressée à son assureur, lacompagnie malgache Ny Havana, laquelle a refusé de garantir le sinistre au motif qu'il était la conséquence d'événements politiques non couverts par la police. Un jugement du tribunal de première instance de Mahajanga du 20 octobre 2010 a condamné ... ... à payer à PGM 14.337.978.960 ariary (5.855.586,25 euros) au motif que le saccage de l'usine était consécutif à un conflit social au sein de l'entreprise et non à des émeutes à caractère politique. L'arrêt confirmatif de la cour d'appel de Mahajanga du 4 juillet 2011, exécutoire selon la loi malgache, a fait l'objet, d'abord, par ... ... d'un pourvoi non suspensif, puis, par le procureur général près la Cour suprême d'un pourvoi dans l'intérêt de la loi, suspensif d'exécution.
PGM, (DS)2 et MM. ... ... ont déposé auprès de la Chambre de commerce internationale une demande d'arbitrage dirigée contre la RÉPUBLIQUE DE MADAGASCAR sur le fondement du traité bilatéral de protection des investissements conclu entre celle-ci et l'Union économique belgo-luxembourgeoise.
Par une sentence rendue à Paris le 29 août 2014, le tribunal arbitral constitué d'un arbitre unique, M. ...
- s'est déclaré incompétent à l'égard des demandes présentées par PGM,
- s'est reconnu compétent pour examiner les prétentions des trois autres demandeurs,
- a jugé qu'en l'espèce, le pourvoi dans l'intérêt de la loi avait été engagé non pour corriger une erreur d'intérêt public, conformément à la loi malgache, mais dans le seul but de suspendre l'exécution d'une décision défavorable à une compagnie d'assurance dont le capital était majoritairement détenu par la RÉPUBLIQUE DE MADAGASCAR
- a condamné celle-ci à payer à (DS) 2 et MM ... ..., la somme de 691.233,40 euros, correspondant à l'application, à compter de la date du pourvoi dans l'intérêt de la loi et jusqu'au 30 juin 2014, d'un taux de 6 % sur le principal qui avait été alloué par la cour d'appel de Mahajanga, outre les intérêts au taux de 6 % l'an sur le principal de 5.885.333,02 euros postérieurement au 1er juillet 2014 et jusqu'au retrait du pourvoi dans l'intérêt de la loi ou l'issue définitive de toutes procédures devant la Cour de cassation malgache.


Le 22 septembre 2014, la RÉPUBLIQUE DE MADAGASCAR a formé un recours en annulation de cette sentence.


Par une ordonnance du 17 décembre 2015, le conseiller de la mise en état a déclaré irrecevables comme tardives en application de l'article 909 du code de procédure civile les conclusions signifiées le 7 juillet 2015 par la SARL POLO GARMENTS MAJUNGA, la SA (DS)2, et MM. ... et ... DE SUTTER, ainsi que les conclusions signifiées le 7 décembre 2015 en ce qu'elles tendaient à voir déclarer nul l'acte de recours en annulation.
Par des conclusions signifiées le 3 février 2016, la RÉPUBLIQUE DE MADAGASCAR demande à la cour de déclarer

Copyright Lexbase

irrecevable, comme incompatible avec la nature contractuelle de l'arbitrage, l'intervention volontaire de la SA CEBELEC, d'annuler la sentence et de condamner sur le fondement de l'article 700 du code de procédure civile PGM, (DS)2 et MM ... ..., in solidum, à lui payer la somme 150.000 euros, et CEBELEC celle de 10.000 euros.

Elle invoque l'incompétence du tribunal arbitral en faisant valoir

- en premier lieu, que (DS) 2, qui n'a pas un siège social effectif au Luxembourg mais une simple adresse postale, n'est pas un investisseur protégé au sens du traité, et que MM. ... ... n'ont pas davantage cette qualité, dès lors qu'ils se prévalent d'actions au porteur et que cet anonymat ne leur permet pas de prétendre à la protection d'un Etat qui n'a pu les identifier,

- en deuxième lieu, qu'il n'y a pas en l'espèce d'investissement protégé, la 'créance au terme du contrat d'assurance' retenue par l'arbitre n'ayant pas été invoquée par les demandeurs, les décisions des juridictions malgaches étant frappés de pourvois pendants et ne faisant donc, en l'état, naître aucun droit, et, enfin la condition, prévue par le traité d'un investissement ou d'un réinvestissement dans un secteur d'activité économique faisant défaut,

- en troisième lieu, qu'il n'y a pas de litige opposant un investisseur protégé à l'Etat malgache, le contrat d'assurance, les décisions de justice et le pourvoi en cassation ne concernant que PGM qui, en tant que société malgache, n'est pas un investisseur protégé au sens du traité et a d'ailleurs été mis hors de cause par l'arbitre,

- en quatrième lieu, que la condition de négociation ou de conciliation préalable à l'engagement de la procédure arbitrale n'a pas été observée.

La RÉPUBLIQUE DE MADAGASCAR soutient que le tribunal arbitral a méconnu sa mission - en élargissant sa compétence au mépris de la volonté des parties,

- en interprétant le traité non pas au regard des principes d'interprétation admis en droit international mais par référence aux dictionnaires de la langue française,

- en prononçant une condamnation aux bénéfices dont le requérants avaient été privés alors que cette mesure relevait de l'équité et non du traité ou du droit international,

- en appréciant la conformité au regard de la loi malgache du pourvoi dans l'intérêt de la loi formé en l'espèce,

- en allouant une indemnité correspondant au bénéfice que les requérants n'avaient pu obtenir alors qu'aucune demande en ce sens n'avait été formée,

- en retenant un taux d'intérêt de 6 % sans se référer à aucune disposition du traité ni aucune règle du droit international.

La RÉPUBLIQUE DE MADAGASCAR allègue que le tribunal arbitral a méconnu le principe de la contradiction

- en prenant en considération des conventions internationales et des jurisprudences arbitrales non citées par les parties,

- en allouant des dommages-intérêts pour le bénéfice que les requérants n'ont pu obtenir, alors qu'une telle demande n'était pas formulée et que l'arbitre a ainsi modifié le fondement de la demande sans inviter les parties à s'en expliquer.

Enfin, la RÉPUBLIQUE DE MADAGASCAR soutient que la reconnaissance et l'exécution de la sentence sont contraires à l'ordre public international dès lors

- qu'elle ordonne au procureur général de retirer un pourvoi dans l'intérêt de la loi,

- qu'elle empêche la Cour de cassation d'examiner sereinement le recours dont elle est saisie,

- qu'elle consacre la fraude des intimés qui instrumentalisent le traité pour imputer à l'Etat une créance privée alors que leurs droit sont purement provisoires, et pour tenter d'obtenir une double condamnation,

- qu'elle détourne la procédure d'arbitrage pour en faire une voie de recours contre les pourvois internes,

- qu'elle entrave l'action des procureurs généraux et des juges,

- qu'elle rend une décision inconciliable avec les décisions de justice malgache,

- qu'elle fait d'un arbitre un organe de contrôle des décisions et des actions des cours suprêmes

Par des conclusions signifiées le 10 décembre 2015, la SA CEBELEC, société de droit belge, est intervenue volontairement à l'instance en faisant valoir qu'elle a consenti à (DS) 2 et à MM ... ... un prêt en garantie duquel les emprunteurs ont donné en gage toute créance actuelle ou future sur la base de la sentence du 29 août 2014. Elle demande à la cour de déclarer le recours irrecevable ou, subsidiairement, mal fondé.


SUR QUOI

Sur la recevabilité de l'intervention volontaire de CEBELEC

Considérant que l'intervention volontaire dans l'instance sur recours en annulation d'une sentence est incompatible avec la nature contractuelle de l'arbitrage;

Qu'il convient donc de déclarer irrecevable l'intervention d'une société tierce à l'instance arbitrale qui se prévaut du gage que des parties à l'arbitrage lui auraient consenti sur la créance résultant de la sentence entreprise;

Sur le moyen tiré de la violation du principe de la contradiction (article 1520, 4° du code de procédure civile)

La RÉPUBLIQUE DE MADAGASCAR soutient qu'en allouant des dommages-intérêts pour le bénéfice que les requérants n'ont pu obtenir, alors qu'une telle demande n'était pas formulée, l'arbitre qui a modifié le fondement de la demande sans inviter les parties à s'en expliquer a méconnu le principe de la contradiction.

Considérant que la société PGM a obtenu en première instance et en appel devant les juridictions malgaches la condamnation de son assureur ... ... à la garantir de l'incendie et du saccage de son usine; qu'un pourvoi, non

suspensif selon la loi malgache, a été formé par ... ...; qu'alors que des mesures d'exécution étaient en cours, un pourvoi dans l'intérêt de la loi, à caractère suspensif, a été formé par le procureur général près la Cour de cassation;

Considérant que si par PGM et par ses actionnaires belges et luxembourgeois sur le fondement du traité bilatéral de protection des investissements conclu entre l'Union économique belgo-luxembourgeoise et la RÉPUBLIQUE DE MADAGASCAR (l'Accord), le tribunal arbitral a estimé que 'le pourvoi dans l'intérêt de la loi, dans les circonstances de l'espèce, n'est pas conforme aux obligations de l'article 3 (2) de l'Accord imposant à l'Etat d'exclure 'toute mesure injustifiée'. Ce pourvoi n'est pas non plus conforme à l'obligation de traitement juste et équitable de l'article 3 (1) de l'Accord'; qu'il a condamné la RÉPUBLIQUE DE MADAGASCAR à payer à (DS) 2 et MM ... ..., la somme de 691.233,40 euros, correspondant à l'application, à compter de la date du pourvoi dans l'intérêt de la loi et jusqu'au 30 juin 2014, d'un taux de 6 % sur le principal qui avait été alloué par la cour d'appel de Mahajanga, outre les intérêts au taux de 6 % l'an sur le principal de 5.885.333,02 euros postérieurement au 1er juillet 2014 et jusqu'au retrait du pourvoi dans l'intérêt de la loi ou l'issue définitive de toutes procédures devant la Cour de cassation malgache;

Considérant que la sentence expose dans les termes suivants, au paragraphe 242, les demandes qui étaient soumises à l'arbitre 'Les demandeurs réclament des dommages-intérêts dont le montant correspond à la somme mise à la charge de ... ... dans le dispositif de l'arrêt de la cour d'appel de Mahajanga. Ce montant est de 14,3 milliards ariary et correspond à 5,2 millions euros. Les demandeurs réclament également des intérêts à hauteur de 6 % (six pour cent) correspondant à la somme de 627.130 euros (pour la période s'étendant jusqu'au 17 avril 2012) et la somme de 691.233 euros (pour la période du 17 avril 2012 au 30 juin 2014). Ce taux de 6 % correspond au taux légal applicable à Madagascar selon les demandeurs (proposition n'ayant pas été contredite par le défendeur)';

Considérant que le tribunal arbitral a répondu à ces prétentions de la manière suivante '246. il n'existe pas de lien de causalité entre la plupart des dommages demandés et les violations de l'Accord établies par les demandeurs. La demande du montant fixé dans l'arrêt de la cour d'appel serait bien fondée en présence d'une expropriation ou d'une dépossession aux termes de l'article 7 de l'Accord. Or aucune dépossession n'a été établie. Au contraire, comme cela a été observé ci-dessus, PGM possède toujours sa réclamation contre ... ... et bénéficie également toujours de l'arrêt de la cour d'appel (...)

248. Les violations de l'Accord établies ci-dessus concernent la suspension de l'exécution de l'arrêt de la cour d'appel. Les violations ne concernent pas la suite de la procédure devant la Cour de cassation, cette procédure pouvant aboutir à une décision en faveur de PGM ou à son encontre.

249. Si l'exécution de l'arrêt n'avait pas été suspendue, PGM l'aurait exécuté à l'encontre de ... ..., une société solvable au regard des éléments de preuve présentés. PGM aurait pu bénéficier du montant fixé dans l'arrêt et ce, même pendant la procédure devant la Cour de cassation. La décision qui sera rendue à l'issue de cette procédure déterminera si PGM devrait rendre ou non les sommes qu'elle aurait dû recevoir de ... ... (...)

250. Les violations de l'Accord établies par la présente sentence ont eu pour conséquence que PGM n'a pu bénéficier du montant octroyé par l'arrêt depuis l'introduction du pourvoi dans l'intérêt de la loi. Il existe un lien de causalité entre les violations établies et ce dommage. Cependant, il n'existe pas de lien de causalité entre les violations et les autres dommages-intérêts réclamés par les demandeurs.

251. Le tribunal arbitral décide alors que le défendeur devra verser aux demandeurs des dommages-intérêts correspondant au bénéfice qu'ils n'ont pu obtenir. En l'absence du pourvoi dans l'intérêt de la loi, PGM aurait eu la possibilité d'utiliser le montant octroyé par l'arrêt de la cour d'appel depuis l'introduction de ce pourvoi à aujourd'hui. Le tribunal arbitral considère que ce bénéfice non obtenu par PGM doit être calculé jusqu'à la date du 30 juin 2014 (paragraphe 114 du mémoire en réplique). Ce paragraphe comprend un calcul des intérêts dus au taux légal de 6 %, intérêts calculés sur le montant dû à PGM selon l'arrêt de la cour d'appel du 17 avril 2012. Le montant dû à cette date était de 5.885.333,02 euros. Le tribunal arbitral estime que les intérêts sur ce montant au taux de 6 % correspondent au bénéfice dont PGM n'a pu profiter';

Considérant que le tribunal arbitral ne pouvait, sans inviter les parties à s'en expliquer, substituer à la demande d'allocation du principal de la condamnation prononcée par la cour d'appel de Mahajanga, assorti des intérêts au taux légal en vigueur à Madagascar, une demande tendant à l'indemnisation de la perte de bénéfices pendant la durée de l'instance en cassation, demande que l'arbitre a décidé de calculer par référence au cours de l'intérêt légal malgache, mais qui n'en procède pas moins d'un fondement différent de celle dont il était saisi;

Considérant que cette méconnaissance du principe de la contradiction emporte annulation de la sentence;

Sur l'article 700 du code de procédure civile

Considérant que l'équité ne commande pas qu'il soit fait application de l'article 700 du code de procédure civile;


PAR CES MOTIFS

Constate l'irrecevabilité des conclusions de la SARL POLO GARMENTS MAJUNGA, de la SA (DS)2, et de MM. ... et ... DE SUTTER.

Déclare irrecevable l'intervention volontaire de la société CEBELEC.

Annule la sentence rendue entre les parties le 29 août 2014.

Rejette toute autre demande.

Condamne in solidum la SARL POLO GARMENT MAJUNGA, la SA (DS)2, M. ... ... ... et M. ... ... ... aux dépens.

LA GREFFIÈRE LA CONSEILLÈRE, faisant fonction de présidente

Copyright Lexbase

Copyright Lexbase



## CA Paris, 1, 1, 22-09-2015, n° 14/17200, Infirmation

Article, 565, CPC

Article, 1184, C. civ.

Article, 954, CPC

Convention, 12-10-2010

Article, 1100, C. civ.

Récusation

Président d'un tribunal

Arbitre

Article de presse

Défaut d'indépendance

Grosses délivrées RÉPUBLIQUE FRANÇAISE aux parties le AU NOM DU PEUPLE FRANÇAIS
COUR D'APPEL DE PARIS Pôle 1 - Chambre 1 ARRÊT DU 22 SEPTEMBRE 2015 (n°, 7 pages)
Numéro d'inscription au répertoire général 14/17200
Décision déférée à la Cour Sentence du 08 Juillet 2014 rendue à Paris par le le tribunal arbitral constitué de MM. ... et ..., arbitres, et de M. Grigera ..., président,
DEMANDERESSE AU RECOURS
RÉPUBLIQUE DE GUINEE EQUATORIALE représentée par le Ministre de la Justice des cultes et des institutions pénitencières
Présidence de la République
MALABO
représentée par Me Jean-Loup PEYTAVI, avocat postulant du barreau de PARIS, toque B1106
assistée de Me Jean-Charles TCHIKAYA, avocat plaidant du barreau de BORDEAUX
DÉFENDERESSE AU RECOURS
ORANGE MIDDLE EAST AND AFRICA ancienneemnt dénommée FRANCE CABLES ET RADIO (SA FCR)
prise en la personne de ses représentants légaux

PARIS
représentée par Me Audrey LAZIMI de la SELURL AUDREY LAZIMI AVOCAT, avocat postulant du barreau de PARIS, toque L0245
assistée de Me Ghjuvana LUIGI, avocat au barreau de PARIS, et de Me Benoît ... ... de lAARPI LAZAREFF LE BARS, AARPI, avocats plaidant du barreau de PARIS, toque B0184

COMPOSITION DE LA COUR
En application des dispositions des articles 786 et 910 du code de procédure civile, l'affaire a été débattue le 23 juin 2015, en audience publique, le rapport entendu, les avocats des parties ne s'y étant pas opposé, devant Madame GUIHAL, conseillère, faisant fonction de présidente, et Madame DALLERY, conseillère, chargées du rapport.
1

Ces magistrats ont rendu compte des plaidoiries dans le délibéré de la Cour, composée de
Monsieur ACQUAVIVA, président
Madame GUIHAL, conseillère
Madame DALLERY, conseillère

Copyright Lexbase

Greffier, lors des débats Madame PATE
ARRÊT
- CONTRADICTOIRE
- prononcé par mise à disposition de l'arrêt au greffe de la Cour, les parties en ayant été préalablement avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure civile.
- signé par Madame GUIHAL, conseillère, en remplacement de Monsieur le président, empêché et par Madame PATE, greffier présent lors du prononcé.


La RÉPUBLIQUE DE GUINEE EQUATORIALE et la SA FRANCE CABLES ET RADIO (FCR), devenue ORANGE MIDDLE EAST AND AFRICA (OMEA), filiale à 100 % de ORANGE SA, ont conclu le 1er juin 1994 un pacte d'actionnaires relativement à la société équato-guinéenne de télécommunication GETESA dont ils détiennent respectivement 60 % et 40 % du capital.
Le 4 novembre 2011, les parties ont mis fin à leurs différends par un protocole transactionnel qui stipulait notamment une clause de sortie au bénéfice de FCR. A la suite de la délivrance par la RÉPUBLIQUE DE GUINEE EQUATORIALE d'une licence de télécommunication à un nouvel opérateur, FCR a notifié une demande d'achat de ses actions dans GETESA. Faute d'accord amiable, FCR a saisi la Chambre de commerce internationale d'une demande d'arbitrage en application de la clause compromissoire prévue par le protocole.
Par une sentence rendue à Paris le 8 juillet 2014, le tribunal arbitral constitué de MM. ... et ..., arbitres, et de M. Grigera Naon, président, s'est déclaré compétent, dit que le protocole était valable, constaté que la RÉPUBLIQUE DE GUINEE EQUATORIALE avait violé son obligation d'acquérir les actions et d'en payer le prix, l'a condamnée à payer 131.992.915 euros correspondant au prix des actions, outre intérêts simples au taux de la Banque centrale européenne, l'a également condamnée à signer le bordereau de transfert des actions, et à faire transcrire la cession dans les registres de GETESA et dans les comptes des actionnaires, enfin, à payer les frais de défense de FCR et la moitié des frais d'arbitrage.


Par une déclaration déposée le 7 août 2014, la RÉPUBLIQUE DE GUINEE EQUATORIALE a formé un recours contre cette sentence.


Par une ordonnance du 5 février 2015, le conseiller de la mise en état a conféré l'exequatur à la sentence.
Par des conclusions signifiées le 7 mai 2015, la RÉPUBLIQUE DE GUINEE EQUATORIALE sollicite l'annulation de celle-ci, ainsi que la condamnation de la partie adverse à lui payer la somme de 70.000 euros en application de l'article 700 du code de procédure civile. Elle invoque l'irrégularité de la composition du tribunal arbitral (article 1520 2° du code de procédure civile), la violation par les arbitres de leur mission (article 1520 3° du code de procédure civile), et la méconnaissance du principe de la contradiction (article 1520 4° du code de procédure civile).
2

Par des conclusions signifiées le 13 mai 2015, OMEA demande à la cour, principalement, de rejeter le recours en annulation, de condamner la RÉPUBLIQUE DE GUINEE EQUATORIALE à lui payer 15.000 euros de dommages-intérêts pour recours dilatoire et d'assortir la sentence de l'exequatur, subsidiairement de prononcer une annulation partielle et d'assortir les dispositions non censurées de l'exequatur, en tout état de cause, de lui allouer la somme de 60.000 euros en application de l'article 700 du code de procédure civile.


SUR QUOI
Sur le premier moyen d'annulation tiré de l'irrégularité de la constitution du tribunal arbitral (article 1520 2° du code de procédure civile)
La RÉPUBLIQUE DE GUINEE EQUATORIALE fait grief au président du tribunal arbitral de n'avoir pas déclaré un précédent arbitrage rendu moins de trois ans plus tôt au bénéfice de la société ORANGE, dans lequel l'un des arbitres avait dénoncé dans une opinion dissidente la partialité du tribunal. Elle ajoute qu'elle a déposé dans le délai prévu par le règlement d'arbitrage une demande de récusation qui a été rejetée au fond par la Chambre de commerce internationale.
Considérant qu'aux termes de l'article 1466 du code de procédure civile 'La partie qui, en connaissance de cause et sans motif légitime, s'abstient d'invoquer en temps utile une irrégularité devant le tribunal arbitral est réputée avoir renoncé à s'en prévaloir';
Considérant que les modalités de présentation de tels moyens au cours de l'instance arbitrale sont fixées, le cas échéant, par le règlement d'arbitrage auquel les parties ont convenu de se soumettre;
Que suivant l'article 14 (2) du règlement d'arbitrage de la Chambre de commerce internationale, la demande de récusation 'doit être soumise par une partie, à peine de forclusion, soit dans les trente jours suivant la réception par celle-ci de la notification de la nomination ou de la confirmation de l'arbitre, soit dans les trente jours suivant la date à

Copyright Lexbase

laquelle la partie introduisant la récusation a été informée des faits et circonstances qu'elle invoque à l'appui de sa demande de récusation si cette date est postérieure à la réception de la notification susvisée';

Considérant qu'en l'espèce, FCR et la RÉPUBLIQUE DE GUINEE EQUATORIALE ont désigné respectivement comme arbitres, M. ... et M. ...; que dans sa session du 18 juillet 2013, la Cour de la Chambre de commerce internationale a nommé en qualité de président du tribunal arbitral, M. Grigera ... lequel avait indiqué dans la déclaration d'indépendance souscrite le 14 juillet 2013 n'avoir à révéler aucun fait ou circonstance de nature à mettre en cause son indépendance ou à susciter un doute raisonnable dans l'esprit des parties relativement à son impartialité;

Considérant que le 21 août 2013, le conseil de FCR a envoyé par courrier électronique au tribunal arbitral, ainsi qu'aux avocats de la RÉPUBLIQUE DE GUINEE EQUATORIALE le message suivant

'Comme vous le savez, la présente affaire oppose notre client FCR (filiale à 100 % du groupe France Télécom-Orange) à l'Etat de Guinée équatoriale.

Dans ce cadre, nous souhaitons informer, à toutes fins utiles, les membres du tribunal arbitral ainsi que nos confrères que notre client nous a indiqué que notre Président a été désigné il y a plusieurs années par la C.C.I dans une affaire n° 15653/JRF, où France Télécom et Orange étaient parties (sentence rendue en 2009) (ci-après l' 'Affaire Chambre de commerce internationale EUSKALTEL').

Nous savons que notre Président n'avait aucune obligation de déclaration de ce précédent dans notre affaire en cours dans la mesure où (i) il a été nommé dans chacune de ces affaires par la C.C.I, (ii) il n'a jamais été désigné arbitre par l'une quelconque des parties à l'arbitrage, (iii)

3

l'Affaire C. C.I EUSKALTEL et notre présente affaire concernent des marchés très différents (l'Espagne dans un cas et l'Afrique dans l'autre) et des types de contrats sans rapports (exploitation de réseau dans un cas et pacte d'actionnaires dans l'autre), (iv) les questions de fond dans les deux affaires ne sont pas liées, et (v) la sentence rendue dans l'affaire C.C.I EUSKALTEL remonte à plus de quatre ans.

Néanmoins, notre client souhaite que l'existence de l'Affaire C. C.I EUSKALTEL soit portée à la connaissance de nos confrères à titre d'information. Nous indiquons à nos confrères qu'ils disposent d'un délai de 30 jours à compter de la présente lettre pour soulever d'éventuelles objections (article 14 du Règlement C.C.I), bien que nous soyons convaincus pour les raisons évoquées ci-dessus, que le Tribunal est en mesure d'accomplir sa mission de façon impartiale et indépendante conformément à l'article 11 du Règlement C.C.I';

Considérant que le 24 octobre 2013, le représentant de la RÉPUBLIQUE DE GUINEE EQUATORIALE a signé l'acte de mission qui stipule notamment en partie VII b) que 'les parties reconnaissent que le tribunal arbitral a été régulièrement constitué et qu'elles n'ont, à la date de la signature, aucune objection à l'encontre des arbitres';

Considérant que le 25 janvier 2014, la RÉPUBLIQUE DE GUINEE EQUATORIALE a adressé au Secrétariat de la Chambre de commerce internationale une demande de récusation du président du tribunal arbitral fondée sur l'affaire Euskaltel; que cette demande a été rejetée par la Cour d'arbitrage le 27 février 2014;

Considérant que pour soutenir qu'elle n'était pas tardive, la RÉPUBLIQUE DE GUINEE EQUATORIALE fait valoir que ce n'est qu'à la faveur d'une enquête qu'elle a menée après une ordonnance de procédure du 24 janvier 2014 qui lui avait semblé partiale, qu'elle a découvert les circonstances précises de cet arbitrage et en particulier le fait qu'il était plus récent que le laissait entendre FCR, qu'il portait sur le même sujet que la présente affaire, qu'il avait donné lieu à des honoraires très élevés, que l'un des arbitres avait dénoncé la partialité du président dans une opinion dissidente, et que la presse espagnole s'était fait l'écho du caractère exagérément favorable à ORANGE de la sentence rendue dans cet affaire;

Mais considérant que les seuls éléments que la recourante produit à l'appui de ses allégations selon lesquelles le courrier de FCR du 21 août 2013 ne l'aurait pas totalement éclairée sur les circonstances de l'affaire Euskaltel sont des traductions d'articles de presse espagnole en ligne dont deux datés du 28 juillet 2010 et du 11 février 2011; qu'à supposer que de telles informations ne puissent être regardées comme notoires dès la nomination de M. Grigera ..., dont le nom figure expressément dans ces sources, celles-ci étaient aisément accessibles dans le délai de trente jours à compter de la lettre du 21 août 2013, dès lors que l'attention de la RÉPUBLIQUE DE GUINEE EQUATORIALE avait été attirée par l'autre partie sur l'existence de ce précédent arbitrage;

Considérant que la recourante ayant exercé tardivement son droit de récusation au cours de l'arbitrage est réputée avoir renoncé au moyen tiré du défaut d'indépendance ou d'impartialité d'un membre du tribunal arbitral, peu important d'ailleurs que la demande de récusation ait fait l'objet de la part de la Cour d'arbitrage de la Chambre de commerce internationale d'une décision de rejet et non d'irrecevabilité;

Considérant que le premier moyen d'annulation doit donc être écarté;

Sur le deuxième moyen d'annulation tiré de la méconnaissance par les arbitres de leur mission (article 1520 3° du code de procédure civile)

La recourante fait valoir que les arbitres ont fait application du droit espagnol et non pas du droit équato-guinéen choisi par les parties.

4

Considérant que la mission des arbitres, définie par la convention d'arbitrage, est délimitée principalement par l'objet du litige tel qu'il est déterminé par les prétentions des parties;

Considérant qu'en l'espèce la partie IX de l'acte de mission signé par les deux parties et les membres du tribunal

Copyright Lexbase

arbitral énonce

'IX Droit applicable au fond

La clause compromissoire du Protocole stipule que le droit applicable au fond est le droit équato-guinéen.

La défenderesse a, par ailleurs, indiqué dans sa Réponse à la Demande que le droit positif espagnol est directement applicable en matière de droit des contrats et des obligations ainsi qu'il suit 'le droit équato-guinéen des obligations et des contrats est identique à celui du Royaume d'Espagne', puis a poursuivi sa démonstration sur le fondement du droit positif espagnol. La Demanderesse a, de son côté, marqué son accord à l'application du droit positif espagnol des contrats et des obligations dans sa lettre du 12 août 2013 et a confirmé sa position lors de la conférence téléphonique du 21 août 2013.

Le droit applicable au fond est, par conséquent, d'un commun accord des Parties le droit équato-guinéen, le droit OHADA et à titre interprétatif le droit positif espagnol des obligations et des contrats';

Considérant que la RÉPUBLIQUE DE GUINEE EQUATORIALE soutient qu'au regard de ces stipulations, les arbitres ne pouvaient recourir à la jurisprudence et à la doctrine espagnoles que pour éclairer les dispositions du droit équato-guinéen et non pas faire directement application des règles du code civil espagnol en matière de droit des contrats;

Mais considérant que la RÉPUBLIQUE DE GUINEE EQUATORIALE a fait valoir dans la procédure d'arbitrage que le Protocole était illicite, d'une part, en ce qu'il stipulait une clause compromissoire pour trancher un litige inarbitrable comme portant sur l'utilisation du domaine public des télécommunications, d'autre part, en ce qu'il faisait obstacle à la délivrance de nouvelles licences et contrevenait ainsi aux règles sur le maintien ou l'abus de position dominante; que le tribunal arbitral a examiné ces moyens au regard du droit équato-guinéen, du droit de la CEMAC, et du droit de l'OHADA (sentence § 83 à 110);

Qu'en ce qui concerne le fond du litige le tribunal arbitral a fait purement et simplement application des stipulations du Protocole en s'appuyant sur les principes de force obligatoire et d'exécution de bonne foi des conventions énoncés par le code civil espagnol; qu'en interprétant le Protocole au regard de ces principes, qui sont, au demeurant, des règles matérielles du droit international de l'arbitrage, les arbitres n'ont fait qu'adopter la thèse que la RÉPUBLIQUE DE GUINEE EQUATORIALE - qui n'pas conclu au fond - avait énoncée dans sa réponse initiale à la demande d'arbitrage, à savoir que 'le droit équato-guinéen des obligations et des contrats est identique à celui du Royaume d'Espagne';

Considérant que le moyen tiré de la méconnaissance par les arbitres de leur mission ne peut donc qu'être écarté;

Sur le troisième moyen d'annulation tiré de la méconnaissance du principe de la contradiction (article 1520 4° du code de procédure civile)

La recourante fait valoir que les arbitres ont méconnu le principe de la contradiction, d'une part, en substituant un droit national à un autre sans que les parties en aient discuté, d'autre part, en écartant des débats par l'ordonnance de procédure n° 3 son mémoire n° 3 et des pièces, alors que cette 5

sanction n'avait pas été demandée par FCR et n'avait pas été discutée entre les parties, enfin, en se fondant sur l'article 1100 du code civil espagnol non invoqué par les parties pour fixer les intérêts.

Sur la première branche du moyen

Considérant qu'ainsi qu'il a été dit, la RÉPUBLIQUE DE GUINEE EQUATORIALE n'ayant pas conclu sur le fond, les arbitres ont fait application des stipulations contractuelles à la lumière du droit espagnol conformément à la volonté exprimée par cette partie dans l'acte de mission;

Sur la deuxième branche du moyen

Considérant que l'ordonnance de procédure n° 3 du 18 novembre 2013 a écarté des débats, d'une part, toutes les pièces de la RÉPUBLIQUE DE GUINEE EQUATORIALE qui n'avaient pas été produites au plus tard le 12 novembre 2013, conformément à la directive du tribunal arbitral du 9 novembre 2013 ayant accordé à cette partie un nouveau délai de production, d'autre part, le mémoire n° 3 qui, en méconnaissance des instructions de l'ordonnance de procédure n° 1, se bornait à développer des exceptions d'incompétence sans aborder le fond du litige;

Considérant que, contrairement à ce que prétend la recourante, FCR a expressément demandé que ces écritures et ces pièces soient écartées des débats par un courriel du 14 novembre 2013 auquel la RÉPUBLIQUE DE GUINEE EQUATORIALE a répondu le même jour (ordonnance n° 3, § 8 et 9);

Qu'en ses deux premières branches, le moyen ne peut qu'être écarté; Mais sur la troisième branche du moyen

Considérant que pour assortir le principal d'une condamnation à des intérêts au 'taux d'intérêt simple pour des délais de douze mois publié régulièrement par la Banque Centrale Européenne pour les opérations de refinancement', la sentence énonce (§130)

'La Demanderesse a demandé au tribunal arbitral de condamner la Défenderesse au paiement d'intérêts de retard en raison du défaut de paiement, en temps voulu du Prix de Cession définitif, sans indiquer le taux d'intérêt applicable, et sans que la Défenderesse se soit prononcée sur cette question ou la date à partir de laquelle ce prix serait majoré d'un intérêt. Du fait que la lettre de la Demanderesse du 25 juillet 2012 par laquelle elle réclame le paiement du Prix de cession devenu définitif le 22 août 2012 a valablement mis la Défenderesse en demeure si ce Prix n'était pas payé dans le délai découlant de l'article 9 du Protocole, c'est-à-dire au plus tard le 22 août 2012 (article 1100 du code civil espagnol), et au vu de ce que l'Etat n'a pas payé ce Prix dans ce délai, des intérêts de retard sont dus à la Demanderesse à partir de cette date sur le Prix de cession définitif libellé en euros, sans opposition de la Défenderesse, ce qui exige que le taux d'intérêt applicable s'accorde avec la nature européenne de la monnaie de paiement';

Copyright Lexbase

Qu'en se déterminant ainsi, alors que le taux retenu ne résultait pas d'une stipulation contractuelle et ne figurait pas dans les écritures de FCR, de sorte que son adversaire n'avait pas été mise en mesure de le discuter, les arbitres ont violé le principe de la contradiction;

que la sentence sera annulée de ce seul chef;

Sur la demande de dommages-intérêts

Considérant qu'eu égard au sens de l'arrêt il n'y a pas lieu à dommages-intérêts pour recours abusif;

Sur l'article 700 du code de procédure civile

6

Considérant que la RÉPUBLIQUE DE GUINEE EQUATORIALE qui succombe pour la majeure partie de ses prétentions ne saurait bénéficier des dispositions de l'article 700 du code de procédure civile et sera condamnée sur ce fondement à payer à OMEA la somme de 10.000 euros;

PAR CES MOTIFS

Annule la sentence mais seulement en ce qu'elle prononce une condamnation de la RÉPUBLIQUE DE GUINEE EQUATORIALE à payer des intérêts de retard sur la somme de 131.992.915 euros.

Rejette le recours pour le surplus.

Dit que les dispositions non censurées de la sentence sont assorties de l'exequatur.

Rejette la demande de dommages-intérêts.

Condamne la RÉPUBLIQUE DE GUINEE EQUATORIALE aux dépens et au paiement à lasociété ORANGE MIDDLE EAST AND AFRICA de la somme de 10.000 euros en application de l'article 700 du code de procédure civile.

LA GREFFIÈRE P/LE PRÉSIDENT EMPÊCHÉ

7